

E-FILED
Thursday, 23 August, 2007 02:43:23 PM
Clerk, U.S. District Court, ILCD

RECEIVED

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

United States of America ex rel. )
)
  DAVID CARTER  N-43429 )
 )
(Full name and prison number) )
(Include name under which convicted) )
 )
PETITIONER )
 )
vs. )
 )
  TERRY L. MCCANN, Warden )
(Warden, Superintendent, or authorized )
person having custody of petitioner) )
 )
RESPONDENT, and )
 )
**(Fill in the following blank only if judgment** )
**attacked imposes a sentence to commence** )
**in the future)** )
 )
ATTORNEY GENERAL OF THE STATE OF )
 )
 )
_____ )
(State where judgment entered) )

MAR 2 9 2007 *aew*
03-29-07
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# 07CV1758
# JUDGE LEINENWEBER
# MAG. JUDGE ASHMAN

Case Number of State Court Conviction:

87 CF   112

### PETITION FOR WRIT OF HABEAS CORPUS -- PERSON IN STATE CUSTODY

1. Name and location of court where conviction entered: Circuit Court of the Eleventh
   Judicial Circuit; Livingston County, Illinois

2. Date of judgment of conviction: March 31, 1992

3. Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)
   1 Ct. Solicitation/Murder; 2 Cts. Conspiracy to Commit First Degree Murder
   and 3 Cts. of First Degree Murder

4. Sentence(s) imposed: Life imprisonment without any possibility of parole

5. What was your plea? (Check one)    (A) Not guilty    ( XX )
                                      (B) Guilty        (   )
                                      (C) Nolo contendere  (   )

   If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:

   N/A
   _____

## PART I -- TRIAL AND DIRECT REVIEW

1. Kind of trial: (Check one):    Jury (XX)    Judge only ( )

2. Did you testify at trial?    YES ( )    NO    (XX)

3. Did you appeal from the conviction or the sentence imposed? YES (XX) NO ( )

   (A) If you appealed, give the    <u>People v. Carter</u>, No. 4-92-0298

      (1) Name of court:   <u>Illinois Appellate Court, Fourth Judicial District</u>

      (2) Result:   <u>Affirmed conviction and vacated a</u>ll but one murder
                                        conviction.

      (3) Date of ruling:   <u>June 23, 1993    (Rule 23 Order)</u>

      (4) Issues raised:   <u>SEE ATTACHED PAGE - MARKED AS EXHIBIT A</u>

   (B) If you did not appeal, explain briefly why not:

                                  N/A

4. Did you appeal, or seek leave to appeal, to the highest state court?  YES (XX)    NO ( )

   (A) If yes, give the   <u>People v. Carter</u>, No. 75884

      (1) Result   <u>Denied</u>

      (2) Date of ruling:   <u>October 6, 1993</u>

      (3) Issues raised: _____

                    SEE ATTACHED PAGE - MARKED AS EXHIBIT B

   (B) If no, why not: _____ N/A _____

5. Did you petition the United States Supreme Court for a writ of *certiorari*?  Yes ( )  No (XX)

   If yes, give (A) date of petition: ___ N/A ___  (B) date *certiorari* was denied:   ___ N/A ___

Part I -- TRIAL AND DIRECT REVIEW

3(A)(4)    ISSUES RAISED ON DIRECT APPEAL

1.    The trial court abused it's discretion in denying admission of evidence that Ike Easley and Roosevelt Lucas, who stabbed Superintendent Robert Taylor, told a defense investigator that David Carter never gave them any orders or commands.

2.    The prosecutor erred in eliciting hearsay testimony that guards had been threatened by Black Gangster Disciples and that the day before the murder, another guard was attacked by an inmate.

3.    Evidence of gang activity which was preipheral to any motive for killing Supt. Taylor was irrelevant and highly prejudical to David Carter, serving only to inflame the jury against Carter because of his associa- tion with the Black Gangster Disciples.

4.    The admission of evidence by the State that the defen- dant, as allegedly the Unit Cooridinator of the Cellhouse for UFO, the Security Division of the Black Gangster Disciples, had a violent character, denied the defendant a fair trial where his character was not at issue.

5.    The defendant was denied effective representation by counsel, when counsel chose not to be present when the exhibits were shown to the jury.  When photographs were passed among the jurors, one of the jurors expressed her disgust at photographs and indicated she did not want to view all of the photos.  If counsel had been present, he would have voiced an objection to the procedure and challenged the juror's continued service on the panel.

6.    The trial court improperly entered judgement of con- vicition on First Degree Murder as well as Conspiracy To Commit Murder and Solicitation To Commit Murder, because Illinois law prohibits convictions for the inchoate and the principal offense.

7.    The trial court erred in denying the defendant's motion to suppress statements on the grounds that they were involuntary under the Fourteenth Amendment Due Process Clause and obtained in violation of Mr. Carter's Sixth Amendment right to counsel.  The statements were obtained through the pretext used by informant Harry Martin that he had contacted an attorney for Mr. Carter and for all of the other individuals who were allegedly involved in the incident and would be helping insure that Carter had legal assistance.

EXHIBIT A

2A

PART I -- TRIAL AND DIRECT REVIEW

4(A)(3)    ISSUES RAISED IN THE STATE'S HIGHEST COURT

People v. Carter, No. 75884

1. The trial court erred in denying the defendant's motion to suppress statements on grounds that they were involuntary under the Fourteenth Amendment Due Process Clause and obtained in violation of Mr. Carter's Sixth Amendment right to counsel. The statements were obtained through the pretext used by informant Harry Martin that he had contacted an attorney for Mr. Carter and for all the other individuals who were allegedly in the incident and would be helping insure that Carter had legal assistance.

2. The Prosecutor erred in eliciting hearsay testimony that guards had been threatened by Black Gangster Disciples and that the day before the murder, another guard was attacked by an inmate.

3. Evidence of gang activity which was peripheral to any motive for killing Superintendent Taylor was irrelevant and highly prejudicial to David Carter, serving only to inflame the jury against Carter because of his association with the Black Gangster Disciples.

4. The admission of evidence by the State that the defendant, as allegedly the Unit Cooridinator of the Cellhouse for UFO, the Security Division of the Black Gangster Disciples, had a violent character, denied the defendant a fair trial where his character was not at issue.

EXHIBIT B

2B

## PART II – COLLATERAL PROCEEDINGS

1. With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

People v. Carter, No. 87 CF 112

YES (X)   NO ( )   State Post-Conviction Petition combined with Petition For Relief From Judgement, §2-1401, Code of Civil Procedure

With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

A.   Name of court: Circuit Court of Livingston County, 11th Judicial Circuit

B.   Date of filing: August 10, 1998

C.   Issues raised:

SEE ATTACHED PAGE - MARKED AS EXHIBIT C

D.   Did you receive an evidentiary hearing on your petition?     YES ( )   NO (X)

E.   What was the court's ruling? partial summary dismissed

F.   Date of court's ruling: April 23, 1999 and May 1, 2003

G.   Did you appeal from the ruling on your petition?     YES (X)   NO ( )   No. 4-03-0402

H.   (a) If yes,     (1) what was the result? Conviction and sentence affirmed

(2) date of decision: December 9, 2005

(b) If no, explain briefly why not: NOTICE:  The post-conviction petition was denied in 1999.  I did not pursue an appeal because I was under the impression that the entire petition w/2-1401 issues had to be ruled upon.

I.   Did you appeal, or seek leave to appeal this decision to the highest state court?

YES (X) NO ( )   People v. Carter, No. 101983

(a) If yes,   (1) what was the result? denied

(2) date of decision: March 29, 2006

(b) If no, explain briefly why not: NOTICE:  as mentioned above, I did not seek leave to appeal the post-conviction denial because I was under the impression that it was not necessary until my issues in the combined Relief From Judgement Petition was ruled upon, and an appeal would be initiated covering both petitions in their entirety Nor was I informed of my right to appeal the dismissal of my post-conviction petition.

• Part II - COLLATERAL PROCEEDINGS

Combined State Post-Conviction & Relief From Judgement Petition

Case No. 87 CF 112

1(C)  ISSUES RAISED:

1.  IF, BY FRAUD, COLLUSION, TRICKERY & SUBORDINATION
    OF PERJURY ON THE PART OF THOSE REPRESENTING THE
    STATE, THE TRIAL OF AN ACCUSED PERSON RESULTS IN HIS
    CONVICTION, HE HAS BEEN DENIED DUE PROCESS OF LAW.

2.  THE STATE PROSECUTOR'S REMARKS DURING CLOSING
    ARGUMENT CONSTITUTED IMPERMISSIBLE COMMENT OF
    PETITIONER'S FAILURE TO TESTIFY. APPELLATE
    COUNSEL'S FAILURE TO RAISE ISSUE OF FIFTH AMEND-
    MENT VIOLATION ON DIRECT APPEAL CONSTITUTED
    INEFFECTIVE ASSISTANCE OF COUNSEL; AND THEREFORE
    FAILURE TO RAISE FIFTH AMENDMENT ISSUE IS EXCUSABLE
    UNDER CAUSE AND PREJUDICE TEST.

3.  NEWLY DISCOVERED EVIDENCE REVEALS THAT THIS
    CONVICTION IS SECURED BY THE KNOWINGLY USE OF PERJURED
    TESTIMONY BY THE STATE AND THROUGH THE DELIBERATE
    SUPPRESSION OF EVIDENCE FAVORABLE TO THE PETITIONER.

4.  NEWLY DISCOVERED EVIDENCE ESTABLISHES A SHOWING OF
    ACTUAL INNOCENCE.

1(E) & (F)

On April 23, 1999, the trial court  filed an order denying
motion to excuse late filing under the Post-Conviction Relief
Act, granting motion to excuse late filing under Section 2-1401
Petition, granting the State leave to have the Court reconsider
the finding of timeliness under 2-1401 upon submission of further
evidentiary matters, and directing counsel to set cause for
status hearing.

On April 29, 2003, the State filed a motion to dismiss the
petition, asserting that defendant failed to show that Martin's
testimony, even if false, probably controlled the determination
of the jury.

3A           | EXHIBIT C |

Part II - COLLATERAL PROCEEDING (Continue)

1(E) & (F) (cont.)

On May 1, 2003, a hearing was held on the State's motion to dismiss, which the trial court granted.

On May 5, 2003, petitioner filed a timely Notice of Appeal stating that the nature of appeal was "dismissal of post-conviction petition and petition for relief from judgement."

(H)   Appeal to the Illinois Appellate Court, Fourth Judicial
      District in People v. David W. Carter, No. 4-03-0402

      Issues Raised:

On June 9, 2005, petitioner's appellate counsel filed a motion to withdraw pursuant to Pennsylvania v. Finley, 481 U.S. 551, 107 S.Ct. 1990 (1987) stating that there was no issues worthy of appellate review.

On June 10, 2005, the Appellate Court entered the following order:

                Gen. No. :   4-03-0402

                People v. Carter, David W.

                Motion to withdraw as counsel on appeal
                continued.  Leave given appellant to file
                additional points and authorities on or
                before July 11, 2005. Which was extended
                to July 21, 2005.

On July 18, 2005, petitioner filed his pro se Response to Appointed Counsel's Motion To Withdraw on Appeal, raising the following issues:

        1.   Appointed Counsel's Motion To Withdraw On Appeal.

        2.   THIS HONORABLE COURT SHOULD HEAR THE INSTANT APPEAL
             WHERE APPOINTED POST CONVICTION COUNSEL FAILED TO
             PROVIDE CARTER WITH A  REASONABLE LEVEL OF
             ASSISTANCE IN THE TRIAL COURT AND FAILED TO
             COMPLY WITH SUPREME COURT RULE 651(C).

             (a)   APPOINTED COUNSEL'S FAILURE TO COMPLY WITH
                   RULE 651(C) PREJUDICED CARTER.

3B                                   EXHIBIT C - cont.

1(H)

    3.   THIS HONORABLE COURT SHOULD DENY APPOINTED COUNSEL'S
MOTION TO WITHDRAW, BECAUSE THE TRIAL COURT ERRED
IN REFUSING TO PROVIDE CARTER AN EVIDENTIARY HEARING
ON HIS CLAIM THAT THE STATE KNOWINGLY USED PERJURY
IN ORDER TO OBTAIN AUTHORIZATION FOR THE WIRE TAP.

       On July 18, 2005, the Appellate Court entered the following
order:

       Gen. No. : 4-03-0402

       People v. Carter, David W.

       Appellant having responded to counsel's motion
for leave to withdraw as his counsel pursuant
to Pennsylvania v. Finley, 481 U.S. 551, 107
S.Ct. 1990, 95 L.Ed.2d 539 (1987), docketing
schedule is re-established.
See amended docket order.

       On December 9, 2005, the Illinois Appellate Court, Fourth
District issued a 13 page Rule 23 Order, granting the Office of
the State Appellate Defender's withdrawal as counsel and affirmed
the trial court's dismissal of petitioner's Section 2-1401 petition.

1(I)

       On January 23, 2006, petitioner filed his pro se Petition
For Leave To Appeal in the Illinois Supreme Court in People v.
David W. Carter, No. 101983, raising the following issues:

    1.   THE APPELLATE COURT ERRED WITH RESPECT TO DEFENDANT-
APPELLANT'S 5TH, 6TH AND 14TH AMENDMENT VIOLATIONS
WHEN IT DID NOT ADEQUATELY ANSWER THE IMPORTANT
QUESTION ON APPEAL INVOLVING THE FALSE INJECTION
OF COUNSEL CLAIM.  MAY ANY INDIVIDUAL MASQUERADE
AS BEING AN ATTORNEY FOR PURPOSES OF OBTAINING
INCRIMINATING INFORMATION, AS IN PRETENDING TO BE
AN ATTORNEY AND/OR ACTING ON BEHALF OF AN ATTORNEY?

                  EXHIBIT C  continued

Part II    COLLATERAL PROCEEDING (continued)

1(I)

2.  THE TRIAL COURT ERRED IN ITS RULING ADMITTING THE
    TAPED STATEMENT INTO EVIDENCE, BASED ON "THE CONSPIRACY
    BEING ON-GOING" AND THE APPELLATE COURT ERRED WHEN
    IT DID NOT ALLOW DEFENDANT-PETITIONER THE OPPORTUNITY
    TO SUPPLEMENT AND AMEND HIS PETITION TO INCLUDE SUCH
    CONSTITUTIONAL CLAIMS THAT WOULD HAVE EXONERATED
    DEFENDANT-APPELLANT, AND APPOINTED COUNSEL(S), CAREY
    J. LUCKMAN AND W. KEITH DAVIS FAILED TO CONSULT WITH
    THE DEFENDANT TO ASCERTAIN HIS CLAIMS OF CONSTITUTIONAL
    RIGHTS VIOLATED, AND MAKE THE PROPER SUPPLEMENTS AND
    AMENDMENTS  TO HIS PRO SE PETITION THAT WERE NECESSARY
    FOR AN ADEQUATE PRESENTATION OF THE DEFENDANT'S
    CONTENTIONS.

3.  WHETHER THE TRIAL COURT ERRED AND EXCEEDED ITS
    AUTHORITY DURING THE INITIAL STAGE OF THE PROCEEDING
    UNDER THE ILLINOIS POST-CONVICTION HEARING ACT, BY
    PARTIAL DISMISSING DEFENDANT-APPELLANT'S POST-
    CONVICTION PETITION ON THE BASIS OF UNTIMELINESS AND
    WHETHER THE TRIAL COURT ERRED WHEN IT DID NOT INFORM
    THE DEFENDANT OF HIS RIGHT TO APPEAL THE TRIAL
    COURT'S DISMISSAL.

4.  WHETHER THE APPELLATE COURT ERRED WHEN IT REFUSED TO
    ISSUE AN ORDER REMANDING THE TRIAL COURT TO HOLD AN
    EVIDENTIARY HEARING ON DEFENDANT-APPELLANT'S CLAIM
    OF "ACTUAL INNOCENCE", WHICH IS COGNIZABLE UNDER THE
    POST-CONVICTION HEARING ACT.

5.  WHETHER THE TRIAL COURT ERRED IN REFUSING TO PROVIDE
    DEFENDANT-APPELLANT WITH AN EVIDENTIARY HEARING ON HIS
    CLAIM THAT THE STATE USED PERJURED TESTIMONY IN ORDER TO
    OBTAIN AUTHORIZATION FOR THE WIRE TAP.

EXHIBIT C  continued

3D

Part II - COLLATERAL PROCEEDING    (continued)

1(I)

      6.   WHETHER THE TRIAL COURT ERRED IN DISMISSING DEFENDANT-
           APPELLANT'S PETITION DESPITE HIS CLEAR SHOWING OF
           A DUE PROCESS VIOLATION UNDER <u>BRADY</u>, AND BASED ITS
           DECISION UPON THE TAPED RECORDED STATEMENT ITSELF,
           WHICH THE COURT CHARACTERIZED AS "OVERWHELMING
           EVIDENCE OF GUILT."

1(I)(a) & (b)

     On March 29, 2006, the Illinois Supreme Court of Illinois
denied petitioner's Petition For Leave To Appeal in <u>People v.
David W. Carter</u>, No. 101983

---

EXHIBIT C

3E

2. With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?    YES ( )        NO (XX)

   A. If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

      1. Nature of proceeding _____ N/A _____

      2. Date petition filed _____ N/A _____

      3. Ruling on the petition _____ N/A _____

      3. Date of ruling _____ N/A _____

      4. If you appealed, what was
         the ruling on appeal? _____ N/A _____

      5. Date of ruling on appeal _____ N/A _____

      6. If there was a further appeal, _____ N/A _____
         what was the ruling ?

      7. Date of ruling on appeal _____ N/A _____

3. With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**?
        YES (XX    NO ( )

   A. If yes, give name of court, case title and case number: U.S. Dist. Ct., N.D.ILL. E.Div.

U.S. Ex Rel. David W. Carter v. George DeTella, No. 97 C 2926

   B. Did the court rule on your petition? If so, state

      (1) Ruling: Habeas Petition stayed pending outcome of State collateral proceeding.

      (2) Date: On or about April 6, 1999.    Judge Leinenweber, Presiding.

**4. WITH RESPECT TO THIS CONVICTION OR SENTENCE, ARE THERE LEGAL PROCEEDINGS PENDING IN ANY COURT, OTHER THAN THIS PETITION?**

**YES ( )    NO** (XX)

If yes, explain: _____
                    N/A

4

## PART III -- PETITIONER'S CLAIMS

1.  State briefly every ground on which you claim that you are being held unlawfully.  Summarize briefly the facts supporting each ground.  You may attach additional pages stating additional grounds and supporting facts.  If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

**BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

(A)  Ground one    THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION
Supporting facts (tell your story briefly without citing cases or law):

TO SUPPRESS STATEMENTS ON THE GROUNDS THAT THEY WERE INVOLUNTARY

UNDER THE 14TH AMENDMENT DUE PROCESS CLAUSE AND OBTAINED IN

VIOLATION OF HIS 5TH AND 6TH AMENDMENT RIGHT TO COUNSEL.  THE

STATEMENTS WERE OBTAINED THROUGH THE PRETEXT USED BY THE INFORMANT

HARRY MARTIN THAT HE HAD CONTACTED AN ATTORNEY FOR MR. CARTER AND

ALL THE OTHER INDIVIDUALS WHO WERE ALLEGEDLY IN THE INCIDENT AND

WOULD BE HELPING INSURE THAT CARTER HAD LEGAL ASSISTANCE.

[SEE MEMORANDUM IN SUPPORT]

(B)  Ground two _____
Supporting facts:

THE PROSECUTOR ERRED IN ELICITING HEARSAY TESTIMONY THAT GUARDS

HAD BEEN THREATENED BY BLACK GANGSTER DISCIPLES AND THAT THE DAY

BEFORE THE MURDER, ANOTHER GUARD WAS ATTACKED BY AN INMATE.

[SEE MEMORANDUM IN SUPPORT]

5

(C) Ground three _____
Supporting facts:

EVIDENCE OF GANG ACTIVITY WHICH WAS PERIPHERAL TO ANY MOTIVE FOR

KILLING SUPERINTENDENT TAYLOR WAS IRRELEVANT AND HIGHLY

PREJUDICIAL TO DAVID CARTER, SERVING ONLY TO INFLAME THE JURY

AGAINST CARTER BECAUSE OF HIS ASSOCIATION WITH THE BLACK GANGSTER

DISCIPLES.

[SEE MEMORANDUM IN SUPPORT]

(D) Ground four _____
Supporting facts:

THE ADMISSION OF EVIDENCE BY THE STATE THAT THE DEFENDANT, WAS

ALLEGEDLY THE UNIT COORIDINATOR OF THE CELLHOUSE FOR UFO, THE

SECURITY DIVISION OF THE BLACK GANGSTER DISCIPLES, HAD A VIOLENT

CHARACTER, DENIED THE DEFENDANT A FAIR TRIAL WHERE HIS CHARACTER

WAS NOT AT ISSUE.

[SEE MEMORANDUM IN SUPPORT]

[CONTINUE ON NEXT PAGE]

2   Have all grounds raised in this petition been presented to the highest court having jurisdiction?
YES (xX)   NO ( )

3.  If you answered "NO" to question (16), state briefly what grounds were not so presented and why not:

N/A

(e)  Ground Five:

> THE STATE TRIAL COURT IN ITS RULING ADMITTING THE
> TAPED STATEMENT INTO EVIDENCE, BASED ON "THE CON-
> SPIRACY BEING ON-GOING" AND THE APPELLATE COURT
> ERRED WHEN IT DID NOT ALLOW DEFENDANT-PETITIONER
> THE OPPORTUNITY TO SUPPLEMENT AND AMEND HIS PETITION
> TO INCLUDE SUCH CONSTITUTIONAL CLAIMS THAT WOULD
> HAVE EXONERATED DEFENDANT-PETITIONER; AND APPOINTED
> COUNSELS, CAREY J. LUCKMAN AND W. KEITH DAVIS FAILED
> TO CONSULT WITH PETITIONER TO ASCERTAIN HIS CLAIMS
> OF CONSTITUTIONAL RIGHTS VIOLATIONS, AND MAKE THE
> PROPER SUPPLEMENTS AND AMENDMENTS TO HIS PRO SE
> PETITION THAT WERE NECESSARY FOR AN ADEQUATE PRE-
> SENTATION OF PETITIONER'S CONTENTION'S.
>
> [SEE MEMORANDUM IN SUPPORT]

(f)  Ground Six:

> WHETHER THE STATE TRIAL COURT ERRED IN EXCEEDING ITS
> AUTHORITY DURING THE INITIAL STAGE OF THE PROCEEDINGS
> UNDER THE ILLINOIS POST-CONVICTION HEARING ACT, BY
> PARTIALLY DISMISSING PETITIONER CARTER'S POST-CONVIC
> TION PETITION ON THE BASIS OF UNTIMILINESS.  THUS,
> FAILING TO INFORM PETITIONER OF HIS RIGHT TO APPEAL
> THE TRIAL COURT'S DISMISSAL WAS ERROR.
>
> [SEE MEMORANDUM IN SUPPORT]

(g)  Ground Seven:

> WHETHER THE STATE TRIAL COURT ERRED IN REFUSING TO
> PROVIDE PETITIONER CARTER WITH AN EVIDENTAIRY HEARING
> ON HIS CLAIM OF THE STATE'S KNOWING USE OF PERJURED
> TESTIMONY.
>
> [SEE MEMORANDUM IN SUPPORT]

(h)  Ground Eight:

> WHETHER THE STATE APPELLATE COURT ERRED WHEN IT REFUSED
> TO  PROVIDE PETITIONER CARTER WITH AN EVIDENTIARY HEAR-
> ING ON HIS CLAIM OF "ACTUAL INNOCENCE" WHICH IS COGNIZ-
> ABLE UNDER THE POST-CONVICTION ACT.
>
> [SEE MEMORANDUM IN SUPPORT]

(i) Ground Nine:

WHETHER THE STATE TRIAL COURT ERRED IN DISMISSING
PETITIONER CARTER'S PETITION DESPITE HIS CLEAR
SHOWING OF A DUE PROCESS VIOLATION UNDER BRADY,
AND BASED IT'S DECISION UPON THE TAPED RECORDED
STATEMENT ITSELF, WHICH THE COURT CHARACTERIZED
AS "OVERWHELMING EVIDENCE OF GUILT".

[SEE MEMORANDUM IN SUPPORT]

**PART IV -- REPRESENTATION**    DIRECT APPEAL AND STATE POST-CONVICTION & SECTION 2-1401 RELIEF FROM JUDGEMENT PETITION

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(A)  At preliminary hearing _____

(B)  At arraignment and plea _____

(C)  At trial _____

(D)  At sentencing _____

(E)  On appeal  Karen Munoz, Asst. Defender, Office of State App. Def. 4th Dis
                                                                    Keith Davis

(F)  In any post-conviction proceeding  David Ahlemeyer, Carey Luckman, Paul Lawrence

(G)  Other (state):  Appeal from dismissal of Post-Conviction Petition & 2-1401 Petition:  Daniel Yuhas, Deputy Defender, 4th Dist.

**PART V -- FUTURE SENTENCE**

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES ( )  NO (XX)

Name and location of the court which imposed the sentence:  _____N/A_____

Date and length of sentence to be served in the future  _____N/A_____

WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on:  3-21-07
             (Date)                          _____
                                             Signature of attorney (if any)

**I declare under penalty of perjury that the foregoing is true and correct.**

                        _David Carter_____
                        (Signature of petitioner)
                             N43429
                        _____
                        (I.D. Number)
                        Stateville Correctional Center
                        _____
                        (Address)
REVISED 01/01/2001      Post Office Box 112
                        Joliet, Illinois 60434-0112

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. )<br>DAVID W. CARTER, )<br> )<br>　　　　　Petitioner, )<br> )<br>v. )<br> )<br>TERRY L. MCCANN, Warden, )<br> )<br>　　　　　Respondent, ) | No. _____ |

## STATEMENT OF FACTS AND MEMORANDUM OF LAW

### Jurisdictional Statement

　　　　The District Court has jurisdiction to entertain a petition for writ of habeas corpus pursuant to 28 U.S.C. §2241 and 28 U.S.C. §2254.

### Procedural History

　　　　1.　Following a jury trial in the Circuit Court of Livingston County, Illinois, petitioner David W. Carter was convicted of three counts of first degree murder, two counts of conspiracy to commit first degree murder, and one count of solicitation of first degree murder.

　　　　2.　On March 31, 1992, the trial court imposed a term of natural life without any possibility of parole.

　　　　3.　Direct appeal followed, the Appellate Court of Illinois, Fourth Judicial District, affirmed petitioner Carter's conviction and vacated the duplicative sentences entered by the trial court See People v. Carter, No. 4-92-0298 (6/30/93) [Unpublished Order pursuant to Supreme Court Rule 23].

8

4.    On October 6, 1993, the Illinois Supreme Court denied petitioner Carter leave to appeal. See People v. Carter, No. 75884.

5.    On April 23, 1997, petitioner Carter filed his pro se Petition for a Writ of Habeas Corpus, U.S.C.§2254 in the U.S. District Court for the Northern District of Illinois, Eastern Division, in U.S. ex rel. David W. Carter v. George DeTella, Warden, No. 97 C 2926, Honorable Harry D. Leinenweber, Judge Presiding.

On April 1, 1999, petitioner Carter caused to be filed his pro se Motion to Stay Habeas Corpus Proceeding.  Due to the Antiterrorism and Effective Death Penalty Act of 1996 [AEDPA], petitioner requested leave from the Court to hold this matter in abeyance until he has completed the exhaustion requirement of his pending collateral attack upon his conviction, as proscribed by Title I, §101 of the Habeas Corpus Reform Act, which states as follows:

Section 2244 of title 28, United States Code, was amended by adding at the end of the following subsection:

(d)(2)  The time during which a properly filed appli-
cation State post-conviction or other colla-
teral review respect to pertinent judgement
or claim is pending shall not be counted
toward any period of limitation under this
subsection.

On April 28, 1999, the U.S. District Court in a Minute Order granted petitioner's motion to stay his Federal habeas corpus petition.

6.   On August 10, 1998, petitioner Carter filed his <u>pro</u> <u>se</u> combined Petition from Relief from Judgement pursuant to 735 ILCS 5/2-1401, and Petition for Post-Conviction Relief brought pursuant to 735 ILCS 5/122-1, et seq. alleging the following:

  (a) the investigative and interrogation techniques employed by the State through their informant constituted fraud and denied petitioner of his 14th Amendment right to due process of law;

  (b) the State denied petitioner of his right to a fair trial by commenting on his desire not to testify in his own behalf, and appellate counsel was ineffective for failing to raise this claim on direct appeal.

  (c) the State knowingly elicited perjured testimony from their key witness at trial and failed to disclose favorable discovery materials prior to and during trial;

  (d) the State knowingly used perjury to obtain authorization for an eavedropping device from the Circuit Court;

  (e) that petitioner Carter had obtained newly dis- covered evidence of actual innocence.

7.   Subsequently, the trial court appointed counsel to represent petitioner Carter's <u>pro</u> <u>se</u> petitions, and ordered a hearing to determine whether the above-mentioned petitions were filed in a timely fashion.

8.   On February 8, 1998, appointed counsel filed a Motion to Excuse Late Filing of the <u>pro</u> <u>se</u> petitions.   In addition, a preliminary certificate pursuant to Illinois Supreme Court Rule 651(c) was filed.

9.    On March 18, 1999, the trial court conducted a hearing on the timeliness of the petitions, and denied the motion to excuse the late filing of the post-conviction petition.    The trial court granted the motion to excuse the late filing of the Section 2-1401 relief from judgement petition.

10.    On April 29, 2003, the State filed a Motion to Dismiss petitioner's Section 2-1401 petition for relief from judgement.

11.    On May 1, 2003, the trial court conducted a hearing on the State's motion.    At the hearing, the trial court granted the State's motion to dismiss, finding that Carter's allegation that the wire-tap obtained by informant/State's key witness, Harry Martin's fraud, trickery and perjury had no merit because the admissibility of the tape did not depend on Martin's motive for cooperating.    In addition, the trial court denied petitioner Carter's allegation regarding the prosecutorial misconduct in the State blatantly commenting on his fundamental right not to testify on his own behalf.    The  trial court found that this issue was waived, and any event, "the line was not crossed".

Petitioner then requested the trial court to address the issue of perjury being used by the State in order to obtain authorization for the wire-tap by the Circuit Court.    The trial court responded that the issue had been addressed by the trial and appellate court previously.    The court further stated that it was not clear that Martin's sentence was reduced in return for his testimony at Carter's trial.    Judge Frobish stated that even if the witness' sentence was reduced in exchange for his testimony at petitioner's trial, it would not have made a difference.

11

The trial court dismissed petitioner Carter's relief from judgement petition, and requested that a timely notice of appeal be filed in his behalf.

12.   The trial court appointed the Office of the State Appellate Defender, Fourth Judicial District, to represent petitioner Carter on appeal.

13.   Subsequently, appeal counsel filed a motion to withdraw representation pursuant to <u>Pennsylvania v. Finley</u>, 481 U.S. 551 (1987).  Petitioner Carter filed his <u>pro</u> <u>se</u> Response to appellate counsel's <u>Finley</u> motion.

14.   On December 9, 2005, the Illinois Appellate Court, Fourth District allowed counsel to withdraw and affirmed the trial court's denial of relief in <u>People v. Carter</u>, No. 4-03-0402.

15.   On December 27, 2005, petitioner Carter filed his <u>pro</u> <u>se</u> Affidavit of Intent to file Petition for Leave to Appeal in the Illinois Supreme Court.

16.   On January 23, 2006, a <u>pro</u> <u>se</u> Petition for Leave to Appeal was filed in <u>People v. Carter</u>, No. 101983.

17.   On March 29, 2006, the Illinois Supreme Court denied petitioner Carter's petition.

18.   That the foregoing habeas corpus petition derives from State conviction in Livingston County, Illinois, Case No. 87 CF 112, Appellate Court No. 4-03-0402, and Illinois Supreme Court No. 101983, clearly showing that petitioner Carter has exhausted all State remedies available to him.  Direct Appeal No. 4-92-0298, Supreme Court No. 75884.

Statement of Facts

On October 16, 1987, petitioner David W. Carter was charged
by Indictment No. 87 CF 112 in Livingston County with two counts
of conspiracy (first degree murder), three counts of solicitation
(first degree murder), and five counts of first degree murder.
The charges stemmed from the stabbing death of Pontiac Correctional
Center, Superintendent Robert L. Taylor on September 3, 1987.
(Vol. I, C. 26-35)

The defendant filed two motions to suppress statements on
December 16, 1988. The first one alleged that the statements
that were obtained by Harry James Martin from David Carter through
the use of electronic surveillance and eavesdropping devices
should be suppressed because the authorization of the wiretap was
obtained by false statements. (Vol. I, C. 112-17) The second
motion to suppress challenged the process of using an informant,
Harry Martin, to obtain statements from petitioner Carter through
an eavesdropping device while petitioner Carter was incarcerated
in prison on another conviction, but having been placed in segre-
gation as a result of his suspected involvement in the instant
case. (Vol. I, C.107-09)

On February 17, 1989, the trial court entered an order
suppressing the statements of the defendant/petitioner Carter
that were obtained by his conversation with Harry Martin, as
Martin wore a listening device. The court found that defendant/
petitioner's Fifth Amendment rights were violated and that he was
in custody for purposes of Miranda, even though he had not been
formerly charged with Superintendent Taylor's murder. The defen-
dant was a "prime suspect" at the time that he was questioned by

13

the undercover/inmate agent. (Vol. I, C.191-93)   The State filed
an appeal from the suppression order of February 28, 1989. (Vol.
I, C.198)  The appellate court reversed the order of the trial
court in an opinion filed on May 17, 1990. (Vol. I, C.221-27)

On defendant's motion, his cause was severed from that of
his co-defendants and his motion for change of venue was granted.
(Vol. I, R.427)

Prior to the start of trial, several hearings were held in
which James Wasson, an inspector with the Division of Criminal
Investigation of the Illinois State Police, presented his evidence
deposition with regard to the set up of electronic surveillance
in the case.  The court ruled that the prosecution had met its
burden of showing proper foundation, and ruled that the overhear
order was issued pursuant to probable cause and that if the tape
was offered into evidence, it would be admissible. (Vol. IX, R.14)

Following opening statements (Vol. XI, R., 14-40), the State
began its lengthy presentation of evidence in this case
which established that Ike Easley and Roosevelt Lucas killed
Superintendent Robert Taylor on September 3, 1987.  The State's
theory at trial was that the attack on Superintendent Robert
Taylor was retaliation by a gang at the Pontiac Correctional
Center, the Black Gangster Disciples (BGD), who believed that one
of their members had been killed by correctional officers.  Danny
Jarrett was a guard at Pontiac on July 20, 1987 and was assigned
to the Five, Six, Seven and Eight Galleries of the south cellhouse.
On July 20th, he worked the 3:00 to 11:00 p.m. shift.  Over the
objection of defense counsel, the State was allowed to introduce
evidence of the events which led up to the death of inmate Billy

14

Jones and the removal of inmate Kirk Williams from the south cellhouse. (Vol. XII, R. 47-68)

Jarrett stated that in July of 1987, he knew the defendant, Ike Easley and Roosevelt Lucas, because all of them lived in the south cellhouse in the upper galleries, which were under Mr. Jarrett's control.  On July 20th, inmate Kirk Williams and Billy Jones lived in cell 512 on the Five Gallery.  Mr. Jarrett testified that there were several gangs at Pontiac, but there was an alliance bewteen the Black Disciples, the Black Gangsters, and the Latin Disciples.  Inmate Kirk Williams had brought the three gangs together. (Vol. XII, R. 68-70)  The gangs each wore different colors and had different signs or symbols. (Vol. XII, R. 70-71)

According to Jarrett, he saw David Carter wearing gang colors and giving gang signals, and he noticed this same behavior in Kirk Williams, Billy Jones, Roosevelt Lucas, and Ike Easley. (Vol. XII, R. 73-75)  He had also noticed those four men partici-pating in calisthenics, jogging and running when they were in the yard, and they would chant Black Gangster Disciple slogans. (Vol. XII, R. 76)  Mr. Jarrett was of the opinion that Williams, Jones, David Carter, Lucas and Easley all belonged to the Black Gangster Disciples on July 20, 1987. (Vol. XII, R. 77)

Kirk Williams, according to Jarrett, "controlled the whole institution."  Billy Jones was classified as the chief of securities of the institution for the gang. (Vol. XII, R. 77)  On the evening of July 20th, Jarrett was assigned to go into the passageway bewteen the galleries to make sure that nothing was passed through the vents or thrown out.  Kirk Williams and Billy Jones were being moved to the segregation unit in the north cellhouse.  The

15

reason for the removal was because of their activities and accord-
ing to Jarrett, the rest of the organization was "getting out of
control." (Vol. XII, R. 79)  As Williams was being moved, he told
the guards that he had tried to be a diplomat but that the admini-
stration, whom he referred to as "hookers", would not listen.
(Vol. XII, R. 80)

To move the men, the guards used chemical agents in Five
Gallery to stop the debris from being thrown, soap, cans, light
bulbs, and other objects at the officers. (Vol. XII, R. 82)  The
chanting and debris throwing continued as Billy Jones was taken
off the gallery and led away.  Jarrett noticed that Jones was
chewing something.  Jarrett started escorting Jones to the north
segregation unit.  When Jones got about a hundred feet outside
the door, he collapsed.  Cardio pulmonary resuscitation was
attempted, and it was learned that Mr. Jones died from  chewing
on a bag of cocaine. (Vol. XII, R. 84-87)

After the incident involving Mr. Williams and Mr. Jones,
Jarrett received threats from different inmates as they accused
the guards of killing Jones. (Vol. XII, R. 87-89)  Jarrett stated
that the threats were made by members of the Black Gangster
Disciples. (Vol. XII, R. 93)  Mr. Jarrett was eventually reassigned
jobs for his own safety, but testified that he had seen David
Carter in the company of Ike Easley prior to the transfer. (Vol.
XII, R. 96)  Jarrett testified to the types of activities that he
had seen David Carter participate in for the Black Gangster
Disciples.  One person within that gang is in charge of the
security or monitoring the movement of other gang members.
According to Jarrett, the person in charge would often be seen
coordinating indiviuals to make sure that they are posted in

16

certain positions.  Jarrett claimed to have seen Carter perform
that function on several occassions. (Vol. XII, R. 99-100)  Based
on what Jarrett saw, he was of the opinion that David Carter was
the security coordinator of the Black Gangster Disciples for the
upper galleries in the south cellhouse. (Vol. XII, R. 104)  On
cross-examination, Mr. Jarrett admitted that the first time he
had ever told anybody that he saw Carter socializing with Mr.
Jones, Mr. Easley, and Mr. Lucas on Seven and Five Galleries was
about three weeks earlier, and admitted that he had not testified
to this in two previous cases. (Vol. XII, R. 110-12)

    Various guards testified to the events of September 3, 1987
and the death of Superintendent Taylor. (Vol. XII, R. 135-215;
Vol. XIII, R. 70-88)

    Lawrence Spiller testified that he was an inmate at Pontiac
in September of 1987, serving time for attempted murder, attempted
armed robbery, and unlawful use of weapons. (Vol. XIII, R. 188-
19)  Mr. Spiller knew Superintendent Taylor.  Taylor gave Spiller
his job assignments. (Vol. XIII, R. 121)  Sometime before 11:00
a.m. on September 3rd, Spiller saw Taylor in his office on Five
Gallery. (Vol. XIII, R. 121)  While Spiller was in Taylor's
office, two men came in and attacked Taylor.  The first one
jumped on the arm of the chair that Spiller was sitting on, and
then jumped across the desk.  Taylor was then hit in the face
with fists.  The inmate then pulled a knife from his waistbelt
and made a stabbing motion with it. (Vol. XIII, R. 126-27)  The
inmate who stabbed Taylor was Ike Easley. (Vol. XIII, R. 127)

    Spiller started to leave when Roosevelt Lucas ran in. (Vol.
XIII, R. 128-29)  Spiller saw Lucas pull a pipe out of his waist-

17

band and strike Taylor with it. (Vol. XIII, R. 130-31) Spiller had noticed that Easley were wearing gloves. (Vol. XIII, R. 132) Spiller went to the front of cell 546. He saw Easley come out and run toward the front end of Five Gallery. Lucas then came out and threw the pipe back into the office. He ran to the front end of Five Gallery and jumped up to Seven Gallery. (Vol. XIII, R. 133-34) Prior to the attack on Taylor, Ike Easley had been sitting on the radiator a few feet from Taylor's office. (Vol. XIII, R. 136)

Various exhibits were admitted into evidence and passed among the jurors. The defendant and his attorney chose to be absent when this occurred. (Vol. XIII, R. 188-93) One of the jurors indicated that she did not want to view all of the photographs. (Vol. XIII, R. 192)

The key witness against Mr. Carter was Harry Martin. Mr. Martin, who at the time of the trial was incarcerated and who had prior convictions for armed robbery, armed violence, and unlawful use of weapons, testified that he had a college degree in accounting and bookkeeping. In 1987, he was a member of the Black Gangster Disciples. Mr. Martin described the organization of the gang. Larry Hoover was the chairman, and below him was the board of directors consisting of institutional coordinator, assistant institutional coordinator, gallery coordinator, and various other subordinate departmental heads. (Vol. XIV, R. 18-19) The security division of the gang is called the UFO, the United Front of the Organization. According to Martin, this group does the assassinations, protects the board members or any hierarchy of the organization, guards the leadership and disciplines any organiza-

18

tion members that may get out of line. (Vol. XIV, R. 19-20)
The Black Gangster Disciples operate in and out of the prison
system. (Vol. XIV, R. 20)   Mr. Martin's former position was that
of financial adviser to the board. (Vol XIV, R. 20)   He stated
that the majority of his  education was financed through the
gang. (Vol. XIV, R. 21)

Mr. Martin stated that the gang made money by various
illegal activities, but also some legitimate business.  He admitted
that when he was on the board as the financial adviser, he had
knowledge of the illegal activities and participated in them.   In
May of 1987, a conspiracy was put together to assassinate Harry
Martin.   Martin received word of this threat from the warden at
Stateville.   Martin initially did not believe the warden, so he
asked a few other board members, whom he believed were allies.
They confirmed the warden's information, and Martin then asked
for protection in return for cooperating with the law enforcement
officials. (Vol. XIV, R. 22-23)

Martin was transferred to Dixon Correctional Center and then
to Pontiac in the second week of August in 1987. (Vol. XIV, R.
24-25)   While at Pontiac, Martin met with some gang members,
including Corwyn Brown, who was known as "Ketchup."   Brown was
the assistant institutional coordinator. (Vol. XIV, R. 26-27)
While at Pontiac, Martin saw Roosevelt Lucas, and stated that he
provided security for Martin and Brown. (Vol. XIV, R. 28-29)

While at Pontiac, Martin talked with Corwyn Brown about the
death of Billy Jones.   Brown told Martin that the gang membership
did not believe that Jones' death was an accident, and he thought

19

that the administration was responsible for Jones' death. (Vol. XIV, R. 33-34)  Brown also told Martin that the gang members in the institution wanted to retaliate against the administration. (Vol. XIV, R. 35)

In September of 1987, Martin was incarcerated in Logan Correctional Center, and he was approached by the BGD assistant institutional coordinator who told him that the gang wanted inmate Larry Spiller killed.  Spiller was to be killed by poisoning his food.  Both Martin and Spiller were in the segregation unit. Martin informed the warden. (Vol. XIV, R. 37-38)

While at Logan, Mr. Martin was approached by Department of Corrections investigators regarding the murder of Superitendent Taylor.  They asked Martin to assist them in investigating various Black Gangster Disciple members whom Corrections believed were involved in the murder. (Vol. XIV, R. 44-45)  Martin insisted that he had not received anything from the Department of Corrections in return for his cooperation.  He said that he decided to wear a wire and visit various inmates to aid in the investigation. (Vol. XIV, R. 46)  On October 7, 1987, while wearing a wire, he visited David Carter.

On that date, Martin and his wife were driven to the Pontiac Correctional Center.  Martin's wife had sent Carter a letter asking to have Martin put on Carter's visiting list. (Vol. XIV, R.47)  Carter and Martin talked, and Martin told Carter that he was there to get information to share with other gang members in Chicago and to find out about the murder of Superintendent Taylor. (Vol. XIV, R. 49-50)  Martin asked Mr. Carter who gave

20

him instructions, and Carter said it was Michael "Dice" Johnson,
who was institutional coordinator for the security division.
(Vol. XIV, R. 50)  Carter said that Mr. Johnson had told him that
they were "to knock a patch out of Superintendent Taylor's head
with pipes". (Vol. XIV, R.51)

According to Martin, David Carter told him that Superintendent
Taylor was killed because of what happened to inmate Jones, and
because of the guards "whipping folks in the dining room and on
the sidewalk." (Vol. XIV, R. 53)  Martin stated that before
inmate Williams was shipped out, he allegedly left word with
Carter to make the hit.  Carter told Martin that he sent Roosevelt
Lucas and Ike Easley to do the job. (Vol. XIV, R. 53)  Martin was
told by the defendant that he just wanted Lucas and Easley to go
in there and knock Taylor out and leave him there.  The defendant
told Martin that the attack had been planned for three or four
weeks, and Taylor was followed so that arrangements could be
made. (Vol. XIV, R. 54).

Carter told Martin that he had security people on the
gallery playing the radio very loudly, and had other security
people stationed at the gate.  Lucas and Easley were given instruc-
tions not to jump up on the gallery and were told to drop the
weapons at the scene of the crime.  Carter was on Seven Gallery
when Lucas and Easley hit Taylor.  Carter said that things did
not go according to plan, and that Superintendent Taylor staggered
out of his office.  Carter had given Lucas and Easley specific
instructions to leave him in the cell, unconscious. (Vol. XIV, R.
55)

21

Carter told Martin that Lucas and Easley wore masks and gloves, had wiped the weapons before the attack. As instructed, they left the weapons at the scene. (Vol. XIV, R. 57-58) Carter indicated that two inmates were witnesses to the crime. (Vol. XIV, R. 58) After the death of Superintendent Taylor, Carter was promoted to the institutional coordinator of UFO. (Vol. XIV, R. 59) Carter also indicated that there were several people who knew about the hit before it took place, and they were all in agreement as to the plan. (Vol. XIV, R. 60) When the two men talked about Billy Jones' death, Martin mentioned that he had heard that Jones swallowed cocaine. Mr. Carter got angry, and stated that he got upset every time someone said that caused Jones' death, and told Martin that that was not the way it happened. He said it would have been impossible for him to swallow a bag of cocaine on his own. (Vol. XIV, R. 61-62)

Harry Martin testified that if an order is given to kill someone it would have to have come from the chairman of the gang. in this case Larry Hoover. Hoover then would pass the word through the chain of command. He would not have given orders directly to Carter. (Vol. XIV, R. 62-63) Martin also stated that if the attack on Taylor had not been sanctioned from the top, Mr. Carter would have been disciplined, because one of the rules within the gang organization is to not come in confrontation with employees of the Department of Corrections. (Vol. XIV, R. 64)

Martin stated that he listened to the tape of the conversation that he had with David Carter, and was able to identify both himself and Carter on the tape. (Vol. XIV, R. 65-66)

22

On cross-examination, Mr. Martin stated that he still had ten years left to serve on his prison sentence. He stated that all he got in return for his cooperation with the authorities was protection. (Vol.XIV, R. 67-68) Martin also admitted that when he went to talk to Carter, he lied to him about being sent by Larry Hoover. (Vol. XIV, R. 74)

James Wasson's testimony was presented through evidence deposition. Mr. Wasson was an Inspector with the Division of Criminal Investigation of the Illinois State Police, and he set up the wire on Harry Martin prior to his meeting with David Carter. Mr. Wasson then recorded the conversation bewteen Mr. Carter and Mr. Martin. Mr. Wasson's evidence deposition was then read to the jury. (Vol. XIV, R. 104-17)

The tape of the overhear was played to the jury. (Vol. XIV, R. 118-50)

Demetre Brown, whose nickname was "PeeWee", was serving time for armed robbery and murder, and also had an unlawful use of weapons conviction. On September 3, 1987, Mr. Brown was housed at the Pontiac Correctional Center in cell 549. On the morning of September 3rd, Mr. Brown was between his cell and Superintendent Taylor's office. He was waiting for two inmates to come out of Superintendent Taylor's office, and he was talking to Lucas and Easley, who were putting on gloves and hats. Brown moved to the front of Taylor's office and watched through the window as the two men entered the office, jumped on the desk, and hit Taylor and stabbed him. (Vol. XV, R. 8-10) Brown went to his cell and saw two men run by, throwing off their hats and gloves.

(Vol. XV, R. 10-12) Brown then went into cell 546 with inmates Nealy and Spiller. (Vol. XV, R. 13-15) People's Exhibits 2 through 42B were admitted into evidence, and the State rested. (Vol. XV, R. 58)

The defendant's motion for a directed verdict was denied. (Vol.XV, R. 59-65) Douglas Read, an Internal Security Investigator with the Department of Corrections, testified to his conversation with Demetre Brown on September 3, 1987. Read spoke to Mr. Brown twice on that date. In the second interview, Brown told him that inmate Corwyn Brown had been with Easley and Lucas just minutes before the attack, and that Corwyn Brown had nodded his head and pointed toward Taylor's office at that time. (Vol. XV. R. 106-07) He also told Read that he believed Corwyn Brown was the institutional coordinator of the Black Gangster Disciples gang. (Vol. XV, R. 107) Inmate Spiller has also been interviewed by other investigators and he, too, has stated that he had observed Corwyn Brown point toward Taylor's office prior to the attackers entering. (Vol. XV, R. 117) The trial court admonished Mr. Carter of his right to testify, and determined that he was waiving that right. (Vol. XV, R. 117-19)

An instruction conference was held. (Vol. XV, R. 132-57) Closing arguments were made. (Vol. XV, R. 181-256) The jury was then instructed. (Vol. XV, R. 256-72)

The jury returned verdicts finding David Carter guilty of conspiracy as charged in Counts I and II; not guilty of solicitation as charged in Count III; guilty of solicitation as charged in Count V; not guilty of first degree murder as charged in Count

VI; guilty of first degree murder as charged in Count VII; not guilty of first degree murder as charged in Count VIII; guilty of first degree murder as charged in Count IX; and guilty of first degree murder as charged in Count X. (Vol. XVI, R. 305-17)

The defendant filed a motion for new trial on January 13, 1992. (Vol. I, C. 343) A hearing was held on March 31, 1992. Following arguments of counsel, the motion was denied. (Vol. XVII, R. 2-9) A sentencing hearing was then conducted. As evidence in aggravation, the State introduced a certified copy of Mr. Carter's prior murder conviction in Cook County, as well as his conviction for armed violence. (Vol. XVII, R. 9-15) While entering judgement on all of the counts, the court ruled that the convictions for murder, conspiracy, and solicitation merged and sentenced the defendant only on Count X, first degree murder. (Vol. XVII, R. 21) Following arguments of counsel, the trial court sentenced David Carter to natural life imprisonment. (Vol. XVII, R. 24-33)

On April 6, 1992, a timely notice of appeal was filed. On June 30, 1993, the Appellate Court affirmed Mr. Carter's conviction and sentence for the first degree murder (Count X) but vacated the petitioner's other convictions; (Unpublished Order pursuant to Illinois Supreme Court Rule 23.

On October 6, 1993, the Illinois Supreme Court denied Petitioner Carter's petition for leave to appeal.

On August 10, 1998, petitioner Carter filed his pro se combined Petition for Post-Conviction Relief (725 ILCS 5/122-1 et seq.) and Petition for Relief from Judgement (725 ILCS 5/2-1401 et. seq.) alleging the following:

(1)  that the investigation and interrogation techniques employed by the State through their informant constituted fraud and denied petitioner Carter his 14th Amendment right to due process of law; (2)  that the State denied petitioner his fundamental right to a fair trial by commenting on his right not to testify, and his appellate counsel was ineffective for failing to raise this meritorious issue in his appeal; (3)  that the State knowingly elicited perjured testimony from their key witness at trial and failed to disclose favorable discovery materials to the defendant/petitioner prior to trial; (4)  that the State knowingly used perjury to obtain authorization for an eavesdropping device from the Circuit Court; and (5)  that petitioner Carter had obtained newly discovered evidence of actual innocence.

On September 10, 1998, the trial court appointed counsel to represent petitioner Carter's pro se petitions, and ordered a hearing set to determine the timeliness of the petitions.

On February 16, 1999, appointed counsel filed a Motion to Excuse the Late Filing of his pro se petitions.  In addition, a preliminary certificate pursuant to Illinois Supreme Court Rule 651(c).

On March 18, 1999, the trial court conducted a hearing on the timeliness of the pro se petitions; and denied the motion to excuse the late filing of the Post-Conviction Petition.  Subsequently, the trial court granted the motion to excuse the late filing of the Petition for Relief from Judgement [2-1401].

On April 29, 2003, the State filed a motion to dismiss the petition for relief from judgement.

26

On May 1, 2003, the trial court conducted a hearing on the
State's motion to dismiss.  At the hearing, the trial court
granted the State's motion, finding that petitioner's allegation
that the wire-tap tape obtained by Harry Martin's fraud, trickery
and perjury had no merit because the admissibility of the tape
did not depend on  Martin's motive for cooperating.  The trial
court also denied petitioner's allegation regarding the State's
commenting on his right to testify.  The trial court found that
the issue was waived, and in any event, "the line was not crossed".
Defendant/petitioner asked the trial court to address the issue
of perjury being used by the State in order to obtain authorization
for the wire-tap by the Circuit Court.  The trial court responded
that the issue had been addressed by the trial court and appellate
court previously.  In addition, the trial court stated that it
was not clear that Martin's sentence was reduced in return for
his testimony at Carter's trial.  Jude Frobish also stated that
even if the witness' testimony was reduced in exchange for his
testimony at Carter's trial, it would not have made a difference.

The trial court therefore dismissed Carter's petition for
relief from judgement, and the defendant/petitioner requested a
notice of appeal to be filed.

The Office of the State Appellate Defender was appointed
to represent Mr. Carter on appeal, and subsequently filed a
Motion to Withdraw on appeal purusant to <u>Pennsylvania v. Finley</u>,
481 U.S. 551 (1987).  Immediately thereafter, petitioner Carter
filed his <u>pro</u> <u>se</u> Response to Appellate Counsel's <u>Finley</u> Request
on July 18, 2005, in <u>People v. Carter</u>, No. 4-03-0402.

27

On December 9, 2005, the Illinois Appellate Court, Fourth
judicial District, granted appellant counsel's request to withdraw
and affirmed the trial court's dismissal of petitioner's request
for relief from judgement in People v. Carter, No. 4-03-0402
(Unpublished Rule 23 Order).

On December 27, 2005, petitioner Carter filed his pro se
Affidavit of Intent to file Petition for Leave to Appeal in the
Illinois Supreme Court in People v. Carter, No. 101983.

On January 23, 2006, the Illinois Supreme Court denied
petitioner Carter's petition for leave to appeal.

Issues Raised on Direct Review:

Issue

I.

The Trial Court Erred In Denying The Defendant's Motion
To Suppress Statements On Grounds That They Were Involun-
tary Under The Fourteenth Amendment Due Process Clause
And Obtained In Violation Of Mr. Carter's Sixth Amendment
Right To Counsel.   The Statements Were Obtained Through
The Pretext Used By Informant Harry Martin That He Had
Contacted An Attorney For Mr. Carter And For All The
Other Individuals Who Were Allegedly In The Incident
And Would Be Helping Insure That Carter Had Legal Assis-
tance.

The crux of this argument derives from the evasive manner
in which the State orchestrated a plot to obtain an involuntary
statement from petitioner Carter, using coercive and trickery
methods contributing to the violation of his constitutional rights.

28

The trial court had granted the State's motion for an order authorizing the use of an eavesdropping device for purposes of recording conversations bewteen State agent Harry Martin and various inmates of the Illinois Department of Corrections (hereinafter IDOC), including petitioner David Carter. (C.242-244) Harry Martin was an inmate within the IDOC (confined at Logan Correctional Center), upon hearing of the death of Superintendent Taylor at the Pontiac Correctional Center, arrangements were made with IDOC officials to gather information from petitioner Carter and other inmates who were suspected to have been involved in the murder of Superintendent Taylor.

With the assistance of IDOC officials, inmate-agent Harry Martin contacted individually, each inmate being investigated and secluded in segregation from the general prison population by IDOC officials; requesting that his name and wife's name be placed on their institutional visiting list, as a prerequisite to his initial visit with petitioner Carter and other suspected inmates.

On October 7, 1987, State agent Harry Martin and his wife traveled to the Pontiac Correctional Center, inmate-agent Martin had a conversation with petitioner Carter, which was tape recorded, without petitioner Carter's knowledge. During the conversation bewteen Harry Martin and petitioner Carter, at the prison's visiting room at Pontiac, inmate-agent Martin solicited from petitioner Carter information concerning his involvement in the murder of Superintendent Taylor.

On December 16, 1988, petitioner Carter, in his motion to suppress statement II, argued that the statements were inadmissible on Fifth Amendment grounds and also alleged that the statements were obtained in violation of his Sixth Amendment right to counsel and violated his Fourteenth Amendment right to due process of law. (C.107-08)

The trial court entered an order suppressing the statements as a result of a custodial interrogation in the absence of <u>Miranda</u> warnings, basing its decision on <u>People v. Perkins</u>, 176 Ill.App.3d 443, 531 N.E.2d 141 (5th Dist.1998). <u>Perkins</u> was subsequently reversed by the United States Supreme Court. <u>Illinois v. Perkins</u>, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). On appeal by the State, the appellate court reversed the trial court's suppression order, concluding that the statements were not the result of a custodial interrogation requiring the protections of <u>Miranda</u>. (Vol. 1, C.221-27)

On remand, another pretrial hearing was held and the motion to suppress statements was renewed.

As argued by defense counsel:

> Mr. Thomas:    ... Judge, then the other motion
> I have is coupled with matters that went up on
> appeal but raising the Sixth Amendment issue.
> There is one reference in the tape with David
> Carter about getting some lawyers.  It did not
> mention Shel Bannister by name, that particular
> tape, but there is a reference made about it and
> also, Judge, Mr. Carter in order for Mr. Martin
> to get in to see Mr. Carter, that whole rumor
> went out about whether somebody coming down here
> and going to help with some lawyers. I think
> the whole thing is tainted with the fact it is
> indicated Mr. Martin was working on behalf of
> trying to secure some lawyers for people who may
> or may not have been suspected of something.
> . . .

                                    (Vol. V., R. 432-33)

The trial court then discussed the differences bewteen the interrogations made by Harry Martin of David Carter, codefendant Ike Easley, and codefendant Michael Johnson. In the case of Easley, Harry Martin convinced Ike Easley that he had talked to an attorney named Shel Bannister, and that the lawyer wanted Martin to ask Easley a series of questions. Easley had said nothing to Martin prior to this representation by State agent Martin. (Vol. V, R. 433) As to Mr. Martin's interview with David Carter, the court summarized it as follows:

> THE COURT: Mr. Thomas (defense counsel) indicates on page 14 of 19 pages of the interview by Martin with Mr. Carter that at the top of the page 14 it says "that if they need something, I'll be here." That is Martin talking to Carter. "And if the indictments come down, then they'll have lawyers. Whatever else they need, you know, I'll be on top of. I don't perceive you all getting indicted. I don't see how. I don't think they've got anything, frankly. Then how long now, a month and a week or something?" Carter responds, "Almost a month or something like that."
>
> So the reference to Mr. Carter is -- by Mr. Martin is that anything Mr. Carter or any person who was involved in the investigation would need would be provided. That would include if indicted hiring lawyers. And in Mr. Johnson's case they said we have already talked to a lawyer and In Mr. Easley's case they have said not only we have talked to a lawyer but there is a whole bunch of questions the lawyer wants me to ask you, and Mr. Easley proceeded to spill his guts after he believed Mr. Martin had come from the lawyer. This is a case where I am in the unenviable position of quite possibly in the Fourth District being wrong twice. Wrong because of <u>Ilinois v. Perkins</u> and if, in fact, for some reason they did not catch the Sixth Amendment issue and it slipped through, I, quite frankly, feel I may have the oppurtunity to be wrong again because I'm not going to suppress based upon Sixth Amendment issue in this case....

Now, Mr. Carter had made quite a few statements
before the issue of counsel was injected....
And in Mr. Carter's case, the injection of
counsel came at the very end of it  and it was
very vague and it would not seem to me a reason-
able inmate, and I am looking at it from the
eyes of someone in seg and ticketed and is out
in the visiting room and under no coercion or
complusion out there that those -- and I would
have to adopt the position of the appellate
court those are correct, the statements came
late enough there the statements are voluntary.
So at the risk of doing this all over again,
the court will deny, first of all, defense
motion to -- the motion concerning probable
cause ...

I further find, I think, we have some serious
Sixth Amendment issues coming in this country.
It ·is my opinion those issues are not raised
in People v. Johnson or People v. Carter and
the renewed motion to suppress their statements
will be denied, the court finding that under my
interpretation of Illinois v. Perkins trickery
is authorized, and if that trickery includes
trickery concerning counsel. then I think the
trickery must go beyond what is done in these
two cases. .I think impermissible trickery
occurred in Mr. Easley's case and I suppressed
that and the State chose not to take that ·up
and even let the appellate court look at what
happened there.  I think trickery in People v.
Carter and People v. Johnson presses the limits
but is within the permissive range of what can
be done.  I am personally very uncomfortable
with that in terms of constitutional law but I
think I have been overruled sufficiently in
this I will adhere to the finding of the U.S.
Supreme Court, and if the Fourth District has
to address the issue again, so be it, let them
look and see it.  Motion to suppress is denied...

(Vol. V, R. 438-41)

The defendant maintains that the trial court was properly
concerned about the trickery used in this case by Harry Martin in
order to get petitioner David Carter to make statements incrimina-
ting himself in these offenses.  The statements were constitutionally
involuntary in violation of the due process clause of the Fourteenth
Amendment. (U.S.CONST.,amend XIV)  The voluntariness of the

32

statement depends on the absence of police overreaching.   People
v. Easley, 148 Ill.2d 281, 592 N.E.2d 1036, 1049 (1982), citing
Colorado v. Connelley, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d
473, 482 (1986).   Interrogation techniques that overreach are
offensive to a civilized system of justice and will be condemned.
(Easley, 592 N.E.2d 1036, 1050, citing Miller v. Fenton, 474 U.S.
104, 106 S.Ct. 445, 88 L.Ed.2d 405, 410 (1985).)  Ulitmately, the
inquiry in determining whether statements are involuntary as a
matter of due process is whether the conduct of the State agent
is "casually related to defendant's confession." (Easley, 592
N.E.2d at 1049.)

     In this instant case, the records clearly shows complete
awareness by the State and trial court that Harry Martin
(confidential informant) was recruited by the Illinois Department
of Correction, taken from one penal institution to another, in a
ploy to obtain information from defendants Easley, Johnson and
petitioner Carter, pertaining to the murder of Superintendent
Taylor at the Pontiac Correctional Center.   Prior to his visit to
the penal institution to see the defendants, State agent Harry
Martin had his wife contact each defendant, requesting them to
place State agent Harry Martin on their prison visiting list, as
required.   State Agent visited each defendant under the guise
that he was no longer incarcerated and the defendants were reporting
to him to communicate information to other gang members in Chicago,
and information given to him was to be relayed to attorney Shel
Bannister, whom State agent Martin alleged had been hired to
represent petitioner Carter and co-defendants.   When in fact, the
purpose of this blatant fabrication was to obtain information
from each defendant, under the guise of them believing that it

would be confidential information. See Judge's Docket Sheet #9,
[C. 9].

Furthermore, paragraph #5 of the trial court's order suppres-
sing statements (of the defendants) stated:

> 5.   The Department of Corrections cloaked in-
> mate Harry Martin with a cover story that he
> was not in fact, at the time of the visit in
> the Department of Corrections; Mr. Martin's
> wife was permitted to join him in the ruse;
> he asked three of the defendants numerous
> questions about their involvement in the
> death of Superintendent Taylor; he told
> defendants that a lawyer by the name of Shel
> Bannister, had been hired to represent him
> and Martin was asking questions for the purpose
> of relaying information to the lawyer; that
> Martin was a member of a street gang who
> D.O.C. believed has sufficient rank which
> would cause defendants to talk to him under
> the guise of reporting to their superior.
> [C. 9-11]

The record clearly shows that D.O.C. officials and State agent
Martin worked inconjuntion to obtain enough probable cause to
indict petitioner Carter.  Excerpts from the trial records
states the following:

THE COURT:

> What do you do with a particular problem which
> I was struck by in listening to the tapes and
> also as evidence by portions of the transcript
> that Mr. Martin represented to the person whom
> he was talking that contact had already been
> made with a Chicago lawyer, Shel Bannister,
> and that the information that was being obtained

34

from the defendants was so that Mr. Martin
could carry that information back to the
lawyer who was being retained to represent
them and that, in fact, the information defen-
dant was giving to Mr. Martin was information
that he had been commissioned by the lawyer to
obtain information and take back to Chicago.
He didn't just say there was a lawyer, he said
it was Shel Bannister. For anyone who has
been involved in cases involving the Illinois
prison system, Shel Bannister is someone who
is known to this court and most courts as a
lawyer who has, I guess, what I would call an
activist practioner. She does a lot of
defense work. I have not encountered her
since the Pontiac riot trials ten years ago
but to many inmates in the Department of
Corrections when somebody tells them Shel
Bannister has been hired to represent them,
this is a person that is familiar to them,
and when somebody says this is who your lawyer
is going to be, we have already gotten this
set up, I need to know now. I am here from
Shel, I need to know this and this, and then
a defendant, and am I not saying this is the
case where anybody spilled anybody's guts
because there is a limited amount of information
that was obtained as a result of the eavesdrop,
but nonetheless, statements are made thinking
that they are going to go back to a lawyer, which
is a ruse, who has never been hired and never
contacted as far as I know is not going to repre-
sent them. Does that shock the conscience that Mr.
Martin, whether somebody told him to do this
because it might help in getting information. Is
that something which, Mr. Bernadri, you feel
might shock the conscience?

[Vol. II, R. 282-284]

35

Petitioner Carter contends that State agent Harry Martin's fabrication that his decision to visit him, derived from the D.O.C. officials approval of his (1) having his wife prepare a letter to each individual requesting that her husband, Harry Martin and herself, be placed on their institutional visiting list; (2) upon arrival of said letter, petitioner Carter and co-defendants were under the impression that State agent Harry Martin was sent to visit him by gang members in Chicago, that an attorney would eventually be retained to represent them... prior to the actual visit, this was discussed by the defendants; (3) D.O.C. officials brought State agent Harry Martin from a State Correctional facility to meet with his wife prior to entering the Pontiac Correctional Center's visiting room to maintain the illusion that Harry Martin was no longer confined. The above actions by Harry Martin and through D.O.C. officials was as the trial court stated "shock the conscience".

COURT:
    The trial court in it's colloquy, went on to state:

> My concern is whether injection of an attorney
> who, in fact, and in reality existed, who was
> known to inmates to represent them in certain
> prison related matters  but who had, in fact,not
> been   hired in these cases, who had not been
> contacted in these cases, and it was simply a
> misrepresentation by Mr. Martin to gain the
> confidence presumably of Mr. Johnson and Mr.
> Carter, Martin having been held at another
> prison than the one these two defendants were
> in.  It was  simply a ploy, an investigative  technique
> used, a trick, deception, to make it more plaus-
> ible for these two defendants to talk to
> Martin and tell him what they knew.
> [Vol. III, R. 436-437]

36

Petitioner Carter contends that the D.O.C. officials com-
bined with State agent Harry Martin's involvement shows
a clear and apparent acknowledgement by the trial court, that
each defendant was aware of Shel Bannister supposedly representing
them and that Harry Martin was gathering information for her,
and/or for those who retained her.   This conclusion must be
deemed obvious, under the joint allegations made against each of
them.   Information was collectively communicated  to each of
them.   Thus, comporting to a blatant due process violation.

The prosecution was aware of this occurrance, the record
states the following:

MR. BERNARDI:

> ... It was quite obvious to the defendant that
> Mr. Martin was not an attorney, and he did not
> explain in any of these tapes that he was a
> lawyer, he was representing himself as being
> sent by one and if that is going to be a due
> process argument, and I guess it can be a due
> process argument, I do not believe that it
> rises to  the level of due process violation
> under the Fourteenth Amendment...
> [Vol. II, R. 287]

Any attempt to exclude any defendant involved in this
alleged conspiracy to commit the murder of the decedent in this
case, should be scrutinized, given that the evidence points
directly towards the State agent Harry Martin's fabrication that
"he was acting on behalf of attorney Shel Bannister", and collecting
information about the case for her.   The State tends to base
their argument "that the evidence was not closely balanced" to
fall within the perimeters of the Plain Error Doctrine.

37

It is insignificant as to when an attorney or attorney's name, may or may not have been mentioned or injected into any particular conversation. The sole purpose of including State agent Harry Martin's name on any of the defendant's visiting list ... freely and voluntarily meeting with State agent Martin in the prison visiting room... was based solely upon the false belief circulating amongst the defendants "that Mr. Martin had obtained lawyers to represent the defendants and that he was in fact, functioning in the name of attorney Shel Bannister.

The misrepresentation made by State agent Martin, as part of a ruse by the State and pre-planned with him for the purpose of securing incriminating statements from the defendants, under the guise of being sent by a well-known attorney. In People v. Easley, 170 Ill.Dec. 356, 592 N.E.2d 1036, the Illinois Supreme Court stated the following:

> During a conversation bewteen defendant and Martin in the prison visiting area Martin told defendant:
>> "Now the other thing is we got you all some lawyers, but we ain't gonna bring them in yet. We got [attorney] Shel Bannister cause we don't want to make it seem like you all are admitting to guilt. You know, you bring lawyers in before you have been indicted, you are saying I did something. So we gonna bring them in later. But what I need for Shel is information insofar as is there anybody that saw the shit?"    [emphasis supplied]

Id. Easley, 170 Ill.Dec. at 367.

When Harry Martin visited Ike Easley at the Pontiac Correctional Center, he advised Easley that he had retained attorney Shel Bannister "for all defendants" and that he needed to visit with Easley, Carter and Johnson for the purpose of obtaining information for the lawyer.  See People v. Easley, 529 N.E.2d 1036, 1047 (Ill. 1992).  It was under this premise that prompted petitioner Carter to place Martin's name on his visiting list, and agreed to meet with him.

Such tactics and actions which may have resulted in such adverse behavior on the part of the State, or their agent, must be firmly rejected and harshly condemned.  This court must render a decision, finding that such conduct by the State, and their agents actions (manner of obtaining incriminating statements from defendants) were gathered by means in which amounted to an violation of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution, and the Illinois Constitution, Article I, Section 2.  The question of voluntariness of the statement depends on the absence of police overreaching.  People v. Easley, 148 Ill.2d 281, 592 N.E.2d 1036, 1049 (1992), citing Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473, 482 (1986).  Interrogation techniques that overreach are offensive to a civilized system of justice and will be condemned.  Easley, 592 N.E.2d 1036, 1050, citing Miller v. Fenton, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed. 2d 405, 410 (1985).

The Court in Easley stated "the inquiry in determining whether statements are involuntary as a matter of Due Process is whether the conduct of the State agent is "casually related to defendant's confession".  Easley, 592 N.E.2d at 1049.

39

In People v. Bowman, (5th Dist. 12-27-02) No. 5-01-0340,
___ Ill.App.3d ___, ___ N.E.2d ___, defendant Bowman was convicted
in 1979 for murder.  Twenty years later, a newspaper article
alleged a previous unknown collaboration bewteen the detective
whom Bowman confessed to, and a cellblock mate of defendant's
during the time of his confession.  Bowman filed a post-conviction
petition asserting that the new information rendered his confession
coerced and his constitutional rights violated.  After a hearing
on Bowman's petition, the trial court granted him a new trial.
The State appealed the trial court's order granting him a new
trial.  On appeal, the State asserted, inter alia, that the trial
court erred in ordering Bowman a new trial, because the evidence
indicated no police scheme to coerce Bowman's confession.  The
Appellate Court affirmed the trial court's decision.

Defendant Bowman alleged in his petition, that his statements
to deputy sheriff Robert Miller were involuntary because defendant
had recently learned from an newspaper article that Deputy Miller
and Danny Stark (his cellmate) had contrived a scheme to acquire
his confession, thereby creating circumstances bespeaking fraud,
trickery, deceit, and coercion, which violated his constitutional
rights.  The Appellate Court held that based on the totality of
the circumstances, defendant's statement was the result of deceptive
interrogation tactics calculated to overcome defendant's free
will at the time of his confession and that defendant's confession
cannot be the product of a rational intellect.

In this instant case, the State and their agents contrived
a similar scheme to obtain incriminating statements from petitioner
Carter.

40

The State may not extort confessions by deliberate fraud or trickery. People v. Smith, 108 Ill.App.2d 172, 180 (1969). Evidence that the accused was threatened, tricked, or cajoled into the waiver of his rights will, of course, show that the defendant did not voluntarily waive his privilege against self-incrimination. Smith, 108 Ill.App.2d at 179; see also Miranda v. Arizona, 384 U.S. 436, 476, 16 L.Ed.2d 694, 725, 86 S.Ct. 1602, 1629 (1966).  "Trickery involves affirmative acts of fraud or deceit." Smith, 108 Ill.App.2d at 179.  The confession must not result from deceptive interrogation tactics calculated to overcome the defendant's free will. United States v. Kontny, 238 F.3d 815, 818 (2001).

Petitioner Carter contends that a degree of trickery has been upheld by the U.S. Supreme Court, pursuant to the high court's holding in Illinois v. Perkins, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990).  However, at no time, has the U.S. Supreme Court held that the State may, by way of misrepresentation in respect to legal counsel, employing deceptive practices in vigorously asserting that they were "acting on behalf of legal counsel", in order to induce a criminal defendant to incriminate himself or herself.  Nonetheless, such is the level in which the State trammeled over petitioner's fundamental rights.  The record has established this fact.

Petitioner Carter still maintains that  a Sixth Amendment violation occurred because State agent Harry Martin interferred with the petitioner's attorney-client privilege. United States v. Seale 461 F.2d 345 (7th Cir. 1972), but recognizing the decision in People v. Easley, 148 Ill.2d 281, 592 N.E.2d 1036, 1053 (1992),

41

which rejected a Sixth Amendment claim because the right to
counsel had not attached.

Because the statements in the present case were involuntary
under the due process clause of the Fourteenth Amendment, and
obtained in violation of the Sixth Amendment, their admission
amounted to a denial of petitioner Carter's fundamental right
requiring reversal of his conviction, ·or in the alternative, an
evidentiary hearing.

Issue
II

THE PROSECUTOR ERRED IN ELICITING HEARSAY
TESTIMONY THAT GUARDS HAD BEEN THREATENED
BY BLACK GANGSTER DISCIPLES AND THAT THE
DAY BEFORE THE MURDER, ANOTHER GUARD WAS
ATTACKED BY AN INMATE.

The State's theory of prosecution entailed that Superin-
tendent Taylor was murdered by Ike Easley and Roosevelt Lucas as
part of a Black Gangster Disciple conspiracy to avenge the death
of Billy Jones.   Billy Jones, also known as "Zodiac", was a
member  of the Black Gangster Disciples who died in the south
cellhouse on July 20, 1987.

On September 3, 1987, approximately two and a half months
after the death of inmate Billy Jones, Robert Taylor, superinten-
dent at Pontiac Correctional Center was attacked and died from
the result of the injuries he received during an attack in his
office.  The State theorized that David Carter was one of the
security leaders of the Black Gangster Disciples and that he had

42

given the order to retaliate for Jones' death and had ordered the
"hit" on Superintendent Taylor.

Correctional Sargeant Danny Jarrett testified to the circum-
stances surrounding the death of Billy Jones.  Jarrett had assisted
in moving Kirk Williams and Billy Jones from the south cellhouse.
According to Jarrett, Kirk Williams "controlled the whole institu-
tion", and Billy Jones was the chief of securities of the institu-
tion for the gang. (Vol.XII, R.77)  On the night of July 20,
Williams and Jones were being moved to segregation because the
gang was "getting out of control". (Vol.II, R.79)

Over the objection of defendant, Mr. Jarrett was allowed to
testify to Williams' statement as he was being moved to segregation.
He allegedly told the guards that he had tried to be a diplomat
but the administration, whom he referred to as "hookers," would
not listen. (Vol.XII, R.80)  Jarrett stated that Williams was
angry and stated that "he was going to tear the fucking place
up." (Vol.XII, R.80)  As Jones was being transferred to segregation,
he suddenly collasped and died from chewing on abag of cocaine.
CPR was attempted unsuccessfully. (Vol.XII, R.85-86)

Again, the defense objected , Jarrett was allowed to testify
to threats that he received after Jones' death on July 20.
Jarrett testified that the threats came from "several inmates."
and continued from the time of the incident until August 19,
1987.  Jarrett was of the opinion that the inmates threatening
him were from the Black Gangster Disciples. (Vol.XII, R.87-88)

In closing argument, the State argued that the evidence of
those threats showed the motive for the killing of Superintendent
Taylor and that there was a conspiracy among the Black Gangster

Disciples:

> In the weeks that followed July 20 and
> preceded September 3, the Black Gangster
> Disciples and their membership became
> extremely hostile, increasingly threat-
> ening to members of the staff of the
> Pontiac Correctional Center.  And five
> weeks later, five weeks later, Superin-
> tendnent Robert Taylor was murdered by
> who?  Easley and Lucas, members of the
> Black Gangster Disciples.

(Vol.XVI, R.240)

Jarrett's testimony regarding the threats that he received
from Black Gangster Disciples members was improperly introduced
into evidence.  The same issue was raised in the case of co-
defendant Roosevelt Lucas, and the Illinois Supreme Court found
that the testimony regarding the threats was error, although
harmless in Lucas' case.  People v. Lucas, 151 Ill.2d 461, 603
N.E.2d 460 (1992).  As stated in Lucas:

> The general rule that  prior threats by
> an accused to do violence to the person
> eventually slain are admissible applies
> when the statements are introduced to
> show malice or criminal intent. The
> factors a court considers in determining
> whether the statements are relevant to
> show malice or criminal intent include
> whether (1) the defendant made the state-
> ment, (2) the statement was a threat, (3)
> the statement was made close in time to
> the crime, (4) the victim was threatened
> See People v. Lampkin (1983), 98 Ill.2d
> 418, 75 Ill.Dec. 260, 457 N.E.2d 50
> (threat made by the defendant held inad-
> missible as evidence of malice and criminal
> intent where the threat was too general
> and impersonal to be reasonably charac-
> terized as directed toward any one in
> particular, and was made six years prior
> to the murder which the defendant was on
> trial).

> People v. Lucas, 603 N.E.2d at 467.

44

In Lucas, the Illinois Supreme Court found that Jarrett's testimony was inadmissible because there was no evidence that the defendant had made any of the threats that had been directed at Jarrett or those he heard directed at other guards, nor was there any testimony that Superintendent Tayor was the recipient of any threats from defendant Lucas. The court also found that Taylor's murder, which occurred more than two months after inmate Jones' death, was not sufficently close in time to the alleged threats so as to deem them relevant to show motive, which was the purpose of their introduction. In People v. Mitz, 143 Ill.2d 82, 572 N.E.2d 895 (1991), the Illinois Supreme Court, once again, allowed certain statements made by defendant to be admitted at trial to show evidence of motive, and the court subjected those statements to the same evidentiary standards as those introduced to show malice or criminal intent.

In the instant case, as in the Lucas case, there was no testimony from Sergeant Jarrett that petitioner David Carter was responsible for any threats made against Jarrett or that Superintendent Taylor was ever the target of a threat. In fact, the evidence was to the contrary, that Superintendent Taylor had a good relationship with the inmates, many of whom viewed him as a father figure. Where inmate Jones' death was the result of an accident from ingesting cocaine, it is not reasonable to infer that the inmates held every agent of the Department of Corrections responsible for Jones' death. At most, only those correctional employees whom the inmates might have perceived did not respond to the emergency situation in the expeditious manner would have been held accountable. In the instant case, the threats to

45

Jarrett cannot be construed  to have extended to Superintendent
Taylor so as to allow the admissibility of this evidence.

The State also introduced evidence, over defense objection
on relevancy grounds, that the day prior to Superintendent Taylor's
murder, a superintendent on one of the lower galleries had been
assaulted, with fists, by an inmate. (Vol.XV, R.39)  Because
there was no evidence that petitioner Carter committed this
crime, and there was no evidence that the crime was related in
any way to Superintendent Taylor's murder, the admission of this
evidence was improper. and prejudical.

Evidence of collateral crimes is inadmissible if used
merely to establish a defendant's propensity to commit crimes.
People v. Lindgen, 79 Ill.2d 129, 402 N.E.2d 238, 242 (1980).
Even if used for a proper purpose, it cannot be admitted until it
is shown that a crime actually took place and that defendant
committed it or participated in its commission. People v. Miller,
55 Ill.App.3d 421, 370 N.E.2d 1155, 1159 (1st Dist. 1977); People
v. Gugliotta, 81 Ill.App.3d 362, 401 N.E.2d 262, 264 (2d Dist.
1980).

This exact issue was raised in the Lucas case, and the
Illinois Supreme Court agreed that the evidence was inadmissible
because there was no evidence connecting the defendant to the
attack on the officer the day before Superintendent Taylor's
murder. People v. Lucas, 151 Ill.2d 461, 603 N.E.2d 460 (1992).

The other crime evidence did not tend to prove any issue
properly provable in the case because there was no evidence that
petitioner Carter participated in the attack on the prison official

46

the day before Taylor's murder, or that the attack was in any way
related to the attack on Taylor.  There was no such evidence that
the attack on the correctional officer was anything other than a
singular, unconnected act of violence by one inmate against a
correctional officer, which supplied no basis for the jury to
infer that it was part of a common plan to retaliate against the
administration.  It remained an isolated outbreak of violence by
one inmate.

The admission of the hearsay testimony reagrding threats
that Correctional Officer Jarrett had received from unnamed
inmates deprived petitioner David Carter of his right to confront
witnesses face to face as guaranteed by Section 8 of Article I of
the Illinois Constitution and violated the confrontation rights
bestowed by the Sixth and Fourteenth Amendments to the United
States Constitution. See People v. Smith, 38 Ill.2d 13, 230
N.E.2d 188, 190 (1967).

The evidence of an unrelated attack on a guard was not
probative of any fact in issue and only served to create suspicion
in the minds of the jurors of petitioner David Carter's involvement
in these other crimes.  Evidence of unconnected offenses is
objectionable, not because it has no appreciable probative value,
but because it has too much.  It over-persuades the trier of fact
who is likely to convict the defendant because he is a bad person
deserving of punishment, rather than on the basis of facts related
to the offense for which he is being tried.  People v. Romero, 66
Ill.2d 325, 362 N.E.2d 288 (1977).  The prejudice in allowing
this collateral evidence is there was a danger that the jury
convicted David Carter because it suspected his involvement in a
larger criminal scheme, which they then believed made it more

47

likely that he was involved in the instant offense.   Because of
the error in allowing this hearsay and collateral crimes evidence,
the State courts findings is in error and this Court should grant
petitioner Carter relief.

### Issue
### III

EVIDENCE OF GANG ACTIVITY WHICH WAS PERIPHERAL TO ANY
MOTIVE FOR KILLING SUPERINTENDENT TAYLOR WAS IRRELEVANT
AND HIGHLY PREJUDICIAL TO DAVID CARTER, SERVING ONLY
TO INFLAME THE JURY AGAINST CARTER BECAUSE OF HIS
ASSOCIATION WITH THE BLACK GANGSTER DISCIPLES.

In this case, the trial court erred in allowing evidence of
details of gang activity which was peripheral to the issue of
whether David Carter was involved in the murder of Superintendent
Taylor.   The jury's consideration of this evidence could only
have distracted it from its fact-finding function and inflamed
the jury against Carter because of his association with the Black
Gangster Disciples. People v. Cruz, 164 Ill.App.3d 802, 518
N.E.2d 320 (1st Dist. 1987).

Harry Martin was the chief witness against David Carter.
Martin identified himself as a former member of the hierarchy of
the Black Gangster Disciples, the corporate-like structure of the
gang, the inner-workings of the gang organization.   Martin testified
that the first rule of the organization is silence and secrecy.
According to Martin, any member who broke those rules would be
considered to be an enemy, and a policy of the Black Gangster
Disciples was death before dishonor, which meant that if you said
anything against the organization or violated any organizational
policies, your ultimate fate was death. (Vol.XIV, R. 28-31)

**48**

Martin described his own involvement with the Black Gangster Disciples, and testified that the gang had put him through school. He became a board member and a financial advisor to the BGD, and he had ultimately been forced out of power and himself become a target of a Black Gangster Disciples assassination plot, which led to him cooperating with the Department of Corrections. (Vol.XIV, R.18-35)  Evidence of the history and structure of the gang and its criminal activities, and Harry Martin's involvement within the organization, was peripheral and irrelevant to whether petitioner David Carter was involved in the murder of Superintendent Taylor. It only distracted the jury from its task of weighing and evaluating the proper evidence before it to reach an accurate determination of guilt or innocence.  The passions of the jury were undoubtedly aroused when it heard of the sordid activities of Black Gangster Disciples and the consequences that Martin suffered when he became an informer, even though that evidence did not shed any light on the question of David Carter's guilt.

In People v. Cruz, 164 Ill.App.3d 802, 518 N.E.2d 320 (1st Dist. 1987), the defendant was charged with a shooting that the prosecutor contended was gang motivated, either by a desire for revenge against a rival gang or to recruit new members.  To impeach defendant's denial that he was a gang member on the date of the shooting, the State introduced portions of a documentary film on gangs, entitled "Street Wars," which showed defendant to be an active gang member three months prior to the shooting, but also depicted violent gang activity and commented on the escalation of gang warfare in Chicago.

The Illinois Appellate Court reversed Cruz's conviction, because inter alia, the jury saw portions of the film which shed no light on whether defendant did the shooting but were highly inflammatory and could only have aroused the passions of the jury against street gang activity, and motivated the jury's hostility against the defendant. Cruz, 518 N.E.2d at 327.   Harry Martin's testimony had the same affect.

Martin also testified, over defense objection, in that September of 1987, he was an inmate at Logan Correctional Center, and was still a gang member, when he was approached by the Assistant Institutional Coordinator for the gang at Logan, who told him that inmate Lawrence Spiller had been transferred to Logan and that he was a witness in the Pontiac case.   Martin was told that the gang would like to have Spiller killed, and they were going to poison his food. (Vol.XIV, R.37-38)   Martin said that he managed to stall the other gang members, and he then contacted the warden.

There was no evidence connecting David Carter to the plan to poison the food of Lawrence Spiller.   While evidence of a plan to eliminate witnesses is admissible to show consciousness of guilt and should  be excluded from evidence.   Compare People v. Baptist, 76 Ill.2d 19, 389 N.E.2d 1200, 1204-05 (1979)(evidence that defendant's brother and others executed a plan to kill the State's eyewitnesses was admissible where a letter written by defendant to a family member of one of the eyewitnesses, threatening to have his brother and cousin harm the eyewitness if he testified, connected the defendant to the shootings) with People v. Frazier, 107 Ill.App.3d 1096, 438 N.E.2d 623, 626 (1st Dist. 1982)(evidence that defendant tried to pay complainant $1,000 in return for an

50

agreement to drop the charges not admissible as evidence of his consciousness of guilt where it was the complaintant who suggested the payment).

Allowance or an excessive amount of evidence on an issue which is only peripheral to the offense for which the defendant is being tried demostrates an insensitivity by the trial court to the need of balancing the probative value of each piece of evidence against its potential prejudice against the defendant.

The effect of this evidence which had no relevance on the question of petitioner David Carter's guilt as to the murder of Superintendent Taylor, was to divert the jury's attention from the true question at hand.  This Court cannot speculate that the jury acted only on the basis of competent evidence.  Therefore, a new trial is warranted, or in the alternative, an evidentiary hearing.

## Issue

## IV.

THE ADMISSION OF EVIDENCE BY THE STATE THAT THE DEFENDANT, AS ALLEGEDLY THE UNIT COORDINATOR OF THE CELLHOUSE FOR UFO, THE SECURITY DIVISION OF THE BLACK GANGSTER DISCIPLES, HAD A VIOLENT CHARACTER, DENIED THE DEFENDANT A FAIR TRIAL WHERE HIS CHARACTER WAS NOT AT ISSUE.

At trial, Harry Martin, who described  himself as a former member of the board of directors of the Black Gangster Disciples (BGD), testified to a series of descriptions regarding the security members of the gang, and thereby presented evidence indicating that the defendant,  because he was allegedly a security coordinator for the cellhouse, was allegedly of violent character.

51

During Harry Martin's testimony, he described the alleged qualifi-

cations and responsibilities of the security division of the BGD:

> Q: (By the prosecutor)  Okay.  With respect to
> the security division of the gang, what is
> that called?
>
> A: (By Harry Martin)  UFO.
>
> Q: And what does UFO stand for?
>
> A: The United Front of the Organization.
>
> Q: What is its function?
>
> A: They are like the first line of order for
> the organization.  Like the Marines in
> comparison to what we have in the U.S.
> They are the front line.  When something
> happens they are the first to go in. They
> protect the board members, or any of the
> hierarchy of the organization. They guard
> the leadership and discipline the organi-
> zation members that may get out of line or
> out of policy.
>
> (Vol.XIV, R.19-20)
>
> Q: You mentioned that the UFO members, security
> fashion, who chooses the UFO members?
>
> A: In each institution they are chosen by the
> UFO coordinator of the institution.  There is
> a board member who chooses only the head of
> staff, but in each individual institution the
> institutional coordinator and institutional
> UFO coordinator would choose his staff.
>
> Q: What type of qualities would be considered
> in choosing a UFO member?
>
> A: The length of time that they have.  The
> charge in the case for which they were convicted.
> How long they have been in the organization.
> His strength.  Their ability to carry out the
> functions.
>
> Q: Would a code of silence be taken in account
> on that?
>
> A: Definitely that would come into play where
> they would have to be somebody who has been in
> the organization for a long period of time and
> proved that they can conduct themselves according
> to Rule 1 especially.
>
> Q: Which is the code of silence?

52

    A:  Right....

       (Vol.XIV, R.32-33)

    Harry Martin testified that David Carter told him that he
was the unit coordinator of the cellhouse for UFO. (Vol. XIV, R.
51)  Mr. Martin stated that Mr. Carter would then be dealing with
security. (Vol. XIV, R. 51)  The prosecutor then questioned Mr.
Martin as follows:

    Q:  Why did you pick out Carter as a possible
        person to talk to?

    A:  Because he was the head of security in the
        south house.

    Q:  Would a person in that position have any
        special knowledge that you thought would be
        helpful to the investigation as a matter of
        course?

    A:  Yes.  If he is the unit coordinator in the
        security in the south house it would be his
        direct responsibility to coordinate and make
        sure something was carried out if something
        happened in his cellhouse with respect to the
        UFO member in the cellhouse.

       (Vol. XIV, R. 65)


    In People v. Lucas, 151 Ill.2d 641, 603 N.E.2d 460 (1992),
the Illinois Supreme Court dealt with a similar issue.  Lucas
involved the prosecution of Roosevelt Lucas for Superintendent
Taylor's murder.  In Lucas, the State introduced evidence that
Lucas, as a member of the UFO, had a violent character.  As here,
the evidence was introduced through the testimony of Harry Martin,
who described the qualifications of a member of the UFO. 603
N.E.2d 470.  The State Supreme Court concluded that the admission
of character evidence was error, concluding:

            Generally, character evidence is inadmissible
            when a party's character is not in issue. (Cita-
            tion omitted)  The prosecutor may not present

                          53

evidence of defendant's bad character until
the defendant puts his character in issue by
presenting evidence of good character. (Citation
omitted)  Where it is admissible, evidence of
character is confined to proof of general
reputation at or prior to the alleged offense.
It should also be confined to a time not very
remote from the date of the alleged offense.
The personal opinion of a witness and evidence
of specific acts are not proper. (Citation
omitted)  Reputation evidence may not be based
upon specific acts of either bad conduct or
good conduct. (Citation omitted)

Defendant's character was not an element of the
offense of murder.  Martin's testimony was pre-
sented as part of the State's case-in-chief;
defendant did not invite introduction of evi-
dence of his bad character or propensity to
violence by placing his charcater in issue.
 Martin's testimony identifying defendant as a
UFO member and describing the qualifications
and responsibilities of the UFO was nothing
more than an effort by the State to portray
defendant as a person capable of murdering
Taylor and thereby persuading the jury that his
propensity for violence may be likely that he
was guilty as charged....

603 N.E.2d at 470.

Under the authority of Lucas, 603 N.E.2d 460 (1992), the
character evidence introduced in this case was error.  Harry
Martin's testimony was presented as part of the State's case-in-
chief.  Petitioner Carter did not invite introduction of the
evidence of his bad character or propensity to violence.  The
testimony by Martin was nothing more than an effort by the State
to portray the defendant as a person capable of ordering the
murder of Superitendent Taylor, and thereby improperly influencing
the jury that propensity for violence made it likely that he was
guilty.

The introduction of this evidence was error, and it is
requested that this Court grant petitioner a new trial, or in the
alternative, an evidentiary hearing.

54

Issue

V.

The State Trial Court Erred In Its Ruling Admitting
The Taped Statement Of Petitioner Carter Into Evi-
dence Based On "The Conspiracy Being On-Going" And
The State Appellate Court Erred When It Did Not
Allow Petitioner The Oppurtunity To Supplement And
Amend His Petition To Include Such Constitutional
Claims That Would Have Exonerated Him; And Appointed
Counsels, Carey J. Luckman And W. Keith Davis Failed
To Consult With Petitioner Carter To Ascertain His
Claims Of Constitutional Rights Violations And Make
The Proper Supplements And Amendments To His Pro Se
Petition That Were Necessary For An Adequate Present-
ation of Petitioner's Contentions.

Petitioner Carter contends that the Appellate Court failed
to address the legal question as to "whether or not the conspiracy
had ended" for purposes of determining it's admissibility.
Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716 (1949).

In Krulewitch, the U.S. District Court indictment charged
in a three count indictment that Krulewitch and a woman defendant
had (1) induced and persuaded another woman to go from New York
City to Miami, Florida for the purpose of prostitution; (2)trans-
ported or caused her to transport from New York to Miami for that
purpose; (3) conspired to commit those offenses.  The challenged
testimony was elicted by the Government from its complaining
witness, the person whom Krulewitch and the woman defendant
allegedly induced to make the trip for the purpose of prostitution.
The conversation bewteen the complaining witness and Krulewitch's
co-defendant consisted of the following: "She asked me, she says,

55

"You didn't talk yet?  And I says, 'No.'  And she says, 'Well, don't,' she says, until we get you a lawyer.'  And then she says, 'Be every careful what you say.'  And I can't put it in exact words.  But she said, 'It would be better for us two girls to take the blame than Kay (the defendant) because he couldn't stand it, he couldn't stand to take it."  <u>Krulewitch</u>, 69 S.Ct. at 717.

In this case, a jury impaneled in the Circuit Court of McLean County convicted petitioner, David Carter, of first degree murder, and conspiracy to commit first degree murder.  Prior to trial, the trial court denied petitioner's motion to suppress (wiretap) statements on grounds that they were involuntary under the Fourteenth Amendment Due Process Clause and obtained in violation of petitioner Carter's Sixth Amendment right to counsel. The statements were obtained through the pretext used by informant Harry Martin that he had contacted an attorney for petitioner Carter and for all the other individuals allegedly involved in the incident and would be helping insure that petitioner had legal assistance.

---

1/   At the inception of the alleged conspiracy transpiring, Harry Martin was an inmate in the Illinois Department of Corrections serving sentences imposed by Cook and DuPage Counties perspectively. IDOC officials, working in conjunction with the McLean County State's Attorney obtained an eavesdropping order for the sole purpose of having inmate Harry Martin furloughed from the institution in which he was detained to a motel, his objective was to visit petitioner and other inmates suspected in the murder of Superintendent Taylor at the Pontiac Correctional Center.  Inmate Martin with the assistance of his wife, contacted petitioner and others through the mail requesting that she and Harry Martin be placed on their visiting list.   That Harry Martin was released on appeal bond.   DOC officials and Harry Martin perpetrated this ruse to have Martin wear a wire into the institution's visiting room, assuring each gang member that he was sent by an attorney to discover what took place and report the occurance to their gang leader.

Prior to trial in this matter, trial counsel attempt to suppress the statements arguing that the alleged conspiracy had terminated, was denied.  Notwithstanding the fact that without the taped recorded statement of petitioner Carter, it was very likely that he could not be connected to the instant offense.

During a hearing regarding whether or not the conspiracy had ended, the following colloquy took place:

THE COURT:    Mr. Thomas has filed on behalf of Mr. Carter a motion in limine, and that motion needs to be addressed.  It is directed toward what the defense believes will be hear'say statements of unindicted co-conspirators and statements of indicted conspira-tors and the motion specifically raises that issue that the defense position is that any such state-ments would have been made prior to the existence of any alleged conspiracy or subsequent to the termination of the conspiracy and accordingly would not be admissible as evidence in this case, and the defense has move in limine for an order that all such declarations, acts or statements prior to the existence of any alleged conspiracy and following any alleged conspiracy be barred by the court and that is a matter the court needs to rule on.

Argument on the motion, Mr. Thomas?

MR. THOMAS:    I will stand on my motion.

MR. BROWN:    Judge, we don;t have a copy of that.  Is there anyway we can get a copy of that?

MR. THOMAS:    It was sent to your office.

MR. BROWN:    Unless it got lost in all the papers.

THE COURT:    This is filed from Chicago October 25th and I think I received probably two copies of it at some point.

MR. THOMAS:    I do have an extra copy, judge.  Do you need it?

THE COURT:    Yes.

[After a short interruption, proceedings were presumed.]

MR. CASSON:    Judge, with regard to the statements, recorded statements, that were made to Harry Martin, it is not our intention at this time to attempt to intro-duce any of those statements which were made to Mr. Martin by any either alleged indicted or alleged

57

unindicted co-conspirators.  The only recorded
statement which at this time we intend to introduce
during the course of our case in chief would be the
recorded statement which was made to Harry Martin
by the defendant, and it is, of course, our position
with regard to that statement that was an admission
made by the defendant as to acts charged in this
case and we are not attempting to introduce that on
the basis it was a statement made in furtherance of
a conspiracy.  We would, of course, reserve our
right to use any recorded statements that were made
to Mr. Martin by any witnesses who might appear and
testify on behalf of the defense for impeachment
purposes.

THE COURT:    Does the state intend to introduce or attempt to
introduce the testimony of any witnesses who would
testify as to events after superintendent Taylor's
death that the state would contend would be in
furtherance of some conspiracy to murder him?

MR. CASSON:    Statements made by the defendant after the death?

THE COURT:    Defendant is on tape with Harry Martin, and sitting
aside for the moment what that is, are there any
other witnesses subsequent to the death of superin-
tendent Taylor on September 3, 1987 which the state
intends to call who would testify as to activities
after the superintendent's death which the state
would contend were in furtherance of a conspiracy
to kill him?

MR. CASSON:    No.  The only evidence we would have would be
activity and statements made prior to the murder.

THE COURT:    Because the general problem area, particularly in
the federal cases are statements made by someone
alleged to be a conspirator or co-conspirator after
after the event has taken place and I think Mr.
Thomas correctly points out that such statements
once the conspiracy, alleged conspiracy, is termi-
nated cannot be used.  As far as statements predat-
ing the death of superintendent Taylor, it gets a
little harder to distinguish what statements are
presented which are pursuant to a conspiracy,
depending on te timing and who is involved and what
is being said, and I guess I will have to deal with
those as best I can.  The real issue is, can the
state use the defendant's taped statement to Harry
Martin when Harry Martin who is an inmate was
working undercover, wired for sound, and went into
the Pontiac Correctional Center approximately,
what, a month - how long after the superintendent
Taylor's death did Martin go into the Pontiac
Correctional Center to talk to Carter?

MR. CASSON:    Slightly over a month.

THE COURT:    Slightly over a month. Martin wired for sound goes
into the visitor's room of the Pontiac Correctional
Center. He is working as an undercover agent. Mr.
Martin at the time was an inmate in the Department
of Corrections. He was incarcerated in DOC.
However, as a part of a ruse that was concocted, he
was accompanied by his wife or girlfriend to the
Pontiac Correctional Center. His cover story was
he was out on an appeal bond, he was a high ranking
member of a street gang, that he wanted information
from Mr. Carter as to what occurred in Pontiac in
connection with superintendent Taylor's murder and
Mr.Martin asked Mr. Carter a whole series of questions
a number of which Mr. Carter responded to.    I
suppressed that statement originally based upon
People v. Perkins out of the Fifth District which
had ruled in Illinois that the police may not
do indirectly what they cannot do directly. That
is to say that a police officer or a police agent
or someone working for the police cannot simply
take off the uniform, ask questions of someone in
connection with a crime, and then use those un-
mirandized answers or responses against that person
and that had relied on the Mathias case and People
vs. Perkins as those here in the courtroom is aware
was taken the United States Supreme Court out of
the Fifth District of Illinois and Mathias was
reversed and Perkins now holds in the U.S. Supreme
Court, decided subsequent to the trial of People v.
Easley, that an undercover agent acting surreptitiously
is not required to Mirandize a person being held in
custody on an unrelated charge when police are
investigating that person for another unrelated
offense and that trickery and deceit are reasonable
means of obtaining information by the police of
their agents. The question in Perkins, or Illinois
vs. Perkins, is how far does that go? But, in any
 event, People v. Carter having gone to the  Illinois
Appellate Court the case came back from the Appellate
Court of the Fourth District who ruled that the
Fifth District case of People v. Perkins had been
"wrongly decided" and the Fourth District case
correctly anticipated that the U.S. Supreme Court
would, and the U.S. Supreme Court did approximately
a month later, change the law in the United States
concerning statements of this type. So we have a
statement made by Mr. Carter a little over a month
after superintendent Taylor's death taken at a time
when Mr. Carter was in disciplinary segregation
locked up 24 hours a day, isolated from contact
with other persons, unable to make phone calls,
administratively charged, I believe, at that time
with murder but had not been indicted who was
allowed to go to the visiting room on the Pontiac
Correctional Center and in a non-coercive atmosphere,
and I think the record is clear Pontiac Correctional

59

Center visiting room is the least coercive atmosphere
anybody has seen in a maximum security prison in
that it much resembles a circus and free-for-all
with family members, children, concessions, photo
oppurtunities, electronic games, you name it and it
is in the visiting room with about 130 tables, a
video camera, and depending on staff, perhaps one
corrections officer, maybe two, to try and ride
herd over this absolute chaos where anything and
many times everything does occur in that visiting
room.   Nonetheless, Mr. Carter in response to a
letter from Harry Martin, another member of the
organization who was working undercover, agreed to
go to the visiting room and there he had a discussion
with Mr.Martin who was wired for sound and so there
was no coercion.   What occurred is simply that Mr.
Carter was not aware Mr. Martin was working under-
cover, that the People had obtained an eavedrop
order from me.   My expectation was that Mr. Martin
would go in and acting like a fly on the wall
without prompting Mr. Carter to say anything which
would be incriminating would just simply sit there
and listen to see if Mr. Carter said anything about
what occurred.   Instead, as the transcript shows,
Mr. Martin asked Mr. Carter numerous questions and
also managed to direct him back to what was going
on and what his involvement and that of others was.
In any event, the Appellate Court said that is
admissible.   Now, the Appellate Court didn't address
the question of whether that statement or those
statements by Carter to Martin were made after the
conspiracy terminated.   But I think Mr. Casson is
correct, this is an  admission by the defendant as
to his involvement and is no different than any
statement someone might make other than the circum-
stancesunder which it was made and the fact that
the U.S. Supreme Court has, in effect, said Miranda
doesn't apply.   So is admissible for those reasons.

The other concern I had was in looking through it
was the issue  of whether, in fact, this was just
history.   Was this Martin just asking Carter what
happened?   Nothing in the present tense, also in
the past tense.   For the most part, that is correct.
It is simply a historical statement by Mr. Carter
as to what he understands has happened, and I have
looked at the transcript.   The only deviation from
that appears on page 13 of at least what I have
received as a typewitten transcript which has to do
with a letter and what was going on with the letter?
Starting on page 12 it says "Martin:   Cause Larry's
interested in that cause Ketchup.   I heard a lot
missed stories about Ketchup and I want to see
exactly what he wrote cause he ain't supposed to be
on no shit like that no way.

60

CARTER:   He talking about something to the effect where he's
          telling me  he's gonna take it to court and say he
          did it, then when it gets to court, he's gonna say
          he didn't.  Something like that shit."

          Then there is a series of questions, and getting
          down about two-thirds of the way down the page,
          Carter:  The main thing is this here.  I just don't
          want all these brothers to be giving different
          stories, then you got five differnt stories to tell
          the man."

          Then over on page 14 again there is a conversation
          about who is reporting what information to whom.
          There is some discussion, and in Mr. Carter's
          statement  is the only reference to attorneys and
          that is by Martin who says, "and if the indictments
          come down, then they'll have lawyers.  Whatever
          else they need, you know, I'll be on top of.  I
          don't forsee you all getting indicted.  I don't see
          how.  I don't think they got anything, frankly.
          Been how long now, a month now, a month and a week
          or something?"

          Whereas in Easley, Martin injected the attorney
          issue early on.  In Mr. Carter's case, the question
          of counsel did not come up until well into the
          interview and then it wasn't under a subterfuge
          Martin had obtained a lawyer for Mr. Carter and
          that Martin was reporting back to a lawyer and
          asking questions of Carter at the lawyer's request.
          In Martin's discussion with Carter an attorney is
          mentioned in passing that counsel can be obtained
          later.  In my opinion – and then going into page 17
          of the transcript, we are back to the letter.
          About a third of the way down the page, Martin says
          "disappear."  He is talking to Nichelle who is
          accompanying him, the female with him, to give his
          story more believability that he is out on appeal
          bond.

          Martin:  Disappear.  Tell Dice to give you that
          letter and I'll be back to get it – the one that
          Ketchup wrote.  Anybody else writing letters?

          Carter:  No, I hope not anyway."

          Then down a little further, Martin:  Tell Dice I'm
          gonna want to know if the letter was opened when it
          got there and I want the letter.  I'm gonna give
          that to him.  I'm gonna go see Mr. Corwyn Brown.

          Carter:  I hope somebody talked to him about the
          real deal.

          Martin:  I talked to him already, but I'll talk to
          him again, I'm gonna talk to him again. He's straight.

                              61

Carter: Try to find out what he said though, man.

Martin: You talking about in the letter?

Carter: No, I'm talking about what he said to those honkies.

Martin: What he said to them?

Carter: Yeah."

And on page 19, the last page, they are still talking about the letter.

Martin: He don't do no work. Doesn't do no work. Tell Dice to give me that letter. I'll be back to get it."

And then on down, "Carter: Tell the boss I said everything all right."

My impression of the transcript of the tape, and I don't know how accurate it is. I did listen to the original tape pursuant to the wire after I authorized it. There are times where because of noise, the background noise in the visiting room and accents that is difficult at times to catch everything and I suspect you have to listen to the tape a couple of times in certain spots. But assuming for the moment the accuracy of the tape and the transcript made from it, it does appear to the court while most of this is a history given by Carter to Martin as to what occurred, also what is going on is, for want of a better term, a cover-up or attempted cover-up, that is still ongoing relative to the murder, relative to who is telling what story and communications back and forth bewteen persons implicated in the murder as to what they are saying, who they are saying it to and to and to try and get their stories straight. So my response is that I read the transcript as if the conspiracy is ongoing, that it did't terminate with the murder, that it was in what amounts to a cover-up phase of people trying to get their stories straight, protecting each other and, of course, we are talking here about a street gang and the inner connections bewteen them, their hierarchy, their officers, their communications, not only in Pontiac but with other correctional centers and with other high ranking street gang members. There is a reference to Larry Hoover. I think it is clear, at least at time from the testimony and transcript, Mr. Hoover was in Stateville at the time but yet he was the person calling the shots among the Black Gangster Disciples in the Department of Corrections. So I believe the conspiracy could be considered to be ongoing based upon statements in the transcript,

62

and for that reason it is admissble on the issue of
conspiracy.  Just as importantly I believe it is
now admissible under People vs. Carter in the
Appellate Court opinion in this case as an admission
a statement by the defendant and that Miranda
wasn't required and is therefore admissible on
those grounds.

The third issue was the question of counsel on
sixth amendment, and in Mr. Carter's case, unlike
Mr. Easley's case where counsel was really used to
help manipulate Mr. Easley in thinking he was communi-
cating information that would go back to his attorney
and he was given the name of someone who, as it
turns out, was part of the story who had been hired
to represent him and that hadn't actually occurred.
Mr. Carter was not told that by Mr. Martin and the
question of counsel only comes up well after Mr.
Carter is talking about what allegedly occurred.

Anybody want to add anything further to the record?
Mr. Thomas?

MR. THOMAS:        Judge, I would just state to your Honor that the
passages you read were all passages that were
elicited by Mr. Martin, when the letter came up,
Mr. Martin injected the Larry Hoover situation into
the case.  I will state to your Honor that is not
something Mr. Carter came forth with without being
prompted by Mr. Martin.

THE COURT:         State?

MR. CASSON:        No.

THE COURT:         The only thing I would respond, on page 13 when Mr.
Carter says "the main thing is this here."  I just
don't want all these brothers to be giving different
stories, then you got five different stories to
tell the man."

Mr. Carter has determined apparently in his own
right that there needs to be some damage control,
there need to be some uniformity as to who is
saying what, and that needs to be coordinated by
someone and I think that clearly indicates that the
jury could determine that was part of a ongoing
conspiracy relating to the murder of superintendent
Taylor.

Yes, Martin, I don't think anybody can fairly look
at this and not conclude that Harry Martin is not
an actor of the first order and injects his own
characterization and personality into a lot of
this.  Nonetheless, I believe it is clear Mr.

63

Carter has some understanding of something transpi-
ring which control is needed over in order not to
damage people within the organization and other
people.  So is admissible both pursuant to the
Appellate Court opinion in this case reversing my
suppression and it is  further admissible on the
issue whether or not there was a conspiracy.  So
the motion in limine I am going to mark as being
denied.

MR. THOMAS:    Which one?

THE COURT:    This is the –

MR. THOMAS:    Sixth amendment.

THE COURT:    This is as to – no, a statement made before initia-
tion of or after termination of a conspiracy.  The
The sixth amendment you may want to argue somewhat
further.  I don't know if you want to make a further
argument on that or not?

MR. THOMAS:    No.

THE COURT:    The state want to make any further argument on the
sixth amendment issue, right to counsel, specifically
being raised that  before anybody should be talking
to Mr. Carter in light of the circumstances he
found himself where he is confined in seg, he is a
prime suspect in the murder, he is isolated, DOC
controls all communications with him, that he had
at that point in time a sixth amendment right to
counsel and the attempt to obtain information from
him when effectively could not exercise that
right to counsel would be in violation of his sixth
amendment right?

MR. CASSON:    Judge, just a couple of things.  I think the tape,
anyway, reflects Mr. Carter was not in segregation.
That was not his status at the time of the reporting.
The transcript of the tape indicates that he was
still in the cellhouse and was on lockdown status,
not segregation status, and it would be our position
that he was not under charge at the time the conver-
sation took place and that the sixth amnedment does
not arise until there is a charge, and he was not
indicted and there was no charge so there is no
sixth amendment right.

THE COURT:    Mr. thomas, anything further?

MR. THOMAS:    No, judge.  I would just state on the first motion
it is my understanding that you granted it as to
other tape?

THE COURT:    I haven't ruled on it as to any othet tape.  The
state has assured me right now they don't intend to
introduce any other tape.

64

MR. THOMAS:    Your ruling is based only on Mr. Carter's tape?

THE COURT:    Yes. I frankly have not reviewed any such statement
to determine whether, in fact, it is indicated that
any conspiracy could, by a juror, be considered to
be ongoing based upon what they have said.

The motion in limine related to the sixth amendment
grounds in violation of defendant's right to counsel,
if Mr. Carter was not in segregation, my understand-
ing is that lockdown did prevent at least telephonic
communications, that letters would have gotten in
and out of the correctional center......

[VOL. III, Nov. 4, 1991, p. 505-518  SEE ATTACHMENT]

The trial court's ruling is in direct conflict with <u>Krulewitch</u>,

in it's findings that "the conspiracy was on-going in nature",

without pause, or termination.  In <u>Krulewitch</u>, the U.S. Supreme

Court stated the following:

"Although, the Government recognizes that the
chief objective of the conspiracy - transport-
ation for prostitution purposes - had ended
in success or failure before the reported con-
versation took place, it nevertheless argues
for admissibility of the hearsay declaration
as one in furtherance of a continuing subsidiary
objective of the conspiracy. Its argument runs
this way. Conspirators about to commit crimes
always expressly or implicitly agree to colla-
borate with each other to conceal facts in
order to prevent detention, conviction and pun-
ishment. Thus the argument is that even after
the central criminal objectives of a conspiracy
have succeeded or failed, an implicit subsidiary
phase of the conspiracy always survives, the
phase which which has concealment as its sole
objective. The Court of Appeals adopted this
view. It viewed all the alleged hearsay decla-
ration as one in furtherance of this continuing
subsidiary phase of the conspiracy, as part of
"the implied agreement to conceal." 167 F.2d
943, 948. It consequently held the declaration
properly admitted.

We cannot accept the Government's contention.
There are many logical and practical reasons that
 could be advanced against a special evidentiary
rule that permits out-of-court statements of
one conspirator to be used against another. But
however cogent these reasons, it is firmly estab-
lished that where made in furtherance of the
objectives of a going conspiracy, such statements

are admissible as to exceptions to the hearsay rule.  The prerequisite to admissibility, that hearsay statements by some conspirators to be admissible against others must be made in furtherance of the conspiracy charged, has been scrupulously observed by the federal courts.  The Government now ask us to expand this narrow exception to the hearsay rule and hold admissible a declaration, not made in furtherance of the alleged criminal transportation conspiracy charged, but made in furtherance of an alleged implied but uncharged conspiracy aimed at preventing detection and punishment.  No federal court case cited by the Government suggest so hospitable a reception to the use of hearsay evidence to convict in conspiracy cases. The Government contention does find support in some but not all of the state court opinions cited in the Government brief.  But in none of them does there appear to be recognition of any such broad exception to the hearsay rule as that here urged.  The rule contended for by the Government could have far-reaching results.  For under this rule pausible arguments could generally be made in conspiracy cases that most out-of-court statements offered in evidence tended to shield co-conspirators.  We are not persuaded to adopt the Government's implicit conspiracy theory which in all criminal conspiracy cases would create automatically a further breach of the general rule against the admission of hearsay evidence."
Id. <u>Krulewitch</u>, 69 S.Ct. at 718-19.

This meritorious issue was not raised in petitioner Carter's post-trial motion or raised on direct appeal pursuant to the Doctrine of Plain Error. <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Petitioner Carter contends that a claim of ineffective assistance of counsel has two components.  First, defendant must show that counsel's performance was deficient in that counsel made errors so serious that he denied defendant his Sixth Amendment right to counsel.  Second, defendant must show that counsel's errors were so serious as to deprive defendant of a fair trial whose results is reliable, thus prejudicing the defendant.
Id. <u>Strickland</u>, 466 U.S. at 687.

Furthermore, to succeed on a claim that appellate counsel rendered ineffective assistance by failing to argue an issue on appeal, a defendant must specifically establish that appellate counsel's failure to raise that issue was objectively unreasonable and that appellate counsel's decision not to raise the issue prejudiced him.  People v. Peeples, 205 Ill.2d 480, 513, 793 N.E.2d 641 (2002).  Appellate counsel is not obligated to brief every issue on appeal, and is not incompetence of counsel to refrain from raising issues which, in his or her judgement, are without merit, unless counsel's appraisal of the merits is patently wrong.  Id. Peeples, 205 Ill.2d at 514; Gray v. Greer, 800 F.2d 644 at 646.

In this case, appellate counsel chose not to raise trial counsel's ineffectiveness for not properly raising the foregoing "conspiracy" issue.  Appellate counsel's appraisal of the merits of this issue was patently wrong because the "on-going conspiracy" issue is meritorious.

Neither res judicata or waiver applies or bar consideration of this issue, it was not decided on direct appeal and pursuant to ineffective assistance of appellate counsel, is not barred from consideration.  As held in People v. Winsett, 153 Ill.2d 335, 606 N.E.2d 1186 (1992) "the doctrine of waiver should not bar the court from considering  an issue where alleged waiver stems from incompetency of counsel on appeal."  Thus, a single error of counsel may constitute ineffective assistance of counsel. Murray v. Carrier, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 391 (1986).

On collateral review of petitioner Carter's petition, the trial court judge's decision that "the conspiracy remained ongoing" is in direct conflict with Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, which rejected the Government's attempt to establish an on-going conspiracy based upon allegations of effort to conceal and/or escape prosecution.  Id. Krulewitch, 69 S.Ct. at 718.

Petitioner Carter contends that his trial, appeal and post-conviction and post-conviction appellate counsels, failed to comply with the dictates of Krulewitch , depriving him of his 6th and 14th Amendment rights as guaranteed by both the U.S. Constitution violating his Due Process, Equal Protection and Right To Counsel.  Had either counsel properly raised the aforegoing issue, there probably would have been a different result.  Strickland v. Washington, supra.

Furthermore, petitioner Carter mounted an argument in his pro se Response To Appellate Counsel's Request for Withdrawal in the Appellate and Supreme Court, including the caselaw, should be considered in reviewing this issue.  In United States v. Cook, 45 F.3d 388 (10th Cir. 1995) the U.S. Court of Appeals held:

> Conversely, an appellate advocate may deliver deficient performance and  prejudice a defendant by omitting a "deadbanger winner" even though counsel may have presented strong but unsuccessful claims on appeal. Page v. United States, 844 F.2d 300, 302 (7th Cir. 1989). Although courts have not defined the term "dead-bang winner", we conclude it is an issue which was obvious from the trial record, see e.g. Matire v. Wainwright , 811 F.2d 1430, 1438 (11th Cir. 1987)(counsel's failure to raise issue which was obvious on the record, and must have leaped out upon even a casual reading of [the] transcript was deficient performance), and one which would have resulted in a reversal on appeal.  By omitting

68

an issue under these circumstances, counsel's
peformance is objectively unreasonable because
the omitted issue is obvious from the trial
record.  Additionally,  the omission prejudices
the defendant because had counsel raised the
issue, the defendant would have obtained a
reversal on appeal, Cook, 45 F.3d at 395.

The Court concluded by stating:

"... although Defendant did not  raise the
conflict of interest issue on direct appeal,
we hold that cause and prejudice present in
this case excuse the omission.  Moreover,
because Defendant has demostrated that the
district court's failure to comply with the
dictates of the Supreme Court's decision in
Holloway deprived him of his Sixth Amendment
right to effective assistance of counsel, we
reverse the judgement of the district court..."
Id. at Cook, 45 F.3d at 395-396.

In addition, the U.S. Supreme Court in Massaro v. U.S.,

_____ U.S. _____, _____ S.Ct. _____ (No. 01-1559)(2003) held that

there is no procedural default for failure to raise an ineffective

assistance of counsel claim on direct appeal.

This issue is ripe for review.  Petitioner Carter's request
for habeas relief should be granted in this regard.

Issue

VI.

Whether The State Trial Court Erred In Exceeding
Its Authority During The Initial Stage Of The
Proceedings Under The Illinois Post-Conviction
Hearing Act, By Partially Dismissing Petitioner
Carter's Post-Conviction Petition On The Basis
Of Untimiliness.  Thus, Failing To Inform
Petitioner Of His Right To Appeal The Trial
Court's Dismissal Was Error.

The Post-Conviction Hearing Act provides a remedy to a criminal defendant who demostrates a substantial violation of his constitutional rights.   725 ILCS 5/122-1 et seq. (1998).   The trial court must conduct an evidentiary hearing when the record or accompaning affidavits support the petitioner's claim that his constitutional rights were violated.   People v. Caballero, 126 Ill.2d 248, 259, 533 N.E.2d 1089 (1989); People v. Dockery, 296 Ill.App.3d 271, 274, 694 N.E.2d 599 (1st Dist. 1998).

For the purpose of determining whether to grant an evidentiary hearing, the court must accept as true all well-pleaded facts in the petition and any accompanying affidavits, and must determine whether the defendant has made a substantial showing a deprivation of a constitutional right at trial.   People v. Morgan, 187 Ill.2d 500, 528, 719 N.E.2d 681 (1999); People v. Coleman, 183 Ill.2d 366, 381, 701 N.E.2d 1063 (1998); Caballero, 126 Ill.2d at 259.

A defendant makes a substantial showing when the allegations in the petition are supported by the trial record or by affidavits accompanying the petition. Morgan, 187 Ill.2d at 528; Coleman, 183 Ill.2d at 381.   If the record presents unrefuted evidence that supports the petition's allegations, no further evidentiary hearing on the matter is necessary and the case should be remanded for a new trial.   People v. Hawkins, 181 Il.2d 41, 62-64, 690 N.E.2d 999 (1998); see also People v. Skinner, 220 Ill.App.3d 479, 486-87, 581 N.E.2d 252 (1st Dist. 1991)(dismissal of post-conviction petition without evidentiary hearing reversed; case remanded for new trial).

Whether a post-conviction petition was improperly dismissed at the second stage of proceedings is a legal question that requires the reviewing court to make its own assessment of the allegations independent of the trial court's findings. <u>Coleman</u>, 183 Ill.2d at 388-89.

The dismissal of a post-conviction petition is appropriate "only when the petition's allegations of fact - liberally construed in favor of the petitioner and in light of the original trial record - fail to make a substantial showing of imprisonment in violation of the State or Federal constitution." Id. at 382.

On August 10, 1998, petitioner Carter filed his combined <u>pro</u> <u>se</u> Petition for Post-Conviction Relief, 725 ILCS 5/122-1 et seq. West 1998) and Petition from Relief of Judgement, pursuant to Section 2-1401 of the Code of Civil Procedure, 735 ILCS 5/2-1401 (West 1998). (CLR 36-165)  On April 23, 1999, the trial court denied petitioner's motion to excuse the late filing of his post-conviction petition under the Act, dismissed said petition as untimely filed; and granted his motion to excuse the late filing of his petition under Section 2-1401. (CLR 253-258).

Post-conviction counsel failed to file a certificate of compliance as mandated by Supreme Court Rule 651(c).  Illinois Supreme Court Rule 651(c) requires that an appointed attorney file a certificate stating that the attorney has consulted with the petitioner to ascertain petitioner's contentions of deprivation of Constitutional right, has examined the trial record, and has made any necessary amendments. 134 Ill.2d R. 651(c). <u>People v. Landers</u>, 215 Il.2d 577, 831 N.E.2d 596 (2005).

71

In <u>Landers</u>, the defendant filed a post-conviction petition along with motion for leave to file a late post-conviction petition. Counsel was appointed to assist the defendant with his post-conviction petition and the case was docketed for second-stage proceedings under the Act.  Appointed counsel ultimately filed an amended motion for leave to file a late post-conviction petition but never filed an amended petition.  The State filed a motion to dismiss and following a hearing, the trial court granted the State's motion. Id. <u>Landers</u>, 215 Ill.2d at 578.

On appeal, the defendant argued that he was denied reasonable assistance of counsel where appointed counsel failed to comply with Supreme Court Rule 651(c) and that the untimely filing of his petition was not due to the defendant's culpable negligence. The Appellate Court held that the requirement of Rule 651(c) <u>did</u> <u>not</u> apply because counsel had no obligation to consult with the defendant unless the untimeliness of the petition was overcome by a showing of a lack of culpable negligence.

However, the Illinois Supreme Court in <u>Landers</u> reached a different conclusion.  Specifically, the Court found that the defendant's appointed counsel was required to comply with Rule 651(c) to assure that the defendant received the reasonable assistance of counsel mandated by the Act, despite the untimeliness of the petition. Id. <u>Landers</u>, 215 Ill.2d at 586. The Court noted that in the event the defendant demostrates that he suffered a deprivation of constitutional rights, a dutiful prosecutor may choose to waive the timeliness requirement.  That counsel must comply with Rule 651(c) and present <u>all</u> of defendant's substantial claims to give the State the oppurtunity to determine whether to waive the statute of limitations affirmative defense.

In this case, petitioner Carter's first appointed post-
conviction counsel filed on March 15, 1999, a Rule 651(c) certifi-
cate entitled "Limited to the question of timeliness of petition
filing". (CLR 259-262)  In the certificate, counsel stated that
he consulted with petitioner Carter about the substantive claims
"to a lesser degree" and that his consultation in this regard was
"insufficient at this stage in the proceedings to make a determina-
tion as to the amendment or presenting upon the existing pro se
petition."  Thereafter, the post-conviction petition was dismissed
as untimely, and the Section 2-1401 petition proceeded on the
merits.

Petitioner Carter contends that he was not admonished by
the post-conviction court or appointed counsel that he could
appeal the dismissal of his pro se post-conviction petition. In
People v. Pearson, 216 Ill.2d 58, 833 N.E.2d 827 (2005), the
Illiniois Supreme Court set requirements for treating a pro se
petition for relief from judgement pursuant to 735 ILCS 5/2-1401
as a successive petition (in this instant case, petition for
post-conviction relief) which consisted of the following:

The trial court must:

(1)  notify the defendant of its intent;

(2)  warn the defendant that the recharacterization
     means that the filing is subject to the
     restrictions on successive petitions, and

(3)  provide the defendant with an oppurtunity
     to withdraw or amend the pleading so that it
     contains all factors and arguments appropriate
     to a successive petition.

Id. Pearson, 833 N.E.2d at 832.

73

Under Pearson, a defendant can amend the pro se filing to include allegations of cause and prejudice for failing to raise those claims in his or her prior post-conviction petition. In this instance, petitioner Carter's post-conviction counsel did not attempt to show that the late filing of the petition was not due to petitioner's culpable negligence as required by the Act. Yet, counsel argued "culpable negligence" in the Section 2-1401 matter. Post-conviction counsel did not file a notice of appeal as required by Supreme Court Rules 651(d) and 606(b).

There is no constitutional right to the effective assistance of counsel in post-conviction proceedings. Pennsylvania v. Finley A petitioner is entitled to a reasonable level of post-conviction representation. People v. Davis, 156 Ill.2d 149, 162, 619 N.E.2d 750 (1993).

The record clearly shows that post-conviction counsel advised petitioner Carter in a written letter [see PFL, exh.#1] that the "untimeliness issue" was not appealable. Notwithstanding the fact, that post-conviction counsel failed to file a notice of appeal preserving this valid issue. U.S. v. Peak, 992 F.2d 39 (4th Cir. 1992); U.S. v. NAGIB, 56 F.3d 798 (7th Cir. 1995).

Issue

VII

Whether The State Trial Court Erred In Refusing To Provide Petitioner Carter With An Evidentiary Hearing On His Claim Of The State's Knowing Use Of Perjured Testimony.

74

Petitioner Carter contends that the State's knowingly use of perjured testimony and <u>Brady</u>[1] violation deprived him of a fair and impartial trial.  The trial and appellate court's decision is contrary to established U.S. Supreme Court precedents, violating his due process right as guaranteed by the 5th & 14th Amendments of U.S. Constitution and Article 1, Section 2 and 8 of the Illinois Constitution.

On August 10, 1998, petitioner Carter filed his combined <u>pro</u> <u>se</u> Petition for Post-Conviction Relief, 725 ILCS 5/122-1 et seq. (West 1998) and Petition from Relief of Judgement, pursuant to Section 2-1401 of the Code of Civil Procedure, 735 ILCS 5/2-1401 (West 1998). (CLR 36-165)  On April 23, 1999, the trial court denied petitioner's motion to excuse the late filing of his post-conviction petition under the Act, dismissed said petition as untimely filed; and granted his petitioner's motion to excuse the late filing of his petition under Section 2-1401, instead. (CLR 253-258).

Post-conviction counsel failed to comply with Illinois Supreme Court Rule 651(c), which requires that an appointed counsel file a certificate stating that he has consulted with the petitioner to ascertain petitioner's contentions of deprivation of Constitutional rights, has examined the record, and has made any necessary amendments. 134 Ill.2d R. 651(c). <u>People v. Landers,</u> 215 Ill.2d 577, 831 N.E.2d 596 (2005).

---

1.  Petitioner's <u>Brady</u> violation is contained in Issue IX. To avoid duplication, Issue IX has been incorporated in the above issue.

Although, the initial post-conviction petition was dismissed, the trial court allowed the Section 2-1401 petition to proceed. The petition contained information of petitioner Carter's recent discovery of pertinent evidence in the case of both the State's knowing use of perjured testimony, Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217; and the failure to disclose Brady materials. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. Attached and made part of petitioner's petition was various affidavits and letters as proscribed by 725 ILCS 5/122-2, which states "the petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached."

Petitioner Carter contends that he was denied a fair and impartial trial, in that the State's agent, Harry Martin perjured himself, prior to trial and during trial in this cause. Thus, receiving benefits from State officials that were never disclosed to petitioner. That petitioner Carter discovered this mishap which prompted him to file a combined post-conviction petition and petition for relief from judgement. (CLR 36-165).

The use of perjured testimony to obtain a criminal conviction violates due process of law. People v. Olinger, 176 Ill.2d 326, 345, 680 N.E.2d 321, 223 Ill.Dec. 588 (1997). Even where the prosecution did not solicit false testimony, but allows it to go uncorrected when it appears, due process is violated. Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). In Brady v. Maryland 373 U.S. 83, S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court announced that "suppression by the

prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good or bad faith of the prosecution." Id. <u>Brady</u>, 373 U.S. at 87.    Impeachment evidence merits the same constitutional treatment as exculpatory evidence. <u>Giglio v. United States</u>, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1970).

The following incidents took place in this cause:

Prior to trial, petitioner Carter filed a motion to suppress the wiretap evidence and  a hearing was held to determine the admissibility of the tape recorded conversations bewteen petitioner and State agent Harry Martin.  At this hearing, petitioner argued that he should have been afforded <u>Miranda</u> warnings prior to any discussion with Harry Martin, being that the conversations consti- tuted a "custodial interrogation".  The trial court agreed and granted petitioner's motion to suppress the taped recording evidence.  The State initiated an interlocutory appeal regarding this matter in <u>People v. Johnson</u>, 555 N.E.2d 412 (4th Dist. (1990).  However, the Illinois Appellate Court reversed the trial court's suppression order.

Thereafter, prior to the start of trial, several hearings were held in which James Wasson, an inspector with the Criminal Division of the Illinois State Police, presented his evidence disposition with regard to the set-up of electronic surveilance in the case.  The Court ruled that the prosecution had met it's burden of showing proper foundation, and ruled that the overhear was issued pursuant to probable cause and that if the tape was offered into evidence, it would be admissible. (Vol. IX, R. 14).

State agent Harry Martin was recruited by the Illinois Department of Corrections officials, taken from one penal institution to another, in a ploy to obtain information from defendants Carter, Easley and Johnson, pertaining to the murder of Supt. Taylor at the Pontiac Correctional Center. Prior to his visit to the prisons to see the defendants, State agent Harry Martin and his wife contacted each defendant, requesting them to put them on their prison visiting list, as required. They later visited each defendant under the guise that he (Harry Martin) was no longer incarcerated, was released on appeal bond and the defendants were reporting to him to relay information to other gang members in Chicago, and specifically, the information gathered was to be relayed to attorney Shel Banister, whom he alleged had been hired to represent petitioner Carter and co-defendants. When in fact, the purpose of this blatant fabrication was to obtain viable information from each defendant, under the guise that it was confidential information.

The key witness against petitioner Carter was inmate/agent Harry Martin. Harry Martin, who at the time of trial was serving a sentence imposed by the DuPage and Cook Counties perspectively. He testified that he had a college degree in accounting and bookkeeping. In 1987, he was a member of the Black Gangster Disciples. Mr. Martin (not an Gang Intelligence Officer) was permitted to vividly describe the organization of the gang. Larry Hoover was the chairman, and below him was the board of directors consisting of institutional coordinator, assistant institution coordinator, gallery coordinator, and various other subordinate departmental heads. (Vol. XIV, R. 18-19).

The security division of the gang is called the UFO, the United
Front of the Organization. According to Martin, this group does
the assassinations, protects the board members or any hierarchy
of the organization, guards the leadership and disciplines any
organization members that may get out of line. (Vol. XIV, R. 19-
20)  The Black Gangster Disciples operate in and out of the
prison system. (Vol. XIV, R.20)  Mr. Martin's former position was
that of financial adviser to the board. (Vol.XIV, R.20)  He
stated that the majority of his education was financed through
the gang. (vol. XIV, R.21).

Martin alleged that in May of 1987, a conspiracy was put
together to assassinate him. That Martin received word of this
threat from the warden at Stateville. Martin initially did not
believe the warden, so he asked a few board members, whom he
believed were allies. They confirmed the warden's information,
and Martin then asked for protection in return for cooperating
with the law enforcement officials. (Vol. XIV, R. 22-23)

Martin was transferred to Dixon Correctional Center and
then to Pontiac Correctional Center in the second week of August
in 1987. (Vol. XIV, R. 24-25)  While at Pontiac, Martin met with
some gang members, including Corwyn Brown, who was known as
"Ketchup". Brown was the assistant institutional coordinator.
(Vol. XIV, R. 26-27)  While at Pontiac, Martin saw Roosevelt
Lucas, and stated that he provided security for Harry Martin and
Corwyn Brown. (Vol. XIV, 28-29)

In September of 1987, Martin was incarcerated at the Logan Correc-
tional Center.  He was approached  by Department of Corrections
investigators regarding the murder of superintendent Taylor.
They asked Martin to assist them in investigating various Black
Gangster Disciples members whom IDOC believed were involved in
the murder. (Vol. XIV, R.44-45)  Martin insisted that he had not
received anything from the Department of Corrections in return
for his cooperation.  He said that he decide to wear a wire and
visit various inmates to aid in the investigation. (Vol. XIV,
R.46)  On October 7, 1987, while wearing a wire, he visited
petitioner Carter.

        The record shows complete awareness of the state and their
agents of informant Harry Martin's recruitment by IDOC, taken
from one penal institution to another, in a ploy to obtain inform-
ation from defendants Easley, Johnson and petitioner Carter,
pertaining to the murder of superintendent Taylor at the Pontiac
Correctional Center.  Their deceptive scheme held no limits,
Harry Martin's wife (a civilian) was included in this elaborate
ploy.  Prior to his visit to see the defendants, Harry Martin had
his wife contact each defendant to further contribute to the
IDOC's scheme by telling each defendant that her husband was
released on appeal bond and was being sent to see each defendant,
requesting that their names be included on each defendant's
visiting list to enable her and Harry Martin to visit them.
Harry Martin visited each defendant under the guise that he was
no longer incarcerated and the defendants were reporting to him
to communicate information to other gang members in Chicago, and

information gathered was to be relayed to attorney Shel Bannister,
whom State agent Martin alleged had been retained to represent
petitioner Carter and co-defendants.  When in fact, the purpose
of this blantant elaboration was to obtain prejudicial information
from each defendant, under the guise of them believing that it
would be confidential information. See Judge's Docket Sheet #9,
(CLR 9).

Furthermore, during trial the following colloquy took place
in pertinent part:

THE COURT:     The third issue there is an agreement by the State
               that they would provide to the Court, and then the
               Court would do an in camera inspection of master
               files relating to inmate witnesses who the prosecution
               would indicate they would be calling.  The defense
               said as long as we have that information the day
               before ah, trial, so we could look at it ah, then
               that was acceptable procedure.

               Could anyone assume there was some kind of quid pro
               quo or deal struck as to how inmates would be
               treated if they cooperated with the State as far as
               administrative good time, information, and other
               things, and that information is contained in the
               master files and I think the defense has a right to
               see that plus information concerning gang affiliations
               of witnesses and other matters.

                    [Volume 13, R. 9-10]   [CLR 344]


MR. CASSON:    You want to address the issue now with regard to
               Mr. Martin?

THE COURT:     Mr. Spiller... was out on the street by the fall of
               89.  That as far as Mr. Martin is concerned, Mr.
               Martin has not been ah, in DOC custody since roughly
               that time.  He has been in Federal custody and DOC
               does not have, does not have material on him since
               that time.  Ah, that would have been probably a
               year, a year or so, I am not sure how long after I
               had made the copies of the stuff that appeared to
               me to be germane from the master file.

               [The Court apparently referring, at page 15, to
               material to be given to defendant's counsel regard-
               ing Martin.]

THE COURT:    The material I look for, and I would indicate for
the record when I do an in camera, I also look for
any special relationship bewteen witnesses and
correctional staff before or after the event in
question.   Ah, and ah, I also look for any indication
I try and pull their disciplinary record in the
institution ah, their, ah, rap sheet, any copies of
charges or calculation of release dates or anything
else.   So that is the type of material that I
pulled from Mr. Martin and Mr. Spiller's files.

If there is material, Mr. Thomas, in looking through
there, I realize there was an in camera, but if you
see some kind of gap tell me and I can do some
further checking.

MR. CASSON:    With regard to Mr. Martin, I know the Court indicated
some concern over the fact that Mr. Martin's inform-
ation in his master file was terminated in the
month of September of 87, and as far as information
pertaining to any deals or agreements or anything
that Mr. Martin has received in return for his
cooperation in this case, then we are prepared to
ah, make a record on that through ah, former Deputy
Director Gerald Long and Deputy Director Watkins
today, if the Court wants us to?

THE COURT:    Okay, I want a record on what, if anything, Mr.
Martin has been promised, information as to his
treatment, at least in the Department of Corrections
ah, other information which would indicate, or
could possibly influence any interest, bias, or
motive he might have in testifying.   I understand
that DOC may not have him.   I just understand there
may be somebody out there who has knowledge as to
how Mr. Martin has been handled and ah, that I need
to know.

[Volume 13, R. 13-20]  [CLR 344-345]

Direct examination by Asst. State's Attorney Casson of Lt.

Gerald O. Long, Illinois State Police; previously assigned as

Deputy Director for the Department of Corrections, 1986 to 1990.

Q:    During the month of September 1987, did you become
familiar with an individual by the name of Harry Martin?

A:    Yes, I did.

Q:    And Mr. Martin was an inmate in the Department of
Corrections at the time, was he not?

A:    Yes, he was.

.   .   .   .   .   .

81

Q:    And did you subsequently have occassion to meet with
      Mr. Martin ah, during the month of September of 1987?

A:    Yes, I did.

Q:    Would that meeting have been after the murder of
      Superintendent Robert Taylor?

A:    Yes, it was.

Q:    And where did that take place?

A:    That meeting, as I recall, was in Logan Correctional
      Center.

      .  .  .  .  .  .

Q:    During that meeting could you tell the Court what
      transpired during the meeting?

A:    During that particular meeting which was followed by
      a phone call which precipitated that meeting, Harry
      Martin indicated that he was willing, if it could be
      accomplished to wear a listening device, or a
      recording device into one of the institutions to
      have conversations with what we believed participants
      in the murder of Superintendent taylor.

Q:    And he did subsequently do that?

A:    Yes, he did.

Q:    At that meeting, did you make any promises to Mr.
      Martin in order to obtain his cooperation with
      respect to this case?

A:    Made no promises.  Only thing I gave him was assurance
      that we would do all we could to protect both he and
      his family if it became an object.

Q:    After that meeting, did Mr. Martin continue to
      remain in the Illinois Department of Corrections?

A:    Yes, he did.

Q:    For how long?

A:    He still is.

Q:    Was he maintained in the Department of Corrections
      facility after the meeting?

A:    No, he wasn't.

Q:    For a period of time, was he?

A:    For a period of time after the meeting, yes, he was?

82

Q:    Approximately how long?

A:    I forget the exact date that we moved him ah, to a
      holding facility other than the state facility.    It
      would probably have been within a month.

Q:    Since the time of his removal from the Department of
      Corrections facility, to your knowledge, has he
      maintained, has he been housed in a facility outside
      the Department of Corrections?

A:    Yes, he has.

Q:    And bewteen the time he was moved and the time you
      left as Deputy Director, did you monitor where he
      was being housed?

A:    Yes, I did.

Q:    During the period of time bewteen September of 87,
      when you had your meeting with regarding the Taylor
      case, and the time you left your position as Deputy
      Director, did you, at any time, make any promises to
      help Mr.Martin in anyway in return for his cooperation
      in this case?

A:    No sir.

Q:    To your knowledge has anyone from the Illinois Depart-
      ment of Corrections made any agreement or any arrange-
      ment to help Mr. Martin in anyway in return for his
      cooperation in this case?

A:    Not that I am aware of.

Q:    That would be other than promising to do your best
      to keep he and his family safe, is that correct?

A:    That is the only agreement we made was to assure
      insofar as humanly possible the safety of himself,
      his wife and his child.

Q:    To your knowledge has Mr. Martin received any benefits
      any sentence reduction, any sentence cut, any restora-
      tion of good time, anything of that nature in return
      for his cooperation in testifying in the Taylor case?

A:    Not that I am aware of.

Cross-examination by defense counsel Thomas:

Q:    Mr. Long, you are saying that you didn't offer Mr.
      Martin anything?

A:    No sir.  I did not offer Mr. Martin anything.

Q:    Nobody gave him any good time?

A:    Not that I am aware of. I didn't.

Q:    The question is: did he get any good time? Is
      there good time that he might have got that you
      aren't aware of?

A:    Any and all things are possible, but not to my know-
      ledge. He  and I had an agreement specifically that
      he, nor any of the investigators, would discuss
      anything that would benefit him insofar as good time
      sentence  reduction during any of the time he was
      cooperating with us, either he or his attorney,
      Mr. Don Bernadi, who was sitting State's Attorney
      for Livingston County.

Q:    Were you privy to those conversations?

A:    No, I was not.

Q:    So, you don't know if anybody has offered him anything
      or not, is that what you are telling me?

A:    No, I know that he was not offered anything because
      Mr. Bernardi didn't have a meeting with him during
      the course of these trials.

Q:    He's still cooperating, isn't that correct?

A:    I would assume so. I am no longer a part of that
      investigation.

. . . . . .

Examination by the Court:

Q:    Let me clarify in my mind. You say are unaware of
      any agreement, and I would expand, it's not only to
      reduction of sentence through good time and other
      devices, but special treatment ah, by the Department
      of Corrections other than putting him in protective
      status, any special treatment Mr. Martin was accorded
      by the Department other than protective custody?

A:    There has been nothing other than protection accorded
      him by the Department of Corrections.

Q:    Could any good time credit, or reduction of sentence
      have been possible during the time that you were
      Deputy Director without that going through you in
      the chain of command?

A:    Not that I am aware of because at that point in time
      any of the mechanics of good time is that it is
      applied first through the institutional counselor,

84

who then forward that up through the assistant
warden of operations, or prehaps up to the warden.
The warden then, in fact, makes the recommendation
as to the application of good time.

Q:    In your conversations with Mr. Martin then what benefit,
if any, would he derive in his cooperation?

A:    The benefit that he would be deriving from the mere
fact that he was being protected insofar as his life
and his family and his child, because one of his
main motivators, as far as motivation goes, in
cooperating with us in any investigation, whether it
be information and intelligence, or prosecutorial
sence [sic] in Court, was the fact that the gang,
that being the BGD, had made attempts to murder him
while he was at Stateville in segregation.  When
that attempt was brought to his attention, through
the warden, then he began cooperating in other areas
prior to the Taylor homocide [sic].  So, we had
begun protecting him on an informational basis prior
to Superintendent Taylor's murder.

Continued cross-examination by defense counsel Thomas.

Q:    How much time is he serving?

A:    How much time is he serving?

Q:    Yeah.

A:    I haven't seen his master file in quite some time
and I forgot.  I think his original sentence, if I
am not mistaken, was like a 30 year sentence for
armed robbery.

Q:    He was at Stateville and he started cooperating with
you earlier?

A:    Yes, that is a fact.

.  .  .  .  .  .

Q:    And ah, he was transferred to a federal correction
facility, is that right?

MR. CASSON:    I am going to object as far as where he is at.

MR. THOMAS:    I asked if he was transferred to a federal system?

THE COURT:    The objection is overruled.  I think in general
context who is responsible for Mr. Martin's welfare
this witness can answer, if he knows.

MR. THOMAS:    He is, right?

A:    I cannot tell you where he is because I do not know.
.  .  .  .  .  .

85

Q:      He is no longer in the state system, is that correct?

A:      That's true.

Q:      He is in another system, right?

A:      He is serving time, but he is housed in other - -

. . . . . .

MR. THOMAS:    Mr. Long, he is no longer in the State of Illinois
               Correction system, is that correct?

A:      He is serving state time and he is not being housed
        in a penal institution.

Q:      Mr. Long, he is no longer in the State corrections
        system, is that correct?

MR. CASSON:    Judge, I think it has been asked and answered if he
               knows where it is at.

THE COURT:    No, no.  My understanding of the answer is he is serving
              his time, but it is not in a State of Illinois facility.

A:      Exactly.

MR. THOMAS:    But DOC is still rsponsible for him?

A:      They would be responsible for him.

. . . . . .

Q.      Mr. Long placed him wherever he is, isn't that correct?

A:      That is not correct.

Q:      No?  How did he get there then?

A:      I don't know, sir.  I wasn't there when he went there.

Q:      He made -- Somebody in the State system decided he
        should be transferred?

A:      No, that isn't true either.

Q:      Well, how did he get to where he is?

A:      I don't know.  I wasn't working there at the time.

Q:      You don't know what anybody told him?

A:      No, sir.

. . . . . .

86

Q:    And they could put him in the State system too,
      couldn't they?

A:    I don't believe that is possible now though.

Q:    You don't?  Why isn't that possible?

A:    Because now I believe that he is ah, even though he
      serving Illinois time for a crime committed in
      Illinois, he has since been transferred over for
      safekeeping and/or housing in the Federal Government.
      And I believe that if anything were to occur as far
      as to where he is going to be housed in institutions
      would be something worked out between the Director
      now currently at the Department of Corrections,
      and/or his representative, Mr. Watkins, and the
      Government.

Q:    Mr. Watkins is his lawyer?

A:    No, Mr. Watkins is the Deputy Director which came
      in after I left.

Q:    So, Mr. Watkins and the Director could tell the
      Federal Government we want him back in the State
      couldn't they?

A:    I don't know what the Director could tell him.

                    [Volume 13, R. 21-37] [CLR 345-353]

MR. THOMAS:    Judge, I would move that Mr. Long's testimony be
               stricken.  He has no information regarding what
               could, would, should, or has been done in terms of
               Mr. Martin and really has no relevance to anything
               that we are talking about here.  He is talking
               about what he thinks he knows and what he may have
               been party to.  It seems to me that either Mr.
               Bernardi, or Mr. Brown, or somebody should just
               make a report and say that we have offered this man
               something, or we haven't, or we are holding it in
               abeyance.  Quit wasting time.

THE COURT:    Let's hear from Deputy Director Watkins.  We need
              to play this thing out at least as far as what the
              top officials of DOC are aware of.

       Direct examination of David C. Watkins by Asst. State's
       Attorney Casson:

Q:    State your name please?

A:    David C. Watkins.

Q:    What is your occupation, Mr. Watkins?

                              87

A:      Deputy Director, Illinois Department of Corrections
        for Inspections and Audit.

Q:      How long have you been employed in that capacity?

A:      Since March 15th, 1990.

. . . . . .

Q:      During the period of time that you have been Deputy
        Director with the Department of Corrections have
        you made any promises to Mr. Martin, or any represen-
        tative of Mr. Martin in return for his testimony in
        the cases involving the murder of Superintendent
        Robert Taylor?

A:      I have not.

Q:      Have you made any agreements, or any arrangements
        with Mr. Martin, or any of his representatives as
        far as any sentence cut, good time restoration, or
        made any arrangements for Mr. Martin to be accorded
        special treatment in return for his cooperation of
        these cases?

A:      I have not.

Q:      To your knowledge has anyone in the Department of
        Corrections made any such arrangements, or agreements?

A:      Since I have been Deputy Director, nobody has made
        any arrangements, or agreements for any special
        time for Harry Martin.

                [Volume 13, R. 37-40]  [CLR 353-354]

    Following the testimony of Deputy Director Watkins, the

following colloquy occurred:

MR. CASSON:  I would like to supplement the record on the Livingston
             County State's Attorney's Office and any agreements
             with Mr. Martin.  I can represent to the Court the
             Livingston County State's Attorney's Office has
             made no agreements or arrangements with Mr. Martin,
             or anyone else concerning any sentence reduction,
             any recommendation of good time restoration, or any
             recommendation Mr. Martin be accorded any special
             treatment in return for his testifying in this case
             or any other case involving the death of Superinten-
             dent Taylor.

THE COURT:   Do you know whether anyone else has?

MR. CASSON:  In our office?

THE COURT:   No, no, no.

MR. CASSON:     Oh, I have no knowledge that anyone has made any
                such agreements or arrangements.

THE COURT:      Does Mr. Martin have any charges presently pending
                against him?  Is the State aware?

MR. WATKINS:    You are asking me, your Honor?

THE COURT:      I am asking anybody here who knows if Harry Martin
                has any charges that anybody is sitting on that
                would provide some leverage for cooperation?

MR. CASSON:     Not that I am aware of.

MR. WATKINS:    He has no outstanding charges, your Honor.

THE COURT:      Have any charges been favorably - - Well, has there
                been any disposition of any charges that would have
                been outstanding against Mr. Martin from September
                3rd of 1987, up to the present.

MR. CASSON:     Judge, it is my understanding there were no outstand-
                ing charges pending against Mr. Martin.

THE COURT:      Mr.Martin had a lot of potential.  He was a defendant,
                although I don't know if Indiana pursued him, it
                would have been before this incident, I don't know
                if there was any carry-over, where allegedly he was
                forging State tax refunds for the State of Indiana
                out of his cell in Stateville in cooperation with a
                family member and I don't know if that carried
                through.  It didn't appear from his file that he
                had been prosecuted.  I think they Indicted him in
                Indiana.  It didn't appear that they pursued it.  I
                don't know if that terminated before 87' or after
                this.  Ah, okay.

                        [CLR 354-355]

. . . . . .

     Lt. Gerald O. Long, Illinois State Police, previously
assigned as Deputy Director for the Department of Corrections
1986-1990.

        End of Direct Examination by Assistant State's Attorney Casson:

        Q:     What agreements did you make with Mr. Carter,
               excuse me, Mr. Martin during the month of September,
               87, or at any time in return for his cooperation
               with your investigation in this case?

        A:     Well, the only assurance given to him, no promises,
               the only assurance we would provide to him for his
               personal security and/or his family, if it became
               necessary.

        Q:     Did you ever agree to reduce any sentence that he
               was serving, or restore any of his good time, or
               make him any promises of any special treatment in

                                89

return for his cooperation?

A:  No, sir.

Q:  Was he promised anything by you at any time other than that you would give your best in your position to insure he and his family safety?

A:  No, sir.  Nothing other than that.

Cross-examination by defense counsel Thomas:

Q:  Mr. Long, how much time was Mr. Martin doing?

MR. CASSON:  Judge, I am going to object to that.

THE COURT:  Overruled.  If he knows.

A:  I don't exactly.  I think his original sentence was somewhere in the neighborhood of 30 years, but I am not sure.

MR. THOMAS:  Do you know how much time he has left to do?

A:  No, sir, not without authority I don't.

Q:  Do you know when he came into the penitentiary system?

A:  I can't recall.  I think he was about 18 years old, but I am not really certain of it.

[CLR 355-357]

Cross-examination by defense counsel Thomas  [Harry Martin]

Q:  Mr. Martin, how much time do you have left on your sentence?

A:  Ten years.

Q:  And ah, you stated that ah, you hadn't been promised anything, is that right?

A:  That's correct.

Q:  And you stated that you didn't want anything?

A:  No, that is not what I stated.

Q:  Did you ask for something?

A:  No, I hadn't.

Q:  And so, you just cooperating here today out of the

90

goodness of your heart?

A:  No, sir.

Q:  Well, what are you getting back in return for your
    cooperation?

A:  Nothing, other than protection.

Q:  You say that the organization that you were so dear
    to and sent you to school is trying to kill you, is
    that right?

A:  Exactly.

Q:  So, you are in effect seeking protection from the
    organization, is that right?

A:  From the Department of Corrections, the State of
    Illinois, the Federal Government.

Q:  All of these people want to kill you too?

A:  No, they are protecting me.

Q:  From the organization?

A:  Exactly.

[CLR 363]

Forty-three years ago, the U.S. Supreme Court in <u>Brady v.</u>
<u>Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), held

that due process requires the prosecution to provide the defense

upon request any evidence favorable to the accused which is

material, either to guilt, or to punishment.  <u>Brady</u>, 83 S.Ct at

1197.  Over thirty-four years ago, in <u>Giglio v. United States</u>,

405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the U.S.

Supreme Court held that "the government's <u>Brady</u> obligation to

provide evidence to the defense encompasses evidence affecting a

government's witness' credibility.  <u>Giglio</u>, 405 U.S. at 154.

91

The Supreme Court in <u>Giglio</u> also stated that the <u>Brady</u> obligation extended beyond the mere knowledge of trial prosecutor. In <u>Giglio</u>, a prosecutor, other than the one who tried the case, had made a promise of immunity to the key government witness. The promise of immunity was not disclosed to Giglio's counsel and he was convicted. The Supreme Court reversed the conviction. In it's opinion in <u>Giglio</u>, the Supreme Court imposed upon the govern-ment the obligation to disclose impeaching information of which government personnel are aware, even though the information is not known to the prosecutors personally involved in the trial of the case. The Supreme Court stated:

> "To the extent this place a burden on the
> large prosecution offices, procedures,
> and regulations can be established to
> carry that burden and to insure commu-
> nication of all relevant information on
> each case to every lawyer who deals
> with it".
> Id. <u>Giglio</u>, 405 U.S. at 154.

The rule compelling the government disclosure discussed by the Supreme Court in <u>Brady</u> and <u>Giglio</u> opinions is based upon the constitutional doctrine requiring due process of law in the administration of criminal justice. To prove a constitutional due process violation resulting from the government's failure to make a proper disclosure under <u>Brady</u>, a defendant must establish three elements: (1) that the prosecution suppressed the evidence; (2) that such evidence was favorable to the defense; and (3) that the suppressed evidence was material. See <u>Moore v. Illinois</u>, 408 U.S. 786, 794-95, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); <u>United States v. Jackson</u>, 780 F.2d 1305, 1308 (7th Cir. 1986).

In this case, the State's prosecutors, Gerald O. Long, then Deputy Director (Inspectors and Audit) of the IDOC 1986-1990, and his predecessor, David C. Watkins, March 15, 1991 (held this position during the trial in this cause), and informant-witness Harry Martin, each individually testified that... Harry Martin was provided no consideration whatsoever, other than protection for him and his family. In addition, there were specific representations to the trial court and to defense counsel, and in testimony at trial that..."there was no deals, no agreements extended to Harry Martin, other than protection". [TR 344-366].

Unbeknownst to petitioner Carter or defense counsel, approximately one month before testifying at the trial in this cause, informant-witness Harry Martin appeared pro se before the Circuit Court in DuPage County, Case No. 81 CF-325. The State was represented by Assisant State's Attorney Stock of DuPage County, at which time Harry Martin's thirty-five (35) year sentence in that case imposed on October 13, 1981, was vacated and reduced to twenty-one (21) years with all time considered served. On the State's motion, the file in that cause was impounded. Attached hereto and marked as appendix is DuPage County documents pertaining to the above.

On October 1, 1991, Harry Martin was writted to the Circuit Court of the 18th Judicial Circuit, DuPage County, Illinois and was re-sentenced to "time considered served" on one (1) of the sentences being served during this occurance. On November 18, 1991 (1½ month later) Harry Martin appeared at the trial in this cause and stated the following:

93

Pages 44-46

MR. BROWN:      Who was the first investigator to talk to you when
                you got to Logan?

HARRY MARTIN:   Russ Nelson.

Q:      And did that conversation lead to ah, a conversation
        with another investigator?

A:      Yes.

Q:      And who would that investigator have been?

A:      Ah, Jerry Donovan, Doug Read a whole sluc of investi-
        gators.

Q:      Did you ultimately speak, as a result of those
        investigators, with Jerry Long?

A:      Yes.

Q:      And what the nature of the conversation with Mr.
        Long?

A:      That there was a - - there was superintendent in
        Pontiac that was murdered and they suspected that
        BOS was involved in the murder and what, if any-
        thing, I could do to assist in their efforts.

Q:      And did you ultimately agree to assist in their efforts?

A:      Yes.

* * *

Q:      For this cooperation were you promised anything
        from the Department of Corrections?

A:      No.

Q:      From the course of the investigation and up until
        today have you been promised anything from the
        Illinois Departement of Corrections?

A:      No.

Q:      <u>Have you received anything from the Illinois Depart-
        ment of Corrections, or anyone else, with respect
        to cooperating in this investigation of Taylor's
        murder</u>?

A:      No.

                                    [emphasis supplied]
                [see appendix]

94

The law is clear that partiality or bias of a witness is always relevant in discrediting a witness and affecting the weight of his testimony.  Davis v. Alabama (1974) 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347.

In this instance, State agent, Harry Martin credibility went unchallenged, when the State requested an order authorizing use of an eavesdropping device for the sole purposes of recording conversations bewteen Martin and various inmates of the Department of Corrections, including petitioner Carter.  Harry Martin's testimony at trial was crucial to the State's presentation of their case; combined with the fact that the prosecution and State officials openly declared that Harry Martin "received no agreements of any kind".  When in fact, one month prior to testifying in this case, Harry Martin sentence that he was serving for DuPage County was reduced to "time served" violating petitioner Carter's due process rights guaranteed by both the U.S. Constitution and Illinois Constitution.

Petitioner Carter did not receive a fair and impartial trial in this cause.  Subsequently, he was found guilty and sentence to a term of natural life imprisonment.  Direct appeal was taken, the Appellate Court affirmed his conviction and he sought review from the Illinois Supreme Court, which was denied.

in 1997, petitioner Carter obtain an affidavit from Harry Martin stating that he was a paid witness for the State, that prior to his testifying at the trial in this cause, he had never cooperated with the State, that prior to his testifying, he was given furloughs to be with his wife and unlimited access to phone calls, etc.  In addition to Martin's affidavit, petitioner Carter

95

obtained an affidavit from inmate Corwyn Brown. . . . . which
clearly showed that petitioner Carter did not give an order that
resulted in the death of Superientendent Taylor. SEE APPENDIX.

In 1998, petitioner Carter filed his pro se Petition for
Post-Conviction Relief pursuant to 725 ILCS 5/122.1 et seq. and
combined Petition for Relief from Judgement pursuant to 735 ILCS
5/2-1401. See CLR 36-165. The trial court denied petitioner
Carter's motion to excuse late filing with respect to his pro se
post-conviction petition, but granted the motion to excuse late
filing with respect to his pro se Section 2-1401 petition. See
CLR 253-258. Notwithstanding the fact that post-conviction counsel
failed to file  a timely Notice of Appeal regarding the dismissal
of petitioner's post-conviction petition, as required.

On October 18, 2001, during a hearing on the State's motion
to reconsider an order entered on April 23, 1999 finding that a
post-conviction petition had been untimely pursued by petitioner
Carter, but finding that petitioner fit within the requirements
of section 2-1401, the following court colloquy stated, in pertinent
part;            Pages 11-18

THE COURT;    Did Deputy Long lie.

MS. HOFFMAN;  Well, at this point, what we have to demostrate
              that is that Mr. Martin says he was given X, Y, and
              Z in return for his testimony in this case.

THE COURT;    We don't have anything from Deputy Long or from
              DOC or from the State saying, you're not disputing
              that a month ahead of this trial, he got reduced to
              time served in DuPage.

MS. HOFFMAN;  I'm disputing that.  And I would draw your attention
              to, and I'm looking now at things that were appended
              to Mr. Carter's original petition, 2-1401 petition,
              but I believe they're also part of Mr. Luckman's

96

review of the record, and these are, this is when
Mr. Martin is discussing his DuPage County case,
and he says, - - We can talk about the page numbers,
it's a record page number 4351, it's attached to
Mr. Carter's original petition as Exhibit --

THE COURT;    Let me find that since we're looking at it.

MS. HOFFMAN;   This is a filing of August of '98; so we're not
talking --

THE COURT;    August of '98.  I have that.  And I've got the
affidavit  of Harry Martin after it.  We've got
letters from Aviva Futorian. ·

MS. HOFFMAN;   There's a motion -- This is an appendices to that
filing.  He filed that --

MR. LAWRENCE   To the actual petition.

MS. HOFFMAN;   Right, to the actual petition.  And it says, appendices
exhibits, exhibits of pay money and deals and State
witness, Harry Martin, the key State witness, Harry
Martin.

THE COURT;    I'm not -- Oh, it's on a transcript.

MS. HOFFMAN;   Yes, And the exhibits are numbered 45- something,

THE COURT;    Yeah.

MS. HOFFMAN;   It's 45-10 is what --

THE COURT;    I've got 45-10.

MS. HOFFMAN;   Okay.  And if you read there where he says, this is
I believe is cross examination of Mr. Martin in
this particular situation, but he is talking about
his deal in DuPage County and the fact that DuPage
County, that he had a 35-year sentence in DuPage
County to be served consecutively with a 10 year
sentence.  That's on actually the pages preceding
this.

And then he said.  What authority was ultilized to
reduce your sentence in 1991.  This is at the top
of 45-10 there.  Mr. Martin says;  I filed post-
conviction petition and he granted it.

And what was the basis of your post-conviction
motion.  And he says;  The Appellate Court in 1986
overturned four of my six convictions, yet they did
not send me back for resentencing.  They left it up
to the circuit court.  We went into those grounds.
I presume he means, in on those grounds.

THE COURT:    Oh.  Question from line 11.  So, you got a reduction
that nothing to do with your cooperation then?

MS. HOFFMAN;    And he said.  The State of Illinois and the people
                I have assisted and vouched for me, for lack of
                better way to put it.

                My point with respect to that is, is that when you
                have, based on Mr. Martin's testimony, his own
                testimony regarding this DuPage County case, Mr.
                Martin gives a perfectly good reason why he was,
                obviously, his case was overturned for his six
                convictions vacated.  I believe that was based on,
                you know, there was nothing, those were, it was one
                of those situations where you get convicted of
                lesser-includeds and they need to be vacated by
                appellate court.  They didn't have a resentence.
                Essentially went back to DuPage County for resentencing.
                And that gives a perfect pausible explanation.

                Now, when you say got time served, it's true.  He
                was sentenced to 35 years and 10 years consecuitve
                in Cook.  They gave him 21 years; so, he got, it
                was 31 down to 21, 35 down to 21.  He had already
                served 10 and a half; so, he did get time served.
                But --

THE COURT;      And what about the Cook sentence.

MS. HOFFMAN;    Pardon me.  The Cook County sentence I believe
                remained intact.

THE COURT;      Well, he testified here, Martin did, that he was
                serving, he had 9 years yet to go; so, he's referring
                to the Cook County sentence.

MS. HOFFMAN;    Right.  That was the consecutive Cook County sentence.

THE COURT;      So, he's not loose, he's in Federal custody when he
                testifies here, serving the Cook County sentence.

MS. HOFFMAN;    I believe so, yes.

THE COURT;      So, he was accurate, he was truthful when he said;
                I got 9 years to go.

MS. HOFFMAN;    Right.  He had 10-year consecutive on Cook County.
                What DuPage did was --

THE COURT;      DuPage was ahead of Cook.

MS. HOFFMAN;    Right.  Resentenced him to 35, to 21 off of the 35.

THE COURT;      Okay.  One of the possibilities was that all of his
                time in the State of Illinois Department of Corrections
                was over and done with when he was testifying here;
                and what I'm hearing today, no, Judge, Cook remains
                same.  It's just that he started to serve Cook; and
                so, he had the 9- or 10-year sentence yet to be
                served because a month later he got down to time

served in DuPage.  So, we don't have any misrepresent-
ation.  We don't have any fraud.  We don't have any
perjury, if you will, on the part of Mr. Martin
here.  He had the 9 years to serve.

The only issue we then have as to fraudulent conceal-
ment is the reason  for the reduction up in DuPage
and you're telling me that wasn't a negotiated
plea, that was just a flat-out sentencing where the
circuit judge decided.  I mean up till now, for all
I knew, that was a negotiated plea.

MS. HOFFMAN;    Well, actually, I do want to make it clear, and
this will actually answer another of your questions
to me which was;   Well, we had, you know, we don't,
you don't have anything from the DOC officials that
testified from our perspective as an answer to
that.   and my response to both of those things is;
We don't have a pleading requirement at this point.

THE COURT;    Right.

MS. HOFFMAN;    The defendant has a pleading requirement.  He needs
to demostrate a fraud on the part of the State with
respect to the testimony of Mr. Martin and the
Department of Corrections' officials at Mr. Carter's
trial.

THE COURT;    Okay.  Until today, I thought in terms, we're
having a civil pleading you know, I thought today,
well, they are at least raising by implication
maybe that he walked in '91.  And I'm learning
today, no, he served his 9 or 10.

But the the implication also is by pleading that,
with Martin's affidavit, that he was promised and
they delivered.  But I'm getting a different picture
today, no, there was no negotiated deal, there were
no promises because it was not within the authority
of the Department of Corrections to promise anything.
They went to bat for him.  They left it up to the
judge.

Now, if they went to bat for him and left it up to
the judge, that's a far different situation than
there's a negotiated deal that the State's Attorney
of DuPage County buys into it up there for its
cooperation here and DOC executed a bunch of leverage
saying, listen, we've got to have this guy, we want
you to go in there to the judge and say, this is
what we've got to have.  And the judge, most judges
wouldn't even say, why are you doing this.  But if
the judge dis ask the question, they would say,
well, DOC wants us to do this because there's
something else more important here.

99

Doesn't this cast, Mr. Lawrence, a whole different picture on it if this was a resentencing out of DuPage County?

MR. LAWRENCE;    Of course, one of the things that I'm concerned about, why would the court file up there be impounded. It was impounded.

THE COURT;    Yeah.

MR. LAWRENCE;    It was impounded the exact same day which was October 11.

THE COURT;    It has a aroma to it, doesn't it?

MR. LAWRENCE    Exactly.

MS. HOFFMAN;    And, you know, I can't answer the question.  I can, in fact, tell you though that I did call yesterday before I left the office.  The file remains impounded in DuPage at the clerk's office.  I don't know the answer.  I believe, quite frankly, that the clerk's office is in violation of the statute that --

THE COURT;    Yeah.

MS. HOFFMAN;    -- states that -- And I don't know that anybody's ever attempted to unimpound it.  I have not.  And, as I said, we believe at this point, we don't have a burden at this point.  Now, if we have to go to answering the merits of the 2-1401 petition, then that file becomes important to the merits of the claim, then, you know, and we need to respond in some fashion and that requires us to --

THE COURT;    Why do you believe that the judge, what basis is your belief that this was just a new sentencing where the judge in DuPage said, well, I'm going to reduce this to time served as opposed to there was a deal.

MS. HOFFMAN;    I have absolutely no idea why the file was impounded and I don't think that there, at least to my know- ledge, there have been no attempt to do that.  I'm not sure if Mr. Luckman had.  I don't think he had tried to do that.

THE COURT;    Lets' have a hypothetical here.  If the record up there is that this was just a brand new sentencing, we have the questions of the impact of that on the timeliness issue here.  Well, I suppose it could be argued it's no big deal anymore.  He thought there was a deal, he thought he could show it; but the record up there doesn't even support that; there wasn't perjury and Martin's saying this, but we've got enough here that this is no big deal anymore.

100

During the hearing in this cause, the State was represented by Lisa Anne Hoffman, Assistant Attorney General and petitioner Carter was represented by attorney Paul G. Lawrence ( whom immediately thereafter became Circuit Court Judge).  Petitioner Carter was not present at the hearing, causing him to be totally unaware of the unorthodox manner in which the Court and Assistant Attorney General concluded that State witness Harry Martin's resentencing was justified and not perjured testimony as alleged in the petition, because Harry Martin mentioned during a hearing, when questioned about how much time he has left to serve... he stated 10 years and the Appellate Court reversed his convictions from DuPage County and the Appellate Court left the resentencing up to the Circuit Court.

Petitioner Carter contends that the Court and State rendered their decision from invalid information... conceding with the testimony of Harry Martin, whom stated that the time reduction from DuPage County was a product of his appeal decision in <u>People</u> <u>v. Martin</u>  Ill.App.2 Dist. 1984  121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642, where the Appellate Court decision clearly showed that Harry Martin was initially charged in Case Nos. 82-105 and 82-114, with the following offenses:

```
COUNT I      ARMED ROBBERY
COUNT II     ARMED ROBBERY
COUNT III    ARMED VIOLENCE
COUNT IV     ARMED VIOLENCE
COUNT V      UNLAWFUL USE OF WEAPON
COUNT VI     UNLAWFUL USE OF WEAPON
COUNT VII    UNLAWFUL USE OF WEAPON
COUNT VIII   UNLAWFUL USE OF WEAPON
```

101

COUNT IX    UNLAWFUL USE OF WEAPON
COUNT X     UNLAWFUL USE OF WEAPON
COUNT XI    UNLAWFUL USE OF WEAPON

A consolidated jury trial was held for State's witness
Harry Martin and his codefendant on Counts I thru IV, guilty
verdicts were returned on all fours counts.  A consolidated bench
trial was held for both defendants on Counts V thru XI, they were
found guilty of all counts of the indictments.

Harry Martin was sentenced to a 35 year term on Count IV
Armed Violence and a 5 year concurrent term on Count VII Unlawful
Use of Weapon, the Appellate Court reversed and vacated all other
convictions and sentences, except these two convictions.  Martin,
supra, Id. 121 Ill.App.3d at 196-197. SEE APPENDIX.

The Appellate Court's decision is in complete conflict with
State witness Harry Martin's testimony, the Illinois Appellate
Court held;

> 'where defendants received separate sentences
> for multiple convictions, they were not
> entitled to resentencing on the convictions
> affirmed on appeal where certain convictions
> were vacated.' Id. 121 Ill.App.3d at 196.
>                              emphasis supplied

State's witness Harry Martin testified during cross-examina-
tion by Mr. Collins concerning his pending conviction and sentence
from DuPage County.  At petitioner Carter's hearing, the Court
and Assistant Attorney General relied upon the following colloquy
in declaring that there was no perjured testimony, being that
Martin stated the following;

MR. COLLINS;

Q;  Now, sir, what is your understanding, sir, as to what sentence
    you must serve on your state charges.

102

E-FILED
Thursday, 23 August, 2007  02:43:54 PM
Clerk, U.S. District Court, ILCD

The law is clear that partiality or bias of a witness is always relevant in discrediting a witness and affecting the weight of his testimony.  Davis v. Alabama (1974) 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347.

In this instance, State agent, Harry Martin credibility went unchallenged, when the State requested an order authorizing use of an eavesdropping device for the sole purposes of recording conversations bewteen Martin and various inmates of the Department of Corrections, including petitioner Carter.  Harry Martin's testimony at trial was crucial to the State's presentation of their case; combined with the fact that the prosecution and State officials openly declared that Harry Martin "received no agreements of any kind".  When in fact, one month prior to testifying in this case, Harry Martin sentence that he was serving for DuPage County was reduced to "time served" violating petitioner Carter's due process rights guaranteed by both the U.S. Constitution and Illinois Constitution.

Petitioner Carter did not receive a fair and impartial trial in this cause.  Subsequently, he was found guilty and sentence to a term of natural life imprisonment.  Direct appeal was taken, the Appellate Court affirmed his conviction and he sought review from the Illinois Supreme Court, which was denied.

in 1997, petitioner Carter obtain an affidavit from Harry Martin stating that he was a paid witness for the State, that prior to his testifying at the trial in this cause, he had never cooperated with the State, that prior to his testifying, he was given furloughs to be with his wife and unlimited access to phone calls, etc.  In addition to Martin's affidavit, petitioner Carter

95

obtained an affidavit from inmate Corwyn Brown . . . . . which clearly showed that petitioner Carter did not give an order that resulted in the death of Superientendent Taylor. SEE APPENDIX.

In 1998, petitioner Carter filed his <u>pro</u> <u>se</u> Petition for Post-Conviction Relief pursuant to 725 ILCS 5/122.1 et seq. and combined Petition for Relief from Judgement pursuant to 735 ILCS 5/2-1401. See CLR 36-165. The trial court denied petitioner Carter's motion to excuse late filing with respect to his <u>pro</u> <u>se</u> post-conviction petition, but granted the motion to excuse late filing with respect to his <u>pro</u> <u>se</u> Section 2-1401 petition. See CLR 253-258. Notwithstanding the fact that post-conviction counsel failed to file  a timely Notice of Appeal regarding the dismissal of petitioner's post-conviction petition, as required.

On October 18, 2001, during a hearing on the State's motion to reconsider an order entered on April 23, 1999 finding that a post-conviction petition had been untimely pursued by petitioner Carter, but finding that petitioner fit within the requirements of section 2-1401, the following court colloquy stated, in pertinent part:          Pages 11-18

THE COURT:    Did Deputy Long lie.

MS. HOFFMAN:  Well, at this point, what we have to demostrate
              that is that Mr. Martin says he was given X, Y, and
              Z in return for his testimony in this case.

THE COURT:    We don't have anything from Deputy Long or from
              DOC or from the State saying, you're not disputing
              that a month ahead of this trial, he got reduced to
              time served in DuPage.

MS. HOFFMAN:  I'm disputing that.  And I would draw your attention
              to, and I'm looking now at things that were appended
              to Mr. Carter's original petition, 2-1401 petition,
              but I believe they're also part of Mr. Luckman's

96

review of the record, and these are, this is when
Mr. Martin is discussing his DuPage County case,
and he says, - - We can talk about the page numbers,
it's a record page number 4351, it's attached to
Mr. Carter's original petition as Exhibit --

THE COURT:      Let me find that since we're looking at it.

MS. HOFFMAN:    This is a filing of August of '98; so we're not
                talking --

THE COURT:      August of '98.  I have that.  And I've got the
                affidavit  of Harry Martin after it.  We've got
                letters from Aviva Futorian.

MS. HOFFMAN:    There's a motion -- This is an appendices to that
                filing.  He filed that --

MR. LAWRENCE    To the actual petition.

MS. HOFFMAN:    Right, to the actual petition.  And it says, appendices
                exhibits, exhibits of pay money and deals and State
                witness, Harry Martin, the key State witness, Harry
                Martin.

THE COURT:      I'm not -- Oh, it's on a transcript.

MS. HOFFMAN:    Yes, And the exhibits are numbered 45- something,

THE COURT:      Yeah.

MS. HOFFMAN:    It's 45-10 is what --

THE COURT:      I've got 45-10.

MS. HOFFMAN:    Okay.  And if you read there where he says, this is
                I believe is cross examination of Mr. Martin in
                this particular situation, but he is talking about
                his deal in DuPage County and the fact that DuPage
                County, that he had a 35-year sentence in DuPage
                County to be served consecutively with a 10 year
                sentence.  That's on actually the pages preceding
                this.

                And then he said.  What authority was ultilized to
                reduce your sentence in 1991.  This is at the top
                of 45-10 there.  Mr. Martin says; I filed post-
                conviction petition and he granted it.

                And what was the basis of your post-conviction
                motion.  And he says;  The Appellate Court in 1986
                overturned four of my six convictions, yet they did
                not send me back for resentencing.  They left it up
                to the circuit court.  We went into those grounds.
                I presume he means, in on those grounds.

THE COURT:      Oh.  Question from line 11.  So, you got a reduction
                that nothing to do with your cooperation then?

MS. HOFFMAN;    And he said.  The State of Illinois and the people
                I have assisted and vouched for me, for lack of
                better way to put it.

                My point with respect to that is, is that when you
                have, based on Mr. Martin's testimony, his own
                testimony regarding this DuPage County case, Mr.
                Martin gives a perfectly good reason why he was,
                obviously, his case was overturned for his six
                convictions vacated.  I believe that was based on,
                you know, there was nothing, those were, it was one
                of those situations where you get convicted of
                lesser-includeds and they need to be vacated by
                appellate court.  They didn't have a resentence.
                Essentially went back to DuPage County for resentencing.
                And that gives a perfect pausible explanation.

                Now, when you say got time served, it's true.  He
                was sentenced to 35 years and 10 years consecuitve
                in Cook.  They gave him 21 years; so, he got, it
                was 31 down to 21, 35 down to 21.  He had already
                served 10 and a half; so, he did get time served.
                But --

THE COURT;      And what about the Cook sentence.

MS. HOFFMAN;    Pardon me.  The Cook County sentence I believe
                remained intact.

THE COURT;      Well, he testified here, Martin did, that he was
                serving, he had 9 years yet to go; so, he's referring
                to the Cook County sentence.

MS. HOFFMAN;    Right.  That was the consecutive Cook County sentence.

THE COURT;      So, he's not loose, he's in Federal custody when he
                testifies here, serving the Cook County sentence.

MS. HOFFMAN;    I believe so, yes.

THE COURT;      So, he was accurate, he was truthful when he said;
                I got 9 years to go.

MS. HOFFMAN;    Right.  He had 10-year consecutive on Cook County.
                What DuPage did was --

THE COURT;      DuPage was ahead of Cook.

MS. HOFFMAN;    Right.  Resentenced him to 35, to 21 off of the 35.

THE COURT;      Okay.  One of the possibilities was that all of his
                time in the State of Illinois Department of Corrections
                was over and done with when he was testifying here;
                and what I'm hearing today, no, Judge, Cook remains
                same.  It's just that he started to serve Cook; and
                so, he had the 9- or 10-year sentence yet to be
                served because a month later he got down to time

98

served in DuPage.  So, we don't have any misrepresent-
ation.  We don't have any fraud.  We don't have any
perjury, if you will, on the part of Mr. Martin
here.  He had the 9 years to serve.

The only issue we then have as to fraudulent conceal-
ment is the reason  for the reduction up in DuPage
and you're telling me that wasn't a negotiated
plea, that was just a flat-out sentencing where the
circuit judge decided.  I mean up till now, for all
I knew, that was a negotiated plea.

MS. HOFFMAN;   Well, actually, I do want to make it clear, and
this will actually answer another of your questions
to me which was;  Well, we had, you know, we don't,
you don't have anything from the DOC officials that
testified from our perspective as an answer to
that.  and my response to both of those things is;
We don't have a pleading requirement at this point.

THE COURT;    Right.

MS. HOFFMAN;   The defendant has a pleading requirement.  He needs
to demostrate a fraud on the part of the State with
respect to the testimony of Mr. Martin and the
Department of Corrections' officials at Mr. Carter's
trial.

THE COURT;    Okay.  Until today, I thought in terms, we're
having a civil pleading you know, I thought today,
well, they are at least raising by implication
maybe that he walked in '91.  And I'm learning
today, no, he served his 9 or 10.

But the the implication also is by pleading that,
with Martin's affidavit, that he was promised and
they delivered.  But I'm getting a different picture
today, no, there was no negotiated deal, there were
no promises because it was not within the authority
of the Department of Corrections to promise anything.
They went to bat for him.  They left it up to the
judge.

Now, if they went to bat for him and left it up to
the judge, that's a far different situation than
there's a negotiated deal that the State's Attorney
of DuPage County buys into it up there for its
cooperation here and DOC executed a bunch of leverage
saying, listen, we've got to have this guy, we want
you to go in there to the judge and say, this is
what we've got to have.  And the judge, most judges
wouldn't even say, why are you doing this.  But if
the judge dis ask the question, they would say,
well, DOC wants us to do this because there's
something else more important here.

Doesn't this cast, Mr. Lawrence, a whole different picture on it if this was a resentencing out of DuPage County?

MR. LAWRENCE;  Of course, one of the things that I'm concerned about, why would the court file up there be impounded. It was impounded.

THE COURT;  Yeah.

MR. LAWRENCE;  It was impounded the exact same day which was October 11.

THE COURT;  It has a aroma to it, doesn't it?

MR. LAWRENCE  Exactly.

MS. HOFFMAN;  And, you know, I can't answer the question.  I can, in fact, tell you though that I did call yesterday before I left the office.  The file remains impounded in DuPage at the clerk's office.  I don't know the answer.  I believe, quite frankly, that the clerk's office is in violation of the statute that --

THE COURT;  Yeah.

MS. HOFFMAN;  -- states that -- And I don't know that anybody's ever attempted to unimpound it.  I have not.  And, as I said, we believe at this point, we don't have a burden at this point.  Now, if we have to go to answering the merits of the 2-1401 petition, then that file becomes important to the merits of the claim, then, you know, and we need to respond in some fashion and that requires us to --

THE COURT;  Why do you believe that the judge, what basis is your belief that this was just a new sentencing where the judge in DuPage said, well, I'm going to reduce this to time served as opposed to there was a deal.

MS. HOFFMAN;  I have absolutely no idea why the file was impounded and I don't think that there, at least to my know-ledge, there have been no attempt to do that.  I'm not sure if Mr. Luckman had.  I don't think he had tried to do that.

THE COURT;  Lets' have a hypothetical here.  If the record up there is that this was just a brand new sentencing, we have the questions of the impact of that on the timeliness issue here.  Well, I suppose it could be argued it's no big deal anymore.  He thought there was a deal, he thought he could show it; but the record up there doesn't even support that; there wasn't perjury and Martin's saying this, but we've got enough here that this is no big deal anymore.

During the hearing in this cause, the State was represented
by Lisa Anne Hoffman, Assistant Attorney General and petitioner
Carter was represented by attorney Paul G. Lawrence (whom immediately
thereafter became Circuit Court Judge).  Petitioner Carter was
not present at the hearing, causing him to be totally unaware of
the unorthodox manner in which the Court and Assistant Attorney
General concluded that State witness Harry Martin's resentencing
was justified and not perjured testimony as alleged in the petition,
because Harry Martin mentioned during a hearing, when questioned
about how much time he has left to serve... he stated 10 years
and the Appellate Court reversed his convictions from DuPage
County and the Appellate Court left the resentencing up to the
Circuit Court.

Petitioner Carter contends that the Court and State rendered
their decision from invalid information... conceding with the
testimony of Harry Martin, whom stated that the time reduction
from DuPage County was a product of his appeal decision in People
v. Martin  Ill.App.2 Dist. 1984  121 Ill.App.3d 196, 459 N.E.2d
279, 76 Ill.Dec. 642, where the Appellate Court decision clearly
showed that Harry Martin was initially charged in Case Nos. 82-105
and 82-114, with the following offenses;

```
COUNT I      ARMED ROBBERY
COUNT II     ARMED ROBBERY
COUNT III    ARMED VIOLENCE
COUNT IV     ARMED VIOLENCE
COUNT V      UNLAWFUL USE OF WEAPON
COUNT VI     UNLAWFUL USE OF WEAPON
COUNT VII    UNLAWFUL USE OF WEAPON
COUNT VIII   UNLAWFUL USE OF WEAPON
```

COUNT IX    UNLAWFUL USE OF WEAPON
COUNT X     UNLAWFUL USE OF WEAPON
COUNT X1    UNLAWFUL USE OF WEAPON

A consolidated jury trial was held for State's witness Harry Martin and his codefendant on Counts I thru IV, guilty verdicts were returned on all fours counts. A consolidated bench trial was held for both defendants on Counts V thru XI, they were found guilty of all counts of the indictments.

Harry Martin was sentenced to a 35 year term on Count IV Armed Violence and a 5 year concurrent term on Count VII Unlawful Use of Weapon, the Appellate Court reversed and vacated all other convictions and sentences, except these two convictions. Martin, supra, Id. 121 Ill.App.3d at 196-197. SEE APPENDIX.

The Appellate Court's decision is in complete conflict with State witness Harry Martin's testimony, the Illinois Appellate Court held;

> 'where defendants received separate sentences
> for multiple convictions, they were not
> entitled to resentencing on the convictions
> affirmed on appeal where certain convictions
> were vacated.' Id. 121 Ill.App.3d at 196.
>                                 emphasis supplied

State's witness Harry Martin testified during cross-examination by Mr. Collins concerning his pending conviction and sentence from DuPage County. At petitioner Carter's hearing, the Court and Assistant Attorney General relied upon the following colloquy in declaring that there was no perjured testimony, being that Martin stated the following;

MR. COLLINS;

Q; Now, sir, what is your understanding, sir, as to what sentence you must serve on your state charges.

102

A:    The State of Illinois has already reduced my 35-year-sentence to 21.

Q:    When did that come about, sir.

A:    That came about at the end of the -- my cooperation in the State cases.

Q:    Now, the 35 -- strike that.  Did you say 35 or 45 years.

A:    My entire sentence got cut.

Q:    That is not what I asked you.

A:    The 35 --

THE COURT:

     If you are asking what he said, he said 35, and it was cut to 21.

BY THE WITNESS:

A:    To 21, to time served.

BY MR. COLLINS:

Q:    You got 25 and 10 consecutive, right.

A:    Exactly.

Q:    You got 25 in DuPage and 10 in Cook, right.

A:    Exactly.

Q:    What was your understanding, sir, as to how many years you would have to serve to satisfy that 35-year sentence.

A:    17-and-a-half years.

Q:    All right.  And you say some time in 1987, you got a reduction in your sentence, is that correct.

A:    No, no.  I got the reduction in my sentence in 1991.

Q:    1991.  Now, this sentence of 35 years was imposed upon you in what year, sir.

A:    In 1991.

Q:    And how about the 10-year sentence.

A:    In 1991.

103

Q:    And, sir, what was your understanding as to what authority
      was utilized to reduce your sentence in 1991.

A;    I filed a post-conviction motion in DuPage County, and they
      granted it.

Q:    What was the basis of your  post-conviction motion.

A;    The Appellate Court in 1986 overturned four of my six con-
      victions, yet they didn't send me for resentencing.  They
      left it up to the Circuit Court.  We went into those grounds.
                                               emphasis supplied

Q:    So you got a reduction that had nothing to do with your
      cooperation.

A;    The State of Illinois and the people that I have assisted
      went in and vouched for me, for lack of a better way to put
      it.                                       emphasis supplied

Q;    Went in and what.

A;    Vouched for me.

Q:    Okay, the 35-year -- strike that.  The 35-year sentence you
      got was on a charge of armed robbery, wasn't it.

A;    35 years.

Q:    That was for two different armed robberies.

A;    That was for one.  The ten years was for the other.  It was
      a total of 45.

Q;    The 25-year sentence was on an armed robbery charge.

A;    35.

Q;    You got a straight 35-year sentence.

A;    35, and 10 made it 45.

Q;    Okay.  Well, then, you had to serve 23-and-a-half years, not
      17-and-a-half.

A;    You asked me how much did I have to serve on 35 years.  I
      responded.

      NOTICE;  this transcript was attached to petitioner Carter's
               combined post-conviction petition and 2-1401
               petition as EXHIBIT 45, 45-8 thru 45-11,
               SEE C.L.R. 79-82 and APPENDIX

Petitioner Carter states that during a hearing on his post-conviction petition ( 2-1401), the Circuit Court and Assistant Attorney General's reliance upon a specific excerpt from trial trancripts other than records from matters that took place in this cause, pertaining to State Agent Harry Martin's testimony that "he had 10 years remaining to be served for Cook County". The Court's acceptance that Martin's (once again-uncorroborated) testimony  was sufficient enough to show that "there was no perjury", must fail.  SEE.( APPENDIX and 10-18-01 Tr. p. 12-18) . The portion of the record used to arrive at this adverse decision was attached to petitioner Carter's petition to show due diligence in bringing this matter to the Court.  The attachment were records from co-defendant's trial labeled as Exhibit 45 and 46.

The above-occurrance took place without the Court or Asst. Attorney General acknowledging the contents of Harry Martin's affidavit, attached to petitioner's petition stating that he was a "paid witness", among other things.

The record in this case is in direct conflict with the testimony Harry Martin gave at co-defendant's trial.  Not once during direct or cross-examination of Harry Martin at petitioner Carter's trial, was there any mentioning that Harry Martin had an ten ( 10 ) year sentence pending in Cook County. Instead, records would show the opposite, such as, the following colloquy took place, in pertinent part:

Record, Volume 13 - November 18, 1991

Lt. Gerald O. Long, previously Deputy Director IDOC (1986 - 1990)
Continued cross-examination by defense counsel Thomas;

Q;    How much time is he serving?

A;    How much time is he serving.

Q;    Yeah.

A;    I haven't seen his master file in quite some time and I
      forgot.  I think his original sentence, if I am not mistaken
      was like a 30 year sentence for armed robbery.

( CLR 351)

Page 40-42   jury not present

      Following the testimony of Deputy Director Watkins...

THE COURT;  Does Mr. Martin have any charges presently pending
            against him.  Is the State aware?

MR. WATKINS; You are asking me, your Honor.

THE COURT;  I'm asking anybody here who knows if Harry Martin has
            any charges that anybody is sitting on that would
            provide some leverage of cooperation?

MR. CASSON; Not that I'm aware of.

MR. WATKINS;  He has no outstanding charges, your Honor.

( CLR. 356 )

Pages 17-82  jury present   Harry Martin's testimony

Direct examination, ASA Brown, pages 17-67

Cross-examination, defense counsel Thomas; pages 67-80

Redirect examination ASA Brown;  pages 81-82

Recross examination, defense counsel Thomas;  page 82

Page 17

Q;    Mr. Martin, are you currently incarcerated?

A;    Yes.

Q;    And what felony convictions have you received?

A;    Armed robbery, armed violence, unlawful use of weapons.

( CLR. 358-359 )

Cross-examination by defense counsel Thomas

Q;    Mr. Martin, how much time do you have left on your sentence?

A;    Ten years.

## CLR. 362

Information of State's cooperating witness, Harry Martin's reduction of his DuPage County sentence to "time considered served" approximately one ( 1 ) month prior to testifying in this case, combined with the unjustified concealment of the DuPage County's resentencing amounts to a deprival of petitioner Carter's due process rights as guaranteed by the 14th Amendment of the U.S. Constitution and Article I, Section 2 and 8 of the Illinois Constitution.

The record clearly show that Harry Martin's testimony at petitioner Carter's trial was inconsistent with what actually occurred a month earlier in DuPage County, in People v. Martin No. 81 CF 325[1]. At the trial in this cause, Martin feigned the accuracies of his convictions and sentences and the State allowed this perjured testimony to go uncorrected. The State's failure to disclose certain information to the defense is in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ; Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 ( 1972); and Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 ( 1995) .

---------------------------------

[1]    On 2-25-81, Harry Martin was arrested and charged with 2 cts. of Armed Robbery, 2 cts. Armed Violence, and 7 cts. of Unlawful Use of Weapon in DuPage County, Case Nos. 82-105 and 82-114 . After a consolidated jury and bench trial, Martin was found guilty by jury of 2 cts. Armed Robbery and 2 cts. Armed Violence. The bench trial found him guilty of 2 cts. of Unlawful Use of Weapons.He was sentenced to 35 yrs. on each Armed Robbery, 35 years on each Armed Violence and 5 yrs. on the 2 remaining UUW cts. to be ran concurrent w/each other.

In <u>Giglio</u>, the U.S. Supreme Court held that the government's <u>Brady</u> obligation to provide evidence to the defense encompasses evidence affecting a government witness' credibility.  Id. 405 U.S. at 154.  The Court stated that the <u>Brady</u> violation extends beyond the mere knowledge of the trial prosecutor.  Id. 405 U.S. at 154.  The <u>Giglio</u> Court explicitly imposed upon the government the obligation to disclose impeaching information of which govern- ment personnel are aware, even though the information is not known to the prosecutors personally involved in the trial of the case.  The Court stated the following:

> To the extent this places a burden on the
> large prosecution offices, procedures and
> regulations can be established to carry that
> burden and to insure communication of all
> relevant information on each case to every
> lawyer who deals with it.
>             Id. <u>Giglio</u>, 404 U.S. at 154.

In this instant case, being that the murder of Supt. Robert Taylor took place at the Pontiac Correctional Center, within the Illinois Department of Corrections ( IDOC ),  a large cast of characters were involved in the investigative, charging and prosecuting process, including, but not limited to IDOC officials, Illinois State Police, various State prosecutors ( the trials took place in various counties), the Illinois Attorney General and the Federal Government.

Unfortunately, each individual State agency and their agents, denies either offering or promising State witness, Harry Martin, a deal, other than protection of his family and ultimately feign ignorance to his time-cut in DuPage County and the immediate sealing of the files in that case therafter. <u>United States ex rel.</u> <u>Smith v. Fairman</u>, 769 F.2d 386 ( 7th Cir. 1985 ) .

In Smith, the Seventh Circuit affirmed the District Court's decision granting a habeas corpus petition. The Seventh Circuit held that a State prosecutor's ignorance of the withheld Brady material did not justify the nondisclosure of the Brady material which had been known to a police ballistics expert, but which was not included in the official report the expert prepared and provided to the prosecutor. The Court stated;

> We believe that the purpose of Brady would not be served by allowing material exculpatory evidence to be withheld simply because the police, rather than the prosecutors, are responsible for the nondisclosure. See Carey v. Duckworth, 738 F.2d 875, 878 (7th Cir. 1984) 'a prosecutor's office cannot get around Brady by keeping itself ignorance, or compartmentalizing information about different aspects of the case.' Id. Smith, 769 F.2d at 391-92.

In this case, the Brady materials involved State witness Harry Martin's sentence reduction to time-served one month prior to testifying in this case, the disposition of his direct appeal[2] and the discovery of another time-reduction in Cook County. The sundry items, phone services and cash benefits bestowed upon him. SEE; Exhibits attached to petitioner Carter's 2-1401 petition and affidavit of Harry Martin.

------------------------------

2] On 1-12-84, the Illinois Appellate Court, Second District, in People v. Martin, 121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642, all counts were vacated except Ct. IV Armed Violence and Ct. VII Unlawful Use of Weapon. His sentence of 35 yrs. and 5 yrs. concurrent remained and the Appellate Court specifically stated.. since there is no evidence in the record suggesting that defendant's remaining sentences were improperly affected by their separate additional convictions and sentences, we will not remand their remaining convictions for resentencing.

The perjured testimony was expounded during petitioner

Carter's trial, when Harry Martin testified regarding the following,

in pertinent part;

1    Harry Martin explicitly declared under oath, when
     asked 'how much time was he serving.'  He would state
     35 years.  When asked on what charges.  He would state
     Armed Robbery, Armed Violence and Unlawful Use of
     Weapon.  When asked how much time he has remaining to
     be served.  He stated, 10 years.

2    Martin was no longer serving his DuPage County sentence,
     He <u>did</u> <u>not</u> mention that he was no longer doing the
     DuPage County sentence, or that he <u>only</u> had time
     remaining to be served for Cook County.  There is no
     ryhme or reason for him to bogusly allege that his
     charges were armed robbery, armed violence and UUW,
     the charges he had in DuPage County.  He had previously
     testified at codefendants, Lucas and Easley's trial,
     therefore, his manner of testifying cannot be considered
     a mistake of some kind on his part.

Black's Law Dictionary ( 4th ed.) defines perjury as..

     'the willful assertion as to a matter of fact,
     opinion, belief, or knowledge, made by a
     witness in a judicial proceeding as part of
     his evidence, ... such assertion being
     material to the issue or point of inquiry
     and known to such witness to be false.'

The State's non-disclosure of the substantial benefits

received by their witness, Harry Martin violated petitioner's

rights under the  Confrontation Clause of the Sixth Amendment to

the Constitution.  As the U.S. Supreme Court stated in <u>Delaware</u>

<u>v. Van Arsdall</u>, 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89

L.Ed.2d 674 ( 1986 ) ;

     We think a criminal defendant states a
     violation of the Confrontation Clause by
     showing that he was prohibited from en-
     gaging in otherwise appropriate cross-
     examination designed to show a prototypical
     form of bias on the part of the witness,
     and thereby 'to expose to the jury the facts
     from which jurors ... could appropriately

draw inferences relating to the reliability
of the witness.'Davis v. Alaska, supra,
415 U.S. at 318.

Petitioner Carter did not discover the irregularities, nor had prior knowledge of the complained of discrepancies until years after the trial in this cause. In September of 1997, codefendant Easley's counsel sent him copies of Harry Martin's affidavit and court documents showing Martin's time reduction in DuPage County, and receipts for expenses paid to him. These documents were included as Exhibits in codefendant Easley's post-conviction petition.

Petitioner was without counsel to assist him in collateral attacking his conviction and sentence. Possessed with limited knowledge of the law, petitioner Carter sought assistance from fellow inmates. This proved to be a futile attempt, due to the nature of the case... involving the death of a IDOC employee, inmates feared that there would be an act of retaliation upon them from the prison staff, combined with the numerous prison lockdowns affected petitioner's ability to prepare his petition in a timely fashion.

On August 10, 1998, petitioner filed his pro se Petition for Post-Conviction Relief pursuant to 725 ILCS 5/122.1 et seq. and combined Petition From Relief of Judgement, pursuant to 735 ILCS 5/2-1401, raising a Brady, Napue violation, Newly Discovered Evidence and Actual Innocence claims within his petition. The circuit court dismissed the post-conviction petition as untimely filed. Petitioner was not admonished about his appeal rights. The 2-1401 petition was allowed.

- 111 -

From the inception of the proceedings, up until the dismissal of his petition, petitioner Carter was represented by the following appointed counsels:

| Name | Reason For Termination of Representation |
|------|------------------------------------------|
| David Ahlmeyer | Appointed 09-11-98, due to conflict of interest...he represented codefendant Johnson during the initial trial. See CLR-172 |
| Carey Luckman | Appointed 10-23-98, he became an Assistant State's Attorney in December of 2000. |
| Eric Frobish | Appointed December of 2000, relocated immediately thereafter. |
| Paul Lawrence | Appointed 02-22-01, he became a Circuit Court Judge on April 15, 2002. |
| W. Keith Davis | Appointed 04-15-02, he represented petitioner throughout the remaining proceedings. |

Petitioner Carter contends that the periodic representation of various attorneys caused his issues to be piece-meal, rather than presented to the Court as a whole. Furthermore, petitioner attempts to discuss the issues and raise trial and appellate counsels ineffectiveness was futile. Numerous letters were written to the Circuit Court Judge regarding petitioner's inability to communicate with his appointed counsel regarding the issues being presented to the Court. See CLR-442, 446-447. Appendix

The Court in Carey v. Duckworth, (7th Cir. 1984) 738 F.2d 875, 878, announced that "a prosecutor's office cannot get around Brady by keeping itself in ignorance, or comparmentalizing information about different aspects of a case." The records in this case conclusively shows the many antics of State's witness Harry Martin, consisting of the following:

- 112 -

## Harry Martin's Performances and Benefits

1. On October 2, 1987, James Wasson, filed a Petition for Order Authorizing Use of Eavesdropping Device to use in attempt to record conversations bewteen Martin and petitioner.
   NOTICE - Harry Martin stated in his affidavit that paragraph 1 b of Attachment 1, contains false accusations pertaining to his cooperation with IDOC.

2. On October 1, 1991, Harry Martin appeared in DuPage Circuit Court before Honorable Edward W. Kowal, Judge for the purpose of a Post-Conviction Hearing in Case No. 81 CF 325. The Court reduced Harry Martin's thirty-five ( 35 ) year sentence to twenty-one ( 21 ) years ( time served).
   NOTICE - The following colloquy took place regarding a Supreme Court Rule 402 which is designed specifically for parties to hold a conference with the Judge regarding the defendant entering a guilty plea to a specific charge and sentence:

MS. GUSTAFON:    Judge, I have prepared an order to impound this file as well as any record of proceedings.

THE COURT:    Motion granted.

THE COURT:    All right. This matter coming on to be heard on the post-conviction petition, the provision in the petition requesting this matter be resentenced, any objection by the State?

MR. STOCK:    No, your Honor.

THE COURT:    Motion granted. The matter comes on for resentencing. Any arguments by the State, any arguments by the defense counsel?

MR. STOCK:    No, your Honor. We would rely on what was said during the 402 conference.
              [Attached hereto and labeled as an appendix is the transcript of the 10-01-91 hearing in that cause]

3. On November 18, 1991, State's witness Harry Martin testified at petitioner Carter's trial in this cause. He stated that "there was no deals with the Illinois Department of Corrections"
   NOTICE - Harry Martin failed to mention that "he had recently been granted a time-cut on his DuPage County case". The State allowed this mishap to go uncorrected.

4. On March 28, 1994, Harry Martin appeared in Cook Co. Circuit Court (Skokie) before Honorable Francis Mahon in Case No. 811998 and 81011926, where he received "time-served" during a in-chambers hearing.
              [Attached hereto and labeled as an appendix is the transcript of the 03-28-94 hearing in that cause]

5.  Copies of receipts for money in various amounts, sundrys, phone calls, motel expenses, etc. that were given to Harry Martin by IDOC officials.  None of which were disclosed and/or raised during the trial in this cause.  These documents were atached to petitioner Carter's post-conviction petition.  See Appendix.

6.  On December 30, 1992, in the U.S. District Court, Northern District of Illinois, in U.S. v. Burnside, et al., 89 CR 909, Harry Martin testified before the Honorable James F. Holderman he had in fact received a reduction in his sentence for testifying against petitioner Carter and other codefendants in this case.  He testified that he cooperated with the State on a capital murdercase involving four inmates in the Illinois Department of Corrections.  After completing his cooperation, he was placed in the Federal Witness Protection Program.  He also testified that he was serving two consecutive sentences armed robbery totalling 45 years, 35 DuPage County and 10 County.  That in exchange for his testimony in this case, the DuPage County sentence was reduced to 21 years.  He testified that when the Illinois Appellate Court overturned four of his six convctions, "the State of Illinois and the people he had assisted vouched for him and got his sentence reduced."  See pages 4349-4352 of Exhibit C of codefendant Easley's post-conviction petition.

The non-disclosure of this evidence caused an extreme  amount of prejudice, affecting the defense's ability to impeach Mr. Martin, and expose his motive and bias to testify to the jurors hearing the case, his credibility being at issue, would have permitted the defense to question his trustworthyness prior to obtaining the request for the wire tap.  Brady, supra.  Although, a suppression of the tape recording is normally a pretrial issue, petitioner could not possible request something that has been held from him, unknowingly.  There is an reasonable likelihood that there would have been a different result.

An evidentiary hearing is essential to allow petitioner to prove the allegations contained in his petition.  Townsend v. Sain, ___ U.S. ___.

Issue

VIII

WHETHER THE STATE APPELLATE COURT ERRED WHEN IT
REFUSED TO PROVIDE PETITIONER CARTER WITH AN
EVIDENTIARY HEARING ON HIS CLAIM OF "ACTUAL
INNOCENCE" WHICH IS COGNIZABLE UNDER THE POST-
CONVICTION HEARING ACT.

In People v. Washington, 665 N.E.2d 1330 (Ill. 1996), the
Illinois Supreme Court was presented with a question of "whether
due process is implicated in a claim of innocence based upon new
evidence so as to permit the claim to be raised in a petition
under the Post-Conviction Act... the majority of the Court held
that it is."  Id. Washington, 665 N.E.2d at 1331

In this instant case, evidence obtained by petitioner
Carter clearly shows that "someone other than petitioner" was
responsible for designing and initiating the plot to injure the
victim in this case.  Petitioner alleged in his pro se Petition
for post-Conviction Relief that certain evidence was obtained
after his trial and appeal process in this matter.  The evidence
tended to show that someone other than himself committed the
offense in which he is presently being held in confinement for.

In support of his actual innocence claim, petitioner attached
an affidavit prepared by inmate Corwyn Brown to his petition. (C-
66)  In his affidavit, Corwyn Brown admit that he was responsible
for ordering "the hit" on Supt. Taylor on September 2, 1987.  (C-
66)  Corwyn Brown also admits that petitioner Carter was forced
into taking the blame for the crime and was intimidated into

- 115 -

keeping quiet about his innocence.   (C-50 C-66)   Such declaration
was made with sufficent indicia of truthworthiness, and coincides
with eyewitness' accounts of Corwyn Brown's direct involvement.
See appendix - attached hereto and made part of for the sole
purpose of verification is Corwyn Brown's affidavit.

The following excerpts from the trial transcripts which
disclose testimony pertaining to the direct involvement of Corwyn
Brown.  Douglas Read, an Internal Security Investigator with the
Illinois Department of Corrections, testified that he had a
conversation with inmate Demetre Brown (occurance witness).   Read
spoke to Demetre Brown twice on that date.   In the second interview, ·
Mr. Brown told him that inmate Corwyn Brown had been with inmates
Easley and Lucas just minutes  before the attack, and that Corwyn
Brown had nodded his head and pointed towards Supt. Taylor's
office. (11-20-91 Vol. I, R 106-07).

Inmate Spiller (occurence witness) stated that he observed
Corwyn Brown point towards Supt. Taylor's office prior to the
attackers entering his office. (11-20-91 Vol. I, R.-110)

After obtaining Corwyn Brown's affidavit, petitioner also
obtained an affidavit from Michael Shaw a.k.a. Torrence Evans.
In Shaw's affidavit, Shaw states that he had spoken with Corwyn
Brown in October of 1996, while he was incarcerated at the Joliet
Correctional Center.  Shaw states that Corwyn Brown admitted to
him that he (Brown) ordered the attack  on Supt. Taylor and that
petitioner Carter was not involved.  See appendix, Shaw's affidavit.
Attached hereto and made part of for the sole purpose of verifica-
tion.

Clearly, Michael Shaw's affidavit obtained after petitioner's conviction, gives credence to petitioner's claim that he had no involvement in the attack and/or murder of Supt. Taylor, it corroborates inmate Corwyn Brown's statement also that petitioner was forced into accepting responsibility of this instant case by gang members.

In spite of raising an "actual innocence" claim with support-ing affidavits. Appointed counsels, Carey J. Luckman and W. Keith Davis failed to consult with petitioner Carter regarding this essential issue prior to preparation and filing of the amendment to the petition.

Petitioner Carter request this Court to hold an evidentiary hearing to enable him to prove that his constitutional rights were violated in the process. <u>Townsend v. Sain</u>, 312 U.S. 293.

CONCLUSION

WHEREFORE, petitioner David Carter humbly prays that this Honorable Court will review and recognize the manner in which the State of Illinois, and their agents, the Government and their agent feigned ignorance to the State's plight in this cause, and appoint counsel to represent him, and hold an evidentiary hearing.

Respectfully submitted,

David Carter    N-43429
Stateville Correctional Center
Post Office Box 112
Joliet, Illinois  60434-0112

- 117 -

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. DAVID CARTER, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | No. _____ |
| TERRY L. MCCANN, Warden, | ) ) | |
| Respondent, | ) ) ) | |

# A P P E N D I C E S

| Item | Contents | Page |
|------|----------|------|
| Affidavit | Harry Martin regarding deals & benefits | 1-6 |
| Affidavit | Michael Shaw regarding petitoner's involvement | 7-8 |
| Affidavit | Corwyn Brown regarding petitioner's involvement | 9-13 |
| Transcript | Du Page Co. Harry Martin's time reduction | 14-20 |
| Order | DuPage Co. sealing Martin's file | 21 |
| Order | DuPage Co. granting Martin's petition | 22 |
| Mittimus | DuPage Co.  re-sentencing Martin to time-served | 23 |
| Motion | Copy of Notice of Filing to Martin's petition | 24 |
| letter | To Judge Frobih from petitioner Carter 3-4-03 | 25-27 |
| letter | To attorney Carey Luckman from petitioner Carter | 28-32 |
| letter | To Judge Frobish from petitioner Carter 6-9-02 | 33-34 |
| Transcript | Cook County - Martin's time reduction | 35-46 |
| Transcript | Hearing on State's Motion to Dismiss 6-1-03 | 47-69 |
| Decision | People v. Harry Martin, (Jan. 12, 1984) | 70-87 |

IN THE

CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

LIVINGSTON COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS )
         Respondants )
)
)    No 87 CF 112
)
)
-VS- )
)
)
)    Charles E. Glennon
)    Judge Presiding
DAVID W. CARTER )
         Petitioner )

---

AFFIDAVIT OF HARRY MARTIN

David W. Carter #N43429
P.O. Box 112
Joliet, Illinois 60434-0112

C-58

(1)

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
LIVINGSTON COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS,          )
                                          )
    *Plaintiff-Respondent,*                )
                                          )
    vs.                                   )    **No. 87-CF-113**
                                          )
IKE J. EASLEY, JR.                        )
                                          )
    *Defendant-Petitioner.*               )

---

### AFFIDAVIT OF HARRY MARTIN

HARRY MARTIN, on oath, states:

1.    I am the government informer who used an eavesdropping device to record a conversation with the defendant in this case in October 1987. I am also the subject of Exhibits 45-47 to the Second Amended Petition for Post-Conviction Relief filed by the same defendant. I am presently in federal custody.

2.    I have read the Petition for Order Authorizing Use of Eavesdropping Device, filed in this case on October 2, 1987, by James Wasson, requesting authorization for an eavesdropping device to record a conversation between the defendant and me.

3.    That petition, at paragraph 1(b) of Attachment 1, falsely states that I had "cooperated" with the Department of Corrections for a number of years and had been found to be "reliable" during that time. The truth is that I had never cooperated with the Department of Corrections as an informer or in any other way until after the murder of Robert Taylor on September 3, 1987.

4.    Before that time, Michael O'Leary, the warden at Stateville Correctional Center, and Russ Nelson, an investigator for the Department of Corrections ("DOC"), had tried

C-59

ATTACHMENT (2)

unsuccessfully to get me to cooperate with the DOC in its investigation of Larry Hoover and the Brotherhood of Struggle. This happened in June of 1987 in the warden's office at Stateville where I was an inmate. O'Leary and Nelson offered to get my sentence reduced, get me out of prison, and put me in the witness protection program.

5.     Nelson and O'Leary also tried to get me to cooperate by threatening me: they said that the Board of Governors of the Black Gangster Disciples ("BGDs") were planning to assassinate me, and that if I did not cooperate with the State, DOC officials would "parade" me in front of other inmates so that the other inmates would think I was cooperating. I refused to cooperate.

6.     Nelson and O'Leary then had me placed in protective custody, and within two or three days brought me to the prosecutor's office in Will County, as if to suggest that I was cooperating with the State.

7.     When I was brought to the prosecutor's office, several people were there: Nelson, O'Leary, Mike McKinney (chief investigator at DOC), investigators from the Cook County State's Attorney's office, including J.W. Glasscott, lawyers from the Will County State's Attorney's office, and an investigator from the Department of Criminal Investigations of the State Police. They continued to lean on me to cooperate. I was afraid, so I said that I would cooperate with the investigation if DOC moved me to Dixon, a medium/minimum security prison.

8.     They moved me to Dixon. Once I was there, Russ Nelson and J.W. Glasscott came down and tried to get information from me. But I stonewalled them. I was then transferred to Pontiac Correctional Center. This was some time in July 1987, right after

2

C. 60

"Zodiac" was killed. I was put in lockdown.

9.    A day or two after I arrived at Pontiac, my wife visited me and told me that the word "in the street" was that the BGDs were planning to assassinate me in prison. After visiting me, my wife went to Warden James Chrans' office and told him the same thing. Chrans called me into his office that evening and said that he was not going to have me killed on his watch. He then transferred me to Logan Correctional Center. All of this happened within three days of my being sent to Pontiac.

10.    Within a day or two after the murder of Robert Taylor on September 3, 1987, Russ Nelson telephoned me at Logan. I took the call in an office there. Nelson asked me to help in their investigation of the murder. I refused.

11.    The very next morning Warden Chrans telephoned me -- I was again brought to an office to take the call -- and reminded me that he had saved my life by sending me to Logan and that I owed him a favor. I said I would listen to what the State had to say.

12.    The next day, Gerald Long, a Deputy Director of DOC, and Jerry Donovan, a DOC investigator, came to Logan to see me. They said they needed my help, and they pointed out that I was in trouble as long as I was in prison, as a result of having been set up. I realized that I would always be in danger while I was in prison, and I felt the only way I could survive would be if I cooperated with the State. So I finally agreed to help with the investigation of the killing, including testifying at trials, if necessary.

13.    At that same meeting, which took place at an office at Logan within a week of Taylor's murder, we ironed out a deal, whereby Long and Donovan promised me the following benefits in return for my cooperation:

3

C. 61

AFT. - 3    (4)

a.    they would immediately move my wife and three children downstate so that they could be near me.

b.    I would be allowed to make "home visits" or furloughs, beginning immediately. Home visits consisted of leaving Logan once or twice a week to visit my wife and children. During these day visits, I was free to do whatever I wanted to do and go wherever I wanted to go.

c.    I would get paid generously. They stressed that there was lots of different ways of paying me, including cash, commissary goods, witness funds, federal money and "O.A.F." funds (they did not say what that stood for).

d.    All of the state officials with whom I cooperated, including Long, Donovan, McKinney, and Will County State's Attorney's lawyers Bernardi, Brown, and Wasson, would vouch for me in court or through clemency petitions to get me released from incarceration once the investigation and trials were completed.  (At the time of this meeting, I had served about eight years of two sentences totalling 45 years -- 10 from a Cook County conviction and 35 from a DuPage County conviction.)

e.    Long and Donovan said that the DOC Director would bring a clemency petition to the Governor to sign to make sure I was released, if the courts did not commute my sentences.  (In fact, in October of 1990, Deputy Director Klemm took a clemency petition to the Governor, but I was out by then.)

14.   This "deal" was set out on that first day I met with Long and Donovan at Logan. In subsequent meetings, details were ironed out, such as where the money would come from. (For example, Long gave me a DOC phone card in the name of Stu Erickson, a DOC

4

C.62

investigator, in September, 1987.) But the basic outline as set forth above was laid out before I had done any eavesdropping for the Department.

15.    On September 26, 1987, I wore an eavesdropping device to record a conversation with Corwyn Brown, an inmate from Pontiac who had been sent to Logan so that I could record a conversation with him about Taylor's murder. Following my conversation with Brown, on the same day, Gerald Long came to see me and again confirmed all parts of the deal outlined above.

16.    I have looked at Exhibit 46 to the defendant's Second Amended Petition for Post-Conviction Relief. That exhibit contains copies of state vouchers showing payments to me of approximately $8,000 made during a three and one-half month period, from September 21, 1987, to January 7, 1988. Those vouchers do not show anywhere near the total amount I was paid by the State. The State actually paid me three to four times as much by the time of Ike Easley's trial, in June of 1989.

17.    I received many cash payments. I ran up hundreds, if not thousands of dollars worth of phone calls on Stu Erickson's phone card. I made extensive purchases at the commissary at Logan under the name of James Brokaw. The vouchers in Exhibit 46 list business calls from hotels. But I never made any "business calls". They were all calls to friends and family.

18.    I was given two polygraph tests s by the state. Long told me I failed both of them. The first one was administered to me in October or November 1987, after I had completed all of my electronic conversations, in Springfield at the office of the Illinois State Police. The purpose was to show how reliable I was, so I was asked (and confirmed) if I had

$C \cdot 63$

(6)

been cooperating with the State for a long time. I also was asked about the BGDs and about Taylor's murder. I don't know what questions caused me to fail the test. Long told me he had a friend of his at the State Police doctor the polygraph. The second polygraph was administered at Logan by DOC in November 1988 and involved the same questions. I believe the State suppressed both tests.

19.   I am willing to testify to all of the statements I have made in this affidavit.

HARRY MARTIN

Sworn to and subscribed
before me this _5th_ day
of September, 1997.

Witnessed by:

_____

Notary Public

Bar # 04952300

Leonard E. Cox, Attorney

6

C.64

(7)

ATT. - 6

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
LIVINGSTON COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS, )
)
      Plaintiff-Respondent, )
)
)
)
      vs. )    No. 87-CF-112
)
)
)
DAVID W. CARTER )
)
      Defendant-Petitioner. )

---

### AFFIDAVIT OF MICHEAL SHAW, AKA TORRENCE EVANS

MICHEAL SHAW, on oath, states:

1. I am a person who on October 27, 1996 was an inmate at the Joliet Correctional Center with another inmate by the name of CORWYN BROWN. I am presently in State custody at the Stateville Correctional Center FARM DIVISION.

2. That on or about October 27, 1996 I had a conversation with CORWYN BROWN while incarcerated at the Joliet Correctional Center.

3. While conversating with CORWYN BROWN he stated to me that he had ordered by threat of bodily injury, David Carter and Micheal Johnson to take responsibility for the murder of Superintendent ROBERT TAYLOR in 1987 at the Pontiac Correctional Center.

4. CORWYN BROWN stated to me that neither DAVID CARTER nor MICHEAL JOHNSON had any knowledge of the murder of Superintendent ROBERT TAYLOR before the murder occured.

(8)

5. CORWYN BROWN stated to me that he alone had given the order on the attack of Superintendent Robert Taylor, and he had personally saw to it that his order was carried out.

6. Corwyn Brown stated to me that he had ordered by threat of bodily injury, DAVID CARTER and MICHEAL JOHNSON to take responsibility for the murder of Superintendent ROBERT TAYLOR with the HIERARCHY of the B.O.S., an organization in which he was a high ranking member.

7. In 1996 and in the years since I have tried to tell D.O.C. officials of the aforementioned statements, but I have been met with threats of prolonged incarceration, prosecution, and intimidation. I have been weighed down with this burden of knowing that two innocent men have been incarcerated all these years for a crime in which they were set up to take the fall for.

8. I come forward today in hopes of righting this terrible wrong, and I am willing to testify to all of the statements I have made in this affidavit.

MICHEAL SHAW    A 72965

Sworn to and subscribed before

me this  15  day

"OFFICIAL SEAL"
Candice M. Crooks
Notary Public, State of Illinois
My Commission Expires 04/26/03

Notary Public

(9)

IN THE

CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

LIVINGSTON COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS )
                    Respondants )
                                )   No 87 CF 112
                                )
                                )          - 
                                )
-VS-                            )
                                )
                                )   Charles E. Glennon
                                )   Judge Presiding
                                )
DAVID W. CARTER                 )
              Petitioner        )
                                )

AFFIDAVIT OF CORWYN BROWN

David W. Carter #N43429
P.O. Box 112
Joliet, Illinois 60434-0112

C-65

(10)

Oct. 30, 1996   J.C.C.

<u>Affidavit</u>

I, Corwyn Brown ; Do Hereby STATE AND AFFIRM THAT THe following is TRUE
iN everyway to the best of my Knowledge AND Recellections.

(s) Corwyn Brown N-07101

THAT ON Sept. 2, 1987 I Corwyn Brown met with two members of my
personal Security STAFF AND Discussed THe ATTACK of Correctional STAFF
AT THe Pontiac Correctional Center. THese two INmates were ANTHONY "T-21"
Williams who was my cellmate AND personal security STAFF member AND Perry
"P.M." Moore who Live NexT DOOR TO me AND was my personal security STAFF
member Also. I Advised THem iNside cell 536 iN THe SOUTH House THAT we HAD
TO ASSIST THe OTHer ORGANIZATION uNDer THe Six iN ATTACKiNG THe STAFF.
THey Asked why was THe security STAFF, GeNeral members STAFF NOT GOiNG
TO Be iNvolved AND I explaiNed THAT I Needed iNdividuals Loyal TO me
first AND THe MOB second. THey both uNDerSTOOd THis AND AGreed TO "Hit"
CaptaiN WHiTHer iN His office. I THeN ASked THree more iNdividuals
THAT I persoNally TRusTed TO iNvolved THemselves iN CertaiN THiNGs.
ONe was TO PLAY A kAdio ON THe BACKBreaks, NUMBer Two was TO
TAKE THe cAGe officer DOWNSTAiRs AND THe LAST was TO HAve A BAG
ON Five gallery for THe clothes AND Gloves TO Be THROWN OUT of THe
WiNDOW. THe LAST ONe was TO KNOw THere was A Hit ON BUT ON WHO,
WHAT OK WHere, STAFF OR INmate, He HAD No KNOwledge. THe MemBer
ON THe Breaks was Singue off six Gallery, AND All He was Told was TO
STAND ON THe BACK of Six + five AND BLAST THe sounds After YARD.
THe member THAT TOOK THe BACKBreaks officer DOWNSTAiRs was Melvin
"K-Dog" CLArk, who was ONly Told TO bo THAT so we could violate some
members. THe LAST member was Ike "J.R." Easley who was TO pick
up THe clothes AND Gloves, He was Aware of A Hit BUT ON WHO He
was NOT Aware. AND Knew He was ONly suppose TO DUMP some SHit

C.66

(11)

²⁵ OUT THE WINDOW. THEy were TOld THe Sept. 2, 1980, iN A cell oN five gALLERY SouTH Cell House. ON THe eveNING of Sept. 2, 1980, I, CoRwyn BROWN, WENT AND spoke to THE TWO SENIOR SECURITY PERSONS iN THe cell House AND INSTITUTION. I explained TO MicHeAl "Dice" JoHNSON AND DAviD "CAP" CARTER, THAT I WAS ABOUT TO pull A STUNT THAT WAS AGAINST orgANIZATIONAL policies from THe WHite House AND I wANTED THem TO Be THE BuffERs between me AND THe wHiteHouse so I would explAiN my "Olivek NoRth" buffer to them iN THe morNiNG.

THAT MORNING I HAD THe INSTITUTIONAl STAFF out AND ABOUT WITH me AND MADE ARe selves very NOTicABle THROUGHOUT THe INSTITUTION's GROUNDS. I weNT iN THAT AFTERNOON TO cHeck AND see wAS everyTHING ReAdy. AND I wANTED TO persoNAlly issue THe directive becAuse THey HAD Killed my brotHER Billy JoNes. WHeN THey cAlled yARD I wAiTed til eveRyoNe else HAD Left off THe gAlleRy AND wiTH my secuRity, I CoRwyn BROwN wAlked TOwARds ANTHoNy "T=21" Williams AND PeRRY "P.M." MooRe STANDING AT THe eND of THe gAlleRy iN froNT of SupeRiNTeNd-ANT RobeRt TAyLoR's office. As I wAlked pASS His office I NoDDed my HeAd AT Williams AND MooRe. By THe Time I got TO THe iNstitutioNAl mAiN cross wAlk THe officeRs weRe RunNiNG TowARds THe cell House so I weNT iNTo THe CHapel. AT THAT Time I pulled MicHeAl "Dice" JoHNSON TO THe side AlONg WiTH DAviD "CAP" CARTER AND TOld THem THAT THey Would HAve TO Accept the ResponsibiliTy WiTH THe wHile House AND wHeN AsKed STATE THAT THe INSTITUTIONAL CoordiNATORS HAD No KNowledge of ANy of THe eveNTs BUT it wAs A security imposed opeRATioN BecAuse Billy JoNe wAs oNce A OuTLAW from MicHeAl "Dice" JoHNSoN's Neighbor hood. AND BecAuse it wAs A STUNT By THe secuRity STAFF THe INSTITUTIONAl STAFF would be spARed from flAK. AND THe puNisHmeNT would be Left iN the HANds of THe INSTITUTIONAl CoordiNATeRs wHo would still be iN poweR. AND still beiNG iN poweR we would proTecT OUR GUys. AND THAT is THe STORy THAT wAs TO Be Held TO SubstituTING NAmes iN ceRTAiN ARRA's.

C-67                                    (12)

5.

Because if known to be in trouble they would obtain a great deal of support just to keep their mouths shut in case they knew who was actually responsible, and as long as their innocent they can't get convicted plus don't know anything to tell.

At no time prior to the assualt on Supt. Robert Taylor did either Micheal Johnson nor David Carter have knowledge of anything other than they had to be a buffer for a stunt I was going to pull.

At no time did Micheal Johnson or David Carter have the authority to tell any member to do something of this nature and extreme magnitude. It is not possible within the structure of the organization, unless it was done individually. But it was not. At no time did Micheal Johnson or David Carter have the loyality of the membership to attempt something of this magnitude without the Institutional Coordinator staff making the call, one of the two at least.

That on Sept. 3, 1987 I, Corwyn Brown No2101, ordered Anthony 'T-21' Williams and Perry "P.M" Moore into cell 552 to attack a correctional employee. To pipe them badly yet not to kill them but just one point worst then Supt. Goskie the day before. I now admit to this truth now because I see the waste of life and the killing of Supt. Robert Taylor and possible death of the two guys innocently convicted of murder when we're totally and solely responsible. It happened exactly as stated and the I.D.O.C. know's it and after a through and through investigation wrote and found me guilty of a disciplinary report stating exactly as the above except with different names. Please note that the two named individuals used there personal knowledge of the incident to convict Micheal Johnson and David Carter.

C.68

(13)

4.

LASTLY ANTHONY WILLIAMS WAS VERY AWARE THAT TO implicate me CORWYN BROWN THAT He would be implicating Himself. AND WHile WORKING IN Behalf of THe STATe of Illinois AND Dept. of CORRECTION FORged MY NAMe TO A COMplAINT THAT I CORWYN BROWN Refused TO SIGN IN Hopes of ENTRAPPING MR TO TESTIFY IN Behalf of THe STATe AGAINST THe Upper RANKING LEADERSHip of THe ORGANIZATION.

TO THe AFOREMENTIONed STATe I SWEAR before God AND COURT THAT IT is TRUE, I STATe AND Depose THis before PENALTY of PREJURY.

[s] Corwyn T. Brown N02101

Subscribe AND SWORE before me

THIS 20 DAY of NOV, 1996

Jeanne T. Ciancavelli
NOTARY PUBLIC

"OFFICIAL SEAL"
JEANNE T. CIANCANELLI
NOTARY PUBLIC. STATE OF ILLINOIS
MY COMMISSION EXPIRES 10-21-98

C.69

1

```
 1   STATE OF ILLINOIS    )
                          )  SS.      Duplicate Original
 2   COUNTY OF DU PAGE    )

 3      IN THE CIRCUIT COURT OF DU PAGE COUNTY FOR
        THE EIGHTEENTH JUDICIAL CIRCUIT OF ILLINOIS
 4
     THE PEOPLE OF THE              )
 5   STATE OF ILLINOIS              )
                                    )
 6              Plaintiff,          )
                                    )
 7          vs.                     )  No. 81 CF 325
                                    )
 8   HARRY MARTIN,                  )
                                    )
 9              Defendant.          )

10

11              REPORT OF PROCEEDINGS had at the

12   hearing of the above-entitled cause, before

13   the Honorable EDWARD W. KOWAL, Judge of said

14   Court, on Tuesday, the 1st day of October,

15   A.D. 1991, at the hour of 3:20 o'clock P.M.

16   PRESENT:

17
          MR. JAMES E. RYAN,
18        State's Attorney of DuPage County, by
          MR. RICHARD STOCK,
19        Assistant State's Attorney,

20             appeared on behalf of The People
               of the State of Illinois.
21

22
               DU PAGE COUNTY JUDICIAL CENTER
23             505 N. COUNTY FARM ROAD
               WHEATON, ILLINOIS 60187
24
```

C-418

2

```
 1    ALSO PRESENT:

 2

 3         MR. KENNETH W. TORLUEMKE,
           Public Defender of DuPage County, by
 4         MS. HARRIET DOHENY GUSTAFSON,
           Assistant Public Defender.
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

C-419

(16)

3

```
 1            THE COURT:  People versus Harry
 2    Martin.
 3            MS. GUSTAFSON:  Judge, I have
 4    prepared an order to impound this file as well
 5    as any record of proceedings.
 6            THE COURT:  Motion granted.
 7            MS. GUSTAFSON:  There is also, as the
 8    Court is aware -- I don't know what date in
 9    the Court file the post-conviction petition is
10    filed by Mr. Martin, what date it got filed.
11    I don't have a file stamp on my copy.
12            MR. STOCK:  I don't, either.
13                It's dated at the top of the
14    petition September 9th.
15            MS. GUSTAFSON:  I know we received
16    our copy on or about September 11th, so I
17    would imagine the Clerk's Office --
18            THE COURT:  The letter is dated
19    September 9, so we'll indicate that the
20    petition for post-conviction relief is dated
21    September 9, 1991.
22                Present in Court today is
23    Mr. Stock, representing the People, and
24    Ms. Gustafson, representing the Defendant.
```

4

1            MS. GUSTAFSON:   Judge, only in the

2      capacity as Officer of the Court.   We have

3      never formally been appointed.   And it's

4      Mr. Martin's pro se petition which is being

5      proceeded upon.

6            With respect to that, Judge,

7      Mr. Martin has raised issues with respect to

8      the appropriateness of the sentencing in his

9      post-conviction petition, and that is the

10     matter he's asking the Court to grant him

11     relief upon.

12            THE COURT:   All right.   This matter

13     coming on to be heard on the post-conviction

14     petition, the provision in the petition

15     requesting this matter be resentenced, any

16     objection by the State?

17            MR. STOCK:   No, your Honor.

18            THE COURT:   Motion granted.

19            The matter comes on for

20     resentencing.   Any arguments by the State, any

21     argument by defense counsel?

22            MR. STOCK:   No, your Honor.   We would

23     rely on what was said during the 402

24     conference.

5

1          THE COURT:  Resentencing on this

2    matter, the sentence now will be 21 years

3    Department of Corrections, credit for time

4    served.

5          It is my understanding that

6    Defendant, therefore, will be entitled to a

7    release.  Is that correct?

8          MS. GUSTAFSON:  It's my

9    understanding, Judge, that once the Department

10   of Corrections processes the appropriate

11   paperwork, he will be released from the

12   Department of Corrections sentence.

13          He may, perhaps, still be on a

14   Mandatory Supervised Release period.  However,

15   that will be coordinated with the federal

16   government.

17          MR. STOCK:  And, as we discussed,

18   Judge, there is a consecutive sentence in

19   Cook County, which he would remain, at this

20   point at least, still serving.

21          THE COURT:  All right.  Order entered

22   granting the relief as required, and an order

23   has been drawn.

24          The usual admonishment on

6

1   resentencing on this matter of the right of

2   appeal; 30 days to file notice of appeal.

3           Appellate Defender will be

4   appointed if he seeks counsel.  And the

5   Defendant can file his own request for the

6   Clerk to file a notice of appeal if he wishes.

7           MS. GUSTAFSON:  Thank you.

8           MR. STOCK:  Thank you.

9

10          (WHICH were all of the

11           proceedings had at the

12           hearing of the above-

13           entitled cause, this date

14           and time aforesaid.)

15

16

17

18

19

20

21

22

23

24

C-423 (20)

7

```
 1    STATE OF ILLINOIS   )
                          )  SS.
 2    COUNTY OF DU PAGE   )

 3

 4            I, ERNEST C. SCOLA, C.S.R.,

 5    Official Court Reporter, do hereby certify

 6    that I reported in shorthand the proceedings

 7    had at the hearing of the above-entitled

 8    cause, and that the foregoing Report of

 9    Proceedings, consisting of Pages 1 to 6,

10    inclusive, is a true, correct and complete

11    transcript of my shorthand notes so taken at

12    the time and place hereinabove set forth.

13

14

15

16

17
      _____
18            OFFICIAL COURT REPORTER
                 C.S.R. No. 084-001200
19      Eighteenth Judicial Circuit of Illinois
                    DuPage County.
20

21

22

23

24
```

Ernest C. Scola, CSR
Official Court Reporter

C-424   (21)

T-CR 35 (Rev. 1/82)

**UNITED STATES OF AMERICA**

**STATE OF ILLINOIS**                                      **COUNTY OF DUPAGE**
**IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT**

PEOPLE OF THE STATE OF ILLINOIS

                    –VS–                      Case No. _____ 81 CF 325

            HARRY MARTIN
                              Defendant

## ORDER

This cause having come on to be heard upon the motion of the ____STATE____
and the Court being fully advised in the premises, and having jurisdiction of the subject matter:

**IT IS HEREBY ORDERED**    that this file is to be impounded by the Clerk of the

Circuit Court until further order of this Court.

COPY

Name _____
DuPage Attorney No. _____
Attorney for _____          Enter: _____
Address _____                                      Judge
City _____
Phone _____          Date _____

PROCESSED
2 1991

JOHN W. COCKRELL, CLERK OF THE 18TH JUDICIAL CIRCUIT COURT    EXHIBIT 45-1

C.330

(22)

T-CR 35(Rev. 1/82)

**UNITED STATES OF AMERICA**

**STATE OF ILLINOIS**                                                                  **COUNTY OF DUPAGE**
**IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT**

PEOPLE OF THE STATE OF ILLINOIS

—VS—                                                Case No. ___81 CF 325___

HARRY MARTIN

_____ Defendant

File Stamp Here

## ORDER

This cause having come on to be heard upon the motion of the     Petitioner, Harry Martin for post conviction
and the Court being fully advised in the premises, and having jurisdiction of the subject matter:

IT IS HEREBY ORDERED     that the post-conviction petition ~~filed on~~ dated Sept. 9, 1991

is hereby granted only with respect to sentencing issues. Therefore,

sentence of October 13, 1981 is vacated and petitioner is resentenced

to 21 (twenty one) years in the Illinois Department of Corrections,

day for day credit to apply, all time considered served.

COPY

Name     ASA. Stock/Petitioner Pro-se
DuPage Attorney No.     50000
Attorney for _____
Address _____                                        _____
City _____                                                          Judge
Phone _____

PROCESSED

DATE   2 1991 10 - 1 - 91

CIRCUIT CLERK

EXH. 45-2

JOHN W. COCKRELL, CLERK OF THE 18TH JUDICIAL CIRCUIT COURT

C-331

(23)

Criminal Sentence Form

AD-152 (Rev. 6/91)

**UNITED STATES OF AMERICA**

**STATE OF ILLINOIS**                                            **COUNTY OF DU PAGE**
**IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT**

People of the State of Illinois          NO. 81 CF 325

                                          DO #_____

                                          ☑ Indictment

Vs.                                       ☐ Information

HARRY MARTIN                              ☐ Complaint
Defendant
                                          ☐ Resentence
                                                            File Stamp Here

**PLEA** ☒ NOT GUILTY  ☐ GUILTY  **FINDING OF GUILTY BY** ☐ COURT  ☒ JURY
It is hereby ordered that the defendant is sentenced as follows:
**TYPE OF SENTENCE**

☐ FINED TOTAL AMOUNT $ _____         ☐ COURT SUPERVISION—END DATE _____
which includes court costs, penalties and fees as provided by
statute.                                         ☐ COUNTY JAIL _____ DAYS

☐ FINES $ _____ plus statutory court    TO BEGIN _____
costs and fees and the following penalties
☐ Criminal Surcharge Fund                       ☒ ILLINOIS DEPARTMENT OF CORRECTIONS
☐ Violent Crime Victim Assistance Fund             ☐ Boot Camp
☐ Driver's Education Fund
                                                 ☐ CUSTODY OF THE U. S. ATTORNEY GENERAL
☐ PROBATION _____ MONTHS—END DATE _____
☐ PERIODIC IMPRISONMENT                          ☐ STATE'S ATTORNEY ALLOWED
☐ Work Release Program                              _____ NO. OF DAYS PER DIEM
☐ Week End
                                                 ☐ NO CREDIT FOR GOOD TIME
☐ CONDITIONAL DISCHARGE—END DATE _____
                                                 ☐ AMENDED CHARGE _____

RE- SENTENCE

Upon granting defendant petition for post conviction relief on sentence only
sentence of 10 |13| 81 is vacated. Defendant resentenced
to 21 years Illinois Dept of Corrections, day for day
credit to apply, all time considered served.

Disposition of companion cases (not sentenced) _____

State's Attorney _Stock_                    JUDGE _____
Defense Attorney _Defendant Pro Se_        Date _10 /1/91_
Deputy Clerk _Bostick_                          PROCESSED
Reporter _Scola_          C.74             OCT 2 1991
                                           ☐ No Credit Time Served.  Credit will be given unless this box is checked
Bailiff _Stors_                            ☐ Defendant released from custody.

                                                                        (24)

JOEL A. KAGANN, CLERK OF THE 18TH JUDICIAL CIRCUIT COURT
WHEATON, ILLINOIS

FXH  45-3

8/c/= 325

IN THE

CIRCUIT COURT OF DUPAGE COUNTY

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS,<br>Respondent,<br><br>vs<br><br>HARRY JAMES MARTIN,<br>Petitioner, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

PC. No.

Honorable,

Judge Presiding
UNDER SEAL —
IN CAMERA

## MOTION TO PROCEED IN FORMA PAUPERIS

## AND TO APPOINT COUNSEL

Petitioner Harry Martin comes before the court and respectfully requests that he be permitted to file the attached Petition for Post-Conviction Relief in forma pauperis and to proceed in forma pauperis and to have an attorney appointed to represent him in this proceeding.

In support of this request, Petitioner states:

1. That he is presently incarcerated.

2. That he is without any income or assets with which to pay for the costs of this litigation or to procure counsel.

Wherefore , Petitioner prays that he be granted leave to file and to proceed in forma pauperis in the above captioned Petition for Post-Conviction Relief and to have counsel appointed to represent him in this proceeding.

PROCESSED

Harry J. Martin
Petitioner

CIRCUIT CLERK

C.75

(25)

ExH. 45-4

I swear under the penalty of perjury that the facts stated in this Motion are true and correct in substance and in fact.

March 4, 2003

Hon. Harold J. Frobish
Circuit Court Judge
Circuit Court of Illinois
Eleventh Judicial Circuit
Livingston County Courthouse
112 West Madison Street
Pontiac, Illinois 61764



Re:  People v. David Carter (Livingston County Case No. 87
     CF 112); assigned legal counsel Mr. Keith Davis.

Dear Honorable Judge Frobish:

Sir, it is with a great deal of personal reluctancy that I
find myself writing this particular letter to you.  However,
in realizing that it is my responsibility to protect myself
in situations such as this, I find that no other option is
open to me, thus this letter.

Following the appointment of Attorney Keith Davis to my case
it has been increasingly difficult if not impossible, to
form some sort of working relationship with him, as the
following chart will illustrate:

    a.  appointment of Keith Davis on 04/15/02;
    b.  correspondence from defendant to Hon. Judge Frobish
        on 06.09/02;
    c.  correspondence from legal counsel Keith Davis on
        07/03/02;
    d.  notification from Keith Davis's Office regarding
        his placement on my visiting list for a legal
        visit;
    e.  correspondence from defendant to legal counsel
        Keith Davis on 07/11/02;
    f.  visit with legal counsel Keith Davis on 11/05/02;
        at the Stateville Correctional Center;
    g.  correspondence to legal counsel Keith Davis from
        the defendant on 11/11/02;
    h.  correspondence to legal counsel Keith Davis on
        12/26/02 from defendant;
    i.  correspondence to legal counsel Keith Davis on
        01/23/03; from defendant;
    j.  correspondence to legal counsel Keith Davis on
        01/30/03; from defendant;
    k.  correspondence to legal counsel Keith Davis on
        02/08/03; from defendant.

Sir, the overall majority of my correspondence to Attorney
Keith Davis from 11/11/02; contained both legal questions
and/or legal documentation pertaining to my legal situation,
on up to my last effort to communicate with him on 02/08/03.
As reflected above herein, there has not been any acknowledge-
ment of my correspondence by Attorney Keith Davis, nor has
he bothered to respond to any of my letters.

It is obvious, that given the fact that he (Attorney Keith
Davis) and I, are not able to form any means of mutual

C- 444

(26)

communication between us, that we are not able to have a
working attorney/client relationship. This of course hinders
any participation on my part as far as assisting in my own
defense, given the fact that I have been unable to form any
working relationship with assigned legal counsel Keith
Davis.

Sir, this case has been pending for a number of years now,
and I am certain that this Honorable Court would like to get
the matter resolved as soon as possible, such is likewise my
intent as well. However, given the current attorney/client
relationship that I find myself in, that possibility appears
to be remote.

I therefore respectfully request that this Honorable Court
appoint someone other than Attorney Keith Davis to represent
my cause before bar, for it may be logically inferred that
said legal counsel has no genuine interest in this Cause
which he has been assigned to.

Your time and attention to this most urgent matter is greatly
appreciated!

Respectfully requested,

_Mr. David Carter_
Mr. David Carter
Reg. No. N-43429
P.O. Box 112
Joliet, IL. 60434

## CERTIFICATE OF SERVICE

The undersigned do hereby certify under penalties of perjury
that he has forwarded a copy of this correspondence to
assigned legal counsel Keith Davis, by depositing such copy
in the United States mail-box at P.O. Box 112, Joliet,
Illinois 60434; in an envelope bearing sufficient postage.

/s/ _David Carter_

SWORN and SUBSCRIBED to before me

this 4th day of March, 2003 A.D.

Notary Public

OFFICIAL SEAL
EDMUND BUTKIEWICZ
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 10-11-06

C. 445

(27)

May 1, 1999

Mr. Carey J. Luckman
   Attorney At Law
   305 W. Washington
   Pontiac, IL 61764

re: Relevant information for my Post-Conviction Petition & Section 2-
1401 of the Code of Civil Procedure.

Dear Mr. Luckman:

        I received yesterday 4-30-99 your letter dated April 26,
1999 along with the enclosed Order from Judge Frobish pertaining to my
Motion to Excuse Late Filing under the Post-Conviction Relief Act &
Section 2-1401 Petition. I have thoroughly read the Judges Order and
quite frankly it seems to me that the Judge is playing politics within
his decision by allowing the State a second opportunity to somehow
convince him to deny my petition altogether. To bolster my point on
this matter I would point to page (5) of Judge Frobish's Order where
it is stated in the first part of that paragraph "Whether the defendant
can meet the stringent requirements of Post-Judgement relief on the
merits may be speculative; such particularly is the case inasmuch as
the evidence against him includes very damaging inculpatory statements
on his part that were taped." This part of the Order is designed to
give the State the "Harmless Error" route in its reconsideration
strategy and something in which I feel the Judge will be politically
safe to rule against me on. Therefore, I would like to bring to your
attention as a part of our strategy on that point the following facts.
(A) I am making a claim of ACTUAL INNOCENCE in this matter. I was
forced by threat of my life and family well-being to make the statements
that I made to Martin. The Affidavit of Corwyn Brown backs up this
fact.  ·
(B) I made the Statements to Martin that were taped over 30 days after
the Murder occured, and I only did so to survive in prison under
threat of my life from Corwyn Brown. (See Corwyn Brown Affidavit.)

(28)

(1)

(C) I did not have knowledge of this crime until after it occured and
I was not involved in the planning or any other conpiracy in this
crime. Nor did I have the authority to direct anyone else to commit
such a crime. (See Corwyn Brown Affidavit.)

(D) Martin's Affidavit establishes that the STATE provided FALSE
INFORMATION to the Court when in its APPLICATION for an EAVESDROPPING
device it claimed that Martin had been a confidential informant for
some years and had provided reliable information to the State. (See
Affidavit of Harry Martin, page 1 paragraph 3.) This fact alone would
make the taped conversation inadmissible when proven in a Court of
Law. So this would make the taped conversation ·FRUITS of a POISONOUS
TREE, or NULL & VOID. To bolster this point I would refer you to
People V. M.H. and J.M., No. 2-97-0697 (July 23.) Section 114-1 (A)
114-1 (E). The essense of this case states as follows: The 2d District
Appeallate Court recently held in a case of first impression that
obtaining an indictment through the use of PERJURED TESTIMONY is not
only a Due Process violation sufficient to warrant dismissal, but
incapable of being cured by returning a new charge against the defendant.

(E) Martin alleges that he was given 2 polygraph examinations in which
the above question and others were asked and according to Martin ·he
was told by Deputy Director Gerald Long that he had failed both of
them. (See Paragraph 18 of Martin's Affidavit.) Of course none of this
information was turned over to the defense and still have not been
turned over to this day May 1 1999, nor have any results of said exam,
or even the acknowledgement that such tests were ever taken. I believe
that I may have found a case that may be of assistance regarding this
issue. (See Rupe V. Wood - F. Supp - 1994 WL 518844 (W.D. Wash.)
(Death Penalty - Polygraph Evidence.)

Furthermore, I have discovered additional case law which would support
my Post-Conviction & Relief from Judgment Petition.

(1) Where Prosecutor's alledged intentional violation of discovery
orders was not known at trial and was not known by the Appeallate
Court at time of opinion on direct appeal, defendant was not forclosed
from raising issue in support of petition for relief from Judgement or
decree. (See People V. Hammond 1982, 61 Ill. Dec. 1, 105 Ill. App. 3d.
175, 433 N.E. 2d. 1329.) & Lubers V. Norfolk and Western Ry Co. cited

(2)

(29)

by Judge Frobish in his ORDER.

Moreover, there are Four particular cases that are crucial in helping us overturn this conviction. Two of these cases I felt the need to copy and send to you right away so that they will be included in any arguments or further pleadings on my behalf. (See People V. Dedrick Coleman.) In support of helping to get an evidentiary hearing.) Attached. Also, (See People V. Jimmerson Supreme Ct. of Illinois.) Attached. The other two cases are People V. Owens  129 Ill. 2d 303, 308, 544, N.E. 276 (1989) Where it is stated that the trial court MUST conduct an evidentiary hearing where the record or accompanying Affidavits support the defendants claim that his constitutional rights were violated. Also see People V. Ronnie Dockery No. 1-97-1790 fourth Division April 23, 1998.

The next issue I will address is at page (5) of Judge Frobish's order paragraph 2 states "At the same time, it is true that what the defendant knew and when he knew it is peculiarly within the knowledge of the defendant. Should the State desire an evidentiary hearing involving the defendant on this issue, the Court would be inclined to permit the State to request reconsideration of the order made herein after examination of the defendant and consideration of any relevant evidence.

FACT: This question has already been answered in my original Petition filed stamped Aug. 10, 1997. (See Letters from attorney Aviva futorian. Letter dated August 11. 1997, Letter Dated August 14, 1997, Letter dated August 25, 1997, Letter Dated September 15, 1997. These letters are further proof of when I received the facts that support my petition.

Secondly, you can subpoena my institutional legal mail records that will also show when I received the information that was fraudulently concealed & the affidavit that support my petition.

Third, Attorney Aviva Futorian can be contacted, and I am sure she will be willing to forward an affidavit to the Court regarding when & what she forwarded to me relevant to the Fraudulently Concealed evidence and Affidavit concerning key State witness Harry Martin.

(3)                                                    (30)

Dear Mr. Luckman here is a list of questions to be presented for Evidentiary Review.

(1) ACTUAL INNOCENCE CLAIM, (Corwyn Brown Affidavit.)
(A) Did Corwyn Brown order me to talk to Martin and take responsibility for his crime.?

(B) If I had not followed the orders of Corwyn Brown would my life or my family be in danger. (We will have to subpoena Corwyn Brown to testify.?

(C) If the JURY had been allowed to here this testimony would the outcome have been different?

(2) Did Martin receive a reduction in his sentence to time served 6 weeks prior to testifying in this case that he had not received anything in return for his cooperation in this case?

(A) Did the D.O.C. & the State know of these deals & Monies given to Martin. (See testimony of Gerald Long Deputy Director of D.O.C & Martin's Affidavit.)

(B) Should the State have known of these deals?

(3) Did the State provide False information to the Court in its application for an eavesdropping device. (See paragraph 2 & 3 of Martin's affidavit.)

(A) We must subpoena any and all records of Martin's alledged reliable information provided to the State for the years they claim he had provided reliable information.

(4) Was there a polygraph examination done on Martin? WHERE, WHEN, & WHAT were the results? Why was'nt this information turned over to the defense? (See paragraph 18 of Martin's affidavit.) Martin must be subpoena to testify.

(31)

(4)

(5) Was Martin given day & night furloughs to visit his family? (See paragraph 13 B of Martin's Affidavit.)

(A) The Department of Corrections Records regarding Martin's where abouts during the entire time he was a witness in this case must be subpoena.

(6) How much MONEY exactly was Martin given in return for his cooperation? (See paragraph 13,14,15,16,&17 of Martin's Affidavit.) We have to subpoena this information.

(7) Why was'nt Martin's extensive criminal history turned over to the defense? (See EXHIBIT 47 of Petition.)

Please add any other questions that you see beneficial to over turning this conviction.

---

Dear Mr. Luckman, I have added pieces of crucial testimony of Martin, Gerald Long. Trial transcript showing that Corwyn Brown was the true perpetrator in this crime and that I was set up to take the fall. (Please see attached documents.)

Finally, I want to APPEAL the Judge's decision to deny our Motion to excuse Late filing under the Post-Conviction Hearing Act. I know that we still have one tank left on the battle field, but two tanks are better than one, and I do not want to waive any of my Constitutional Rights.

Again I truly thank you for all that you have done thus far, and I pray that God Almighty blesses you and yours with perfect health & happiness

Very Truly Yours,

David Carter

(32)

(5)

P.S. Also enclosed is a copy of the Motion to Stay my HABEAS CORPUS
PETITION. (See Motion to STAY proceedings.

(33)

June 9, 2002

Hon. Harold J. Frobish
Circuit Judge, Eleventh Judicial Circuit
Livingston County Courthouse
112 West Madison Street
Pontiac, Illinois 61764



re: Correspondence from you dated April 15, 2002; and appointment
    of new legal counsel.

Dear Hon. Harold Frobish:

Sir, I am the Defendant in People v. Carter, No. 87-CF-112. On
the 15th of April, 2002; you specifically informed me via
correspondence that the following attorney had been assigned to
represent me, because prior legal counsel had been appointed to
the position of Associate Judge.

> Attorney Keith Davis
> 237 E. Front Street
> Bloomington, IL. 61701
> (309) 827-5425.

After waiting a period of more than (10) business days and not
hearing from Attorney Davis, I wrote and basically introduced
myself and expressed my position. To-Date, said counsel has not
acknowledged my correspondence, nor has he made any effort to
contact me in any manner.

I am concerned because it is essential that he review prior
correspondence, that I had with Attorney Paul Lawrence. Therein,
I presented materials and raised issues which I believe to be
meritorious, and I requested that such be presented before bar.

Please inform me of the status of counsel and this cause.

C-425

(34)

(2)

Respectfully Requested,

*David Carter*

Mr. David Carter
No. N43429
P.O. Box 112
Joliet, Ill. 60434-0112

cc: per. file

C.426

(35)

| | |
|---|---|
| 1 | IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT |
| 2 | MUNICIPAL DEPARTMENT - SECOND MUNICIPAL DIVISION |

| | | |
|---|---|---|
| 3 | THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) |
| 4 | Plaintiff, | ) ) |
| 5 | -vs- | ) ) 811998 and 81011926 |
| 6 | HARRY MARTIN, | ) ) |
| 7 | Defendant. | ) ) ) |

8

9              REPORT OF PROCEEDINGS

had at the hearing of the above-entitled cause came on for

10   hearing before the Honorable FRANCIS MAHON, on the 28th

11   day of March, 1994 in Skokie.

12

13      APPEARANCES:

14          MR. JACK O'MALLEY,
            State's Attorney of Cook County,
15          by:  MR. BERNIE MURRAY,
            Assistant State's Attorney,
16          for the People of the State of Illinois;

17          MR. PAUL HICKEY,
               appeared on behalf of the Defendant.

18

19

20

21

22

23   SUZIE W. NOLAN, CSR
     Official Court Reporter
     5600 Old Orchard - 204
24   Skokie, IL  60077

1

C-534 C-405

(36)

1          THE CLERK:  Harry Martin.

2          THE COURT:  Everybody agrees to go back in chambers

3    to make a decision, and whatever else we have to do

4    instead of being in the public.

5          MR. MURRAY:  Gentlemen, my name is Peter

6    H-i-c-k-e-y.  I represent Mr. Martin.

7          MR. MURRAY:  Assistant State's Attorney

8    Murray M-u-r-r-a-y.

9                    (The following proceedings were had in

10                    chambers.)

11         THE COURT:  Anybody want to say anything further

12   about this case or would you like to ask some questions?

13   I will ask the questions first, and then anybody can

14   answer.

15         MR. MURRAY:  That's fine, Judge.

16         THE COURT:  Okay.  First I want to know is when the

17   appellate court reversed some of the findings of the

18   DuPage County court and what counts were -- was the

19   reversal made in.

20         MR. HICKEY:  Judge, I did provide the Court with a

21   copy of the opinion.

22         THE COURT:  I haven't had a chance to read it.  You

23   want to glance over it?

24         MR. HICKEY:  It was in 1984.

                              2

                                    C.406

                    C-535              (37)

```
1              THE COURT:  Whatever.

2                      That is when the reversal was?

3              MR. HICKEY:  Yes, Judge.

4              THE COURT:  You gave it to me, but I have not had a

5       chance to read it.

6                      And what counts were reversed?

7              MR. HICKEY:  Two counts of armed robbery, and the two

8       counts of armed violence.

9              THE COURT:  Go ahead.

10             MR. HICKEY:  And one conviction of UUW.

11             THE COURT:  Remaining.

12                     How many does that leave?

13             MR. HICKEY:  One arm violence and one UUW.

14             THE COURT:  That's it?

15             MR. HICKEY:  Yes, Judge.  Instead of six Class Xs, it

16      became two Class Xs, and he gave thirty-five years.

17             THE COURT:  Originally?

18             MR. HICKEY:  Yes.  And our position that is what you

19      took into account when you gave him the --

20             THE COURT:  I certainly did.  No question about that.

21             MR. HICKEY:  As you were informed on the last in

22      camera proceeding, the DuPage County court in fact granted

23      his petition for post conviction relief and communicated

24      the sentence time served.
```

                            3      C-407

                              C-536                    (38)

1      MR. MURRAY:  Which was essentially a sentence of
2    twenty-one years.

3      MR. HICKEY:  Correct.

4      THE COURT:  Twenty-one years.

5      I, of course, having been advised that he
6    had gotten thirty-five years I felt that possibly all of
7    those counts would be -- finding will be sustained, and I
8    gave him ten years consecutive to the thirty-five.

9      MR. HICKEY:  That is correct.

10      And if I can refresh your Honor, I was the
11    Assistant Public Defender that represented Mr. Martin
12    before your Honor back in 1982.  At that time your Honor
13    was willing to give him -- strike that.   Concurrent
14    sentence.   But because we felt that we were on firm
15    footing getting that sentence reversed, we didn't want a
16    concurrent sentence.  I know that was your Honor's
17    impression.

18      MR. MURRAY:  Well, I have no information to support
19    that claim by counsel, and obviously something that
20    happened back in 1981 we are talking about thirteen years
21    ago.   If there is any memorandum or notes to confirm that
22    that is one thing.  But for him to say it like that is
23    unreasonable at this point.

24      MR. HICKEY:  It is my independent recollection.

4

C-408        (39)

1       THE COURT:  Okay.  Now, he is scheduled to be

2    released when?

3       MR. HICKEY:  About two and a half years.

4       THE COURT:  Two and a half years.

5            How old is your daughter?

6       THE DEFENDANT:  She is seven.  She will be eight in

7    August.

8       THE COURT:  Seven years old.

9            Now, it is my understanding that both will

10   remain in protective custody.  She can't get in the

11   protective custody without you?

12      THE DEFENDANT:  Correct.

13      THE COURT:  Where is she now?

14      THE DEFENDANT:  She is in a foster home down state.

15      THE COURT: Okay.  Any protection there?

16      THE DEFENDANT:  Under a false identity.

17      THE COURT:  Anybody want to say anything?

18      MR. HICKEY:  No, your Honor.

19      MR. MURRAY:  Judge, I would just reiterate -- well,

20   two points.  First I would reiterate the argument made on

21   the last court date regarding the statute of limitations

22   on counsel's petition both as mandamus, the substance of

23   mandamus and the post conviction itself.  It is our belief

24   under the Bates decision it is untimely filed.

5

C-409  (40)

C-538

1           Judge, just regarding your Honor's

2      consideration of a new sentence, a reduction in sentence,

3      which essentially is a relief post conviction petition to

4      ask for.

5           If I can just put a couple of points on the

6      record.

7           THE COURT:  Certainly.

8           MR. MURRAY:  One, Judge.  I do not believe that it

9      raises a proper constitutional issue which of course has

10     to be the subject of post conviction petition.  You can't

11     raise any issue under the sun.

12          Second point, it relates to the plea itself

13     at an arms length plea back in 1981.  He was sentenced to

14     ten years consecutive to thirty-five.

15          Now, your Honor believed that the

16     thirty-five years would withstand appellate scrutiny.

17     You intended for him to receive a sentence of forty-five

18     years total in the penitentiary.  And now that the DuPage

19     County sentence has been reduced to twenty-one years

20     approximately fourteen years difference out there,

21     counsel asked to reduce his sentence further here.

22          It seems to me that not being part of the

23     plea negotiations back in 1981, but just looking at him on

24     the face seems that it can also be argued that your Honor

6

C.410    (41)

C-539

1    intended to punish him more severely than the thirty-five

2    years sentence, and that your Honor took into

3    consideration the fact that the thirty-five was a base.

4                    What I am trying to say is you would have

5    given more if he didn't receive thirty-five from DuPage.

6                    Judge, finally regarding the facts you

7    considered if you do choose to resentence Mr. Martin, I

8    ask you to consider what was raised in the cross

9    examination of Mr. Martin on the last court date.

10                   Essentially evidence --

11   THE COURT:  I read it.

12   MR. MURRAY:  -- of his further criminal activities in

13   the penitentiary which I think is to use the word is

14   significant.  I do not think most people do it out in the

15   street much less doing through the penitentiary system.

16        THE COURT:  That is twenty-one years ago.

17   MR. MURRAY:  Well, I am talking -- referring to my

18   cross examination of Mr. Martin.  We are talking about

19   what he was doing in 1977 and '78 in the penitentiary.

20   That is certainly not twenty-years ago.

21                   But in any event, I would ask you to

22   reconsider your Honor's rulings from the last court date.

23   And if your Honor does choose to resentence Mr. Martin

24   under the post conviction to look at it whether there is

7

C-411

C-540

(42)

1    appropriate constitutional issue there, and then finally

2    to look at his criminal behavior in the penitentiary which

3    was certainly significant.

4         THE COURT:  I have taken everything into

5    consideration.  And as you have reiterated and I stated

6    at the outset, I felt that he was -- he was sentenced with

7    the assumption that the more important and the worse

8    counts in the indictment or information would be

9    sustained.  So I think that Mr. Martin had done enough

10   time, so I am going to give him time served, actually

11   served and considered served.

12        MR. HICKEY:  Thank you, Judge.

13        THE COURT:  I think that is only fair.  I am also

14   taking into consideration how long ago this happened, and

15   he has a seven-year old daughter in my opinion who

16   deserves some protection and the love of a father, and I

17   think that he will.  People change, you know.  Okay.

18        MR. HICKEY:  Thank you, your Honor.  Have a good day.

19        THE COURT:  Whatever I have to sign, just prepare it.

20        MR. HICKEY:  Thank you, Judge.  I will inform the

21   clerk as to what your Honor's ruling along with Mr.

22   Martin.

23        THE COURT:  Thank you both.

24        MR. MURRAY:  Thank you, Judge.

8

C.412

C S41

(43)

```
1              THE COURT:  Thank you all.
2                        (The following proceedings were had in open
3                        court.)
4              THE COURT:  There is something that should be
5      changed.  You know what I want to do.   Prepare any order
6      that are -- will accomplish what I want to do.
7              MR. HICKEY:  Mr. Murray and I agree that a new
8      Mittimus should issue.  We have both spoken with your
9      clerk and informed what your Honor's ruling was that being
10     granting the petition and giving him time served.
11             THE COURT:  Time served, actually time considered
12     served.
13             MR. HICKEY:  Thank you, your Honor.
14                       Judge, can we -- Mr. Murray I believe will
15     agree the file has been sealed up until this point.  Can
16     we continue to have the file sealed?
17             THE COURT:  Yes, it is back there now.
18                       Time served, actually served.  Release
19     today.
20             THE CLERK:  Any amount of years?
21             THE COURT:  Well, he was sentenced to thirty-five  in
22     DuPage.  I gave him ten consecutive.   They found him not
23     guilty of most important counts in DuPage, the armed
24     robbery and armed violence.   It was still two Class Xs
```

9

C.413

C-542

(44)

1    remaining, but he already done twenty-three years, and I

2    think that is enough.

3        MR. HICKEY:  Is our guy from the State's Attorney?

4        THE COURT:  Mr. Murray was here.

5        THE CLERK:  You are reducing it to twenty-three years

6    IDOC time considered served?

7        THE COURT:  Whatever it is.

8            Not reducing.  I just gave him ten.  You

9    can't reduce ten from twenty.  I gave him ten consecutive.

10   I am reducing it ten or whatever time considered served.

11   I do not know how much of that you are going to allocate.

12    It was reduced in DuPage to twenty-three years from

13   thirty-five.  So I am reducing it to time served whatever

14   part of that will cover mine.

15       THE CLERK  Okay.

16       THE COURT:  The attorney can figure that.

17            (Which was all the evidence offered and

18             received and all other proceedings had

19             in the trial of the above cause.)

20

21

22

23

24

10

C.414

C.543

(45)

```
1    STATE OF ILLINOIS  )
                         )  SS:
2    COUNTY OF C O O K   )

3

4         IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT - MUNICIPAL DIVISION,

5

6              I, SUZIE W. NOLAN, Official Court Reporter

7    of the Circuit Court of Cook County, Municipal

8    Department - Second Municipal District, do hereby certify

9    that I reported in shorthand the proceedings had on the

10   hearing in the aforementioned cause; that I thereafter

11   caused the foregoing to be transcribed into typewriting,

12   which I hereby certify to be a true and accurate

13   transcript of the report of Proceedings had before the

14   Honorable FRANCIS MAHON, Judge of said court.

15

16                    Suzie W. Nolan
                      _____
                      Official Court Reporter   084-003001

17

18

19

20

21

22

23

24
```

11

C.415

C-544

(46)

1          IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
                        LIVINGSTON COUNTY, ILLINOIS
2

3    PEOPLE OF THE STATE OF        )
       ILLINOIS,                   )
4                                  )
            Plaintiff,             )
5                                  )
            vs.                    )        87-CF-112
6                                  )
     DAVID W. CARTER,              )
7                                  )
            Defendant.             )
8

9                            _____

10

           REPORT OF PROCEEDINGS of the hearing before the
11   Honorable Harold J. Frobish, on the 1st day of May, 2003.

12         APPEARANCES:

13         LISA ANNE HOFFMAN
           ASSISTANT ATTORNEY GENERAL
14         100 West Randolph Street
           12th Floor
15         Chicago, IL 60601

16              for the Plaintiff.

17         W. KEITH DAVIS
           ATTORNEY AT LAW
18         237 East Front Street
           Bloomington, IL 61701
19
                for the Defendant.
20

21   Dora L. Immke, C. S. R.
     Official Court Reporter
22   License No. 084-004364
     Livingston County Courthouse
23   Pontiac, IL 61764
     (815) 844-5172
24

(47)

1       THE COURT:   In 87-CF-112, People vs. David Carter,

2   Miss Hoffman appears from the Office of Attorney General,

3   the defendant appears in the custody of the Department of

4   Corrections with his attorney, Mr. Davis.

5       Scheduled for hearing today are several discovery

6   motions filed by Mr. Davis and also a motion to dismiss

7   filed by Miss Hoffman.

8       So, that the record is clear here, we've had very

9   lengthy proceedings as this matter developed.   This all

10   started out September 10 of 1998, when I entered an order

11   docketing a combination petition.   There was a

12   postconviction petition and a petition for the relief

13   of judgment.   I first appointed David Ahlemeyer who was

14   then public defender on October 23 of '98.   I vacated that

15   appointment and I appointed Carey Luckman who did a lot of

16   work on this case.   Mr. Luckman, after reviewing

17   transcripts and the like filed on February 16, 1999, a

18   motion to excuse late filing.   The petition of Mr. Carter

19   was late in terms of the postconviction statute and the

20   petition for relief from judgment.   And -- Argument is

21   heard.

22       On April 23 of '99, I entered an order denying the

23   motion to excuse late filing of the postconviction

24   petition.   So, that petition is gone.   But I granted the

(48)

1   defendant's motion to excuse late filing under 2-1401.   For

2   practical purposes, I think the 2-1401 petition amounts to

3   a postconviction petition, but they are two separate

4   remedies and filings.

5        The Attorney General's Office felt that I was wrong

6   in that decision and filed a motion to reconsider on July

7   26 of '99; and after that, there's been a great, great deal

8   of effort directed to whether a reduction in sentence was

9   given to Harry Martin who was a gang leader purportedly,

10  whether a reduction in sentence was granted to him in

11  exchange for his testimony in the trial.   And on August 19

12  of 1999, I directed an investigation be undertaken to

13  determine what was in fact disclosed at trial.   What did

14  Harry Martin say?

15       On December 15 of 2000, Mr. Luckman, that's probably

16  when he became a prosecutor, I needed to find a new defense

17  lawyer; so, I appointed Eric Frobish who has the

18  same last name as the trial judge but is sufficiently

19  distantly related that there would be no disqualification

20  involved.   That did not work out because he moved, as I

21  understand it, or for some other reason.

22       In any event, on February 22nd, 2001, I appointed

23  Paul Lawrence of Bloomington.   And then October 18 of 2001,

24  where this alleged reduction in sentence took place, I

1    directed some investigation occur regarding what actually

2    happened in DuPage County.  That's where the alleged

3    reduction took place, if there was a reduction.  The only

4    question was:  Why was there a reduction?  So, there was

5    much work spent getting transcripts and that type of thing.

6         Then Paul Lawrence became a judge; so, on April 15

7    of 2002, I appointed Mr. Davis.  And on May 14 of 2002, I

8    ordered that the transcript of the overhear be produced.

9    It's probably the most single -- The piece of evidence that

10   was most important in this trial was an overhear that was

11   conducted between Mr. Martin and the defendant, and I

12   ordered that the transcript be produced.  And presumably

13   Mr. Davis has seen that.

14        On July 12 of 2002, Mr. Davis filed numerous

15   motions; and those have yet to be ruled on.  Those motions

16   were filed before I took dispositive action on the State's

17   motion to reconsider my prior decision on the 2-1401

18   petition.  And on October 22 of 2002, I did deny that

19   motion to reconsider.

20        So, we have pending at this time the 2-1401

21   petition, we have pending at this time some motions for

22   discovery; and we're going to talk about those in a second.

23   It seems to me, most, if not all, have been rendered moot

24   by the relief I've already granted to the defendant.

1       A motion to dismiss has been filed directed to the

2   2-1401 petition.  We've had various status conferences

3   getting ready for today.  It's not clear to me, Mr. Davis,

4   that we have on file here a 651(c) petition from you; so,

5   I'm going to ask, in due course, that that be accomplished

6   so that our record is clear.  I know you've done a great

7   deal of work on this file, but I want to make sure that

8   there be a 651(c) certification.  That may be directed, I

9   don't remember, only at the postconviction statute, but, in

10  any event, I think we ought to have it because the 2-1401

11  amounts to postconviction petition.

12      So, let me see if we agree where we're at.  We need

13  to first, I need to first dispose of, in some fashion,

14  these various motions of Mr. Davis; and then, depending on

15  what happens there, we need to have a hearing on the motion

16  to dismiss.

17      Is that the way you see it, Mr. Davis?

18      MR. DAVIS:  Yes, sir.

19      THE COURT:  And, Miss Hoffman?

20      MS. HOFFMAN:  Yes.

21      THE COURT:  All right.  Looking at the motion, --

22  Let me ask.  I just said a whole mouthful, Mr. Carter.  Did

23  you understand what I said?

24      THE DEFENDANT:  Very well.

1        THE COURT:   Okay.   Mr. Davis has filed a number of

2    discovery motions.   They are a motion for leave to take

3    evidentiary depositions and for the furnishing of expenses.

4    These would be directed to people who would have knowledge,

5    Donald Bernardi who was then State's Attorney but who is

6    now a judge, Tom Brown who is now the State's Attorney,

7    James Casson who was a prosecutor, now is privately

8    practicing.

9        There's a second discovery motion, motion for order

10   to the State's Attorney's Office for DuPage County, Cook

11   County, Livingston County to provide their files for an

12   in-camera inspection by the Court and for leave to take

13   evidentiary depositions and for the furnishing of expenses

14   attaching thereto, C, as I call it, we have a motion to

15   produce Harry Martin for testimony and for an order

16   requiring the State's cooperation in obtaining his presence

17   to testify.   We have a motion for order to admit fact under

18   the Code of Civil Procedure.

19       And, finally, E, we have a motion for order to

20   produce overhear tape.   With respect to the last one, I do

21   note that Miss Hoffman has furnished a transcript of that.

22   So, it seems to me, we've dealt with that.

23       With respect to A through D, as I call them, all the

24   others, explain to me, Mr. Davis, why these have not been

1    rendered moot, first of all, by my denying the Attorney

2    General's relief that's requested, and, secondly, in any

3    event, they shouldn't be entertained unless the defendant

4    can get by a motion to dismiss.

5         MR. DAVIS:  Well, obviously, if the case is

6    dismissed, the case is dismissed.  It is our contention

7    that Mr. Carter, has in his dual motion as the Court has

8    put it, stated a cause of action, 2-1401.  Mr. Carter has

9    clearly stated that at trial Harry Martin made a deal in

10    effect with the State's Attorney's office.  That deal was

11    to obtain perjured testimony against Mr. Carter; that, in

12    fact, perjured testimony was obtained; and that the State

13    knew it.

14         In effect, what the State's, what the Attorney

15    General's motion is is an attack on the pleadings.  That's

16    what the State says, that, if the pleadings and their

17    factual averments are accepted to be true, which is what

18    the Court must do at this juncture, the Court must assume

19    that every fact that Mr. Carter has pled in his dual motion

20    is in fact true.  If, based upon the truthfulness of those

21    assertions he states a cause of action, then the State

22    cannot prevail on this motion to dismiss.

23         It is our position that in point of fact, Mr. Carter

24    has stated a valid cause of action in 2-1401.  He has

36

(53)

1    averred every single element of the 2-1401 theory upon

2    which we are founding our action in court today, that there

3    was a deal, that it was used to procure Mr. Martin's

4    perjured testimony, that it did in fact procure Mr.

5    Martin's perjured testimony, and that the State knew it.

6    Accordingly, we submit that Mr. Carter's 2-1401 petition

7    should survive and the State's motion ought be denied.

8        Having said that, it is our position that the

9    various motions that I'm requesting concerning discovery,

10    and you're absolutely right, I've listed basically every

11    one that I could think of as possibly having firsthand

12    knowledge, not double hearsay or triple hearsay, but

13    firsthand knowledge, the State's Attorney and chief

14    prosecuting attorney at the time, the prosecuting attorney

15    in DuPage County wherein, as the Court is well aware I

16    presume having reviewed the transcripts that I have

17    reviewed and Miss Hoffman has presumably reviewed, there

18    was a substantial, in fact, drastic reduction in Mr.

19    Martin's testimony [sic], we submit that Mr. Carter has at

20    least stated --

21        THE COURT:   Reduction in the sentence?

22        MR. DAVIS:   Reduction of the sentence, correct.

23        THE COURT:   Okay.

24        MR. DAVIS:   We submit that Mr. Carter has stated a

1    cause of action sufficient to allow those discovery motions

2    to proceed.   There is no other way, as a practical matter,

3    that Mr. Carter can show that the State knowingly procured

4    perjured testimony other than to get individuals from the

5    State to give discovery and for us to obtain the

6    documentary discovery which I am seeking here.

7          As far as Mr. Martin's presence, as perhaps the

8    Court knows, perhaps the Court does not know, but at the

9    last transcripts out of DuPage county, it was represented

10   in the transcript I believe that Mr. Martin was in the

11   protection program, the witness protection program.   We

12   have, I personally contacted Aviva Futorian who is Mr.

13   Martin's prior attorney to try to obtain his whereabouts.

14   She doesn't know where he is.   I have attempted to locate

15   Mr. Leonard Cox who is the attorney who verified Mr.

16   Martin's affidavit which is attached to Mr. Carter's

17   petition.   Mr. Cox, to the best of my knowledge,

18   information and belief has retired and is no longer

19   practicing law; his whereabouts are unknown.   Those are the

20   only two people from the defense side that I know who could

21   possibly get in touch with Mr. Martin.

22         The only thing that I have right now is a piece of

23   paper that is written in Mr. Martin's name and which bears

24   his signature; but that piece of paper is not sufficient

1    for me to go forward unless the State admits its

2    truthfulness, hence my request to admit fact, or we can

3    prove it extrinsically by means of Mr. Martin's testimony

4    or other methods.

5         Accordingly, I submit that my requests for discovery

6    are reasonable and ought be allowed.  Thank you.

7         THE COURT:  All right.  Miss Hoffman.

8         MS. HOFFMAN:  Your Honor, I suppose that my response

9    to both of the discovery motions --

10        THE COURT:  Just argue both of them.

11        MS. HOFFMAN:  It's really the same argument.  First

12   of all, I've set it forth quite succinctly I think, but,

13   just for the record, it's the People's position that in

14   fact Mr. Carter's 2-1401 petition does not plead

15   sufficiently to permit, to afford him relief.  What he must

16   demonstrate, facts must be alleged and proved by clear and

17   convincing evidence which show that, that establish grounds

18   for relief and show that -- Pardon me, because I'm just

19   looking through this and not finding what I'm supposed to

20   be saying right now which is never a good thing.

21        THE COURT:  Page 2 is what --

22        MS. HOFFMAN:  There may have been -- What he needs

23   to demonstrate is that this was a material fact that would

24   it, had it been known to the judge at the time of the

1      trial, it would have changed the outcome of the judgment or

2      it would have, I guess in traditional terms of 2-1401,

3      would have prevented entry of the judgment.  And, in this

4      case, what we are saying is, what Mr. Carter has alleged is

5      only that, had this information been known at the time,

6      assuming for the sake of this pleading that the facts

7      alleged are true, had Mr. Martin's inducements provided by

8      the Department of Corrections to Mr. Martin in exchange for

9      his testimony been known, the most that could have happened

10     is that Mr. Martin's testimony would have been impeachable.

11          However, there's no suggestion that that evidence

12     would have provided a basis for the trial court to deny the

13     admission of the tape into evidence.  And when we have the

14     tape in the evidence, we have, that's essentially what the

15     Appellate Court has already said:  Would have it, it

16     provided the overwhelming evidence of guilt without Mr.

17     Martin?  Yes, you would have been able to impeach Mr.

18     Martin.  But would you have been able to avoid the

19     admissibility of that tape?  No.  And since he cannot

20     provide, he did not plead facts which suggest that had they

21     been known to the Court they would have changed the

22     outcome, he's not entitled to relief under 2-1401, and

23     that's on the basis of the pleadings.

24          For the same reason, we believe that the discovery

1    motions are inappropriate because they all go to that same

2    issue; and, once again, if the issue itself cannot provide

3    the basis for relief under 2-1401, then there is no reason

4    to go forward with such discovery.

5            THE COURT:  Any response, Mr. Davis?

6            MR. DAVIS:  The only thing that I would also point

7    out, Judge, is that it's my understanding that, at trial,

8    Harry Martin not only testified to the requisite facts

9    concerning the admissibility of the tape, but he also gave,

10   as I recall, substantial and fairly extensive testimony

11   regarding, for instance, Mr. Carter's alleged role in gang

12   hierarchy at the Pontiac correctional facility, the means

13   by which the gang hierarchy engaged in what was effectively

14   a conspiracy to commit bodily harm and ultimately the

15   murder of Warden Taylor and other aspects not connected,

16   either directly or even indirectly, to the tape which would

17   render Mr. Martin's testimony crucial concerning Mr.

18   Carter's actual criminal responsibility on an

19   accountability theory under Illinois criminal law.

20   Remember, the factual setting of the case was not that Mr.

21   Carter committed the actual acts which resulted in Warden

22   Taylor's death; but, rather, the State's theory was that

23   Mr. Martin, I'm sorry, Mr. Carter, commanded others to

24   perform acts which led to that death, and, without Mr.

1   Martin's testimony concerning that hierarchy and the

2   participation of Mr. Carter in that hierarchy, the State's

3   case cannot proceed.

4          Accordingly, although I understand that the State

5   relied heavily on the tape, it was obviously an important

6   piece of evidence, it was by no means the only piece of

7   evidence that Mr. Martin testified to.  He testified, as I

8   recall, for a very long time concerning matters not

9   resolved, I'm sorry, not involving the tape; and,

10  accordingly, while I understand the prosecutor's urgings

11  concerning the tape, in no way does her argument go to that

12  other testimony which was, in our view, crucial.  Thank

13  you.

14         THE COURT:  All right.

15         Any final reply, Miss Hoffman?

16         MS. HOFFMAN:  Your Honor, I would just direct the

17  Court's attention, as I have previously, to the Rule 23

18  order of the Appellate Court on direct review of Mr.

19  Carter's case because I think that they did in fact address

20  some allegations regarding other aspects of Mr. Martin's

21  testimony.  Those were ultimately found, those arguments

22  were found waived; but, when doing analysis on whether or

23  not a plain error analysis was appropriate, the Court says,

24  plain error could not possibly be appropriate with respect

42

(59)

1    to Mr. Martin and the propriety of his testimony because

2    the evidence was not closely balanced in any area that

3    might have occurred as a result of Mr. Martin's testimony.

4    It was not so fundamental and of such a magnitude to deny

5    him a fair trial.  And I'm quoting from page 12:  Martin

6    testified that defendant admitted directing Lucas and

7    Easley to attack Taylor.  On appeal, defendant does not

8    challenge this fact or the fact that Taylor was murdered by

9    Lucas and Easley.

10    Again, I think the Appellate Court's position is

11    that Mr. Martin's testimony, and, again, they were talking

12    about his testimony with respect to issues other than the

13    overhear tape, was not so substantial that it had a

14    fundamental part in this case; and, in fact, the evidence

15    regarding the tape was the overwhelming evidence that made

16    this case not closely balanced.

17    So, while I certainly don't disagree that Mr. Martin

18    testified to other things, I think, in the end, what sealed

19    the case was the tape; and the Court had found that that

20    was the overwhelming evidence.  And, as the Court stated,

21    Mr. Carter did not challenge that admission by Mr. Taylor

22    on direct appeal, and that's what they found controlled

23    factually in this case.

24    THE COURT:  All right.  The postconviction petition

43

(66)

1    and petition for relief from judgment filed August 10,

2    1998, has several contentions.  Central to all of those

3    contentions is the proposition put forth by the defendant

4    that the, or, a key witness against defendant was Harry

5    Martin.  The key to this case, I find, is the tape.  The

6    Appellate Court summarized the contents of that tape on

7    pages 14 and 15 of its opinion of June 30 that was filed

8    June 30, 1993.  That opinion states as follows:

9         According to the tape recording of the conversation

10   between Martin and defendant, defendant became upset when

11   Martin suggested that Jones died accidentally as a result

12   of overdosing on a bag of cocaine.  Defendant insisted that

13   Jones had ample time to flush the cocaine down the toilet

14   before the guards came for him and that he would not have

15   attempted to stuff a medicine bag filled with cocaine in

16   his mouth.  Defendant told Martin that Taylor was murdered

17   to avenge Jones' murder and the administration's treatment

18   of BGD members.  Defendant stated that the order to attack

19   Taylor was handed down to him by his superiors in the gang

20   and that he, as unit security officer, implemented that

21   order by procuring Easley and Lucas to carry out the deed.

22   According to defendant, preparations for the attack on

23   Taylor were made three to four weeks prior to the event.

24   It was arranged that Easley and Lucas would hit Taylor in

44

(61)

1    the head with pipes.  They wore masks and gloves and just

2    left the weapons at the scene.  The weapons had been wiped

3    clean of fingerprints.  Defendant admitted helping wipe off

4    the fingerprints.  However, defendant also said the attack

5    on the other superintendent by another inmate named Chico,

6    C-H-I-C-O, was an "isolated incident."  Defendant made no

7    mention of threats to guards.

8          The tape in crass terms is the guts of the State's

9    case against this defendant, I find.

10         It is true that Martin gave background testimony of

11   how gangs operated at the Pontiac Correctional Center at

12   that time.  That has some importance.  And, as this case

13   has gone on since I got into it in September of '98, I have

14   seen nowhere it contended or argued, in any substantial

15   manner, that the background information given by Martin was

16   incorrect.  As I understand it, and I wasn't here, he was

17   quite a performer and he enjoyed his day in court and the

18   attention he was getting.  But he testified how gangs

19   worked out there, and I've not gleaned from the record or

20   otherwise that his testimony, in terms of general activity

21   of gangs, was incorrect.

22         So, I think central to Mr. Carter's arguments are,

23   you know, what is the key to the case?  I think the key to

24   the case is the tape.

1        Now, we have in the petition, the postconviction

2   relief and petition for relief from judgment, the

3   contention that somehow that tape should not have been

4   admitted because it was obtained by fraud, collusion,

5   trickery, insubordination, perjury, et cetera.   The

6   admissibility of that tape has already been ruled; and

7   Judge Glennon initially suppressed it because he felt the

8   defendant was in custody.   The Fourth District Appellate

9   Court said, no, for purposes of custody, for purposes of

10  the admission of the tape, the defendant was not in

11  custody; admissibility of this tape does not depend on

12  Martin's motive for cooperating.   The issue of the

13  admissibility of the tape has been sealed, and there's

14  nothing in this petition by the defendant that would cause

15  a different result.

16        There is mentioned in Mr. Carter's petition about

17  closing arguments being improper regarding his failure to

18  testify.   I find that those are waived; and, in any event,

19  the line was not crossed.   What we spent four years plus on

20  really is this so-called, newly discovered evidence where

21  Mr. Carter contends that there was a deal made Mr. Martin;

22  and, as part of Mr. Martin's testimony here in this case,

23  the defense was not made aware of that deal and perjury

24  therefore occurred when Mr. Martin testified at least

46

(63)

1    initially that there was no deal.  And after the trial, or

2    before the trial, I forget which, he did get his sentence

3    reduced to time served up in DuPage County.

4         THE DEFENDANT:  What about the false testimony given

5    in application for the authorization of the wire tap?

6         THE COURT:  Well, I've dealt with that, Mr. Carter,

7    I've dealt with that; and the Fourth District Appellate

8    Court has dealt with that.  On this point of the importance

9    of this reduction in sentence, we have worked diligently

10   four years now trying to get to why this reduction took

11   place.  It is not clear to me that the reduction took place

12   because of the testimony given by Mr. Martin here.

13        In any event, even if that were true, even if that

14   were true, it has not been shown here that Mr. Martin's

15   testimony was untrue.  It has not been shown that his

16   testimony was untrue.  And, furthermore, even if Mr. Martin

17   got a reduction in sentence because of his cooperation in

18   coming down here and testifying, I find that that

19   circumstance, if true, would not have made a difference in

20   this trial.

21        We have to look to the case law as to when such a

22   circumstance would make a difference.  In People vs.

23   Williams, a Fifth District case June 28, 2002, 265 Ill.Dec.

24   781, I'm looking at page 787:

1        In accord with the United States Supreme Court,

2   Illinois has long recognized that a conviction based upon

3   false testimony is contrary to fundamental principles of

4   fairness.  It is further well established that the State's

5   knowing use of perjured testimony to obtain a conviction

6   constitutes a violation of due process of law and must be

7   set aside if, if there is any reasonable likelihood that

8   the false testimony could have affected the jury's verdict.

9        A very recent case that I came across March 13 of

10  2003, People vs. David Thurman, --

11        MR. DAVIS:  How do you spell that?

12        THE COURT:  T-H-U-R-M-A-N.

13        MR. DAVIS:  Thank you.

14        THE COURT:  Fourth Division of Cook County, March

15  13, 2003.  I have, my computer skills are not wonderful.  I

16  see that the number 1002841.ht.

17        MS. HOFFMAN:  That is 1002841 would be, that's the

18  Appellate Court number --

19        THE COURT:  Okay.  There, the case dealt with a

20  postconviction petition.  And there was a murder and the

21  question about the importance of that testimony.  The

22  Appellate Court there cites the Williams case and says at

23  page 3 of 4:

24        Therefore, even assuming that Alvarez received

1    consideration in exchange for his testimony, and the State

2    failed to disclose it, it is unreasonable to conclude that

3    Alvarez's uncorrected testimony to the contrary affected

4    the outcome of this case.

5         So, I think it comes down to that.  It's not clear

6    to me at all that there was fabrication.  It's not clear to

7    me at all why the reduction in sentence occurred.  But,

8    even if all those things are true, with this tape, Mr.

9    Carter, I think your fate was sealed.  This is a damaging

10   tape, it is a damning tape; and it is the crux, it is the

11   crux of the case, and it is damaging to you to an extent

12   that you can't recover from it.

13             THE DEFENDANT:  The whole tape is allowable --

14                       (Whereupon the court reporter

15                       asked that the defendant repeat

16                       what he said.)

17             THE DEFENDANT:  If the whole tape is allowable --

18             THE COURT:  Well, be that as it may, I believe the

19   motion to dismiss of the Attorney General's Office here is

20   meritorious; and I am granting that motion to dismiss

21   today.

22        I do believe these various motions for leave to take

23   evidence depositions and the like may have needed to be

24   entertained and maybe some granted if I hadn't denied the

1  State the relief that it wanted.  These, I think many of

2  them went to when, why, whatever; but I denied the State's

3  motion to reconsider.  We don't get to those things if I

4  grant the motion to dismiss.  So, I find that these various

5  matters have either, one, been rendered moot, these various

6  motions have either, one, been rendered moot or they were

7  premature because the petition of the defendant cannot

8  withstand a motion to dismiss.

9      Now, the court reporter is directed to prepare a

10  transcript of today's proceeding, furnish a copy to Mr.

11  Davis, furnish a copy to Miss Hoffman.  Before we go today,

12  Mr. Davis, I'd like your 651(c) certificate.

13      You appear very much, Mr. Carter, to understand what

14  it is that I've said.  Does he have any questions?

15      THE DEFENDANT:  I would like a copy of the

16  transcript also.

17      THE COURT:  All right.  We'll furnish that to Mr.

18  Davis, and he's your lawyer, he needs to be the one to

19  contact you.  We'll let him furnish it to you.

20      And is there anything else we need to do today,

21  Counsel?

22      MR. DAVIS:  Judge, the State having succeeded in its

23  motion to dismiss, Mr. Carter may wish to appeal the ruling

24  of today.

1    THE COURT:  Right.

2    MR. DAVIS:  If that's the case, --

3    THE COURT:  Presumably he will.

4    MR. DAVIS:  What?

5    THE COURT:  Presumably he will.

6    MR. DAVIS:  I presume that he will.  I would ask

7 that the Court entertain a preparation by the clerk of a

8 timely notice to appeal and appoint the Appellate Defender

9 --

10    THE COURT:  Yes.

11    MR. DAVIS:  -- for the purpose of that kind of

12 relief.

13    THE COURT:  Let me suggest this:  This may be

14 something that you want to file a motion to reconsider or

15 maybe you've already made that determination, I don't know.

16 If you just call me and say, file the notice of appeal,

17 I'll do it right there, unless you want me to go ahead and

18 do it right now.  That's fine.  Maybe you want to talk to

19 him.

20    MR. DAVIS:  May I have a few words with Mr. Carter?

21    THE COURT:  That's fine.  Why don't you --

22    THE DEFENDANT:  File the notice to appeal

23 because you're not going to change your mind and --

24    THE COURT:  I don't think I will change my mind --

1          THE DEFENDANT:  So, what's the point of doing this?

2          THE COURT:  I worked very hard, Mr. Carter, I think

3    I understand it.  I always try to keep an open mind.  I

4    don't think I will, I can't think of any reason I would;

5    so, why don't we go ahead and do that.  The clerk is

6    directed to file a notice of appeal and the Appellate

7    Defender is appointed to represent you.  And you'll be in

8    contact with, Mr. Carter, the Appellate Defender when they

9    get a copy of the order.  So this is going up.  All right.

10         MR. DAVIS:  Thank you.

11         THE COURT:  Thank you.

12                     (Which was all the evidence

13                      offered and received and all

14                      other proceedings had in the

15                      hearing of the above cause.)

16                 * * * * * * * * *

17

18

19

20

21

22

23

24

1       IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

2                    LIVINGSTON COUNTY, ILLINOIS

3

4           I, Dora L. Immke, an Official Court Reporter for

5    the Circuit Court of Livingston County, Eleventh Judicial

6    Circuit of Illinois, do hereby certify that I reported in

7    shorthand the proceedings had on the hearing in the

8    above-entitled cause; that I thereafter caused the

9    foregoing to be transcribed into typewriting, which I

10   hereby certify to be a true and accurate transcript of the

11   proceedings had before the Honorable Harold J. Frobish,

12   Judge of said court.

13

14                              Dora L. Immke, C. S. R.
                                Official Court Reporter
15                              License No. 084-004364

16   Dated this 30th day

17   of May, 2003.

18

19

20

21

22

23

24

Westlaw.

459 N.E.2d 279

Page 1

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

▷

People v. Martin Ill.App. 2 Dist.,1984.
Appellate Court of Illinois,Second District.
PEOPLE of the State of Illinois, Plaintiff-Appellee,
v.
Harry MARTIN and Dennis McClinton,
Defendants-Appellants.
**Nos. 82-105, 82-114.**

Jan. 12, 1984.
Rehearing Denied Feb. 23, 1984.

Defendants were convicted in the 18th Circuit
Court, DuPage County, Charles Norgle, J., of two
counts of armed robbery, two counts of armed
violence and two counts of unlawful use of
weapons, and they appealed. The Appellate Court,
Van Deusen, J., held that: (1) initial detention of
defendants by police officers was justified based on
defendants' close resemblance to a circulated,
composite physical description of suspected robbers
and fact that defendants' vehicle was parked outside
a restaurant at the same approximate time as the
previous robbery of similar restaurant; furthermore,
police acted reasonably in drawing their guns,
ordering defendants out of their vehicle and then
conducting an immediate pat-down search of
defendants; (2) two counts of armed robbery and
two counts of armed violence, which arose from
same single act committed during robbery, could
result in only one conviction and sentence for each
defendant; furthermore, where two counts of
unlawful use of weapons also arose from a single
act, one count of that offense would be vacated;
and (3) where defendants received separate
sentences for multiple convictions, they were not
entitled to resentencing on the convictions affirmed
on appeal where certain convictions were vacated.

Affirmed in part and reversed in part.
West Headnotes
**[1] Searches and Seizures 349 €═165**

349 Searches and Seizures

349IV Standing to Object
349k165 k. Automobile Searches. Most Cited
Cases
(Formerly 349k7(26))
Defendants had standing to challenge detention of
their borrowed vehicle and therefore could contest
legality of police conduct in seizing them.

**[2] Criminal Law 110 €═394.5(2)**

110 Criminal Law
110XVII Evidence
110XVII(I) Competency in General
110k394 Evidence Wrongfully Obtained
110k394.5 Objections to Evidence
110k394.5(2) k. Persons Entitled to
Object. Most Cited Cases
No standing problem exists where a defendant
claims that the evidence sought to be suppressed
was obtained as result of an illegal seizure of that
defendant.

**[3] Arrest 35 €═63.5(4)**

35 Arrest
35II On Criminal Charges
35k63.5 Investigatory Stop or Stop-And-Frisk
35k63.5(3) Grounds for Stop or
Investigation
35k63.5(4) k. Reasonableness;
Reasonable or Founded Suspicion, Etc. Most Cited
Cases

**Arrest 35 €═63.5(8)**

35 Arrest
35II On Criminal Charges
35k63.5 Investigatory Stop or Stop-And-Frisk
35k63.5(8) k. Justification for Arrest or
Pat-Down Search. Most Cited Cases
"Stop and frisk" rule of *Terry* involves a two-part
procedure: first, police officer must have a
reasonable, articulable suspicion of criminal activity
to justify detention and, second the "frisk" of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

person detained must be based on a reasonable fear that defendant is armed, and limited to a pat-down search for weapons. S.H.A. ch. 38, ¶¶ 107-14, 108-1.01.

## [4] Arrest 35 ☞63.5(5)

35 Arrest
   35II On Criminal Charges
      35k63.5 Investigatory Stop or Stop-And-Frisk
         35k63.5(3)   Grounds  for  Stop  or Investigation
         35k63.5(5) k. Particular Cases. Most Cited Cases

## Arrest 35 ☞63.5(8)

35 Arrest
   35II On Criminal Charges
      35k63.5 Investigatory Stop or Stop-And-Frisk
         35k63.5(8) k. Justification for Arrest or Pat-Down Search. Most Cited Cases
Initial detention of defendants by police officers was justified based on defendants' close resemblance to a circulated, composite physical description of suspected robbers and fact that defendants' vehicle was parked outside a restaurant at the same approximate time as the previous robbery of similar restaurant; furthermore, police acted reasonably in drawing their guns, ordering defendants out of their vehicle and then conducting an immediate pat-down search of defendants.

## [5] Searches and Seizures 349 ☞192.1

349 Searches and Seizures
   349VI Judicial Review or Determination
      349k192 Presumptions and Burden of Proof
         349k192.1 k. In General. Most Cited Cases
(Formerly 349k192, 349k7(29))
Burden of proof that a search and seizure in a public place was unlawful is on person seeking to challenge the seizure or suppress evidence.

## [6] Criminal Law 110 ☞1158(2)

110 Criminal Law
   110XXIV Review
      110XXIV(O) Questions of Fact and Findings

         110k1158 In General
            110k1158(2)  k.  Conclusiveness  of Findings on Preliminary Proceedings in Conduct of Trial in General. Most Cited Cases
Finding that a particular detention was reasonable will not be disturbed on review unless manifestly erroneous.

## [7] Arrest 35 ☞63.5(7)

35 Arrest
   35II On Criminal Charges
      35k63.5 Investigatory Stop or Stop-And-Frisk
         35k63.5(7) k. Mode of Stop; Warnings; Arrest Distinguished. Most Cited Cases
Fact that police officers halted defendants with guns drawn and conducted a pat-down search without preliminary questioning did not necessarily convert an investigatory stop into an arrest.

## [8] Searches and Seizures 349 ☞63

349 Searches and Seizures
   349I In General
      349k60 Motor Vehicles
         349k63 k. Plain View. Most Cited Cases
(Formerly 349k3.3(4), 349k7(1))
Since defendants' detention was lawful, police officer was rightfully in a position where he could observe interior of defendants' vehicle and therefore money bag matching description of bag used in robbery was properly visible within plain view doctrine; peering into the halted vehicle for purpose of insuring police safety from potential hidden suspects did not rise to level of a "search" within meaning of Fourth Amendment. U.S.C.A. Const.Amend. 4.

## [9] Arrest 35 ☞63.5(9)

35 Arrest
   35II On Criminal Charges
      35k63.5 Investigatory Stop or Stop-And-Frisk
         35k63.5(9) k. Duration of Detention and Extent or Conduct of Investigation or Frisk. Most Cited Cases
An investigatory stop does not become unreasonable because officers take precautionary measures which do not further invade privacy

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

interest of defendants; a protective investigation beyond defendant's person may be justified when there is possibility that other persons, not detained, present injury to the investigating officers.

**[10] Arrest 35 ☞63.4(16)**

35 Arrest
  35II On Criminal Charges
    35k63 Officers and Assistants, Arrest Without Warrant
      35k63.4 Probable or Reasonable Cause
        35k63.4(16) k. Possession, Disposal, or Concealment of Article; Flight or Hiding. Most Cited Cases

**Arrest 35 ☞71.1(5)**

35 Arrest
  35II On Criminal Charges
    35k71.1 Search
      35k71.1(4) Scope of Search
        35k71.1(5) k. Particular Places or Objects. Most Cited Cases

**Searches and Seizures 349 ☞62**

349 Searches and Seizures
  349I In General
    349k60 Motor Vehicles
      349k62 k. Probable or Reasonable Cause. Most Cited Cases
  (Formerly 349k3.3(6))
When police officer, who lawfully detained defendants, observed bag on seat of defendants' vehicle, he could reasonably have inferred that the occupants of the vehicle were connected to restaurant burglary and that evidence, discovered in plain view, was sufficient to escalate officer's suspicions to level of probable cause to arrest; search of defendants' vehicle could be justified under either search incident to lawful arrest doctrine or under warrantless automobile search doctrine.

**[11] Criminal Law 110 ☞228**

110 Criminal Law
  110XII Pretrial Proceedings
    110k222 Necessity and Requisites of

Preliminary Examination
      110k228 k. Time for Examination. Most Cited Cases
Delay in filing charges against defendants, who were taken before daily bond court approximately 24 hours after commencement of next business day following arrest and who failed to establish prejudice resulting from their minimal delay before a preliminary hearing, did not violate defendants' constitutional rights. U.S.C.A. Const.Amends. 4, 14 ; S.H.A. Const. Art. 1, § 7.

**[12] Criminal Law 110 ☞228**

110 Criminal Law
  110XII Pretrial Proceedings
    110k222 Necessity and Requisites of Preliminary Examination
      110k228 k. Time for Examination. Most Cited Cases
A delay of a day or day and one-half before filing of charges is unlikely to be an unreasonable detention; determination of what is unnecessary or unreasonable delay depends on facts and circumstances of each case and some latitude is allowed and presentment to judge need be performed only with that reasonable promptness which its circumstances permit.

**[13] Criminal Law 110 ☞641.3(10)**

110 Criminal Law
  110XX Trial
    110XX(B) Course and Conduct of Trial in General
      110k641 Counsel for Accused
        110k641.3 Stage of Proceedings as Affecting Right
          110k641.3(8) Identification in General and Tests, Handwriting Exemplars. Photographing, Etc
          110k641.3(10) k. Lineup or Showup. Most Cited Cases
  (Formerly 110k641.3)
No judicial adversarial stage warranting right to counsel had arisen at time identification lineups were conducted prior to defendants' preliminary hearing. U.S.C.A. Const.Amend. 6.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

**[14] Constitutional Law 92 ☜266(3.2)**

92 Constitutional Law
   92XII Due Process of Law
     92k256 Criminal Prosecutions
       92k266 Rules of Evidence in General
         92k266(3) Identification Evidence
           92k266(3.2) k. Out-Of-Court or
Pretrial Confrontation. Most Cited Cases
Defendants failed to establish that pretrial
identification procedures were so unnecessarily
suggestive and conducive to mistaken identification
as to deny them due process. U.S.C.A.
Const.Amend. 14.

**[15] Criminal Law 110 ☜1166.10(1)**

110 Criminal Law
   110XXIV Review
     110XXIV(Q) Harmless and Reversible Error
       110k1166.5 Conduct of Trial in General
         110k1166.10 Counsel for Accused
           110k1166.10(1) k. In General. Most
Cited Cases
   (Formerly 110k1166.11(5), 110k1166.11)
Even if defendants were denied their statutory right
to communicate with an attorney of their choice
following their arrest, they were not entitled to
reversal of their convictions or setting aside the
witness identifications where there were no
statements or confessions that came from
defendants during their detention, where defendants
were not entitled to counsel at lineup prior to their
preliminary hearing and where record did not reflect
that defendants ever did actually retain their own
counsel. S.H.A. ch. 38, ¶ 103-3; U.S.C.A.
Const.Amend. 14.

**[16] Criminal Law 110 ☜339.10(4)**

110 Criminal Law
   110XVII Evidence
     110XVII(D) Facts in Issue and Relevance
       110k339.5 Identity of Accused
         110k339.10 Effect of Prior Events on
Subsequent Identification
           110k339.10(4) k. Absence of
Counsel, Advice or Warnings. Most Cited Cases

**Criminal Law 110 ☜1166.10(1)**

110 Criminal Law
   110XXIV Review
     110XXIV(Q) Harmless and Reversible Error
       110k1166.5 Conduct of Trial in General
         110k1166.10 Counsel for Accused
           110k1166.10(1) k. In General. Most
Cited Cases
   (Formerly 110k1166.11(5), 110k1166.11)
Failure to abide by statutory provision providing
arrestees with right to contact their attorneys does
not necessarily mandate a vacation of conviction or
suppression of identification; the statute is not a per
se rule of exclusion or reversal and absent the
substantive right to counsel, making of
incriminating statements in custodial interrogation,
or evidence of abuse of police procedures, a
defendant's conviction will not be reversed because
of violation of the statute. S.H.A. ch. 38, ¶ 103-3.

**[17] Constitutional Law 92 ☜268.1(1)**

92 Constitutional Law
   92XII Due Process of Law
     92k256 Criminal Prosecutions
       92k268.1 Assistance of Counsel
         92k268.1(1) k. In General. Most Cited
Cases
Right to communicate with counsel may rise to
level of a violation of constitutional due process
when denial of such right interferes with ability of
defendant or his counsel to prepare for or defend at
trial. U.S.C.A. Const.Amend. 14.

**[18] Criminal Law 110 ☜369.2(6)**

110 Criminal Law
   110XVII Evidence
     110XVII(F) Other Offenses
       110k369 Other Offenses as Evidence of
Offense Charged in General
         110k369.2 Evidence Relevant to
Offense, Also Relating to Other Offenses in General
           110k369.2(3) Particular Offenses,
Prosecutions for
             110k369.2(6) k. Burglary,
Robbery, Larceny, and Embezzlement; Stolen
Property. Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

In prosecution of defendants for robbery of a restaurant which was part of a chain, trial court did not err in permitting testimony to effect that defendants were arrested outside another restaurant in the same chain since mention of the second restaurant was an integral part of the narrative of defendant's arrest, involving relevant evidence of time, proximity and defendants' identity.

**[19] Criminal Law 110 ☞349**

110 Criminal Law
　110XVII Evidence
　　110XVII(D) Facts in Issue and Relevance
　　　110k349 k. Subsequent Incriminating or Exculpatory Circumstances. Most Cited Cases
Facts and circumstances surrounding arrest of an accused may be put into evidence when they tend to connect defendant with the offense for which he is being tried.

**[20] Weapons 406 ☞17(4)**

406 Weapons
　406k17 Criminal Prosecutions
　　406k17(4) k. Weight and Sufficiency of Evidence. Most Cited Cases
State failed to prove beyond a reasonable doubt that defendant, who wore a type of tinted pink or peach glasses and a ski hat during perpetration of the crime and whose glasses did not hide or distort defendant's features, was masked and therefore State failed to prove an essential element of offense of unlawful use of the weapons. S.H.A. ch. 38, ¶ 24-1(a)(9), (b).

**[21] Criminal Law 110 ☞29(11)**

110 Criminal Law
　110I Nature and Elements of Crime
　　110k29 Different Offenses in Same Transaction
　　　110k29(5) Particular Offenses
　　　　110k29(11) k. Robbery and Burglary. Most Cited Cases
　(Formerly 110k29)

**Sentencing and Punishment 350H ☞537**

350H Sentencing and Punishment
　350HIII Sentence on Conviction of Different Charges
　　350HIII(A) In General
　　　350Hk515 Particular Offenses
　　　　350Hk537 k. Robbery. Most Cited Cases
　(Formerly 110k984(8))
Two counts of armed robbery and two counts of armed violence, which arose from same single act committed during robbery, could result in only one conviction and sentence for each defendant; furthermore, where two counts of unlawful use of weapons also arose from a single act, one count of that offense would be vacated.

**[22] Criminal Law 110 ☞1190**

110 Criminal Law
　110XXIV Review
　　110XXIV(U) Determination and Disposition of Cause
　　　110k1185 Reversal
　　　　110k1190 k. Effect. Most Cited Cases
Where defendants received separate sentences for multiple convictions, they were not entitled to resentencing on the convictions that were affirmed on appeal even though certain convictions were vacated.

**[23] Sentencing and Punishment 350H ☞1289**

350H Sentencing and Punishment
　350HVI Habitual and Career Offenders
　　350HVI(D) Convictions and Dispositions Usable for Enhancement
　　　350Hk1289 k. Guilty and Nolo Contendere Pleas. Most Cited Cases
　(Formerly 110k1202.5(1), 110k1202.5)
Under statutory section providing that extended term may be imposed upon a defendant who has previously been convicted of any felony of the same or greater class within ten years under certain conditions, extended term sentences could be imposed where the prior convictions were based on guilty pleas. S.H.A. ch. 38, ¶ 1005-5-3.2(b)(1).

**\*198 \*\*281 \*\*\*644** Alan D. Goldberg, Asst. State

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)

Page 6

Public Defender, Steven Clark, Deputy Defender, Chicago, for defendants-appellants.

J. Michael Fitzsimmons, State's Atty., Wheaton, Phyllis J. Perko, Cheri A. Novak, **282 ***645 State's Attys. Appellate Service Com'n, Elgin, for plaintiff-appellee.

VAN DEUSEN, Justice:

In separate informations, defendants Harry Martin and Dennis McClinton*199 were each charged with two counts of armed robbery, two counts of armed violence and seven counts of unlawful use of weapons. In a consolidated jury trial on the armed robbery and armed violence counts, the defendants were each found guilty of two counts of armed robbery (Ill.Rev.Stat.1979, ch. 38, par. 18-2(a)) and two counts of armed violence (Ill.Rev.Stat.1979, ch. 38, par. 33A-2). In the defendants' consolidated bench trial regarding the unlawful use of weapons charges, each was found guilty of two counts of unlawful use of weapons. (Ill.Rev.Stat.1979, ch. 38, par. 24-1(a)(9).) Defendant Martin was sentenced to 35 years' imprisonment on each count of armed robbery, 35 years on each count of armed violence, and five years on each count of unlawful use of weapons. Defendant McClinton was sentenced to 30 years on each count of armed robbery, 30 years on each count of armed violence, and five years on each count of unlawful use of weapons. All sentences were to run concurrently for both defendants.

On February 18, 1981, at about 11 p.m., the defendants pushed their way through the rear door of an Oak Brook McDonald's restaurant during the course of a bread delivery. The defendants herded the employees into a corner and approached John Kasprzyk, the store manager. The defendant Martin was dressed in a snowmobile suit, wearing a ski hat and gloves and wielding a revolver. He pointed the gun at Mr. Kasprzyk's face, ordered the manager to the rear of the store, and then commanded him to open and empty the contents of the store safe into a bucket. The other employees were ordered into the walk-in refrigerator. The defendant McClinton, who was dressed in dark pants, ski cap, gloves, jacket and pinkish glasses, then took Mr. Kasprzyk at gunpoint to the front of the restaurant and directed him to empty the cash register drawers into the bucket. In addition to

over $1,800, the defendants also took a white bank bag from the safe. On the bag were written the words "BACK UP".

One week later, on February 25, 1981, at approximately 11 p.m., the defendants were observed in the immediate area of a Darien McDonald's. When stopped, the officers found the two revolvers and the bank bag from McDonald's. Defendants were subsequently arrested and charged with armed violence, armed robbery and unlawful use of weapons.

On May 26, 1981, defendants filed two motions to suppress evidence. On June 8, 1981, a hearing was first held on the motion to suppress pertaining to the stop and search of the car in which Martin and McClinton were arrested.

The first witness on this motion was Harry Martin. He testified *200 that on February 25, 1981, he was driving in his brother's Ford station wagon with Dennis McClinton as his passenger, when they were stopped by the Darien police. According to Martin, immediately after they were stopped, the arresting police officers stood about ten or fifteen feet away with their guns drawn, and told Martin to get out of the vehicle and put his hands on his head and walk toward them. None of the police officers approached the vehicle prior to the time Martin was ordered out of the car. When he was ordered to get out of the car, Martin turned to McClinton and told the other man to get out of the vehicle, and they then walked toward the police with their hands on their heads. When they reached the squad cars, Martin testified that the police threw them to the ground, placed shotguns and pistols against their heads and backs, and then proceeded to go to the car. Martin and McClinton were both searched, and they were then told to stand up and were placed against the squad car. Martin stated that after searching the defendant's car, an officer announced that he had found a bag but had not found what the police were looking for. The officer was told by a sergeant to keep searching. Martin thereafter**283 ***646 heard the motor of his car turn off, and then a police officer hollered that he had found something in the glove compartment. Prior to this, Martin testified that the glove compartment had

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

been locked. After the officers had opened the glove compartment, Martin and McClinton were taken over to the car and placed inside. Martin was read his rights and was told that the defendants were going to be taken to the police station, and that they were being arrested and held under investigation for an armed robbery.

The first witness for the State on this motion to suppress evidence was Darien Police Sergeant Edward S. Musial. His version of the events occurring on February 25, 1981, was quite different from that presented by the defendants. He testified that on February 25 he was in his car with another officer when he observed a Ford station wagon on Seminole Drive just north of Plainfield Road, directly across from a McDonald's in Darien. The vehicle first passed by the squad car and then backed up in front of them. At this time, Musial said he observed that a taillight lense was cracked on defendants' vehicle, although the light was operative. Defendants' car then turned around and parked on Seminole Drive for about a minute. Officer Musial then heard the car's engine start up again, the headlights came on, and the car moved onto Plainfield Road. The officer then testified that he lost the vehicle, but "two other officers stationed in the area someplace else viewed the vehicle the whole time." Musial and his partner subsequently saw the vehicle going eastbound on a different **\*201** street. According to Musial, the defendants' car traveled directly in front of the police vehicle, pausing at a stop sign. In the light cast by the squad car headlights, Musial observed two male blacks in the interior of the passing car and noticed one was wearing a blue snowmobile suit, similar to that which one of the robbers had been wearing at the February 18 McDonald's robbery. The age of the two male blacks appeared to be the approximate age of the subjects mentioned in a police radio message regarding the previous McDonald's robbery. By the time the vehicle was actually pulled over by Officer Musial, at 10:45 or 10:50 p.m., five to ten minutes had passed since the officer first observed the vehicle with the broken taillight lense.

Immediately after stopping the defendant's station wagon on Nantucket Street, Sergeant Musial

ordered the occupants out of their vehicle. As they exited the car, the defendants were ordered away from the vehicle and directed to get on the ground. Subsequently, they were both patted-down. While defendants were on the ground, Musial went up to the station wagon to check if there was anyone else hiding in the darkened vehicle. Musial testified that as he approached the vehicle, he could see on the floor a red bank bag marked with a McDonald's name, plus a blue ski mask, a blue knit cap and two pairs of gloves on the front seat. In a prior police radio message, and in a flier the officer had received concerning the Oak Brook McDonald's robbery, he had gained information that one of the robbers had worn a blue ski mask, the other had worn a blue knit cap, and they both had been wearing gloves. After finding the bag, gloves, and hat, Musial walked back to the squad car and gave his handcuffs to an officer so that one of the defendants could be handcuffed.

Musial then returned to the station wagon because he had additional information that one of the robbers had been armed with a 4 " revolver and the other with a 2 " revolver. According to Musial, he opened the unlocked glove compartment and found a 4 ", .38 caliber revolver in "plain view", and a bank-type bag with the words "BACK UP" written on the bag. Inside the bank bag, he found a .32 caliber, 2 " revolver inside a holster. Musial testified that he had looked in the glove compartment because "we were investigating two subjects in an armed robbery" and he wanted to check for weapons or other fruits of the crime.

A head security manager from McDonald's, who was present at the scene, identified the bank bag as having been **\*\*284   \*\*\*647** taken from a McDonald's store in an armed robbery. Musial then advised the other officers that he believed that these were the two men who were wanted for investigation in an armed robbery. The two men were read their **\*202** *Miranda* warnings and taken into custody.

Following the testimony of Martin and Musial, the trial court denied the defendants' motion to suppress and made the following finding:
"That the stopping of the vehicle based on the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

articulable suspicion was reasonable and the vehicle having been stopped and the observations of the police officer who testified as to what he saw in the vehicle, justified a further intrusion into the vehicle that is, the glove compartment."

A hearing was then held on a second motion to suppress. In this motion defendants requested the suppression of identification testimony on the grounds that the defendants had been illegally detained without being presented to a magistrate, and that during this period of illegal detention a counselless lineup was conducted. Both Martin and McClinton testified that initially they were denied an opportunity to call a lawyer at the Darien police station. Martin stated that he was told that he did not need to call an attorney because he was only being held for investigation. Martin and McClinton were held in the station house basement for approximately an hour, and then were taken upstairs to be photographed and fingerprinted. Afterwards, each defendant was permitted to make a phone call. Martin telephoned his fiancee and told her to contact his lawyer and inform the attorney of his location and predicament. McClinton called his mother.

Subsequently, the defendants were transported to the Oak Brook police station. They each testified that they were denied their requests to make another phone call from the second station house. Sometime during the morning of February 26, defendants were put in several separate lineups. There was no attorney present at any of the lineups, although Martin testified he requested his lawyer's presence. At the lineups, McClinton was identified by three of five witnesses, while Martin was identified by one witness.

After the lineups, McClinton was served with a complaint for armed robbery and an arrest warrant with a bond of $100,000. Martin received a copy of a charge for armed robbery and unlawful use of weapons, as well as a warrant from Chicago. Each defendant was also given a ticket for driving without a license and for having an inoperable taillight. On the morning of February 27, both defendants were taken before a judge.

The trial court denied defendants' motion to suppress the identification testimony and the case proceeded to a jury trial on counts I, II, III and IV charging armed robbery and armed violence. The defendants waived their right to a jury on counts VI and VII charging unlawful*203 use of weapons on February 18, 1981, (date of robbery). Counts VIII through XII charging unlawful use of weapons on February 25, 1981, (date of arrest) were initially severed and later *nolle prossed.* Count V, charging unlawful use of weapons on February 18, was also *nolle prossed.*

At trial, the State produced a number of eyewitnesses to the February 18 robbery. Their testimony included identification of the defendants, identification of the items worn by defendants during the crime, and identification of the revolvers used by defendants.

During the presentation of witnesses, the defense renewed a prior motion *in limine* to restrict the State from bringing out the fact that defendants were arrested in the vicinity of the Darien McDonalds. The court denied the motion again. The attorneys for each defendant also renewed the motion to suppress the fruits of the search of the car. The motion to suppress was again denied.

[1] Defendants have appealed both their convictions and sentences, and they allege a score of pretrial, trial and post-trial errors. We first consider, however, the **285 ***648 State's preliminary challenge of defendants' standing to raise a constitutional fourth amendment claim. Under the general principles of *Rakas v. Illinois* (1978), 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387, the State asserts that because defendants drove a borrowed automobile they had no "reasonable expectations of privacy" in the vehicle and consequently they cannot contest the halt and search of that automobile. Evidence at the trial court indicates that the car driven by defendant Martin was not owned by either himself or McClinton, but that the defendants did have the owner's permission to use the car.

[2] While the State may raise some issue as to the rights of persons who borrow another's automobile

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

to challenge police searches of that vehicle, that is not the relevant issue in this appeal. As the defendants correctly point out, the search of their car is only being attacked as a fruit of the illegal police conduct in *seizing* the defendants. No standing problem exists where a defendant claims that the evidence sought to be suppressed was obtained as a result of a illegal seizure of that defendant. (*People v. Reynolds* (1981), 101 Ill.App.3d 576, 57 Ill.Dec. 144, 428 N.E.2d 694 *aff'd* (1983), 94 Ill.2d 160, 68 Ill.Dec. 122, 445 N.E.2d 766; *People v. Bradi* (1982), 107 Ill.App.3d 594, 597-98, 63 Ill.Dec. 363, 437 N.E.2d 1285.) Since the defendants do have standing to challenge the detention of their vehicle, they may rightfully contest whether the police conduct involved was legal.

Defendants' first substantive contention on appeal is that the forceful actions of the police in making the stop of defendants' automobile amounted to an arrest, requiring probable cause. Alternatively, *204 they argue that even if characterized as "investigatory stop" under *Terry*, the halt of defendants' vehicle was not based on the requisite reasonable suspicion. (*Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.) In light of the exact language used by the trial court in its ruling on defendants' motion to suppress, the relevant issue can be narrowed to whether the arresting officers' actions met the requirements of a *Terry* investigatory stop.

[3] It should be remembered that the "stop and frisk" rule of *Terry* involves a two-part procedure. First, the police officer must have a reasonable, articulable suspicion of criminal activity to justify a detention; and second, the "frisk" of the person detained must be both based on a reasonable fear that defendant is armed, and limited to a pat-down search for weapons. In total, the permissible intrusion of an investigatory detention is governed by a balancing of the societal need to detect crime and insure police safety against the severity of intrusion into a citizen's privacy. (*People v. Smithers* (1980), 83 Ill.2d 430, 437-38, 47 Ill.Dec. 322, 415 N.E.2d 327.) These concerns are not only important to a constitutional analysis of a "stop and frisk" but also for a statutory review of such a

detention. The Illinois Code of Criminal Procedure of 1963, sections 107-14 and 108-1.01, essentially codify the same concerns articulated in the federal constitutional cases. Ill.Rev.Stat. 1981, ch. 38, pars. 107-14, 108-101; *People v. Lee* (1971), 48 Ill.2d 272, 279, 269 N.E.2d 488; *People v. McGowan* (1977), 69 Ill.2d 73, 77, 12 Ill.Dec. 733, 370 N.E.2d 537.

[4] The defendants in the instant case contest the legality of both their initial detention and the subsequent frisk by police officers. As to the stop of defendants, the requisite degree of suspicion which will constitutionally justify such a detention was originally set forth in the *Terry* case: "[I]n justifying the particular intrusion, the police officer must be able to point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant the intrusion." (392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906.) While *Terry* involved an on-the-street encounter, the stopping of a motor vehicle and detention of its occupants falls within the scope of the same rule. See *People v. Drummer* (1980), 81 Ill.App.3d 626, 37 Ill.Dec. 417, 402 N.E.2d 307; *People v. Kantowski* (1983), 98 Ill.2d 75, 74 Ill.Dec. 486, 455 N.E.2d 1379; **286***649 *Pennsylvania v. Mimms* (1977), 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331.

While there is a wealth of authority on investigatory stops, including the numerous cases cited by the defendants, the various facts of those cases make each distinguishable. As in all cases involving a search and seizure, the reasonableness of the police conduct in the present case depends upon its particular facts and attendant circumstances.*205 (*People v. Smithers* (1980), 83 Ill.2d 430, 435, 47 Ill.Dec. 322, 415 N.E.2d 327; *People v. Mills* (1983), 115 Ill.App.3d 809, 812, 71 Ill.Dec. 247, 450 N.E.2d 935.) In the present controversy, the factual justification for the police officer's detention of defendants is based in large part upon defendants' close resemblance to a circulated, composite physical description of the suspected robbers. This description detailed the race, age, size and clothing of the suspects, including mention of the rather distinctive snowsuit garb worn by one of the robbers. While the height and weight of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

defendants would be difficult to ascertain from merely viewing the suspects while they sat in an automobile. the arresting officer testified at trial that he had ample opportunity to closely observe the other elements of the defendants' appearance. The propriety of a particular detention for investigatory purposes is obviously heightened when a defendants' appearance is similar to an accurate description of a suspected criminal. *(People v. Jones* (1981), 102 Ill.App.3d 238, 57 Ill.Dec. 820, 429 N.E.2d 1094, (defendant's uniquely patterned turtle neck sweater, his race, and age served as basis for officers' stop of defendant.); *People v. Hall* (1980), 90 Ill.App.3d 1073, 46 Ill.Dec. 479, 414 N.E.2d 201. *cert. denied* (1981), 454 U.S. 893, 102 S.Ct. 388, 70 L.Ed.2d 207 (defendants' height, race, and apparel, as well as their location, held sufficient for investigatory stop).) In addition, the defendants' vehicle was parked outside a McDonald's restaurant at the same approximate time as the previous robbery of the Oak Brook McDonald's. Since the method used in the robbery was to gain entrance when a certain delivery was made, the location and time of defendants' position was a highly relevant factor. *People v. McGowan* (1977), 69 Ill.2d 73, 78-79, 12 Ill.Dec. 733. 370 N.E.2d 537 (defendant and companion wearing dark clothes spotted late at night walking in a high crime area.).

[5][6] Taken together, and in light of the detaining officers' experience, the evidence adduced at trial was sufficient to lead a man of reasonable caution to believe that the detention of the defendants was appropriate. *(Terry v. Ohio* (1968), 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889, 911; *People v. Grice* (1980), 87 Ill.App.3d 718, 722, 43 Ill.Dec. 209, 410 N.E.2d 209, *cert. denied* (1981), 450 U.S. 1003, 101 S.Ct. 1714, 68 L.Ed.2d 207.) The burden of proof that a search and seizure in a public place was unlawful is on the person seeking to challenge the seizure or suppress evidence (87 Ill.App.3d 718, 722, 43 Ill.Dec. 209, 410 N.E.2d 209, *cert. denied* (1981), 450 U.S. 1003, 101 S.Ct. 1714, 68 L.Ed.2d 207; *People v. Beacham* (1980), 87 Ill.App.3d 457, 464, 43 Ill.Dec. 87, 410 N.E.2d 87), and a finding by the trial court that a particular detention was reasonable will not be disturbed on review unless manifestly erroneous. *(People v.*

*Conner* (1979), 78 Ill.2d 525, 532, 36 Ill.Dec. 672, 401 N.E.2d 513; 87 Ill.App.3d 718, 722, 43 Ill.Dec. 209, 410 N.E.2d 209. *cert. denied* (1981), 450 U.S. 1003, 101 S.Ct. 1714, 68 L.Ed.2d 207.) Defendants have **\*206** failed to sustain their burden in the instant case.

In addition to challenging their initial detention, defendants also contest the forceful nature of the alleged investigatory stop. From their perspective, the detention and frisk by the officers exceeded what was "minimally necessary to learn whether the men were armed and to disarm them \* \* \*." (392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889, 911.) The evidence produced at trial is somewhat controverted, but it can fairly be stated that immediately upon the stopping of defendants' car, McClinton and Martin were ordered to exit the vehicle. The officers had their guns drawn, and ordered the defendants to the **\*\*287 \*\*\*650** ground where they were patted-down for weapons.

[7] Once again, the intrusiveness of the police officers' actions must be reviewed in light of the countervailing public interests in detecting crime and protecting law enforcement personnel. Considering the highly dangerous nature of the suspected criminal activity and the officers' knowledge that the persons sought were armed, the conduct of the police in the present case was not unreasonable. The fact that the officers halted defendants with guns drawn and conducted a pat-down search without preliminary questioning does not necessarily convert an investigatory stop into an arrest. *(People v. Roberts* (1981), 96 Ill.App.3d 930, 933-34, 52 Ill.Dec. 473, 422 N.E.2d 154, see *Adams v. Williams* (1972), 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612; *United States v. Place* (1983), 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110.)

"During the period of the investigation, the person's freedom of movement is restricted. He is no more free to leave than if he were placed under a full arrest. The difference between an arrest and a stop lies not in the initial restraint on movement, but rather in length of time the person may be detained and the scope of investigation which may follow the initial encounter. \* \* \*

It would be anomalous to grant an officer authority

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279

Page 11

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

to detain pursuant to an investigatory stop and yet deny him the use of force necessary to effectuate that detention." 96 Ill.App.3d 930, 933-34, 52 Ill.Dec. 473, 422 N.E.2d 154, see also *People v. Polk* (1981), 95 Ill.App.3d 875, 51 Ill.Dec. 402, 420 N.E.2d 816; *People v. Sanford* (1976), 34 Ill.App.3d 990, 341 N.E.2d 453.

The officers in the immediate case acted reasonably in treating defendants with a high degree of caution even prior to initiating questioning. The police action in drawing their guns, ordering the defendants out of their vehicle, and then conducting an immediate pat-down search of the defendants on the ground is an intrusion which is outweighed by the great threat posed by suspected felons. **\*207** See *People v. Zielinski* (1980), 91 Ill.App.3d 519, 521, 46 Ill.Dec. 960, 414 N.E.2d 1113; *People v. Gunderson* (1978), 66 Ill.App.3d 516, 523, 23 Ill.Dec. 269, 383 N.E.2d 1296.

[8][9] Since the defendants' detention was lawful, it follows that Officer Musial was rightfully in a position where he could observe the interior of defendants' vehicle; consequently, the McDonald's money bag he saw was properly visible within the plain view doctrine. (*Texas v. Brown* (1983), 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502; *People v. Davis* (1981), 93 Ill.App.3d 217, 48 Ill.Dec. 675, 416 N.E.2d 1197; *People v. Carroll* (1973), 12 Ill.App.3d 869, 299 N.E.2d 134, *cert. denied* (1974), 417 U.S. 972, 94 S.Ct. 3180, 41 L.Ed.2d 1144.) Peering into a halted vehicle for the purpose of insuring police safety from potential hidden suspects does not rise to the level of a " search" within the meaning of the Federal Constitution's fourth amendment. (See *People v. Brandys* (1973), 15 Ill.App.3d 379, 304 N.E.2d 471; *People v. Piper* (1981), 101 Ill.App.3d 296, 56 Ill.Dec. 815, 427 N.E.2d 1361.) Illinois cases have interpreted the word "search" to imply prying into hidden places for concealed materials, not merely observing what is open to view. (101 Ill.App.3d 296, 299, 56 Ill.Dec. 815, 427 N.E.2d 1361, citing *City of Decatur v. Kushmer* (1969), 43 Ill.2d 334, 338, 253 N.E.2d 425.) An investigatory stop does not become unreasonable because the officers take precautionary measures which do not further invade

the privacy interest of the defendants. A protective investigation beyond defendant's person may be justified when there is the possibility that other persons, not detained, present a danger to the investigating officers. See 3 W. LaFave, Search and Seizure, § 9.4, at 134-37 (1978).

[10] When Officer Musial observed the McDonald's bag on the seat of defendants' vehicle, he could reasonably infer that the occupants of the vehicle were connected to the restaurant burglary. This evidence, discovered in plain view, was sufficient to escalate the officer's suspicions to the level **\*\*288 \*\*\*651** of probable cause to arrest. *People v. Drummer* (1980), 81 Ill.App.3d 626, 629, 37 Ill.Dec. 417, 402 N.E.2d 307; *People v. Cribbs* (1972), 8 Ill.App.3d 750, 753, 291 N.E.2d 326.

The ensuing search of defendants' automobile, including the opening of the closed glove compartment, is not directly contested by the defendants. While the propriety of this extensive search was questioned at the trial court level, the defendants on appeal challenge the search only as a fruit of the allegedly illegal initial stop. Even assuming that the issue had been raised in this appeal, the search of the defendants' vehicle would nonetheless be justified under either the expansive search-incident-to-lawful-arrest doctrine espoused in *New York v. Belton* (1981), 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768, or under the warrantless automobile search doctrine authorized by **\*208***United States v. Ross* (1982), 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572.

[11] Defendants next argue that the police intentionally delayed filing charges against them in order to hold counselless lineups. This delay, defendants contend, constitutes a violation of their rights under the fourth and fourteenth amendments to the United States Constitution and section 7 of article I of the Illinois Constitution of 1970, and also amounts to a breach of their statutory right (Ill.Rev.Stat.1981, ch. 38, par. 109-1) to a prompt, probable cause determination. The record discloses that the defendants were held in custody approximately 36 hours before being taken to court for a probable cause determination. Their initial arrest occurred at about 11 p.m. on February 25,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279
121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

1981. The following day, a number of counselless lineups were held and identifications were made. After the lineups, defendants were served with formal charges. On the morning of February 27, defendants were brought to daily bond court before a judge.

[12] As the State correctly suggests, a delay of a day, or a day and a half, is unlikely to be an unreasonable detention. (See *People v. Dees* (1981), 85 Ill.2d 233, 52 Ill.Dec. 614, 422 N.E.2d 616; *People v. Kirkley* (1978), 60 Ill.App.3d 746, 18 Ill.Dec. 251, 377 N.E.2d 540; *People v. Jackson* (1961), 23 Ill.2d 274, 178 N.E.2d 299.) The determination of what is an unnecessary or unreasonable delay depends upon the facts and circumstances of each case. (23 Ill.2d 274, 278, 178 N.E.2d 299.) Some latitude is allowed, and presentment to a judge need be performed only with that reasonable promptness which circumstances permit (see *People v. Georgev* (1967), 38 Ill.2d 165, 230 N.E.2d 851; *People v. Kelly* (1949), 404 Ill. 281, 89 N.E.2d 27; *People v. Mallett* (1970), 45 Ill.2d 388, 259 N.E.2d 241.) A lineup held for investigatory purposes, prior to preliminary hearing, does not necessarily indicate law enforcement abuse. For example, in the *Kelly* case, the defendant was arrested about 9 p.m. on Saturday night and was thereafter identified in a police lineup by two of the victims. It was not until the following Tuesday, that he was taken before a magistrate. The Illinois Supreme Court rejected the defendants claim that there was unreasonable delay in taking him before a judge in view of the circumstances that the police investigation was not completed until Monday morning. (See also *People v. Bryant* (1982), 105 Ill.App.3d 285, 61 Ill.Dec. 163, 434 N.E.2d 316.) As the United States Supreme Court noted in *Gerstein v. Pugh* (1975), 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54, it is the serious consequences arising from prolonged detention which necessitated its holding that the fourth amendment requires a judicial determination of probable cause as a prerequisite to *extended restraint of liberty following arrest.* (420 U.S. 103, 114, 95 S.Ct. 854, 865, 43 L.Ed.2d 54, 65.) In the instant case, no such prolonged detention or extended restraint of liberty occurred prior to the taking of defendants before a judge. The

defendants were arrested late at night **\*209** on February 25 and taken before daily bond court approximately 24 hours after the commencement of the next business day. Such a minimal delay was reasonable considering the time necessary to perform the administrative **\*\*289 \*\*\*652** steps incident to arrest. Contra *Bernard v. City of Palo Alto* (9th Cir.1983), 699 F.2d 1023.

Moreover, the defendants have not clearly established that any prejudice resulted from their minimal delay before a preliminary hearing. ( *People v. Dees* (1981), 85 Ill.2d 233, 238, 52 Ill.Dec. 614, 422 N.E.2d 616.) Defendants made no incriminating statements during the delay, nor have they shown that the lineups conducted were unnecessarily suggestive and conducive to irreparable mistaken identification. A short delay in presentment before a judge cannot be a basis for reversal absent a showing of undue prejudice. 85 Ill.2d 233, 238, 52 Ill.Dec. 614, 422 N.E.2d 616.

Defendants further contend that since they requested that retained counsel be present at lineups held prior to their preliminary hearing, the conducting of such lineups without honoring that request violated their rights to counsel and to due process under the fifth and sixth amendments of the United States Constitution, article 1, sections 2 and 8 of the Illinois Constitution of 1970, and section 103-3 of the Code of Criminal Procedure of 1963 (Ill.Rev.Stat., 1981, ch. 38, par. 103-3). We find no merit to this argument.

[13] Since the identification lineups of February 26, were prior to the defendants' preliminary hearing, no judicial adversarial stage warranting the right to counsel had yet arisen. (See *Kirby v. Illinois* (1972), 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411; *People v. Agee* (1981), 100 Ill.App.3d 878, 56 Ill.Dec. 164, 427 N.E.2d 244; *People v. Williams* (1980), 90 Ill.App.3d 524, 45 Ill.Dec. 727, 413 N.E.2d 60, *cert. denied* (1981), 452 U.S. 943, 101 S.Ct. 3090, 69 L.Ed.2d 958; *People v. Johnson* (1973), 55 Ill.2d 62, 302 N.E.2d 20.) Defendants' reliance upon cases from southern jurisdictions, where the right to counsel has been expanded to include other additional police-defendant contacts, is misplaced since Illinois has not adopted that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279

Page 13

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

expansive approach. (*People v. Harrell* (1982), 104 Ill.App.3d 138, 142, 60 Ill.Dec. 264, 432 N.E.2d 1163.) In our State, a warrantless arrest based on probable cause simply does not initiate such adversary judicial proceedings as would give rise to a right to counsel at a lineup conducted prior to the preliminary hearing. *People v. Agee* (1981), 100 Ill.App.3d 878, 881-82, 56 Ill.Dec. 164, 427 N.E.2d 244; *People v. Williams* (1980), 90 Ill.App.3d 524, 529, 45 Ill.Dec. 727, 413 N.E.2d 60, *cert. denied* (1981), 452 U.S. 943, 101 S.Ct. 3090, 69 L.Ed.2d 958; *People v. Shorter* (1978), 59 Ill.App.3d 468, 476, 16 Ill.Dec. 640, 375 N.E.2d 513.

[14] Defendants have likewise failed to show that the pretrial identification procedures were so unnecessarily suggestive and condusive to mistaken identification as to deny them due process. *210 *Neil v. Biggers* (1972), 409 U.S. 188, 197, 93 S.Ct. 375, 381, 34 L.Ed.2d 401, 410; *People v. Williams* (1980), 90 Ill.App.3d 524, 528, 45 Ill.Dec. 727, 413 N.E.2d 60, *cert. denied* (1981), 452 U.S. 943, 101 S.Ct. 3090, 69 L.Ed.2d 958; *People v. Owens* (1977), 46 Ill.App.3d 978, 990, 5 Ill.Dec. 321, 361 N.E.2d 644, see *People v. Bryant* (1983), 94 Ill.2d 514, 520-21, 69 Ill.Dec. 84, 447 N.E.2d 301.

[15][16] The defendants also assert that they were denied their statutory right to communicate with an attorney of their choice. (Ill.Rev.Stat.1981, ch. 38, par. 103-3.) There is some factual dispute regarding this matter, but assuming arguendo that such a statutory violation occurred, it would not be a basis for reversing defendants' conviction or setting aside the witness identifications in this case. As has already been stated, defendants did not have a right to counsel at the lineup prior to their preliminary hearing. Further, there were no statements or confessions that came from the accused during their detention. While section 103-3 of the Code of Criminal Procedure of 1963 does provide arrestees with the right to contact their attorneys, failure to abide by this provision does not necessarily mandate a vacation of conviction or suppression of identification. (Ill.Rev.Stat.1981, ch. 38, par. 103-3; *People v. Ishman* (1969), 44 Ill.2d 61, 254 N.E.2d 482.) Section 103-3 is not a per se rule of exclusion or reversal, and absent the

substantive right to counsel, the making of **290 ***653 incriminating statements in custodial interrogation, or evidence of abuse of police procedures, a defendants' conviction will not be reversed because of a violation of this section.

[17] In addition, while the right to communicate with counsel may rise to the level of a violation of constitutional due process when the denial of such right interferes with the ability of the defendant or his counsel to prepare for or defend at trial (see *City of Chicago v. Harmon* (1969), 117 Ill.App.2d 361, 365, 254 N.E.2d 573), we discern no such constitutional violation under the facts of this case. In the present case, each defendant was allowed to make a phone call, and although defendants argue that they were prevented from communicating with their retained counsel, the record does not reflect that defendants, either separately or cooperatively, ever did actually retain their own counsel. To the contrary, the record reflects that the court *appointed* counsel to represent each defendant, and the appointments were made sufficiently in advance of the preliminary hearings so that no claim is made that defendants' counsel did not have adequate time or opportunity to properly prepare for the hearing or the subsequent trial.

[18] Defendants' next argument on appeal is that they were prejudiced by the introduction of evidence which suggested other criminal conduct. Before trial, the lower court held a hearing on a motion *in *211 limine* regarding the introduction of the fact that defendants were arrested in the vicinity of a second McDonald's restaurant. While not making any precise ruling at that time, the trial judge said that if the prosecutor referred to the circumstances attending defendants' arrest, she should be ready to introduce supporting evidence. The assistant State's Attorney did not mention the location of the arrest in her opening statement.

Subsequently, however, on cross-examination of Officer Musial, defense counsel inquired whether the officer had observed defendants commit a crime during the time of surveillance. On the State's objection that this question was leading into the total circumstances of the arrest, defense counsel withdrew the question. Upon further examination

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(83)

459 N.E.2d 279

Page 14

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)

by both parties, the trial judge apparently concluded that defense counsel had opened the door as to all matters surrounding defendants' arrest. He explained, "I believe now the door has been opened so far as this officer can let the jury know what information he was armed with when he made the stop." He then permitted the prosecutor a limited number of additional inquiries involving the location of defendants' stop.

Defendants argue that evidence of their location at a second McDonald's was unduly prejudicial because it suggested that defendants were committing a second crime. (*People v. Miller* (1977), 55 Ill.App.3d 421, 13 Ill.Dec. 128, 370 N.E.2d 1155.) The *Miller* court stated the general rule that evidence of other crimes cannot be admitted to show motive, identity, or intent until it is shown that those other crimes actually took place and that defendant participated in their commission. (55 Ill.App.3d 421, 426, 13 Ill.Dec. 128, 370 N.E.2d 1155.) Consequently, defense counsel argues that the defendants presence at the second McDonald's was not a crime in itself and therefore could not be properly introduced. Moreover, the defendants argue that their location at the time of the arrest was irrelevant to the issue of their guilt of the February 18 robbery; defendants' location at the second McDonald's was relevant only as to the reasons for Officer Musial's stop of defendants on February 25 and that matter was resolved at the pretrial suppression hearing.

[19] The trial court, however, concluded that defense counsel's questioning had planted in the minds of the jury uncertainties as to why Officer Musial took special note of the two defendants on February 25. He permitted limited introduction of evidence of defendants' presence at the second McDonald's, not to establish defendants' propensity to commit crime, but as relevant circumstantial evidence pertaining to the February 18 robbery. Mention of **291 ***654 the second McDonald's restaurant was an integral part of the narrative of the defendants arrest,*212 involving relevant evidence of time, proximity and defendants' identity. (*People v. Walls* (1965), 33 Ill.2d 394, 397-98, 211 N.E.2d 699; *People v. Spiezio* (1982), 105 Ill.App.3d 769, 772-73, 61 Ill.Dec. 482, 434 N.E.2d 837; *People v.*

*Davis* (1981), 93 Ill.App.3d 187, 191, 48 Ill.Dec. 657, 416 N.E.2d 1179; *People v. Schubert* (1975), 28 Ill.App.3d 599, 329 N.E.2d 23.) The facts and circumstances attending an arrest of an accused may be put into evidence when they tend to connect defendant with the offense for which he is being tried. (See *People v. Evans* (1962), 25 Ill.2d 194, 184 N.E.2d 836, *cert. denied* (1963), 372 U.S. 922, 83 S.Ct. 738, 9 L.Ed.2d 727; *People v. Schubert* (1975), 28 Ill.App.3d 599, 329 N.E.2d 23.) Testimony involving the location of defendants' arrest was carefully limited, and no prejudicial or inflammatory language was used. The trial court did not err in permitting the admission of such evidence.

[20] The next issue raised on appeal is whether defendant Dennis McClinton was properly found guilty of two related counts of unlawful use of weapons. Under the Criminal Code of 1961 (Ill.Rev.Stat.1981, ch. 38, pars. 24-1(a)(9) and 24-1(b)), the guilty defendant must be armed with a revolver and masked in such a manner as to conceal his identity. Under these charges, whether defendant McClinton was masked in such a manner as to conceal his identity was an essential element of the offense which the State necessarily had to prove beyond a reasonable doubt. See *People v. Smith* (1978), 71 Ill.2d 95, 105, 15 Ill.Dec. 864, 374 N.E.2d 472; *People v. Rothermel* (1982), 88 Ill.2d 541, 544, 59 Ill.Dec. 93, 431 N.E.2d 378.

According to the testimony adduced at trial, McClinton wore a type of tinted pink or peach glasses and a ski hat during the perpetration of the crime. Eyewitness Jerry Kinzey testified as to McClinton's apparel, stating that he could see through the pink glasses worn by the defendant although they were dark. He added that about 3/4 " was open between the defendant's hat and the dark glasses. Upon further questioning, Kinzey stated that the glasses did not hide or distort defendant's features. Eyewitness Judith Wordel testified that the glasses were wire-framed, pink or peach tinted aviator-type glasses. She stated that the glasses were not sunglasses, but they did have a little bit of shade to them. The glasses did not interfere with her view of the subject.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

While generally it is the jury's responsibility to make the factual determinations such as this one ( *People v. Davis* (1983), 95 Ill.2d 1, 27, 69 Ill.Dec. 136, 447 N.E.2d 353; *People v. Smith* (1978), 71 Ill.2d 95, 102, 15 Ill.Dec. 864, 374 N.E.2d 472), a fair reading of the evidence falls far short of establishing that defendant McClinton was masked in such a manner as to conceal his identity. We therefore conclude that the State failed to prove beyond a reasonable doubt that Dennis McClinton was masked.

The State attempts to rebut defendant's position by claiming that *213 even if McClinton were not masked within the meaning of the statute, he can be found guilty under alternative theories encompassed in the unlawful use of weapons statute (Ill.Rev.Stat.1981, ch. 38, par. 24-1). However, the alternative subsections of section 24-1 which the State attempts to raise were *nolle prossed* by the State prior to trial. The Illinois Supreme Court has made it clear that the mere citation of the statute allegedly violated is insufficient to incorporate by reference, the whole statute into the charge. ( *People v. Pujoue* (1975), 61 Ill.2d 335, 335 N.E.2d 437.) Also, where a defendant is charged with a violation of a statute which contains disparate and alternative methods of committing an offense, the charging instrument must detail which alternative the defendant is accused of committing, (*People v. Heard* (1970), 47 Ill.2d 501, 504-05, 266 N.E.2d 340; See *People v. Hall* (1982), 96 Ill.2d 315, 323-24, 70 Ill.Dec. 836, 450 N.E.2d 309.) We conclude that the State failed to prove an essential element of the offense of unlawful use of weapons beyond a reasonable **292 ***655 doubt, and therefore, as to the defendant McClinton the convictions and sentences for unlawful use of weapons are reversed.

Defendants next argue that since each defendant was convicted of two counts of armed robbery and two counts of armed violence, and all counts arose from the same single act committed during the robbery, only one count of armed violence can stand and the other three counts must be vacated. The same contention is made, now relevant only to the defendant Martin, that both counts of unlawful use of weapons also arise from a single act, and one

count of that offense should be vacated. Further, defendants urge that if these numerous counts, on which judgments were entered and sentences imposed, are vacated on appeal, the causes should be remanded for new sentencing on the convictions which remain.

The State concedes the correctness of defendants' contention on this matter, except that it argues that there is no indication that the trial court considered duplicative counts when sentencing, and thus remand for resentencing is not necessary.

[21] We agree with both parties that under the doctrine of *People v. King* (1977), 66 Ill.2d 551, 6 Ill.Dec. 891, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 98 S.Ct. 273, 54 L.Ed.2d 181, the two counts of armed robbery and the two counts of armed violence can result in only one conviction and sentence for each defendant. However, since armed robbery and armed violence are both Class X felonies and of equal seriousness, it would appear that the conviction and sentence could stand on either offense. (*People v. Simmons* (1982), 93 Ill.2d 94, 98, 66 Ill.Dec. 330, 442 N.E.2d 891; *People v. Mormon* (1982), 92 Ill.2d 268, 270, 65 Ill.Dec. 939, 442 N.E.2d 250.) Although there is some judicial expression that the conviction for armed robbery is the more specific *214 and the more serious offense, and therefore it should stand while the armed violence conviction and sentence should be vacated (*People v. Velleff* (1981), 94 Ill.App.3d 820, 825-26, 50 Ill.Dec. 222, 419 N.E.2d 89), other decisions express deference to the prosecutorial discretion granted to the State. (See *People v. Rayford* (1982), 104 Ill.App.3d 124, 60 Ill.Dec. 142, 432 N.E.2d 1041.) In this case, since both crimes are Class X felonies and the State and the defendants agree that the armed violence conviction should stand, we shall abide by their choice.

We have already set aside the convictions and sentences for unlawful use of weapons with regard to the defendant McClinton, and applying again the doctrines of the *King* case, we also conclude that one conviction and sentence for unlawful use of weapons imposed on the defendant Martin must be vacated.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279    Page 16

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

[22] We do not, however, agree with defendant's conclusion that in view of the number of convictions and sentences being vacated it is necessary to remand the cases for resentencing. Defendant argues that the existence of the counts which we are vacating may have affected the judge's determination of the length of all the concurrent sentences imposed, including the sentences for the convictions of armed violence and unlawful use of weapons which we are affirming; therefore, defendant concludes that even those sentences must be vacated and the cause remanded for resentencing as to those convictions.

Although there is some precedent which suggests that resentencing is appropriate whenever a trial court's sentence determination *might* have been influenced by a vacated conviction (*People v. Vallero* (1978), 61 Ill.App.3d 413, 415-16, 19 Ill.Dec. 48, 378 N.E.2d 549; *People v. Bone* (1982), 103 Ill.App.3d 1066, 1069, 59 Ill.Dec. 745, 432 N.E.2d 329; *People v. Alegos* (1982), 104 Ill.App.3d 414, 416, 60 Ill.Dec. 147, 432 N.E.2d 1046, *aff'd* (1983), 97 Ill.2d 502, 74 Ill.Dec. 18, 455 N.E.2d 48), the genesis of that case line reveals an inapposite origin. (See *People v. Einstein* (1982), 106 Ill.App.3d 526, 535, 62 Ill.Dec. 285, 435 N.E.2d 1257.) The above cases which find resentencing appropriate rely upon authority expressly limited to the context of a defendant convicted of multiple offenses but receiving**293 ***656 a single sentence for all of the convictions. (See *People v. Guppy* (1975), 30 Ill.App.3d 489, 333 N.E.2d 576; *People v. Walton* (1981), 94 Ill.App.3d 903, 50 Ill.Dec. 387, 419 N.E.2d 495; *People v. Ross* (1978), 60 Ill.App.3d 857, 18 Ill.Dec. 77, 377 N.E.2d 230.) Obviously, in that context, resentencing was imperative when one of the convictions was vacated; however, the same conclusion does not follow when a defendant has properly received separate sentences for each conviction.

A reviewing tribunal cannot conclude, *solely* from a trial court's simultaneous imposition of separate sentences for multiple convictions, that the sentence imposed for one offense has been influenced*215 by the conviction or sentence for another offense. Sentencing is a trial court function (*People v. Cox*

(1980), 82 Ill.2d 268, 280, 45 Ill.Dec. 190, 412 N.E.2d 541; *People v. LaPointe* (1981), 88 Ill.2d 482, 492-93, 59 Ill.Dec. 59, 431 N.E.2d 344), and unless the record demonstrates to the contrary, we will conclude that the court considered only the appropriate factors in making its sentencing determinations. Since there is no evidence in the record suggesting that defendants' remaining sentences were improperly affected by their separate additional convictions and sentences, we will not remand their remaining convictions for resentencing. *People v. Owens* (1982), 109 Ill.App.3d 1150, 1160, 65 Ill.Dec. 593, 441 N.E.2d 908; *People v. Einstein* (1982), 106 Ill.App.3d 526, 535, 62 Ill.Dec. 285, 435 N.E.2d 1257; *People v. Worthen* (1982), 105 Ill.App.3d 386, 392, 61 Ill.Dec. 270, 434 N.E.2d 423; *People v. Wilson* (1981), 93 Ill.App.3d 395, 397, 48 Ill.Dec. 744, 417 N.E.2d 146.

[23] Defendants make the final claim that the trial court improperly ruled that they were eligible for extended-term sentences under section 5-5-3.2(b)(1) of the Unified Code of Corrections (Ill.Rev.Stat.1981, ch. 38, par. 1005-5-3.2(b)(1)). This section provides that under certain conditions, an extended-term may be imposed upon a defendant who has previously been convicted of any felony of the same or a greater class within ten years. While each defendant admits that he has previously been convicted of armed robbery, each contends that the provisions of the statute in question apply only when the previous conviction arose in the situation where the defendant was separately brought and tried. They argue that a defendant who is convicted after a guilty plea has not been "tried." Two districts of this court recently addressed this identical contention. (See *People v. Way* (1983), 115 Ill.App.3d 198, 70 Ill.Dec. 830, 450 N.E.2d 43; *People v. Baker* (1983), 114 Ill.App.3d 803, 69 Ill.Dec. 913, 448 N.E.2d 631.) The result of both cases was to uphold the extended-term sentence where the prior conviction was based on a guilty plea. The court in *Way* explained the purpose of section 5-5-3.2(b)(1):

"This provision * * * prevents a court from imposing an extended-term upon a defendant based upon charges tried concurrently. The language in question thereby ensures that a prior conviction,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

when used as a basis for an extended term, will be
totally separate and distinct from the charges for
which the extended sentence is imposed, so that it is
clear that the accused is in fact a recidivist." (115
Ill.App.3d 198, 202, 70 Ill.Dec. 830, 450 N.E.2d 43
.)

Under the rationale of the *Way* and *Baker* decisions,
defendants' position on their sentencing hearings
has no merit.

Consistent with the holdings and conclusions of this
opinion, we reverse, in trial court number 81 CF
325 of the Eighteenth Judicial Circuit, defendant
Harry Martin's judgments of conviction and
sentences**216 for armed robbery in counts I and
II, for armed violence in count III, and for unlawful
use of weapons in count VI; we affirm the
judgments of conviction and sentences of Harry
Martin for armed violence in count IV and for
unlawful use of weapons in count VII.

In trial court number 81 CF 326 of the Eighteenth
Judicial Circuit, we reverse the judgments of
conviction and sentences of Dennis McClinton for
armed robbery in counts I and II, for armed
violence in count **294 ***657 III and for
unlawful use of weapons in counts III and VII; we
affirm the judgment of conviction and sentence of
Dennis McClinton for armed violence in count IV.

AFFIRMED IN PART AND REVERSED IN
PART.

SEIDENFELD, P.J., and LINDBERG, J., concur.
Ill.App. 2 Dist.,1984.
People v. Martin
121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. )<br>DAVID CARTER, )<br>  )<br>            Petitioner, )<br>  )<br>v. )<br>  )<br>TERRY L. McCANN, Warden, )<br>  )<br>            Respondent, ) | No. _____ |

## NOTICE OF FILING

TO:  Clerk
     U.S. District Court
     Northern District of Illinois
     219 S. Dearborn Street
     Chicago, Illinois 60602

     PLEASE TAKE NOTICE that on March  21 , 2007, I have
caused to be filed the requisite number of copies and original of
my pro se PETITION FOR A WRIT OF HABEAS CORPUS §2254 with the
Clerk of the U.S. District Court for the Northern District of
Illinois, 219 S. Dearborn St., Chicago, IL 60602, a copy of which
is hereby served upon you.

David Carter, pro se petitioner
Register No. N-43429
Stateville Correctional Center
Post Office Box 112
Joliet, IL 60434-0112

## CERTIFICATE OF SERVICE

     I, DAVID CARTER, hereby certify that I have caused the
above-mentioned documents to be forwarded to the party listed
above by placing same into the U.S. Mail through the mailroom
situated at the Stateville Correctional Center, proper postage
affixed on March  21 , 2007.

David Carter, affiant

## AFFIRMATION

     I, DAVID CARTER, affirm under the penalty of perjury that
the foregoing is true and correct to the best of my knowledge and
belief.

David Carter, affiant