IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

E-FILED
Monday, April 14, 2008 11:41:08 AM
Clerk, U.S. District Court, ILCD

APR 1 4 2008

CLERK OF COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

DAVID CARTER,          )

          Petitioner,   )

v.                     )          No. 07-1222

                       )

TERRY L. McCANN,        )          Honorable
                       )          Joe Billy McDade,
          Respondent,   )          Presiding Judge

## AMENDED MEMORANDUM IN SUPPORT OF
## PETITIONER'S HABEAS CORPUS PETITION §2254

### Jurisdictional Statement

The District Court has jurisdiction to entertain a petition for writ of habeas corpus pursuant to 28 U.S.C. §2241 and 28 U.S.C. §2254.

### Procedural History

1. Following a jury trial in the Circuit Court of Livingston County, Illinois, petitioner David Carter was convicted of three counts of first degree murder, two counts of conspiracy to commit first degree murder, and one count of solicitation of first degree murder.

2. On March 31, 1992, the trial court imposed a term of natural life without any possibility of parole.

3. Direct appeal followed, the Appellate Court of Illinois, Fourth Judicial District, affirmed petitioner Carter's conviction and vacated the duplicative sentences entered by the trial court. See **People v. Carter, No. 4-92-0298** (/30/93) [Unpublished Order pursuant to Supreme Court Rule 23].

- 1 -

4. On October 6, 1993, the Illinois Supreme Court denied petitioner Carter's leave to appeal. See **People v. Carter**, **No. 75884.**

5. On April 23, 1997, petitioner Carter filed his pro se habeas petition in **U.S. ex rel. David W. Carter v. George DeTella**, **No. 97 C 2926** before Honorable Harry D. Leinenweber, Judge. On April 1, 1999, petitioner Carter filed a pro se Motion To Stay Habeas Corpus Proceeding pursuant to Section 2244(d)(2) of Title 28, U.S. Code. On April 28, 1999, the U.S. District Court in a **Minute Order** granted petitioner's motion to stay the habeas proceedings.

6. On August 10, 1998, petitioner Carter filed his combined pro se Petition From Relief From Judgement, and Petition For Post-Conviction Relief, alleging the following:

(a) the investigative and interrogation techniques employed by the State through their informant constituted fraud and denied petitioner of his 14th Amendment right to due process of law;

(b) the State denied petitioner of his right to a fair trial by commenting on his desire not to testify in his own behalf, and appellate counsel was ineffective for failing to raise this claim on direct appeal;

(c) the State knowingly elicted perjured testimony from their key witness at trial and failed to disclose favorable discovery materials prior to and during trial;

(d) the State knowingly used perjury to obtain authorization for an eavedropping device from the Circuit Court;

(e) that petitioner Carter had obtained newly discovered evidence of actual innocence.

- 2 -

8. On February 8, 1999, appointed counsel filed a Motion To Excuse Late Filing of his pro se motions. In addition, a preliminary certificate pursuant to Supreme Court Rule 651(c) was filed.

9. On March 18, 1999, the trial court conducted a hearing on the timeliness of the petitions, and denied the motion to excuse the late filing of the post-conviction petition. The trial court granted the motion to excuse the late filing of the Section 2-1401 petition for relief from judgement petition.

10. On April 29, 2003, the State filed a Motion To Dismiss his Section 2-1401 petition for relief from judgement.

11. On May 1, 2003, the trial court held a hearing on the State's motion. At the hearing, the State's motion to dismiss was granted, finding that petitioner's allegations that the wire tap obtained by informant/State's key witness, Harry Martin's fraud, trickery and perjury had no merit because the admissibility of the tape did not depend on Martin's motive to testify. In addition, the trial court denied petitioner Carter's allegation regarding the prosecutorial misconduct in the State blantantly commenting on his fundamental right not to testify on his own behalf. The trial court found that this issue was waived, and in any event, "the line was not crossed".

Petitioner then requested the trial court to address the issue of perjury being used by the State in order to obtain authorization for the wire-tap by the trial court. The court responded that the issue had been addressed by the trial court and appellate court previously. The court furthered stated that it was not

- 3 -

clear that Martin's sentence was reduced in return for his coopera-
tion at petitioner's trial, it would not have made a difference.
The trial court dismissed petitioner's §2-1401 petition, and re-
quested that a timely notice of appeal be filed in his behalf.

12.   The State Appellate Defender was appointed to represent
petitioner Carter on appeal.  Subsequently, appellate counsel filed
a motion to withdraw representation pursuant to **Pennsylvania v.
Finley**, 481 U.S. 551 (1987).  Petitioner filed a <u>pro</u> <u>se</u> Response
to appellate counsel's <u>Finley</u> motion.

13.   On December 9, 2005, the Illinois Appellate Court,
Fourth District, allowed counsel to withdraw and affirmed the trial
courts denial of §2-1401 relief in **People v. Carter**, **No. 4-03-0402.**

14.   On December 27, 2005, petitioner Carter filed his <u>pro</u>
<u>se</u> Affidavit of Intent to file Petition for Leave to Appeal in the
Illinois Supreme Court.

15.   On January 23, 2006, a <u>pro</u> <u>se</u> Petition for Leave to
Appeal was filed in **People v. Carter**, **No. 101983** in the Supreme Court.

16.   On March 29, 2006, the Illinois Supreme Court denied
his PLA.

17.   On March 21, 2007, petitioner Carter forwarded his <u>pro</u>
<u>se</u> Petition for a Writ of Habeas Corpus with Memorandum In Support
and Appendices; Motion for Appointment of Counsel;Motion For Leave
to File Additional Pages, with the Clerk of the U.S. District
Court for the Northern District of Illinois, Eastern Division for
proper filing.

- 4 -

18. March 29, 2007, the U.S. District Court, Northern District of Illinois, Eastern Division, acknowledged receiving his habeas petition and motions.

19. Pursuant to Rule 3 of the Rules Governing Section 2254 Cases. On April 12, 2007, the filing fee was paid.

20. This case was filed and cited as **U.S. ex rel. David Carter v. Terry L. McCann, Warden,** and assigned **No. 07-C-1758** before **Judge Leinenweber** in this matter.

21. On April 20, 2007, the U.S. District Court for the Northern District of Illinois, ordered this action transferred to this jurisdiction pursuant to **28 U.S.C. §2241(d).**

22. On June 25, 2007, the U.S. District Court received his **pro se REQUEST TO RESCIND COURT ORDERED TRANSFER OF CASE** after awaiting a substantial amount of time without a responsive pleading from Respondent in either jurisdiction.

23. On August 16, 2007, the U.S. District Court for the Northern District of Illinois, in **No. 07 C 1758,** docket entry stated:

> Due to clerical error, this action was not transferred although the court ordered that this petition be transferred to the United States District Court for the Central District of Illinois at Peoria for preliminary consideration pursuant to Rule 4 of the Rules Governing 2254 Cases on 4/20/07. The Clerk is directed to transfer this petition to the United States District Court for the Central District of Illinois at Peoria forthwith.

- 5 -

24.   On August 23, 2007, this Court issued a docket entry

stating:

>Case transferred in from District of NDIL;
>Case Number 07-1758.  Original file with
>documents numbered 1-14, certified copy of
>transfer order and docket sheet received.
>New case number in Peoria Division of the
>Central District of IL is 07-1222.   All
>future pleadings to be filed in Peoria
>Division. (entered 8/23/07)

25.   On December 17, 2007, petitioner Carter forwarded to the
Clerk of this Court for proper filing, his **pro** **se** **MOTION TO REQUEST
COURT TO ORDER THE RESPONDENT TO FILE AN ANSWER TO PETITIONER'S
HABEAS PETITION.**

26.   On March 14, 2008, this Court denied petitioner Carter's
pro se motions and ordered petitioner to downsize his pro se
memorandum to forty (40) pages or less by April 14, 2007.   In
addition, his habeas petition was **stricken** and filed as an
**amended habeas corpus petition.**

## STATEMENT OF FACTS

[see appendix]

## CLAIMS RAISED FOR REVIEW

### CLAIM
### I

Petioner Carter Was Denied His Fundamental Right To A
Fair And Impartial Trial And Due Process Of Law In
That Illinois Courts Refused To Grant His Motion To
SuppressAn Involuntary Statement, In Violation Of His
Fifth, Sixth and Fourteenth Amendmend Rights As Gua-
ranteed By The U.S. Constitution And Illinois Consti-
tution.

- 6 -

The crux of the argument derives from the evasive manner in which the State orchestrated a plot to obtain an involuntary statement from petitioner Carter (while housed at the Pontiac Correctional Center Segregation Unit - during a visit in the prison's visiting room), using coercive and trickery methods contributing to the violation of his Fifth, Sixth and Fourteenth Amendment Rights as guaranteed by the U.S. Constitution and Article I, Section 2 of the Illinois Constitution.

On December 16, 1988, petitioner Carter, in his motion to suppress statements II, argued that the statements were inadmissible on Fifth Amendment grounds and also alleged that the statements were obtained in violation of his Sixth Amendment right to counsel and violated his Fourteenth Amendment right to due process of law. (C.107-08). The trial court entered an order suppressing the Statements as a result of a custodial interrogation in the absence of **Miranda** warnings, basing its decision on **People v.Perkins**, 176 Ill. App.3d 443, 531 N.E.2d 141 (5th Dist. 1998). **Perkins,** was subsequently reversed by the U.S. Supreme Court in **Illinois v. Perkins**, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). On appeal by the State, the Appellate Court reversed the trial court's suppression order, concluding that the statements were not the results of a custodial interrogation requring the protections of **Miranda**. (Vol. I, C.221-27).

On remand, another pretrial hearing was held and the motion to suppress statements was renewed:

As argued by defense counsel:

- 7 -

MR. THOMAS:  Judge, then the other motion I have is coupled
with matters that went up on appeal but raising
the Sixth Amendment issue. **There is one re-
ference in the tape with David Carter about get-
ting some lawyers.** It did not mention Shel
Bannister by name, that particular tape, **but
there is a reference made about it** and also,
Judge, in order for Mr. Martin to get in to see
Mr. Carter, that whole rumor went out about
**whether somebody is coming down here and going
to help with some lawyers.** I think the whole
thing is tainted with the fact it is indicated
Mr. Martin was working on behalf of trying to
secure lawyers for people who may not have been
suspected of something.

        **[emphasis added]**      (Vol.V., R.432-33)

The trial court then discussed the difference bewteen the

interrogations from State agent Harry Martin of Petitioner Carter,

codefendant Ike Easley and Michael Johnson. In the case of Easley,

Harry Martin convinced Ike Easley as he did the others that gang

members in Chicago sent him to talk to them (Easley and codefendants)

that he had talked to an attorney named **Shel Bannister,** and that

the lawyer wanted Martin to ask Easley a series of questions. Easley

had not spoken to Martin prior to this representation. (Vol.V.R.433)

As to Harry Martin's interview with petitioner Carter, the

Court summarized it as follows:

THE COURT:  Mr. Thomas (defense counsel) indicates on page
14 of 19pages of the interview by Mr. Martin
with Mr. Carter that at the top of the page 14
it says **"if they need something, I'll be here".**
That is Martin talking to Carter. **"And if the
indictments come down, then they'll have lawyers.
Whatever else they need, you know, I'll be on
top of it."** I don't perceive you all getting
indicted. I don't see how. I don't think they'
ve got anything, frankly. Then how long now,
a month and a week or something?" Carter re-
sponds, Almost a month or something like that."

- 8 -

So the reference to Mr. Carter is -- by Mr.
Martin is that anything Mr. Carter or any
person who was involved in the investigation
would need would be provided. That would
include if indicted hiring lawyers. And in
Mr. Johnson's case thay said we have already
talked to a lawyer and in Mr. Easley's case
they have said not only have we talked to a
lawyer but there is a whole bunch of questions
the lawyer wants me to ask you, and Mr. Easley
proceeded to spill his guts after he believed
Mr. Martin had come from the lawyer. **This is
a case where I am in the unenviable position
of quite possibly in the Fourth District being
wrong twice. Wrong because of Illinois v. Per-
kins and if, in fact, for some reason they did
not catch the Sixth Amendment issue and it slip-
ed through. I, quite frankly, feel I may have
the oppurtunity to be wrong again because I'm
not going to suppress based upon the Sixth
Amendment issue in this case...**

I further find, I think, we have some serious
Sixth Amendment issues coming in this country.
It is my opinion those issues are not raised
in People v. Johnson or People v. Carter and
the renewed motion to suppress their statements
will be denied, the court finding that under my
interpretation of Illinois v. Perkins trickery
is authorized, and if that trickery includes
trickery concerning counsel, then I think the
trickery must go beyond what is done in these two
cases. I think impermissible trickery occurred
in Mr. Easley's case and I suppressed that and
the State chose not to take that up and even
let the appellate court look at what happened
there. I think trickery in People v. Carter
and People v. Johnson presses the limits but is
within the permissive range of what can be done.
I am personally very uncomfortable with that
in terms of constitutional law but I think I
have been overruled sufficiently in this I will
adhere to the findings of the U .S. Supreme
Court, and if the Fourth District has to address
this issue again, so be it, let them look and
see it. Motion to suppress is denied...

[**emphasis added**]        (Vol.V., R. 438-41)

Petitioner Carter maintains that the trial judge was properly
concerned about the trickery used in this case by Harry Martin in

- 9 -

order to get petitioner Carter to incriminate himself. The State-
ments were constitutionally involuntarary in violation of the due
process clause of the Fourteenth Amendment. (U.S.Const. Amend.XIV)

The voluntariness of the statement depends on the absence of
police overreaching. **People v. Easley**, 148 Ill.2d 281, 592 N.E.2d
281, 592 N.E.2d 1036, 1049 (1982), **citing Colorado v. Connelley**,
479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473, 482 (1986). Interro-
gation techniques that overreach are offensive to a civilized sys-
tem of justice and will be condemned. (**Easley**, 592 N.E.2d 1036,
1050, citing **Miller v. Fenton**, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.
2d 405, 410 (1985)). Ultimately, the inquiry in determining whether
statements are involuntarily as a matter of due process is whether
the conduct of the State agent is "casually related to defendant's
confession." **Easley**, 592 N.E.2d at 1049.

Petitioner Carter contends that a degree of trickery has been
upheld by the U.S. Supreme Court, pursuant to the high court's hold-
ing in **Illinois v. Perkins**, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.
2d 243 (1990). However, at no time, has the U.S. Supreme Court
held that the State may, by way of misrepresentation in respect to
legal counsel, employing deceptive practices in vigorously asserting
that they were **"acting on behalf of legal counsel"**, in order to in-
duce a criminal defendant to incriminate himself or herself. None-
theless, such is the level in which the State trammelled over peti-
tioner Carter's fundamental rights. The record has established
that.

The State may not extort confessions by deliberate fraud or trickery. **People v. Smith**, 108 Ill.App.2d 172, 180 (1969). Evidence that the accused was threatened, tricked, or cajoled into the waiver of his rights will, of course, show that the defendant did not voluntarily waive his privilege against self-incrimination. **Smith**, 108 Ill.App.2d at 179; see also **Miranda v. Arizona**, 384 U.S. 436, 476, 16 L.Ed.2d 694, 725, 86 S.Ct. 1602, 1629 (1966). "Trickery involves affirmative acts of fraud or deceit." **Smith**, 108 Ill.App.2d at 179. The confession must not result from deceptive interrogation tactics calculated to overcome the defendant's free will. **United States v. Kontny**, 238 F.3d 815, 818 (2001).

Furthermore, petitioner Carter has consistently maintained that a Sixth Amendment violation occurred because State agent Harry Martin interferred with petitioner's attorney-client privilege. **United States v. Seale**, 461 F.2d 345 (7th Cir. 1972), but recognizing the decision in **People v. Easley**, 148 Ill.2d 281, 592 N.E.2d 1036, 1053 (1992), which rejected a Sixth Amendment claim because the right to counsel had not attached.

The record certainly reflects that the State trial judge during petitioner Carter's suppression hearing II had issue with having to deny petitioner relief, considering the trickery the State prosecution, State Police and IDOC officials used to obtain incriminating statements from the petitioner, feigning that he was a represenative of the gang petitioner was involved with, that an attorney is working inconjunction with him (Vol.V. R.438-41) that these actions **shocked the conscience**, in addition the court stated:

- 11 -

COURT:      My concern is whether injection of an attorney
            who, in fact, and in reality existed, who was
            known to inmates to represent them in certain
            prison related matters but who had, in fact,
            not been hired in these cases, who had not been
            contacted in these cases, and it was simply a
            misrepresentation  by Mr. Martin to gain the
            confidence  presumably of Mr. Johnson and Mr.
            Carter, Martin having been held at another
            prison  than the one these two defendants were
            in.   It was simply a ploy, an investigative
            technique  used, a trick, deception, to make it
            more plausible for these two defendants to talk
            to Martin and tell him what they knew.
                        [Vol. iii, R.436-37]

Because the statements in the present case were involuntary
under the due process clause of the Fourteenth Amendment and Arti-
cle I, Section 2 of the Illinois Constitution, and obtained in
violation of the Sixth Amendment, their admission amounted to a
denial of petitioner Carter's fundamental right requiring reversal
of his conviction, or in the alternative, an evidentiary hearing.

                              ISSUE
                               II

    The State Courts Erroneously Allowed Petitioner Carter's
    Taped Statement Into Evidence Based On "The Conspiracy
    Being On-Going", And Deliberately Prevented Him Amending
    His Petition To Prove Otherwise, In Violation Of His
    Constitutional Rights As Guaranteed By The U.S. Constitution
    And Illinois Constitution.

    Petitioner Carter contends that Illinois Courts failed to
address the legal question as to **whether or not the conspiracy had
ended"** for purposes of determining it's admissibility. **Krulewitch
v. United States,** 336 U.S. 440, 69 S.Ct. 716 (1949).

                             - 12 -

In **Krulewitch**, the U.S. District Court indictment charged in a three count indictment that Krulewitch and a woman defendant had (1) induced and persuaded another woman to go from New York City to Miami, Florida for the purpose of prostitution; (2) transported or caused her to transport from New York to Miami for that purpose; (3) conspired to commit those offenses. The challenged testimony was elicited by the Government from its complaining witness, the person whom Krulewitch and the woman defendant allegedly induced to make the trip for the purpose of prostitution. The conversation bewteen the complaining witness and Krulewitch's co-defendant consisted of the following: "She asked me, she says, You didn't talk yet? And I says, NO, And she says, "Well, don't', she says, until we get you a lawyer'. And then she says, 'Be careful about what you say'. And I can't put it in exact words. But she said, 'It would be better for us two girls to take the blame than Kay (the defendant) because he couldn't stand it, he couldn't stand to take it." **Krulewitch**, 69 S.Ct. at 717.

In this case, a jury impaneled in the Circuit Court of McLean County convicted petitioner David Carter, of first degree murder, and conspiracy to commit first degree murder. Prior to trial, the trial court denied petitioner's motion to suppress (wiretap) statements on grounds that they were involuntary under the Fourteenth Amendment Due Process Clause and obtained in violation of petitioner Carter's Sixth Amendment right to counsel. The statements were obtained through the pretext used by informant Harry Martin[1] that he had

---

1/  At the inception of the alleged conspiracy transpiring, Harry Martin was an inmate in the Illinois Department of Corrections serving sentences imposed by Cook and DuPage Counties perspectively The State & IDOC officials working together with the McLean County

contacted an attorney for petitioner Carter and for all the other
individuals allegedly involved  in the incident and would be help-
ing insure that petitioner had legal assistance.

    Prior to trial, trial counsel attempted to suppress the
statements arguing that the alleged conspiracy had terminated, was
denied.  Notwithstanding the fact that without the taped recorded
statement of petitioner Carter, it was very likely that he could
not be connected to the instant case.

    During a hearing regarding whether or not the conspiracy had
ended, the court's colloquy took place, in pertinent part:

THE COURT:    Mr. Thomas has filed on behalf of Mr. Carter a
              motion in limine, and that motion needs to be
              addressed.  It is directed towards what the de-
              fense believes will be hearsay statements of un-
              indicted co-conspirators and statements of
              indicted conspirators and the motion specifically
              raises that issue that the defense position is
              that any such statement is that any such state-
              ments would have been made prior to the existence
              of any alleged conspiracy or subsequent to the
              termination of the conspiracy and accordingly
              would not be admissible as evidence in this case,
              and the defense has moved in limine for an order
              that all such declarations, acts or statements
              prior to the existence of any alleged conspiracy
              and following any alleged conspiracy be barred
              by the court and that is a matter the court needs
              to rule on.

    Argument on the motion, Mr. Thomas?

    This colloquy took place on November 4, 1991.  SEE APPENDIX

Volume III, pp. 505-518.

-----

State's Attorney obtained an eavesdropping order for the sole pur-
pose of having inmate Harry Martin furloughed from the institution
in which he waa detained to a motel, his objective was to visit
petitioner and other inmates suspected in the murder of Supt. Taylor
at the Pontiac Correctional Center.  Inmate Martin with the assis-
tance of his wife, contacted petitioner and others through the mail
requesting that sheand her husband be placed on their visiting list
feigning that he was released on appeal bond and gang members in
Chicago wanted him to talk to them.  State and IDOC officials created
this ruse to have Martin wear a wire into the prison.

The trial court's  ruling was in direct conflict with

**Krulewitch**, in finding that "the conspiracy was on-going in

nature", without pause or termination.  In **Krulewitch**, the U.S.

Supreme Court stated the following:

> "Although, the Government recognizes that the
> chief objective of the conspiracy - transpor-
> tation for prostitution purposes - had ended
> in success or failure before the reported con-
> versation took place, it nevertheless argues
> for admissibility of the hearsay declaration
> as one in furtherance of a continuing subsidiary
> objective of the conspiracy.  Its arguments run
> this way.  Conspirators about to commit crimes
> always expressly or implicitly agree to collabo-
> rate with each other to conceal facts in order
> to prevent detention, conviction and punishment.
> Thus the argument is that even after the central
> criminal objectives of a conspiracy have succeed
> or failed, an implicit subsidiary phase of the
> conspiracy always survives, the phase which has
> concealment as its sole objective.  The Court of
> Appeals adopted this view.  It viewed all the
> alleged hearsay declarations as one in furtherance
> of this continuing subsidiary phase of the con-
> spiracy, as part of "the implied agreement to
> conceal." 167 F.2d 943, 948.  It consequently held
> the declaration properly admitted.
>
> We cannot accept the Government's contention.
> There are many logical and practical reasons that
> could be advanced against a special evidentiary
> rule that permits out-of-court statements of one
> conspirator to be used against another.  But how-
> ever, it is firmly established they where made in
> furtherance of the objectives of a on-going con-
> spiracy, such statements are admissible as to
> exceptions to the hearsay rule.  The prerequisite
> to admissibility,that hearsay statements by some
> conspirators to be admissible against others must
> be made in furtherance of the conspiracy charged,
> has been scrupulously observed by the federal
> courts.  The Government now ask us to expand this
> narrow exception to the hearsay rule and hold ad-
> missible a declaration, not made in furterance of
> the alleged criminal transportation conspiracy
> charged, but made in furtherance   We are not per-
> suaded to adopt the Government's implicit con-
> spiracy theory which in all criminal conspiracy
> cases would create a further breach of the general
> rule against the admission of hearsay evidence."
> Id. **Krulewitch**, 69 S.Ct. at 718-19.

This viable issue was not raised in petitioner Carter's post-trial motion or raised on direct appeal pursuant to the plain error doctrine. **Strickland v. Washington**, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

In this case, appellate counsel chose not to raise trial counsel's ineffectiveness for failing to properly raise the foregoing **conspiracy issue.** Appellate counsel is not obligated to brief every issue on appeal, and is not incompetent to refrain from from raising issues which, in his or her judgement, are without merit, unless counsel's appraisal of the merits is patently wrong. **Gray v. Greer**, 800 F.2d 644, at 646.

Neither **res judicata** or waiver applies or bar consideration of this issue, it was not decided on direct appeal and pursuant to ineffectiveassistance of appellate counsel, is not barred from consideration. As held in **People v. Wisett**, 153 Ill.2d 335, 606 N.E. 2d 1186 (1992) "the doctrine of waiver should not bar the court fromfrom considering an issue where alleged waiver stems from incomptency of counsel on appeal." Thus, a single error of counsel may constitute ineffective assistance of counsel. **Murray v.Carrier**, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 391

On collateral review of petitioner Carter's petition, the trial court judge's decision that "the conspiracy remained on-going" is in direct conflict with**Krulewitch v. United States**, **supra**, which rejected the Government's attempt to establish an on-going conspiracy based upon allegations of effort to conceal and/or escape prosecution. Id. **Krulewitch**, 69 S.Ct. at 718..

- 16 -

Petitioner Carter contends that his trial, appeal and post-conviction and post-conviction appeal counsels, failed to comply with the dictates of **Krulewitch,** depriving him of his 6th and 14th Amendment rights as guaranteed by both the U.S. Constitution and Illinois Constitution violating his Due Process, Equal Protection and Right to Counsel. Had either counsel properly raised the afore-going issue, there probably would have been a different result. **Strickland v. Washington, supra.**

Furthermore, petitioner Carter mounted an argument in his pro se Response to appellate counsel's request to withdraw in the Illi-nois Appellate and Supreme Court, including the caselaw, should be considered in reviewing this issue. In **United States v. Cook,** 45 F.3d 388 (10th Cir. 1995), the U.S. Court of Appeals held:

> Conversely, an appellate advocate may deliver deficient performance and prejudice a defendant by omitting a "deadbang winner" even though counsel may have presented strong but unsuccess-ful claims on appeal. Page v. United States, 844 F.2d 300, 302 (7th Cir. 1989). Although courts have not defined the term "dead-bang winner", we conclude it is an issue which was obvious from the trial record, see e.g. Maitre v. Wainwright, 811 F.2d 1430, 1438 (11th Cir. 1987)(counsel's failure to raise issue which was obvious on the record, and must have leaped out upon even a casual reading of [the] transcript was deficient performance), and one which would have resulted in a reversal on appeal, by omitting an issue these circumstamces, counsel's performance is objectively unreasonable because the omitted issue is obvious from the trial record. Additionally, the omission prejudices the defendant because had counsel raised the issue, the defendant would have obtained a reversal on appeal. **Cook,** 45 F.3d at 395.

The Court concluded by stating:

> "    although Defendant did not raise the conflict of interest issue on direct appeal, we hold that cause and prejudice present in this case excuse

the omission.  Moreover, because Defendant has
demostarted that the district court's failure
to comply with the dictates of the Supreme Court's
decision in Holloway deprived him of his Sixth
Amendment right to effective assistance of coun-
sel, we reverse the judgement of the district court.."
Id. at **Cook**, 45 F.3d at 395-96.

In addition, the U.S. Supreme Court in **Massaro v. U.S.**, ___
U.S. ____, _____ S.Ct. _____(No. 01-1559)(2003) held that there is
no procedural default for failure to raise an ineffective assistance
of counsel claim on direct appeal.

Petitioner Carter contends that Illinois courts decisions
regarding this matter is contrary to, and involve an unreasonable
application of clearly established Federal law as determined by the
United States Supreme Court.  This issue is worthy ofhabeas review,
and petitioner Carter request that an evidentiary hearing be held
in this cause.

ISSUE

III

Whether Illinois Courts Violated Petitioner's
Subtantial Rights By Refusing To Provide Him
With An Evidentiary Hearing On His Claim Of
**Actual Innocence** Which  Is Cognizable Under The
State Created Remedies.

In **People v. Washington**, 665 N.E.2d 1330 (Ill. 1996), the
illinois Supreme Court was presented with a question of "whether
due process is implicated in a claim of actual innocence based upon
new evidence so as to permit the claim to be raised in a petition
under the Post-Conviction Act... the majority of the Court held
that it is."  Id. **Washington**, 665 N.E.2d at 1331.

- 18 -

In this case, evidence obtained by petitioner Carter clearly shows that "someone other than petitioner" was responsible for designing and initiating the plot to injure the victim in this case.  Petitioner alleged in his pro se Petition for Post-Conviction Relief that certain evidence was obtained **after** his trial and appeal process in this matter.  The evidence tended to show that someone other than himself committed the offense in which he is presently being held for.

In support of his actual innocence claim, petitioner attached an affidavit prepared by inmate Corwyn Brown to his petition. (C.66) In his affidavit, Corwyn Brown admitted that he was responsible for ordering **"the hit"** on Supt. Taylor on September 2, 1987. (C.66) Corwyn Brown also admitted that petitioner Carter was forced into taking the blame for the crime and was intimidated into keeping quiet about his innocence. (C.50, C.66)  Such declaration was made with sufficient indicia of trustworthiness, and coincides with eye-witness' accounts of Corwyn Brown's direct involvement.  **See** Appendix attached hereto and made part of for verification is Mr. Brown's affidavit.

The following excerpts from trial records which disclose testimony pertaining to the direct involvement of Corwyn Brown. Douglas Read, an Internal Security Investigator with the Illinois Department of Corrections, testified that he had a conversation with inmate Demetre Brown (occurrence witness).  Read spoke to Demetre Brown twice on that date.  In the second interview, Mr.Brown told him that inmate Corwyn Brown had been with inmates Easley and Lucas just minutes **before** the attack, and that Corwyn Brown had nodded his head and pointed towards Supt. Taylor's office. (11-20-91, Vol. I, R. 106-07).

Inmate Spiller (occurrence witness) stated that he observed Corwyn Brown point towards Supt. Taylor's office prior to the attackers entering his office. (Vol I, R.110)

After obtaining Corwyn Brown's affidavit, petitioner alos obtained an affidavit from Michael Shaw aka Torrence Evans. In Shaw's affidavit, Shaw states that he had spoken with Corwyn Brown in October of 1996, while he was incarcerated at the Joliet Correctional Center. Shaw states that Corwyn Brown admitted to him that he (Brown) ordered the attack on Supt Taylor and that petitioner Carter was not involved. **See** Appendix containing Shaw's affidavit.

Clearly, Michael Shaw's affidavit obtained after petitioner's conviction, give credence to petitioner Carter's calim that he had no involvement in the attack and/or murder of Supt.Taylor. it corroborates inmate Corwyn Brown's statement also that petitioner was forced into accepting responsibility of this instant case by gang members.

That inspite of raising an **actual innocence claim** with supporting affidavits. Appointed counsels, Carey J. Luckman and W. Keith Davis failed to consult with petitioner Carter regarding this essential issue prior to preparation and filing of the amendment to the petition.

Petitioner Carter request this Honorable Court to hold an evidentiary hearing to enable him to prove that his constitutional rights were violated in the process. **Townsend v. Sain**, 312 US 293.

- 20 -

ISSUE

IV

Petitioner Carter Contends That Prosecution's
Knowing Use Of Perjured Testimony And **Brady
v. Maryland** Violation Violated His Due Process
Rights As Guaranteed By The 5th And 14th Amend-
ments of the U.S. Constitution And Article I,
Section 2 of the Illinois Constitution.

On August 10, 1998, petitioner Carter filed his combined pro
se Petition for Post-Conviction Relief, 725 ILCS 5/122-1 et seq.
(West 1998) and Petition From Reelief of Judgement, 735 ILCS 5/2-
1401 (West 1998). (CLR 36-165) On April 23, 1999, the trial court
denied petitioner's motion to excuse the late filing of his post-
conviction petition under the Act, dismissed said petition as untimely
filed; and granted his motion to excuse the late filing of his
petition under Section 2-1401, instead. (CLR 253-258).

Post-conviction counsel failed to comply with Illinois Supreme
Court Rule 651(c), which requires that an appointed counsel file
a certificate stating that he or she has consulted with the
petitioner to ascertain petitioner's contentions of deprivation
of Constitutional rights, has examined the record, and has made
any necessary amendments. 134 Ill.2d R. 651(c). **People v. Landers,**
215 Ill.2d 577, 831 N.E.2d 596 (2005).

Although, the initial post-conviction petition was dismissed, the trial court allowed the Section 2-1401 petition to proceed. The petition contained information of petitioner Carter's recent discovery of pertinent evidence in the case of both the State's knowing use of perjured testimony, Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217; and the failure to disclose Brady materials. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. Attached and made part of petitioner's petition was various affidavits and letters as proscribed by 725 ILCS 5/122-2, which states "the petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached."

Petitioner Carter contends that he was denied a fair and impartial trial, in that the State's agent, Harry Martin perjured himself, prior to trial and during trial in this cause. Thus, receiving benefits from State officials that were never disclosed to petitioner. That petitioner Carter discovered this mishap which prompted him to file a combined post-conviction petition and petition for relief from judgement. (CLR 36-165).

The use of perjured testimony to obtain a criminal conviction violates due process of law. People v. Olinger, 176 Ill.2d 326, 345, 680 N.E.2d 321, 223 Ill.Dec. 588 (1997). Even where the prosecution did not solicit false testimony, but allows it to go uncorrected when it appears, due process is violated. Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). In Brady v. Maryland 373 U.S. 83, S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court announced that "suppression by the

- 22 -

prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good or bad faith of the prosecution." Id. Brady, 373 U.S. at 87.  Impeachment evidence merits the same constitutional treatment as exculpatory evidence. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1970).

The following incidents took place in this cause:

Prior to trial, petitioner Carter filed a motion to suppress the wiretap evidence and  a hearing was held to determine the admissibility of the tape recorded conversations bewteen petitioner and State agent Harry Martin.  At this hearing, petitioner argued that he should have been afforded Miranda warnings prior to any discussion with Harry Martin, being that the conversations consti- tuted a "custodial interrogation".  The trial court agreed and granted petitioner's motion to suppress the taped recording evidence.  The State initiated an interlocutory appeal regarding this matter in People v. Johnson, 555 N.E.2d 412 (4th Dist. (1990).  However, the Illinois Appellate Court reversed the trial court's suppression order.

Thereafter, prior to the start of trial, several hearings were held in which James Wasson, an inspector with the Criminal Division of the Illinois State Police, presented his evidence disposition with regard to the set-up of electronic surveillance in the case.  The Court ruled that the prosecution had met it's burden of showing proper foundation, and ruled that the overhear was issued pursuant to probable cause and that if the tape was offered into evidence, it would be admissible. (Vol. IX, R. 14).

State agent Harry Martin was recruited by the Illinois Department of Corrections officials, taken from one penal institution to another, in a ploy to obtain information from defendants Carter, Easley and Johnson, pertaining to the murder of Supt. Taylor at the Pontiac Correctional Center. Prior to his visit to the prisons to see the defendants, State agent Harry Martin and his wife contacted each defendant, requesting them to put them on their prison visiting list, as required. They later visited each defendant under the guise that he (Harry Martin) was no longer incarcerated, was released on appeal bond and the defendants were reporting to him to relay information to other gang members in Chicago, and specifically, the information gathered was to be relayed to attorney Shel Banister, whom he alleged had been hired to represent petitioner Carter and co-defendants. When in fact, the purpose of this blatant fabrication was to obtain viable information from each defendant, under the guise that it was confidential information.

The key witness against petitioner Carter was inmate/agent Harry Martin. Harry Martin, who at the time of trial was serving a sentence imposed by the DuPage and Cook Counties perspectively. He testified that he had a college degree in accounting and bookkeeping. In 1987, he was a member of the Black Gangster Disciples. Mr. Martin (not an Gang Intelligence Officer) was permitted to vividly describe the organization of the gang. Larry Hoover was the chairman, and below him was the board of directors consisting of institutional coordinator, assistant institution coordinator, gallery coordinator, and various other subordinate departmental heads. (Vol. XIV, R. 18-19).

The security division of the gang is called the UFO, the United Front of the Organization. According to Martin, this group does the assassinations, protects the board members or any hierarchy of the organization, guards the leadership and disciplines any organization members that may get out of line. (Vol. XIV, R. 19-20) The Black Gangster Disciples operate in and out of the prison system. (Vol. XIV, R.20) Mr. Martin's former position was that of financial adviser to the board. (Vol.XIV, R.20) He stated that the majority of his education was financed through the gang. (vol. XIV, R.21).

Martin alleged that in May of 1987, a conspiracy was put together to assassinate him. That Martin received word of this threat from the warden at Stateville. Martin initially did not believe the warden, so he asked a few board members, whom he believed were allies. They confirmed the warden's information, and Martin then asked for protection in return for cooperating with the law enforcement officials. (Vol. XIV, R. 22-23)

Martin was transferred to Dixon Correctional Center and then to Pontiac Correctional Center in the second week of August in 1987. (Vol. XIV, R. 24-25) While at Pontiac, Martin met with some gang members, including Corwyn Brown, who was known as "Ketchup". Brown was the assistant institutional coordinator. (Vol. XIV, R. 26-27) While at Pontiac, Martin saw Roosevelt Lucas, and stated that he provided security for Harry Martin and Corwyn Brown. (Vol. XIV, 28-29)

- 25 -

In September of 1987, Martin was incarcerated at the Logan Correctional Center. He was approached by Department of Corrections investigators regarding the murder of superintendent Taylor. They asked Martin to assist them in investigating various Black Gangster Disciples members whom IDOC believed were involved in the murder. (Vol. XIV, R.44-45) Martin insisted that he had not received anything from the Department of Corrections in return for his cooperation. He said that he decide to wear a wire and visit various inmates to aid in the investigation. (Vol. XIV, R.46) On October 7, 1987, while wearing a wire, he visited petitioner Carter.

The record shows complete awareness of the state and their agents of informant Harry Martin's recruitment by IDOC, taken from one penal institution to another, in a ploy to obtain information from defendants Easley, Johnson and petitioner Carter, pertaining to the murder of superintendent Taylor at the Pontiac Correctional Center. Their deceptive scheme held no limits, Harry Martin's wife (a civilian) was included in this elaborate ploy. Prior to his visit to see the defendants, Harry Martin had his wife contact each defendant to further contribute to the IDOC's scheme by telling each defendant that her husband was released on appeal bond and was being sent to see each defendant, requesting that their names be included on each defendant's visiting list to enable her and Harry Martin to visit them. Harry Martin visited each defendant under the guise that he was no longer incarcerated and the defendants were reporting to him to communicate information to other gang members in Chicago, and

information gathered was to be relayed to attorney Shel Bannister, whom State agent Martin alleged had been retained to represent petitioner Carter and co-defendants. When in fact, the purpose of this blantant elaboration was to obtain prejudicial information from each defendant, under the guise of them believing that it would be confidential information. See Judge's Docket Sheet #9, (CLR 9).

Furthermore, during trial the following colloquy took place in pertinent part:

THE COURT:    The third issue there is an agreement by the State that they would provide to the Court, and then the Court would do an in camera inspection of master files relating to inmate witnesses who the prosecution would indicate they would be calling. The defense said as long as we have that information the day before ah, trial, so we could look at it ah, then that was acceptable procedure.

Could anyone assume there was some kind of quid pro quo or deal struck as to how inmates would be treated if they cooperated with the State as far as administrative good time, information, and other things, and that information is contained in the master files and I think the defense has a right to see that plus information concerning gang affiliations of witnesses and other matters.

[Volume 13, R. 9-10]  [CLR 344]

MR. CASSON:   You want to address the issue now with regard to Mr. Martin?

THE COURT:    Mr. Spiller... was out on the street by the fall of 89. That as far as Mr. Martin is concerned, Mr. Martin has not been ah, in DOC custody since roughly that time. He has been in Federal custody and DOC does not have, does not have material on him since that time. Ah, that would have been probably a year, a year or so, I am not sure how long after I had made the copies of the stuff that appeared to me to be germane from the master file.

[The Court apparently referring, at page 15, to material to be given to defendant's counsel regarding Martin.]

The Supreme Court in _Giglio_ also stated that the _Brady_ obligation extended beyond the mere knowledge of trial prosecutor. In _Giglio_, a prosecutor, other than the one who tried the case, had made a promise of immunity to the key government witness. The promise of immunity was not disclosed to Giglio's counsel and he was convicted.   The Supreme Court reversed the conviction.   In it's opinion in _Giglio_, the Supreme Court imposed upon the government the obligation to disclose impeaching information of which government personnel are aware, even though the information is not known to the prosecutors personally involved in the trial of the case.   The Supreme Court stated:

> "To the extent this place a burden on the
> large prosecution offices, procedures,
> and regulations can be established to
> carry that burden and to insure commu-
> nication of all relevant information on
> each case to every lawyer who deals
> with it".
> Id. _Giglio_, 405 U.S. at 154.

The rule compelling the government disclosure discussed by the Supreme Court in _Brady_ and _Giglio_ opinions is based upon the constitutional doctrine requiring due process of law in the administration of criminal justice.   To prove a constitutional due process violation resulting from the government's failure to make a proper disclosure under _Brady_, a defendant must establish three elements:   (1) that the prosecution suppressed the evidence; (2) that such evidence was favorable to the defense; and (3) that the suppressed evidence was material.   See _Moore v. Illinois_, 408 U.S. 786, 794-95, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); _United States v. Jackson_, 780 F.2d 1305, 1308 (7th Cir. 1986).

In this case, the State's prosecutors, Gerald O. Long, then Deputy Director (Inspectors and Audit) of the IDOC 1986-1990, and his predecessor, David C. Watkins, March 15, 1991 (held this position during the trial in this cause), and informant-witness Harry Martin, each individually testified that... Harry Martin was provided no consideration whatsoever, other than protection for him and his family. In addition, there were specific represen-tations to the trial court and to defense counsel, and in testimony at trial that..."there was no deals, no agreements extended to Harry Martin, other than protection". [TR 344-366].

Unbeknownst to petitioner Carter or defense counsel, approxi-mately one month before testifying at the trial in this cause, informant-witness Harry Martin appeared pro se before the Circuit Court in DuPage County, Case No. 81-CF-325. The State was repre-sented by Assisant State's Attorney Stock of DuPage County, at which time Harry Martin's thirty-five (35) year sentence in that case imposed on October 13, 1981, was vacated and reduced to twenty-one (21) years with all time considered served. On the State's motion, the file in that cause was impounded. Attached hereto and marked as appendix is DuPage County documents pertaining to the above.

On October 1, 1991, Harry Martin was writted to the Circuit Court of the 18th Judicial Circuit, DuPage County, Illinois and was re-sentenced to "time considered served" on one (1) of the sentences being served during this occurance. On November 18, 1991 (1½ month later) Harry Martin appeared at the trial in this cause and stated the following:

- 29 -

The law is clear that partiality or bias of a witness is always relevant in discrediting a witness and affecting the weight of his testimony. <u>Davis v. Alabama</u> (1974) 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347.

In this instance, State agent, Harry Martin credibility went unchallenged, when the State requested an order authorizing use of an eavesdropping device for the sole purposes of recording conversations bewteen Martin and various inmates of the Department of Corrections, including petitioner Carter. Harry Martin's testimony at trial was crucial to the State's presentation of their case; combined with the fact that the prosecution and State officials openly declared that Harry Martin "received no agreements of any kind". When in fact, one month prior to testifying in this case, Harry Martin sentence that he was serving for DuPage County was reduced to "time served" violating petitioner Carter's due process rights guaranteed by both the U.S. Constitution and Illinois Constitution.

Petitioner Carter did not receive a fair and impartial trial in this cause. Subsequently, he was found guilty and sentence to a term of natural life imprisonment. Direct appeal was taken, the Appellate Court affirmed his conviction and he sought review from the Illinois Supreme Court, which was denied.

in 1997, petitioner Carter obtain an affidavit from Harry Martin stating that he was a paid witness for the State, that prior to his testifying at the trial in this cause, he had never cooperated with the State, that prior to his testifying, he was given furloughs to be with his wife and unlimited access to phone calls, etc. In addition to Martin's affidavit, petitioner Carter

- 30 -

During the hearing in this cause, the State was represented by Lisa Anne Hoffman, Assistant Attorney General and petitioner Carter was represented by attorney Paul G. Lawrence ( whom immediately thereafter became Circuit Court Judge). Petitioner Carter was not present at the hearing, causing him to be totally unaware of the unorthodox manner in which the Court and Assistant Attorney General concluded that State witness Harry Martin's resentencing was justified and not perjured testimony as alleged in the petition, because Harry Martin mentioned during a hearing, when questioned about how much time he has left to serve... he stated 10 years and the Appellate Court reversed his convictions from DuPage County and the Appellate Court left the resentencing up to the Circuit Court.

Petitioner Carter contends that the Court and State rendered their decision from invalid information... conceding with the testimony of Harry Martin, whom stated that the time reduction from DuPage County was a product of his appeal decision in People v. Martin  Ill.App.2 Dist. 1984  121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642, where the Appellate Court decision clearly showed that Harry Martin was initially charged in Case Nos. 82-105 and 82-114, with the following offenses;

                COUNT I      ARMED ROBBERY
                COUNT II     ARMED ROBBERY
                COUNT III    ARMED VIOLENCE
                COUNT IV     ARMED VIOLENCE
                COUNT V      UNLAWFUL USE OF WEAPON
                COUNT VI     UNLAWFUL USE OF WEAPON
                COUNT VII    UNLAWFUL USE OF WEAPON
                COUNT VIII   UNLAWFUL USE OF WEAPON

COUNT IX   UNLAWFUL USE OF WEAPON
COUNT X    UNLAWFUL USE OF WEAPON
COUNT XI   UNLAWFUL USE OF WEAPON

A consolidated jury trial was held for State's witness
Harry Martin and his codefendant on Counts I thru IV, guilty
verdicts were returned on all fours counts.  A consolidated bench
trial was held for both defendants on Counts V thru XI, they were
found guilty of all counts of the indictments.

Harry Martin was sentenced to a 35 year term on Count IV
Armed Violence and a 5 year concurrent term on Count VII Unlawful
Use of Weapon, the Appellate Court reversed and vacated all other
convictions and sentences, except these two convictions.  <u>Martin</u>,
<u>supra</u>, Id. 121 Ill.App.3d at 196-197. SEE APPENDIX.

The Appellate Court's decision is in complete conflict with
State witness Harry Martin's testimony, the Illinois Appellate
Court held;

> 'where defendants received separate sentences
> for multiple convictions, they were not
> <u>entitled to resentencing on the convictions</u>
> <u>affirmed on appeal</u> where certain convictions
> were vacated.' Id. 121 Ill.App.3d at 196.
> <u>emphasis supplied</u>

State's witness Harry Martin testified during cross-examina-
tion by Mr. Collins concerning his pending conviction and sentence
from DuPage County.  At petitioner Carter's hearing, the Court
and Assistant Attorney General relied upon the following colloquy
in declaring that there was no perjured testimony, being that
Martin stated the following;

MR. COLLINS;

Q;  Now, sir, what is your understanding, sir, as to what sentence
    you must serve on your state charges.

A;    Ten years.

CLR. 362

Information of State's cooperating witness, Harry Martin's reduction of his DuPage County sentence to "time considered served" approximately one ( 1 ) month prior to testifying in this case, combined with the unjustified concealment of the DuPage County's resentencing amounts to a deprival of petitioner Carter's due process rights as guaranteed by the 14th Amendment of the U.S. Constitution and Article I, Section 2 and 8 of the Illinois Constitution.

The record clearly show that Harry Martin's testimony at petitioner Carter's trial was inconsistent with what actually occurred a month earlier in DuPage County, in People v. Martin No. 81 CF 325[1]. At the trial in this cause, Martin feigned the accuracies of his convictions and sentences and the State allowed this perjured testimony to go uncorrected. The State's failure to disclose certain information to the defense is in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ; Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 ( 1972); and Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 ( 1995) .

-----------------------------------

1]   On 2-25-81, Harry Martin was arrested and charged with 2 cts. of Armed Robbery, 2 cts. Armed Violence, and 7 cts. of Unlawful Use of Weapon in DuPage County, Case Nos. 82-105 and 82-114 . After a consolidated jury and bench trial, Martin was found guilty by jury of 2 cts. Armed Robbery and 2 cts. Armed Violence. The bench trial found him guilty of 2 cts. of Unlawful Use of Weapons.He was sentenced to 35 yrs. on each Armed Robbery, 35 years on each Armed Violence and 5 yrs. on the 2 remaining UUW cts. to be ran concurrent w/each other.

In _Giglio_, the U.S. Supreme Court held that the government's _Brady_ obligation to provide evidence to the defense encompasses evidence affecting a government witness' credibility. Id. 405 U.S. at 154. The Court stated that the _Brady_ violation extends beyond the mere knowledge of the trial prosecutor. Id. 405 U.S. at 154. The _Giglio_ Court explicitly imposed upon the government the obligation to disclose impeaching information of which government personnel are aware, even though the information is not known to the prosecutors personally involved in the trial of the case. The Court stated the following;

> To the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it.
> Id. _Giglio_, 404 U.S. at 154.

In this instant case, being that the murder of Supt. Robert Taylor took place at the Pontiac Correctional Center, within the Illinois Department of Corrections ( IDOC ), a large cast of characters were involved in the investigative, charging and prosecuting process, including, but not limited to IDOC officials, Illinois State Police, various State prosecutors ( the trials took place in various counties}, the Illinois Attorney General and the Federal Government.

Unfortunately, each individual State agency and their agents, denies either offering or promising State witness, Harry Martin, a deal, other than protection of his family and ultimately feign ignorance to his time-cut in DuPage County and the immediate sealing of the files in that case therafter. United States ex rel. Smith v. Fairman, 769 F.2d 386 ( 7th Cir. 1985} .

- 34 -

In <u>Smith</u>, the Seventh Circuit affirmed the District Court's decision granting a habeas corpus petition.  The Seventh Circuit held that a State prosecutor's ignorance of the withheld <u>Brady</u> material  did not justify the nondisclosure of the <u>Brady</u> material which had been known to a police ballistics expert, but which was not included in the official report the expert prepared and provided to the prosecutor.  The Court stated;

> We believe that the purpose of <u>Brady</u> would
> not be served by allowing material exculpa-
> tory evidence to be withheld simply because
> the police, rather than the prosecutors,
> are responsible for the nondisclosure. <u>See</u>
> <u>Carey v. Duckworth</u>, 738 F.2d 875, 878
> (7th Cir. 1984) 'a prosecutor's office can-
> not get around <u>Brady</u> by keeping itself
> ignorance, or compartmentalizing information
> about different aspects of the case.'
> Id. <u>Smith</u>, 769 F.2d at 391-92.

In this case, the <u>Brady</u> materials involved State witness Harry Martin's sentence reduction to time-served one month prior to testifying in this case, the disposition of his direct appeal[2] and the discovery of another time-reduction in Cook County.  The sundry items, phone services and cash benefits bestowed upon him.  SEE;  Exhibits attached to petitioner Carter's 2-1401 petition and affidavit of Harry Martin.

---------------------------

2]  On 1-12-84, the Illinois Appellate Court, Second District, in
<u>People v. Martin</u>, 121 Ill.App.3d 196, 459 N.E.2d 279, 76
Ill.Dec. 642, all counts were vacated except Ct. IV Armed
Violence and Ct. VII Unlawful Use of Weapon.  His sentence of
35 yrs. and 5 yrs. concurrent remained and the Appellate Court
specifically stated.. since there is no evidence in the record
suggesting that defendant's remaining sentences were improperly
affected by their separate additional convictions and sentences,
we will not remand their remaining convictions for resentencing.

The perjured testimony was expounded during petitioner Carter's trial, when Harry Martin testified regarding the following, in pertinent part;

1    Harry Martin explicitly declared under oath, when asked 'how much time was he serving.' He would state 35 years. When asked on what charges. He would state Armed Robbery, Armed Violence and Unlawful Use of Weapon. When asked how much time he has remaining to be served. He stated, 10 years.

2    Martin was no longer serving his DuPage County sentence, He did not mention that he was no longer doing the DuPage County sentence, or that he only had time remaining to be served for Cook County. There is no ryhme or reason for him to bogusly allege that his charges were armed robbery, armed violence and UUW, the charges he had in DuPage County. He had previously testified at codefendants, Lucas and Easley's trial, therefore, his manner of testifying cannot be considered a mistake of some kind on his part.

Black's Law Dictionary ( 4th ed.) defines perjury as..

'the willful assertion as to a matter of fact, opinion, belief, or knowledge, made by a witness in a judicial proceeding as part of his evidence, ... such assertion being material to the issue or point of inquiry and known to such witness to be false.'

The State's non-disclosure of the substantial benefits received by their witness, Harry Martin violated petitioner's rights under the Confrontation Clause of the Sixth Amendment to the Constitution. As the U.S. Supreme Court stated in Delaware v. Van Arsdall, 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 ( 1986 ) ;

We think a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from en- gaging in otherwise appropriate cross- examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors ... could appropriately

> draw inferences relating to the reliability
> of the witness.'Davis v. Alaska, supra,
> 415 U.S. at 318.

Petitioner Carter did not discover the irregularities, nor had prior knowledge of the complained of discrepancies until years after the trial in this cause. In September of 1997, codefendant Easley's counsel sent him copies of Harry Martin's affidavit and court documents showing Martin's time reduction in DuPage County, and receipts for expenses paid to him. These documents were included as Exhibits in codefendant Easley's post-conviction petition.

Petitioner was without counsel to assist him in collateral attacking his conviction and sentence. Possessed with limited knowledge of the law, petitioner Carter sought assistance from fellow inmates. This proved to be a futile attempt, due to the nature of the case... involving the death of a IDOC employee, inmates feared that there would be an act of retaliation upon them from the prison staff, combined with the numerous prison lockdowns affected petitioner's ability to prepare his petition in a timely fashion.

On August 10, 1998, petitioner filed his pro se Petition for Post-Conviction Relief pursuant to 725 ILCS 5/122.1 et seq. and combined Petition From Relief of Judgement, pursuant to 735 ILCS 5/2-1401, raising a Brady, Napue violation, Newly Discovered Evidence and Actual Innocence claims within his petition. The circuit court dismissed the post-conviction petition as untimely filed. Petitioner was not admonished about his appeal rights. The 2-1401 petition was allowed.

- 37 -

From the inception of the proceedings, up until the dismissal of his petition, petitioner Carter was represented by the following appointed counsels:

| Name | Reason For Termination of Representation |
|------|------------------------------------------|
| David Ahlmeyer | Appointed 09-11-98, due to conflict of interest,...he represented codefendant Johnson during the initial trial. See CLR-172 |
| Carey Luckman | Appointed 10-23-98, he became an Assistant State's Attorney in December of 2000. |
| Eric Frobish | Appointed December of 2000, relocated immediately thereafter. |
| Paul Lawrence | Appointed 02-22-01, he became a Circuit Court Judge on April 15, 2002. |
| W. Keith Davis | Appointed 04-15-02, he represented petitioner throughout the remaining proceedings. |

Petitioner Carter contends that the periodic representation of various attorneys caused his issues to be piece-meal, rather than presented to the Court as a whole. Furthermore, petitioner attempts to discuss the issues and raise trial and appellate counsels ineffectiveness was futile. Numerous letters were written to the Circuit Court Judge regarding petitioner's inability to communicate with his appointed counsel regarding the issues being presented to the Court. See CLR-442, 446-447. Appendix

The Court in Carey v. Duckworth, (7th Cir. 1984) 738 F.2d 875, 878, announced that "a prosecutor's office cannot get around Brady by keeping itself in ignorance, or comparmentalizing information about different aspects of a case." The records in this case conclusively shows the many antics of State's witness Harry Martin, consisting of the following:

- 38 -

### Harry Martin's Performances and Benefits

1. On October 2, 1987, James Wasson, filed a Petition for Order
   Authorizing Use of Eavesdropping Device to use in attempt to
   record conversations bewteen Martin and petitioner.
   NOTICE - Harry Martin stated in his affidavit that paragraph
               1 b of Attachment 1, contains false accusations
               pertaining to his cooperation with IDOC.

2. On October 1, 1991, Harry Martin appeared in DuPage Circuit
   Court before Honorable Edward W. Kowal, Judge for the purpose
   of a Post-Conviction Hearing in Case No. 81 CF 325. The Court
   reduced Harry Martin's thirty-five ( 35 ) year sentence to
   twenty-one ( 21 ) years ( time served ).
   NOTICE - The following colloquy took place regarding a Supreme
               Court Rule 402  which is designed specifically for
               parties to hold a conference with the Judge regarding
               the defendant entering a guilty plea to a specific
               charge and sentence:

MS. GUSTAFON:   Judge, I have prepared an order to impound this
                file as well as any record of proceedings.

THE COURT:      Motion granted.

THE COURT:      All right.  This matter coming on to be heard on the
                post-conviction petition, the provision in the
                petition requesting this matter be resentenced. any
                objection by the State?

MR. STOCK:      No, your Honor.

THE COURT:      Motion granted. The matter comes on for resentencing.
                Any arguments by the State, any arguments by the
                defense counsel?

MR. STOCK:      No, your Honor.  We would rely on what was said
                during the 402 conference.
                [Attached hereto and labeled as an appendix is the
                 transcript of the 10-01-91 hearing in that cause]

3. On November 18, 1991, State's witness Harry Martin testified
   at petitioner Carter's trial in this cause.  He stated that
   "there was no deals with the Illinois Department of Corrections"
   NOTICE - Harry Martin failed to mention that "he had recently
               been granted a time-cut on his DuPage County case".
               The State allowed this mishap to go uncorrected.

4. On March 28, 1994, Harry Martin appeared in Cook Co. Circuit Court
   (Skokie) before Honorable Francis mahon in Case No. 811998
   and 81011926, where he received "time-served" during a in-
   chambers hearing.
                [Attached hereto and labeled as an appendix is the
                 transcript of the 03-28-94 hearing in that cause]

5. Copies of receipts for money in various amounts, sundrys, phone calls, motel expenses, etc. that were given to Harry Martin by IDOC officials. None of which were disclosed and/or raised during the trial in this cause. These documents were atached to petitioner Carter's post-conviction petition. <u>See</u> Appendix.

6. On December 30, 1992, in the U.S. District Court, Northern District of Illinois, in <u>U.S. v. Burnside, et al</u>, 89 CR 909, Harry Martin testified before the Honorable James F. Holderman he had in fact received a reduction in his sentence for testifying against petitioner Carter and other codefendants in this case. He testified that he cooperated with the State on a capital murdercase involving four inmates in the Illinois Department of Corrections. After completing his cooperation, he was placed in the Federal Witness Protection Program. He also testified that he was serving two consecutive sentences armed robbery totalling 45 years, 35 DuPage County and 10 County. That in exchange for his testimony in this case, the DuPage County sentence was reduced to 21 years. He testified that when the Illinois Appellate Court overturned four of his six convctions, "the State of Illinois and the people he had assisted vouched for him and got his sentence reduced." <u>See</u> pages 4349-4352 of Exhibit C of codefendant Easley's post-conviction petition.

The non-disclosure of this evidence caused an extreme amount of prejudice, affecting the defense's ability to impeach Mr. Martin, and expose his motive and bias to testify to the jurors hearing the case, his credibility being at issue, would have permitted the defense to question his trustworthyness prior to obtaining the request for the wire tap. <u>Brady</u>, <u>supra</u>. Although, a suppression of the tape recording is normally a pretrial issue, petitioner could not possible request something that has been held from him, unknowingly. There is an reasonable likelihood that there would have been a different result.

An evidentiary hearing is essential to allow petitioner to prove the allegations contained in his petition. <u>Townsend    v. Sain</u>, ___ U.S. ___.

- 40 -

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA ex rel. )
DAVID CARTER,                    )
                                 )
            Petitioner,          )
                                 )
v.                               )    No. 07-1222
                                 )
TERRY L. MCCANN, Warden,         )
                                 )
            Respondent,          )

A P P E N D I C E S

| Item | Contents | Page |
|------|----------|------|
| Affidavit | Harry Martin regarding deals & benefits | 1-6 |
| Affidavit | Michael Shaw regarding petitoner's involvement | 7-8 |
| Affidavit | Corwyn Brown regarding petitioner's involvement | 9-13 |
| Transcript | Du Page Co. Harry Martin's time reduction | 14-20 |
| Order | DuPage Co. sealing Martin's file | 21 |
| Order | DuPage Co. granting Martin's petition | 22 |
| Mittimus | DuPage Co.  re-sentencing Martin to time-served | 23 |
| Motion | Copy of Notice of Filing to Martin's petition | 24 |
| letter | To Judge Frobih from petitioner Carter 3-4-03 | 25-27 |
| letter | To attorney Carey Luckman from petitioner Carter | 28-32 |
| letter | To Judge Frobish from petitioner Carter 6-9-02 | 33-34 |
| Transcript | Cook County - Martin's time reduction | 35-46 |
| Transcript | Hearing on State's Motion to Dismiss 6-1-03 | 47-69 |
| Decision | People v. Harry Martin, (Jan. 12, 1984) | 70-87 |

IN THE

CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

LIVINGSTON COUNTY, ILLINOIS

|  |  |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS<br>Respondants<br><br>-VS-<br><br>DAVID W. CARTER<br>Petitioner | )<br>)<br>)<br>)<br>)  No 87 CF 112<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Charles E. Glennon<br>)  Judge Presiding<br>)<br>)<br>) |

_____

AFFIDAVIT OF HARRY MARTIN

David W. Carter #N43429
P.O. Box 112
Joliet, Illinois 60434-0112

C.58

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
LIVINGSTON COUNTY, ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS,    ) | |
| )                                    | |
| *Plaintiff-Respondent,*    )          | |
| )                                    | |
| vs.    )                             | No. 87-CF-113 |
| )                                    | · ¢ |
| IKE J. EASLEY, JR.    )               | |
| )                                    | |
| *Defendant-Petitioner.*    )          | |

---

## AFFIDAVIT OF HARRY MARTIN

HARRY MARTIN, on oath, states:

1.    I am the government informer who used an eavesdropping device to record a
conversation with the defendant in this case in October 1987. I am also the subject of Exhibits
45-47 to the Second Amended Petition for Post-Conviction Relief filed by the same defendant.
I am presently in federal custody.

2.    I have read the Petition for Order Authorizing Use of Eavesdropping Device, filed
in this case on October 2, 1987, by James Wasson, requesting authorization for an
eavesdropping device to record a conversation between the defendant and me.

3.    That petition, at paragraph 1(b) of Attachment 1, falsely states that I had
"cooperated" with the Department of Corrections for a number of years and had been found to
be "reliable" during that time. The truth is that I had never cooperated with the Department of
Corrections as an informer or in any other way until after the murder of Robert Taylor on
September 3, 1987.

4.    Before that time, Michael O'Leary, the warden at Stateville Correctional Center,
and Russ Nelson, an investigator for the Department of Corrections ("DOC"), had tried

C-59

ATTACHMENT(

unsuccessfully to get me to cooperate with the DOC in its investigation of Larry Hoover and the Brotherhood of Struggle. This happened in June of 1987 in the warden's office at Stateville where I was an inmate. O'Leary and Nelson offered to get my sentence reduced, get me out of prison, and put me in the witness protection program.

5.    Nelson and O'Leary also tried to get me to cooperate by threatening me: they said that the Board of Governors of the Black Gangster Disciples ("BGDs") were planning to assassinate me, and that if I did not cooperate with the State, DOC officials would "parade" me in front of other inmates so that the other inmates would think I was cooperating. I refused to cooperate.

6.    Nelson and O'Leary then had me placed in protective custody, and within two or three days brought me to the prosecutor's office in Will County, as if to suggest that I was cooperating with the State.

7.    When I was brought to the prosecutor's office, several people were there: Nelson, O'Leary, Mike McKinney (chief investigator at DOC), investigators from the Cook County State's Attorney's office, including J.W. Glasscott, lawyers from the Will County State's Attorney's office, and an investigator from the Department of Criminal Investigations of the State Police. They continued to lean on me to cooperate. I was afraid, so I said that I would cooperate with the investigation if DOC moved me to Dixon, a medium/minimum security prison.

8.    They moved me to Dixon. Once I was there, Russ Nelson and J.W. Glasscott came down and tried to get information from me. But I stonewalled them. I was then transferred to Pontiac Correctional Center. This was some time in July 1987, right after

2

C-60

ATT - 2    (3

"Zodiac" was killed. I was put in lockdown.

9.    A day or two after I arrived at Pontiac, my wife visited me and told me that the word "in the street" was that the BGDs were planning to assassinate me in prison. After visiting me, my wife went to Warden James Chrans' office and told him the same thing. Chrans called me into his office that evening and said that he was not going to have me killed on his watch. He then transferred me to Logan Correctional Center. All of this happened within three days of my being sent to Pontiac.

10.    Within a day or two after the murder of Robert Taylor on September 3, 1987, Russ Nelson telephoned me at Logan. I took the call in an office there. Nelson asked me to help in their investigation of the murder. I refused.

11.    The very next morning Warden Chrans telephoned me -- I was again brought to an office to take the call -- and reminded me that he had saved my life by sending me to Logan and that I owed him a favor. I said I would listen to what the State had to say.

12.    The next day, Gerald Long, a Deputy Director of DOC, and Jerry Donovan, a DOC investigator, came to Logan to see me. They said they needed my help, and they pointed out that I was in trouble as long as I was in prison, as a result of having been set up. I realized that I would always be in danger while I was in prison, and I felt the only way I could survive would be if I cooperated with the State. So I finally agreed to help with the investigation of the killing, including testifying at trials, if necessary.

13.    At that same meeting, which took place at an office at Logan within a week of Taylor's murder, we ironed out a deal, whereby Long and Donovan promised me the following benefits in return for my cooperation:

3

C. 61

a.    they would immediately move my wife and three children downstate so that they could be near me.

b.    I would be allowed to make "home visits" or furloughs, beginning immediately. Home visits consisted of leaving Logan once or twice a week to visit my wife and children. During these day visits, I was free to do whatever I wanted to do and go wherever I wanted to go.

c.    I would get paid generously. They stressed that there was lots of different ways of paying me, including cash, commissary goods, witness funds, federal money and "O.A.F." funds (they did not say what that stood for).

d.    All of the state officials with whom I cooperated, including Long, Donovan, McKinney, and Will County State's Attorney's lawyers Bernardi, Brown, and Wasson, would vouch for me in court or through clemency petitions to get me released from incarceration once the investigation and trials were completed. (At the time of this meeting, I had served about eight years of two sentences totalling 45 years -- 10 from a Cook County conviction and 35 from a DuPage County conviction.)

e.    Long and Donovan said that the DOC Director would bring a clemency petition to the Governor to sign to make sure I was released, if the courts did not commute my sentences. (In fact, in October of 1990, Deputy Director Klemm took a clemency petition to the Governor, but I was out by then.)

14.    This "deal" was set out on that first day I met with Long and Donovan at Logan. In subsequent meetings, details were ironed out, such as where the money would come from. (For example, Long gave me a DOC phone card in the name of Stu Erickson, a DOC

4



~~investigator~~, in September, 1987.) But the basic outline as set forth above was laid out before I had done any eavesdropping for the Department.

15.    On September 26, 1987, I wore an eavesdropping device to record a conversation with Corwyn Brown, an inmate from Pontiac who had been sent to Logan so that I could record a conversation with him about Taylor's murder.  Following my conversation with Brown, on the same day, Gerald Long came to see me and again confirmed all parts of the deal outlined above.

16.    I have looked at Exhibit 46 to the defendant's Second Amended Petition for Post-Conviction Relief.  That exhibit contains copies of state vouchers showing payments to me of approximately $8,000 made during a three and one-half month period, from September 21, 1987, to January 7, 1988.  Those vouchers do not show anywhere near the total amount I was paid by the State. The State actually paid me three to four times as much by the time of Ike Easley's trial, in June of 1989.

17.    I received many cash payments.  I ran up hundreds, if not thousands of dollars worth of phone calls on Stu Erickson's phone card.  I made extensive purchases at the commissary at Logan under the name of James Brokaw.  The vouchers in Exhibit 46 list business calls from hotels.  But I never made any "business calls".  They were all calls to friends and family.

18.    I was given two polygraph tests s by the state.  Long told me I failed both of them.  The first one was administered to me in October or November 1987, after I had completed all of my electronic conversations, in Springfield at the office of the Illinois State Police.  The purpose was to show how reliable I was, so I was asked (and confirmed) if I had

$C-63$

(6)

been cooperating with the State for a long time. I also was asked about the BGDs and about Taylor's murder. I don't know what questions caused me to fail the test. Long told me he had a friend of his at the State Police doctor the polygraph. The second polygraph was administered at Logan by DOC in November 1988 and involved the same questions. I believe the State suppressed both tests.

19.    I am willing to testify to all of the statements I have made in this affidavit.


HARRY MARTIN

Sworn to and subscribed
before me this _5th_ day
of September, 1997.

Witnessed by:

_____
Notary Public

Leonard E. Cox, Attorney

9-5-9
Attorney at Law
State of Tennesse
Bar # 04952300

6
C.64

(7)

ATT. — 6

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
LIVINGSTON COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS,  )
                                   )
        Plaintiff-Respondent,      )
                                   )
                                   )
                                   )
        vs.                        )     No. 87-CF-112
                                   )
                                   )
                                   )
DAVID W. CARTER                    )
                                   )
        Defendant-Petitioner.      )

---

## AFFIDAVIT OF MICHEAL SHAW, AKA TORRENCE EVANS

MICHEAL SHAW, on oath, states:

1. I am a person who on October 27, 1996 was an inmate at the Joliet Correctional Center with another inmate by the name of CORWYN BROWN. I am presently in State custody at the Stateville Correctional Center FARM DIVISION.


2. That on or about October 27, 1996 I had a conversation with CORWYN BROWN while incarcerated at the Joliet Correctional Center.


3. While conversating with CORWYN BROWN he stated to me that he had ordered by threat of bodily injury, David Carter and Micheal Johnson to take responsibility for the murder of Superintendent ROBERT TAYLOR in 1987 at the Pontiac Correctional Center.


4. CORWYN BROWN stated to me that neither DAVID CARTER nor MICHEAL JOHNSON had any knowledge of the murder of Superintendent ROBERT TAYLOR before the murder occured.

(8)

5. CORWYN BROWN stated to me that he alone had given the order on the attack of Superintendent Robert Taylor, and he had personally saw to it that his order was carried out.

6. Corwyn Brown stated to me that he had ordered by threat of bodily injury, DAVID CARTER and MICHEAL JOHNSON to take responsibility for the murder of Superintendent ROBERT TAYLOR with the HIERARCHY of the B.O.S., an organization in which he was a high ranking member.

7. In 1996 and in the years since I have tried to tell D.O.C. officials of the aforementioned statements, but I have been met with threats of prolonged incarceration, prosecution, and intimidation. I have been weighed down with this burden of knowing that two innocent men have been incarcerated all these years for a crime in which they were set up to take the fall for.

8. I come forward today in hopes of righting this terrible wrong, and I am willing to testify to all of the statements I have made in this affidavit.

MICHEAL SHAW  A 72965

Sworn to and subscribed before

me this 15 day

"OFFICIAL SEAL"
Candice M. Crooks
Notary Public, State of Illinois
My Commission Expires 04/26/03

Notary Public

(9)

IN THE

CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

LIVINGSTON COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS
      Respondants        )
                          )    No 87 CF 112
                          )
    -VS-                  )
                          )    Charles E. Glennon
                          )    Judge Presiding
DAVID W. CARTER         )
        Petitioner      )

AFFIDAVIT OF CORWYN BROWN

*David W. Carter*
David W. Carter #N43429
P.O. Box 112
Joliet, Illinois 60434-0112

C-65

(10)

P33

<u>Affidavit</u>                 Oct. 30, 1996   J.C.C.

I, Corwyn Brown ; Do Hereby STATE AND AFFIRM THAT The following is TRUE in everyway to the best of my Knowledge AND Recollections.

(3) Corwyn Brown N-82181

THAT ON Sept. 2, 1987 I CORWYN BROWN met with two members of my PERSONAL SECURITY STAFF AND Discussed THE ATTACK OF CORRECTIONAL STAFF AT THE PONTIAC CORRECTIONAL Center. THese two INMATES were ANTHONY "T-21" Williams WHO WAS my Cellmate AND PERSONAL SECURITY STAFF member AND PERRY "P.M." Moore who Live NEXT DOOR to me AND WAS my PERSONAL SECURITY STAFF Member Also. I Advised THem INSIDE Cell 536 IN THE SOUTH House THAT WE HAD TO ASSIST THE OTHER ORGANIZATION UNDER THE SIX IN ATTACKING THE STAFF. THey ASKED WHY WAS THE SECURITY STAFF, GENERAL members STAFF NOT GOING TO BE INVOLVED AND I explained THAT I Needed INDIVIDUALS LOYAL TO me FIRST AND THE MOB SECOND. THey both UNDERSTOOD THIS AND AGREED TO "Hit" Captain WHither IN His office. I THEN ASKED THREE more INDIVIDUALS THAT I PERSONALLY TRUSTED TO INVOLVED THEMSELVES IN CERTAIN THINGS. ONE WAS TO PLAY A RADIO ON THE BACKBREAKS, NUMBER TWO WAS TO TAKE THE CAGE officer DOWNSTAIRS AND THE LAST WAS TO HAVE A BAG ON Five gallery for THE Clothes AND Gloves TO Be THROWN OUT OF THE WINDOW. THE LAST ONE WAS TO KNOW THERE WAS A Hit ON BUT ON WHO, WHAT OR WHERE, STAFF OR INMATE, He HAD NO Knowledge. THE MEMBER ON THE BREAKS WAS SINGUR off SIX GALLERY, AND All He WAS Told WAS TO STAND ON THE BACK OF SIX + FIVE AND BLAST THE SOUNDS AFTER YARD. THE member THAT TOOK THE BACKBREAKS officer DOWNSTAIRS WAS Melvin "K-DOG" CLARK, WHO WAS ONLY Told TO DO THAT SO WE COULD VIOLATE SOME members. THE LAST member WAS IKE "J.R." EASLEY WHO WAS TO PICK up THE Clothes AND Gloves, He WAS AWARE of A Hit BUT ON WHO He WAS NOT AWARE. AND KNEW He WAS ONLY SUPPOSE TO DUMP SOME SHIT

C.bb

(11)

p 34

OUT THE WINDOW. THey weRe Told THE Sept. 2, 1987 iN A cell oN Five gallery SouTH cell House. ON THE EveNiNG of Sept. 2, 1987 I, CeRwyN BRowN, weNT AND spoke To THE Two SENioR SecuRiTY peRsoNs iN THE cell House AND INSTITUTioN. I explaiNed To MicHeal "Dice" JoHNsoN AND DaviD "CAp" CARTeR, THAT I WAS AbouT To pull A STuNT THAT WAS AGAINST oRGANizATioNal policies from THE WHiTe House AND I wANTed THEm To Be THE BuffeRs betweeN me AND THE wHiTeHouse so I would explaiN my "Oliver NorTH" buffer to them iN THe moRNiNG.

THAT moRNiNG I HAD THE INSTiTuTioNAl STAff ouT AND ABouT wiTH me AND MADE AHE selves very NoTiCAble THRouGHouT THe INSTITuTioN'S GRouNDS I weNT iN THAT AfTeRNooN To cHeck AND see WAS everyTHiNG ReaDy. AND I wANTed To peRSoNAlly issue THe direcTive Because THey HAD killeD my bRoTHer Billy JoNes. WHEN THey called yaRD I waiTed til everyoNe else HAD Left off THe gALleRy AND wiTH my secuRiTY, I ColwyN BRowN walked TowaRDS ANTHoNy "T-21" Williams AND PeRRy "P.M." MooRe STANDiNG AT THe eND of THe gALleRy iN fRoNT of SupeRiNTeND- ANT RoberT TayloR's office. AS I walked pass His office I NoDDeD my HeAD AT WilliAms AND MooRe. By THe Time I GoT To THe iNSTiTuTioNal MAiN cRoss walk THe officeRs weRe RuNNiNG TowARDs THe cellHouse so I weNT iNTo THe cHApel. AT THAT Time I pulled MicHeAl "Dice" JoHNsoN To THe side AloNG wiTH DaviD "CAp" CARTeR AND ToLD THem THAT THey WoulD HAve To Accept the RespoNsibiliTy wiTH THe wHiTe House AND wHeN Asked STATe THAT THe INSTiTuTioNAl CooRDiNATORS HAD No KNowledge of ANy of THe eveNTs BuT iT WAS A secuRiTY imposed opeRATioN Because Billy JoNe WAS oNce A OuTLaw from MicHeal "Dice" JoHNsoN's NeighborHood. AND BecAuse iT WAS A STuNT By THe secuRiTy STAff THe INSTiTuTioNAl STAff would be spaReD fRom flak. AND THe puNisHmeNT would be Left iN the HANDs of THe INSTiTuTioNAl CooRDiNATORS wHo would sTill be iN poweR. AND sTill beiNG iN poweR we would pRoTecT ouR Guys. AND THAT is THe sToRY THAT WAS To Be Held To SubsTiTuTiNG NAmes iN ceRTAiN AREA's.

C-67

(12)

P 35

3.

Because if known to be in trouble they would obtain a great deal of support just to keep their mouths shut in case they knew who was actually responsible, and as long as their innocent they can't get convicted plus don't know anything to tell.

At no time prior to the assault on Supt. Robert Taylor did either Micheal Johnson nor David Carter have knowledge of anything other than they had to be a buffer for a stunt I was going to pull.

At no time did Micheal Johnson or David Carter have the authority to tell any member to do something of this nature and extreme magnitude. It is not possible within the structure of the organization, unless it was done individually. But it was not. At no time did Micheal Johnson or David Carter have the loyality of the membership to attempt something of this magnitude without the institutional coordinator staff making the call, one of the two at least.

That on Sept. 3, 1987 I, Corwyn Brown no2101, ordered Anthony 'T-21' Williams and Perry "P.M" Moore into cell 552 to attack a correctional employee. To pipe them badly yet not to kill them but just one point worst then Supt. Goskie the day before. I now admit to this truth now because I see the waste of life and the killing of Supt. Robert Taylor and possible death of the two guys innocently convicted of murder when we're totally and solely responsible. It happened exactly as stated and the I.D.O.C. know's it and after a through and through investigation wrote and found me guilty of a disciplinary report stating exactly as the above except with different names. Please note that the two named individuals used there personal knowledge of the incident to convict Micheal Johnson and David Carter.

C.68

(13)

P36

4.

LASTLY ANTHONY WILLIAMS WAS VERY AWARE THAT TO implicate me CORWYN BROWN THAT HE WOULD BE implicating HIMSELF. AND WHILE WORKING IN Behalf of THE STATE of ILLINOIS AND Dept. of CORRECTION FORGED MY NAME TO A COMPLAINT THAT I CORWYN BROWN Refused TO SIGN IN Hopes of ENTRAPPING ME TO Testify IN Behalf of THE STATE AGAINST THE upper RANKING LEADERSHIP of THE ORGANIZATION.

TO THE AFOREMENTIONED STATE I SWEAR before God AND COURT THAT IT IS TRUE. I STATE AND DEPOSE THIS before PENALTY of PREJURY.

[S] Corwyn L. Brown N02101

Subscribe AND SWORE before me THIS 20 DAY of Nov , 1996

Jeanne T. Ciancanelli
NOTARY PUBLIC

```
"OFFICIAL SEAL"
JEANNE T. CIANCANELLI
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 10-21-98
```

C.69

(14)

1

```
 1   STATE OF ILLINOIS   )
                         )   SS.      Duplicate Original
 2   COUNTY OF DU PAGE   )

 3      IN THE CIRCUIT COURT OF DU PAGE COUNTY FOR
        THE EIGHTEENTH JUDICIAL CIRCUIT OF ILLINOIS
 4
     THE PEOPLE OF THE            )
 5   STATE OF ILLINOIS            )
                                  )
 6             Plaintiff,         )
                                  )
 7      vs.                       )  No. 81 CF 325
                                  )
 8   HARRY MARTIN,                )
                                  )
 9             Defendant.         )

10

11            REPORT OF PROCEEDINGS had at the

12   hearing of the above-entitled cause, before

13   the Honorable EDWARD W. KOWAL, Judge of said

14   Court, on Tuesday, the 1st day of October,

15   A.D. 1991, at the hour of 3:20 o'clock P.M.

16   PRESENT:

17
         MR. JAMES E. RYAN,
18       State's Attorney of DuPage County, by
         MR. RICHARD STOCK,
19       Assistant State's Attorney,

20            appeared on behalf of The People
              of the State of Illinois.
21

22
              DU PAGE COUNTY JUDICIAL CENTER
23            505 N. COUNTY FARM ROAD
              WHEATON, ILLINOIS 60187
24
```

C-418

(15)

Ernest C. Scola, CSR
Official Court Reporter

2

```
 1   ALSO PRESENT:

 2

 3        MR. KENNETH W. TORLUEMKE,
          Public Defender of DuPage County, by
 4        MS. HARRIET DOHENY GUSTAFSON,
          Assistant Public Defender.

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

C-419  (16)

3

```
 1              THE COURT:  People versus Harry
 2   Martin.
 3              MS. GUSTAFSON:  Judge, I have
 4   prepared an order to impound this file as well
 5   as any record of proceedings.
 6              THE COURT:  Motion granted.
 7              MS. GUSTAFSON:  There is also, as the
 8   Court is aware -- I don't know what date in
 9   the Court file the post-conviction petition is
10   filed by Mr. Martin, what date it got filed.
11   I don't have a file stamp on my copy.
12              MR. STOCK:  I don't, either.
13                   It's dated at the top of the
14   petition September 9th.
15              MS. GUSTAFSON:  I know we received
16   our copy on or about September 11th, so I
17   would imagine the Clerk's Office --
18              THE COURT:  The letter is dated
19   September 9, so we'll indicate that the
20   petition for post-conviction relief is dated
21   September 9, 1991.
22                   Present in Court today is
23   Mr. Stock, representing the People, and
24   Ms. Gustafson, representing the Defendant.
```

4

```
 1              MS. GUSTAFSON:  Judge, only in the
 2   capacity as Officer of the Court.  We have
 3   never formally been appointed.  And it's
 4   Mr. Martin's pro se petition which is being
 5   proceeded upon.
 6              With respect to that, Judge,
 7   Mr. Martin has raised issues with respect to
 8   the appropriateness of the sentencing in his
 9   post-conviction petition, and that is the
10   matter he's asking the Court to grant him
11   relief upon.
12         THE COURT:  All right.  This matter
13   coming on to be heard on the post-conviction
14   petition, the provision in the petition
15   requesting this matter be resentenced, any
16   objection by the State?
17         MR. STOCK:  No, your Honor.
18         THE COURT:  Motion granted.
19              The matter comes on for
20   resentencing.  Any arguments by the State, any
21   argument by defense counsel?
22         MR. STOCK:  No, your Honor.  We would
23   rely on what was said during the 402
24   conference.
```

5

1        THE COURT:  Resentencing on this

2   matter, the sentence now will be 21 years

3   Department of Corrections, credit for time

4   served.

5        It is my understanding that

6   Defendant, therefore, will be entitled to a

7   release.  Is that correct?

8        MS. GUSTAFSON:  It's my

9   understanding, Judge, that once the Department

10   of Corrections processes the appropriate

11   paperwork, he will be released from the

12   Department of Corrections sentence.

13        He may, perhaps, still be on a

14   Mandatory Supervised Release period.  However,

15   that will be coordinated with the federal

16   government.

17        MR. STOCK:  And, as we discussed,

18   Judge, there is a consecutive sentence in

19   Cook County, which he would remain, at this

20   point at least, still serving.

21        THE COURT:  All right.  Order entered

22   granting the relief as required, and an order

23   has been drawn.

24        The usual admonishment on

6

```
 1    resentencing on this matter of the right of

 2    appeal; 30 days to file notice of appeal.

 3              Appellate Defender will be

 4    appointed if he seeks counsel.  And the

 5    Defendant can file his own request for the

 6    Clerk to file a notice of appeal if he wishes.

 7              MS. GUSTAFSON:  Thank you.

 8              MR. STOCK:  Thank you.

 9

10              (WHICH were all of the

11               proceedings had at the

12               hearing of the above-

13               entitled cause, this date

14               and time aforesaid.)

15

16

17

18

19

20

21

22

23

24
```

C-423  (20)

7

```
 1    STATE OF ILLINOIS    )
                           ) SS.
 2    COUNTY OF DU PAGE    )

 3

 4              I, ERNEST C. SCOLA, C.S.R.,

 5    Official Court Reporter, do hereby certify

 6    that I reported in shorthand the proceedings

 7    had at the hearing of the above-entitled

 8    cause, and that the foregoing Report of

 9    Proceedings, consisting of Pages 1 to 6,

10    inclusive, is a true, correct and complete

11    transcript of my shorthand notes so taken at

12    the time and place hereinabove set forth.

13

14

15

16

17
      -----------------------------------------
18             OFFICIAL COURT REPORTER
                 C.S.R. No. 084-001200
19         Eighteenth Judicial Circuit of Illinois
                     DuPage County.
20

21

22

23

24
```

Ernest C. Scola, CSR
Official Court Reporter

C-424    (21)

T-CR 35(Rev. 1/82)

UNITED STATES OF AMERICA

**STATE OF ILLINOIS**                          **COUNTY OF DUPAGE**
**IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT**

PEOPLE OF THE STATE OF ILLINOIS

–VS–

81 CF 325

Case No.

HARRY MARTIN

Defendant

File Stamp Here

## ORDER

This cause having come on to be heard upon the motion of the ⸻STATE⸻
and the Court being fully advised in the premises, and having jurisdiction of the subject matter:

that this file is to be impounded by the Clerk of the

**IT IS HEREBY ORDERED**

Circuit Court until further order of this Court.

COPY

Name _____
DuPage Attorney No. _____
Attorney for _____                Enter: _~~E W Knal~~_
Address _____                                    Judge
City _____
Phone _____                Date _____

PROCESSED
2 1991

JOHN W. COCKRELL, CLERK OF THE 18TH JUDICIAL CIRCUIT COURT

EXHIBIT 45-1

C. 330

( 22 )

T-CR 35(Rev. 1/82)

UNITED STATES OF AMERICA

**STATE OF ILLINOIS**                    **COUNTY OF DUPAGE**
**IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT**

PEOPLE OF THE STATE OF ILLINOIS

–VS–                    Case No. 81 CF 325

HARRY MARTIN

Defendant

### ORDER

This cause having come on to be heard upon the motion of the    Petitioner, Harry Martin for post conviction
and the Court being fully advised in the premises, and having jurisdiction of the subject matter;

**IT IS HEREBY ORDERED**    that the post-conviction petition ~~filed on~~ dated Sept. 9, 1991
is hereby granted only with respect to sentencing issues.  Therefore,
sentence of October 13, 1981 is vacated and petitioner is resentenced
to 21 (twenty one) years in the Illinois Department of Corrections,
day for day credit to apply, all time considered served.

COPY

Name    ASA. Stock/Petitioner Pro-se
DuPage Attorney No.   50000
Attorney for
Address
City
Phone

PROCESSED
OCT 2 1991
CIRCUIT CLERK

Judge

EXH. 45-2

JOHN W. COCKRELL. CLERK OF THE 18TH JUDICIAL CIRCUIT COURT

C-331

(23)

Criminal Sentence Form

## UNITED STATES OF AMERICA

STATE OF ILLINOIS                                      COUNTY OF DU PAGE
### IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT

People of the State of Illinois          NO. 81 CF 325

                                         DO #_____

Vs.                                      ☑ Indictment

HARRY MARTIN                             ☐ Information
_____
Defendant                                ☐ Complaint

                                         ☐ Resentence

PLEA ☒ NOT GUILTY   ☐ GUILTY    FINDING OF GUILTY BY ☐ COURT ☒ JURY

It is hereby ordered that the defendant is sentenced as follows:

### TYPE OF SENTENCE

☐ FINED TOTAL AMOUNT $ _____
  which includes court costs, penalties and fees as provided by
  statute.

☐ FINES $ _____ plus statutory court
  costs and fees and the following penalties
  ☐ Criminal Surcharge Fund
  ☐ Violent Crime Victim Assistance Fund
  ☐ Driver's Education Fund

☐ PROBATION_____MONTHS—END DATE_____

☐ PERIODIC IMPRISONMENT
  ☐ Work Release Program
  ☐ Week End

☐ CONDITIONAL DISCHARGE—END DATE_____

☐ COURT SUPERVISION—END DATE _____

☐ COUNTY JAIL _____ DAYS
  TO BEGIN _____

☒ ILLINOIS DEPARTMENT OF CORRECTIONS
  ☐ Boot Camp

☐ CUSTODY OF THE U. S. ATTORNEY GENERAL

☐ STATE'S ATTORNEY ALLOWED
  _____ NO. OF DAYS PER DIEM

☐ NO CREDIT FOR GOOD TIME

☐ AMENDED CHARGE_____

### RE- SENTENCE

Upon granting defendant petition for post conviction relief the sentence and
sentence of 10/13/81 is vacated. Defendant resentenced
to 21 years Illinois Dept of Corrections, day for day
credit to apply, all time considered served.

Disposition of companion cases (not sentenced) _____

State's Attorney  Stock
Defense Attorney  Defendant Pro Se
Deputy Clerk  Bostick
Reporter  Scola
Bailiff  Storo

JUDGE _____
Date  10/1/91

PROCESSED
OCT 2 1991

☐ Sentence stayed until _____
☐ No Credit Time Served_____  Credit will be given unless this box is checked
☐ Defendant released from custody_____

( 2A)

JOEL A. KAGANN, CLERK OF THE 18TH JUDICIAL CIRCUIT COURT

8/c/= 325

IN THE

CIRCUIT COURT OF DUPAGE COUNTY

PEOPLE OF THE STATE OF ILLINOIS,            )
        Respondent,            )
                          )        PC. No._____
                          )
vs                        )        Honorable,
                          )
HARRY JAMES MARTIN,            )
            Petitioner,            )        _____
                          )        Judge Presiding
                          )        UNDER SEAL —
                          )          IN CAMERA

### MOTION TO PROCEED IN FORMA PAUPERIS

### AND TO APPOINT COUNSEL

    Petitioner Harry Martin comes before the court and respectfully requests that he be permitted to file the attached Petition for Post-Conviction Relief in forma pauperis and to proceed in forma pauperis and to have an attorney appointed to represent him in this proceeding.

    In support of this request, Petitioner states:

    1. That he is presently incarcerated.

    2. That he is without any income or assets with which to pay for the costs of this litigation or to procure counsel.

    Wherefore , Petitioner prays that he be granted leave to file and to proceed in forma pauperis in the above captioned Petition for Post-Conviction Relief and to have counsel appointed to represent him in this proceeding.



C.75

PROCESSED

Harry J. Martin
Petitioner

CIRCUIT CLERK

    I swear under the penalty of perjury that the facts stated in this Motion are true and correct in substance and in fact.

(25)

EXH. 45-4

March 4, 2003

Hon. Harold J. Frobish
Circuit Court Judge
Circuit Court of Illinois
Eleventh Judicial Circuit
Livingston County Courthouse
112 West Madison Street
Pontiac, Illinois 61764



Re:  People v. David Carter (Livingston County Case No. 87
     CF 112); assigned legal counsel Mr. Keith Davis.

Dear Honorable Judge Frobish:

Sir, it is with a great deal of personal reluctancy that I
find myself writing this particular letter to you.  However,
in realizing that it is my responsibility to protect myself
in situations such as this, I find that no other option is
open to me, thus this letter.

Following the appointment of Attorney Keith Davis to my case
it has been increasingly difficult if not impossible, to
form some sort of working relationship with him, as the
following chart will illustrate:

    a.  appointment of Keith Davis on 04/15/02;
    b.  correspondence from defendant to Hon. Judge Frobish
        on 06.09/02;
    c.  correspondence from legal counsel Keith Davis on
        07/03/02;
    d.  notification from Keith Davis's Office regarding
        his placement on my visiting list for a legal
        visit;
    e.  correspondence from defendant to legal counsel
        Keith Davis on 07/11/02;
    f.  visit with legal counsel Keith Davis on 11/05/02;
        at the Stateville Correctional Center;
    g.  correspondence to legal counsel Keith Davis from
        the defendant on 11/11/02;
    h.  correspondence to legal counsel Keith Davis on
        12/26/02 from defendant;
    i.  correspondence to legal counsel Keith Davis on
        01/23/03; from defendant;
    j.  correspondence to legal counsel Keith Davis on
        01/30/03; from defendant;
    k.  correspondence to legal counsel Keith Davis on
        02/08/03; from defendant.

Sir, the overall majority of my correspondence to Attorney
Keith Davis from 11/11/02; contained both legal questions
and/or legal documentation pertaining to my legal situation,
on up to my last effort to communicate with him on 02/08/03.
As reflected above herein, there has not been any acknowledge-
ment of my correspondence by Attorney Keith Davis, nor has
he bothered to respond to any of my letters.

It is obvious, that given the fact that he (Attorney Keith
Davis) and I, are not able to form any means of mutual

communication between us, that we are not able to have a working attorney/client relationship. This of course hinders any participation on my part as far as assisting in my own defense, given the fact that I have been unable to form any working relationship with assigned legal counsel Keith Davis.

Sir, this case has been pending for a number of years now, and I am certain that this Honorable Court would like to get the matter resolved as soon as possible, such is likewise my intent as well. However, given the current attorney/client relationship that I find myself in, that possibility appears to be remote.

I therefore respectfully request that this Honorable Court appoint someone other than Attorney Keith Davis to represent my cause before bar, for it may be logically inferred that said legal counsel has no genuine interest in this Cause which he has been assigned to.

Your time and attention to this most urgent matter is greatly appreciated!

Respectfully requested,

*David Carter*

Mr. David Carter
Reg. No. N-43429
P.O. Box 112
Joliet, IL. 60434

## CERTIFICATE OF SERVICE

The undersigned do hereby certify under penalties of perjury that he has forwarded a copy of this correspondence to assigned legal counsel Keith Davis, by depositing such copy in the United States mail-box at P.O. Box 112, Joliet, Illinois 60434; in an envelope bearing sufficient postage.

/s/ *David Carter*

SWORN and SUBSCRIBED to before me

this 4th day of March, 2003 A.D.

Notary Public

OFFICIAL SEAL
EDMUND BUTKIEWICZ
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 10-11-05

C.445

(27)

May 1, 1999

Mr. Carey J. Luckman
   Attorney At Law
   305 W. Washington
   Pontiac, IL 61764

                                        1 5 1999

re: Relevant information for my Post-Conviction Petition & Section 2-
    1401 of the Code of Civil Procedure.

Dear Mr. Luckman:

          I received yesterday 4-30-99 your letter dated April 26,
1999 along with the enclosed Order from Judge Frobish pertaining to my
Motion to Excuse Late Filing under the Post-Conviction Relief Act &
Section 2-1401 Petition. I have thoroughly read the Judges Order and
quite frankly it seems to me that the Judge is playing politics within
his decision by allowing the State a second opportunity to somehow
convince him to deny my petition altogether. To bolster my point on
this matter I would point to page (5) of Judge Frobish's Order where
it is stated in the first part of that paragraph "Whether the defendant
can meet the stringent requirements of Post-Judgement relief on the
merits may be speculative; such particularly is the case inasmuch as
the evidence against him includes very damaging inculpatory statements
on his part that were taped." This part of the Order is designed to
give the State the "Harmless Error" route in its reconsideration
strategy and something in which I feel the Judge will be politically
safe to rule against me on. Therefore, I would like to bring to your
attention as a part of our strategy on that point the following facts.
(A) I am making a claim of ACTUAL INNOCENCE in this matter. I was
forced by threat of my life and family well-being to make the statements
that I made to Martin. The Affidavit of Corwyn Brown backs up this
fact. ·
(B) I made the Statements to Martin that were taped over 30 days after
the Murder occured, and I only did so to survive in prison under
threat of my life from Corwyn Brown. (See Corwyn Brown Affidavit.)

                                                    (28)

(1)

(C) I did not have knowledge of this crime until after it occured and I was not involved in the planning or any other conpiracy in this crime. Nor did I have the authority to direct anyone else to commit such a crime. (See Corwyn Brown Affidavit.)

(D) Martin's Affidavit establishes that the STATE provided FALSE INFORMATION to the Court when in its APPLICATION for an EAVESDROPPING device it claimed that Martin had been a confidential informant for some years and had provided reliable information to the State. (See Affidavit of Harry Martin, page 1 paragraph 3.) This fact alone would make the taped conversation inadmissible when proven in a Court of Law. So this would make the taped conversation FRUITS of a POISONOUS TREE, or NULL & VOID. To bolster this point I would refer you to People V. M.H. and J.M., No. 2-97-0697 (July 23,) Section 114-1 (A) 114-1 (E). The essense of this case states as follows: The 2d District Appeallate Court recently held in a case of first impression that obtaining an indictment through the use of PERJURED TESTIMONY is not only a Due Process violation sufficient to warrant dismissal, but incapable of being cured by returning a new charge against the defendant

(E) Martin alleges that he was given 2 polygraph examinations in which the above question and others were asked and according to Martin he was told by Deputy Director Gerald Long that he had failed both of them. (See Paragraph 18 of Martin's Affidavit.) Of course none of this information was turned over to the defense and still have not been turned over to this day May 1 1999, nor have any results of said exam, or even the acknowledgement that such tests were ever taken. I believe that I may have found a case that may be of assistance regarding this issue. (See Rupe V. Wood - F. Supp - 1994 WL 518844 (W.D. Wash.) (Death Penalty - Polygraph Evidence.)

Furthermore, I have discovered additional case law which would support my Post-Conviction & Relief from Judgment Petition.

(1) Where Prosecutor's alledged intentional violation of discovery orders was not known at trial and was not known by the Appeallate Court at time of opinion on direct appeal, defendant was not forclosed from raising issue in support of petition for relief from Judgement or decree. (See People V. Hammond 1982, 61 Ill. Dec. 1, 105 Ill. App. 3d. 175, 433 N.E. 2d. 1329.) & Lubers V. Norfolk and Western Ry Co. cited

(2)                                                                    (29)

by Judge Frobish in his ORDER.

Moreover, there are Four particular cases that are crucial in helping
us overturn this conviction. Two of these cases I felt the need to
copy and send to you right away so that they will be included in any
arguments or further pleadings on my behalf. (See People V. Dedrick
Coleman.) In support of helping to get an evidentiary hearing.) Attached.
Also, (See People V. Jimmerson Supreme Ct. of Illinois.) Attached.
The other two cases are People V. Owens  129 Ill. 2d 303, 308, 544,
N.E. 276 (1989) Where it is stated that the trial court MUST conduct
an evidentiary hearing where the record or accompanying Affidavits
support the defendants claim that his constitutional rights were
violated. Also see People V. Ronnie Dockery No. 1-97-1790 fourth
Division April 23, 1998.

The next issue I will address is at page (5) of Judge Frobish's order
paragraph 2 states "At the same time, it is true that what the defendant
knew and when he knew it is peculiarly within the knowledge of the
defendant. Should the State desire an evidentiary hearing involving
the defendant on this issue, the Court would be inclined to permit the
State to request reconsideration of the order made herein after
examination of the defendant and consideration of any relevant evidence.

FACT: This question has already been answered in my original Petition
filed stamped Aug. 10, 1997. (See Letters from attorney Aviva futorian.
Letter dated August 11. 1997, Letter Dated August 14, 1997, Letter
dated August 25, 1997, Letter Dated September 15, 1997. These letters
are further proof of when I received the facts that support my petition.

Secondly, you can subpoena my institutional legal mail records that
will also show when I received the information that was fraudulently
concealed & the affidavit that support my petition.

Third, Attorney Aviva Futorian can be contacted, and I am sure she
will be willing to forward an affidavit to the Court regarding when &
what she forwarded to me relevant to the Fraudulently Concealed evidence
and Affidavit concerning key State witness Harry Martin.

(3)                                                              (30)

Dear Mr. Luckman here is a list of questions to be presented for Evidentiary Review.

(1) ACTUAL INNOCENCE CLAIM, (Corwyn Brown Affidavit.)
(A) Did Corwyn Brown order me to talk to Martin and take responsibility for his crime.?

(B) If I had not followed the orders of Corwyn Brown would my life or my family be in danger. (We will have to subpoena Corwyn Brown to testify.?

(C) If the JURY had been allowed to here this testimony would the outcome have been different?


(2) Did Martin receive a reduction in his sentence to time served 6 weeks prior to testifying in this case that he had not received anything in return for his cooperation in this case?

(A) Did the D.O.C. & the State know of these deals & Monies given to Martin. (See testimony of Gerald Long Deputy Director of D.O.C & Martin's Affidavit.)

(B) Should the State have known of these deals?


(3) Did the State provide False information to the Court in its application for an eavesdropping device. (See paragraph 2 & 3 of Martin's affidavit.)

(A) We must subpoena any and all records of Martin's alledged reliable information provided to the State for the years they claim he had provided reliable information.

(4) Was there a polygraph examination done on Martin? WHERE, WHEN, & WHAT were the results? Why was'nt this information turned over to the defense? (See paragraph 18 of Martin's affidavit.) Martin must be subpoena to testify.

(4)

(31)

(5) Was Martin given day & night furloughs to visit his family? (See paragraph 13 B of Martin's Affidavit.)

(A) The Department of Corrections Records regarding Martin's where abouts during the entire time he was a witness in this case must be subpoena.

(6) How much MONEY exactly was Martin given in return for his cooperation? (See paragraph 13,14,15,16,&17 of Martin's Affidavit.) We have to subpoena this information.

(7) Why was'nt Martin's extensive criminal history turned over to the defense? (See EXHIBIT 47 of Petition.)

Please add any other questions that you see beneficial to over turning this conviction.

---

Dear Mr. Luckman, I have added pieces of crucial testimony of Martin, Gerald Long. Trial transcript showing that Corwyn Brown was the true perpetrator in this crime and that I was set up to take the fall. (Please see attached documents.)

Finally, I want to APPEAL the Judge's decision to deny our Motion to excuse Late filing under the Post-Conviction Hearing Act. I know that we still have one tank left on the battle field, but two tanks are better than one, and I do not want to waive any of my Constitutional Rights.

Again I truly thank you for all that you have done thus far, and I pray that God Almighty blesses you and yours with perfect health & happiness

Very Truly Yours,

David Carter

(32)

(5)

P.S. Also enclosed is a copy of the Motion to Stay my HABEAS CORPUS
PETITION. (See Motion to STAY proceedings.

(6)

(33)

June 9, 2002

Hon. Harold J. Frobish
Circuit Judge, Eleventh Judicial Circuit
Livingston County Courthouse
112 West Madison Street
Pontiac, Illinois 61764



re: Correspondence from you dated April 15, 2002; and appointment
    of new legal counsel.

Dear Hon. Harold Frobish:

Sir, I am the Defendant in <u>People v. Carter</u>, No. 87-CF-112. On
the 15th of April, 2002; you specifically informed me via
correspondence that the following attorney had been assigned to
represent me, because prior legal counsel had been appointed to
the position of Associate Judge.

          Attorney Keith Davis
          237 E. Front Street
          Bloomington, IL. 61701
          (309) 827-5425.

After waiting a period of more than (10) business days and not
hearing from Attorney Davis, I wrote and basically introduced
myself and expressed my position. To-Date, said counsel has not
acknowledged my correspondence, nor has he made any effort to
contact me in any manner.

I am concerned because it is essential that he review prior
correspondence, that I had with Attorney Paul Lawrence. Therein,
I presented materials and raised issues which I believe to be
meritorious, and I requested that such be presented before bar.

Please inform me of the status of counsel and this cause.

C-425

(34)

(2)

Respectfully Requested,

David Carter

Mr. David Carter
No. N43429
P.O. Box 112
Joliet, Ill. 60434-0112

cc: per. file

C.426

(35.

```
 1            IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT
              MUNICIPAL DEPARTMENT - SECOND MUNICIPAL DIVISION
 2
      THE PEOPLE OF THE              )
 3    STATE OF ILLINOIS,             )
                                     )
 4                    Plaintiff,     )
                                     )
 5      -vs-                         )   811998 and 81011926
                                     )
 6    HARRY MARTIN,                  )
                                     )
 7                    Defendant.     )

 8
                         REPORT OF PROCEEDINGS
 9
      had at the hearing of the above-entitled cause came on for
10
      hearing before the Honorable FRANCIS MAHON, on the 28th
11
      day of March, 1994 in Skokie.
12

13         APPEARANCES:

14              MR. JACK O'MALLEY,
                State's Attorney of Cook County,
15              by:  MR. BERNIE MURRAY,
                Assistant State's Attorney,
16              for the People of the State of Illinois;

17              MR. PAUL HICKEY,
                    appeared on behalf of the Defendant.
18

19

20

21

22
      SUZIE W. NOLAN, CSR
23    Official Court Reporter
      5600 Old Orchard - 204
24    Skokie, IL  60077
```

1

C-534  C-405

(36)

1          THE CLERK:  Harry Martin.

2          THE COURT:  Everybody agrees to go back in chambers

3     to make a decision, and whatever else we have to do

4     instead of being in the public.

5          MR. MURRAY:  Gentlemen, my name is Peter Hickey,

6     H-i-c-k-e-y.  I represent Mr. Martin.

7          MR. MURRAY:  Assistant State's Attorney,

8     Murray M-u-r-r-a-y.

9                    (The following proceedings were had in

10                    chambers.)

11         THE COURT:  Anybody want to say anything further

12    about this case or would you like to ask some questions?

13    I will ask the questions first, and then anybody can

14    answer.

15         MR. MURRAY:  That's fine, Judge.

16         THE COURT:  Okay.   First I want to know is when the

17    appellate court reversed some of the findings of the

18    DuPage County court and what counts were -- was the

19    reversal made in.

20         MR. HICKEY:  Judge, I did provide the Court with a

21    copy of the opinion.

22         THE COURT:  I haven't had a chance to read it.   You

23    want to glance over it?

24         MR. HICKEY:  It was in 1984.

2

C.406

C-535

(37)

1            THE COURT:  Whatever.

2                        That is when the reversal was?

3            MR. HICKEY:  Yes, Judge.

4            THE COURT:  You gave it to me, but I have not had a

5     chance to read it.

6                        And what counts were reversed?

7            MR. HICKEY:  Two counts of armed robbery, and the two

8     counts of armed violence.

9            THE COURT:  Go ahead.

10           MR. HICKEY:  And one conviction of UUW.

11           THE COURT:  Remaining.

12                        How many does that leave?

13           MR. HICKEY:  One arm violence and one UUW.

14           THE COURT:  That's it?

15           MR. HICKEY:  Yes, Judge.  Instead of six Class Xs, it

16    became two Class Xs, and he gave thirty-five years.

17           THE COURT:  Originally?

18           MR. HICKEY:  Yes.  And our position that is what you

19    took into account when you gave him the --

20           THE COURT:  I certainly did.  No question about that.

21           MR. HICKEY:  As you were informed on the last in

22    camera proceeding, the DuPage County court in fact granted

23    his petition for post conviction relief and communicated

24    the sentence time served.

3

C.407

C 536

(38)

1          MR. MURRAY:  Which was essentially a sentence of

2     twenty-one years.

3          MR. HICKEY:  Correct.

4          THE COURT:  Twenty-one years.

5               I, of course, having been advised that he

6     had gotten thirty-five years I felt that possibly all of

7     those counts would be -- finding will be sustained, and I

8     gave him ten years consecutive to the thirty-five.

9          MR. HICKEY:  That is correct.

10              And if I can refresh your Honor, I was the

11    Assistant Public Defender that represented Mr. Martin

12    before your Honor back in 1982.  At that time your Honor

13    was willing to give him -- strike that.   Concurrent

14    sentence.   But because we felt that we were on firm

15    footing getting that sentence reversed, we didn't want a

16    concurrent sentence.  I know that was your Honor's

17    impression.

18         MR. MURRAY:  Well, I have no information to support

19    that claim by counsel, and obviously something that

20    happened back in 1981 we are talking about thirteen years

21    ago.   If there is any memorandum or notes to confirm that

22    that is one thing.  But for him to say it like that is

23    unreasonable at this point.

24         MR. HICKEY:  It is my independent recollection.

                              4        C-408      (39)

1          THE COURT:  Okay.  Now, he is scheduled to be

2    released when?

3          MR. HICKEY:  About two and a half years.

4          THE COURT:  Two and a half years.

5                    How old is your daughter?

6          THE DEFENDANT:  She is seven.  She will be eight in

7    August.

8          THE COURT:  Seven years old.

9                    Now, it is my understanding that both will

10   remain in protective custody.  She can't get in the

11   protective custody without you?

12         THE DEFENDANT:  Correct.

13         THE COURT:  Where is she now?

14         THE DEFENDANT:  She is in a foster home down state.

15         THE COURT: Okay.  Any protection there?

16         THE DEFENDANT:  Under a false identity.

17         THE COURT:  Anybody want to say anything?

18         MR. HICKEY:  No, your Honor.

19         MR. MURRAY:  Judge, I would just reiterate -- well,

20   two points.  First I would reiterate the argument made on

21   the last court date regarding the statute of limitations

22   on counsel's petition both as mandamus, the substance of

23   mandamus and the post conviction itself.  It is our belief

24   under the Bates decision it is untimely filed.

5

C-409  (40)

538

1            Judge, just regarding your Honor's

2    consideration of a new sentence, a reduction in sentence,

3    which essentially is a relief post conviction petition to

4    ask for.

5            If I can just put a couple of points on the

6    record.

7        THE COURT:  Certainly.

8        MR. MURRAY:  One, Judge.  I do not believe that it

9    raises a proper constitutional issue which of course has

10    to be the subject of post conviction petition.  You can't

11    raise any issue under the sun.

12            Second point, it relates to the plea itself

13    at an arms length plea back in 1981.  He was sentenced to

14    ten years consecutive to thirty-five.

15            Now, your Honor believed that the

16    thirty-five years would withstand appellate scrutiny.

17    You intended for him to receive a sentence of forty-five

18    years total in the penitentiary.  And now that the DuPage

19    County sentence has been reduced to twenty-one years

20    approximately fourteen years difference out there,

21    counsel asked to reduce his sentence further here.

22            It seems to me that not being part of the

23    plea negotiations back in 1981, but just looking at him on

24    the face seems that it can also be argued that your Honor

6

C-410    (41)

C 529

1    intended to punish him more severely than the thirty-five

2    years sentence, and that your Honor took into

3    consideration the fact that the thirty-five was a base.

4         What I am trying to say is you would have

5    given more if he didn't receive thirty-five from DuPage.

6         Judge, finally regarding the facts you

7    considered if you do choose to resentence Mr. Martin, I

8    ask you to consider what was raised in the cross

9    examination of Mr. Martin on the last court date.

10        Essentially evidence --

11   THE COURT:   I read it.

12   MR. MURRAY:   -- of his further criminal activities in

13   the penitentiary which I think is to use the word is

14   significant.  I do not think most people do it out in the

15   street much less doing through the penitentiary system.

16   THE COURT:   That is twenty-one years ago.

17   MR. MURRAY:   Well, I am talking -- referring to my

18   cross examination of Mr. Martin.  We are talking about

19   what he was doing in 1977 and '78 in the penitentiary.

20   That is certainly not twenty-years ago.

21        But in any event, I would ask you to

22   reconsider your Honor's rulings from the last court date.

23   And if your Honor does choose to resentence Mr. Martin

24   under the post conviction to look at it whether there is

7

C-411

(42)

1    appropriate constitutional issue there, and then finally

2    to look at his criminal behavior in the penitentiary which

3    was certainly significant.

4         THE COURT:  I have taken everything into

5    consideration.  And as you have reiterated and I stated

6    at the outset, I felt that he was -- he was sentenced with

7    the assumption that the more important and the worse

8    counts in the indictment or information would be

9    sustained.  So I think that Mr. Martin had done enough

10   time, so I am going to give him time served, actually

11   served and considered served.

12       MR. HICKEY:  Thank you, Judge.

13       THE COURT:  I think that is only fair.  I am also

14   taking into consideration how long ago this happened, and

15   he has a seven-year old daughter in my opinion who

16   deserves some protection and the love of a father, and I

17   think that he will.  People change, you know.  Okay.

18       MR. HICKEY:  Thank you, your Honor.  Have a good day.

19       THE COURT:  Whatever I have to sign, just prepare it.

20       MR. HICKEY:  Thank you, Judge.  I will inform the

21   clerk as to what your Honor's ruling along with Mr.

22   Martin.

23       THE COURT:  Thank you both.

24       MR. MURRAY:  Thank you, Judge.

C.412

A 541

(43)

1          THE COURT:  Thank you all.

2                      (The following proceedings were had in open

3                      court.)

4          THE COURT:  There is something that should be

5     changed.  You know what I want to do.   Prepare any order

6     that are -- will accomplish what I want to do.

7          MR. HICKEY:  Mr. Murray and I agree that a new

8     Mittimus should issue.  We have both spoken with your

9     clerk and informed what your Honor's ruling was that being

10    granting the petition and giving him time served.

11         THE COURT:  Time served, actually time considered

12    served.

13         MR. HICKEY:  Thank you, your Honor.

14                      Judge, can we -- Mr. Murray I believe will

15    agree the file has been sealed up until this point.  Can

16    we continue to have the file sealed?

17         THE COURT:  Yes, it is back there now.

18                      Time served, actually served.  Release

19    today.

20         THE CLERK:  Any amount of years?

21         THE COURT:  Well, he was sentenced to thirty-five  in

22    DuPage.  I gave him ten consecutive.   They found him not

23    guilty of most important counts in DuPage, the armed

24    robbery and armed violence.   It was still two Class Xs

9

C.413

(44)

1    remaining, but he already done twenty-three years, and I

2    think that is enough.

3         MR. HICKEY:  Is our guy from the State's Attorney?

4         THE COURT:  Mr. Murray was here.

5         THE CLERK:  You are reducing it to twenty-three years

6    IDOC time considered served?

7         THE COURT:  Whatever it is.

8              Not reducing.  I just gave him ten.  You

9    can't reduce ten from twenty.  I gave him ten consecutive.

10   I am reducing it ten or whatever time considered served.

11   I do not know how much of that you are going to allocate.

12   It was reduced in DuPage to twenty-three years from

13   thirty-five.  So I am reducing it to time served whatever

14   part of that will cover mine.

15        THE CLERK  Okay.

16        THE COURT:  The attorney can figure that.

17              (Which was all the evidence offered and

18               received and all other proceedings had

19               in the trial of the above cause.)

20

21

22

23

24

                    10

                                    C.414

                        C-543

                                    (45)

```
1    STATE OF ILLINOIS  )
                         )  SS:
2    COUNTY OF C O O K  )

3

4         IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT - MUNICIPAL DIVISION,
5

6              I, SUZIE W. NOLAN, Official Court Reporter

7    of the Circuit Court of Cook County, Municipal

8    Department - Second Municipal District, do hereby certify

9    that I reported in shorthand the proceedings had on the

10   hearing in the aforementioned cause; that I thereafter

11   caused the foregoing to be transcribed into typewriting,

12   which I hereby certify to be a true and accurate

13   transcript of the report of Proceedings had before the

14   Honorable FRANCIS MAHON, Judge of said court.

15

16                    Suzie W. Nolan

17            Official Court Reporter   084-003001

18

19

20

21

22

23

24
```

11

C.415

N-544

(46)

1            IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
                       LIVINGSTON COUNTY, ILLINOIS
2

3    PEOPLE OF THE STATE OF          )
       ILLINOIS,                     )
4                                    )
             Plaintiff,              )
5                                    )
             vs.                     )      87-CF-112
6                                    )
     DAVID W. CARTER,                )
7                                    )
             Defendant.              )
8

9                             _____

10

             REPORT OF PROCEEDINGS of the hearing before the
11   Honorable Harold J. Frobish, on the 1st day of May, 2003.

12           APPEARANCES:

13           LISA ANNE HOFFMAN
             ASSISTANT ATTORNEY GENERAL
14           100 West Randolph Street
             12th Floor
15           Chicago, IL 60601

16                   for the Plaintiff.

17           W. KEITH DAVIS
             ATTORNEY AT LAW
18           237 East Front Street
             Bloomington, IL 61701
19
                     for the Defendant.
20

21   Dora L. Immke, C. S. R.
     Official Court Reporter
22   License No. 084-004364
     Livingston County Courthouse
23   Pontiac, IL 61764
     (815) 844-5172
24

(47)

1            THE COURT:   In 87-CF-112, People vs. David Carter,

2    Miss Hoffman appears from the Office of Attorney General,

3    the defendant appears in the custody of the Department of

4    Corrections with his attorney, Mr. Davis.

5            Scheduled for hearing today are several discovery

6    motions filed by Mr. Davis and also a motion to dismiss

7    filed by Miss Hoffman.

8            So, that the record is clear here, we've had very

9    lengthy proceedings as this matter developed.  This all

10   started out September 10 of 1998, when I entered an order

11   docketing a combination petition.  There was a

12   postconviction petition and a petition for the relief

13   of judgment.  I first appointed David Ahlemeyer who was

14   then public defender on October 23 of '98.  I vacated that

15   appointment and I appointed Carey Luckman who did a lot of

16   work on this case.  Mr. Luckman, after reviewing

17   transcripts and the like filed on February 16, 1999, a

18   motion to excuse late filing.  The petition of Mr. Carter

19   was late in terms of the postconviction statute and the

20   petition for relief from judgment.  And -- Argument is

21   heard.

22           On April 23 of '99, I entered an order denying the

23   motion to excuse late filing of the postconviction

24   petition.  So, that petition is gone.  But I granted the

1    defendant's motion to excuse late filing under 2-1401. For
2    practical purposes, I think the 2-1401 petition amounts to
3    a postconviction petition, but they are two separate
4    remedies and filings.

5        The Attorney General's Office felt that I was wrong
6    in that decision and filed a motion to reconsider on July
7    26 of '99; and after that, there's been a great, great deal
8    of effort directed to whether a reduction in sentence was
9    given to Harry Martin who was a gang leader purportedly,
10   whether a reduction in sentence was granted to him in
11   exchange for his testimony in the trial. And on August 19
12   of 1999, I directed an investigation be undertaken to
13   determine what was in fact disclosed at trial. What did
14   Harry Martin say?

15       On December 15 of 2000, Mr. Luckman, that's probably
16   when he became a prosecutor, I needed to find a new defense
17   lawyer; so, I appointed Eric Frobish who has the
18   same last name as the trial judge but is sufficiently
19   distantly related that there would be no disqualification
20   involved. That did not work out because he moved, as I
21   understand it, or for some other reason.

22       In any event, on February 22nd, 2001, I appointed
23   Paul Lawrence of Bloomington. And then October 18 of 2001,
24   where this alleged reduction in sentence took place, I

32

(49)

1    directed some investigation occur regarding what actually
2    happened in DuPage County.  That's where the alleged
3    reduction took place, if there was a reduction.  The only
4    question was:  Why was there a reduction?  So, there was
5    much work spent getting transcripts and that type of thing.

6        Then Paul Lawrence became a judge; so, on April 15
7    of 2002, I appointed Mr. Davis.  And on May 14 of 2002, I
8    ordered that the transcript of the overhear be produced.
9    It's probably the most single -- The piece of evidence that
10   was most important in this trial was an overhear that was
11   conducted between Mr. Martin and the defendant, and I
12   ordered that the transcript be produced.  And presumably
13   Mr. Davis has seen that.

14       On July 12 of 2002, Mr. Davis filed numerous
15   motions; and those have yet to be ruled on.  Those motions
16   were filed before I took dispositive action on the State's
17   motion to reconsider my prior decision on the 2-1401
18   petition.  And on October 22 of 2002, I did deny that
19   motion to reconsider.

20       So, we have pending at this time the 2-1401
21   petition, we have pending at this time some motions for
22   discovery; and we're going to talk about those in a second.
23   It seems to me, most, if not all, have been rendered moot
24   by the relief I've already granted to the defendant.

1         A motion to dismiss has been filed directed to the

2    2-1401 petition.  We've had various status conferences

3    getting ready for today.  It's not clear to me, Mr. Davis,

4    that we have on file here a 651(c) petition from you; so,

5    I'm going to ask, in due course, that that be accomplished

6    so that our record is clear.  I know you've done a great

7    deal of work on this file, but I want to make sure that

8    there be a 651(c) certification.  That may be directed, I

9    don't remember, only at the postconviction statute, but, in

10   any event, I think we ought to have it because the 2-1401

11   amounts to postconviction petition.

12        So, let me see if we agree where we're at.  We need

13   to first, I need to first dispose of, in some fashion,

14   these various motions of Mr. Davis; and then, depending on

15   what happens there, we need to have a hearing on the motion

16   to dismiss.

17        Is that the way you see it, Mr. Davis?

18        MR. DAVIS:  Yes, sir.

19        THE COURT:  And, Miss Hoffman?

20        MS. HOFFMAN:  Yes.

21        THE COURT:  All right.  Looking at the motion, --

22   Let me ask.  I just said a whole mouthful, Mr. Carter.  Did

23   you understand what I said?

24        THE DEFENDANT:  Very well.

```
 1              THE COURT:  Okay.  Mr. Davis has filed a number of
 2      discovery motions.  They are a motion for leave to take
 3      evidentiary depositions and for the furnishing of expenses.
 4      These would be directed to people who would have knowledge,
 5      Donald Bernardi who was then State's Attorney but who is
 6      now a judge, Tom Brown who is now the State's Attorney,
 7      James Casson who was a prosecutor, now is privately
 8      practicing.
 9              There's a second discovery motion, motion for order
10      to the State's Attorney's Office for DuPage County, Cook
11      County, Livingston County to provide their files for an
12      in-camera inspection by the Court and for leave to take
13      evidentiary depositions and for the furnishing of expenses
14      attaching thereto, C, as I call it, we have a motion to
15      produce Harry Martin for testimony and for an order
16      requiring the State's cooperation in obtaining his presence
17      to testify.  We have a motion for order to admit fact under
18      the Code of Civil Procedure.
19              And, finally, E, we have a motion for order to
20      produce overhear tape.  With respect to the last one, I do
21      note that Miss Hoffman has furnished a transcript of that.
22      So, it seems to me, we've dealt with that.
23              With respect to A through D, as I call them, all the
24      others, explain to me, Mr. Davis, why these have not been
```

1    rendered moot, first of all, by my denying the Attorney

2    General's relief that's requested, and, secondly, in any

3    event, they shouldn't be entertained unless the defendant

4    can get by a motion to dismiss.

5        MR. DAVIS:  Well, obviously, if the case is

6    dismissed, the case is dismissed.  It is our contention

7    that Mr. Carter, has in his dual motion as the Court has

8    put it, stated a cause of action, 2-1401.  Mr. Carter has

9    clearly stated that at trial Harry Martin made a deal in

10   effect with the State's Attorney's office.  That deal was

11   to obtain perjured testimony against Mr. Carter; that, in

12   fact, perjured testimony was obtained; and that the State

13   knew it.

14       In effect, what the State's, what the Attorney

15   General's motion is is an attack on the pleadings.  That's

16   what the State says, that, if the pleadings and their

17   factual averments are accepted to be true, which is what

18   the Court must do at this juncture, the Court must assume

19   that every fact that Mr. Carter has pled in his dual motion

20   is in fact true.  If, based upon the truthfulness of those

21   assertions he states a cause of action, then the State

22   cannot prevail on this motion to dismiss.

23       It is our position that in point of fact, Mr. Carter

24   has stated a valid cause of action in 2-1401.  He has

1    averred every single element of the 2-1401 theory upon

2    which we are founding our action in court today, that there

3    was a deal, that it was used to procure Mr. Martin's

4    perjured testimony, that it did in fact procure Mr.

5    Martin's perjured testimony, and that the State knew it.

6.   Accordingly, we submit that Mr. Carter's 2-1401 petition

7    should survive and the State's motion ought be denied.

8         Having said that, it is our position that the

9    various motions that I'm requesting concerning discovery,

10   and you're absolutely right, I've listed basically every

11   one that I could think of as possibly having firsthand

12   knowledge, not double hearsay or triple hearsay, but

13   firsthand knowledge, the State's Attorney and chief

14   prosecuting attorney at the time, the prosecuting attorney

15   in DuPage County wherein, as the Court is well aware I

16   presume having reviewed the transcripts that I have

17   reviewed and Miss Hoffman has presumably reviewed, there

18   was a substantial, in fact, drastic reduction in Mr.

19   Martin's testimony [sic], we submit that Mr. Carter has at

20   least stated --

21        THE COURT:  Reduction in the sentence?

22        MR. DAVIS:  Reduction of the sentence, correct.

23        THE COURT:  Okay.

24        MR. DAVIS:  We submit that Mr. Carter has stated a

1   cause of action sufficient to allow those discovery motions

2   to proceed.  There is no other way, as a practical matter,

3   that Mr. Carter can show that the State knowingly procured

4   perjured testimony other than to get individuals from the

5   State to give discovery and for us to obtain the

6   documentary discovery which I am seeking here.

7       As far as Mr. Martin's presence, as perhaps the

8   Court knows, perhaps the Court does not know, but at the

9   last transcripts out of DuPage county, it was represented

10  in the transcript I believe that Mr. Martin was in the

11  protection program, the witness protection program.  We

12  have, I personally contacted Aviva Futorian who is Mr.

13  Martin's prior attorney to try to obtain his whereabouts.

14  She doesn't know where he is.  I have attempted to locate

15  Mr. Leonard Cox who is the attorney who verified Mr.

16  Martin's affidavit which is attached to Mr. Carter's

17  petition.  Mr. Cox, to the best of my knowledge,

18  information and belief has retired and is no longer

19  practicing law; his whereabouts are unknown.  Those are the

20  only two people from the defense side that I know who could

21  possibly get in touch with Mr. Martin.

22      The only thing that I have right now is a piece of

23  paper that is written in Mr. Martin's name and which bears

24  his signature; but that piece of paper is not sufficient

1    for me to go forward unless the State admits its

2    truthfulness, hence my request to admit fact, or we can

3    prove it extrinsically by means of Mr. Martin's testimony

4    or other methods.

5         Accordingly, I submit that my requests for discovery

6    are reasonable and ought be allowed.  Thank you.

7         THE COURT:  All right.  Miss Hoffman.

8         MS. HOFFMAN:  Your Honor, I suppose that my response

9    to both of the discovery motions --

10        THE COURT:  Just argue both of them.

11        MS. HOFFMAN:  It's really the same argument.  First

12   of all, I've set it forth quite succinctly I think, but,

13   just for the record, it's the People's position that in

14   fact Mr. Carter's 2-1401 petition does not plead

15   sufficiently to permit, to afford him relief.  What he must

16   demonstrate, facts must be alleged and proved by clear and

17   convincing evidence which show that, that establish grounds

18   for relief and show that -- Pardon me, because I'm just

19   looking through this and not finding what I'm supposed to

20   be saying right now which is never a good thing.

21        THE COURT:  Page 2 is what --

22        MS. HOFFMAN:  There may have been -- What he needs

23   to demonstrate is that this was a material fact that would

24   it, had it been known to the judge at the time of the

1    trial, it would have changed the outcome of the judgment or

2    it would have, I guess in traditional terms of 2-1401,

3    would have prevented entry of the judgment. And, in this

4    case, what we are saying is, what Mr. Carter has alleged is

5    only that, had this information been known at the time,

6    assuming for the sake of this pleading that the facts

7    alleged are true, had Mr. Martin's inducements provided by

8    the Department of Corrections to Mr. Martin in exchange for

9    his testimony been known, the most that could have happened

10   is that Mr. Martin's testimony would have been impeachable.

11          However, there's no suggestion that that evidence

12   would have provided a basis for the trial court to deny the

13   admission of the tape into evidence. And when we have the

14   tape in the evidence, we have, that's essentially what the

15   Appellate Court has already said: Would have it, it

16   provided the overwhelming evidence of guilt without Mr.

17   Martin? Yes, you would have been able to impeach Mr.

18   Martin. But would you have been able to avoid the

19   admissibility of that tape? No. And since he cannot

20   provide, he did not plead facts which suggest that had they

21   been known to the Court they would have changed the

22   outcome, he's not entitled to relief under 2-1401, and

23   that's on the basis of the pleadings.

24          For the same reason, we believe that the discovery

1    motions are inappropriate because they all go to that same

2    issue; and, once again, if the issue itself cannot provide

3    the basis for relief under 2-1401, then there is no reason

4    to go forward with such discovery.

5              THE COURT:  Any response, Mr. Davis?

6              MR. DAVIS:  The only thing that I would also point

7    out, Judge, is that it's my understanding that, at trial,

8    Harry Martin not only testified to the requisite facts

9    concerning the admissibility of the tape, but he also gave,

10   as I recall, substantial and fairly extensive testimony

11   regarding, for instance, Mr. Carter's alleged role in gang

12   hierarchy at the Pontiac correctional facility, the means

13   by which the gang hierarchy engaged in what was effectively

14   a conspiracy to commit bodily harm and ultimately the

15   murder of Warden Taylor and other aspects not connected,

16   either directly or even indirectly, to the tape which would

17   render Mr. Martin's testimony crucial concerning Mr.

18   Carter's actual criminal responsibility on an

19   accountability theory under Illinois criminal law.

20   Remember, the factual setting of the case was not that Mr.

21   Carter committed the actual acts which resulted in Warden

22   Taylor's death; but, rather, the State's theory was that

23   Mr. Martin, I'm sorry, Mr. Carter, commanded others to

24   perform acts which led to that death, and, without Mr.

 1   Martin's testimony concerning that hierarchy and the

 2   participation of Mr. Carter in that hierarchy, the State's

 3   case cannot proceed.

 4        Accordingly, although I understand that the State

 5   relied heavily on the tape, it was obviously an important

 6   piece of evidence, it was by no means the only piece of

 7   evidence that Mr. Martin testified to.  He testified, as I

 8   recall, for a very long time concerning matters not

 9   resolved, I'm sorry, not involving the tape; and,

10   accordingly, while I understand the prosecutor's urgings

11   concerning the tape, in no way does her argument go to that

12   other testimony which was, in our view, crucial.  Thank

13   you.

14        THE COURT:  All right.

15        Any final reply, Miss Hoffman?

16        MS. HOFFMAN:  Your Honor, I would just direct the

17   Court's attention, as I have previously, to the Rule 23

18   order of the Appellate Court on direct review of Mr.

19   Carter's case because I think that they did in fact address

20   some allegations regarding other aspects of Mr. Martin's

21   testimony.  Those were ultimately found, those arguments

22   were found waived; but, when doing analysis on whether or

23   not a plain error analysis was appropriate, the Court says,

24   plain error could not possibly be appropriate with respect

1    to Mr. Martin and the propriety of his testimony because
2    the evidence was not closely balanced in any area that
3    might have occurred as a result of Mr. Martin's testimony.
4    It was not so fundamental and of such a magnitude to deny
5    him a fair trial.  And I'm quoting from page 12:  Martin
6    testified that defendant admitted directing Lucas and
7    Easley to attack Taylor.  On appeal, defendant does not
8    challenge this fact or the fact that Taylor was murdered by
9    Lucas and Easley.

10    Again, I think the Appellate Court's position is
11    that Mr. Martin's testimony, and, again, they were talking
12    about his testimony with respect to issues other than the
13    overhear tape, was not so substantial that it had a
14    fundamental part in this case; and, in fact, the evidence
15    regarding the tape was the overwhelming evidence that made
16    this case not closely balanced.

17    So, while I certainly don't disagree that Mr. Martin
18    testified to other things, I think, in the end, what sealed
19    the case was the tape; and the Court had found that that
20    was the overwhelming evidence.  And, as the Court stated,
21    Mr. Carter did not challenge that admission by Mr. Taylor
22    on direct appeal, and that's what they found controlled
23    factually in this case.

24    THE COURT:  All right.  The postconviction petition

1    and petition for relief from judgment filed August 10,

2    1998, has several contentions.  Central to all of those

3    contentions is the proposition put forth by the defendant

4    that the, or, a key witness against defendant was Harry

5    Martin.  The key to this case, I find, is the tape.  The

6    Appellate Court summarized the contents of that tape on

7    pages 14 and 15 of its opinion of June 30 that was filed

8    June 30, 1993.  That opinion states as follows:

9          According to the tape recording of the conversation

10   between Martin and defendant, defendant became upset when

11   Martin suggested that Jones died accidentally as a result

12   of overdosing on a bag of cocaine.  Defendant insisted that

13   Jones had ample time to flush the cocaine down the toilet

14   before the guards came for him and that he would not have

15   attempted to stuff a medicine bag filled with cocaine in

16   his mouth.  Defendant told Martin that Taylor was murdered

17   to avenge Jones' murder and the administration's treatment

18   of BGD members.  Defendant stated that the order to attack

19   Taylor was handed down to him by his superiors in the gang

20   and that he, as unit security officer, implemented that

21   order by procuring Easley and Lucas to carry out the deed.

22   According to defendant, preparations for the attack on

23   Taylor were made three to four weeks prior to the event.

24   It was arranged that Easley and Lucas would hit Taylor in

1   the head with pipes.  They wore masks and gloves and just

2   left the weapons at the scene.  The weapons had been wiped

3   clean of fingerprints.  Defendant admitted helping wipe off

4   the fingerprints.  However, defendant also said the attack

5   on the other superintendent by another inmate named Chico,

6   C-H-I-C-O, was an "isolated incident."  Defendant made no

7   mention of threats to guards.

8        The tape in crass terms is the guts of the State's

9   case against this defendant, I find.

10       It is true that Martin gave background testimony of

11  how gangs operated at the Pontiac Correctional Center at

12  that time.  That has some importance.  And, as this case

13  has gone on since I got into it in September of '98, I have

14  seen nowhere it contended or argued, in any substantial

15  manner, that the background information given by Martin was

16  incorrect.  As I understand it, and I wasn't here, he was

17  quite a performer and he enjoyed his day in court and the

18  attention he was getting.  But he testified how gangs

19  worked out there, and I've not gleaned from the record or

20  otherwise that his testimony, in terms of general activity

21  of gangs, was incorrect.

22       So, I think central to Mr. Carter's arguments are,

23  you know, what is the key to the case?  I think the key to

24  the case is the tape.

(62)

1           Now, we have in the petition, the postconviction

2     relief and petition for relief from judgment, the

3     contention that somehow that tape should not have been

4     admitted because it was obtained by fraud, collusion,

5     trickery, insubordination, perjury, et cetera.   The

6     admissibility of that tape has already been ruled; and

7     Judge Glennon initially suppressed it because he felt the

8     defendant was in custody.   The Fourth District Appellate

9     Court said, no, for purposes of custody, for purposes of

10    the admission of the tape, the defendant was not in

11    custody; admissibility of this tape does not depend on

12    Martin's motive for cooperating.   The issue of the

13    admissibility of the tape has been sealed, and there's

14    nothing in this petition by the defendant that would cause

15    a different result.

16          There is mentioned in Mr. Carter's petition about

17    closing arguments being improper regarding his failure to

18    testify.   I find that those are waived; and, in any event,

19    the line was not crossed.   What we spent four years plus on

20    really is this so-called, newly discovered evidence where

21    Mr. Carter contends that there was a deal made Mr. Martin;

22    and, as part of Mr. Martin's testimony here in this case,

23    the defense was not made aware of that deal and perjury

24    therefore occurred when Mr. Martin testified at least

1    initially that there was no deal.  And after the trial, or

2    before the trial, I forget which, he did get his sentence

3    reduced to time served up in DuPage County.

4            THE DEFENDANT:  What about the false testimony given

5    in application for the authorization of the wire tap?

6            THE COURT:  Well, I've dealt with that, Mr. Carter,

7    I've dealt with that; and the Fourth District Appellate

8    Court has dealt with that.  On this point of the importance

9    of this reduction in sentence, we have worked diligently

10   four years now trying to get to why this reduction took

11   place.  It is not clear to me that the reduction took place

12   because of the testimony given by Mr. Martin here.

13           In any event, even if that were true, even if that

14   were true, it has not been shown here that Mr. Martin's

15   testimony was untrue.  It has not been shown that his

16   testimony was untrue.  And, furthermore, even if Mr. Martin

17   got a reduction in sentence because of his cooperation in

18   coming down here and testifying, I find that that

19   circumstance, if true, would not have made a difference in

20   this trial.

21           We have to look to the case law as to when such a

22   circumstance would make a difference.  In People vs.

23   Williams, a Fifth District case June 28, 2002, 265 Ill.Dec.

24   781, I'm looking at page 787:

1            In accord with the United States Supreme Court,

2    Illinois has long recognized that a conviction based upon

3    false testimony is contrary to fundamental principles of

4    fairness.  It is further well established that the State's

5    knowing use of perjured testimony to obtain a conviction

6    constitutes a violation of due process of law and must be

7    set aside if, if there is any reasonable likelihood that

8    the false testimony could have affected the jury's verdict.

9            A very recent case that I came across March 13 of

10   2003, People vs. David Thurman, --

11            MR. DAVIS:  How do you spell that?

12            THE COURT:  T-H-U-R-M-A-N.

13            MR. DAVIS:  Thank you.

14            THE COURT:  Fourth Division of Cook County, March

15   13, 2003.  I have, my computer skills are not wonderful.  I

16   see that the number 1002841.ht.

17            MS. HOFFMAN:  That is 1002841 would be, that's the

18   Appellate Court number --

19            THE COURT:  Okay.  There, the case dealt with a

20   postconviction petition.  And there was a murder and the

21   question about the importance of that testimony.  The

22   Appellate Court there cites the Williams case and says at

23   page 3 of 4:

24            Therefore, even assuming that Alvarez received

1     consideration in exchange for his testimony, and the State

2     failed to disclose it, it is unreasonable to conclude that

3     Alvarez's uncorrected testimony to the contrary affected

4     the outcome of this case.

5          So, I think it comes down to that.  It's not clear

6     to me at all that there was fabrication.  It's not clear to

7     me at all why the reduction in sentence occurred.  But,

8     even if all those things are true, with this tape, Mr.

9     Carter, I think your fate was sealed.  This is a damaging

10    tape, it is a damning tape; and it is the crux, it is the

11    crux of the case, and it is damaging to you to an extent

12    that you can't recover from it.

13               THE DEFENDANT:  The whole tape is allowable --

14                         (Whereupon the court reporter

15                         asked that the defendant repeat

16                         what he said.)

17               THE DEFENDANT:  If the whole tape is allowable --

18               THE COURT:  Well, be that as it may, I believe the

19    motion to dismiss of the Attorney General's Office here is

20    meritorious; and I am granting that motion to dismiss

21    today.

22          I do believe these various motions for leave to take

23    evidence depositions and the like may have needed to be

24    entertained and maybe some granted if I hadn't denied the

49

(66)

1   State the relief that it wanted.  These, I think many of

2   them went to when, why, whatever; but I denied the State's

3   motion to reconsider.  We don't get to those things if I

4   grant the motion to dismiss.  So, I find that these various

5   matters have either, one, been rendered moot, these various

6   motions have either, one, been rendered moot or they were

7   premature because the petition of the defendant cannot

8   withstand a motion to dismiss.

9       Now, the court reporter is directed to prepare a

10  transcript of today's proceeding, furnish a copy to Mr.

11  Davis, furnish a copy to Miss Hoffman.  Before we go today,

12  Mr. Davis, I'd like your 651(c) certificate.

13      You appear very much, Mr. Carter, to understand what

14  it is that I've said.  Does he have any questions?

15      THE DEFENDANT:  I would like a copy of the

16  transcript also.

17      THE COURT:  All right.  We'll furnish that to Mr.

18  Davis, and he's your lawyer, he needs to be the one to

19  contact you.  We'll let him furnish it to you.

20      And is there anything else we need to do today,

21  Counsel?

22      MR. DAVIS:  Judge, the State having succeeded in its

23  motion to dismiss, Mr. Carter may wish to appeal the ruling

24  of today.

(67)

```
 1                  THE COURT:  Right.

 2             MR. DAVIS:  If that's the case, --

 3             THE COURT:  Presumably he will.

 4             MR. DAVIS:  What?

 5             THE COURT:  Presumably he will.

 6             MR. DAVIS:  I presume that he will.  I would ask

 7   that the Court entertain a preparation by the clerk of a

 8   timely notice to appeal and appoint the Appellate Defender

 9   --

10             THE COURT:  Yes.

11             MR. DAVIS:  -- for the purpose of that kind of

12   relief.

13             THE COURT:  Let me suggest this:  This may be

14   something that you want to file a motion to reconsider or

15   maybe you've already made that determination, I don't know.

16   If you just call me and say, file the notice of appeal,

17   I'll do it right there, unless you want me to go ahead and

18   do it right now.  That's fine.  Maybe you want to talk to

19   him.

20             MR. DAVIS:  May I have a few words with Mr. Carter?

21             THE COURT:  That's fine.  Why don't you --

22             THE DEFENDANT:  File the notice to appeal

23   because you're not going to change your mind and --

24             THE COURT:  I don't think I will change my mind --
```

```
 1            THE DEFENDANT:  So, what's the point of doing this?

 2            THE COURT:  I worked very hard, Mr. Carter, I think

 3    I understand it.  I always try to keep an open mind.  I

 4    don't think I will, I can't think of any reason I would;

 5    so, why don't we go ahead and do that.  The clerk is

 6    directed to file a notice of appeal and the Appellate

 7    Defender is appointed to represent you.  And you'll be in

 8    contact with, Mr. Carter, the Appellate Defender when they

 9    get a copy of the order.  So this is going up.  All right.

10            MR. DAVIS:  Thank you.

11            THE COURT:  Thank you.

12                         (Which was all the evidence

13                          offered and received and all

14                          other proceedings had in the

15                          hearing of the above cause.)

16                          * * * * * * * * *

17

18

19

20

21

22

23

24
```

(69)

```
 1              IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

 2                        LIVINGSTON COUNTY, ILLINOIS

 3

 4          I, Dora L. Immke, an Official Court Reporter for

 5     the Circuit Court of Livingston County, Eleventh Judicial

 6     Circuit of Illinois, do hereby certify that I reported in

 7     shorthand the proceedings had on the hearing in the

 8     above-entitled cause; that I thereafter caused the

 9     foregoing to be transcribed into typewriting, which I

10     hereby certify to be a true and accurate transcript of the

11     proceedings had before the Honorable Harold J. Frobish,

12     Judge of said court.

13

14                                    Dora L. Immke, C. S. R.
                                      Official Court Reporter
15                                    License No. 084-004364

16     Dated this 30th day

17     of May, 2003.

18

19

20

21

22

23

24
```

(76)

Westlaw

459 N.E.2d 279

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

▷
People v. MartinIll.App. 2 Dist.,1984.
Appellate Court of Illinois,Second District.
PEOPLE of the State of Illinois, Plaintiff-Appellee,
v.
Harry MARTIN and Dennis McClinton,
Defendants-Appellants.
**Nos. 82-105, 82-114.**

Jan. 12, 1984.
Rehearing Denied Feb. 23, 1984.

Defendants were convicted in the 18th Circuit
Court, DuPage County, Charles Norgle, J., of two
counts of armed robbery, two counts of armed
violence and two counts of unlawful use of
weapons, and they appealed. The Appellate Court,
Van Deusen, J., held that: (1) initial detention of
defendants by police officers was justified based on
defendants' close resemblance to a circulated,
composite physical description of suspected robbers
and fact that defendants' vehicle was parked outside
a restaurant at the same approximate time as the
previous robbery of similar restaurant; furthermore,
police acted reasonably in drawing their guns,
ordering defendants out of their vehicle and then
conducting an immediate pat-down search of
defendants; (2) two counts of armed robbery and
two counts of armed violence, which arose from
same single act committed during robbery, could
result in only one conviction and sentence for each
defendant; furthermore, where two counts of
unlawful use of weapons also arose from a single
act, one count of that offense would be vacated;
and (3) where defendants received separate
sentences for multiple convictions, they were not
entitled to resentencing on the convictions affirmed
on appeal where certain convictions were vacated.

Affirmed in part and reversed in part.
West Headnotes
**[1] Searches and Seizures 349 ⬅165**

349 Searches and Seizures

349IV Standing to Object
349k165 k. Automobile Searches. Most Cited
Cases
(Formerly 349k7(26))
Defendants had standing to challenge detention of
their borrowed vehicle and therefore could contest
legality of police conduct in seizing them.

**[2] Criminal Law 110 ⬅394.5(2)**

110 Criminal Law
110XVII Evidence
110XVII(I) Competency in General
110k394 Evidence Wrongfully Obtained
110k394.5 Objections to Evidence
110k394.5(2) k. Persons Entitled to
Object. Most Cited Cases
No standing problem exists where a defendant
claims that the evidence sought to be suppressed
was obtained as result of an illegal seizure of that
defendant.

**[3] Arrest 35 ⬅63.5(4)**

35 Arrest
35II On Criminal Charges
35k63.5 Investigatory Stop or Stop-And-Frisk
35k63.5(3) Grounds for Stop or
Investigation
35k63.5(4) k. Reasonableness;
Reasonable or Founded Suspicion, Etc. Most Cited
Cases

**Arrest 35 ⬅63.5(8)**

35 Arrest
35II On Criminal Charges
35k63.5 Investigatory Stop or Stop-And-Frisk
35k63.5(8) k. Justification for Arrest or
Pat-Down Search. Most Cited Cases
"Stop and frisk" rule of *Terry* involves a two-part
procedure: first, police officer must have a
reasonable, articulable suspicion of criminal activity
to justify detention and, second the "frisk" of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279                                                Page 2

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

person detained must be based on a reasonable fear that defendant is armed, and limited to a pat-down search for weapons. S.H.A. ch. 38, ¶¶ 107-14, 108-1.01.

**[4] Arrest 35 ⛥63.5(5)**

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(3) Grounds for Stop or Investigation
            35k63.5(5) k. Particular Cases. Most Cited Cases

**Arrest 35 ⛥63.5(8)**

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(8) k. Justification for Arrest or Pat-Down Search. Most Cited Cases
Initial detention of defendants by police officers was justified based on defendants' close resemblance to a circulated, composite physical description of suspected robbers and fact that defendants' vehicle was parked outside a restaurant at the same approximate time as the previous robbery of similar restaurant; furthermore, police acted reasonably in drawing their guns, ordering defendants out of their vehicle and then conducting an immediate pat-down search of defendants.

**[5] Searches and Seizures 349 ⛥192.1**

349 Searches and Seizures
    349VI Judicial Review or Determination
        349k192 Presumptions and Burden of Proof
            349k192.1 k. In General. Most Cited Cases
    (Formerly 349k192, 349k7(29))
Burden of proof that a search and seizure in a public place was unlawful is on person seeking to challenge the seizure or suppress evidence.

**[6] Criminal Law 110 ⛥1158(2)**

110 Criminal Law
    110XXIV Review
        110XXIV(O) Questions of Fact and Findings

            110k1158 In General
                110k1158(2) k. Conclusiveness of Findings on Preliminary Proceedings in Conduct of Trial in General. Most Cited Cases
Finding that a particular detention was reasonable will not be disturbed on review unless manifestly erroneous.

**[7] Arrest 35 ⛥63.5(7)**

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(7) k. Mode of Stop; Warnings; Arrest Distinguished. Most Cited Cases
Fact that police officers halted defendants with guns drawn and conducted a pat-down search without preliminary questioning did not necessarily convert an investigatory stop into an arrest.

**[8] Searches and Seizures 349 ⛥63**

349 Searches and Seizures
    349I In General
        349k60 Motor Vehicles
            349k63 k. Plain View. Most Cited Cases
    (Formerly 349k3.3(4), 349k7(1))
Since defendants' detention was lawful, police officer was rightfully in a position where he could observe interior of defendants' vehicle and therefore money bag matching description of bag used in robbery was properly visible within plain view doctrine; peering into the halted vehicle for purpose of insuring police safety from potential hidden suspects did not rise to level of a "search" within meaning of Fourth Amendment. U.S.C.A. Const.Amend. 4.

**[9] Arrest 35 ⛥63.5(9)**

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(9) k. Duration of Detention and Extent or Conduct of Investigation or Frisk. Most Cited Cases
An investigatory stop does not become unreasonable because officers take precautionary measures which do not further invade privacy

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279                                                              Page 3

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

interest of defendants; a protective investigation beyond defendant's person may be justified when there is possibility that other persons, not detained, present injury to the investigating officers.

**[10] Arrest 35 ☞63.4(16)**

35 Arrest
  35II On Criminal Charges
    35k63 Officers and Assistants, Arrest Without Warrant
      35k63.4 Probable or Reasonable Cause
        35k63.4(16) k. Possession, Disposal, or Concealment of Article; Flight or Hiding. Most Cited Cases

**Arrest 35 ☞71.1(5)**

35 Arrest
  35II On Criminal Charges
    35k71.1 Search
      35k71.1(4) Scope of Search
        35k71.1(5) k. Particular Places or Objects. Most Cited Cases

**Searches and Seizures 349 ☞62**

349 Searches and Seizures
  349I In General
    349k60 Motor Vehicles
      349k62 k. Probable or Reasonable Cause. Most Cited Cases
    (Formerly 349k3.3(6))
When police officer, who lawfully detained defendants, observed bag on seat of defendants' vehicle, he could reasonably have inferred that the occupants of the vehicle were connected to restaurant burglary and that evidence, discovered in plain view, was sufficient to escalate officer's suspicions to level of probable cause to arrest; search of defendants' vehicle could be justified under either search incident to lawful arrest doctrine or under warrantless automobile search doctrine.

**[11] Criminal Law 110 ☞228**

110 Criminal Law
  110XII Pretrial Proceedings
    110k222 Necessity and Requisites of

Preliminary Examination
      110k228 k. Time for Examination. Most Cited Cases
Delay in filing charges against defendants, who were taken before daily bond court approximately 24 hours after commencement of next business day following arrest and who failed to establish prejudice resulting from their minimal delay before a preliminary hearing, did not violate defendants' constitutional rights. U.S.C.A. Const.Amends. 4, 14 ; S.H.A. Const. Art. 1, § 7.

**[12] Criminal Law 110 ☞228**

110 Criminal Law
  110XII Pretrial Proceedings
    110k222 Necessity and Requisites of Preliminary Examination
      110k228 k. Time for Examination. Most Cited Cases
A delay of a day or day and one-half before filing of charges is unlikely to be an unreasonable detention; determination of what is unnecessary or unreasonable delay depends on facts and circumstances of each case and some latitude is allowed and presentment to judge need be performed only with that reasonable promptness which its circumstances permit.

**[13] Criminal Law 110 ☞641.3(10)**

110 Criminal Law
  110XX Trial
    110XX(B) Course and Conduct of Trial in General
      110k641 Counsel for Accused
        110k641.3 Stage of Proceedings as Affecting Right
          110k641.3(8) Identification in General and Tests, Handwriting Exemplars, Photographing, Etc
            110k641.3(10) k. Lineup or Showup. Most Cited Cases
    (Formerly 110k641.3)
No judicial adversarial stage warranting right to counsel had arisen at time identification lineups were conducted prior to defendants' preliminary hearing. U.S.C.A. Const.Amend. 6.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279                                                        Page 4

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

**[14] Constitutional Law 92 ⬚266(3.2)**

92 Constitutional Law
  92XII Due Process of Law
    92k256 Criminal Prosecutions
      92k266 Rules of Evidence in General
        92k266(3) Identification Evidence
          92k266(3.2) k. Out-Of-Court or
Pretrial Confrontation. Most Cited Cases
Defendants failed to establish that pretrial identification procedures were so unnecessarily suggestive and conducive to mistaken identification as to deny them due process. U.S.C.A. Const.Amend. 14.

**[15] Criminal Law 110 ⬚1166.10(1)**

110 Criminal Law
  110XXIV Review
    110XXIV(Q) Harmless and Reversible Error
      110k1166.5 Conduct of Trial in General
        110k1166.10 Counsel for Accused
          110k1166.10(1) k. In General. Most
Cited Cases
  (Formerly 110k1166.11(5), 110k1166.11)
Even if defendants were denied their statutory right to communicate with an attorney of their choice following their arrest, they were not entitled to reversal of their convictions or setting aside the witness identifications where there were no statements or confessions that came from defendants during their detention, where defendants were not entitled to counsel at lineup prior to their preliminary hearing and where record did not reflect that defendants ever did actually retain their own counsel. S.H.A. ch. 38, ¶ 103-3; U.S.C.A. Const.Amend. 14.

**[16] Criminal Law 110 ⬚339.10(4)**

110 Criminal Law
  110XVII Evidence
    110XVII(D) Facts in Issue and Relevance
      110k339.5 Identity of Accused
        110k339.10 Effect of Prior Events on Subsequent Identification
          110k339.10(4) k. Absence of Counsel, Advice or Warnings. Most Cited Cases

**Criminal Law 110 ⬚1166.10(1)**

110 Criminal Law
  110XXIV Review
    110XXIV(Q) Harmless and Reversible Error
      110k1166.5 Conduct of Trial in General
        110k1166.10 Counsel for Accused
          110k1166.10(1) k. In General. Most
Cited Cases
  (Formerly 110k1166.11(5), 110k1166.11)
Failure to abide by statutory provision providing arrestees with right to contact their attorneys does not necessarily mandate a vacation of conviction or suppression of identification; the statute is not a per se rule of exclusion or reversal and absent the substantive right to counsel, making of incriminating statements in custodial interrogation, or evidence of abuse of police procedures, a defendant's conviction will not be reversed because of violation of the statute. S.H.A. ch. 38, ¶ 103-3.

**[17] Constitutional Law 92 ⬚268.1(1)**

92 Constitutional Law
  92XII Due Process of Law
    92k256 Criminal Prosecutions
      92k268.1 Assistance of Counsel
        92k268.1(1) k. In General. Most Cited
Cases
Right to communicate with counsel may rise to level of a violation of constitutional due process when denial of such right interferes with ability of defendant or his counsel to prepare for or defend at trial. U.S.C.A. Const.Amend. 14.

**[18] Criminal Law 110 ⬚369.2(6)**

110 Criminal Law
  110XVII Evidence
    110XVII(F) Other Offenses
      110k369 Other Offenses as Evidence of Offense Charged in General
        110k369.2 Evidence Relevant to Offense, Also Relating to Other Offenses in General
          110k369.2(3) Particular Offenses, Prosecutions for
            110k369.2(6) k. Burglary, Robbery, Larceny, and Embezzlement; Stolen Property. Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279                                                                                 Page 5

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

In prosecution of defendants for robbery of a restaurant which was part of a chain, trial court did not err in permitting testimony to effect that defendants were arrested outside another restaurant in the same chain since mention of the second restaurant was an integral part of the narrative of defendant's arrest, involving relevant evidence of time, proximity and defendants' identity.

**[19] Criminal Law 110 ⟜349**

110 Criminal Law
    110XVII Evidence
        110XVII(D) Facts in Issue and Relevance
            110k349 k. Subsequent Incriminating or Exculpatory Circumstances. Most Cited Cases
Facts and circumstances surrounding arrest of an accused may be put into evidence when they tend to connect defendant with the offense for which he is being tried.

**[20] Weapons 406 ⟜17(4)**

406 Weapons
    406k17 Criminal Prosecutions
        406k17(4) k. Weight and Sufficiency of Evidence. Most Cited Cases
State failed to prove beyond a reasonable doubt that defendant, who wore a type of tinted pink or peach glasses and a ski hat during perpetration of the crime and whose glasses did not hide or distort defendant's features, was masked and therefore State failed to prove an essential element of offense of unlawful use of the weapons. S.H.A. ch. 38, ¶ 24-1(a)(9), (b).

**[21] Criminal Law 110 ⟜29(11)**

110 Criminal Law
    110I Nature and Elements of Crime
        110k29 Different Offenses in Same Transaction
            110k29(5) Particular Offenses
                110k29(11) k. Robbery and Burglary. Most Cited Cases
    (Formerly 110k29)

**Sentencing and Punishment 350H ⟜537**

350H Sentencing and Punishment
    350HIII Sentence on Conviction of Different Charges
        350HIII(A) In General
            350Hk515 Particular Offenses
                350Hk537 k. Robbery. Most Cited Cases
    (Formerly 110k984(8))
Two counts of armed robbery and two counts of armed violence, which arose from same single act committed during robbery, could result in only one conviction and sentence for each defendant; furthermore, where two counts of unlawful use of weapons also arose from a single act, one count of that offense would be vacated.

**[22] Criminal Law 110 ⟜1190**

110 Criminal Law
    110XXIV Review
        110XXIV(U) Determination and Disposition of Cause
            110k1185 Reversal
                110k1190 k. Effect. Most Cited Cases
Where defendants received separate sentences for multiple convictions, they were not entitled to resentencing on the convictions that were affirmed on appeal even though certain convictions were vacated.

**[23] Sentencing and Punishment 350H ⟜1289**

350H Sentencing and Punishment
    350HVI Habitual and Career Offenders
        350HVI(D) Convictions and Dispositions Usable for Enhancement
            350Hk1289 k. Guilty and Nolo Contendere Pleas. Most Cited Cases
    (Formerly 110k1202.5(1), 110k1202.5)
Under statutory section providing that extended term may be imposed upon a defendant who has previously been convicted of any felony of the same or greater class within ten years under certain conditions, extended term sentences could be imposed where the prior convictions were based on guilty pleas. S.H.A. ch. 38, ¶ 1005-5-3.2(b)(1).

**\*198 \*\*281 \*\*\*644** Alan D. Goldberg, Asst. State

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(76)

459 N.E.2d 279

Page 6

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

Public Defender, Steven Clark, Deputy Defender, Chicago, for defendants-appellants.

J. Michael Fitzsimmons, State's Atty., Wheaton, Phyllis J. Perko, Cheri A. Novak, **282 ***645 State's Attys. Appellate Service Com'n, Elgin, for plaintiff-appellee.

VAN DEUSEN, Justice:

In separate informations, defendants Harry Martin and Dennis McClinton*199 were each charged with two counts of armed robbery, two counts of armed violence and seven counts of unlawful use of weapons. In a consolidated jury trial on the armed robbery and armed violence counts, the defendants were each found guilty of two counts of armed robbery (Ill.Rev.Stat.1979, ch. 38, par. 18-2(a)) and two counts of armed violence (Ill.Rev.Stat.1979, ch. 38, par. 33A-2). In the defendants' consolidated bench trial regarding the unlawful use of weapons charges, each was found guilty of two counts of unlawful use of weapons. (Ill.Rev.Stat.1979, ch. 38, par. 24-1(a)(9).) Defendant Martin was sentenced to 35 years imprisonment on each count of armed robbery, 35 years on each count of armed violence, and five years on each count of unlawful use of weapons. Defendant McClinton was sentenced to 30 years on each count of armed robbery, 30 years on each count of armed violence, and five years on each count of unlawful use of weapons. All sentences were to run concurrently for both defendants.

On February 18, 1981, at about 11 p.m., the defendants pushed their way through the rear door of an Oak Brook McDonald's restaurant during the course of a bread delivery. The defendants herded the employees into a corner and approached John Kasprzyk, the store manager. The defendant Martin was dressed in a snowmobile suit, wearing a ski hat and gloves and wielding a revolver. He pointed the gun at Mr. Kasprzyk's face, ordered the manager to the rear of the store, and then commanded him to open and empty the contents of the store safe into a bucket. The other employees were ordered into the walk-in refrigerator. The defendant McClinton, who was dressed in dark pants, ski cap, gloves, jacket and pinkish glasses, then took Mr. Kasprzyk at gunpoint to the front of the restaurant and directed him to empty the cash register drawers into the bucket. In addition to

over $1,800, the defendants also took a white bank bag from the safe. On the bag were written the words "BACK UP".

One week later, on February 25, 1981, at approximately 11 p.m., the defendants were observed in the immediate area of a Darien McDonald's. When stopped, the officers found the two revolvers and the bank bag from McDonald's. Defendants were subsequently arrested and charged with armed violence, armed robbery and unlawful use of weapons.

On May 26, 1981, defendants filed two motions to suppress evidence. On June 8, 1981, a hearing was first held on the motion to suppress pertaining to the stop and search of the car in which Martin and McClinton were arrested.

The first witness on this motion was Harry Martin. He testified *200 that on February 25, 1981, he was driving in his brother's Ford station wagon with Dennis McClinton as his passenger, when they were stopped by the Darien police. According to Martin, immediately after they were stopped, the arresting police officers stood about ten or fifteen feet away with their guns drawn, and told Martin to get out of the vehicle and put his hands on his head and walk toward them. None of the police officers approached the vehicle prior to the time Martin was ordered out of the car. When he was ordered to get out of the car, Martin turned to McClinton and told the other man to get out of the vehicle, and they then walked toward the police with their hands on their heads. When they reached the squad cars, Martin testified that the police threw them to the ground, placed shotguns and pistols against their heads and backs, and then proceeded to go to the car. Martin and McClinton were both searched, and they were then told to stand up and were placed against the squad car. Martin stated that after searching the defendant's car, an officer announced that he had found a bag but had not found what the police were looking for. The officer was told by a sergeant to keep searching. Martin thereafter**283 ***646 heard the motor of his car turn off, and then a police officer hollered that he had found something in the glove compartment. Prior to this, Martin testified that the glove compartment had

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279

Page 7

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

been locked. After the officers had opened the glove compartment, Martin and McClinton were taken over to the car and placed inside. Martin was read his rights and was told that the defendants were going to be taken to the police station, and that they were being arrested and held under investigation for an armed robbery.

The first witness for the State on this motion to suppress evidence was Darien Police Sergeant Edward S. Musial. His version of the events occurring on February 25, 1981, was quite different from that presented by the defendants. He testified that on February 25 he was in his car with another officer when he observed a Ford station wagon on Seminole Drive just north of Plainfield Road, directly across from a McDonald's in Darien. The vehicle first passed by the squad car and then backed up in front of them. At this time, Musial said he observed that a taillight lense was cracked on defendants' vehicle, although the light was operative. Defendants' car then turned around and parked on Seminole Drive for about a minute. Officer Musial then heard the car's engine start up again, the headlights came on, and the car moved onto Plainfield Road. The officer then testified that he lost the vehicle, but "two other officers stationed in the area someplace else viewed the vehicle the whole time." Musial and his partner subsequently saw the vehicle going eastbound on a different *201 street. According to Musial, the defendants' car traveled directly in front of the police vehicle, pausing at a stop sign. In the light cast by the squad car headlights, Musial observed two male blacks in the interior of the passing car and noticed one was wearing a blue snowmobile suit, similar to that which one of the robbers had been wearing at the February 18 McDonald's robbery. The age of the two male blacks appeared to be the approximate age of the subjects mentioned in a police radio message regarding the previous McDonald's robbery. By the time the vehicle was actually pulled over by Officer Musial, at 10:45 or 10:50 p.m., five to ten minutes had passed since the officer first observed the vehicle with the broken taillight lense.

Immediately after stopping the defendant's station wagon on Nantucket Street, Sergeant Musial

ordered the occupants out of their vehicle. As they exited the car, the defendants were ordered away from the vehicle and directed to get on the ground. Subsequently, they were both patted-down. While defendants were on the ground, Musial went up to the station wagon to check if there was anyone else hiding in the darkened vehicle. Musial testified that as he approached the vehicle, he could see on the floor a red bank bag marked with a McDonald's name, plus a blue ski mask, a blue knit cap and two pairs of gloves on the front seat. In a prior police radio message, and in a flier the officer had received concerning the Oak Brook McDonald's robbery, he had gained information that one of the robbers had worn a blue ski mask, the other had worn a blue knit cap, and they both had been wearing gloves. After finding the bag, gloves, and hat, Musial walked back to the squad car and gave his handcuffs to an officer so that one of the defendants could be handcuffed.

Musial then returned to the station wagon because he had additional information that one of the robbers had been armed with a 4 " revolver and the other with a 2 " revolver. According to Musial, he opened the unlocked glove compartment and found a 4 ", .38 caliber revolver in "plain view", and a bank-type bag with the words "BACK UP" written on the bag. Inside the bank bag, he found a .32 caliber, 2 " revolver inside a holster. Musial testified that he had looked in the glove compartment because "we were investigating two subjects in an armed robbery" and he wanted to check for weapons or other fruits of the crime.

A head security manager from McDonald's, who was present at the scene, identified the bank bag as having been **284 ***647 taken from a McDonald's store in an armed robbery. Musial then advised the other officers that he believed that these were the two men who were wanted for investigation in an armed robbery. The two men were read their *202 *Miranda* warnings and taken into custody.

Following the testimony of Martin and Musial, the trial court denied the defendants' motion to suppress and made the following finding:
"That the stopping of the vehicle based on the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279

Page 8

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

articulable suspicion was reasonable and the vehicle having been stopped and the observations of the police officer who testified as to what he saw in the vehicle, justified a further intrusion into the vehicle that is, the glove compartment."

A hearing was then held on a second motion to suppress. In this motion defendants requested the suppression of identification testimony on the grounds that the defendants had been illegally detained without being presented to a magistrate, and that during this period of illegal detention a counselless lineup was conducted. Both Martin and McClinton testified that initially they were denied an opportunity to call a lawyer at the Darien police station. Martin stated that he was told that he did not need to call an attorney because he was only being held for investigation. Martin and McClinton were held in the station house basement for approximately an hour, and then were taken upstairs to be photographed and fingerprinted. Afterwards, each defendant was permitted to make a phone call. Martin telephoned his fiancee and told her to contact his lawyer and inform the attorney of his location and predicament. McClinton called his mother.

Subsequently, the defendants were transported to the Oak Brook police station. They each testified that they were denied their requests to make another phone call from the second station house. Sometime during the morning of February 26, defendants were put in several separate lineups. There was no attorney present at any of the lineups, although Martin testified he requested his lawyer's presence. At the lineups, McClinton was identified by three of five witnesses, while Martin was identified by one witness.

After the lineups, McClinton was served with a complaint for armed robbery and an arrest warrant with a bond of $100,000. Martin received a copy of a charge for armed robbery and unlawful use of weapons, as well as a warrant from Chicago. Each defendant was also given a ticket for driving without a license and for having an inoperable taillight. On the morning of February 27, both defendants were taken before a judge.

The trial court denied defendants' motion to suppress the identification testimony and the case proceeded to a jury trial on counts I, II, III and IV charging armed robbery and armed violence. The defendants waived their right to a jury on counts VI and VII charging unlawful*203 use of weapons on February 18, 1981, (date of robbery). Counts VIII through XII charging unlawful use of weapons on February 25, 1981, (date of arrest) were initially severed and later *nolle prossed.* Count V, charging unlawful use of weapons on February 18, was also *nolle prossed.*

At trial, the State produced a number of eyewitnesses to the February 18 robbery. Their testimony included identification of the defendants, identification of the items worn by defendants during the crime, and identification of the revolvers used by defendants.

During the presentation of witnesses, the defense renewed a prior motion *in limine* to restrict the State from bringing out the fact that defendants were arrested in the vicinity of the Darien McDonalds. The court denied the motion again. The attorneys for each defendant also renewed the motion to suppress the fruits of the search of the car. The motion to suppress was again denied.

[1] Defendants have appealed both their convictions and sentences, and they allege a score of pretrial, trial and post-trial errors. We first consider, however, the **285 ***648 State's preliminary challenge of defendants' standing to raise a constitutional fourth amendment claim. Under the general principles of *Rakas v. Illinois* (1978), 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387, the State asserts that because defendants drove a borrowed automobile they had no "reasonable expectations of privacy" in the vehicle and consequently they cannot contest the halt and search of that automobile. Evidence at the trial court indicates that the car driven by defendant Martin was not owned by either himself or McClinton, but that the defendants did have the owner's permission to use the car.

[2] While the State may raise some issue as to the rights of persons who borrow another's automobile

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279

Page 9

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

to challenge police searches of that vehicle, that is not the relevant issue in this appeal. As the defendants correctly point out, the search of their car is only being attacked as a fruit of the illegal police conduct in *seizing* the defendants. No standing problem exists where a defendant claims that the evidence sought to be suppressed was obtained as a result of a illegal seizure of that defendant. (*People v. Reynolds* (1981), 101 Ill.App.3d 576, 57 Ill.Dec. 144, 428 N.E.2d 694 *aff'd* (1983), 94 Ill.2d 160, 68 Ill.Dec. 122, 445 N.E.2d 766; *People v. Bradi* (1982), 107 Ill.App.3d 594, 597-98, 63 Ill.Dec. 363, 437 N.E.2d 1285.) Since the defendants do have standing to challenge the detention of their vehicle, they may rightfully contest whether the police conduct involved was legal.

Defendants' first substantive contention on appeal is that the forceful actions of the police in making the stop of defendants' automobile amounted to an arrest, requiring probable cause. Alternatively, **\*204** they argue that even if characterized as " investigatory stop" under *Terry,* the halt of defendants' vehicle was not based on the requisite reasonable suspicion. (*Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.) In light of the exact language used by the trial court in its ruling on defendants' motion to suppress, the relevant issue can be narrowed to whether the arresting officers' actions met the requirements of a *Terry* investigatory stop.

[3] It should be remembered that the "stop and frisk " rule of *Terry* involves a two-part procedure. First, the police officer must have a reasonable, articulable suspicion of criminal activity to justify a detention; and second, the "frisk" of the person detained must be both based on a reasonable fear that defendant is armed, and limited to a pat-down search for weapons. In total, the permissible intrusion of an investigatory detention is governed by a balancing of the societal need to detect crime and insure police safety against the severity of intrusion into a citizen's privacy. (*People v. Smithers* (1980), 83 Ill.2d 430, 437-38, 47 Ill.Dec. 322, 415 N.E.2d 327.) These concerns are not only important to a constitutional analysis of a "stop and frisk" but also for a statutory review of such a

detention. The Illinois Code of Criminal Procedure of 1963, sections 107-14 and 108-1.01, essentially codify the same concerns articulated in the federal constitutional cases. Ill.Rev.Stat. 1981, ch. 38, pars. 107-14, 108-101; *People v. Lee* (1971), 48 Ill.2d 272, 279, 269 N.E.2d 488; *People v. McGowan* (1977), 69 Ill.2d 73, 77, 12 Ill.Dec. 733, 370 N.E.2d 537.

[4] The defendants in the instant case contest the legality of both their initial detention and the subsequent frisk by police officers. As to the stop of defendants, the requisite degree of suspicion which will constitutionally justify such a detention was originally set forth in the *Terry* case: "[I]n justifying the particular intrusion, the police officer must be able to point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant the intrusion." (392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906.) While *Terry* involved an on-the-street encounter, the stopping of a motor vehicle and detention of its occupants falls within the scope of the same rule. See *People v. Drummer* (1980), 81 Ill.App.3d 626, 37 Ill.Dec. 417, 402 N.E.2d 307; *People v. Kantowski* (1983), 98 Ill.2d 75, 74 Ill.Dec. 486, 455 N.E.2d 1379; **\*286\*\*\*649** *Pennsylvania v. Mimms* (1977), 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331.

While there is a wealth of authority on investigatory stops, including the numerous cases cited by the defendants, the various facts of those cases make each distinguishable. As in all cases involving a search and seizure, the reasonableness of the police conduct in the present case depends upon its particular facts and attendant circumstances.**\*205** ( *People v. Smithers* (1980), 83 Ill.2d 430, 435, 47 Ill.Dec. 322, 415 N.E.2d 327; *People v. Mills* (1983), 115 Ill.App.3d 809, 812, 71 Ill.Dec. 247, 450 N.E.2d 935.) In the present controversy, the factual justification for the police officer's detention of defendants is based in large part upon defendants' close resemblance to a circulated, composite physical description of the suspected robbers. This description detailed the race, age, size and clothing of the suspects, including mention of the rather distinctive snowsuit garb worn by one of the robbers. While the height and weight of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279

Page 10

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

defendants would be difficult to ascertain from merely viewing the suspects while they sat in an automobile, the arresting officer testified at trial that he had ample opportunity to closely observe the other elements of the defendants' appearance. The propriety of a particular detention for investigatory purposes is obviously heightened when a defendants' appearance is similar to an accurate description of a suspected criminal. (*People v. Jones* (1981), 102 Ill.App.3d 238, 57 Ill.Dec. 820, 429 N.E.2d 1094, (defendant's uniquely patterned turtle neck sweater, his race, and age served as basis for officers' stop of defendant.); *People v. Hall* (1980), 90 Ill.App.3d 1073, 46 Ill.Dec. 479, 414 N.E.2d 201, *cert. denied* (1981), 454 U.S. 893, 102 S.Ct. 388, 70 L.Ed.2d 207 (defendants' height, race, and apparel, as well as their location, held sufficient for investigatory stop.).) In addition, the defendants' vehicle was parked outside a McDonald's restaurant at the same approximate time as the previous robbery of the Oak Brook McDonald's. Since the method used in the robbery was to gain entrance when a certain delivery was made, the location and time of defendants' position was a highly relevant factor. *People v. McGowan* (1977), 69 Ill.2d 73, 78-79, 12 Ill.Dec. 733, 370 N.E.2d 537 (defendant and companion wearing dark clothes spotted late at night walking in a high crime area.).

[5][6] Taken together, and in light of the detaining officers' experience, the evidence adduced at trial was sufficient to lead a man of reasonable caution to believe that the detention of the defendants was appropriate. (*Terry v. Ohio* (1968), 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889, 911; *People v. Grice* (1980), 87 Ill.App.3d 718, 722, 43 Ill.Dec. 209, 410 N.E.2d 209, *cert. denied* (1981), 450 U.S. 1003, 101 S.Ct. 1714, 68 L.Ed.2d 207.) The burden of proof that a search and seizure in a public place was unlawful is on the person seeking to challenge the seizure or suppress evidence (87 Ill.App.3d 718, 722, 43 Ill.Dec. 209, 410 N.E.2d 209, *cert. denied* (1981), 450 U.S. 1003, 101 S.Ct. 1714, 68 L.Ed.2d 207; *People v. Beacham* (1980), 87 Ill.App.3d 457, 464, 43 Ill.Dec. 87, 410 N.E.2d 87), and a finding by the trial court that a particular detention was reasonable will not be disturbed on review unless manifestly erroneous. (*People v.*

*Conner* (1979), 78 Ill.2d 525, 532, 36 Ill.Dec. 672, 401 N.E.2d 513; 87 Ill.App.3d 718, 722, 43 Ill.Dec. 209, 410 N.E.2d 209, *cert. denied* (1981), 450 U.S. 1003, 101 S.Ct. 1714, 68 L.Ed.2d 207.) Defendants have *206 failed to sustain their burden in the instant case.

In addition to challenging their initial detention, defendants also contest the forceful nature of the alleged investigatory stop. From their perspective, the detention and frisk by the officers exceeded what was "minimally necessary to learn whether the men were armed and to disarm them * * *." (392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889, 911.) The evidence produced at trial is somewhat controverted, but it can fairly be stated that immediately upon the stopping of defendants' car, McClinton, and Martin were ordered to exit the vehicle. The officers had their guns drawn, and ordered the defendants to the **287 ***650 ground where they were patted-down for weapons.

[7] Once again, the intrusiveness of the police officers' actions must be reviewed in light of the countervailing public interests in detecting crime and protecting law enforcement personnel. Considering the highly dangerous nature of the suspected criminal activity and the officers' knowledge that the persons sought were armed, the conduct of the police in the present case was not unreasonable. The fact that the officers halted defendants with guns drawn and conducted a pat-down search without preliminary questioning does not necessarily convert an investigatory stop into an arrest. (*People v. Roberts* (1981), 96 Ill.App.3d 930, 933-34, 52 Ill.Dec. 473, 422 N.E.2d 154, see *Adams v. Williams* (1972), 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612; *United States v. Place* (1983), 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110.)
"During the period of the investigation, the person's freedom of movement is restricted. He is no more free to leave than if he were placed under a full arrest. The difference between an arrest and a stop lies not in the initial restraint on movement, but rather in length of time the person may be detained and the scope of investigation which may follow the initial encounter. * * *
It would be anomalous to grant an officer authority

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279

Page 11

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)

to detain pursuant to an investigatory stop and yet deny him the use of force necessary to effectuate that detention." 96 Ill.App.3d 930, 933-34, 52 Ill.Dec. 473, 422 N.E.2d 154, see also *People v. Polk* (1981), 95 Ill.App.3d 875, 51 Ill.Dec. 402, 420 N.E.2d 816; *People v. Sanford* (1976), 34 Ill.App.3d 990, 341 N.E.2d 453.

The officers in the immediate case acted reasonably in treating defendants with a high degree of caution even prior to initiating questioning. The police action in drawing their guns, ordering the defendants out of their vehicle, and then conducting an immediate pat-down search of the defendants on the ground is an intrusion which is outweighed by the great threat posed by suspected felons. *207 See *People v. Zielinski* (1980), 91 Ill.App.3d 519, 521, 46 Ill.Dec. 960, 414 N.E.2d 1113; *People v. Gunderson* (1978), 66 Ill.App.3d 516, 523, 23 Ill.Dec. 269, 383 N.E.2d 1296.

[8][9] Since the defendants' detention was lawful, it follows that Officer Musial was rightfully in a position where he could observe the interior of defendants' vehicle; consequently, the McDonald's money bag he saw was properly visible within the plain view doctrine. (*Texas v. Brown* (1983), 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502; *People v. Davis* (1981), 93 Ill.App.3d 217, 48 Ill.Dec. 675, 416 N.E.2d 1197; *People v. Carroll* (1973), 12 Ill.App.3d 869, 299 N.E.2d 134, *cert. denied* (1974), 417 U.S. 972, 94 S.Ct. 3180, 41 L.Ed.2d 1144.) Peering into a halted vehicle for the purpose of insuring police safety from potential hidden suspects does not rise to the level of a " search" within the meaning of the Federal Constitution's fourth amendment. (See *People v. Brandys* (1973), 15 Ill.App.3d 379, 304 N.E.2d 471; *People v. Piper* (1981), 101 Ill.App.3d 296, 56 Ill.Dec. 815, 427 N.E.2d 1361.) Illinois cases have interpreted the word "search" to imply prying into hidden places for concealed suspects, not merely observing what is open to view. (101 Ill.App.3d 296, 299, 56 Ill.Dec. 815, 427 N.E.2d 1361, citing *City of Decatur v. Kushmer* (1969), 43 Ill.2d 334, 338, 253 N.E.2d 425.) An investigatory stop does not become unreasonable because the officers take precautionary measures which do not further invade

the privacy interest of the defendants. A protective investigation beyond defendant's person may be justified when there is the possibility that other persons, not detained, present a danger to the investigating officers. See 3 W. LaFave, Search and Seizure, § 9.4, at 134-37 (1978).

[10] When Officer Musial observed the McDonald's bag on the seat of defendants' vehicle, he could reasonably infer that the occupants of the vehicle were connected to the restaurant burglary. This evidence, discovered in plain view, was sufficient to escalate the officer's suspicions to the level **288 ***651 of probable cause to arrest. *People v. Drummer* (1980), 81 Ill.App.3d 626, 629, 37 Ill.Dec. 417, 402 N.E.2d 307; *People v. Cribbs* (1972), 8 Ill.App.3d 750, 753, 291 N.E.2d 326.

The ensuing search of defendants' automobile, including the opening of the closed glove compartment, is not directly contested by the defendants. While the propriety of this extensive search was questioned at the trial court level, the defendants on appeal challenge the search only as a fruit of the allegedly illegal initial stop. Even assuming that the issue had been raised in this appeal, the search of the defendants' vehicle would nonetheless be justified under either the expansive search-incident-to-lawful-arrest doctrine espoused in *New York v. Belton* (1981), 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768, or under the warrantless automobile search doctrine authorized by *208*United States v. Ross* (1982), 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572.

[11] Defendants next argue that the police intentionally delayed filing charges against them in order to hold counselless lineups. This delay, defendants contend, constitutes a violation of their rights under the fourth and fourteenth amendments to the United States Constitution and section 7 of article I of the Illinois Constitution of 1970, and also amounts to a breach of their statutory right (Ill.Rev.Stat.1981, ch. 38, par. 109-1) to a prompt, probable cause determination. The record discloses that the defendants were held in custody approximately 36 hours before being taken to court for a probable cause determination. Their initial arrest occurred at about 11 p.m. on February 25,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1981. The following day, a number of counselless lineups were held and identifications were made. After the lineups, defendants were served with formal charges. On the morning of February 27, defendants were brought to daily bond court before a judge.

[12] As the State correctly suggests, a delay of a day, or a day and a half, is unlikely to be an unreasonable detention. (See *People v. Dees* (1981), 85 Ill.2d 233, 52 Ill.Dec. 614, 422 N.E.2d 616; *People v. Kirkley* (1978), 60 Ill.App.3d 746, 18 Ill.Dec. 251, 377 N.E.2d 540; *People v. Jackson* (1961), 23 Ill.2d 274, 178 N.E.2d 299.) The determination of what is an unnecessary or unreasonable delay depends upon the facts and circumstances of each case. (23 Ill.2d 274, 278, 178 N.E.2d 299.) Some latitude is allowed, and presentment to a judge need be performed only with that reasonable promptness which circumstances permit (see *People v. Georgev* (1967), 38 Ill.2d 165, 230 N.E.2d 851; *People v. Kelly* (1949), 404 Ill. 281, 89 N.E.2d 27; *People v. Mallett* (1970), 45 Ill.2d 388, 259 N.E.2d 241.) A lineup held for investigatory purposes, prior to preliminary hearing, does not necessarily indicate law enforcement abuse. For example, in the *Kelly* case, the defendant was arrested about 9 p.m. on Saturday night and was thereafter identified in a police lineup by two of the victims. It was not until the following Tuesday, that he was taken before a magistrate. The Illinois Supreme Court rejected the defendants claim that there was unreasonable delay in taking him before a judge in view of the circumstances that the police investigation was not completed until Monday morning. (See also *People v. Bryant* (1982), 105 Ill.App.3d 285, 61 Ill.Dec. 163, 434 N.E.2d 316.) As the United States Supreme Court noted in *Gerstein v. Pugh* (1975), 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54, it is the serious consequences arising from prolonged detention which necessitated its holding that the fourth amendment requires a judicial determination of probable cause as a prerequisite to *extended restraint of liberty following arrest.* (420 U.S. 103, 114, 95 S.Ct. 854, 865, 43 L.Ed.2d 54, 65.) In the instant case, no such prolonged detention or extended restraint of liberty occurred prior to the taking of defendants before a judge. The

defendants were arrested late at night *209 on February 25 and taken before daily bond court approximately 24 hours after the commencement of the next business day. Such a minimal delay was reasonable considering the time necessary to perform the administrative **289 ***652 steps incident to arrest. Contra *Bernard v. City of Palo Alto* (9th Cir.1983), 699 F.2d 1023.

Moreover, the defendants have not clearly established that any prejudice resulted from their minimal delay before a preliminary hearing. ( *People v. Dees* (1981), 85 Ill.2d 233, 238, 52 Ill.Dec. 614, 422 N.E.2d 616.) Defendants made no incriminating statements during the delay, nor have they shown that the lineups conducted were unnecessarily suggestive and conducive to irreparable mistaken identification. A short delay in presentment before a judge cannot be a basis for reversal absent a showing of undue prejudice. 85 Ill.2d 233, 238, 52 Ill.Dec. 614, 422 N.E.2d 616.

Defendants further contend that since they requested that retained counsel be present at lineups held prior to their preliminary hearing, the conducting of such lineups without honoring that request violated their rights to counsel and to due process under the fifth and sixth amendments of the United States Constitution, article I, sections 2 and 8 of the Illinois Constitution of 1970, and section 103-3 of the Code of Criminal Procedure of 1963 (Ill.Rev.Stat., 1981, ch. 38, par. 103-3). We find no merit to this argument.

[13] Since the identification lineups of February 26, were prior to the defendants' preliminary hearing, no judicial adversarial stage warranting the right to counsel had yet arisen. (See *Kirby v. Illinois* (1972), 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411; *People v. Agee* (1981), 100 Ill.App.3d 878, 56 Ill.Dec. 164, 427 N.E.2d 244; *People v. Williams* (1980), 90 Ill.App.3d 524, 45 Ill.Dec. 727, 413 N.E.2d 60, *cert. denied* (1981), 452 U.S. 943, 101 S.Ct. 3090, 69 L.Ed.2d 958; *People v. Johnson* (1973), 55 Ill.2d 62, 302 N.E.2d 20.) Defendants' reliance upon cases from southern jurisdictions, where the right to counsel has been expanded to include other additional police-defendant contacts, is misplaced since Illinois has not adopted that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279

Page 13

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)

expansive approach. (*People v. Harrell* (1982), 104 Ill.App.3d 138, 142, 60 Ill.Dec. 264, 432 N.E.2d 1163.) In our State, a warrantless arrest based on probable cause simply does not initiate such adversary judicial proceedings as would give rise to a right to counsel at a lineup conducted prior to the preliminary hearing. *People v. Agee* (1981), 100 Ill.App.3d 878, 881-82, 56 Ill.Dec. 164, 427 N.E.2d 244; *People v. Williams* (1980), 90 Ill.App.3d 524, 529, 45 Ill.Dec. 727, 413 N.E.2d 60, *cert. denied* (1981), 452 U.S. 943, 101 S.Ct. 3090, 69 L.Ed.2d 958; *People v. Shorter* (1978), 59 Ill.App.3d 468, 476, 16 Ill.Dec. 640, 375 N.E.2d 513.

[14] Defendants have likewise failed to show that the pretrial identification procedures were so unnecessarily suggestive and condusive to mistaken identification as to deny them due process. *210 *Neil v. Biggers* (1972), 409 U.S. 188, 197, 93 S.Ct. 375, 381, 34 L.Ed.2d 401, 410; *People v. Williams* (1980), 90 Ill.App.3d 524, 528, 45 Ill.Dec. 727, 413 N.E.2d 60, *cert. denied* (1981), 452 U.S. 943, 101 S.Ct. 3090, 69 L.Ed.2d 958; *People v. Owens* (1977), 46 Ill.App.3d 978, 990, 5 Ill.Dec. 321, 361 N.E.2d 644, see *People v. Bryant* (1983), 94 Ill.2d 514, 520-21, 69 Ill.Dec. 84, 447 N.E.2d 301.

[15][16] The defendants also assert that they were denied their statutory right to communicate with an attorney of their choice. (Ill.Rev.Stat.1981, ch. 38, par. 103-3.) There is some factual dispute regarding this matter, but assuming arguendo that such a statutory violation occurred, it would not be a basis for reversing defendants' conviction or setting aside the witness identifications in this case. As has already been stated, defendants did not have a right to counsel at the lineup prior to their preliminary hearing. Further, there were no statements or confessions that came from the accused during their detention. While section 103-3 of the Code of Criminal Procedure of 1963 does provide arrestees with the right to contact their attorneys, failure to abide by this provision does not necessarily mandate a vacation of conviction or suppression of identification. (Ill.Rev.Stat.1981, ch. 38, par. 103-3; *People v. Ishman* (1969), 44 Ill.2d 61, 254 N.E.2d 482.) Section 103-3 is not a per se rule of exclusion or reversal, and absent the

substantive right to counsel, the making of **290 ***653 incriminating statements in custodial interrogation, or evidence of abuse of police procedures, a defendants' conviction will not be reversed because of a violation of this section.

[17] In addition, while the right to communicate with counsel may rise to the level of a violation of constitutional due process when the denial of such right interferes with the ability of the defendant or his counsel to prepare for or defend at trial (see *City of Chicago v. Harmon* (1969), 117 Ill.App.2d 361, 365, 254 N.E.2d 573), we discern no such constitutional violation under the facts of this case. In the present case, each defendant was allowed to make a phone call, and although defendants argue that they were prevented from communicating with their retained counsel, the record does not reflect that defendants, either separately or cooperatively, ever did actually retain their own counsel. To the contrary, the record reflects that the court *appointed* counsel to represent each defendant, and the appointments were made sufficiently in advance of the preliminary hearings so that no claim is made that defendants' counsel did not have adequate time or opportunity to properly prepare for the hearing or the subsequent trial.

[18] Defendants' next argument on appeal is that they were prejudiced by the introduction of evidence which suggested other criminal conduct. Before trial, the lower court held a hearing on a motion *in *211 limine* regarding the introduction of the fact that defendants were arrested in the vicinity of a second McDonald's restaurant. While not making any precise ruling at that time, the trial judge said that if the prosecutor referred to the circumstances attending defendants' arrest, she should be ready to introduce supporting evidence. The assistant State's Attorney did not mention the location of the arrest in her opening statement.

Subsequently, however, on cross-examination of Officer Musial, defense counsel inquired whether the officer had observed defendants commit a crime during the time of surveillance. On the State's objection that this question was leading into the total circumstances of the arrest, defense counsel withdrew the question. Upon further examination

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(83)

459 N.E.2d 279

Page 14

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)

by both parties, the trial judge apparently concluded that defense counsel had opened the door as to all matters surrounding defendants' arrest. He explained, "I believe now the door has been opened so far as this officer can let the jury know what information he was armed with when he made the stop." He then permitted the prosecutor a limited number of additional inquiries involving the location of defendants' stop.

Defendants argue that evidence of their location at a second McDonald's was unduly prejudicial because it suggested that defendants were committing a second crime. (*People v. Miller* (1977), 55 Ill.App.3d 421, 13 Ill.Dec. 128, 370 N.E.2d 1155.) The *Miller* court stated the general rule that evidence of other crimes cannot be admitted to show motive, identity, or intent until it is shown that those other crimes actually took place and that defendant participated in their commission. (55 Ill.App.3d 421, 426, 13 Ill.Dec. 128, 370 N.E.2d 1155.) Consequently, defense counsel argues that the defendants presence at the second McDonald's was not a crime in itself and therefore could not be properly introduced. Moreover, the defendants argue that their location at the time of the arrest was irrelevant to the issue of their guilt of the February 18 robbery; defendants' location at the second McDonald's was relevant only as to the reasons for Officer Musial's stop of defendants on February 25 and that matter was resolved at the pretrial suppression hearing.

[19] The trial court, however, concluded that defense counsel's questioning had planted in the minds of the jury uncertainties as to why Officer Musial took special note of the two defendants on February 25. He permitted limited introduction of evidence of defendants' presence at the second McDonald's, not to establish defendants' propensity to commit crime, but as relevant circumstantial evidence pertaining to the February 18 robbery. Mention of **291 ***654 the second McDonald's restaurant was an integral part of the narrative of the defendants arrest, *212 involving relevant evidence of time, proximity and defendants' identity. (*People v. Walls* (1965), 33 Ill.2d 394, 397-98, 211 N.E.2d 699; *People v. Spiezio* (1982), 105 Ill.App.3d 769, 772-73, 61 Ill.Dec. 482, 434 N.E.2d 837; *People v.*

*Davis* (1981), 93 Ill.App.3d 187, 191, 48 Ill.Dec. 657, 416 N.E.2d 1179; *People v. Schubert* (1975), 28 Ill.App.3d 599, 329 N.E.2d 23.) The facts and circumstances attending an arrest of an accused may be put into evidence when they tend to connect defendant with the offense for which he is being tried. (See *People v. Evans* (1962), 25 Ill.2d 194, 184 N.E.2d 836, *cert. denied* (1963), 372 U.S. 922, 83 S.Ct. 738, 9 L.Ed.2d 727; *People v. Schubert* (1975), 28 Ill.App.3d 599, 329 N.E.2d 23.) Testimony involving the location of defendants' arrest was carefully limited, and no prejudicial or inflammatory language was used. The trial court did not err in permitting the admission of such evidence.

[20] The next issue raised on appeal is whether defendant Dennis McClinton was properly found guilty of two related counts of unlawful use of weapons. Under the Criminal Code of 1961 (Ill.Rev.Stat.1981, ch. 38, pars. 24-1(a)(9) and 24-1(b)), the guilty defendant must be armed with a revolver and masked in such a manner as to conceal his identity. Under these charges, whether defendant McClinton was masked in such a manner as to conceal his identity was an essential element of the offense which the State necessarily had to prove beyond a reasonable doubt. See *People v. Smith* (1978), 71 Ill.2d 95, 105, 15 Ill.Dec. 864, 374 N.E.2d 472; *People v. Rothermel* (1982), 88 Ill.2d 541, 544, 59 Ill.Dec. 93, 431 N.E.2d 378.

According to the testimony adduced at trial, McClinton wore a type of tinted pink or peach glasses and a ski hat during the perpetration of the crime. Eyewitness Jerry Kinzey testified as to McClinton's apparel, stating that he could see through the pink glasses worn by the defendant although they were dark. He added that about 3/4 " was open between the defendant's hat and the dark glasses. Upon further questioning, Kinzey stated that the glasses did not hide or distort defendant's features. Eyewitness Judith Wordel testified that the glasses were wire-framed, pink or peach tinted aviator-type glasses. She stated that the glasses were not sunglasses, but they did have a little bit of shade to them. The glasses did not interfere with her view of the subject.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

While generally it is the jury's responsibility to make the factual determinations such as this one ( *People v. Davis* (1983), 95 Ill.2d 1, 27, 69 Ill.Dec. 136, 447 N.E.2d 353; *People v. Smith* (1978), 71 Ill.2d 95, 102, 15 Ill.Dec. 864, 374 N.E.2d 472), a fair reading of the evidence falls far short of establishing that defendant McClinton was masked in such a manner as to conceal his identity. We therefore conclude that the State failed to prove beyond a reasonable doubt that Dennis McClinton was masked.

The State attempts to rebut defendant's position by claiming that *213 even if McClinton were not masked within the meaning of the statute, he can be found guilty under alternative theories encompassed in the unlawful use of weapons statute (Ill.Rev.Stat.1981, ch. 38,· par. 24-1). However, the alternative subsections of section 24-1 which the State attempts to raise were *nolle prossed* by the State prior to trial. The Illinois Supreme Court has made it clear that the mere citation of the statute allegedly violated is insufficient to incorporate by reference, the whole statute into the charge. ( *People v. Pujoue* (1975), 61 Ill.2d 335, 335 N.E.2d 437.) Also, where a defendant is charged with a violation of a statute which contains disparate and alternative methods of committing an offense, the charging instrument must detail which alternative the defendant is accused of committing. (*People v. Heard* (1970), 47 Ill.2d 501, 504-05, 266 N.E.2d 340; See *People v. Hall* (1982), 96 Ill.2d 315, 323-24, 70 Ill.Dec. 836, 450 N.E.2d 309.) We conclude that the State failed to prove an essential element of the offense of unlawful use of weapons beyond a reasonable **292 ***655 doubt, and therefore, as to the defendant McClinton the convictions and sentences for unlawful use of weapons are reversed.

Defendants next argue that since each defendant was convicted of two counts of armed robbery and two counts of armed violence, and all counts arose from the same single act committed during the robbery, only one count of armed violence can stand and the other three counts must be vacated. The same contention is made, now relevant only to the defendant Martin, that both counts of unlawful use of weapons also arise from a single act, and one

count of that offense should be vacated. Further, defendants urge that if these numerous counts, on which judgments were entered and sentences imposed, are vacated on appeal, the causes should be remanded for new sentencing on the convictions which remain.

The State concedes the correctness of defendants' contention on this matter, except that it argues that there is no indication that the trial court considered duplicative counts when sentencing, and thus remand for resentencing is not necessary.

[21] We agree with both parties that under the doctrine of *People v. King* (1977), 66 Ill.2d 551, 6 Ill.Dec. 891, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 98 S.Ct. 273, 54 L.Ed.2d 181, the two counts of armed robbery and the two counts of armed violence can result in only one conviction and sentence for each defendant. However, since armed robbery and armed violence are both Class X felonies and of equal seriousness, it would appear that the conviction and sentence could stand on either offense. (*People v. Simmons* (1982), 93 Ill.2d 94, 98, 66 Ill.Dec. 330, 442 N.E.2d 891; *People v. Mormon* (1982), 92 Ill.2d 268, 270, 65 Ill.Dec. 939, 442 N.E.2d 250.) Although there is some judicial expression that the conviction for armed robbery is the more specific *214 and the more serious offense, and therefore it should stand while the armed violence conviction and sentence should be vacated (*People v. Velleff* (1981), 94 Ill.App.3d 820, 825-26, 50 Ill.Dec. 222, 419 N.E.2d 89), other decisions express deference to the prosecutorial discretion granted to the State. (See *People v. Rayford* (1982), 104 Ill.App.3d 124, 60 Ill.Dec. 142, 432 N.E.2d 1041.) In this case, since both crimes are Class X felonies and the State and the defendants agree that the armed violence conviction should stand, we shall abide by their choice.

We have already set aside the convictions and sentences for unlawful use of weapons with regard to the defendant McClinton, and applying again the doctrines of the *King* case, we also conclude that one conviction and sentence for unlawful use of weapons imposed on the defendant Martin must be vacated.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279

Page 16

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)

[22] We do not, however, agree with defendant's conclusion that in view of the number of convictions and sentences being vacated it is necessary to remand the cases for resentencing. Defendant argues that the existence of the counts which we are vacating may have affected the judge's determination of the length of all the concurrent sentences imposed, including the sentences for the convictions for armed violence and unlawful use of weapons which we are affirming; therefore, defendant concludes that even those sentences must be vacated and the cause remanded for resentencing as to those convictions.

Although there is some precedent which suggests that resentencing is appropriate whenever a trial court's sentence determination *might* have been influenced by a vacated conviction (*People v. Vallero* (1978), 61 Ill.App.3d 413, 415-16, 19 Ill.Dec. 48, 378 N.E.2d 549; *People v. Bone* (1982), 103 Ill.App.3d 1066, 1069, 59 Ill.Dec. 745, 432 N.E.2d 329; *People v. Alegos* (1982), 104 Ill.App.3d 414, 416, 60 Ill.Dec. 147, 432 N.E.2d 1046, *aff'd* (1983), 97 Ill.2d 502, 74 Ill.Dec. 18, 455 N.E.2d 48), the genesis of that case line reveals an inapposite origin. (See *People v. Einstein* (1982), 106 Ill.App.3d 526, 535, 62 Ill.Dec. 285, 435 N.E.2d 1257.) The above cases which find resentencing appropriate rely upon authority expressly limited to the context of a defendant convicted of multiple offenses but receiving**293 ***656 a single sentence for all of the convictions. (See *People v. Guppy* (1975), 30 Ill.App.3d 489, 333 N.E.2d 576; *People v. Walton* (1981), 94 Ill.App.3d 903, 50 Ill.Dec. 387, 419 N.E.2d 495; *People v. Ross* (1978), 60 Ill.App.3d 857, 18 Ill.Dec. 77, 377 N.E.2d 230.) Obviously, in that context, resentencing was imperative when one of the convictions was vacated; however, the same conclusion does not follow when a defendant has properly received separate sentences for each conviction.

A reviewing tribunal cannot conclude, *solely* from a trial court's simultaneous imposition of separate sentences for multiple convictions, that the sentence imposed for one offense has been influenced*215 by the conviction or sentence for another offense. Sentencing is a trial court function (*People v. Cox*

(1980), 82 Ill.2d 268, 280, 45 Ill.Dec. 190, 412 N.E.2d 541; *People v. LaPointe* (1981), 88 Ill.2d 482, 492-93, 59 Ill.Dec. 59, 431 N.E.2d 344), and unless the record demonstrates to the contrary, we will conclude that the court considered only the appropriate factors in making its sentencing determinations. Since there is no evidence in the record suggesting that defendants' remaining sentences were improperly affected by their separate additional convictions and sentences, we will not remand their remaining convictions for resentencing. *People v. Owens* (1982), 109 Ill.App.3d 1150, 1160, 65 Ill.Dec. 593, 441 N.E.2d 908; *People v. Einstein* (1982), 106 Ill.App.3d 526, 535, 62 Ill.Dec. 285, 435 N.E.2d 1257; *People v. Worthen* (1982), 105 Ill.App.3d 386, 392, 61 Ill.Dec. 270, 434 N.E.2d 423; *People v. Wilson* (1981), 93 Ill.App.3d 395, 397, 48 Ill.Dec. 744, 417 N.E.2d 146.

[23] Defendants make the final claim that the trial court improperly ruled that they were eligible for extended-term sentences under section 5-5-3.2(b)(1) of the Unified Code of Corrections (Ill.Rev.Stat.1981, ch. 38, par. 1005-5-3.2(b)(1)). This section provides that under certain conditions, an extended-term may be imposed upon a defendant who has previously been convicted of any felony of the same or a greater class within ten years. While each defendant admits that he has previously been convicted of armed robbery, each contends that the provisions of the statute in question apply only when the previous conviction arose in the situation where the defendant was separately brought and tried. They argue that a defendant who is convicted after a guilty plea has not been "tried." Two districts of this court recently addressed this identical contention. (See *People v. Way* (1983), 115 Ill.App.3d 198, 70 Ill.Dec. 830, 450 N.E.2d 43; *People v. Baker* (1983), 114 Ill.App.3d 803, 69 Ill.Dec. 913, 448 N.E.2d 631.) The result of both cases was to uphold the extended-term sentence where the prior conviction was based on a guilty plea. The court in *Way* explained the purpose of section 5-5-3.2(b)(1):
"This provision * * * prevents a court from imposing an extended-term upon a defendant based upon charges tried concurrently. The language in question thereby ensures that a prior conviction,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

459 N.E.2d 279

Page 17

121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642
**(Cite as: 121 Ill.App.3d 196, 459 N.E.2d 279)**

when used as a basis for an extended term, will be totally separate and distinct from the charges for which the extended sentence is imposed, so that it is clear that the accused is in fact a recidivist." (115 Ill.App.3d 198, 202, 70 Ill.Dec. 830, 450 N.E.2d 43 .)

Under the rationale of the *Way* and *Baker* decisions, defendants' position on their sentencing hearings has no merit.

Consistent with the holdings and conclusions of this opinion, we reverse, in trial court number 81 CF 325 of the Eighteenth Judicial Circuit, defendant Harry Martin's judgments of conviction and sentences*216 for armed robbery in counts I and II, for armed violence in count III, and for unlawful use of weapons in count VI; we affirm the judgments of conviction and sentences of Harry Martin for armed violence in count IV and for unlawful use of weapons in count VII.

In trial court number 81 CF 326 of the Eighteenth Judicial Circuit, we . reverse the judgments of conviction and sentences of Dennis McClinton for armed robbery in counts I and II, for armed violence in count **294 ***657 III and for unlawful use of weapons in counts III and VII; we affirm the judgment of conviction and sentence of Dennis McClinton for armed violence in count IV.

AFFIRMED IN PART AND REVERSED IN PART.

SEIDENFELD, P.J., and LINDBERG, J., concur.
Ill.App. 2 Dist.,1984.
People v. Martin
121 Ill.App.3d 196, 459 N.E.2d 279, 76 Ill.Dec. 642

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| DAVID CARTER | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 07-1222 |
| | ) | |
| TERRY L. McCANN, | ) | Honorable |
| | ) | Joe Billy McDade, |
| Respondent, | ) | Presiding Judge |

### NOTICE OF FILING

TO:  Clerk
     U.S. District Court
     Central District of Illinois
     Federal Building, Room 309
     100 N.E. Monroe
     Peoria, Illinois 61602

   **PLEASE TAKE NOTICE** that on April _10th_, 2008, I have caused
to be filed the requisite number of copies and original of my **pro
se AMENDED MEMORANDUM IN SUPPORT OF PETITIONER'S HABEAS CORPUS
PETITION, §2254,** with the Clerk of the U.S. District Court for the
Central District of Illinois, a copy of which is hereby being ser-
ved upon you.

                              Respectfully submitted,

                              _David Carter_
                              David Carter No. N-43429
                              Stateville Correctional Ctr.
                              Post Office Box 112
                              Joliet, IL 60434-0112

### CERTIFICATION OF SERVICE

   I, <u>DAVID CARTER</u>, hereby certify that I have caused the above-
mentioned document to be forwarded to the party listed by placing
same in the U.S. Mail through the mailroom situated at the State-
ville Correctional Center, proper postage affixed on April _10th_,
2008.

                              _David Carter_
                              David Carter, affiant

### AFFIRMATION

   I, <u>DAVID CARTER</u>, affirm under the penalties of perjury that
the foregoing document is true and correct to the best of my know-
ledge and belief.

                              _David Carter_
                              David Carter, affiant