E-FILED
Friday, 02 May, 2008 11:17:51 AM
Clerk, U.S. District Court, ILCD

FILED

MAY - 2 2008

CLERK OF COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

DAVID CARTER,                    )
                                 )
            Petitioner,          )
                                 )
V.                               )        No. 07-1222
                                 )
TERRY L. McCANN,                 )        Honorable
                                 )        Joe Billy McDade,
            Respondent,          )        Presiding Judge

### AMENDED MEMORANDUM IN SUPPORT OF
### PETITIONER'S HABEAS CORPUS PETITIONS §2254

**Jurisdictional Statement**

The District Court has jurisdiction to entertain a petition for writ of habeas corpus pursuant to 28 U.S.C. §2241 and 28 U.S.C. §2254.

The Petitioner therefore respectfully requests that this Honorable Court review his Petition pursuant to _Haines v. Kerner,_ 404 U.S. 519, 520 (1972); and in accord with the established manner in which _Pro Se Petitions_ are ordinarily handled by Illinois reviewing Courts, forgiving any mistakes that may have been made.

**Procedural History**

1. Following a jury trial in the Circuit Court of Livingston County, Illinois, Petitioner David Carter was convicted of three counts of first degree murder, two counts of conspiracy to commit first degree murder, and one count of solicitation of first degree murder.

2. On March 31, 1992, the trial court imposed a sentence of natural life without any possibility of parole.

3. Direct appeal followed, the Appellate Court of Illinois, fourth Judicial District, affirmed Petitioner's conviction and vacated the duplicative sentences entered by the trial court. _See People v. Carter,_ No. 4-92-0298 (06-30-93) [Unpublished order pursuant to Supreme Court Rule 23].

4. On October 6, 1993, the Illinois Supreme Court denied The Petitioner leave to appeal. _See People v. Carter,_ no. 75884

5. On April 23, 1997, Petitioner filed his Pro Se Habeas Corpus Petition in

U.S. ex rel. David w. Carter v. George DeTella, No. 97-C-2926 before the Honorable

Harry D. Leinenweber, Judge. On April 1, 1999, Petitioner filed a Pro se Motion To

Stay Habeas Corpus Proceeding pursuant to section 2244 (d) (2) of Title 28, U.S. Code.

On April 28, 1999, the U.S. District Court in a Minute Order granted Petitioner's

motion to stay the Habeas Proceedings.

6. On August 10, 1998, Petitioner filed his combined Pro se Petition from

relief from judgment, and Petition for Post Conviction Relief, alleging the following:

(a) The investigative and interrogation techniques employed by the State
through their informant constituted fraud and denied petitioner of his
14th. Amendment right to due process of law;

(b) The State denied petitioner of his right to a fair trial by commenting
on his desire not to testify in his own behalf, and appellate counsel was
ineffective for failing to raise this claim on direct appeal;

(c) The State knowingly elicted perjured testimony from their key witness
at trial and failed to disclose favorable discovery materials prior to and
during trial;

(d) The State knowingly used perjury to obtain authorization for an
eavesdropping device from the Circuit Court;

(e) That Petitioner had obtained newly discovered evidence of actual
innocence.

7. On February 8, 1999, appointed counsel filed a Motion To Excuse Late filing

of his Pro se motions. In addition, a preliminary certificate to Supreme Court Rule

651 (c) was filed.

8. On March 18, 1999, the trial court conducted a hearing on the timeliness

of the Petitions, and denied the motion to excuse the late filing of the Post

Conviction Petition. The trial court granted the motion to excuse the late filing

of the Section 2-1401 petition for relief from judgment Petition.

9. On April 29, 2003, the State filed a Motion to Dismiss Petitioner's

Section 2-1401 petition for relief from Judgment.

10. On May 1, 2003, the trial Court held a hearing on the State's Motion.

At the hearing, the State's Motion to dismiss was granted, finding that Petitioner's

allegations that the wire tap obtained by informant/State's key witness, Harry Martin's

fraud trickery and perjury had no merit because the admissibility of the tape did

(2)

not depend on Martin's motive to testify. In addition, the trial court denied Petitioner's allegation regarding the prosecutorial misconduct in the State blantantly commenting on his fundamental right not to testify on his own behalf. the trial court found that this issue was waived, and in any event, "the line was not crossed".

11. Petitioner then requested the trial court to address the issue of perjury being used by the State in order to obtain authorization for the wire-tap by the trial court. The court responded that the issue had been addressed by the trial court and appellate court previously. the court furthered stated that it was not clear that Martin's sentence was reduced in return for his cooperation at Petitioner's trial, it would not have made a difference. The trial court dismissed Petitioner's §2-1401 Petition, and requested that a timely notice of appeal be filed in his behalf.

12. The State Appellate Defender was appointed to represent Petitioner on appeal. Subsequently, appellate counsel filed a motion to withdraw representation pursuant to Pennsylvania v. Finley, 481 U.S. 551 (1987). Petitioner filed a Pro se Response to appellate counsel's Finley motion.

13. On December 9, 2005, the illinois Appellate Court, Fourth District, allowed counsel to withdraw and affirmed the trial courts denial of §2-1401 relief in People v. carter, No. 4-03-0402.

14. On December 27, 2005, Petitioner filed his Pro se Affidavit of Intent to file Petition for Leave to Appeal in the Illinois Supreme Court.

15. On January 23, 2006, a Pro se Petition for Leave to Appeal was filed in People v. Carter, No. 101983 in the Illinois Supreme Court.

16. On March 29, 2006, the Illinois Supreme Court denied Petitioner's PLA.

17. On March 21, 2007, Petitioner forwarded his Pro se Petition for writ of habeas corpus with memorandum in support and appendices; motion for appointment of counsel; motion for leave to file additional pages, with the Clerk of the U.S. District Court for the Northern District of Illinois, Eastern Division for proper filing.

18. On March 29, 2007, the U.S. District Court, Northern District of Illinois, Eastern Division, acknowledged receiving Petitioner's Habeas Petition and Motions.

19. Pursuant to Rule 3 of the Rules Governing Section 2254 cases. On

April 12, 2007, the filing fee was paid.

20. This case was filed and cited as <u>U.S. ex rel. David Carter v. Terry L. McCann, Warden,</u> and assigned No. 07-C-1758 before Judge Leinenweber in this matter.

21. On April 20, 2007, the U.S. District Court for the Northern District of Illinois, ordered this action transferred to this jurisdiction pursuant to 28 U.S.C. §2241 (d).

22. On June 25, 2007, the U.S. District Court received his <u>Pro se</u> REQUEST TO RESCIND COURT ORDERED TRANSFER OF CASE after awaiting a substantial amount of time without a responsive pleading form Respondent in either jurisdiction.

23. On August 16, 2007, the U.S. District Court for the Northern District of Illinois, in No. 07-C-1758, docket entry stated:

> Due to clerical error, this action was not transferred although the court ordered that this Petition be transferred to the United States District Court for the Central District of Illinois at Peoria for preliminary consideration pursuant to Rule 4 of the Rules governing 2254 Cases on 04/20/07. The Clerk is directed to transfer this Petition to the United States District Court for the Central District of Illinois at Peoria forthwith.

24. On August 23, 2007, this Court issued a docket entry stating:

> case transferred in from District of NDIL; Case Number 07-C-1758. Original file with documents numbered 1-14, certified copy of transfer order and docket sheet received. New case number in Peoria Division of the Central District of IL. is 07-1222. All future pleadings to be filed in Peoria Division. (entered 8/23/07)

25. On December 17, 2007, Petitioner forwarded to the Clerk of this Court for proper filing, his <u>Pro se</u> MOTION TO REQUEST COURT TO ORDER THE RESPONDENT TO FILE AN ANSWER TO PETITIONER'S HABEAS CORPUS PETITION.

26. On March 14, 2008, this Court denied Petitioner's <u>Pro se</u> motions and ordered Petitioner to down size his <u>Pro se</u> memorandum to forty (40) pages or less by April 14, 2008. In addition, his Habeas Corpus Petition was STRICKEN and filed as an AMENDED HABEAS CORPUS PETITION.

27. Petitioner has therefore been forced to reduce his original Petition of Eight (8) meritorious Constitutional claims down to Four (4) in an effort to comply with this Honorable Courts order of a forty (40) page limit of Petitioner's amended memorandum in support of his Habeas Corpus Petition §2254.

## STATEMENT OF FACTS

[ See Appendix ]

## CLAIMS RAISED FOR REVIEW

### CLAIM
### I

PETITIONER WAS DENIED HIS FUNDAMENTAL RIGHT TO A FAIR AND IMPARTIAL TRIAL AND DUE PROCESS OF LAW IN THAT ILLINOIS COURTS REFUSED TO GRANT HIS MOTION TO SUPPRESS AN INVOLUNTARY STATEMENT, IN VIOLATION OF HIS FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS AS GUARANTEED BY THE U.S. CONSTITUTION AND ILLINOIS CONSTITUTION.

The crux of the argument derives from the evasive manner in which the state orchestrated a plot to obtain an involuntary statement from the Petitioner (while housed at the Pontiac Correctional Center Segregation unit - during a visit in the prisons visiting room), using coercive and trickery methods contributing to the violation of his fifth, sixth, and fourteenth amendment rights as guaranteed by the U.S. Constitution and Article i, Section 2 of the Illinois Constitution.

On December 16, 1988, Petitioner, in his motion to suppress statements II, argued that the statements were obtained in violation of his Sixth Amendment right to counsel and violated his Fourteenth Amendment right to due process of law. (C. 107-08) The trial court entered an order suppressing the statements as a result of a custodial interrogation in the absence of MIRANDA warnings, basing its decision People v. Perkins, 176 Ill. App. 3d 443, 531 N.E. 2d 141 (5th. Dist. 1998). Perkins, was subsequently reversed by the U.S. Supreme Court in Illinois v. Perkins, 496 U.S. 292, 110 S. CT. 2394, 110 L. Ed. 2d 243 (1990). On Appeal by the State, the Appellate Court reversed the trial courts suppression order, concluding that the statements were not the results of a custodial interrogation requiring the protections of MIRANDA. (Vol. I, C. 221-27)

On remand, another pretrial hearing was held and the motion to suppress statements was renewed:

as argued by Defense Counsel:

Mr. Thomas:    Judge, then the other motion I have is coupled with matters that went
               up on appeal but raising the Sixth Amendment issue. <u>There is one
               reference in the tape with David Carter about getting some lawyers.</u>
               it did not mention Shel BAnnister by name, that particular tape, <u>but
               there is a reference made about it</u> and also, Judge, in order for
               Mr. Martin to get in to see Mr. Carter, that whole rumor went out about
               <u>whether somebody is coming down here and going to help with some
               lawyers.</u> I think the whole thing is tainted with the fact it is
               indicated Mr. Martin was working on behalf of trying to secure
               lawyers for people who may or may not have been suspected of
               something. (Vol. v., R. 432-33)

    The trial court then discussed the difference between the interrogations from

Stat agent Harry Martin of the Petitioner, codefendant Ike Easley and Michael Johnson,

in the case of Easley, Harry Martin convinced Ike Easley as he did the others that

gang members in Chicago sent him to talk to them (Easley and Codefendants) that he

had talked to an attorney named Shel Bannister, and that the lawyer wanted Martin

to ask Easley a series of questions. Easley had not spoken to Martin prior to this

represention. (Vol. v. R. 433)

    As to Harry Martin's interview with Petitioner, the Court summarized it as

follows:

The Court:    Mr. Thomas (defense counsel) indicates on page 14 of 19 pages of the
              interview by Mr. Martin with Mr. Carter that at the top of page 14
it says <u>"if they need something, I'll be here".</u> That is Martin talking to carter.
<u>"and if the indictments come down, then they'll have lawyers. Whatever else the need,
you know, I'll be on top of it."</u> I don't perceive you all getting indicted. I don't
see how. I don't think they've got anything, frankly. Then how long now, a month
and a week or something? Carter responds, "almost a month or something like that."
So the refrence to Mr. Caretr is -- by Mr. Martin is that anything Mr. Carter or any
person who was involved in the investigation would need would be provided. That would
include if indicted hiring lawyers. And in Mr. Johnson's case they said we have
already talked to a lawyer and in Mr. Easley's case they have said not only have we
talked to a lawyer but there is a whole bunch of questions the lawyer wants me to
ask you, and Mr. Easley proceeded to spill his guts after he believed Mr. Martin had
come from the lawyer. <u>This is a case where I am in the unenviable position of quite
possibly in the Fourth District being wrong twice. Wrong because of Illinois v.
Perkins and if, in fact, for some reason they did not catch the Sixth amendment issue
and it slipped through. I, quite frankly, feel I may have the opportunity to be wrong
again because</u> I'm not going to suppress based upon the Sixth Amendment issue in this
case...

    I further find, I think, we have some serious Sixth Amendment issues coming
in this country. It is my opinion those issues are not raised in <u>People v. Johnson</u>
or <u>People v. Carter</u> and the renewed motion to suppress their statements will be denied,
the court finding that under my interpretation of <u>Illinois v. Perkins</u> trickery is
authorized, and if that trickery occurred in Mr. Easley's case and I suppressed that
and the State chose not to take that up and even let the Appellate Court look at what
happen there. I think trickery in <u>People v. Carter</u> and <u>People v. Johnson</u> presses
the limits but is within the permissive range of what can be done. I am personally
very uncomfortable with that in terms of constitutional law but i think I will adhere
to the findings of the U.S. Supreme Court, and if the fourth District has to address
this issue again, so be it, let them look and see it. Motion to suppress is denied...
(Vol. v., R. 438-41)

Petitioner maintains that the trial Judge was properly concerned about the trickery used in this case by Harry Martin in order to get Petitioner to incriminate himself. The statements were Constitutionally involuntary in violation of the fifth, Sixth, and Fourteenth Amendments of the United State Constitution.

It is insignificant as to when a lawyer or a lawyer's name may or may not have been mentioned and/or injected into any particular conversation. The whole purpose of including Mr. Martin's name or any of the defendant's visiting lists, and going to the visiting room to meet with confidential informant Martin, was based upon the false belief circulating amongst the defendants that Mr. Martin had obtained lawyers to represent the defendants and that he was in fact functioning in the name of the said lawyer - Shel Bannister. Any attempt to exclude any of the defendants who were allegedly involved in this alleged conspiracy to murder the victim in this case, is suspect, given the clear proofs that Mr. Martin was providing the false information to all the defendants, that he was in fact acting on behalf of attorney Shel Bannister, and collecting information about the case for her.

The misrepresentation made by the State agent Martin, as part of a ruse by the State and pre-planed with him for the purpose of securing incriminating statements from the defendants, under the guise of being sent by a well-known attorney. In People v. Easley, 170 Ill. Dec. 356, 592 N.E. 2d 1036, The Illinois Supreme Court Stated the following:

> During a conversation between defendant and Martin in the prison visiting area Martin told defendant:
> " Now the other thing is we got you all some lawyers, but we ain't gonna bring the in yet. we got [attorney] Shel Bannister cause we don't want to make it seem like you all are admitting to guilt. You know, you bring lawyers in before you have been indicted, you are saying I did something. so we gonna bring them in later._
> But what I need for Shel is information insofar as is there anybody that saw shit?"  Id. Easley, 170 Ill. Dec. at 367.

When HArry Martin visited Ike Easley at the Pontiac Correctional Center, he advised Easley that he has retained attorney Shel Bannister for all defendant's and that he needed to visit with Easley, Carter, and Johnson for the purpose of obtaining information for the lawyer. See People v. Easley, 592 N.E. 2d 1036 at 1047 (1992).

(7)

It was under this premise that the Petitioner, Placed martin on his visiting list and

agreed to meet with Martin.

        The record is replete with instances of court awareness in this case to wit:

The following colloquy took place.

COURT:            What do you do with a particular problem which I was struck by in
                  listening to the tapes and also as evidence by portions of the transcript
                  that Mr. Martin represented to the person to whom he was talking that
                  contact had already been made with a Chicago lawyer, Shel Bannister,
                  and that theinformation that was being obtained from the defendants
                  was so that Mr. Martin could carry that information back to the lawyer
                  who was being retained to represent them and that, in fact, the
                  information defendants were giving to Mr. Martin was information that
                  he had been commissioned by the lawyer to obtain and take back to Chicago.
                  He didn't just say there was a lawyer, he said it was Shel Bannister.
                  For anyone who has been involved in cases involving the Illinois Prison
                  System, Shel Bannister is someone who is known to this court and most
                  courts as a lawyer who has, I guess, what I would call an activist
                  practice. She does a lot of defense work. I have not encountered her
                  since the Pontiac riot trials ten years ago, but to many inmates in
                  the Department of Corrections when somebody tells them Shel Bannister
                  has been hired to represent them, this is a person that is familiar
                  to them, and when somebody says this is who your lawyer is going to
                  be, we have already gotten this set up, I need to know this and this,
                  and then the defendant, and I am not saying this is a case where anybody
                  spilled anybody's guts because there is a limited amount of information
                  that was obtained as a result of the eavesdrop, but nonetheless,
                  statements are made thinking they are going back to a lawyer, which
                  is a ruse, who has never been hired and never contacted as far as I
                  know is not going to represent them. Does that shock the conscience
                  that Mr. Martin, whether somebody told him to do this because it might
                  help in getting information. Is that something which, Mr. Bernardi,
                  you feel might shock the conscience? (R. VOL. II P. 282-284)

### Mr. Bernardi, State's Atty:

                  That is so vastly diferrent than what we have in this case. No one walked
                  in there with a briefcase and a suit on. It was quite obvious to the
                  defendant that Mr. Martin was not an attorney, and he did not explain
                  in any of these tapes he was a lawyer, he was representing himself as
                  being sent by one and if that is going to be a due process argument,
                  and I guess it can be a due process argument, I do not believe it rises
                  to the level of due process violation under Fourteenth Amendment...
                  (R. VOL. II P.287)

### See Additional Record Sheet --- No.9

                  Harry Martin, while working as an agent of the Illinois Department of
                  Law Enforcement / Illinois Department of Corrections had defendant place
                  his name on the visiting list and then visited defendant while wearing
                  a listening device and engaged in conversations with defendant. Defendant

(8)

understood Harry Martin to be a former inmate in the Illinois Department
of Corrections who had certain rank or authority within a gang or organizatic
of which defendant was a member. Harry Martin, at the request of law
enforcement agents asked defendants Easley, Johnson and Carter numerous
questions about the death of prison Superintendent Robert L. Taylor
on September 3, 1987. Defendants making statements were lead to believe
that Harry Martin was om the streets at the time that the statements
were made and that they were reporting to him to communicate information
to other gang members in Chicago and further that information given
to him was to be relayed to attorney Shel Bannister, who Martin
represented had been hired to represent defendant (attorney Shel Bannister
had not in fact been hired to represent any of the defendants and the
story was apparently made up to facilitate obtaining information from
them under the thought that it would be treated confidentially).
(SEE ADDITIONAL RECORD SHEET NO.9 ATTACHED AS APPENDIX).

### See Report of Proceedings at Pre-Trial Hearing. Nov. 18, 1991.

COURT:

My concern is whether injection of an attorney who, in fact, and in
reality existed, who was known to inmates to represent them in certain
prison related matters but who had, in fact, not been hired in these
cases, who had not been contacted in these cases, and it was simply
a misrepresentation by Mr. Martin to gain the confidence presumably
of Mr. Johnson and Mr. Carter, Martin having been held at another prison
than the one these two defendants were in. It was simply a ploy, an
investigation technique used, a trick, deception, to make it more
plausible for these two defendants to talk to Martin and tell him what
they knew. (R. VOL. THREE P. 436)

### See Court's Order Suppressing Statements (tapes) Finding at #5, to wit:

the Department of Corrections cloaked confidential informant Martin
with a COVER STORY that he was not in fact, at the time of the visit,
in the custody of the Department of Corrections, confidential informant
Martin's wife was permitted to join him in the ruse; he asked three
of the defendants numerous questions about their involvement in the
death of Superintendent Taylor; he told defendants that a lawyer by
the name of Shel Bannister, had been hired to represent him and
confidential informant Martin was asking questions for the purpose of
relaying information to the lawyer; that Martin was a member of a street
gang who D.O.C. believed had sufficient rank which would cause defendants
to talk to him under the guise of reporting to a superior.
(See Suppression Order Attached as Appendix)

The Court has fully acknowleged that the Petitioner was led to believe and accept that
Attorney Shel Bannister was factually involved on his behalf, and that confidential
informant Martin was gathering information for her. " A collective understanding of
the defendants was that Shel Bannister was their lawyer and confidential informant Martin
was communicating specific facts to her from information conveyed to him by each
defendant."

Such tactics and anything which may have resulted based upon such unconscionable activity
on the part of the State, must be firmly rejected and harshly condemned. this HONORABLE
Court must find that such State activity, for the purpose of tricking a defendant into
incriminating himself, are in fact Constitutionally Involuntary in violation of the
Due Process Clause of the Fourteenth Amendment. (U.S. CONST., AMEND, XIV).

The question of voluntariness of the statement depends on the absence of police
overreaching. People v. Easley, 148 Ill.2d 281, 592 N.E. 2d 1036, 1049 (1992), citing
Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473, 482 (1986).
Interrogation techniques that overreach are offensive to a civilized system of justice
and will be condemned. Easley, 592 N.E.2d 1036, 1050, citing Miller v. Fenton, 474 U.S.
104, 106 S.Ct. 445, 88 L.Ed.2d 405, 410 (1985). " Ultimately, the inquiry in determining
whether statements are involuntary as a matter of Due Process is whether the conduct
of the State Agent is CASUALLY RELATED TO DEFENDANT'S CONFESSION." (Easley, 592 N.E.2d
at 1049.) Based upon all the aforementioned facts herein, there can be absolutely no
doubt, that the activities of the State via its Informant, was in fact RELATED to those
admissions allegedly made by the Petitioner.

Certainly, a degree of trickery has been upheld by the United States Supreme
Court, pursuant to the high Court's holding in Illinois v. Perkins, 496 U.S. 292, 110
S.Ct. 2394, 110 L.Ed.2d 243 (1990). However, at no time did the United States Supreme
Court hold that the State may, by way of misrepresentation in respect to legal counsel,
employ deceptive practices by asserting they were acting on behalf of legal counsel,
in order to induce a criminal defendant into incriminating himself. Nonetheless, such
is the level to which the State did stoop in order to deprive the Petitioner of his
Constitutionally Guaranteed Liberty, by perverting his Constitutional Protections and
safegaurds by misrepresentation, a fact which has been fully and unquestionably
established in the record.

Moreover, were it not for the misrepresentation in this particular case, the
State would not have had any basis for depriving - permanently - the Defendant of his
liberty. It is simply unacceptable, and has always been unacceptable to present one's
self as being an attorney at law for any purpose; such misrepresentation under these
circumstances are in fact acknowleged as criminal.

(10)

The Petitioner asserts that actual criminality is in fact beyond what the United States Supreme Court has held to be acceptable trickery in its ruling involving <u>Illinois v. Perkins,</u> 496 U.S. 292, 110 S. CT. 2394,110 L. Ed 2d 243 (1990).

The State may not extort confessions by deliberate fraud or trickery. <u>People v. smith,</u>108 Ill. App. 2d 172, 180 (1969). Evidence that the accused was threatened, tricked, or cajoled into the waiver of his rights will, of course, show that the defendant did not voluntarily waive his privilege against self-incrimination. <u>Smith,</u> 108 Ill. App. 2d at 179; see also <u>Miranda v. Arizona,</u> 384 U.S. 436,476, 16 L. Ed. 2d 694, 725, 86 S.Ct. 1602, 1629 (1966). "trickery involves affirmative acts of fraud or deceit." <u>Smith,</u> 108 Ill. App. 2d at 179. The confession must not result from deceptive interrogation tactics calculated to over come the defendant's free will. <u>United States v. Kontny,</u> 238 F3d 815, 818 (2001).

Furthermore, Petitioner has consistently maintained that a Sixth Amendment violation occurred because State agent Harry Martin interfered with Petitioner's Attorney-Client Privilege. <u>United States v. Seale,</u> 461 F. 2d 345 (7th. Cir. 1972), but recognizing the decision in <u>People v. Easley,</u> 148 Ill. 2d 281, 592 N.E. 2d 1036, 1053, (1992) which rejected a Sixth Amendment claim because the right to counsel had not attached.

It is to be Properly noted, that the primary provisions of the Fourteenth Amendment effectively applied the Bill of Rights to the States by forbidding States from abridging the privileges and immunities of the United States Citizenship. Criminal Deception to undermine and to subvert such Constitutionally guaranteed safeguards can not be acceptable, and must be rejected.

The Decision of the Illinois State Court is contrary to and involves an unreasonable application of clearly established Federal Laws as determined by the United States Supreme Court as well as other Federal Precedents, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court Proceedings.

CLAIM

II

PETITIONER CONTENDS THAT PROSECUTION'S KNOWING USE OF PERJURED
TESTIMONY AND <u>BRADY V. MARYLAND</u> VIOLATION VIOLATED HIS DUE
PROCESS RIGHTS AS GUARANTEED BY THE 5th AND 14th AMENDMENTS
OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 2
OF THE ILLINOIS CONSTITUTION.

On August 10, 1998, Petitioner filed combined <u>Pro se</u> Petition for Post-Conviction
Relief of Judgment, 725 ILCS 5/122-1 et seq. (West 1998) and Petition Relief of Judgment
735 ILCS 5/2-1401 (West 1998). (CLR 36-165) On April 23, 1999, the trial court denied
Petitioner's motion to excuse the late filing of his Post-Conviction Petition under
the Act, dismissing said Petition as untimely filed; and granted his motion to excuse
the late filing of his Petition under Section 2-1401, instead. (CLR 253-258)

Petitioner contends that he was denied a fair and impartial trial, in that the
State's agent, Harry Martin perjured himself, prior to trial and during trial in this
cause. Thus receiving benefits from State Officials that were never disclosed to
Petitioner. That Petitioner discovered this mishap which prompted him to file a
combined Post-Conviction Petition and Petition for Relief from Judgment. (CLR 36-165)
Furthermore, during trial the following colloquy took place in pertinent part:

THE COURT:    The third issue there is an agreement by the State that they would provide
              to the Court, and then the Court would do an in camera inspection of
              master files relating to inmate witness who the Prosecution would indicate
              they would be calling. The defense said as long as we have that
              information the day before ah, trial, so we could look at it ah, then
              that was acceptable procedure.

              Could anyone assume there was some kind of quid pro quo deal struck as
              to how inmates would be treated if they cooperated with the State as
              far as administrative good time, information, and other things, and that
              information is contained in the master files and I think the defense
              has a right to see that plus information concerning gang affiliations
              of witnesses and other inmates. [ Volume 13,R. 9-10 [ [CLR 344]

MR. CASSON:   You want to address the issue now with regard to Mr. Martin?

THE COURT:    Mr. Spiller... was out on the street by the fall of 89. That as far
              as Mr. Martin is concerned, Mr. Martin has not been ah, in DOC custody

(12)

since roughly that time. He has been in Federal custody and DOC does not have, does not have material on him since that time. Ah, that would have been probably a year, a year or so, I am not sure how long after I had made the copies of the stuff that appeared to me to be germane from the master file.

[The Court apparently referring, at page 15, to material to be given to defendant's counsel regarding Martin.]

THE COURT:    The material I look for, and I would indicate for the record when I do an in camera, I also look for any special relationship between witnesses correctional staff before or after the event in question. Ah, and ah, I also look for any indication I try to pull their disciplinary record in the institution ah, their, ah, rap sheet, any copies of charges or calculation of release dates or anything else. So that is the type of material that I pulled from Mr. Martin and Mr. Spiller's files.

If there is material, Mr thomas, in looking through there, I realize there was an in camera, but if you see some kind of gap tell me and I can do some further checking.

Mr. CASSON:   With regard to Mr. Martin, I know the Court indicated some concern over that fact that Mr. Martin's information in his master file was terminated in the month of September of 87, and as far as information pertaining to any deals or agreements or anything that Mr. Martin has received in return for his cooperation in this case, then we are prepared to ah, make a record on that through ah, former Deputy Director Gerald Long and Deputy Director Watkins today, if the court wants us to?

THE COURT:    Okay, I want a record on what, if anything, Mr. Martin has been promised, information as to his treatment, at least in the Department of Corrections ah, other information which would indicate, or motive he might have in testifying. I understand that DOC may not have him. I just understand there may be somebody out there who has knowledge as to how Mr. Martin has been handled and ah, that i need to know.[Vol. 13 R. 13-20] [CLR 344-345]

Petitioner's defense counsel at trial and the presiding Judge, extensively and thoroughly questioned the State, Deputy Directors Gerald Long and David Watkins of the Illinois department of Corrections, and jailhouse informant Harry Martin with respect to weather or not Martin had received any benefits of any nature from the State in exchange for his cooperation and testimony. All vigorously denied, under sworn oath that any benefit was given to informant Harry Martin in exchange for his cooperation. (see appendix testimony of Deputy Directors Gerald Long, David Watkins and Harry Martin)

Moreover in 1997, Petitioner received from defense counsel of his Co-Defendant Ike Easley, an Affidavit authored by State witness Harry Martin, in which Mr. Martin confessed that he was in fact given not only money, in exchange for his testimony but many other incentives such as, the relocation of his wife and children, the unheard

of privilege of being allowed to leave prison to visit with his wife and children,
a phone card to make unlimited free phone calls, and shopping at the inmate commissary
under an assumed name. All of this pales in comparison to the fact that Mr. Martin
only served a very small amount of time of a 45 year prison sentence. All of these
incentives given to Mr. Mr. Martin for his testimony were not only covered up at trial
by the State, but Deputy Directors Gerald Long and David Watkins perjured themselves
to the Trial Court when they stated nothing was given to Mr. Martin in exchange for
his testimony. The informant himself has come forward and admitted that he committed
perjury, that he was in fact paid for his testimony, there is evidence to support his
claims, this coupled with the perjured testimony of Officials from the Illinois
Department of Corrections clearly deprived Petitioner of his Right to Due Process of
Law under the 14th. Amendment of the United States Constitution. (see Appendix
Affidavit of Mr. Harry Martin)

Unbeknownst to Petitioner or his Defense Counsel at the time, approximately
1 1/2 months BEFORE testifying at the trial in this cause, informant/State witness
Harry Martin appeared Pro se before the Circuit Court in DuPage County,
Case No. 81-CF-325. The State was represented by Assistant States Attorney Richard
Stock of DuPage County. According to trial records from October 1, 1991, Judge Edward
W. Kowal, after a 402 conference held in chambers concerning the 35 year sentence of
Mr. Martin, and with  full support of the State Attorney's office re-sentenced Mr.
Martin to only 21 years and granted him time considered served. Furthermore ON A MOTION
BY THE STATE, THE FILE AND ANY RECORD OF PROCEEDINGS CONCERNING THE RE-SENTENCING OF
MR. MARTIN WAS IMPOUNDED. (see Appendix documents concerning DuPage County Circuit
Court hearing dated October 1, 1991).

Information of State's cooperating witness, Harry Martin's reduction of his
DuPage County sentence to "time considered served" approximately 1 1/2 months prior
to testifying at trial against Petitioner, combined with the unjustified concealment
of the DuPage County's Re-Sentencing amounts to a deprival of Petitioner's Due Process
Rights as guaranteed by the 14th Amendment of the United States Constitution, and

(14)

Article I, Section 2 and 8 of the Illinois Constitution.

The record clearly shows that Harry Martin's testimony at Petitioner's trial was inconsistent with what actually occurred a 1 1/2 months earlier in DuPage County in People v. Martin, No. 81-CF-325. At the trial in this cause, Martin feigned the accuracies of his convictions and sentences and the State allowed this perjured testimony to go uncorrected. The State's failure to disclose certain infomation to the defense is in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed 2d 215 (1963); Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763,31 L. Ed 2d 104 (1972); and Kyles v. Whitley, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed 2d 490 (1995)

In Giglio, the U.S. Supreme Court held that the Government's Brady obligation to provide evidence to the defense encompasses evidence affecting a Government witness' credibility. Id. 405 U.S. at 154. The Court stated that the Brady violation extends beyond the mere knowledge of the trial Prosecutor. Id 405 U.S. at 154. The Giglio Court explicitly imposed upon the Government the obligation to disclose impeaching information of which the Government information of which Government personal are aware, even though the information is not known to the Prosecutors personally involved in the trial of the case. The Court stated the following:

> To the extent this places a burden on the large Prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it. Id. Giglio, 404 U.S. at 154.

In this instant case, being that the murder of Supt. Robert Taylor took place at the Pontiac Correctional Center, within the Illinois Department of Corrections (IDOC) a large cast of characters were involved in the investigative, charging and prosecuting process, including, but not limited to IDOC Officials, Illinois State Police, various State Prosecutors, the trials took place in various counties, the Illinois Attorney General and the Federal Government.

Unfortunately, each individual State agency and their agents, denies either offering or promising State witness Harry Martin, a deal, other than protection of his family and ultimately feign ignorance to his time-cut in DuPage County, and the

immediate sealing of the files in that case thereafter. <u>United States ex rel. Smith v. Fairman,</u> 769 F. 2d 386 (7th Cir. 1985).

In <u>Smith,</u> the Seventh Circuit affirmed the District Court's decision granting a Habeas Corpus Petition. The Seventh Circuit held that a State Prosecutor's ignorance of the withheld <u>Brady</u> material did not justify the nondisclosure of the <u>Brady</u> material which had been known to a Police Ballistics expert, but which was not included in the official report the expert prepared and provided to the Prosecutor. The Court stated:

> We believe that the purpose of <u>Brady</u> would not be served by allowing material exculpatory evidence to be withheld simply because the Police, rather that the Prosecutors, are responsible for the nondisclosure. <u>See Carey v. Duckworth,</u> 738 F. 2d 875, 878 (7th Cir. 1984). A Prosecutor's office cannot get around <u>Brady</u> by keeping itself ignorant or compartmentalizing information about different aspects of the case. Id. <u>Smith,</u> 769 F. 2d at 391-92.

The use of perjured testimony to obtain a criminal conviction violates Due process of Law. <u>People v. Olinger,</u> 176 Ill 2d 326, 345, 680 N.E. 2d 321, 223 Ill. Dec. 588 (1997). Even where the Prosecution did not solicit false testimony, but allows it to go uncorrected when it appears, Due Process is violated. <u>Napue v. Illinois,</u> 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L. Ed. 2d 1217 (1959). In <u>Brady v. Maryland</u> 737 U.S. 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the Supreme Court announced that "suppression by the Prosecution of evidence favorable to an accused upon request violates Due Process where the evidence is material either to guilt or punishment, irrespective of the good or bad faith of the Prosecution." Id. <u>Brady</u>, 373 U.S. at 87. Impeachment evidence merits the same constitutional treatment as exculpatory evidence. <u>Giglio v. United States,</u> 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1970).

The record is extremely clear that the State's witness Mr. Martin perjured himself, numerous times throughout the Petitioner's trial. That the State's Attorney refused to correct the issues when they arose. Thus there is no other recourse to correct such Constitutional errors except to grant the Petitioner a new Trial.

The Decision of the Illinois State Court is Contrary to and involves an Unreasonable Application of Clearly Established Federal Laws as determined by the United States Supreme Court as well as other Federal Precedents, and Resulted in a Decision that was based on an Ureasonable Determination of the Facts in light of the Evidence presented in the State Court Proceedings.

## CLAIM

## III

PETITIONER WAS DENIED HIS FUNDAMENTAL RIGHT TO A FAIR AND IMPARTIAL TRIAL AND DUE PROCESS OF LAW IN THAT ILLINOIS COURTS ERRED IN ITS RULING ADMITTING THE TAPED STATEMENT OF PETITIONER INTO EVIDENCE BASED ON " THE CONSPIRACY BEING ON-GOING ". IN VIOLATION OF HIS SIXTH, AND FOURTEENTH AMENDMENT RIGHTS AS GUARANTEED BY THE U.S. CONSTITUTION AND ILLINOIS CONSTITUTION.

Petitioner contends that the Appellate Court failed to address the legal question as to " whether or not the conspiracy had ended" for purposes of determining it's admissibility . <u>Kurlewitch v. United States,</u> 336 U.S. 440, 69 S.Ct. 716 (1949).

In <u>Krulewitch,</u> The U.S. District Court indictment charged in a three count indictment that Krulewitch and a woman defendant had (1) induced and persuaded another woman to go from New York City to Miami, Florida for the purpose of prostitution; (2) transported or caused her to transport from New York to Miami for that purpose; (3) conspired to commit those offenses. The challenged testimony was elicited by the Government from its complaining witness, the person whom Krulewitch and the woman defendant allegedly induced to make the trip for the purpose of prostitution. The conversation between the complaining witness and Krulewitch's Co-Defendnant consisted of the following: She asked me, she says, you didn't talk yet? and I says, no. and she says, well, don't, she says, until we get you a lawyer. and the she says, be very careful what you say. And i can't put it in exact words. But she said, it would be better for us two girls to take the blame than kay (the Defendant) because he couldn't stand it, he couldn't stand to take it." <u>Krulewitch,</u> 69 S.Ct. at 717.

(17)

In this case, a jury impaneled in the Circuit Court of McLean County convicted Petitioner, of first Degree Murder , and Conspiracy to commit First Degree Murder. Prior to trial, the Trial Court denied Petitioner's motion to suppress (wiretap) statements on grounds that they were involuntary under the fourteenth Amendment Due Process Clause and obtained in violation of Petitioner's Sixth Amendment Right Counsel. The statements were obtained through the pretext used by informant harry Martin that he had contacted an Attorney for Petitioner and for all the other INDIVIDUALS allegedly involved in the incident and would be helping insure that Petitioner had legal assistance.

Prior to trial in this matter, trial counsel's attempt to suppress the statements arguing that the alleged conspiracy had terminated, was denied. Notwithstanding the fact that without the taped recorded statement of Petitioner, it was very likely that he could not be connected to the instant offense.

During a hearing regarding whether or not the conspiracy had ended, the following colloquy took place:

THE COURT:   Mr. Thomas has filed on behalf of Mr. carter a motion in limine, and
             that motion needs to be addressed. It is directed toward what the
             defense believes will be hearsay statements of unindicted co-conspirators
             and statements of indicted conspirators and the motion specifically
             raises that issue that the defense's position is that any such statements
             would have been made prior to the existence of any alleged conspiracy
             or subsequent to the termination of the conspiracy and accordingly would
             not be admissible as evidence in this case, and the defense has moved
             in Limine for an order that all such declarations, acts or statements
             prior to the existence of any alleged conspiracy and following any
             alleged conspiracy be barred by the Court and that is a matter the Court
             needs to rule on.

             Argument on the Motion, Mr. Thomas?

Mr. Thomas:  I will stand on my Motion.

Mr. Brown:   Judge, we don't have a copy of that.  is there anyway we can get a copy
             of that?

Mr. Thomas:  It was sent to your office.

Mr. Brown:   Unless it got lost in all the papers.

THE COURT:      This is filed from Chicago October 25th. and I think I received probably two copies of it at some point.

MR. THOMAS:     I do have an extra copy, Judge. Do you need it?

THE COURT:      Yes.

[After a short interruption, proceedings were resumed.]

MR. CASSON:     Judge, with regard to the statements, recorded statements, that were made to Harry Martin, it is not our intention at this time to attempt to introduce any of those statements which were made to Mr. Martin by any either alleged indicted or alleged unindicted co-conspirators. The only recorded statement which at this time we intend to introduce during the course of our case in chief would be the recorded statement which was made to Harry Martin by the Defendant, and it is, our possition with regard to that statement that was an admission made by the Defendant as to acts charged in this case and we are not attempting to introduce that on the basis it was a statement made in furtherance of a conspiracy. We would, of course, reserve our right to use any recorded statements that were made to Mr. Martin by any witness who might appear and testify on behalf of the Defense for impeachment purposes.

THE COURT:      Does the State intend to introduce or attempt to introduce the testimony of any witnesses who would testify as to events after Superintendent taylor's death that the State would contend would be in furtherance of some conspiracy to murder him/

MR. CASSON:     Statements made by the Defendant after death?

THE COURT:      Defendant is on tape with Harry Martin, and sitting aside for the moment what that is, are there any other witnesses subsequent to the death of Superintendent Taylor on September 3, 1987 which the State intends to call who would testify as to activities after the Superintendent's death which the State would contend were in furtherance of a conspiracy to kill him?

MR. CASSON:     No. The only evidence we would have would be activity and statements made prior to the murder.

THE COURT:      Because the general problem area, particularly in the Federal cases are statements made by someone alleged to be a conspirator or co-conspirator after the event has taken place and I think Mr. Thomas correctly points out that such statements once the conspiracy, alleged conspiracy, is terminated cannot be used. As far as statements predating the death of Superintendent Taylor, it gets a little harder to distinguish what statements are presented which are pursuant to a conspiracy, depending on the timing and who is involved and what is being said, and I guess I will have to deal with those as best I can. The real issue is, can the State use the Defendant's taped statement to Harry Martin when Harry Martin who is an inmate was working under-cover, wired for sound, and went into the Pontiac Correctional Center approximately, what a month - how lone after Superintendent Taylor's death did Martin go into Pontica Correctional Center to talk to Carter?

MR. CASSON:     Slightly over a month.

THE COURT:    Slightly over a month. Martin wired for sound goes in the visitor's
of the Pontiac Correctional Center. He is working as an undercover
agent. Mr. martin at the time was an inmate in the Department of
Corrections. He was incarcerated in DOC. However, as a part of a ruse
that was concocted, he was accompanied by his wife or girlfriend to
the Pontiac Correctional Center. His cover story was he was out on
an appeal bond, he was a high ranking member of a street gang, that
he wanted information from Mr. Carter as to what occurred in Pontiac
in connection with Superintendent Taylor's murder and Mr. Martin asked
Mr. Carter a whole series of questions a number of which Mr. Carter
responded to. I Suppressed that statement originally based upon People
v. perkins out of the Fifth District which had ruled in illinois that
the Police may not do indirectly what they cannot do directly. That
is to say that a Police Officer or a Police agent or someone working
for the Police cannot simply take off the uniform, ask questions of
someone in connection with a crime, and then use those unmirandized
answers or responses against that person and that had relied on the
Mathias case and People v. Perkins as those here in the courtroom is
aware was taken to the United States Supreme Court out of the Fifth
District of Ilinois and Mathias was reversed and Perkins now holds in
the U.S. Supreme Court, decided subsequent to the trial of People v.
Easley, that an undercover agent acting surreptitiously is not required
to Mirandize a person being held in custody on an unrelated charge when
Police are investigating that person for another unrelated offense and
that trickery and deceit are reasonable means of obtaining information
by the Police of thier agents. The question in Perkins, or Illinois
v. Perkins, is how far does that go? But, in any event, People v. Carter
having gone to the Illinois Appellate Court the case came back from
the Appellate Court of the Fourth District who ruled that the Fifth
District case of People v. Perkins had been "wrongly decided" and the
Fourth District case correctly anticipated that the U.S. Supreme Court
would, and the U.S. Supreme Court did approximately a month later, change
the law in the United States concerning statements of this type. So
we have a statement made by Mr. Carter a little over a month after
Superintendent Taylor's death taken at a time when Mr. Carter was in
disciplinary segregation locked up 24 hours a day, isolated from contact
with other persons, unable to make phone calls, administratively charged,
I believe at that time with murder but had not been indicted who was
allowed to go to the visiting room at the Pontiac Correctional Center
and in a non-coercive atmosphere and I think the record is clear Pontiac
Correctional Center visiting room is the least coercive atmosphere
anybody has seen in a maximum security prison in that it much resembles
a circus and free-for-all with family members, children, concessions,
photo opportunities, electronic games, you name it and it is in the
visiting room with about 130 tables, a video camera, and depending on
staff, perhaps one corrections officer, maybe two, to try and ride herd
over this absolute chaos where anything and many times everything does
occur in that visiting room. Nonetheless, Mr. Carter in response to
a letter from harry Martin, another member of the organization who was
working undercover, agreed to go to the visiting room and there he had
a discussion with Mr. Martin who was wired for sound and so there was
no coercion. What occurred is simply that Mr. Carter was not aware
Mr. Martin was working undercover, that the People had obtained an
eavesdrop order from me. My expectation was that Mr. Martin would go
in and acting like a fly on the wall without prompting Mr. Carter to
say anything which would be incriminating would just simply sit there
and listen to see if Mr. Carter said anything about what occurred.
Instead, as the transcripts shows, Mr. Martin asked Mr. Carter numerous

(20)

questions and also managed to direct him back to what was going on and
what his involvement and that of others was. In any event, the Appellate
Court didn't address the question of whether that statement or those
statements by Carter to Martin were made after the conspiracy terminated.
But I think Mr. Casson is correct, this is an admission by the Defendant
as to his involvement and is no different than any statement someone
might make other than the circumstances under which it was made and
the fact that the U.S. Supreme has, in effect, side Miranda doesn't
apply. So is admissible for those reasons.

The other concern I had was in looking through it was the issue of
whether, in fact, this was just history. Was this Martin just asking
Carter what happened? Nothing in the present tense, also in the past
tense. For the most part, that is correct. It is simply a historical
statement by Mr. Carter as to what he understands has happened, and
I have looked at the transcript. The only deviation from that appears
on page 12 it says "Martin: Cause Larry's interested in that cause
Ketchup. I heard a lot missed stories about Ketchup and I want to see
exactly what he wrote cause he ain't supposed to be on no shit like
that no way.

CARTER:  He talking about something to the effect where he's telling me he's
gona take it to court and say he did it, then when it gets to court,
he's gona say he didn't. Something like that shit.

Then there is a series of questions, and getting down about two-thirds
of the way down the page, Carter: The main thing is this here. I just
don't want all these brothers to be giving different stories, then you
got five different stories to tell the man.

Then over on page 14 again there is a conversation about who is reporting
what information to whom. There is some discussion, and in Mr. carter's
statement is the only reference to attorneys and that is by Martin who
says, "and if the indictments come down, then they'll have lawyers.
Whatever else the need, you know, I'll be on top of. I don't forsee
you all getting indicted. I don't see how. I don't think they got
anything, frankly. Been how long now, a month now, a month and a week
or something?"

Whereas in Easley, Martin injected the attorney issue early on, in Mr.
Carter's case, the question of counsel did not come up until well into
the interview and the it wasn't under subterfuge Martin had obtained
a lawyer for Mr. carter and that Martin was reporting back to a lawyer
and asking questions of Carter at the lawyer's request. In Martin's
discussion with Carter an attorney is mentioned in passing that counsel
can be obtained later. In my opinion - and then going into page 17
of the transcript, we are back to the letter. About a third of the
way down the page, Martin says "DISAPPEAR". He is talking to Michelle
who is accompanying him, the female with him, to give his story more
believability that he is out on a appeal bond.

MARTIN: Disappear. Tell Dice to give you that letter and I'll be back
to get it - the one that Ketchup wrote. Anybody else writing letters?

CARTER: No, I hope not anyway.

Then down a little further, Martin: Tell Dice I'm gonna want to know
if the letter was opened when it got there and I want the letter. I'm
gonna give that to him. I'm gonna go see Mr. Corwyn Brown.

(21)

CARTER: I hope somebody talked to him about the real deal.

MARTIN: I talked to him already, but I'll talk to him again, I'm gonna talk to him again. he's straight.

CARTER: Try to find out what he said through, man.

MARTIN: you talking about in the letter?

CARTER: No, I'm talking about what he said to those honkies.

MARTIN: What he said to them?

CARTER: Yeah.

And on page 19, the last page, they are still talking about the letter.

MARTIN: He don't do not work. Doesn't do no work. Tell Dice to give me that letter. I'll be back to get it.

And then on down, CARTER: Tell the boss I said everything all right.

My impression of the transcript of the tape, and I don't know how accurate it is. I did listen to the original tape pursuant to the wire after I authorized it. There are times where because of noise, the background noise in the visiting room and accents that is difficult at times to catch everything and I suspect you have to listen to the tape a couple of times in certain spots. But assuming for the moment the accuracy of the tape and the transcript made from it, it does appear to the Court while most of this is a history given by Carter to Martin as to what occurred, also what is going on is, for want of a better term, a cover-up or attempted cover-up, that is still ongoing relative to the murder, relative to who is telling what story and communications back and forth between persons implicated in the murder as to what they are saying, who they are saying it to and to try and get their stories straight. So my response is that I read the transcript as if the conspiracy is ongoing, that it didn't terminate with the murder, that it was in what amounts to a cover-up phase of people trying to get their stories straight, protecting each other and, of course, we are talking here about a street gang and the inner connections between them, their hierarchy, their officers, their communications centers and with other high ranking street gang members. There is a reference to Larry Hoover. i think it is clear, at least at time from the testimony and transcript, Mr. Hoover was in Stateville at the time but yet he was the person calling the shots among the Black Gangster Disciples in the Department of Corrections. So I believe the conspiracy could be considered to be ongoing based upon statements in the transcript, and for that reason it is admissible on the issue of conspiracy. Just as importantly I believe it is now admissible under People v. Carter in the Appellate Court opinion in this case as an admission a statement by the defendant and that Miranda wasn't required and is therefore admissible on those grounds.

The third issue was the question of counsel on Sixth Amendment, and in Mr. Carter's case, unlike Mr. Easley's case where counsel was really used to help manipulate Mr. Easley in thinking he was communicating information that would go back to his attorney and he was given the name of someone who, as it turns out, was part of the story who had

been hired to represent him and that hadn't actually occurred. Mr. Carter was not told that by Mr. Martin and the question of counsel only comes up well after Mr. Carter is talking about what allegedly occurred.

Anybody want to add anything further to the record? Mr. Thomas?

MR. THOMAS:    Judge, I would just state to your Honor that the passages you read were all passages that were elicited by Mr. Martin, when the letter came up, Mr. Martin injected the Larry Hoover situation into the case. I will state to your Honor that is not something Mr. Carter came forth with without being prompted by Mr. Martin.

THE COURT:    State?

MR. CASSON:    No.

THE COURT:    The only thing I would respond, on page 13 when Mr. Carter says "the main thing is this here. I just don't want all these brothers to be giving different stories, then you got five different stories to tell the man.

Mr. Carter has determined apparently in his own right that there need to be some uniformity as to who is saying what, and that needs to be coordinated by someone and I think that clearly indicates that the jury could determine that was part of a ongoing conspiracy relating to the murder of Superintendent Taylor.

Yes, Martin, I don't think anybody can fairly look at this and not conclude that Harry Martinis not an actor of the first order and injects his own characterization and personality into a lot of this. Nonetheless, I believe it is clear Mr. Carter has some understanding of something transpiring which control is needed over in order not to damage people within the organization and other people. So is admissible both pursuant to the Appellate Court opinion in this case reversing my suppression and it is further admissible on the issue whether or not there was a conspiracy. So the motion in Limine I am going to mark as being denied.

MR. THOMAS:    Which one?

THE COURT:    This is the-

MR. THOMAS:    Sixth Amendment.

THE COURT:    This is as to - no, a statement made before initiation of or after termination of a conspiracy. The Sixth Amendment you may want to argue some what further. I don't know if you want to make a further argument on that or not?

MR. THOMAS:    No.

THE COURT:    The State want to make any further argument on the Sixth Amendment issue, Right to Counsel, specifically being raised that before anybody should be talking to Mr. Carter in light of the circumstances he found himself where he is confined in seg., he is a prime suspect in the murder, he is isolated, DOC controls all communications with him, that he had at that point in time a Sixth Amendment Right to Counsel and the attempt

(23)

to obtain information from him when effectively could not exercise that
Right to Counsel would be in violation of his Sixth Amendment Right?

MR. CASSON:   Judge, just a couple of things. I think the tape, anyway reflects
Mr Carter was not in segregation. That was not his status at that time
of the reporting. The transcript of the tape indicates that he was
still in the cellhouse and was on deadlock status, not segregation status
and it would be our position that he was not under charge at the time
the conversation took place and that the Sixth Amendment does not arise
until there is a charge, and he was not indicted and there was no charge
so there is no Sixth Amendment Right.

THE COURT:   Mr. Thomas, anything further?

MR. THOMASE:   No, Judge. I would just state one the first motion it is my understanding
that you granted it as to other tape?

THE COURT:   I haven't ruled on it as to any other tape. The State has assured me
now they don't intend to introduce any other tape.

MR. THOMAS:   Your ruling is based only on Mr. Carter's tape?

THE COURT:   Yes. I frankly have not reviewed any such statement to determine
whether, in fact, it is indicated that any conspiracy could, by a juror,
be considered to be ongoing based upon what they have said.

The Motion in Limine related to the Sixth Amendment grounds in violation
of Defendant's Right to COunsel, if Mr. Carter was not in Segregation,
my understanding is that lockdown did prevent at least telephonic
communications, that letters would have gotten in and out of the
Correctional Center......

[VOL. III, NOV. 4, 1991 p. 505-518]

The trial Court's ruling is in direct conflict with Krulewitch, in it's findings

that " THE CONSPIRACY WAS ONGOING IN NATURE ', without pause, or termination. In

Krulewitch, the U.S. Supreme Court stated the following:

Although, the Government recognizes that the chief objective of the
conspiracy - transportation for prostitution purposes - had ended in
success or failure before the reported conversation took place, it
nevertheless argues for admissibility of the hearsay declaration as one
in furtherance of a continuing subsidiary objective of the conspiracy.
its argument runs this way. Conspirators about to commit crimes always
expressly or implicitly agree to collaborate with each other to conceal
facts in order to prevent detention, conviction and punishment. Thus
the argument is that even after the central criminal objectives of a
conspiracy have succeeded or failed, an implicit subsidiary phase of
the conspiracy always survives, the phase which has concealment as its
sole view. It viewed all the alleged hearsay declaration as one in
furtherance of this continuing subsidiary phase of the conspiracy, as
part of "THE IMPLIED AGREEMENT TO CONCEAL." 167 F. 2d 943,948. It
consequently held the declaration properly admitted.

We cannot accept the Government's contention. There are many logical

and practical reasons that could be advanced against a special evidentiary rule that permits out-of-court statements of one conspirator to be used against another. But however cogent these reasons, it is firmly established that were made in furtherance of the objectives of a ongoing conspiracy, such statements are admissible as to exceptions to the hearsay rule. The prerequisite to admissibility, that hearsay statements by some conspirators to be admissible against others must be made in furtherance of the conspiracy charged, has been scrupulously observed by Fed by the Federal Courts. The Government now ask us to expand this narrow exception to the hearsay rule and hold admissible a declaration, not made in furtherance of an alleged implied but uncharged conspiracy aimed preventing detection and punishment. No Federal Court case cited by the Government suggest so hospitable a reception to the use of hearsay evidence to convict in conspiracy cases. The Government contention does find support in some but not all of the State Court opinions cited in the Government brief. But in none of them does there appear to be recognition of any such broad exception to the hearsay rule as that here urged. The rule contended for by the Government could far-reaching results. For under this rule plausible arguments could generally be made in conspiracy cases that most out-of-court statements offered in evidence tended to shield co-conspirators. We are not persuaded to adopt the Government's implicit conspiracy theory which in all criminal conspiracy cases would create automatically a further breach of the general rule against the admission of hearsay evidence.
Id. Krulewitch, 69 S.Ct. at 718-19.

This meritorious issue was not raised in Petitioner's Post-Trial Motion or rasied on Direct Appeal pursuant to the Doctrine of Plain Error. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L. Ed. 2d 674 (1984).

Petitioner contends that a claim of ineffective assistance of counsel has two components. First, Defendant must show that counsel's performance was deficient in that counsel made errors so serious that he denied Defendant his Sixth Amendment Right to Counsel. Second, Defendant must show that counsel's errors were so serious as to deprive Defendant of a fair trial whose results is unreliable, thus prejudicing the Defendant. Id. Strickland, 466 U.S. at 687.

Furthermore, to succeed on a claim that Appellate Counsel rendered ineffective assistance by failing to argue an issue on Appeal, a Defendant must specifically establish that Appellate Counsel's failure to raise that issue was objectively

unreasonable and that Appellate Counsel's decision not raise the issue prejudiced him. People v. Peeples, 205 Ill. 2d 480, 513, 793 N.E. 2d 641 (2002). Appellate Counsel is not obligated to brief every issue on Appeal, and is not

incompetence of Counsel to refrain from raising issues which, in his or her judgment, are without merit, unless Counsel's appraisal of the merits patently wrong, Id. Peepels, 205 Ill. 2d at 514; Gray v. Greer, 800 F. 2d 644 at 646.

In this case, Appellate Counsel chose not to raise Trial Counsel's ineffectiveness for not properly raising the foregoing "CONSPIRACY" issue. Appellate Counsel's appraisal of merits of this issue was patently wrong because the "ON-GOING CONSPIRACY" issue is meritorious.

Neither Re Judicats or waiver applies to bar consideration of this issue it was not decided on Direct Appeal and pursuant to ineffective assistance of Appellate Counsel, is not barred from consideration. As held in People v. Winsett, 153 Ill. 2d. 335, 606 N.E. 2d 1186 (1992) "the doctrine of waiver stems from incompetency of Counsel on Appeal." Thus, a single error of Counsel may constitute ineffective assistance of counsel. Murry v. Carrier, 477 U.S. 478, 106 S. Ct. 2639, 91 L. ed.2d 391.

On collateral review of Petitioner's Petition, the Trial Court Judge's decision that " THE CONSPIRACY REMAINED ON-GOING" is in direct conflict with Krulewitch v. United States, 336 U.S. 440, 69 S. Ct. 716, which rejected the Government's attempt to establish an ongoing conspiracy based upon allegations of efforts to conceal and/or escape prosecution. Id. Krulewitch, 69 S. Ct. at 718.

Petitioner contends that his Trial, Appeal, and Post-Conviction, and Post-Conviction Appellate Counsels, failed to comply with the dictates of Krulewitch, depriving him of his Sixth and Fourteenth Amendment Rights as guaranteed by both the U.S. constitution violating his Due Process, Equal Protection and Right to Counsel. Had either Counsel properly raised the aforegoing issue, there probably would have been a different result. Strickland v. Washington, Supra.

Furthermore, Petitioner mounted an argument in his Pro Se response to Appellate Counsel's Request for Withdrawal in the Appellate and Supreme Court, including the

(26)

case law, should be considered in reviewing this issue.  In <u>United States v. Cook,</u>

45 F. 3d 388 (10th. Cir. 1995) the U.S. Court of Appeals held:

> Conversely, an Appellate advocate may deliver deficient performance
> and prejudice a Defendant by omitting a "DEADBANGER WINNER" even though
> Counsel may have presented strong but unsuccessful claims on Appeal.
> <u>Page v. United States</u>, 844 F. 2d 300, 302 (7th. Cir. 1989).  Although
> Courts have not defined the term "DEADBANG WINNER", we conclude it
> is an issue which was obvious from Trial Record, wee e.g. <u>Matire v.</u>
> <u>Wainwright,</u> 811 F. 2d 1430, 1438 (11th. Cir. 1987) (Counsel's failure
> to raise issue which was obvious on the record, and must have leaped
> out upon even a casual reading of [the] transcript was deficient
> performance), and one which would have resulted in a reversal on Appeal.
> By omitting an issue under these circumstances, Counsel's peformance
> is objectively unreasonable because the omitted issue is obvious from
> the Trial Record.  Additionally, the omission prejudices the Defendant
> because had Counsel raised the issue, the Defendant would have obtained
> a reversal on Appeal, <u>Cook,</u> 45 F. 3d at 395.

The Court concluded by stating:

> "... although Defendant did not raise the conflict of interest issue
> on Direct Appeal we hold that cause and prejudice present in this case
> excuse the omission. Moreover, because Defendant has demostrated that
> the District Court's failure to comply with the dictates of the Supreme
> Court's decision in <u>Holloway,</u> deprived him of his Sixth Amendment Right
> to effective assistance of counsel, we reverse the Judgment of the
> District Court..."   Id. at <u>Cook,</u> 45 F. 3d at 395-396.

In addition, the U.S. Supreme Court in <u>Massaro v. U.S.,</u> ___ U.S., ___ S.Ct.____

(No. 01-1559) (2003) held that there is no procedural default for failure to raise

an ineffective assistance of Counsel claim on direct Appeal.


The Decision of the Illinois State Court is contrary to and involves an

unreasonable application of clearly established Federal Laws as determined by the

United States Supreme Court as well as other Federal Precedents, and resulted in a

decision that was based on an unreasonable determination of the facts in light of

the evidence presented in the State Court Proceedings.


This issue is ripe for review.  Petitioner Requests this Honorable Court grant

Habeas Corpus relief regarding this claim due to its merits.

CLAIM

IV

PETITIONER WAS DENIED DUE PROCESS OF LAW IN VIOLATION
OF HIS FOURTEENTH AMENDMENT RIGHTS AS GUARANTEED BY
THE UNITED STATES CONSTITUTION WHEN THE STATE COURT
REFUSED TO PROVIDE PETITIONER WITH AN EVIDENTIARY
HEARING ON HIS CLAIM OF "ACTUAL INNOCENCE" IN
VIOLATION OF THE ILLINOIS CONSTITUTION ARTICLE I SECTION 2.

In People v. Washington, 665 N.E. 2d 1330 (Ill. 1996), the Illinois Supreme
Court was presented with a question of "whether Due Process is implicated on a claim
of innocence based upon new evidence so as to permit the claim to be raised in a
Petition under the Post-Conviction act... the majority of the Court held that it is."
Id. Washington, 665 N.E. 2d at 1331

In this instant case, evidence obtained by Petitioner clearly shows that "someone
other than Petitioner" was responsibly for designing and initiating the plot to injure
the victim in this case. Petitioner alleged in his Pro Se Petition for Post-Conviction
Relief that certain evidence was obtained AFTER his Trial and Appeal process in this
matter. The evidence tended to show that someone other than himself committed the
offense in which he is presently being held in confinement for.

In support of his actual innocence claim, Petitioner attached an affidavit by
inmate Corwyn Brown to his Petition. (C-66) In his Affidavit, Corwyn Brown admitted
that he was responsible for ordering "THE HIT" on Superintendent Taylor on September 2,1987
(C-66) Corwyn Brown also admits that Petitioner was forced into taking the blame
for the crime and was intimidated into keeping quite about his innocence. (C-50 C-66)

(28)

Such declaration was made with sufficent indica of truthworthiness, and conincides with eyewitness' accounts of Corwyn Brown's direct involvement. (See Appendix Corwyn Brown's Affidavit.)

The following excerpts from the trial transcripts which disclose testimony pertaining to direct involvement of Corwyn Brown. Douglas Reed, an Internal Security Investigator with the Illinois Department of Corrections, testified that he has a conversation with inmate Demetre Brown (occurance witness). Reed spoke to Demetre Brown twice on that date. In the second interview, Mr. Brown told him that inmate Corwyn Brown had been with inmates Easley and Lucas just minutes before the attack, and that Corwyn Brown had nodded his head and pointed towards Superintendent Taylor's office. (11-20-91 VOL. I, R. 106-07).

Inmate Spiller (occurence witness) stated that he observed Corwyn Brown point towards Superintendent Taylor's office prior to the attackers entering his office. (11-20-91 Vol. I, R.-110)

After obtaining Corwyn Brown's affidavit, Petitioner also obtained an Affidavit from Michael shaw A.K.A. Torrence Evens. In Shaw's Affidavit, Shaw states that he had spoken with Corwyn Brown in October of 1996, while he was incarcerated at the Joliet Correctional Center. Shaw states that Corwyn Brown admitted to him that he (Brown) ordered the attack on Superintendent Taylor and that Petitioner was not involved. (See Appendix, Saaw's Affidavit.)

Clearly, Michael Shaw's Affidavit obtained after Petitioner's conviction, gives credence to Petitioner's claim that he has no involvement in the attack and/or murder of Superintendent Taylor, it corroborates inmate Corwyn Brown's statement also that Petitioner was forced into accepting responsibility of this instant case by Gang Members.

The decision of the Illinois State Court is contrary to and involves an unreasonable application of clearly established Federal Laws as determined by the United States Supreme Court as well as other Federal Precedents, and resulted in a

(29)

decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court Proceedings.

Petitioner request that this Honorable court hold an Evidentiary Hearing to enable him to prove that his Constitutional Rights were violated in the process. Townsend v. Sain, 312 U.S. 293.

In conclusion, Petition points to the learned Trial Judge in this case when at Petitioner's sentencing hearing, the Judge stated the following.

COURT:        I will note that there are some interesting Constitutional issues
              in this case...

Petitioner, has to the best of his ability framed these issues so that this Honorable Court may see clearly the Constitutional violations, that have occurred in this case. Petitioner respectfully PRAYS that this Honorable Court will grant him Habeas Corpus Relief or in the alternative order him a New Trial, so the Petitioner will have a fair chance to Defend himself and prove his INNOCENCE.

Respectfully Submitted,

David W. Carter  N43429
Stateville Correctional center
P.O. BOX 112-N43429
Joliet, Illinois
60434-0112

(30)

A P P E N D I X

STATEMENT OF FACTS

Statement of Facts

On October 16, 1987, petitioner David W. Carter was charged by Indictment No. 87 CF 112 in Livingston County with two counts of conspiracy (first degree murder), three counts of solicitation (first degree murder), and five counts of first degree murder. The charges stemmed from the stabbing death of Pontiac Correctional Center, Superintendent Robert L. Taylor on September 3, 1987. (Vol. I, C. 26-35)

The defendant filed two motions to suppress statements on December 16, 1988. The first one alleged that the statements that were obtained by Harry James Martin from David Carter through the use of electronic surveillance and eavesdropping devices should be suppressed because the authorization of the wiretap was obtained by false statements. (Vol. I, C. 112-17) The second motion to suppress challenged the process of using an informant, Harry Martin, to obtain statements from petitioner Carter through an eavesdropping device while petitioner Carter was incarcerated in prison on another conviction, but having been placed in segregation as a result of his suspected involvement in the instant case. (Vol. I, C.107-09)

On February 17, 1989, the trial court entered an order suppressing the statements of the defendant/petitioner Carter that were obtained by his conversation with Harry Martin, as Martin wore a listening device. The court found that defendant/petitioner's Fifth Amendment rights were violated and that he was in custody for purposes of Miranda, even though he had not been formerly charged with Superintendent Taylor's murder. The defendant was a "prime suspect" at the time that he was questioned by

1

the undercover/inmate agent. (Vol. I, C.191-93)  The State filed
an appeal from the suppression order of February 28, 1989. (Vol.
I, C.198)  The appellate court reversed the order of the trial
court in an opinion filed on May 17, 1990. (Vol. I, C.221-27)

On defendant's motion, his cause was severed from that of
his co-defendants and his motion for change of venue was granted.
(Vol. I, R.427)

Prior to the start of trial, several hearings were held in
which James Wasson, an inspector with the Division of Criminal
Investigation of the Illinois State Police, presented his evidence
deposition with regard to the set up of electronic surveillance
in the case.  The court ruled that the prosecution had met its
burden of showing proper foundation, and ruled that the overhear
order was issued pursuant to probable cause and that if the tape
was offered into evidence, it would be admissible. (Vol. IX, R.14)

Following opening statements (Vol. XI, R.. 14-40), the State
began its lengthy presentation of evidence in this case
which established that Ike Easley and Roosevelt Lucas killed
Superintendent Robert Taylor on September 3, 1987.  The State's
theory at trial was that the attack on Superintendent Robert
Taylor was retaliation by a gang at the Pontiac Correctional
Center, the Black Gangster Disciples (BGD), who believed that one
of their members had been killed by correctional officers.  Danny
Jarrett was a guard at Pontiac on July 20, 1987 and was assigned
to the Five, Six, Seven and Eight Galleries of the south cellhouse.
On July 20th, he worked the 3:00 to 11:00 p.m. shift.  Over the
objection of defense counsel, the State was allowed to introduce
evidence of the events which led up to the death of inmate Billy

Jones and the removal of inmate Kirk Williams from the south cellhouse. (Vol. XII, R. 47-68)

Jarrett stated that in July of 1987, he knew the defendant, Ike Easley and Roosevelt Lucas, because all of them lived in the south cellhouse in the upper galleries, which were under Mr. Jarrett's control. On July 20th, inmate Kirk Williams and Billy Jones lived in cell 512 on the Five Gallery. Mr. Jarrett testified that there were several gangs at Pontiac, but there was an alliance bewteen the Black Disciples, the Black Gangsters, and the Latin Disciples. Inmate Kirk Williams had brought the three gangs together. (Vol. XII, R. 68-70) The gangs each wore different colors and had different signs or symbols. (Vol. XII, R. 70-71)

According to Jarrett, he saw David Carter wearing gang colors and giving gang signals, and he noticed this same behavior in Kirk Williams, Billy Jones, Roosevelt Lucas, and Ike Easley. (Vol. XII, R. 73-75) He had also noticed those four men partici- pating in calisthenics, jogging and running when they were in the yard, and they would chant Black Gangster Disciple slogans. (Vol. XII, R. 76) Mr. Jarrett was of the opinion that Williams, Jones, David Carter, Lucas and Easley all belonged to the Black Gangster Disciples on July 20, 1987. (Vol. XII, R. 77)

Kirk Williams, according to Jarrett, "controlled the whole institution." Billy Jones was classified as the chief of securities of the institution for the gang. (Vol. XII, R. 77) On the evening of July 20th, Jarrett was assigned to go into the passageway bewteen the galleries to make sure that nothing was passed through the vents or thrown out. Kirk Williams and Billy Jones were being moved to the segregation unit in the north cellhouse. The

3

reason for the removal was because of their activities and according to Jarrett, the rest of the organization was "getting out of control." (Vol. XII, R. 79)  As Williams was being moved, he told the guards that he had tried to be a diplomat but that the administration, whom he referred to as "hookers", would not listen. (Vol. XII, R. 80)

To move the men, the guards used chemical agents in Five Gallery to stop the debris from being thrown, soap, cans, light bulbs, and other objects at the officers. (Vol. XII, R. 82)  The chanting and debris throwing continued as Billy Jones was taken off the gallery and led away.  Jarrett noticed that Jones was chewing something.  Jarrett started escorting Jones to the north segregation unit.  When Jones got about a hundred feet outside the door, he collapsed.  Cardio pulmonary resuscitation was attempted, and it was learned that Mr. Jones died from  chewing on a bag of cocaine. (Vol. XII, R. 84-87)

After the incident involving Mr. Williams and Mr. Jones, Jarrett received threats from different inmates as they accused the guards of killing Jones. (Vol. XII, R. 87-89)  Jarrett stated that the threats were made by members of the Black Gangster Disciples. (Vol. XII, R. 93)  Mr. Jarrett was eventually reassigned jobs for his own safety, but testified that he had seen David Carter in the company of Ike Easley prior to the transfer. (Vol. XII, R. 96)  Jarrett testified to the types of activities that he had seen David Carter participate in for the Black Gangster Disciples.  One person within that gang is in charge of the security or monitoring the movement of other gang members.  According to Jarrett, the person in charge would often be seen coordinating indiviuals to make sure that they are posted in

4

certain positions.  Jarrett claimed to have seen Carter perform that function on several occassions. (Vol. XII, R. 99-100)  Based on what Jarrett saw, he was of the opinion that David Carter was the security coordinator of the Black Gangster Disciples for the upper galleries in the south cellhouse. (Vol. XII, R. 104)  On cross-examination, Mr. Jarrett admitted that the first time he had ever told anybody that he saw Carter socializing with Mr. Jones, Mr. Easley, and Mr. Lucas on Seven and Five Galleries was about three weeks earlier, and admitted that he had not testified to this in two previous cases. (Vol. XII, R. 110-12)

Various guards testified to the events of September 3, 1987 and the death of Superintendent Taylor. (Vol. XII, R. 135-215; Vol. XIII, R. 70-88)

Lawrence Spiller testified that he was an inmate at Pontiac in September of 1987, serving time for attempted murder, attempted armed robbery, and unlawful use of weapons. (Vol. XIII, R. 188-19)  Mr. Spiller knew Superintendent Taylor.  Taylor gave Spiller his job assignments. (Vol. XIII, R. 121)  Sometime before 11:00 a.m. on September 3rd, Spiller saw Taylor in his office on Five Gallery. (Vol. XIII, R. 121)  While Spiller was in Taylor's office, two men came in and attacked Taylor.  The first one jumped on the arm of the chair that Spiller was sitting on, and then jumped across the desk.  Taylor was then hit in the face with fists.  The inmate then pulled a knife from his waistbelt and made a stabbing motion with it. (Vol. XIII, R. 126-27)  The inmate who stabbed Taylor was Ike Easley. (Vol. XIII, R. 127)

Spiller started to leave when Roosevelt Lucas ran in. (Vol. XIII, R. 128-29)  Spiller saw Lucas pull a pipe out of his waist-

band and strike Taylor with it. (Vol. XIII, R. 130-31)  Spiller had noticed that Easley were wearing gloves. (Vol. XIII, R. 132) Spiller went to the front of cell 546.  He saw Easley come out and run toward the front end of Five Gallery.  Lucas then came out and threw the pipe back into the office.  He ran to the front end of Five Gallery and jumped up to Seven Gallery. (Vol. XIII, R. 133-34)  Prior to the attack on Taylor, Ike Easley had been sitting on the radiator a few feet from Taylor's office. (Vol. XIII, R. 136)

Various exhibits were admitted into evidence and passed among the jurors.  The defendant and his attorney chose to be absent when this occurred. (Vol. XIII, R. 188-93)  One of the jurors indicated that she did not want to view all of the photo-graphs. (Vol. XIII, R. 192)

The key witness against Mr. Carter was Harry Martin.  Mr. Martin, who at the time of the trial was incarcerated and who had prior convictions for armed robbery, armed violence, and unlawful use of weapons, testified that he had a college degree in account-ing and bookkeeping.  In 1987, he was a member of the Black Gangster Disciples.  Mr. Martin described the organization of the gang.  Larry Hoover was the chairman, and below him was the board of directors consisting of institutional coordinator, assistant institutional coordinator, gallery coordinator, and various other subordinate departmental heads. (Vol. XIV, R. 18-19)  The security division of the gang is called the UFO, the United Front of the Organization.  According to Martin, this group does the assassi-nations, protects the board members or any hierarchy of the organization, guards the leadership and disciplines any organiza-

tion members that may get out of line. (Vol. XIV, R. 19-20)
The Black Gangster Disciples operate in and out of the prison
system. (Vol. XIV, R. 20)  Mr. Martin's former position was that
of financial adviser to the board. (Vol XIV, R. 20)  He stated
that the majority of his  education was financed through the
gang. (Vol. XIV, R. 21)

    Mr. Martin stated that the gang made money by various
illegal activities, but also some legitimate business.  He admitted
that when he was on the board as the financial adviser, he had
knowledge of the illegal activities and participated in them.  In
May of 1987, a conspiracy was put together to assassinate Harry
Martin.  Martin received word of this threat from the warden at
Stateville.  Martin initially did not believe the warden, so he
asked a few other board members, whom he believed were allies.
They confirmed the warden's information, and Martin then asked
for protection in return for cooperating with the law enforcement
officials. (Vol. XIV, R. 22-23)

    Martin was transferred to Dixon Correctional Center and then
to Pontiac in the second week of August in 1987. (Vol. XIV, R.
24-25)  While at Pontiac, Martin met with some gang members,
including Corwyn Brown, who was known as "Ketchup."  Brown was
the assistant institutional coordinator. (Vol. XIV, R. 26-27)
While at Pontiac, Martin saw Roosevelt Lucas, and stated that he
provided security for Martin and Brown. (Vol. XIV, R. 28-29)

    While at Pontiac, Martin talked with Corwyn Brown about the
death of Billy Jones.  Brown told Martin that the gang membership
did not believe that Jones' death was an accident, and he thought

7

that the administration was responsible for Jones' death. (Vol. XIV, R. 33-34)  Brown also told Martin that the gang members in the institution wanted to retaliate against the administration. (Vol. XIV, R. 35)

In September of 1987, Martin was incarcerated in Logan Correctional Center, and he was approached by the BGD assistant institutional coordinator who told him that the gang wanted inmate Larry Spiller killed.  Spiller was to be killed by poisoning his food.  Both Martin and Spiller were in the segregation unit. Martin informed the warden. (Vol. XIV, R. 37-38)

While at Logan, Mr. Martin was approached by Department of Corrections investigators regarding the murder of Superitendent Taylor.  They asked Martin to assist them in investigating various Black Gangster Disciple members whom Corrections believed were involved in the murder. (Vol. XIV, R. 44-45)  Martin insisted that he had not received anything from the Department of Corrections in return for his cooperation.  He said that he decided to wear a wire and visit various inmates to aid in the investigation. (Vol. XIV, R. 46)  On October 7, 1987, while wearing a wire, he visited David Carter.

On that date, Martin and his wife were driven to the Pontiac Correctional Center.  Martin's wife had sent Carter a letter asking to have Martin put on Carter's visiting list. (Vol. XIV, R.47)  Carter and Martin talked, and Martin told Carter that he was there to get information to share with other gang members in Chicago and to find out  about the murder of Superintendent Taylor. (Vol. XIV, R. 49-50)  Martin asked Mr. Carter who gave

8

him instructions, and Carter said it was Michael "Dice" Johnson, who was institutional coordinator for the security division. (Vol. XIV, R. 50)  Carter said that Mr. Johnson had told him that they were "to knock a patch out of Superintendent Taylor's head with pipes". (Vol. XIV, R.51)

According to Martin, David Carter told him that Superintendent Taylor was killed because of what happened to inmate Jones, and because of the guards "whipping folks in the dining room and on the sidewalk." (Vol. XIV, R. 53)  Martin stated that before inmate Williams was shipped out, he allegedly left word with Carter to make the hit.  Carter told Martin that he sent Roosevelt Lucas and Ike Easley to do the job. (Vol. XIV, R. 53)  Martin was told by the defendant that he just wanted Lucas and Easley to go in there and knock Taylor out and leave him there.  The defendant told Martin that the attack had been planned for three or four weeks, and Taylor was followed so that arrangements could be made. (Vol. XIV, R. 54).

Carter told Martin that he had security people on the gallery playing the radio very loudly, and had other security people stationed at the gate.  Lucas and Easley were given instructions not to jump up on the gallery and were told to drop the weapons at the scene of the crime.  Carter was on Seven Gallery when Lucas and Easley hit Taylor.  Carter said that things did not go according to plan, and that Superintendent Taylor staggered out of his office.  Carter had given Lucas and Easley specific instructions to leave him in the cell, unconscious. (Vol. XIV, R. 55)

9

Carter told Martin that Lucas and Easley wore masks and gloves, had wiped the weapons before the attack. As instructed, they left the weapons at the scene. (Vol. XIV, R. 57-58) Carter indicated that two inmates were witnesses to the crime. (Vol. XIV, R. 58) After the death of Superintendent Taylor, Carter was promoted to the institutional coordinator of UFO. (Vol. XIV, R. 59) Carter also indicated that there were several people who knew about the hit before it took place, and they were all in agreement as to the plan. (Vol. XIV, R. 60) When the two men talked about Billy Jones' death, Martin mentioned that he had heard that Jones swallowed cocaine. Mr. Carter got angry, and stated that he got upset every time someone said that caused Jones' death, and told Martin that that was not the way it happened. He said it would have been impossible for him to swallow a bag of cocaine on his own. (Vol. XIV, R. 61-62)

Harry Martin testified that if an order is given to kill someone it would have to have come from the chairman of the gang. in this case Larry Hoover. Hoover then would pass the word through the chain of command. He would not have given orders directly to Carter. (Vol. XIV, R. 62-63) Martin also stated that if the attack on Taylor had not been sanctioned from the top, Mr. Carter would have been disciplined, because one of the rules within the gang organization is to not come in confrontation with employees of the Department of Corrections. (Vol. XIV, R. 64)

Martin stated that he listened to the tape of the conversation that he had with David Carter, and was able to identify both himself and Carter on the tape. (Vol. XIV, R. 65-66)

10

On cross-examination, Mr. Martin stated that he still had ten years left to serve on his prison sentence. He stated that all he got in return for his cooperation with the authorities was protection. (Vol.XIV, R. 67-68) Martin also admitted that when he went to talk to Carter, he lied to him about being sent by Larry Hoover. (Vol. XIV, R. 74)

James Wasson's testimony was presented through evidence deposition. Mr. Wasson was an Inspector with the Division of Criminal Investigation of the Illinois State Police, and he set up the wire on Harry Martin prior to his meeting with David Carter. Mr. Wasson then recorded the conversation bewteen Mr. Carter and Mr. Martin. Mr. Wasson's evidence deposition was then read to the jury. (Vol. XIV, R. 104-17)

The tape of the overhear was played to the jury. (Vol. XIV, R. 118-50)

Demetre Brown, whose nickname was "PeeWee", was serving time for armed robbery and murder, and also had an unlawful use of weapons conviction. On September 3, 1987, Mr. Brown was housed at the Pontiac Correctional Center in cell 549. On the morning of September 3rd, Mr. Brown was between his cell and Superintendent Taylor's office. He was waiting for two inmates to come out of Superintendent Taylor's office, and he was talking to Lucas and Easley, who were putting on gloves and hats. Brown moved to the front of Taylor's office and watched through the window as the two men entered the office, jumped on the desk, and hit Taylor and stabbed him. (Vol. XV, R. 8-10) Brown went to his cell and saw two men run by, throwing off their hats and gloves.

11

(Vol. XV, R. 10-12)  Brown then went into cell 546 with inmates Nealy and Spiller. (Vol. XV, R. 13-15)  People's Exhibits 2 through 42B were admitted into evidence, and the State rested. (Vol. XV, R. 58)

The defendant's motion for a directed verdict was denied. (Vol.XV, R. 59-65)  Douglas Read, an Internal Security Investigator with the Department of Corrections, testified to his conversation with Demetre Brown on September 3, 1987.  Read spoke to Mr. Brown twice on that date.  In the second interview, Brown told him that inmate Corwyn Brown had been with Easley and Lucas just minutes before the attack, and that Corwyn Brown had nodded his head and pointed toward Taylor's office at that time. (Vol. XV. R. 106-07) He also told Read that he believed Corwyn Brown was the institutional coordinator of the Black Gangster Disciples gang. (Vol. XV, R. 107)  Inmate Spiller has also been interviewed by other investigators and he, too, has stated that he had observed Corwyn Brown point toward Taylor's office prior to the attackers entering. (Vol. XV, R. 117)  The trial court admonished Mr. Carter of his right to testify, and determined that he was waiving that right. (Vol. XV, R. 117-19)

An instruction conference was held. (Vol. XV, R. 132-57) Closing arguments were made. (Vol. XV, R. 181-256)  The jury was then instructed. (Vol. XV, R. 256-72)

The jury returned verdicts finding David Carter guilty of conspiracy as charged in Counts I and II; not guilty of solicitation as charged in Count III; guilty of solicitation as charged in Count V; not guilty of first degree murder as charged in Count

12

VI; guilty of first degree murder as charged in Count VII; not guilty of first degree murder as charged in Count VIII; guilty of first degree murder as charged in Count IX; and guilty of first degree murder as charged in Count X. (Vol. XVI, R. 305-17)

The defendant filed a motion for new trial on January 13, 1992. (Vol. I, C. 343)  A hearing was held on March 31, 1992. Following arguments of counsel, the motion was denied. (Vol. XVII, R. 2-9)  A sentencing hearing was then conducted.  As evidence in aggravation, the State introduced a certified copy of Mr. Carter's prior murder conviction in Cook County, as well as his conviction for armed violence. (Vol. XVII, R. 9-15)  While entering judgement on all of the counts, the court ruled that the convictions for murder, conspiracy, and solicitation merged and sentenced the defendant only on Count X, first degree murder. (Vol. XVII, R. 21)  Following arguments of counsel, the trial court sentenced David Carter to natural life imprisonment. (Vol. XVII, R. 24-33)

On April 6, 1992, a timely notice of appeal was filed.  On June 30, 1993, the Appellate Court affirmed Mr. Carter's conviction and sentence for the first degree murder (Count X) but vacated the petitioner's other convictions: (Unpublished Order pursuant to  Illinois Supreme Court Rule 23.

On October 6, 1993, the Illinois Supreme Court denied Petitioner Carter's petition for leave to appeal.

On August 10, 1998, petitioner Carter filed his <u>pro</u> <u>se</u> <u>combined</u> Petition for Post-Conviction Relief (725 ILCS 5/122-1 et seq.) and Petition for Relief from Judgement (725 ILCS 5/2-1401 et. seq.) alleging the following:

13

(1)   that the investigation and interrogation techniques employed by the State through their informant constituted fraud and denied petitioner Carter his 14th Amendment right to due process of law; (2)   that the State denied petitioner his fundamental right to a fair trial by commenting on his right not to testify, and his appellate counsel was ineffective for failing to raise this meritorious issue in his appeal; (3)   that the State knowingly elicited perjured testimony from their key witness at trial and failed to disclose favorable discovery materials to the defendant/petitioner prior to trial; (4)   that the State knowingly used perjury to obtain authorization for an eavesdropping device from the Circuit Court; and (5)   that petitioner Carter had obtained newly discovered evidence of actual innocence.

On September 10, 1998, the trial court appointed counsel to represent petitioner Carter's pro se petitions, and ordered a hearing set to determine the timeliness of the petitions.

On February 16, 1999, appointed counsel filed a Motion to Excuse the Late Filing of his pro se petitions.  In addition, a preliminary certificate pursuant to Illinois Supreme Court Rule 651(c).

On March 18, 1999, the trial court conducted a hearing on the timeliness of the pro se petitions; and denied the motion to excuse the late filing of the Post-Conviction Petition.  Subsequently, the trial court granted the motion to excuse the late filing of the Petition for Relief from Judgement [2-1401].

On April 29, 2003, the State filed a motion to dismiss the petition for relief from judgement.

14

On May 1, 2003, the trial court conducted a hearing on the State's motion to dismiss. At the hearing, the trial court granted the State's motion, finding that petitioner's allegation that the wire-tap tape obtained by Harry Martin's fraud, trickery and perjury had no merit because the admissibility of the tape did not depend on Martin's motive for cooperating. The trial court also denied petitioner's allegation regarding the State's commenting on his right to testify. The trial court found that the issue was waived, and in any event, "the line was not crossed". Defendant/petitioner asked the trial court to address the issue of perjury being used by the State in order to obtain authorization for the wire-tap by the Circuit Court. The trial court responded that the issue had been addressed by the trial court and appellate court previously. In addition, the trial court stated that it was not clear that Martin's sentence was reduced in return for his testimony at Carter's trial. Jude Frobish also stated that even if the witness' testimony was reduced in exchange for his testimony at Carter's trial, it would not have made a difference.

The trial court therefore dismissed Carter's petition for relief from judgement, and the defendant/petitioner requested a notice of appeal to be filed.

The Office of the State Appellate Defender was appointed to represent Mr. Carter on appeal, and subsequently filed a Motion to Withdraw on appeal purusant to Pennsylvania v. Finley, 481 U.S. 551 (1987). Immediately thereafter, petitioner Carter filed his pro se Response to Appellate Counsel's Finley Request on July 18, 2005, in People v. Carter, No. 4-03-0402.

15

On December 9, 2005, the Illinois Appellate Court, Fourth judicial District, granted appellant counsel's request to withdraw and affirmed the trial court's dismissal of petitioner's request for relief from judgement in People v. Carter, No. 4-03-0402 (Unpublished Rule 23 Order).

On December 27, 2005, petitioner Carter filed his pro se Affidavit of Intent to file Petition for Leave to Appeal in the Illinois Supreme Court in People v. Carter, No. 101983.

On January 23, 2006, the Illinois Supreme Court denied petitioner Carter's petition for leave to appeal.

ADDITIONAL RECORD SHEET no. #9

# ADDITIONAL RECORD SHEET - - - No. 9

Case No. 82CF-112

| DATE | | JUDGE AND REPORTER | | COSTS | |
|---|---|---|---|---|---|
| | | | | Dollars | Cen |
| 2 3 89 | | | *Memorandum In Opposition to Defendants' Motions to Suppress Statements on file.* | | |
| 2 | 17 89 | Glennon Fry | Defendant appears with his court appointed counsel; Donald Bernardi for People. Also appearing are Donald Zoufal, attorney for Illinois Department of Corrections and Harold Fullman, court-appointed investigator for the defendants. Illinois Department of Corrections files Motion for Leave to Intervene and requesting partial vacation of court order entered January 4, 1989, relative to appointment of investigator. Arguments heard on defendant's Motion to Suppress certain statements made by defendants, David Carter, Michael Johnson and Ike Easley. Said statements were made by those defendants in the visitor's room at the Pontiac Correctional Center, Pontiac, Illinois, to a person named Harry Martin pursuant to an Overhear Order entered by this court on September 25, 1987. Harry Martin, while working as an agent of the Illinois Department of Law Enforcement/Illinois Department of Corrections had defendant place his name on the visiting list and then visited defendant while wearing a listening device and engaged in conversations with defendant. Defendant understood Harry Martin to be a former inmate in the Illinois Department of Corrections who had certain rank or authority within a gang or organization of which defendant was a member. Harry Martin, at the request of law enforcement agents asked defendants Easley, Johnson and Carter numerous questions about the death of prison Superintendent Robert L. Taylor on September 3, 1987. Defendants making statements were lead to believe that Harry Martin was on the streets at the time that the statements were made and that they were reporting to him to communicate information to other gang members in Chicago and further that information given to him was to be relayed to attorney Shel Bannister, who Martin represented had been hired to represent defendant (attorney Shel Bannister had not in fact been hired to represent any of the defendants and the story was apparently made up to facilitate obtaining information from them under the thought that it would be treated confidentially). At the time said conversation was recorded, Harry Martin was in fact an inmate in the Illinois Department of Corrections, had not been released from custody, and his wife, who accompanied him to the visit met him at the door of the prison where he was released into the visiting room under the supervision of law enforcement officials. Defendants assert that under those circumstances, defendants were entitled to "Miranda" warnings prior to their speaking to the undercover agent. The State argues that the defendants were not in custody as a result of the murder of Robert Taylor but were confined in the Pontiac Correctional Center because of convictions for other offenses. Because no charges at that time had been filed against | | |

C. 9

COURT'S ORDER SUPPRESSING
STATEMENTS (TAPES) FINDING AT #5

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
LIVINGSTON COUNTY, ILLINOIS

*Judith K. Grimes*
CLERK

| | | |
|---|---|---|
| People of the State of Illinois | : | |
| | : | |
| vs. | : | No. 87-CF-110; |
| | : | 87-CF-111; |
| Roosevelt Lucas; Michael Johnson; | : | 87-CF-112 & |
| David W. Carter and Ike J. Easley, | : | 87-CF-113 |
| | : | |
| Defendants. | : | |

## ORDER SUPPRESSING STATEMENTS

This cause comes on for hearing on Motions filed by the defendants herein to suppress certain statements made by individual defendants to an undercover agent employed by the Illinois Department of Corrections. Although these cases are not consolidated for purposes of trial, all parties agree that defendants' suppression motions pertaining to certain statements shall be consolidated for purposes of this hearing. The court, having considered the arguments of counsel and Memorandums of Law, FINDS:

1. On or about September 3, 1987, Robert L. Taylor, a Superintendent at the Pontiac Correctional Center, Pontiac, Livingston County, Illinois, was murdered.

2. After conducting an investigation, the defendants herein were indicted for said murder on or about October 16, 1987, by a Livingston County Grand Jury.

3. During the course of its investigation into the murder, the Illinois Department of Corrections and its agents obtained an Eavesdrop Order from the court which authorized the use of a listening device concealed on the person of an inmate identified as Harry James Martin.

4. Harry Martin, the "undercover" inmate arranged to have himself placed on certain defendants' approved visitors lists and proceeded to meet individually with defendants, Easley, Carter and Johnson at the visitor's room at the Pontiac Correctional Center approximately one month after the murder.

5. The Department of Corrections cloaked inmate Harry Martin with a cover story that he was not in fact, at the time of the visit, in the custody of the Department of Corrections; Mr. Martin's wife was permitted to join him in the ruse; he asked three of the defendants numerous questions about their involvement in the death of Superintendent Taylor; he told defendants that a lawyer by the name of Shel Bannister, had been hired to represent him and Martin was asking questions for the purpose of relaying information to the lawyer; that Martin

C-262 191

was a member of a street gang who D.O.C. believed had sufficient
rank which would cause defendants to talk to him under the
guise of reporting to a superior.

6.   Defendants moved to suppress all statements
made to inmate Harry Martin and argue that their Fifth-Amendment
right against self-incrimination was violated when the under-
cover/inmate agent asked questions of them without first warning
them of their rights pursuant to Miranda v. Arizona.

7.   The state contends that the defendants had not
yet been formally charged and were not in custody as a result
of charges relating to the death of Superintendent Taylor.
The defendants reply that each of them had already refused to
talk to prison investigators concerning the death; that they
had been told by prison officials that they were "prime suspects"
in the murder investigation and each had been moved into the
investigative segregation unit of the prison where they were
celled, individually, 24 hours per day.

8.   The People contend, and the court hereby finds
that any statements made by defendants to inmate Harry Martin
were voluntary, being the product of trickery,and notcoercion
or compulsion.

9.   The court, however, believes that the case
recently decided by the Fifth Appellate District of Illinois
in People v. Perkins, 126 Ill.Dec.8, 531 N.E.2d 141 (1988)
is clearly controlling under the circumstances herein and
appears to be the only interpretation of Miranda in Illinois
under these circumstances.

10.   This court finds that each of the defendants
herein was "in custody" for purposes of Miranda notwithstanding
the fact that they had not been formally charged with Taylor's
murder.  Each defendant was a "prime suspect" to use the
Department of Corrections' own investigators' words and had been
told that after refusing to talk to D.O.C. investigators prior
to the time they were questioned by the undercover/inmate agent.

11.   In Perkins the Fifth District Appellate Court
held that the ruse employed by the police violated the
defendant's rights under the Fifth Amendment of the Constitution.
The Perkins Court stated "there is no authority in these
circumstances for the police to do indirectly what they may
not directly... the defendant's Fifth-Amendment constitutional
privilege is thus fulfilled only when the agent of the prosecution
warns the defendant of his rights pursuant to Miranda prior
to custodial questioning."  The Perkins Court went on to state
"we cannot permit the police to subvert this important constitutiona
right by engaging in surreptitious tactics as employed in this
case.  The judiciary must apply constitutional rights, even under
new and perhaps difficult circumstances..."

-2-
C.283 192

12.   The State in this case concedes that "the court will have to 'disapprove' or the reasoning set forth in Perkins." This court declines to overrule the Appellate Court for the Fifth District of Illinois.

WHEREFORE, IT IS ORDERED:

A.   That the People of the State of Illinois may not use into evidence in this cause any and all statements whether inculpatory or exculpatory made by defendants, Easley, Carter, and Johnson, to inmate/agent Harry Martin and said statements are hereby ordered suppressed.

DATED this 17th day of February, 1989.

ENTER:

_____
                JUDGE.

-3-

C. 193

TRIAL TESTIMONY OF STATE KEY

WITNESS HARRY MARTIN

IN THE CIRCUIT COURT

FOR THE ELEVENTH JUDICIAL CIRCUIT OF ILLINOIS

BLOOMINGTON, McLEAN COUNTY, ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS,    )
                                        )
                    Plaintiff,          )
                                        )        Livingston County
                    -v-                 )        NO.  87-CF-112
                                        )
DAVID W. CARTER,                        )
                                        )
                    Defendant.          )

REPORT OF PROCEEDINGS of the trial before the

Honorable CHARLES E. GLENNON, and a jury, on the 18th day of

November, 1991.

APPEARANCES:

      HONORABLE DONALD D. BERNARDI
      State's Attorney of Livingston County, by
      MR. THOMAS J. BROWN
      MR. JAMES A. CASSON
      Assistant State's Attorneys
      1st Floor, Livingston County Courthouse
      Pontiac, Illinois  61764

                    on behalf of the Plaintiff,

      MR. ROOSEVELT THOMAS
      Suite 201
      840 East 87th Street
      Chicago, Illinois  60619

                    on behalf of the Defendant.

```
 1                          I N D E X

 2   WITNESS                                        PAGE

 3   HARRY JAMES MARTIN

 4           Direct Examination by Mr. Brown         17

 5           Cross Examination by Mr. Thomas         67

 6           Redirect Examination by Mr. Brown      81

 7           Recross Examination by Mr. Brown       82

 8   JAMES A. WASSON, III

 9           Direct Examination by Mr. Casson       104

10           Cross Examination by Mr. Thomas        116

11   TAPE RECORDING PLAYED FOR THE RECORD           119

12   RICHARD IRVIN

13           Direct Examination by Mr. Casson       155

14           Cross Examination by Mr. Thomas        160

15           Redirect Examination by Mr. Casson     162

16

17   EXHIBITS                           MARKED    REC'D

18   People's Exhibit Number 42-A        157        163

19   People's Exhibit Number 42-B        159        163

20   People's Exhibit Number 43           87

21   People's Exhibit Number 44           38         84

22   People's Exhibit Number 45           15        164

23   People's Exhibit Number 50           66

24   Defendant's Exhibit Number One       78
```

2

1          MR. THOMAS:  Forty-five and 49?

2          THE COURT:  Yeah.

3               Okay.  Bring the jurors in, please.

4                               (The following proceedings were

5                               had in the presence of the

6                               jury.)

7               Ladies and gentlemen, I don't know that Mr.

8     Brown completed his question and I will simply tell you that

9     I have ruled that the witness may testify as to his conduct

10    and action that was involved in this case.

11              Mr. Brown.

12              MR. BROWN:  Thank you, your Honor.

13              Who was the first investigator to talk to you

14    when you got to Logan?

15         A    Russ Nelson.

16         Q    And did that conversation lead to ah, a

17    conversation with another investigator?

18         A    Yes.

19         Q    And who would that investigator have been?

20         A    Ah, Jerry Donovan, Doug Read a whole slue of

21    investigators.

22         Q    Did you ultimately speak, as a result of those

23    investigations, with Jerry Long?

24         A    Yes.


44

1    Q    And what was the nature of the conversation

2 with Mr. Long?

3    A    That there was a - - there was superintendent

4 in Pontiac that was murdered and that they suspected that BOS

5 was involved in the murder and what, if anything, I could do

6 to assist in their efforts.

7    Q    And did you ultimately agree to assist in the

8 efforts?

9    A    Yes.

10    Q    And what did you agree to do?

11    A    I asked him if he would send Corwyn Brown, who

12 was Ketchup, down to Logan Correctional Center on the Circuit

13 in the same status that I was.  That I would wear a wire.

14    Q    What is on the circuit mean?

15    A    That is a process where the Department of

16 Corrections puts certain gang members, or people, dangerous

17 or people they can't control, they put them on a Circuit

18 status whereas they have them sent from institution to

19 institution in segregation, but they never reach population.

20    Q    For this cooperation were you promised anything

21 from anyone from the Department of Corrections?

22    A    No.

23    Q    From the course of the investigation and up

24 until today have you been promised anything from anybody from

45

1    the Illinois Department of Corrections?

2            A    No.

3            Q    Have you received anything from the Illinois

4    Department of Corrections, or anyone else, with respect to

5    cooperating in this investigation of Taylor's murder?

6            A    No.

7            Q    Did you ultimately decide to also wear a wire

8    and go visit various other inmates?

9            A    Yes.

10           Q    And did you agree to do that with respect to

11   the defendant in this case, David Carter?

12           A    Yes.

13           Q    And did that take place on October 7th, 1987?

14           A    Yes.

15           Q    And with respect to the preparation that you

16   received, in a logistical sense getting ready for it, what

17   happened on that date to prepare you to go in and talk to Mr.

18   Carter?

19           A    The date when I went in?

20           Q    Yeah.   How was it setup physically on you and

21   things of that nature.

22           A    They put some sort of a recording device here

23   and they ran a wire.

24           Q    Pointing to your stomach area?

46

# TRIAL TESTIMONY OF ILLINOIS

DEPARTMENT OF CORRECTIONS
DEPUTY DIRECTOR GERALD LONG

1              All right.  I am going to go ahead and look at

2    Mr. Easley's tape, the transcript of the tape, and again all

3    I can do, I don't know how accurate the transcript is based

4    upon the tape or not.  It has been some time since I have

5    heard the tape.

6              MR. CASSON:  Did you want to put Long and Watkins

7    on now as far as their information?

8              MR. THOMAS:  That's fine.

9              THE COURT:  Fine.  Might as well use the time.

10                         (Witness sworn.)

11                       GERALD O. LONG

12   called as a witness on behalf of the Plaintiff herein, being

13   first duly sworn, was examined and testified as follows:

14                    DIRECT EXAMINATION

15                    BY MR. CASSON:

16        Q    State your name?

17        A    First name is Gerald, G-e-r-a-l-d, middle

18   initial is O, Long, L-o-n-g.

19        Q    And what is your occupation?

20        A    I am a lieutenant with the Illinois State

21   Police.

22        Q    And back in 1987 how were you employed?

23        A    I was still a lieutenant with the Illinois

24   State Police.  However, I was on what they considered an

21

1    inner governmental contract between the Department of

2    Corrections and the Illinois State Police and my assignment

3    at that time was Deputy Director for the Department of

4    Corrections.

5         Q    And when was it that you completed your duties

6    as Deputy Director with the Department of Corrections?

7         A    Approximately July of, it would be four years

8    prior to 86, so 82.

9         Q    And how long did you serve in that capacity?

10        A    For approximately four years.

11        Q    When did you leave that position?

12        A    March of 90.

13        Q    During the month of September, 1987, did you

14    become familiar with an individual by the name of Harry

15    Martin?

16        A    Yes, I did.

17        Q    And Mr. Martin was an inmate in the Department

18    of Corrections at that time, was he not?

19        A    Yes, he was.

20        Q    How was it that you became familiar with Mr.

21    Martin?

22        A    My first knowledge of inmate Martin was while

23    he was still being incarcerated at the Stateville maximum

24    institution in Joliet, Illinois.  We were contacted via an

22

 1    agent that was assigned to the Bureau of Inspections and

 2    Audit who had been apprised by the warden that he did have an

 3    inmate by the name of Harry Martin who was of some position

 4    with the gang BGD and that he had certain information that he

 5    would like to relate to us.  As a consequence we began

 6    interviewing him at that point for information that he had

 7    concerning the gang structure.

 8          Q    And would that have been before September, 87,

 9    or after September?

10          A    That was well before.

11          Q    And did you subsequently have occasion to meet

12    with Mr. Martin ah, during the month of September of 1987?

13          A    Yes, I did.

14          Q    Would that meeting have been after the murder

15    of Superintendent Robert Taylor?

16          A    Yes, it was.

17          Q    And where did that meeting take place?

18          A    That meeting, as I recall, was in Logan

19    Correctional Center.

20          Q    And do you recall who was present at the time?

21          A    No, I don't recall who accompanied me there.

22    It may have will have been the Chief Investigator McKinney.

23          Q    You were present and Mr. Martin was also

24    present?

23

1          A    Yes, he was.

2          Q    During that meeting could you tell the Court

3    what transpired during that meeting?

4          A    During that particular meeting which was

5    followed by a phone call which precipitated that meeting,

6    Harry Martin indicated that he was willing, if it could be

7    accomplished, to wear a listening device, or recording device

8    into one of the institutions to have conversations with what

9    we believed participants in the murder of Superintendent

10   Taylor.

11         Q    And did he subsequently do that?

12         A    Yes, he did.

13         Q    At that meeting did you make any promises to

14   Mr. Martin in order to obtain his cooperation with respect to

15   this case?

16         A    Made no promises.  Only thing I gave him was

17   assurance that we would do all we could to protect both he

18   and his family if it became an object.

19         Q    After that meeting did Mr. Martin continue to

20   remain in the custody of the Illinois Department of

21   Corrections?

22         A    Yes, he did.

23         Q    For how long?

24         A    He still is.

24

1          Q   Was he maintained in the Department of

2  Corrections facility after that meeting?

3          A   No, he wasn't.

4          Q   For a period of time was he?

5          A   For a period of time after that meeting, yes,

6  he was.

7          Q   Approximately how long?

8          A   I forget the exact date that we moved him ah,

9  to a holding facility other than the state facility.  It

10  would probably have been within a month.

11         Q   Since the time of his removal from the

12  Department of Corrections facility, to your knowledge, has he

13  been maintained, has he been housed in a facility outside the

14  Department of Corrections?

15         A   Yes, he has.

16         Q   And between the time he was moved, and the time

17  you left as Deputy Director, did you monitor where he was

18  being housed?

19         A   Yes, I did.

20         Q   During the period of time between September of

21  87, when you had your meeting with him regarding the Taylor

22  case, and the time you left your position as Deputy Director,

23  did you, at any time, make any promises to help Mr. Martin in

24  anyway in return for his cooperation in this case?

25

1       A    No, sir.

2       Q    To your knowledge has anyone from the Illinois

3  Department of Corrections made any agreement, or any

4  arrangement to help Mr. Martin in anyway in return for his

5  cooperation in this case?

6       A    Not that I am aware of.

7       Q    That would be other than promising to do your

8  best to keep he and his family safe, is that correct?

9       A    That is the only agreement we made was to

10  assure insofar as humanly possible the safety of himself, his

11  wife, and his child.

12       Q    To your knowledge has Mr. Martin received any

13  benefits, any sentence reduction, any sentence cut, any

14  restoration of good time, anything of that nature in return

15  for his cooperation in testifying in the Taylor case?

16       A    Not that I am aware of.

17       Q    That would be all I have.

18       THE COURT:  Cross?

19       THE WITNESS:  Judge, there was a misstatement as to

20  the period of time I was with the Department of Corrections.

21  It was not 1982.  It was 1986.

22       THE COURT:  The record will stand corrected.

23

24


26

CROSS EXAMINATION

BY MR. THOMAS:

Q    Mr. Long, you are saying you didn't offer Mr. Martin anything?

A    No, sir.  I did not offer Mr. Martin anything.

Q    Nobody gave him any good time?

A    Not that I am aware of.  I didn't.

Q    The question is:  Did he get any good time?  Is there good time that he might have got that you aren't aware of?

A    Any and all things are possible, but not to my knowledge.  He and I had an agreement specifically that he, nor any of the investigators, would discuss anything that would be benefit to him insofar as good time sentence reduction during any of the time he was cooperating with us, either he or his attorney, Mr. Don Bernardi, who was the sitting State's Attorney for Livingston County.

Q    Were you privy to those conversations?

A    No, I was not.

Q    So, you don't know if anybody has offered him anything or not, is that what you are telling me?

A    No.  I know he was not offered anything because Mr. Bernardi didn't have a meeting with him during the course of these trials.

27

1      Q    He's still cooperating, isn't that right?

2      A    I would assume so.  I am no longer a part of

3   that investigation.

4      Q    So, as you sit there now you don't know, since

5   you have not been a part of the investigation, you don't know

6   if anybody has offered him anything or not, is that right?

7      A    If I wasn't there I would have no way of any

8   knowledge of it.  All I can answer to is what I did and the

9   question is:  Did I offer him anything?

10         And the answer is:  No.

11     Q    Do you know if anybody offered him anything

12   other than you?

13     A    No, sir, I do not know.

14     Q    But you did not?

15     A    I did not.

16     Q    And that is your testimony here today?

17     A    That is my testimony.

18     Q    And you haven't been involved with this

19   investigation, or with this case since 1990?

20     A    With this case there has been no extention of

21   investigative endeavors since we began the original trial.

22   So, as a coincidence - -

23     Q    When is the last time you talked to Harry

24   Martin?

28

1          A    He has called me a number of times on the

2    telephone and we have spoken about various things.  I did not

3    maintain a telephone call record.  As a coincidence I

4    couldn't give you the last date, but in my best guesstimate

5    somewhere in the neighborhood of six months since I have

6    spoken with him.

7          Q    I have no further questions.

8          MR. CASSON:   Nothing.

9                          EXAMINATION BY

10                         THE COURT:

11         Q    Let me clarify in my mind.  You say you are

12   unaware of any agreement, and I would expand, it's not only

13   to reduction of sentence through good time and other devices,

14   but special treatment ah, by the Department of Corrections

15   other than putting him in protective status, any special

16   treatment Mr. Martin was accorded by the Department other

17   than protective custody?

18         A    There has been nothing other than protection

19   accorded him by the Department of Corrections.

20         Q    Could any good time credit, or reduction of

21   sentence have been possible during the time that you were

22   Deputy Director without that going through you in the chain

23   of command?

24         A    Not that I am aware of because at that point in

1    time any of the mechanics of good time is that it is applied

2    first through the institutional counselor, who then forwards

3    that up through the assistant warden of operations, or

4    perhaps up to the warden.  The warden then, in fact, makes

5    the recommendation as to the application of good time.

6         In that he was not positioned in a departmental

7    institution, it would mechanically be impossible for him to

8    receive good time.  He would lack the process for gaining

9    good time.  Knowing the system I would have to say there is

10   no good time accomplished to him.  He was not in an

11   environment for the good time to occur.  He had no contact

12   with counselors.  No contact with staff, DOC staff

13   whatsoever, other than myself and/or investigators and none

14   of them would make a recommendation to good time.

15        Q    In your conversations with Mr. Martin then what

16   benefit, if any, would he derive in his cooperation?

17        A    The benefit that he would be deriving from the

18   mere fact that he was being protected insofar as his life and

19   his family and his child, because one of his main motivators,

20   as far as motivation goes, in cooperating with us in any

21   investigation, whether it be information and intelligence, or

22   prosecutoral sence in Court, was the fact that the gang, that

23   being the BGD, had made attempts to murder him while he was

24   at Stateville in segregation.  When that attempt was brought

30

1  to his attention, through the warden, then he began

2  cooperating in other areas prior to the Taylor homocide.  So,

3  we had begun protecting him on an informational basis prior

4  to Superintendent Taylor's murder.

5          THE COURT:  Okay.

6                Any follow-up by the State?

7          MR. CASSON:  No.

8          THE COURT:  Defense?

9          MR. THOMAS:  Yeah.

10                CROSS EXAMINATION (CONT'D)

11                BY MR. THOMAS:

12                How much time is he serving?

13      A    How much time is he serving?

14      Q    Yeah.

15      A    I haven't seen his master file in quite some

16  time and I forget.  I think his original sentence, if I am

17  not mistaken, was like a 30 year sentence for armed robbery

18  wherein he had robbed, or been a part of a robbery, or gang

19  of robberies composed of BGD members that was victimized, he

20  had done transactions because of his employment he knew the

21  way they handled the money.

22          Q    He was at Stateville and he started cooperating

23  with you earlier?

24          A    Yes, that is a fact.

31

1      Q    And his life has been threatened?

2      A    His life had been threatened a number of times.

3      Q    After he started cooperating with you?

4      A    Yes.

5      Q    So, his cooperation in this case you say you

6  guaranteed his safety.  You had already been doing that?

7      A    Sir, I didn't guarantee his safety.  I told him

8  we would do everything possible to protect him and his

9  family.  In an institutional sitting there is no way, unless

10  he wishes to make himself a liar.

11      Q    And ah, he was transferred to a federal

12  correction facility, is that right?

13      MR. CASSON:  I am going to object as far as where

14  he is at.

15      MR. THOMAS: I asked if he was transferred to a

16  federal system?

17      THE COURT:  The objection is overruled.  I think in

18  a general context who is responsible for Mr. Martin's welfare

19  this witness can answer, if he knows.

20      MR. THOMAS:  He is, right?

21      A    I cannot tell you where he is because I do not

22  know.

23      Q    I am not asking you?

24      A    I am glad.


32

1  Q   He is no longer in the state system, is that

2  correct?

3  A   That's true.

4  Q   He is in another system, right?

5  A   He is serving time, but he is being housed in

6  other - -

7  Q   Mr. Long, this will be a lot easier, sir, if

8  you just answer my question rather then run on.

9  MR. CASSON:  Objection.

10  THE COURT:  Objection is sustained.

11  Mr. Thomas, just go ahead and ask the question.

12  MR. THOMAS:  Mr. Long, he is no longer in the State

13  of Illinois Correction system, is that correct?

14  A   He is serving state time and he is not being

15  housed in a penal institution.

16  Q   Mr. Long, he is no longer in the State

17  corrections system, is that correct?

18  MR. CASSON:  Judge, I think it has been asked and

19  answered if he knows where he is at.

20  THE COURT:  No, no.  My understanding of the answer

21  is he is serving his time, but it is not in a State of

22  Illinois facility.

23  A   Exactly.

24  MR. THOMAS:  But DOC is still responsible for him?

33

1  A They would be responsible for him.

2  Q Excuse me, Mr. Long.

3  THE COURT:  All right.  Hold on!

4  Question.  Mr. Thomas, go ahead.

5  MR. THOMAS:  All right.

6  Mr. Long, DOC placed him wherever he is, isn't

7 that correct?

8  A That is not correct.

9  Q No?  How did he get there then?

10  A I don't know, sir.  I wasn't there when he went

11 there.

12  Q He made - - Somebody in the State system

13 decided he should be transferred?

14  A No, that isn't true either.

15  Q Well, how did he get to where he is?

16  A I don't know.  I wasn't working there at the

17 time.

18  Q You don't know what anybody told him?

19  A No, sir.

20  Q And you don't know?

21  You know there is another person who has been

22 Indicted in this case, don't you?

23  A In this case, yes, sir.

24  Q That has not gone to trial?

34

1          A    Yes, sir.

2          Q    And so you don't know what he has been offered

3    after he testified in all of these cases, do you?

4          A    I know that he was not offered anything by us

5    during the course of the investigation.

6          Q    Well, you worked with the Department of

7    Corrections for how long?

8          A    I was over there for four years.

9          Q    And certainly they have the authority to do

10   whatever they want in terms of his sentence after he

11   testifies, isn't that correct?

12         A    No, that is not correct.

13         Q    They don't?  They cannot make any

14   recommendation after his testimony and give him good time?

15         A    We do not adjudicate their sentence nor do we

16   find them guilty or sentence them.  We just house them after

17   all of that has been done.

18         Q    If you would answer the question.  If you give

19   - -

20         A    It would be a lot simplier if you asked a

21   simple question.

22         THE COURT:    Let's drop that debate and ask another

23   question.

24         MR. THOMAS:    Mr. Long, your testimony, you are


35

1   saying the Department of Corrections has no authority to do

2   anything or make any recommendation in regard to the

3   sentence?  Is that what you are saying?

4          A    Well, you have asked a different question.

5          Q    No.  That was the same question.

6          A    It was not.

7          Q    We will go with this question whether it is

8   asked or not.  Mr. Long, can you answer that?

9          A    They would have the ability to make any

10  recommendation, but as to effectuate that recommendation, no,

11  they do not have that ability.

12         Q    See, I didn't ask you anything about

13  effectuate, did I?

14         A    Yes, you did.

15         Q    To make a recommendation?

16         A    Right.

17         Q    And they certainly could do that?

18         A    Oh, yes!

19         Q    And they could put him back in the State system

20  too, couldn't they?

21         A    I don't believe that is possible now though.

22         Q    You don't?  Why isn't that possible?

23         A    Because now I believe that he is ah, even

24  though he is serving Illinois time for a crime committed in

36

1    Illinois, he has since been transferred over for safekeeping

2    and/or housing in the Federal Government.  And I believe that

3    if anything were to occur as far as to where he was going to

4    be housed in institutions would be something worked out

5    between the Director now currently at the Department of

6    Corrections, and/or his representative, Mr. Watkins, and the

7    U.S. Government.

8            Q    Mr. Watkins is his lawyer?

9            A    No, Mr. Watkins is the Deputy Director which

10   came in after I left.

11           Q    So, Mr. Watkins and the Director could tell the

12   Federal Government we want him back in the State, couldn't

13   they?

14           A    I don't know what the Director could tell him.

15           Q    I have no further questions.

16           THE COURT:  The State?

17           MR. CASSON:  No.

18           THE COURT:  Thank you.

19               You may step down.

20                               (Witness excused.)

21           MR. CASSON:  Deputy Director Watkins.

22           MR. THOMAS:  Judge, I would move that Mr. Long's

23   testimony be stricken.  He has no information regarding what

24   could, would, should, or has been done in terms of Mr. Martin

37

1    and really has no relevance to anything that we are talking

2    about here.  He is talking about what he thinks he knows and

3    what he may have been party to.

4            It seems to me that either Mr. Bernardi, or Mr.

5    Brown, or somebody should just make a report and say that we

6    have offered this man something, or we haven't, or we are

7    holding it in abeyance.  Quit wasting time.

8            THE COURT:  Let's hear from Deputy Director

9    Watkins.  We need to play this thing out at least as far as

10   what the top officials of DOC are aware of.

11                        (Witness sworn.)

12                      DAVID C. WATKINS

13   called as a witness on behalf of the Plaintiff herein, being

14   first duly sworn, was examined and testified as follows:

15                    DIRECT EXAMINATION

16                    BY MR. CASSON:

17       Q    State your name, please?

18       A    David C. Watkins.

19       Q    What is your occupation, Mr. Watkins?

20       A    Deputy Director, Illinois Department of

21   Corrections for Inspections and Audit.

22       Q    How long have you been employed in that

23   capacity?

24       A    Since March 15th, 1990.

1          Q    During your tenure as a Deputy Director have

2    you become familiar with an individual by the name of Harry

3    Martin?

4          A    Yes, I have.

5          Q    When did you first become familiar with Harry

6    Martin?

7          A    When I assumed this position.

8          Q    You knew at that time that Mr. Martin was

9    cooperating and had given information with regard to the

10   Taylor murder investigation, is that correct?

11         A    That's correct.

12         Q    During the period of time that you have been

13   Deputy Director with the Department of Corrections have you

14   made any promises to Mr. Martin, or any representative of Mr.

15   Martin in return for his testimony in the cases involving the

16   murder of Superintendent Robert Taylor?

17         A    I have not.

18         Q    Have you made any agreements, or any

19   arrangements with Mr. Martin, or any of his representatives

20   as far as any sentence cut, good time restoration, or made

21   any arrangments for Mr. Martin to be accorded special

22   treatment in return for his cooperation of these cases?

23         A    I have not.

24         Q    To your knowledge has anyone in the Department

TRIAL TESTIMONY OF ILLINOIS
DEPARTMENT OF CORRECTIONS
DEPUTY DIRECTOR DAVID C. WATKINS

1    of Corrections made any such arrangements, or agreements?

2        A    Since I have been Deputy Director nobody has

3    made any arrangements, or agreements for any special time for

4    Harry Martin.

5        Q    That would be all I have.

6        THE COURT:    Cross?

7        MR. THOMAS:    No questions, sir.

8        THE COURT:    Thank you.

9        You can step down.

10                (Witness excused.)

11        Well, I am not going to direct that any of his

12    testimony be stricken.  Ah, these person may or may not be

13    called by either side to testify in front of the jury.

14        Ah, I am assuming we have our medication and

15    our juror here?

16        THE BAILIFF:    Yes, sir.

17        MR. CASSON:    I would like to supplement the record

18    on the Livingston County State's Attorney's Office and any

19    agreements with Mr. Martin.  I can represent to the Court the

20    Livingston County State's Attorney's Office has made no

21    agreements or arrangements with Mr. Martin, or anyone else

22    concerning any sentence reduction, any recommendation of good

23    time restoration, or any recommendation that Mr. Martin be

24    accorded any special treatment in return for his testifying

40

1   in this case or any other case involving the death of

2   Superintendent Taylor.

3         THE COURT:  Do you know whether anyone else has?

4         MR. CASSON:  In our office?

5         THE COURT:  No, no, no.

6         MR. CASSON:  Oh, I have no knowledge that anyone

7   has made any such agreements or arrangements.

8         THE COURT:  Does Mr. Martin have any charges

9   presently pending against him?  Is the State aware?

10        MR. WATKINS:  You asking me, your Honor?

11        THE COURT:  I am asking anybody here who knows if

12  Harry Martin has any charges that anybody is sitting on that

13  would provide some leverage for cooperation.

14        MR. CASSON:  Not that I am aware of.

15        MR. WATKINS:  He has no outstanding charges, your

16  Honor.

17        THE COURT:  Have any charges been favorably - -

18  Well, has there been any disposition of any charges that

19  would have been outstanding against Mr. Martin from September

20  3d, of 1987, up to the present?

21        MR. CASSON:  Judge, it is my understanding there

22  were no outstanding charges pending against Mr. Martin.

23        THE COURT:  Mr. Martin had a lot of potential.  He

24  was a defendant, although I don't know if Indiana pursued

41

AFFIDAVIT OF STATE'S KEY

WITNESS HARRY MARTIN

IN THE

CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

LIVINGSTON COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS )
           Respondants )
                           )    No 87 CF 112

 -VS-                   )

                           )    Charles E. Glennon
                           )    Judge Presiding

DAVID W. CARTER )
           Petitioner )

_____

AFFIDAVIT OF HARRY MARTIN

_David Carter_
David W. Carter #N43429
P.O. Box 112
Joliet, Illinois 60434-0112

C-58

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
LIVINGSTON COUNTY, ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) |
| | ) |
| *Plaintiff-Respondent,* | ) |
| | ) |
| vs. | )    No. 87-CF-113 |
| | ) |
| IKE J. EASLEY, JR. | ) |
| | ) |
| *Defendant-Petitioner.* | ) |

---

### AFFIDAVIT OF HARRY MARTIN

HARRY MARTIN, on oath, states:

    1.    I am the government informer who used an eavesdropping device to record a conversation with the defendant in this case in October 1987. I am also the subject of Exhibits 45-47 to the Second Amended Petition for Post-Conviction Relief filed by the same defendant. I am presently in federal custody.

    2.    I have read the Petition for Order Authorizing Use of Eavesdropping Device, filed in this case on October 2, 1987, by James Wasson, requesting authorization for an eavesdropping device to record a conversation between the defendant and me.

    3.    That petition, at paragraph 1(b) of Attachment 1, falsely states that I had "cooperated" with the Department of Corrections for a number of years and had been found to be "reliable" during that time. The truth is that I had never cooperated with the Department of Corrections as an informer or in any other way until after the murder of Robert Taylor on September 3, 1987.

    4.    Before that time, Michael O'Leary, the warden at Stateville Correctional Center, and Russ Nelson, an investigator for the Department of Corrections ("DOC"), had tried

C-59

ATTACHMENT

unsuccessfully to get me to cooperate with the DOC in its investigation of Larry Hoover and the Brotherhood of Struggle. This happened in June of 1987 in the warden's office at Stateville where I was an inmate. O'Leary and Nelson offered to get my sentence reduced, get me out of prison, and put me in the witness protection program.

5.    Nelson and O'Leary also tried to get me to cooperate by threatening me: they said that the Board of Governors of the Black Gangster Disciples ("BGDs") were planning to assassinate me, and that if I did not cooperate with the State, DOC officials would "parade" me in front of other inmates so that the other inmates would think I was cooperating. I refused to cooperate.

6.    Nelson and O'Leary then had me placed in protective custody, and within two or three days brought me to the prosecutor's office in Will County, as if to suggest that I was cooperating with the State.

7.    When I was brought to the prosecutor's office, several people were there: Nelson, O'Leary, Mike McKinney (chief investigator at DOC), investigators from the Cook County State's Attorney's office, including J.W. Glasscott, lawyers from the Will County State's Attorney's office, and an investigator from the Department of Criminal Investigations of the State Police. They continued to lean on me to cooperate. I was afraid, so I said that I would cooperate with the investigation if DOC moved me to Dixon, a medium/minimum security prison.

8.    They moved me to Dixon. Once I was there, Russ Nelson ~~and J.W. Glasscott~~ came down and tried to get information from me. But I stonewalled them. I was then transferred to Pontiac Correctional Center. This was some time in July 1987, right after

2

C-60

"Zodiac" was killed. I was put in lockdown.

9.   · A day or two after I arrived at Pontiac, my wife visited me and told me that the word "in the street" was that the BGDs were planning to assassinate me in prison. After visiting me, my wife went to Warden James Chrans' office and told him the same thing. Chrans called me into his office that evening and said that he was not going to have me killed on his watch. He then transferred me to Logan Correctional Center. All of this happened within three days of my being sent to Pontiac.

10.   Within a day or two after the murder of Robert Taylor on September 3, 1987, Russ Nelson telephoned me at Logan. I took the call in an office there. Nelson asked me to help in their investigation of the murder. I refused.

11.   The very next morning Warden Chrans telephoned me -- I was again brought to an office to take the call -- and reminded me that he had saved my life by sending me to Logan and that I owed him a favor. I said I would listen to what the State had to say.

12.   The next day, Gerald Long, a Deputy Director of DOC, and Jerry Donovan, a DOC investigator, came to Logan to see me. They said they needed my help, and they pointed out that I was in trouble as long as I was in prison, as a result of having been set up. I realized that I would always be in danger while I was in prison, and I felt the only way I could survive would be if I cooperated with the State. So I finally agreed to help with the investigation of the killing, including testifying at trials, if necessary.

13.   At that same meeting, which took place at an office at Logan within a week of Taylor's murder, we ironed out a deal, whereby Long and Donovan promised me the following benefits in return for my cooperation:

3

C. 61

APT. - 3    (4.

a.    they would immediately move my wife and three children downstate so that they could be near me.

b.    I would be allowed to make "home visits" or furloughs, beginning immediately. Home visits consisted of leaving Logan once or twice a week to visit my wife and children. During these day visits, I was free to do whatever I wanted to do and go wherever I wanted to go.

c.    I would get paid generously. They stressed that there was lots of different ways of paying me, including cash, commissary goods, witness funds, federal money and "O.A.F." funds (they did not say what that stood for).

d.    All of the state officials with whom I cooperated, including Long, Donovan, McKinney, and Will County State's Attorney's lawyers Bernardi, Brown, and Wasson, would vouch for me in court or through clemency petitions to get me released from incarceration once the investigation and trials were completed. (At the time of this meeting, I had served about eight years of two sentences totalling 45 years -- 10 from a Cook County conviction and 35 from a DuPage County conviction.)

e.    Long and Donovan said that the DOC Director would bring a clemency petition to the Governor to sign to make sure I was released, if the courts did not commute my sentences. (In fact, in October of 1990, Deputy Director Klemm took a clemency petition to the Governor, but I was out by then.)

14.    This "deal" was set out on that first day I met with Long and Donovan at Logan. In subsequent meetings, details were ironed out, such as where the money would come from. (For example, Long gave me a DOC phone card in the name of Stu Erickson, a DOC

4

C.62

investigator, in September, 1987.) But the basic outline as set forth above was laid out before I had done any eavesdropping for the Department.

15.    On September 26, 1987, I wore an eavesdropping device to record a conversation with Corwyn Brown, an inmate from Pontiac who had been sent to Logan so that I could record a conversation with him about Taylor's murder. Following my conversation with Brown, on the same day, Gerald Long came to see me and again confirmed all parts of the deal outlined above.

16.    I have looked at Exhibit 46 to the defendant's Second Amended Petition for Post-Conviction Relief. That exhibit contains copies of state vouchers showing payments to me of approximately $8,000 made during a three and one-half month period, from September 21, 1987, to January 7, 1988. Those vouchers do not show anywhere near the total amount I was paid by the State. The State actually paid me three to four times as much by the time of Ike Easley's trial, in June of 1989.

17.    I received many cash payments. I ran up hundreds, if not thousands of dollars worth of phone calls on Stu Erickson's phone card. I made extensive purchases at the commissary at Logan under the name of James Brokaw. The vouchers in Exhibit 46 list business calls from hotels. But I never made any "business calls". They were all calls to friends and family.

18.    I was given two polygraph tests s by the state. Long told me I failed both of them. The first one was administered to me in October or November 1987, after I had completed all of my electronic conversations, in Springfield at the office of the Illinois State Police. The purpose was to show how reliable I was, so I was asked (and confirmed) if I had

$$C^5 \text{-} 63$$

(6)

been cooperating with the State for a long time. I also was asked about the BGDs and about Taylor's murder. I don't know what questions caused me to fail the test. Long told me he had a friend of his at the State Police doctor the polygraph. The second polygraph was administered at Logan by DOC in November 1988 and involved the same questions. I believe the State suppressed both tests.

19.    I am willing to testify to all of the statements I have made in this affidavit.

HARRY MARTIN

Sworn to and subscribed before me this _5th_ day of September, 1997.

Witnessed by:

_____  9-5-9-

Attorney at Law

State of Texas

Bar #        04952300

Leonard E. Cox, Attorney

_____
Notary Public

6

C.64

ATT. - 6

(7)

DOCUMENTS CONCERNING DuPAGE COUNTY
CIRCUIT COURT HEARING DATED
OCTOBER 1, 1991
HARRY MARTIN'S SENTENCE REDUCTION

```
 1   STATE OF ILLINOIS   )
                         )  SS.        Duplicate Original
 2   COUNTY OF DU PAGE   )

 3      IN THE CIRCUIT COURT OF DU PAGE COUNTY FOR
        THE EIGHTEENTH JUDICIAL CIRCUIT OF ILLINOIS
 4
     THE PEOPLE OF THE            )
 5   STATE OF ILLINOIS            )
                                  )
 6            Plaintiff,          )
                                  )
 7      vs.                       )  No. 81 CF 325
                                  )
 8   HARRY MARTIN,                )
                                  )
 9            Defendant..         )
                                  )
10                                )
```

11        REPORT OF PROCEEDINGS had at the

12   hearing of the above-entitled cause, before

13   the Honorable EDWARD W. KOWAL, Judge of said

14   Court, on Tuesday, the 1st day of October,

15   A.D. 1991, at the hour of 3:20 o'clock P.M.

16   PRESENT:

17

18        MR. JAMES E. RYAN,
          State's Attorney of DuPage County, by
          MR. RICHARD STOCK,
19        Assistant State's Attorney,

20             appeared on behalf of The People
               of the State of Illinois.

21

22

23        DU PAGE COUNTY JUDICIAL CENTER
          505 N. COUNTY FARM ROAD
          WHEATON, ILLINOIS 60187

24

                                   C-418

2

```
 1    ALSO PRESENT:

 2

 3         MR. KENNETH W. TORLUEMKE,
           Public Defender of DuPage County, by
 4         MS. HARRIET DOHENY GUSTAFSON,
           Assistant Public Defender.

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

C-419

(16)

3

```
 1              THE COURT:  People versus Harry
 2    Martin.
 3              MS. GUSTAFSON:  Judge, I have
 4    prepared an order to impound this file as well
 5    as any record of proceedings.
 6              THE COURT:  Motion granted.
 7              MS. GUSTAFSON:  There is also, as the
 8    Court is aware -- I don't know what date in
 9    the Court file the post-conviction petition is
10    filed by Mr. Martin, what date it got filed.
11    I don't have a file stamp on my copy.
12              MR. STOCK:  I don't, either.
13              It's dated at the top of the
14    petition September 9th.
15              MS. GUSTAFSON:  I know we received
16    our copy on or about September 11th, so I
17    would imagine the Clerk's Office --
18              THE COURT:  The letter is dated
19    September 9, so we'll indicate that the
20    petition for post-conviction relief is dated
21    September 9, 1991.
22              Present in Court today is
23    Mr. Stock, representing the People, and
24    Ms. Gustafson, representing the Defendant.
```

```
 1              MS. GUSTAFSON:  Judge, only in the

 2    capacity as Officer of the Court.  We have

 3    never formally been appointed.  And it's

 4    Mr. Martin's pro se petition which is being

 5    proceeded upon.

 6              With respect to that, Judge,

 7    Mr. Martin has raised issues with respect to

 8    the appropriateness of the sentencing in his

 9    post-conviction petition, and that is the

10    matter he's asking the Court to grant him

11    relief upon.

12              THE COURT:  All right.  This matter

13    coming on to be heard on the post-conviction

14    petition, the provision in the petition

15    requesting this matter be resentenced, any

16    objection by the State?

17              MR. STOCK:  No, your Honor.

18              THE COURT:  Motion granted.

19              The matter comes on for

20    resentencing.  Any arguments by the State, any

21    argument by defense counsel?

22              MR. STOCK:  No, your Honor.  We would

23    rely on what was said during the 402

24    conference.
```

5

```
 1            THE COURT:  Resentencing on this

 2   matter, the sentence now will be 21 years

 3   Department of Corrections, credit for time

 4   served.

 5            It is my understanding that

 6   Defendant, therefore, will be entitled to a

 7   release.  Is that correct?

 8            MS. GUSTAFSON:  It's my

 9   understanding, Judge, that once the Department

10   of Corrections processes the appropriate

11   paperwork, he will be released from the

12   Department of Corrections sentence.

13            He may, perhaps, still be on a

14   Mandatory Supervised Release period.  However,

15   that will be coordinated with the federal

16   government.

17            MR. STOCK:  And, as we discussed,

18   Judge, there is a consecutive sentence in

19   Cook County, which he would remain, at this

20   point at least, still serving.

21            THE COURT:  All right.  Order entered

22   granting the relief as required, and an order

23   has been drawn.

24            The usual admonishment on
```

1    resentencing on this matter of the right of

2    appeal; 30 days to file notice of appeal.

3              Appellate Defender will be

4    appointed if he seeks counsel.  And the

5    Defendant can file his own request for the

6    Clerk to file a notice of appeal if he wishes.

7              MS. GUSTAFSON:  Thank you.

8              MR. STOCK:  Thank you.

9

10              (WHICH were all of the

11               proceedings had at the

12               hearing of the above-

13               entitled cause, this date

14               and time aforesaid.)

15

16

17

18

19

20

21

22

23

24

C.423  (20)

7

STATE OF ILLINOIS     )
                      ) SS.
COUNTY OF DU PAGE     )


          I, ERNEST C. SCOLA, C.S.R.,

Official Court Reporter, do hereby certify

that I reported in shorthand the proceedings

had at the hearing of the above-entitled

cause, and that the foregoing Report of

Proceedings, consisting of Pages 1 to 6,

inclusive, is a true, correct and complete

transcript of my shorthand notes so taken at

the time and place hereinabove set forth.




-----------------------------------
        OFFICIAL COURT REPORTER
        C.S.R. No. 084-001200
   Eighteenth Judicial Circuit of Illinois
              DuPage County.

C-424

(21.

Criminal Sentence Form                                               AD-152 (Rev. 6/91)

UNITED STATES OF AMERICA

STATE OF ILLINOIS                                              COUNTY OF DU PAGE
IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT

People of the State of Illinois

NO. 81 CF 325

DO #_____

☑ Indictment

Vs.                                                ☐ Information

HARRY MARTIN                                       ☐ Complaint
_____
Defendant                                          ☐ Resentence

PLEA ☒ NOT GUILTY  ☐ GUILTY   FINDING OF GUILTY BY ☐ COURT ☒ JURY
It is hereby ordered that the defendant is sentenced as follows:
TYPE OF SENTENCE

☐ FINED TOTAL AMOUNT $ _____          ☐ COURT SUPERVISION—END DATE _____
which includes court costs, penalties and fees as provided by
statute.                                          ☐ COUNTY JAIL _____ DAYS
☐ FINES $ _____ plus statutory court     TO BEGIN _____
costs and fees and the following penalties
  ☐ Criminal Surcharge Fund                      ☒ ILLINOIS DEPARTMENT OF CORRECTIONS
  ☐ Violent Crime Victim Assistance Fund             ☐ Boot Camp
  ☐ Driver's Education Fund                       ☐ CUSTODY OF THE U. S. ATTORNEY GENERAL
☐ PROBATION _____ MONTHS—END DATE _____       ☐ STATE'S ATTORNEY ALLOWED
☐ PERIODIC IMPRISONMENT                              _____ NO. OF DAYS PER DIEM
  ☐ Work Release Program                          ☐ NO CREDIT FOR GOOD TIME
  ☐ Week End
☐ CONDITIONAL DISCHARGE—END DATE _____          ☐ AMENDED CHARGE _____

RE- SENTENCE

Upon granting defendant petition for post conviction relief on sentence and
sentence of 10/13/81 is Vacated.  Defendant resentenced
to 21 years Illinois Dept of Corrections, day for day
credit to apply, all time considered served.

Disposition of companion cases (not sentenced) _____

State's Attorney  Stock                    JUDGE _____
Defense Attorney  Defendant Pro Se         Date  10/1/91
Deputy Clerk  Bostick                      PROCESSED
Reporter  Scola              C-74          OCT 2 1991
Bailiff  Stars                             ☐ Sentence Stayed until _____
                                           ☐ No Credit Time Served.  Credit will be given unless this box is checked
                                           ☐ Defendant released from custody.

(24)

T-CR 35(Rev. 1/82)

UNITED STATES OF AMERICA

STATE OF ILLINOIS                                    COUNTY OF DUPAGE
IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT

PEOPLE OF THE STATE OF ILLINOIS

–VS–                              Case No. 81 CF 325

HARRY MARTIN

Defendant

## ORDER

This cause having come on to be heard upon the motion of the ___ Petitioner, Harry Martin for post conviction and the Court being fully advised in the premises, and having jurisdiction of the subject matter;

IT IS HEREBY ORDERED that the post-conviction petition ~~filed on~~ dated Sept. 9, 1991

is hereby granted only with respect to sentencing issues. Therefore,

sentence of October 13, 1981 is vacated and petitioner is resentenced

to 21 (twenty one) years in the Illinois Department of Corrections,

day for day credit to apply, all time considered served.

COPY

Name  ASA. Stock/Petitioner Pro-se
DuPage Attorney No. 50000
Attorney for _____
Address _____
City _____
Phone _____

Judge

PROCESSED
OCT  21  1991  10   1    91
CIRCUIT CLERK

EXH. 45-2

JOHN W. COCKRELL, CLERK OF THE 18TH JUDICIAL CIRCUIT COURT

C-331

{23}

T-CR 35(Rev. 1/82)

UNITED STATES OF AMERICA

STATE OF ILLINOIS                                   COUNTY OF DUPAGE
IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT

PEOPLE OF THE STATE OF ILLINOIS

–VS–                              Case No. _____ 81 CF 325

HARRY MARTIN
                    Defendant

File Stamp Here

## ORDER

This cause having come on to be heard upon the motion of the ___STATE___
and the Court being fully advised in the premises, and having jurisdiction of the subject matter:

IT IS HEREBY ORDERED     that this file is to be impounded by the Clerk of the

Circuit Court until further order of this Court.

COPY

Name _____
DuPage Attorney No. _____
Attorney for _____     Enter: _____
Address _____                              Judge
City _____
Phone _____     Date

PROCESSED

2 1991

JOHN W. COCKRELL, CLERK OF THE 18TH JUDICIAL CIRCUIT COURT

EXHIBIT 45-1

C. 330

( 22 )

PETITIONER'S HEARING ON
CONVICTION PERTAINING TO STATE
WITNESS HARRY MARTIN'S SENTENCE

REDUCTION

1      IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
                    LIVINGSTON COUNTY, ILLINOIS
2

3    PEOPLE OF THE STATE OF         )
       ILLINOIS,                    )
4                                   )
             Plaintiff,             )
5                                   )
             vs.                    )        87-CF-112
6                                   )
     DAVID W. CARTER,               )
7                                   )
             Defendant.             )
8

9                       _____

10

11           REPORT OF PROCEEDINGS of the hearing before the
     Honorable Harold J. Frobish, on the 1st day of May, 2003.
12
             APPEARANCES:
13
             LISA ANNE HOFFMAN
14           ASSISTANT ATTORNEY GENERAL
             100 West Randolph Street
15           12th Floor
             Chicago, IL 60601
16
                  for the Plaintiff.
17
             W. KEITH DAVIS
18           ATTORNEY AT LAW
             237 East Front Street
19           Bloomington, IL 61701

20                for the Defendant.

21   Dora L. Immke, C. S. R.
     Official Court Reporter
22   License No. 084-004364
     Livingston County Courthouse
23   Pontiac, IL 61764
     (815) 844-5172
24

(47)

1          THE COURT:   In 87-CF-112, People vs. David Carter,

2     Miss Hoffman appears from the Office of Attorney General,

3     the defendant appears in the custody of the Department of

4     Corrections with his attorney, Mr. Davis.

5          Scheduled for hearing today are several discovery

6     motions filed by Mr. Davis and also a motion to dismiss

7     filed by Miss Hoffman.

8          So, that the record is clear here, we've had very

9     lengthy proceedings as this matter developed.  This all

10    started out September 10 of 1998, when I entered an order

11    docketing a combination petition.  There was a

12    postconviction petition and a petition for the relief

13    of judgment.  I first appointed David Ahlemeyer who was

14    then public defender on October 23 of '98.  I vacated that

15    appointment and I appointed Carey Luckman who did a lot of

16    work on this case.  Mr. Luckman, after reviewing

17    transcripts and the like filed on February 16, 1999, a

18    motion to excuse late filing.  The petition of Mr. Carter

19    was late in terms of the postconviction statute and the

20    petition for relief from judgment.  And -- Argument is

21    heard.

22         On April 23 of '99, I entered an order denying the

23    motion to excuse late filing of the postconviction

24    petition.  So, that petition is gone.  But I granted the

(48)

1    defendant's motion to excuse late filing under 2-1401.   For

2    practical purposes, I think the 2-1401 petition amounts to

3    a postconviction petition, but they are two separate

4    remedies and filings.

5        The Attorney General's Office felt that I was wrong

6    in that decision and filed a motion to reconsider on July

7    26 of '99; and after that, there's been a great, great deal

8    of effort directed to whether a reduction in sentence was

9    given to Harry Martin who was a gang leader purportedly,

10   whether a reduction in sentence was granted to him in

11   exchange for his testimony in the trial.   And on August 19

12   of 1999, I directed an investigation be undertaken to

13   determine what was in fact disclosed at trial.   What did

14   Harry Martin say?

15        On December 15 of 2000, Mr. Luckman, that's probably

16   when he became a prosecutor, I needed to find a new defense

17   lawyer; so, I appointed Eric Frobish who has the

18   same last name as the trial judge but is sufficiently

19   distantly related that there would be no disqualification

20   involved.   That did not work out because he moved, as I

21   understand it, or for some other reason.

22        In any event, on February 22nd, 2001, I appointed

23   Paul Lawrence of Bloomington.   And then October 18 of 2001,

24   where this alleged reduction in sentence took place, I

1    directed some investigation occur regarding what actually

2    happened in DuPage County.  That's where the alleged

3    reduction took place, if there was a reduction.  The only

4    question was:  Why was there a reduction?  So, there was

5    much work spent getting transcripts and that type of thing.

6          Then Paul Lawrence became a judge; so, on April 15

7    of 2002, I appointed Mr. Davis.  And on May 14 of 2002, I

8    ordered that the transcript of the overhear be produced.

9    It's probably the most single -- The piece of evidence that

10   was most important in this trial was an overhear that was

11   conducted between Mr. Martin and the defendant, and I

12   ordered that the transcript be produced.  And presumably

13   Mr. Davis has seen that.

14         On July 12 of 2002, Mr. Davis filed numerous

15   motions; and those have yet to be ruled on.  Those motions

16   were filed before I took dispositive action on the State's

17   motion to reconsider my prior decision on the 2-1401

18   petition.  And on October 22 of 2002, I did deny that

19   motion to reconsider.

20         So, we have pending at this time the 2-1401

21   petition, we have pending at this time some motions for

22   discovery; and we're going to talk about those in a second.

23   It seems to me, most, if not all, have been rendered moot

24   by the relief I've already granted to the defendant.

(50)

```
1          A motion to dismiss has been filed directed to the

2     2-1401 petition.  We've had various status conferences

3     getting ready for today.  It's not clear to me, Mr. Davis,

4     that we have on file here a 651(c) petition from you; so,

5     I'm going to ask, in due course, that that be accomplished

6     so that our record is clear.  I know you've done a great

7     deal of work on this file, but I want to make sure that

8     there be a 651(c) certification.  That may be directed, I

9     don't remember, only at the postconviction statute, but, in

10    any event, I think we ought to have it because the 2-1401

11    amounts to postconviction petition.

12         So, let me see if we agree where we're at.  We need

13    to first, I need to first dispose of, in some fashion,

14    these various motions of Mr. Davis; and then, depending on

15    what happens there, we need to have a hearing on the motion

16    to dismiss.

17         Is that the way you see it, Mr. Davis?

18         MR. DAVIS:  Yes, sir.

19         THE COURT:  And, Miss Hoffman?

20         MS. HOFFMAN:  Yes.

21         THE COURT:  All right.  Looking at the motion, --

22    Let me ask.  I just said a whole mouthful, Mr. Carter.  Did

23    you understand what I said?

24         THE DEFENDANT:  Very well.
```

1          THE COURT:  Okay.  Mr. Davis has filed a number of

2     discovery motions.  They are a motion for leave to take

3     evidentiary depositions and for the furnishing of expenses.

4     These would be directed to people who would have knowledge,

5     Donald Bernardi who was then State's Attorney but who is

6     now a judge, Tom Brown who is now the State's Attorney,

7     James Casson who was a prosecutor, now is privately

8     practicing.

9          There's a second discovery motion, motion for order

10    to the State's Attorney's Office for DuPage County, Cook

11    County, Livingston County to provide their files for an

12    in-camera inspection by the Court and for leave to take

13    evidentiary depositions and for the furnishing of expenses

14    attaching thereto, C, as I call it, we have a motion to

15    produce Harry Martin for testimony and for an order

16    requiring the State's cooperation in obtaining his presence

17    to testify.  We have a motion for order to admit fact under

18    the Code of Civil Procedure.

19         And, finally, E, we have a motion for order to

20    produce overhear tape.  With respect to the last one, I do

21    note that Miss Hoffman has furnished a transcript of that.

22    So, it seems to me, we've dealt with that.

23         With respect to A through D, as I call them, all the

24    others, explain to me, Mr. Davis, why these have not been

1   rendered moot, first of all, by my denying the Attorney

2   General's relief that's requested, and, secondly, in any

3   event, they shouldn't be entertained unless the defendant

4   can get by a motion to dismiss.

5        MR. DAVIS:  Well, obviously, if the case is

6   dismissed, the case is dismissed.  It is our contention

7   that Mr. Carter, has in his dual motion as the Court has

8   put it, stated a cause of action, 2-1401.  Mr. Carter has

9   clearly stated that at trial Harry Martin made a deal in

10  effect with the State's Attorney's office.  That deal was

11  to obtain perjured testimony against Mr. Carter; that, in

12  fact, perjured testimony was obtained; and that the State

13  knew it.

14       In effect, what the State's, what the Attorney

15  General's motion is is an attack on the pleadings.  That's

16  what the State says, that, if the pleadings and their

17  factual averments are accepted to be true, which is what

18  the Court must do at this juncture, the Court must assume

19  that every fact that Mr. Carter has pled in his dual motion

20  is in fact true.  If, based upon the truthfulness of those

21  assertions he states a cause of action, then the State

22  cannot prevail on this motion to dismiss.

23       It is our position that in point of fact, Mr. Carter

24  has stated a valid cause of action in 2-1401.  He has

1    averred every single element of the 2-1401 theory upon

2    which we are founding our action in court today, that there

3    was a deal, that it was used to procure Mr. Martin's

4    perjured testimony, that it did in fact procure Mr.

5    Martin's perjured testimony, and that the State knew it.

6    Accordingly, we submit that Mr. Carter's 2-1401 petition

7    should survive and the State's motion ought be denied.

8        Having said that, it is our position that the

9    various motions that I'm requesting concerning discovery,

10    and you're absolutely right, I've listed basically every

11    one that I could think of as possibly having firsthand

12    knowledge, not double hearsay or triple hearsay, but

13    firsthand knowledge, the State's Attorney and chief

14    prosecuting attorney at the time, the prosecuting attorney

15    in DuPage County wherein, as the Court is well aware I

16    presume having reviewed the transcripts that I have

17    reviewed and Miss Hoffman has presumably reviewed, there

18    was a substantial, in fact, drastic reduction in Mr.

19    Martin's testimony [sic], we submit that Mr. Carter has at

20    least stated --

21        THE COURT:   Reduction in the sentence?

22        MR. DAVIS:   Reduction of the sentence, correct.

23        THE COURT:   Okay.

24        MR. DAVIS:   We submit that Mr. Carter has stated a

1    cause of action sufficient to allow those discovery motions

2    to proceed.  There is no other way, as a practical matter,

3    that Mr. Carter can show that the State knowingly procured

4    perjured testimony other than to get individuals from the

5    State to give discovery and for us to obtain the

6    documentary discovery which I am seeking here.

7         As far as Mr. Martin's presence, as perhaps the

8    Court knows, perhaps the Court does not know, but at the

9    last transcripts out of DuPage county, it was represented

10   in the transcript I believe that Mr. Martin was in the

11   protection program, the witness protection program.  We

12   have, I personally contacted Aviva Futorian who is Mr.

13   Martin's prior attorney to try to obtain his whereabouts.

14   She doesn't know where he is.  I have attempted to locate

15   Mr. Leonard Cox who is the attorney who verified Mr.

16   Martin's affidavit which is attached to Mr. Carter's

17   petition.  Mr. Cox, to the best of my knowledge,

18   information and belief has retired and is no longer

19   practicing law; his whereabouts are unknown.  Those are the

20   only two people from the defense side that I know who could

21   possibly get in touch with Mr. Martin.

22        The only thing that I have right now is a piece of

23   paper that is written in Mr. Martin's name and which bears

24   his signature; but that piece of paper is not sufficient

1    for me to go forward unless the State admits its

2    truthfulness, hence my request to admit fact, or we can

3    prove it extrinsically by means of Mr. Martin's testimony

4    or other methods.

5         Accordingly, I submit that my requests for discovery

6    are reasonable and ought be allowed.  Thank you.

7         THE COURT:  All right.  Miss Hoffman.

8         MS. HOFFMAN:  Your Honor, I suppose that my response

9    to both of the discovery motions --

10        THE COURT:  Just argue both of them.

11        MS. HOFFMAN:  It's really the same argument.  First

12   of all, I've set it forth quite succinctly I think, but,

13   just for the record, it's the People's position that in

14   fact Mr. Carter's 2-1401 petition does not plead

15   sufficiently to permit, to afford him relief.  What he must

16   demonstrate, facts must be alleged and proved by clear and

17   convincing evidence which show that, that establish grounds

18   for relief and show that -- Pardon me, because I'm just

19   looking through this and not finding what I'm supposed to

20   be saying right now which is never a good thing.

21        THE COURT:  Page 2 is what --

22        MS. HOFFMAN:  There may have been -- What he needs

23   to demonstrate is that this was a material fact that would

24   it, had it been known to the judge at the time of the

1    trial, it would have changed the outcome of the judgment or

2    it would have, I guess in traditional terms of 2-1401,

3    would have prevented entry of the judgment.  And, in this

4    case, what we are saying is, what Mr. Carter has alleged is

5    only that, had this information been known at the time,

6    assuming for the sake of this pleading that the facts

7    alleged are true, had Mr. Martin's inducements provided by

8    the Department of Corrections to Mr. Martin in exchange for

9    his testimony been known, the most that could have happened

10   is that Mr. Martin's testimony would have been impeachable.

11        However, there's no suggestion that that evidence

12   would have provided a basis for the trial court to deny the

13   admission of the tape into evidence.  And when we have the

14   tape in the evidence, we have, that's essentially what the

15   Appellate Court has already said:  Would have it, it

16   provided the overwhelming evidence of guilt without Mr.

17   Martin?  Yes, you would have been able to impeach Mr.

18   Martin.  But would you have been able to avoid the

19   admissibility of that tape?  No.  And since he cannot

20   provide, he did not plead facts which suggest that had they

21   been known to the Court they would have changed the

22   outcome, he's not entitled to relief under 2-1401, and

23   that's on the basis of the pleadings.

24        For the same reason, we believe that the discovery

1       motions are inappropriate because they all go to that same

2       issue; and, once again, if the issue itself cannot provide

3       the basis for relief under 2-1401, then there is no reason

4       to go forward with such discovery.

5               THE COURT:  Any response, Mr. Davis?

6               MR. DAVIS:  The only thing that I would also point

7       out, Judge, is that it's my understanding that, at trial,

8       Harry Martin not only testified to the requisite facts

9       concerning the admissibility of the tape, but he also gave,

10      as I recall, substantial and fairly extensive testimony

11      regarding, for instance, Mr. Carter's alleged role in gang

12      hierarchy at the Pontiac correctional facility, the means

13      by which the gang hierarchy engaged in what was effectively

14      a conspiracy to commit bodily harm and ultimately the

15      murder of Warden Taylor and other aspects not connected,

16      either directly or even indirectly, to the tape which would

17      render Mr. Martin's testimony crucial concerning Mr.

18      Carter's actual criminal responsibility on an

19      accountability theory under Illinois criminal law.

20      Remember, the factual setting of the case was not that Mr.

21      Carter committed the actual acts which resulted in Warden

22      Taylor's death; but, rather, the State's theory was that

23      Mr. Martin, I'm sorry, Mr. Carter, commanded others to

24      perform acts which led to that death, and, without Mr.

1    Martin's testimony concerning that hierarchy and the

2    participation of Mr. Carter in that hierarchy, the State's

3    case cannot proceed.

4         Accordingly, although I understand that the State

5    relied heavily on the tape, it was obviously an important

6    piece of evidence, it was by no means the only piece of

7    evidence that Mr. Martin testified to.  He testified, as I

8    recall, for a very long time concerning matters not

9    resolved, I'm sorry, not involving the tape; and,

10   accordingly, while I understand the prosecutor's urgings

11   concerning the tape, in no way does her argument go to that

12   other testimony which was, in our view, crucial.  Thank

13   you.

14        THE COURT:  All right.

15        Any final reply, Miss Hoffman?

16        MS. HOFFMAN:  Your Honor, I would just direct the

17   Court's attention, as I have previously, to the Rule 23

18   order of the Appellate Court on direct review of Mr.

19   Carter's case because I think that they did in fact address

20   some allegations regarding other aspects of Mr. Martin's

21   testimony.  Those were ultimately found, those arguments

22   were found waived; but, when doing analysis on whether or

23   not a plain error analysis was appropriate, the Court says,

24   plain error could not possibly be appropriate with respect

1   to Mr. Martin and the propriety of his testimony because

2   the evidence was not closely balanced in any area that

3   might have occurred as a result of Mr. Martin's testimony.

4   It was not so fundamental and of such a magnitude to deny

5   him a fair trial.  And I'm quoting from page 12:  Martin

6   testified that defendant admitted directing Lucas and

7   Easley to attack Taylor.  On appeal, defendant does not

8   challenge this fact or the fact that Taylor was murdered by

9   Lucas and Easley

10  Again, I think the Appellate Court's position is

11  that Mr. Martin's testimony, and, again, they were talking

12  about his testimony with respect to issues other than the

13  overhear tape, was not so substantial that it had a

14  fundamental part in this case; and, in fact, the evidence

15  regarding the tape was the overwhelming evidence that made

16  this case not closely balanced.

17  So, while I certainly don't disagree that Mr. Martin

18  testified to other things, I think, in the end, what sealed

19  the case was the tape; and the Court had found that that

20  was the overwhelming evidence.  And, as the Court stated,

21  Mr. Carter did not challenge that admission by Mr. Taylor

22  on direct appeal, and that's what they found controlled

23  factually in this case.

24  THE COURT:  All right.  The postconviction petition

1   and petition for relief from judgment filed August 10,

2   1998, has several contentions.  Central to all of those

3   contentions is the proposition put forth by the defendant

4   that the, or, a key witness against defendant was Harry

5   Martin.  The key to this case, I find, is the tape.  The

6   Appellate Court summarized the contents of that tape on

7   pages 14 and 15 of its opinion of June 30 that was filed

8   June 30, 1993.  That opinion states as follows:

9       According to the tape recording of the conversation

10  between Martin and defendant, defendant became upset when

11  Martin suggested that Jones died accidentally as a result

12  of overdosing on a bag of cocaine.  Defendant insisted that

13  Jones had ample time to flush the cocaine down the toilet

14  before the guards came for him and that he would not have

15  attempted to stuff a medicine bag filled with cocaine in

16  his mouth.  Defendant told Martin that Taylor was murdered

17  to avenge Jones' murder and the administration's treatment

18  of BGD members.  Defendant stated that the order to attack

19  Taylor was handed down to him by his superiors in the gang

20  and that he, as unit security officer, implemented that

21  order by procuring Easley and Lucas to carry out the deed.

22  According to defendant, preparations for the attack on

23  Taylor were made three to four weeks prior to the event.

24  It was arranged that Easley and Lucas would hit Taylor in

1    the head with pipes.  They wore masks and gloves and just

2    left the weapons at the scene.  The weapons had been wiped

3    clean of fingerprints.  Defendant admitted helping wipe off

4    the fingerprints.  However, defendant also said the attack

5    on the other superintendent by another inmate named Chico,

6    C-H-I-C-O, was an "isolated incident."  Defendant made no

7    mention of threats to guards.

8        The tape in crass terms is the guts of the State's

9    case against this defendant, I find.

10       It is true that Martin gave background testimony of

11   how gangs operated at the Pontiac Correctional Center at

12   that time.  That has some importance.  And, as this case

13   has gone on since I got into it in September of '98, I have

14   seen nowhere it contended or argued, in any substantial

15   manner, that the background information given by Martin was

16   incorrect.  As I understand it, and I wasn't here, he was

17   quite a performer and he enjoyed his day in court and the

18   attention he was getting.  But he testified how gangs

19   worked out there, and I've not gleaned from the record or

20   otherwise that his testimony, in terms of general activity

21   of gangs, was incorrect.

22       So, I think central to Mr. Carter's arguments are,

23   you know, what is the key to the case?  I think the key to

24   the case is the tape.

1      Now, we have in the petition, the postconviction

2    relief and petition for relief from judgment, the

3    contention that somehow that tape should not have been

4    admitted because it was obtained by fraud, collusion,

5    trickery, insubordination, perjury, et cetera.  The

6    admissibility of that tape has already been ruled; and

7    Judge Glennon initially suppressed it because he felt the

8    defendant was in custody.  The Fourth District Appellate

9    Court said, no, for purposes of custody, for purposes of

10   the admission of the tape, the defendant was not in

11   custody; admissibility of this tape does not depend on

12   Martin's motive for cooperating.  The issue of the

13   admissibility of the tape has been sealed, and there's

14   nothing in this petition by the defendant that would cause

15   a different result.

16      There is mentioned in Mr. Carter's petition about

17   closing arguments being improper regarding his failure to

18   testify.  I find that those are waived; and, in any event,

19   the line was not crossed.  What we spent four years plus on

20   really is this so-called, newly discovered evidence where

21   Mr. Carter contends that there was a deal made Mr. Martin;

22   and, as part of Mr. Martin's testimony here in this case,

23   the defense was not made aware of that deal and perjury

24   therefore occurred when Mr. Martin testified at least

1    initially that there was no deal.  And after the trial, or

2    before the trial, I forget which, he did get his sentence

3    reduced to time served up in DuPage County.

4         THE DEFENDANT:  What about the false testimony given

5    in application for the authorization of the wire tap?

6         THE COURT:  Well, I've dealt with that, Mr. Carter,

7    I've dealt with that; and the Fourth District Appellate

8    Court has dealt with that.  On this point of the importance

9    of this reduction in sentence, we have worked diligently

10   four years now trying to get to why this reduction took

11   place.  It is not clear to me that the reduction took place

12   because of the testimony given by Mr. Martin here.

13        In any event, even if that were true, even if that

14   were true, it has not been shown here that Mr. Martin's

15   testimony was untrue.  It has not been shown that his

16   testimony was untrue.  And, furthermore, even if Mr. Martin

17   got a reduction in sentence because of his cooperation in

18   coming down here and testifying, I find that that

19   circumstance, if true, would not have made a difference in

20   this trial.

21        We have to look to the case law as to when such a

22   circumstance would make a difference.  In People vs.

23   Williams, a Fifth District case June 28, 2002, 265 Ill.Dec.

24   781, I'm looking at page 787:

1        In accord with the United States Supreme Court,

2    Illinois has long recognized that a conviction based upon

3    false testimony is contrary to fundamental principles of

4    fairness.  It is further well established that the State's

5    knowing use of perjured testimony to obtain a conviction

6    constitutes a violation of due process of law and must be

7    set aside if, if there is any reasonable likelihood that

8    the false testimony could have affected the jury's verdict.

9        A very recent case that I came across March 13 of

10   2003, People vs. David Thurman, --

11        MR. DAVIS:  How do you spell that?

12        THE COURT:  T-H-U-R-M-A-N.

13        MR. DAVIS:  Thank you.

14        THE COURT:  Fourth Division of Cook County, March

15   13, 2003.  I have, my computer skills are not wonderful.  I

16   see that the number 1002841.ht.

17        MS. HOFFMAN:  That is 1002841 would be, that's the

18   Appellate Court number --

19        THE COURT:  Okay.  There, the case dealt with a

20   postconviction petition.  And there was a murder and the

21   question about the importance of that testimony.  The

22   Appellate Court there cites the Williams case and says at

23   page 3 of 4:

24        Therefore, even assuming that Alvarez received

48

(65)

```
 1    consideration in exchange for his testimony, and the State

 2    failed to disclose it, it is unreasonable to conclude that

 3    Alvarez's uncorrected testimony to the contrary affected

 4    the outcome of this case.

 5         So, I think it comes down to that.  It's not clear

 6    to me at all that there was fabrication.  It's not clear to

 7    me at all why the reduction in sentence occurred.  But,

 8    even if all those things are true, with this tape, Mr.

 9    Carter, I think your fate was sealed.  This is a damaging

10    tape, it is a damning tape; and it is the crux, it is the

11    crux of the case, and it is damaging to you to an extent

12    that you can't recover from it.

13.        THE DEFENDANT:  The whole tape is allowable --

14                        (Whereupon the court reporter

15                         asked that the defendant repeat

16                         what he said.)

17         THE DEFENDANT:  If the whole tape is allowable --

18         THE COURT:  Well, be that as it may, I believe the

19    motion to dismiss of the Attorney General's Office here is

20    meritorious; and I am granting that motion to dismiss

21    today.

22         I do believe these various motions for leave to take

23    evidence depositions and the like may have needed to be

24    entertained and maybe some granted if I hadn't denied the
```

1       State the relief that it wanted.  These, I think many of

2       them went to when, why, whatever; but I denied the State's

3       motion to reconsider.  We don't get to those things if I

4       grant the motion to dismiss.  So, I find that these various

5       matters have either, one, been rendered moot, these various

6       motions have either, one, been rendered moot or they were

7       premature because the petition of the defendant cannot

8       withstand a motion to dismiss.

9            Now, the court reporter is directed to prepare a

10      transcript of today's proceeding, furnish a copy to Mr.

11      Davis, furnish a copy to Miss Hoffman.  Before we go today,

12      Mr. Davis, I'd like your 651(c) certificate.

13           You appear very much, Mr. Carter, to understand what

14      it is that I've said.  Does he have any questions?

15           THE DEFENDANT:  I would like a copy of the

16      transcript also.

17           THE COURT:  All right.  We'll furnish that to Mr.

18      Davis, and he's your lawyer, he needs to be the one to

19      contact you.  We'll let him furnish it to you.

20           And is there anything else we need to do today,

21      Counsel?

22           MR. DAVIS:  Judge, the State having succeeded in its

23      motion to dismiss, Mr. Carter may wish to appeal the ruling

24      of today.

```
1              THE COURT:  Right.

2              MR. DAVIS:  If that's the case, --

3              THE COURT:  Presumably he will.

4              MR. DAVIS:  What?

5              THE COURT:  Presumably he will.

6              MR. DAVIS:  I presume that he will.  I would ask

7    that the Court entertain a preparation by the clerk of a

8    timely notice to appeal and appoint the Appellate Defender

9    --

10             THE COURT:  Yes.

11             MR. DAVIS:  -- for the purpose of that kind of

12   relief.

13             THE COURT:  Let me suggest this:  This may be

14   something that you want to file a motion to reconsider or

15   maybe you've already made that determination, I don't know.

16   If you just call me and say, file the notice of appeal,

17   I'll do it right there, unless you want me to go ahead and

18   do it right now.  That's fine.  Maybe you want to talk to

19   him.

20             MR. DAVIS:  May I have a few words with Mr. Carter?

21             THE COURT:  That's fine.  Why don't you --

22             THE DEFENDANT:  File the notice to appeal

23   because you're not going to change your mind and --

24             THE COURT:  I don't think I will change my mind --
```

1          THE DEFENDANT:  So, what's the point of doing this?

2          THE COURT:  I worked very hard, Mr. Carter, I think

3     I understand it.  I always try to keep an open mind.  I

4     don't think I will, I can't think of any reason I would;

5     so, why don't we go ahead and do that.  The clerk is

6     directed to file a notice of appeal and the Appellate

7     Defender is appointed to represent you.  And you'll be in

8     contact with, Mr. Carter, the Appellate Defender when they

9     get a copy of the order.  So this is going up.  All right.

10         MR. DAVIS:  Thank you.

11         THE COURT:  Thank you.

12                    (Which was all the evidence

13                    offered and received and all

14                    other proceedings had in the

15                    hearing of the above cause.)

16                    *  *  *  *  *  *  *  *  *

17

18

19

20

21

22

23

24

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

LIVINGSTON COUNTY, ILLINOIS


   I, Dora L. Immke, an Official Court Reporter for

the Circuit Court of Livingston County, Eleventh Judicial

Circuit of Illinois, do hereby certify that I reported in

shorthand the proceedings had on the hearing in the

above-entitled cause; that I thereafter caused the

foregoing to be transcribed into typewriting, which I

hereby certify to be a true and accurate transcript of the

proceedings had before the Honorable Harold J. Frobish,

Judge of said court.

Dora L. Immke, C. S. R.
Official Court Reporter
License No. 084-004364

Dated this 30th day

of May, 2003.

AFFIDAVIT OF CORWYN BROWN

IN THE

CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

LIVINGSTON COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS )
          Respondants )
                    )    No 87 CF 112
                    )
                    )
-VS-              )
                    )    Charles E. Glennon
                    )    Judge Presiding
                    )
DAVID W. CARTER      )
          Petitioner )
                    )

AFFIDAVIT OF CORWYN BROWN

_David W. Carter_
David W. Carter #N43429
P.O. Box 112
Joliet, Illinois 60434-0112

C-65

(10)

P 33

<u>Affidavit</u>

Oct. 30, 1996  J.C.C.

I, Corwyn Brown ; Do Hereby STATE AND AFFIRM THAT The following is TRUE iN everyway to the best of my Knowledge AND Recollections.

(3) Corwyn Brown N-12181

THAT ON Sept. 2, 1987 I CorwyN BrowN met with two members of my personal Security STAFF AND Discussed THe ATTACK of CorrectioNal STAFF AT THe PONTIAC CorrectioNal CeNter. THese two INMATes were ANTHoNy "T-21" WilliAms WHO WAS my cellmate AND personAl security STAFF member AND Perry "P.M." Moore WHO Live NexT DOOR TO me AND WAS my peRSONAl security STAFF member Also. I Advised THem iNSiDe cell 536 iN THe SOUTH HOUSE THAT we HAD TO ASSIST THe OTHER ORGANIZATION uNDer THe SiX iN ATTACKiNG THe STAFF. THey ASked why was THE Security STAFF, GeNerAl members STAFF NOT GOiNG TO Be iNvolved AND I explAiNed THAT I Needed iNDividuAls LoyAl To me fiRST AND THe MOB secoND, THey boTH UNDERSTOOD THiS AND AGreed TO "Hit" CaptAiN WHiTHer iN His office. I THEN ASked THree more iNDividuAls THAT I personAlly TRUSTed TO iNvolved THemselves iN CerTAiN THiNGS. ONe WAS TO PLAY A RADio ON THe BACKBREAKS, NUMBER TWO WAS TO TAKe THe CAGE officer DOWNSTAiRS AND THe LAST WAS TO HAVe A BAG ON Five gAllery foR THe ClOTHes AND Gloves TO Be THROWN OUT of THe WiNDOW. THe LAST ONe WAS TO KNOW THere WAS A Hit ON BUT ON WHO, WHAT OR WHere, STAFF OR INMATe, He HAD NO KNowledge. THe MeMBeR ON THe BREAKS WAS SiNque off SiX GAllery, AND All He WAS TOld WAS TO STAND ON THe BACK of SiX & five AND BLAST THe SOUNDS AFTer YARD. THe member THAT TOOK THe BACKBREAKS officer DOWNSTAiRS WAS Melvin "K-DOG" ClARK, WHO WAS ONLY TOld TO DO THAT SO we could violate some members. THe LAST member WAS Ike "J.R." EASLey WHO WAS TO pick up THe ClOTHes AND Gloves, He WAS AWARe of A Hit BUT ON WHO He WAS NOT AWARe. AND Knew He WAS ONLY suppose TO DUMP some SHit

C.66

(11)

p 34

/

OUT THE WINDOW. They were Told THe Sept. 2, 1987, in A cell on five gallery South cell House. On THe Evening of Sept. 2, 1987, I, Corwyn Brown, went and spoke to THe Two Senior Security persons in THe cell House And Institution. I explained To Micheal "Dice" johnson And David "Cap" Carter, THAT I WAS About to pull A STUNT THAT WAS againct organizational policies from THe White House And I wanted THem To Be THe Buffers between me And THe whiteHouse so I would explain my "Oliver North" buffer to them in THe morning.

THAT morning I HAD THe INSTITUTIONAL STAFF out and about with me AND MADE ARE selves very NOTicAble THROUGHOUT THe INSTITUTION'S GROUNDS I went IN THAT Afternoon to check and see was everything Ready. AND I wanted to personally issue THe directive because THey HAD killed my brother Billy Jones. WHEN THey called yard I waited til Everyone Else HAD Left off THe gallery AND with my security, I Corwyn Brown walked Towards Anthony "T-21" Williams AND Perry "P.M." Moore standing at the End of THe gallery in front of Superintend-ant Robert Taylor's office. As I walked pass His office I NOdDed my Head At Williams AND Moore. By THe Time I Got TO THe INSTITUTIONAL MAIN cross walk THe officers were Running TOwards THe cellHouse so I went into THe cHapel. At THAT Time I pulled Micheal "Dice" Johnson To THe side Along with David "Cap" Carter And told THem THAT THey would Have to Accept the Responsibility with THe white House And when Asked state THAT THE INSTITUTIONAL Coordinators HAd No Knowledge of Any of THe events But it was a security imposed operation Because Billy Jone was once A OutLaw from Micheal "Dice" Johnson's Neighborhood. And Because it was a STUNT By THe security STAFF THe INSTITUTIONAL STAFF would be spared from flak. And THe punishment would be Left in the HArds of THe INSTITUTIONAL Coordinators who would still be in power. And still being in power we would protect our Guys. And THAT is THe story THAT was To Be Held To substituting Names in certain Area's

C-67

(12)

P 35

3.

Because if known to be in trouble they would obtain a great deal of support just to keep their mouths shut in case they knew who was actually responsible, and as long as their innocent they can't get convicted plus don't know anything to tell.

At no time prior to the assault on Supt. Robert Taylor did either Micheal Johnson nor David Carter have knowledge of anything other than they had to be a buffer for a stunt I was going to pull.

At no time did Micheal Johnson or David Carter have the authority to tell any member to do something of this nature and extreme magnitude. It is not possible within the structure of the organization, unless it was done individually. But it was not. At no time did Micheal Johnson or David Carter have the loyality of the membership to attempt something of this magnitude without the institutional coordinator staff making the call, one of the two at least.

That on Sept. 3, 1987 I, Corwyn Brown No2101, ordered Anthony "T-21" Williams and Perry "P.M" Moore into cell 552 to attack a correctional employee. To pipe them badly yet not to kill them but just one point worst then Supt. Goskie the day before. I now admit to this truth now because I see the waste of Life and the killing of Supt. Robert Taylor and possible death of the two guys innocently convicted of murder when we're totally and solely responsible. It happened exactly as stated and the I.D.O.C. know's it and after a through and through investigation wrote and found me guilty of a disciplinary report stating exactly as the above except with different names. Please note that the two named individuals used there personal knowledge of the incident to convict Micheal Johnson and David Carter.

C.68

P36

4.

LASTLY ANTHONY WILLIAMS WAS VERY AWARE THAT TO implicate me CORWYN BROWN THAT He would be implicating Himself. AND WHile WORKING IN Behalf of THE STATE of ILLINOIS AND Dept. of CORRECTION FORGED MY NAME TO A COMPlAINT THAT I CORWYN BROWN Refused TO SIGN IN Hopes of ENTRAPPING ME TO TESTIFY IN Behalf of THE STATE AGAINST THE UPPER RANKING LEADERSHIP of THE ORGANIZATION.

TO THE AFOREMENTIONED STATE I SWEAR before God AND COURT THAT IT is TRUE, I STATE AND DEPOSE THIS before PENALTY of PREJURY.

[S] Corwyn L. Brown N0210

Subscribe AND SWORE before me

THIS 20 DAY of NOV, 1996

Jeanne T. Ciancanelli

NOTARY PUBLIC

"OFFICIAL SEAL"
JEANNE T. CIANCANELLI
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 10-21-98

C.69

(14)

AFFIDAVIT OF

MICHAEL SHAW A.K.A. TORRENCE EVANS

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
LIVINGSTON COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS,        )
                                        )
        Plaintiff-Respondent,           )
                                        )
                                        )
                                        )
        vs.                             )        No. 87-CF-112
                                        )
                                        )
DAVID W. CARTER                         )
                                        )
        Defendant-Petitioner.           )
                                        )

---

AFFIDAVIT OF MICHEAL SHAW, AKA TORRENCE EVANS

MICHEAL SHAW, on oath, states:

1. I am a person who on October 27, 1996 was an inmate at the Joliet Correctional Center with another inmate by the name of CORWYN BROWN. I am presently in State custody at the Stateville Correctional Center FARM DIVISION.

2. That on or about October 27, 1996 I had a conversation with CORWYN BROWN while incarcerated at the Joliet Correctional Center.

3. While conversating with CORWYN BROWN he stated to me that he had ordered by threat of bodily injury, David Carter and Micheal Johnson to take responsibility for the murder of Superintendent ROBERT TAYLOR in 1987 at the Pontiac Correctional Center.

4. CORWYN BROWN stated to me that neither DAVID CARTER nor MICHEAL JOHNSON had any knowledge of the murder of Superintendent ROBERT TAYLOR before the murder occured.

(8)

5. CORWYN BROWN stated to me that he alone had given the order on the attack of Superintendent Robert Taylor, and he had personally saw to it that his order was carried out.

6. Corwyn Brown stated to me that he had ordered by threat of bodily injury, DAVID CARTER and MICHEAL JOHNSON to take responsibility for the murder of Superintendent ROBERT TAYLOR with the HIERARCHY of the B.O.S., an organization in which he was a high ranking member.

7. In 1996 and in the years since I have tried to tell D.O.C. officials of the aforementioned statements, but I have been met with threats of prolonged incarceration, prosecution, and intimidation. I have been weighed down with this burden of knowing that two innocent men have been incarcerated all these years for a crime in which they were set up to take the fall for.

8. I come forward today in hopes of righting this terrible wrong, and I am willing to testify to all of the statements I have made in this affidavit.

_Micheal Shaw_
MICHEAL SHAW    A 72965

Sworn to and subscribed before

me this 15 day

of _November_

"OFFICIAL SEAL"
Candice M. Crooks
Notary Public, State of Illinois
My Commission Expires 04/26/03

_Candice M. Crooks_
Notary Public

(9)

APPELLATE COURT ORDER
FOURTH DISTRICT 12/30/1995



STATE OF ILLINOIS
# APPELLATE COURT
FOURTH DISTRICT
201 WEST MONROE STREET
P.O. BOX 19206
SPRINGFIELD, ILLINOIS 62794-9206

CLERK OF THE COURT
(217) 782-2586

RESEARCH DIRECTOR
(217) 782-3528

COUNSEL WILL PLEASE NOTE:

If you intend to appeal to the Supreme Court you must either
file your affidavit of intent in 21 days from the date of
this judgment [Rule 315(b)] or you must file a petition for
rehearing within 21 days (by _December 30, 2005_)
from the date of this judgment [Rule 367(a)].

IF NEITHER IS FILED our mandate will issue to the Circuit court
on ___January 6, 2005___.

IF A PETITION FOR REHEARING IS FILED our mandate will issue 7
days after the order, if denied, if no affidavit of intent is
filed within those 7 days.

THIS TIME SCHEDULE DOES NOT SHORTEN THE TIME FOR FILING IN THE
SUPREME COURT !  It does prevent recall of a mandate.

We solicit your cooperation in this schedule so that we may
expedite our case load and issue our mandates as soon as possible.

ALSO PLEASE NOTE:   OPINIONS ONLY

Attached to the enclosed copy of the opinion in this case is a
cover sheet indicating the manner in which counsel will be listed
in the various reports of this opinion.  If your name is incorrectly
listed, or if a name has been incorrectly included or omitted,
please immediately convey that information to this office at
217-782-2586. Please also immediately inform the Reporter of
Decisions at 309-827-8513 so that a correct listing of counsel
can be made in the official and unofficial reports of this case.

Thank you.


DARRYL PRATSCHER, Clerk
Appellate Court
Fourth District

DP:ms

Rule 23 Order Filed:    12/09/05

Oral Argument Held:

Justices:                    Honorable Robert W. Cook, J.

                             Honorable John W. Turner, J. - CONCUR

                             Honorable Robert J. Steigmann, J. - CONCUR


Chief Judge _____

Other          _____

```
10/25/05                ILLINOIS APPELLATE COURT          PAGE   9
APBFSPRB.P                   FOURTH DISTRICT              4-03-0402
                           ---FACT SHEET---              SC Rule 606
```

```
4-03-0402    THE PEOPLE OF THE STATE OF ILLINOIS,    STATUS:    ACTIVE
                     Plaintiff-Appellee,             AUTHOR:    RWC
                         v.                          PANEL:     JWT RJS
                DAVID W. CARTER,                     RECUSALS:
                     Defendant-Appellant.            SUBMITTED: 10/21/05
                                                     ASSIGNED:
                                                     READY:     09/27/05
```

```
TRIAL JUDGE: Frobish, Harold J.                     CNTY: Livingston (11)
TRIAL COURT NO.: 87CF112
```

```
Appellant
     ATTORNEY: Daniel D. Yuhas
               Office of State Appellate Defender
               400 W. Monroe, Ste.303, P.O.Box 5270
               Springfield, IL  62705
          FEE:      WVD  DATE:            RECEIPT NO.:
               COURT APPOINTED
     ATTORNEY: Susan M. Wilham
               Asst.Defender, Office of State Aplt.Defender
               400 S.Ninth Street, Suite 102, POB 5750
               Springfield, IL  62705-5750
               217/782-3654
        PARTY:    David W. Carter
                  REG NO: N43429
                  Stateville Correctional Center
                  PO Box 112
                  Joliet, IL  60434-0112
                  AC DESG: Appellant     TC DESG: Defendant
                  IN CUSTODY
-----------------------------------------------------------------------
Appellee
     ATTORNEY: Thomas J. Brown
               State's Attorney
               Livingston County Courthouse
               Pontiac, IL  61764
               815/844-5169
          FEE:      WVD  DATE:            RECEIPT NO.:
     ATTORNEY: Norbert J. Goetten Director
               State's Attorneys Appellate Prosecutor
               725 S. Second St.
               Springfield, IL  62704
     ATTORNEY: Robert J. Biderman
               Dep. Dir., State's Attorneys Aplt. Prosecutor
               725 S. Second Street
               Springfield, IL  62704
               217/782-1628
     ATTORNEY: Denise M. Ambrose
               Staff Atty, State's Attorneys Aplt. Prosecutor
               725 South Second Street
               Springfield, IL  62704
               217/782-8076
        PARTY:    People
                  AC DESG: Appellee      TC DESG: Plaintiff
-----------------------------------------------------------------------
              **** END OF FACT SHEET ****
```



NO. 4-03-0402

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| DAVID W. CARTER, | ) | No. 87CF112 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Harold J. Frobish, |
| | ) | Judge Presiding. |

ORDER

On November 22, 1991, defendant, David W. Carter, was convicted of three counts of first degree murder (Ill. Rev. Stat. 1991, ch. 38, par. 9-1(a)(1)), one count of solicitation to commit first degree murder (Ill. Rev. Stat. 1991, ch. 38, par. 8-1.1(a)), and two counts of conspiracy to commit first degree murder (Ill. Rev. Stat. 1991, ch. 38, par. 8-2(a)).  This court affirmed his conviction on direct appeal.  People v. Carter, No. 4-92-0298 (June 30, 1993) (unpublished order under Supreme Court Rule 23).  Defendant filed a combined petition under the Post-Conviction Hearing Act (725 ILCS 5/122-1 (West 1998)) and under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401(c) (West 1998)).  The postconviction portion was dismissed as untimely.  The section 2-1401 portion was dismissed on the merits.  Defendant appeals.  We affirm.

I. BACKGROUND

On September 3, 1987, two prisoners, Ike Easley and Roosevelt Lucas, attacked Robert Taylor, superintendent at

Pontiac Correction Center, in his office with a shank and pipe.
Taylor died as a result of the injuries he received during this
attack. Easley and Lucas were members of the Black Gangster
Disciples. Defendant, also a member of the gang, was Easley's
and Lucas's superior in the gang and ordered the attack on Taylor
to retaliate against the administration for its treatment of
their gang and to demonstrate the gang's strength.

Before defendant's trial, he filed a motion to suppress
statements he made to Harry Martin acknowledging he ordered the
attack on Taylor. Martin was also a gang member, but he was
working with correctional officers in the investigation of
Taylor's death. He agreed to pretend he had been released from
prison, visit defendant, and wear a tape-recording device con-
cealed on his person. Originally, defendant's motion to suppress
the statements on the tape was granted on fifth-amendment
grounds, but this court reversed that ruling. People v. Johnson,
197 Ill. App. 3d 762, 555 N.E.2d 412 (1990). At trial, Martin
testified about the gang organization. Martin discussed that
when he learned of a conspiracy to murder him, he agreed to
cooperate with authorities in exchange for protection but that he
did not receive anything else in return for his cooperation. The
state and Department of Corrections (DOC) officials who worked
with Martin also testified that he was not promised anything else
in return for his cooperation and testimony. The audiotapes of
Martin and defendant were played for the jury.

After defendant was convicted, the trial court sen-

- 2 -

tenced him to natural life in prison.  On June 30, 1993, on
direct appeal, this court affirmed defendant's conviction while
vacating certain duplicative sentences.  <u>People v. Carter</u>, No. 4-
92-0298 (June 30, 1993) (unpublished order under Supreme Court
Rule 23).

On August 10, 1998, defendant filed the underlying
combined petition for postconviction relief and a petition for
relief from judgment under section 2-1401.  The petition was
based primarily upon evidence that was newly discovered in
September 1997.  Defendant claimed that DOC officials and Martin
committed perjury when applying for the eavesdrop authorization
and committed perjury at trial.  The alleged perjury concerned
Martin's history as an informant and the consideration given
Martin in exchange for his cooperation with the State.  Defendant
claimed to have learned of this information from Easley's
postconviction attorney.  Defendant attached an "affidavit" from
Martin that was supposedly witnessed by a Texas attorney but was
not sworn to before a notary.  Also appended were (1) an order
vacating Martin's original sentence and resentencing him to a
shorter time, (2) an order impounding the file in Martin's
sentence-reduction case, (3) an unidentified witness's testimony
from a transcript that bears no caption or court reporter's
certificate, (4) a partial transcript of Martin testifying as to
his level of involvement as an informer for DOC, and (5) an
affidavit of gang member Corwyn Brown, which stated that Brown
ordered the hit without authority from the gang and asked defen-

- 3 -

dant to accept responsibility.

According to defendant's petition, defendant's statements would have been suppressed had the trial court known of the substantial inducements provided to Martin to procure defendant's statement and the false information officials used to procure the eavesdropping order, namely the false statement that Martin had been a confidential informant for some years. Without Martin's testimony, defendant claims he would not have been convicted. Also, defendant contended Brown's affidavit establishes that he is innocent. Finally, defendant argued that the State's comments in closing arguments impermissibly addressed his failure to testify at trial and his appellate counsel was ineffective for failing to raise this issue in his direct appeal.

The trial court appointed counsel for defendant and held a hearing on the timeliness of defendant's joint petition. Defendant had filed a motion to excuse the late filing of his petitions. On March 15, 1999, defendant's attorney filed a limited Rule 651(c) certificate (134 Ill. 2d R. 651(c)) that addressed the question of timeliness. On April 23, 1999, the court dismissed defendant's postconviction petition as untimely. The court excused the late filing of the section 2-1401 petition, but also granted the State leave to seek a hearing on the issue of timeliness.

The State filed a motion to reconsider the ruling on the section 2-1401 petition. Before the motion was decided, defense counsel provided the trial court with passages from

- 4 -

defendant's trial where Martin and DOC officials denied that they provided any inducements for Martin's testimony other than to provide protection for Martin and his family.  Also, the court sought to have the transcripts of Martin's sentencing hearing released to substantiate defendant's claim of fraudulent conceal-ment of information.  On April 29, 2003, the State filed a motion to dismiss the petition, asserting that defendant failed to show that Martin's testimony, even if false, probably controlled the determination of the jury.

On May 1, 2003, defense counsel filed a Rule 651(c) certificate (134 Ill. 2d R. 651(c)) that stated he made any necessary amendments to defendant's pro se petition.  On the same day, the trial court granted the State's motion to dismiss. Specifically, the court found that the key to the case against defendant was the tape and while defendant alleges the tape should have been suppressed, the tape was admissible and the admissibility of the tape does not depend on Martin's motive for cooperating.  Also, the court stated that the issue of whether false testimony had been given in application for authorization of the wiretap had been addressed previously and it was not clear that Martin's sentence was reduced in return for his testimony. According to the court, even if Martin's sentence was reduced because of his cooperation, that would not have made a difference in defendant's trial.  The court further found that defendant waived any arguments that the closing arguments were improper and, in any event, the closing arguments were proper.

- 5 -

This appeal followed

## II. ANALYSIS

The office of the State Appellate Defender (OSAD) filed a motion to withdraw as counsel on appeal pursuant to Pennsylvania v. Finley, 481 U.S. 551, 95 L. Ed. 2d 539, 107 S. Ct. 1990 (1987). The motion to withdraw claims that the appeal presents no issue of merit upon which the defendant could obtain relief for three reasons. First, defendant's section 2-1401 petition, which alleged State officials used perjured testimony at his trial, was unsupported by affidavits or direct proof. Second, the issue regarding the admissibility of the audiotape of defendant admitting to ordering others to injure Taylor has been extensively litigated. The tape is clearly admissible. Finally, defendant's allegations of improper comments in closing arguments is not newly discovered evidence and cannot be addressed in a section 2-1401 petition. The record shows service of the motion on defendant.

On its own motion, this court granted defendant leave to file additional points and authorities by July 11, 2005, which we extended to July 21, 2005. Defendant has done so, and the State has responded. After examining the record and executing our duties under Finley, we grant OSAD's motion and affirm the trial court's judgment.

Defendant responded with two main arguments. First, defendant claims one of his appointed attorneys for the post-conviction proceedings erroneously limited his consultation with

- 6 -

defendant and examination of the court file to the issue of
timeliness.   Second, defendant claims he was entitled to an
evidentiary hearing on the allegation that officials falsely
represented the length of Martin's cooperation with them when
acquiring the eavesdrop authorization.   Defendant claims this
information would have convinced the trial court to suppress the
wiretap evidence.   Defendant attempts to raise additional argu-
ments in his reply brief.   We will not consider these arguments
as Supreme Court Rule 341(g) does not permit parties to raise new
arguments in reply briefs.   Official Reports Advance Sheet No. 21
(October 17, 2001), R. 341(g), eff. October 1, 2001.

Initially, we note that defendant failed to appeal the
order dismissing the postconviction portion of his petition and
only appealed the order dismissing the section 2-1401 portion.
Defendant states, though, that he is appealing the dismissal of
his postconviction petition and section 2-1401 petition.   Defen-
dant did not file notice of appeal within 30 days of the entry of
the order disposing of his postconviction petition as required by
Supreme Court Rules 651(d) and 606(b).   134 Ill. 2d Rs. 651(d),
606(b).   Rule 651(b) requires, though, that the clerk of the
court mail or deliver notice to the petitioner of the entry of
the adverse judgment and the 30-day time limitation for filing
notice of appeal.   134 Ill. 2d R. 651(b).   Nothing in the record
indicates that defendant received such notification.   Therefore,
we will consider the merits of defendant's arguments regarding
the dismissal of his postconviction petition.   People v. O'Toole,

- 7 -

174 Ill. App. 3d 800, 801, 529 N.E.2d 54, 55 (1988).

### A. Rule 651(c)

Defendant argues that he is entitled to further post-conviction proceedings because one of his first appointed attorneys limited his consultation with defendant and limited his examination of the court file to the issue of timeliness.

Supreme Court Rule 651(c) requires that an appointed attorney file a certificate stating that the attorney has consulted with the petitioner to ascertain petitioner's contentions of deprivation of constitutional right, has examined the trial record, and has made any necessary amendments. 134 Ill. 2d R 651(c). The Supreme Court of Illinois recently held that the untimeliness of a postconviction petition does not excuse post-conviction counsel from fulfilling his duties under Supreme Court Rule 651(c). People v. Lander, 215 Ill. 2d 577, 584-85, 831 N.E.2d 596, 600-01 (2005). In Lander, defendant's postconviction attorney never consulted with defendant on his substantive claims, thus his claims were never submitted to the State to give the prosecutor the opportunity to waive the affirmative defense of untimeliness in the event the claims were meritorious. Lander, 215 Ill. 2d at 585, 831 N.E.2d 601.

In this case, one of defendant's first appointed post-conviction attorneys filed, on March 15, 1999, a Rule 651(c) certificate parenthetically entitled "Limited to the question of timeliness of petition filing." In the certificate, counsel stated he consulted with defendant about the substantive claims

- 8 -

"to a lesser degree" and that his consultation in this regard was
"insufficient at this stage in the proceedings to make a determi-
nation as to amendment or presenting upon the existing pro se
petition."  On April 23, 1999, the postconviction petition was
dismissed as untimely, but the section 2-1401 petition proceeded
on the merits.  After the dismissal of the postconviction portion
of the petition, defendant's attorney filed a report with the
court concerning testimony at defendant's trial regarding consid-
eration given to Martin.  After denying the State's motion to
dismiss for untimeliness, the trial court treated defendant's
surviving section 2-1401 petition as a postconviction petition
for "practical purposes."  On May 1, 2003, a different
postconviction attorney filed a Rule 651(c) certificate that
stated he had consulted with defendant respecting his contentions
of deprivation of constitutional rights.

Unlike the defendant in Lander, defendant in this case
was afforded the chance to fully present his substantive claims
after consulting with counsel.  The substantive claims he ulti-
mately presented were identical to the claims he originally laid
out.  While counsel originally failed to fully comply with Rule
651(c), the failure was ultimately harmless as the State's motion
to dismiss the petition as untimely was denied and defendant's
substantive claims were fully presented after consultation with
an attorney.  The concern in Lander, that a constitutional
deprivation of some magnitude may not be corrected if the State
does not have the opportunity to waive the affirmative defense of

- 9 -

untimely filing, is not implicated in this case. "The failure to file a certificate showing compliance with Rule 651(c) is harmless error if the record demonstrates that counsel adequately fulfilled the required duties.", Lander, 215 Ill. 2d at 584, 831 N.E.2d at 600.

Defendant argues that his postconviction attorneys should have developed new claims of constitutional deprivation regarding the admissibility of the tape and should have secured affidavits of previously unknown witnesses to support his "actual innocence" claim. Postconviction counsel is not obligated to amend the pro se petition by adding new claims. People v. Vasquez, 356 Ill. App. 3d 420, 424-25, 824 N.E.2d 1071, 1076 (2005). Further, counsel is not required to procure witnesses not specifically identified by petitioner to support a claim in the petition. People v. Williams, 186 Ill. 2d 55, 60-61, 708 N.E.2d 1152, 1155 (1999).

B. Hearing on the Misrepresentation

Defendant argues he was entitled to an evidentiary hearing on his allegation that officials used perjured testimony to acquire the eavesdropping authorization for Martin's wiretap. Specifically, defendant claims officials falsely claimed that Martin had been a confidential informant for some years and had provided reliable information to the State. Defendant attached Martin's alleged affidavit in which he admitted that he had never cooperated with DOC before the investigation into the Taylor murder. According to defendant, had the court known of this

misrepresentation, the wiretap evidence would have been sup-
pressed.

 We review the dismissal of a section 2-1401 petition
under an abuse-of-discretion standard of review.  People v.
Pinkonsly, 207 Ill. 2d 555, 562, 802 N.E.2d 236, 241 (2003).  A
section 2-1401 petition allows the court "to determine whether
facts exist that were unknown to the court at the time of trial
and would have prevented entry of the judgment."  Pinkonsly, 207
Ill. 2d at 566, 802 N.E.2d at 243.

 The trial court found that this court and the court at
defendant's trial had previously considered defendant's allega-
tions that officials knowingly used perjury to obtain authoriza-
tion for the eavesdropping device.  Prior to defendant's trial,
defendant filed a motion to suppress the taped statement on
grounds that the affidavit used to obtain the eavesdropping
device contained material false statements other than those
defendant raises now.  The motion was originally granted on the
grounds that the tape violated the constitutional privilege
against compulsory self-incrimination, but this court reversed
finding that defendant was not entitled to Miranda warnings
(Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct.
1602 (1966)) as he was not in "custody" at the time of the
interrogation.  Johnson, 197 Ill. App. 3d at 765-66, 555 N.E.2d
at 413-14.

 Under Franks v. Delaware, 438 U.S. 154, 155-56, 57 L.
Ed. 2d 667, 672, 98 S. Ct. 2674, 2676 (1978), a defendant is

- 11 -

entitled to a hearing on the veracity of an affidavit used to
procure a search warrant if defendant (1) makes a "substantial
preliminary showing that a false statement knowingly and inten-
tionally, or with reckless disregard for the truth, was included
by the affiant in the warrant affidavit" and (2) the "allegedly
false statement is necessary to the finding of probable cause."

In this case, defendant failed to meet either prong
under Franks.  Under the first prong, Martin's affidavit is
rebutted by his testimony at a February 17, 1994, hearing wherein
he stated he began acting as an informer before Taylor's murder.
Further, another official testified in camera during defendant's
trial that Martin had worked with DOC prior to the Taylor murder.
Under the second prong, it is not clear that the allegedly false
statement was necessary to the finding of probable cause.  The
statement relates only to the length of time Martin worked with
the DOC.  Even without the statement, the affidavit could estab-
lish probable cause.  The affidavit stated Martin talked to
Easley and learned of defendant's involvement in the Taylor
murder.  Also, DOC stated it knew defendant was chief of security
of the gang and would be responsible for carrying out orders to
murder Taylor.  Defendant was not, therefore, entitled to an
evidentiary hearing.

As defendant's appeal is without merit, we grant OSAD's
motion to withdraw as counsel on appeal.

### III. CONCLUSION

For the reasons stated, we grant OSAD's motion to

- 12 -

withdraw as counsel on appeal and affirm the trial court's dismissal of defendant's section 2-1401 petition.

Affirmed.

COOK, J., with TURNER, P.J., and STEIGMANN, J., concurring.