**E-FILED**
Monday, 11 August, 2008  12:02:21 PM
Clerk, U.S. District Court, ILCD

IN THE
UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. DAVID CARTER, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | No. 07-1222 |
| TERRY McCANN, Warden, Stateville Correctional Center, | ) ) ) ) | The Honorable Joe Billy McDade, |
| Respondent. | ) | Judge Presiding. |

## <u>MOTION TO DISMISS § 2254 PETITION AS TIME-BARRED</u>

Pursuant to 28 U.S.C. § 2244(d)(1)(A) and Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts,[1] respondent TERRY McCANN moves this Court to dismiss with prejudice petitioner's petition for writ of habeas corpus as untimely and, in support, states as follows:

1.    Petitioner David Carter, identified as prisoner number N43429, is in the custody of Terry McCann, the warden of the Stateville Correctional Center in Joliet, Illinois.

---

[1] Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts contemplates that the respondent's response to the petition may be by "motion, or other response." *See* Advisory Committee Notes to Rule 4, 2004 Amendments ("[t]he amended rule [4] reflects that the response to the habeas petition may be a motion"); *see also* Advisory Committee Notes to Rule 5, 2004 Amendments (Rule 4 permits the filing of pre-answer motions to dismiss, and "reflects the view that if the court does not dismiss the petition, it may require (or permit) the respondent to file a motion.").

2.      In November 1991, following a jury trial in the Circuit Court of Livingston County, petitioner was convicted of first degree murder, conspiracy to commit murder, and solicitation to commit murder.  *See* Rule 23 Order, *People v. Carter*, No. 4-92-0298 (Ill.App. 1993) (Exhibit A).  The proof at petitioner's trial established that petitioner ordered two inmates to attack Robert Taylor, a superintendent at Pontiac Correctional Center.  Petitioner ordered the attack on Taylor to retaliate against the prison administration for its treatment of the Black Gangster Disciples (in which gang petitioner was a supervisor), and to demonstrate the gang's strength.   Taylor died as a result of the injuries he received during the attack.  Exhibit A at 1.  Petitioner was sentenced to a term of natural life imprisonment on the first degree murder count.  *Id.*

3.      The Illinois Appellate Court, Fourth District, affirmed petitioner's first degree murder conviction and sentence, but vacated his conspiracy and solicitation convictions.  *Id*. at 18.  Petitioner filed a counseled petition for leave to appeal (PLA) in the Illinois Supreme Court, which was denied on October 6, 1993.  *See* PLA, *People v. Carter,* No. 75884 (Exhibit B); Order Denying PLA, *People v. Carter*, No. 75884 (Exhibit C).  Petitioner did not petition the United States Supreme Court for a writ of certiorari.  *See* Pet. at 2.

4.      On August 10, 1998, petitioner filed in the Circuit Court of Livingston County a combined petition for postconviction relief (under 725 ILCS 5/122-1) and relief from judgment (under 735 ILCS 5/2-1401).  *See* Postconviction Petition, *People*

2

*v. Carter,* 87 CF 112 (Exhibit D).  The postconviction portion of that pleading was dismissed as untimely, and the section 2-1401 portion was dismissed on the merits. *See* Order, *People v. Carter,* 87 CF 112 (Exhibit E).  Petitioner appealed, and the state appellate court affirmed.[2]  *See* Rule 23 Order, *People v. Carter*, 4-03-0402 (Ill.App. 2005) (Exhibit F).  The supreme court denied leave to appeal on March 29, 2006.  *See* PLA, *People v. Carter*, No. 101983 (Exhibit G); Order Denying PLA, *People v. Carter*, No. 101983 (Exhibit H).

5.      Meanwhile, on April 23, 1997, petitioner filed a habeas petition under 28 U.S.C. § 2254 in the United States District Court for the Northern District of Illinois.  *See* Pet. at 4; *see also* Docket Sheet, *Carter v. DeTella,* No. 97 C 2926 (Exhibit I).  Respondent filed an answer in that case on January 30, 1998.  *Id.* at Doc.30.  On February 23, 1998, the case was stayed and petitioner was given until April 30, 1998, to amend his petition.  *Id.* at Doc.32.  On August 10, 1998, as noted above, petitioner filed his combined petition for postconviction relief and relief from judgment in the state trial court in Livingston County.  On March 12, 1999, the district court lifted the stay and granted petitioner's motion to amend his habeas petition.  *Id.* at Doc.35.  On April 28, 1999, the district court granted petitioner's motion to stay his habeas petition pending the resolution of state collateral proceedings in Livingston County.  *Id.* at Doc.38.  On May 26, 1999, respondent

------

[2] Although petitioner did not file a timely notice of appeal from the order dismissing his postconviction petition, the state appellate court excused his failure to do so after finding that petitioner had not received notice that his postconviction petition had been dismissed.  *See* Exhibit F at 7-8.

3

filed a motion to dismiss the petition for failure to exhaust. *Id.* at Doc.41.  On

October 29, 1999, the court, citing petitioner's ongoing postconviction proceedings,

dismissed the petition without prejudice for failure to exhaust state court remedies.

The operative language of the judgment is as follows: "It is hereby ordered and

adjudged that the motion to dismiss filed by respondent, George DeTella[,] to

dismiss the petition for a writ of habeas corpus is granted, petitioner having failed

to exhaust his state court remedies."  *See* Judgment, *Carter v. DeTella,* No. 97 C

2926 (Exhibit J).

      6.    Almost one year after the conclusion of petitioner's state postconviction

proceedings, on March 21, 2007, petitioner filed in the United States District Court

for the Northern District of Illinois a petition for writ of habeas corpus pursuant to

§ 2254, raising the following claims:

    (1)    petitioner's inculpatory statements were involuntary under the 14th
Amendment and obtained in violation of his 5th and 6th Amendment
rights;

    (2)    the prosecutor elicited improper hearsay testimony at trial;

    (3)    evidence of gang activity was improperly admitted at trial;

    (4)    evidence of petitioner's violent character was improperly admitted at
trial;

    (5)    a taped statement made by petitioner was improperly admitted at
trial;

    (6)    the circuit court erred in dismissing petitioner's postconviction petition
as untimely;

    (7)    the circuit court erred in failing to hold an evidentiary hearing on
petitioner's perjured testimony claim;

4

(8)    the state appellate court erred in failing to grant an evidentiary hearing on his actual innocence claim; and

(9)    the circuit court erred in dismissing petitioner's postconviction petition despite the allegation of a *Brady* violation.

*See* Pet. at 5-6(B).

7.    On August 23, 2007, the instant petition was transferred to this Court. (Doc. 15).  On March 14, 2008, petitioner filed in this Court an amended petition, which sets forth in greater detail claims (1), (5), (7), and (9) from the 2007 petition.

8.    The following materials have been electronically filed as exhibits to this Motion to Dismiss:

Exhibit A:    Rule 23 Order, *People v. Carter*, No. 4-92-0298 (Ill.App. 1993);

Exhibit B:    PLA, *People v. Carter,* No. 75884;

Exhibit C:    Order Denying PLA, *People v. Carter*, No. 75884;

Exhibit D:    Postconviction Petition, *People v. Carter,* 87 CF 112;

Exhibit E:    Order, *People v. Carter,* 87 CF 112;

Exhibit F:    Rule 23 Order, *People v. Carter*, 4-03-0402 (Ill.App. 2005);

Exhibit G:    PLA, *People v. Carter*, No. 101983;

Exhibit H:    Order Denying PLA, *People v. Carter*, No. 101983;

Exhibit I:    Docket Sheet, *Carter v. DeTella,* No. 97 C 2926 (N.D. Ill.); and

Exhibit J:    Judgment, *Carter v. DeTella,* No. 97 C 2926 (N.D. Ill.).

5

## **ARGUMENT**

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) imposes

a one-year statute of limitations on habeas corpus petitions.  28 U.S.C. § 2244(d)(1).

Section 2244(d) provides as follows:

> (1)    A 1-year period of limitation shall apply to an application for writ of
> habeas corpus by a person in custody pursuant to the judgment of a
> State court.  The limitation period shall run from the latest of
>
> > (A)    the date on which the judgment became final by
> > the conclusion of direct review or the expiration of
> > the time for seeking such review;
> >
> > (B)    the date on which the impediment to filing an
> > application created by State action in violation of
> > the Constitution or laws of the United States is
> > removed, if the applicant was prevented from filing
> > by such State action;
> >
> > (C)    the date on which the constitutional right asserted
> > was initially recognized by the Supreme Court, if
> > the right has been newly recognized by the
> > Supreme Court and made retroactively applicable
> > to cases on collateral review; or
> >
> > (D)    the date on which the factual predicate of the claim
> > or claims presented could have been discovered
> > through the exercise of due diligence.
>
> (2)    The time during which a properly filed application for State
> post-conviction or other collateral review with respect to the
> pertinent judgment or claim is pending shall not be counted
> toward any period of limitation under this subsection.

28 U.S.C. §2244(d).

The Seventh Circuit has recognized a one-year grace period in which

petitioners whose convictions became final before the passage of AEDPA may

6

petition for habeas relief. *Lindh v. Murphy*, 96 F.3d 856, 866 (7th Cir. 1996) (en banc), *rev'd on other grounds*, 521 U.S. 320 (1997). A petitioner, such as petitioner Carter, whose conviction became final before April 24, 1996 — the effective date of AEDPA — is allowed one year after AEDPA's passage to file his petition. *Lindh*, 96 F.3d at 866; *see also Newell v. Hanks*, 283 F.3d 827, 833 (7th Cir. 2002) (holding that one-year grace period expired on April 24, 1997).

The grace period applies to this case. Petitioner's PLA to the Illinois Supreme Court was denied on October 6, 1993. Because petitioner did not file a petition for writ of certiorari to the United States Supreme Court, his conviction became "final" 90 days later on January 4, 1994. *See* USSC Rule 13(1); *Balsewicz v. Kingston*, 425 F.3d 1029, 1032 (7th Cir. 2005) (holding that a pre-AEDPA conviction is "final" when direct appeal of the conviction in the state courts is concluded, including the 90-day period in which a petition for writ of certiorari could be filed in the United States Supreme Court). Because petitioner's conviction became final before the effective date of AEDPA, petitioner had until April 24, 1997, to petition for habeas corpus relief. *See Lindh*, 96 F.3d at 866; *Newell*, 283 F.3d at 833. Absent tolling, the habeas petition is untimely, as petitioner did not file it until March 21, 2007.[3]

---

[3] Under the mailbox rule, a *pro se* prisoner's petition for writ of habeas corpus is deemed filed on the date that it is given to the proper prison authorities for mailing, *Jones v. Bertrand*, 171 F.3d 499, 502 (7th Cir. 1999), and respondent calculates the timeliness of this habeas petition under that rule, using the earliest date petitioner could have given it to the authorities — the date he signed the petition.

Under § 2244(d)(2), the limitations period "is tolled during time that 'a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending.'" *Gutierrez v. Schomig*, 233 F.3d 490, 491-92 (7th Cir. 2000) (quoting 28 U.S.C. § 2244(d)(2)).  However, neither the filing of petitioner's first federal habeas petition nor his filing of a combined postconviction/section 2-1401 petition had any tolling effect on AEDPA's statute of limitations.  First, although petitioner filed a federal habeas petition on April 23, 1997, one day before the expiration of the statute of limitations, the pendency of a federal habeas petition has no tolling effect under § 2244(d)(2).  *See Duncan v. Walker,* 533 U.S. 167, 172 (2001).  That petition's timely filing does not help petitioner because, after granting a stay of the petition, the district court's judgment dismissed it outright without continuing the stay previously in effect or giving leave to reinstate ("motion to dismiss . . .  the petition for a writ of habeas corpus is granted, petitioner having failed to exhaust his state court remedies").  Exhibit J.  It is true that the court's minute order advised that the petition was dismissed without prejudice and that "[p]etitioner may refile his petition after all state court remedies are exhausted."  Exhibit I at Doc.43.  However, this language is merely advisory, and the judgment controls.  *See Eakin v. Continental Illinois Nat. Bank & Trust Co.,* 875 F.2d 114, 118 (7th Cir. 1989) ("In the event of a conflict between the opinion and the judgment, the judgment controls").  Under these circumstances, the present habeas petition, filed under a new number, 07 C 1758, in

the Northern District of Illinois, is untimely. *See Arrieta v. Battaglia,* 461 F.3d 861, 864-67 (7th Cir. 2006) (where district court did not continue stay that had been granted or dismiss with leave to reinstate until a specified time, second petition is untimely). Moreover, trumping the judgment with the district court's October 29, 1999 minute order and construing that order as granting petitioner an open-ended time to re-file after he exhausted his state court remedies would eviscerate AEDPA's one-year statute of limitations. This should not be permitted. *See Arrieta,* 461 F.3d at 865 (to permit relief under catchall provision of Rule 60(b)(6) would render one-year limitations period meaningless).

Thus, the dismissal of petitioner's first habeas petition means that by the time that petitioner filed his postconviction/2-1401 petition in the Circuit Court of Livingston County — on August 10, 1998 — the one-year limitations period for filing a federal habeas petition had expired. Accordingly, petitioner can find no relief in AEDPA's tolling provision. *Accord Teas v. Endicott,* 494 F.3d 580, 582-83 (7th Cir. 2007) (petition for state collateral relief filed three years after limitations period expired under § 2244(d)(1)(A) had no tolling effect under subsection (d)(2)). Stated another way, petitioner waited almost one year to file his first habeas petition. With its dismissal, all the time until the present federal filing counts against petitioner unless it were tolled. The untolled periods include from April 24, 1996 until August 10, 1998 (over two years), and from March 29, 2006 until March 21, 2007 (almost one year), or approximately three years — well over AEDPA's one-year limit.

9

Petitioner appears to argue that his false testimony/*Brady* claim — claim 9 — is based on newly discovered evidence. *See* Pet. Mem. at 13. Specifically, petitioner claims that he received "in 1997" an affidavit from Harry Martin in which Martin purports to recant his trial testimony that he had not received any benefits for testifying against petitioner. *Id.* at 13-15. However, this claim is untimely even under the more generous starting date provided by § 2244(d)(1)(D). *See* 28 U.S.C. § 2244(d)(1)(D); *see also Pace v. DiGuglielmo,* 544 U.S. 408, 416 n.6 (2005) (statute of limitations under subsection (d)(1)(D) requires claim by claim consideration). Under that section, the limitations period runs from the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence. Here, the record clearly reflects that petitioner received Martin's affidavit on September 15, 1997. *See* Exhibit E at 2. Assuming the limitations period began to run on that date, petitioner's *Brady* claim is untimely because 329 days ran from that date until he filed his postconviction petition on August 10, 1998, and 357 days ran from the date the state supreme court denied his postconviction PLA (March 29, 2006) to the date he filed the instant petition (March 21, 2007).

Petitioner has not demonstrated — or alleged — any "extraordinary circumstances" that would warrant equitable tolling of the statute of limitations. *See Pace,* 544 U.S. at 418 (assuming without deciding that § 2244(d)(1)'s limitations period may be equitably tolled). Assuming arguendo that equitable tolling is

available, that doctrine is inapplicable here.  First, petitioner waited until nearly the end of the grace period to file his first habeas petition.  Second, petitioner did not attempt to exhaust his *Brady* claim in state court until nearly one year after discovering the claim's factual predicate.  Third, petitioner did not file the instant petition until nearly one year after the state supreme court denied his postconviction PLA.  For these reasons, petitioner cannot show that he has pursued his rights with diligence.  *See Pace,* 544 U.S. at 418 (litigant who seeks the benefit of equitable tolling must exercise reasonable diligence); *Arrieta,* 461 F.3d at 867. Accordingly, petitioner is barred from pursuing federal habeas corpus relief in this Court, and his petition should be dismissed with prejudice as untimely.

## CONCLUSION

This Court should dismiss, with prejudice, petitioner's petition for writ of habeas corpus. If this Court determines that this habeas petition is not time-barred, respondent requests thirty days from the entry of the Court's order denying this motion to address any procedural defaults and/or the merits of the claims in a subsequent submission.

August 11, 2008                          Respectfully submitted,


                                         LISA MADIGAN
                                         Attorney General of Illinois

                              By:        /s/ Dale M. Park
                                         DALE M. PARK, Bar # 6280822
                                         Assistant Attorney General
                                         100 W. Randolph Street, 12th Floor
                                         Chicago, Illinois 60601-3218
                                         PHONE: (312) 814-2197
                                         FAX: (312) 814-2253
                                         EMAIL: dpark@atg.state.il.us

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 11, 2008, I electronically filed respondent's **Motion To Dismiss § 2254 Petition As Time-Barred** with the Clerk of the United States District Court for the Central District of Illinois, Peoria Division, using the CM/ECF system, and on the same date mailed copies of this document via the United States Postal Service to the following non-CM/ECF user:

> David Carter, N43429
> Stateville Correctional Center
> Route 53
> P.O. Box 112
> Joliet, IL 60434

LISA MADIGAN
Attorney General of Illinois

By:    /s/ Dale M. Park
DALE M. PARK, Bar # 6280822
Assistant Attorney General
100 W. Randolph Street, 12th Floor
Chicago, Illinois 60601-3218
PHONE: (312) 814-2197
FAX: (312) 814-2253
EMAIL: dpark@atg.state.il.us



FILED

JUN 3 0 1993

Clerk Of The
Appellate Court, 4th Dist.

NO. 4-92-0298

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
|  Plaintiff-Appellee, | ) | Circuit Court of |
|  v. | ) | Livingston County |
| DAVID W. CARTER, | ) | No. 87CF112 |
|  Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Charles E. Glennon, |
| | ) | Judge Presiding. |

ORDER

Following a jury trial conducted in the circuit court of Livingston County, defendant David W. Carter was found guilty of three counts of the first degree murder of Robert L. Taylor, a superintendent at Pontiac Correctional Center, on September 3, 1987; two counts of conspiracy to commit murder; and one count of solicitation to commit murder. (Ill. Rev. Stat. 1987, ch. 38, pars. 9-1(a)(1), (a)(2), 8-2(a), 8-1(a).) Although a judgments of conviction were entered on all counnts on which defendant was found guilty, he was sentenced to a term of imprisonment for his natural life, without parole, on only count X, first degree murder.

The issues presented in this appeal are as follows: (1) whether the trial court committed an abuse of discretion in

EXHIBIT A

refusing to admit into evidence statements against penal interest by Ike Easley and Roosevelt Lucas to the effect that defendant did not give them orders or commands; (2) whether the trial court should have suppressed the testimony of Harry Martin concerning a statement made by defendant; (3) whether evidence of gang activity was irrelevant and its admission into evidence was an abuse of discretion; (4) whether testimony that defendant admitted he was a coordinator of the security division of the Black Gangster Disciples (BGD) was an abuse of discretion; (5) whether the admission into evidence of threats by BGD to guards other than the victim, and testimony about the attack on another guard by an inmate other than the defendant, was an abuse of discretion; (6) whether defendant was denied the effective assistance of counsel when defense counsel absented himself from the courtroom when photographic exhibits were viewed by the jury and one juror declined to view them; and (7) whether the trial court improperly (a) entered judgment of conviction for the inchoate offenses of conspiracy and solicitation where judgment was entered on the principal offense of first degree murder and (b) entered judgement for more than one conviction for first degree murder where each conviction was based on the same act perpetrated against the same victim. We affirm the conviction of first degree murder based on count X of the indictment for which defendant was sentenced. The State concedes the judgments of conviction for each of the remaining offenses, with the exception of the first degree murder conviction on which defendant was sentenced, should

- 2 -

be vacated, and we agree; those judgments of conviction will be vacated.

With regard to the evidence presented at trial, no contention is raised in this appeal that the evidence was insufficient to prove defendant guilty beyond a reasonable doubt. Instead, defendant specifically challenges the propriety of allowing testimony of certain witnesses into evidence. For this reason, only those facts necessary to an understanding of the analysis of the issues will be presented.

At trial, defendant attempted to have defense investigator Harold Fullman testify regarding statements made by Easley and Lucas to the effect that defendant never gave them any orders or commands. According to the offer of proof, both indicated a willingness to testify when they talked to Fullman, but at the time of trial were unavailable because their appellate counsel had advised them not to testify. Neither Easley nor Lucas told Fullman they killed Taylor. The trial court denied admission of this testimony on the ground it was hearsay.

> "The admissibility of evidence at trial is a matter within the sound discretion of the trial court, and that court's decision may not be overturned on appeal absent a clear abuse of discretion. (People v. Franklin (1990), 135 Ill. 2d 78, 96; People v. Brown (1990), 199 Ill. App. 3d 860; People v. Kimbrough (1985), 138 Ill. App. 3d 481.) Such an abuse of discretion will be found only where the trial court's

decision is `"arbitrary, fanciful or unreason-
able"´ or `"where no reasonable man would take
the view adopted by the trial court."´  (People
v. M.D. (1984), 101 Ill. 2d 73, 90, quoting Peek
v. United States (9th Cir. 1963), 321 F.2d 934,
942.)"  (People v. Illgen (1991), 145 Ill. 2d
353, 364, 583 N.E.2d 515, 519.)

In seeking to convince this court of the impropriety of the trial
court's ruling, defendant cites cases which stand for the propo-
sition that an extrajudicial statement by a person other than the
defendant to the effect that he, not the defendant, committed the
crime, may be admitted when justice requires if there is suffi-
cient indicia of trustworthiness as to the statement. (People v.
Bowel (1986), 111 Ill. 2d 58, 66, 488 N.E.2d 995, 999; People v.
Kokoraleis (1986), 149 Ill. App. 3d 1000, 1018, 501 N.E.2d 207,
219.)  The indicia of trustworthiness discussed in those cases
cited by defendant are:

"(1) the statement was made spontaneously to a
close  acquaintance  shortly  after  the  crime
occurred; (2) the statement was corroborated by
other evidence; (3) the statement was self-in-
criminating and against the declarant's inter-
est; and (4) there was adequate opportunity for
cross-examination of the declarant.  Chambers v.
Mississippi (1973), 410 U.S. 284, 300-01, 35 L.
Ed. 2d 297, 311-12, 93 S. Ct. 1038, 1048-49."
(Bowel, 111 Ill. 2d at 67, 488 N.E.2d at 999.)

- 4 -

1:07-cv-01222-JBM    # 33-2    Page 5 of 19


Although these factors are not considered requirements of admissibility (Bowel, 111 Ill. 2d at 67, 488 N.E.2d at 999-1000), the basic premise for the trustworthiness of such statements is the admission by the declarant of involvement in the crime with which defendant is charged. Since Easley and Lucas did not admit their involvement in the murder of Taylor to Fullman, their statements were not against penal interest. As a result, the trial court did not commit an abuse of discretion in refusing to allow Fullman to testify about the out-of-court statements by Easley and Lucas.

Prior to trial, defendant moved to suppress inculpatory statements made by defendant to Harry Martin, another member of the BGD. Defendant sought to suppress this statement on the basis of violations of defendant's rights under the fifth, sixth and fourteenth amendments to the United States Constitution. (U.S. Const., amends. V, VI, XIV.) The State had obtained an eavesdropping order to tape conversations between defendant and Martin, an informant who visited defendant in prison. The trial court suppressed the tape recordings because the conversations were taped without the defendant having been given warnings pursuant to Miranda v. Arizona (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. The trial court concluded that the taping of these conversations violated defendant's constitutional privilege against compulsory self-incrimination. This court reversed because the interview was not a custodial interrogation. People v. Johnson (1990), 197 Ill. App. 3d 762, 766, 555 N.E.2d 412, 414.

On remand, defendant renewed his argument based on the sixth amendment. The trial court denied the renewed motion to suppress.

In this appeal, defendant relies on the due process analysis in People v. Easley (1992), 148 Ill. 2d 281, 318-19, 592 N.E.2d 1036, 1052, in which the Illinois Supreme Court discussed a very similar investigation ploy used by Martin with regard to Easley's involvement in the murder of Taylor. Initially, the State argues this issue is waived because defendant argued a violation of the sixth amendment right to counsel in the trial court. Although the right to counsel guaranteed by the sixth amendment applies to State prosecutions through the fourteenth amendment (Gideon v. Wainwright (1963), 372 U.S. 335, 342, 9 L. Ed. 2d 799, 804, 83 S. Ct. 792, 795), in Easley, the Illinois Supreme Court considered separate arguments with regard to the sixth amendment and the fourteenth amendment due process clause. (Easley, 148 Ill. 2d at 319-20, 592 N.E.2d at 1052-53.) Indeed, in Easley, on more egregious facts, the Illinois Supreme Court held that the suppression of the evidence based on the sixth amendment analysis was erroneous. (Easley, 148 Ill. 2d at 319, 592 N.E.2d at 1053.) As to the sixth amendment argument, we agree with the trial court's denial of the motion to suppress. Defendant was indicted on October 16, 1987. The conversation with Taylor took place on October 7, 1987. Therefore, there was no sixth amendment violation. Easley, 148 Ill. 2d at 319, 592 N.E.2d at 1053.

In order to preserve an argument for the purpose of appeal in a jury trial, unless plain error occurs, the challenge must be presented to the trial court not only at the motion to suppress stage, but it must also be included in the defendant's post-trial motion. (See <u>People v. Cleesen</u> (1988), 177 Ill. App. 3d 103, 114, 531 N.E.2d 1113, 1120, citing <u>People v. Enoch</u> (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Defendant's motion for a new trial in this case does assert that error occurred in the failure to suppress statements based on the defendant's sixth amendment right to counsel, but does not refer to a fourteenth amendment due process violation. Therefore, defendant has waived, for purposes of review, any argument relating to a violation of his right to due process under the fourteenth amendment as a result of the denial of the motion to suppress. Defendant does not argue that this issue should be considered under the plain error doctrine. 134 Ill. 2d R. 615(a).

Moreover, as the trial court noted, this case is distinguishable from <u>Easley</u> with regard to the facts pertinent to this issue of due process. In his conversation with Easley, Martin referred to an attorney by name, indicated the attorney would be brought in after indictments came down, and stated that he needed information for the attorney. By comparison, the defendant here made several statements to Martin before any reference was made to an attorney. The attorney was not mentioned by name and Martin did not suggest to defendant that he was there seeking information for the attorney. The trial court noted that on page 14 of a 19-page transcript of the conversation

between Martin and defendant, Martin told defendant "if they need something, I'll be here," and "if the indictments come down, then they'll have lawyers. Whatever else they need, you know, I'll be on top of. I don't perceive you all getting indicted. I don't see how. I don't think they've got anything, frankly."

The trial court's determination on a motion to suppress evidence will not be overturned unless it is manifestly erroneous. (People v. Hoskins (1984), 101 Ill. 2d 209, 212, 461 N.E.2d 941, 942; Cleesen, 177 Ill. App. 3d at 115, 531 N.E.2d at 1120.) The trial court's denial of defendant's motion to suppress was not manifestly erroneous.

With regard to Martin's testimony at trial, defendant raises several alleged errors. First, defendant argues that Martin should not have been allowed to testify about the history of the BGD or the gang's corporate-life structure, inner workings, and rules. On appeal, defendant argues that this entire line of questioning was improper. However, defendant did not object to this entire line of questioning. Only two of defendant's objections to two questions were overruled. A nonspecific objection was made to the question, "Now that would be a typical thing for a personal bodyguard to be around a person that is an assistant institutional coordinator?" An objection based on a lack of relevance was made to the following question: "Mr. Martin, [in] your experience as a board member does the gang have a policy regarding its members who testify against other members in court?" Other objections made by defendant were either sustained or withdrawn.

- 8 -

Although defendant has a right to object to the introduction of evidence which he believes is not competent, he may waive that right by failing to object in a timely fashion so as to allow the trial court to correct the error. (<u>People v. Carlson</u> (1980), 79 Ill. 2d 564, 577, 404 N.E.2d 233, 239; <u>People v. Trefonas</u> (1956), 9 Ill. 2d 92, 98-99, 136 N.E.2d 817, 820.) When a defendant fails to object to such evidence, it is to be considered and given its natural and probative effect. <u>People v. Akis</u> (1976), 63 Ill. 2d 296, 299, 347 N.E.2d 733, 735.

"Normally, a general objection is not sufficient to preserve a claim of error for the admission of improper evidence, <u>Illinois C. R. Co. v[.] Prickett</u> (1904)[,] 210 Ill. 140[,] 71 N[.]E[.] 435, but a general objection may be sufficient to preserve an error for review where the testimony is inadmissible for any purpose. <u>Chicago R. I. & P. R. Co. v[.] Rathneau</u> (1907)[,] 225 Ill[.] 278, 80 N[.]E[.] 119. It is sometimes said that a general objection is sufficient if the grounds for the objection are evident and the defect cannot be cured, but it is often difficult to show that the ground is obvious or that the particular defect cannot be cured. <u>Johnson v[.] Jackson</u> (1963)[,] 43 Ill[.] App[.] 2d 251, 193 N[.]E[.]2d 485." R. Hunter, Trial Handbook for Illinois Lawyers §32.5, at 463 (5th ed. 1983).

At best, a general objection raises only the issues of relevancy and materiality. (Johnson v. Bennett (1946), 395 Ill. 389, 398, 69 N.E.2d 899, 904.)  A specific objection waives all grounds not specified such that grounds not presented to the trial court will not be considered on review.  People v. Canaday (1971), 49 Ill. 2d 416, 423-24, 275 N.E.2d 356, 361.

As already noted, defendant did not object to this entire line of questioning.  Therefore, this court will not consider defendant's argument on review.  Defendant did object to two questions.  In one objection, the ground of relevance was specified, and the other objection was general so that, at best, it can be considered only an objection to relevance or material-ity.  On appeal, defendant does not specifically argue that these two questions sought irrelevant information and has waived those objections.  Moreover, the information sought by these questions was clearly relevant to the credibility of this witness to testify about the relationship of the alleged gang members in regard to the conspiracy to commit murder and how he came to have such knowledge.

Defendant's next contention is that the trial court improperly allowed Martin to testify about gang activity which involved a plot to kill Lawrence Spiller, an inmate at the Logan Correctional Center (Logan).  Spiller, a witness to Taylor's murder, was in segregation at Logan, as was Martin.  "Shorty G," the BGD assistant institutional coordinator at Logan, was serving as a porter in segregation and told Martin the BGD, also known as the "Brothers of the Struggle," wanted to kill Spiller by

poisoning his food.  Martin stalled the gang members and informed
the warden.

On appeal, defendant argues that this evidence was not
relevant, was prejudicial, and diverted the jurors' attention
from the question of defendant's involvement in Taylor's murder.
The only objection made by defendant was when Martin was asked
what Shorty G said with regard to Spiller.  Again, defense
counsel made a general objection without specifying the grounds
therefor.  In response, the trial judge stated, "I will overrule
the hearsay objection; however, Mr. Martin, I would ask you to
specify where this meeting took place."

Based on the trial judge's response to the question, it
is apparent that defendant's general objection did not preserve
the issue for review because it was not readily apparent to the
trial judge that the objection was based on the ground which
defendant raises on appeal, lack of relevance.  In light of the
trial court's overruling a hearsay objection and directing the
State to establish a better foundation, had defendant wanted the
judge to also address the relevance of the testimony requested,
then defendant should have made that clear to the trial judge by
objecting further.  In addition, defendant's motion for new trial
did not specifically refer to evidence of threats on Spiller's
life and complained only about "hearsay and prejudicial testimo-
ny" regarding gang identity, affiliation, colors, and rank.
Defendant has failed to preserve this issue for review (Enoch,
122 Ill. 2d at 186, 522 N.E.2d at 1130), and this court will not
consider it.  Defendant does not argue it was plain error, nor

- 11 -

can he, as the evidence in this case was not closely balanced and any error which may have occurred was not so fundamental and of such a magnitude as to deny him a fair trial. (People v. Lucas (1992), 151 Ill. 2d 461, 482, 603 N.E.2d 460, 469.) Martin testified that defendant admitted directing Lucas and Easley to attack Taylor. On appeal, defendant does not challenge this fact or the fact that Taylor was murdered by Lucas and Easley.

Defendant's next contention is that the trial court erred by allowing into evidence testimony of Martin relating to defendant's bad character. Martin testified that the United Front of the Organization (UFO) consisted of gang members whose duties were to carry out assassinations, discipline members who violated the rules, and provide protection for board members and other high-ranking gang members. In each correctional facility, the institutional coordinator and institutional UFO coordinator chose a staff. In selecting a staff, the qualities to be considered included the charge for which a person was convicted, the length of time in the organization, strength, and the ability to perform the functions of the job. They would have to be able to conduct themselves according to the "code of silence." Martin was informed by defendant that he was the unit coordinator of the cell house for the UFO. Defendant would be dealing with security. Martin was later asked why he decided to talk to defendant after agreeing to cooperate with the investigation by the Department of Corrections (DOC). Martin stated that if defendant was "the unit coordinator in the security of the South House it would be his direct responsibility to coordinate and make sure

something was carried out if something happened in his cell house with respect to the UFO members in the cell house."

Not only did defendant not object to this testimony, but his motion for a new trial did not refer to the error of which he now complains. Although the issue is waived for purpose of review by defendant, a fair analysis indicates that any error which might have occurred was harmless beyond a reasonable doubt.

In the cases against Lucas and Easley, the conspiracy charges were not prosecuted. (Lucas, 151 Ill. 2d at 468, 603 N.E.2d at 463; Easley, 148 Ill. 2d at 289, 592 N.E.2d at 1039.) The evidence complained of by defendant, particularly the testimony about defendant's position in the gang hierarchy, was relevant to establish defendant's authority over Lucas and Easley. The only portion of the testimony which could be considered character evidence was Martin's testimony about the "qualities" looked for by the coordinators in selecting their staffs. Even if that evidence had been improperly admitted over the timely objection by defendant, in light of the other evidence in this case, the error would not have denied defendant a fair trial. Lucas, 151 Ill. 2d at 484, 603 N.E.2d at 471.

The next issue to be considered relates to the State's theory of the motive for Taylor's murder. Correctional sergeant Danny Jarrett testified about threats which were made following the death of Billy Jones, the gang's chief of security in the institution who died from chewing on a bag of cocaine while being taken to segregation. The State's theory was that the attack on Taylor was in retaliation for the death of Jones. There was no

evidence that threats were made by defendant.  As a result, such evidence was not admissible to establish motive.  (Lucas, 151 Ill. 2d at 477-78, 603 N.E.2d at 467-68.)  However, just as in Lucas, any error which may have occurred in this case was harmless.  (Lucas, 151 Ill. 2d at 478-79, 603 N.E.2d at 467-68.) Motive is not an essential element of the crime of murder. (People v. Hobbs (1966), 35 Ill. 2d 263, 269, 220 N.E.2d 469, 472.)  Therefore, even without Jarrett's testimony, defendant would have been proved guilty beyond a reasonable doubt.  People v. Reed (1974), 23 Ill. App. 3d 686, 693, 320 N.E.2d 249, 255.

Next, defendant argues the trial court also erred by admitting into evidence, over an objection as to relevance, the testimony of Superintendent Donnie Whitaker that on the day prior to the attack on Taylor, an inmate had assaulted, with his fist, a superintendent on a lower gallery.  Defendant argues that there was no evidence that this crime was committed by defendant or was related to Taylor's murder.  Similar evidence was determined inadmissible, but harmless, in Lucas.  Lucas, 151 Ill. 2d at 486, 603 N.E.2d at 471.

In order for the State to properly admit such evidence, the connection between the defendant, the threats testified to by Jarrett, and the attack testified to by Whitaker must have some basis in proof rather than supposition.  The State argues that defendant was tied to these events by his membership in the BGD and the statements he made to Martin.

According to the tape recording of the conversation between Martin and defendant, defendant became upset when Martin

- 14 -

suggested that Jones died accidentally as a result of overdosing on a bag of cocaine. Defendant insisted that Jones had ample time to flush the cocaine down the toilet before the guards came for him and that he would not have attempted to stuff a medicine bag filled with cocaine in his mouth. Defendant told Martin that Taylor was murdered to avenge Jones' murder and the administration's treatment of BGD members. Defendant stated that the order to attack Taylor was handed down to him by his superiors in the gang and that he, as unit security officer, implemented that order by procuring Easley and Lucas to carry out the deed. According to defendant, preparations for the attack on Taylor were made three to four weeks prior to the event. It was arranged that Easley and Lucas would hit Taylor in the head with pipes. They wore masks and gloves and just left the weapons at the scene. The weapons had been wiped clean of fingerprints. Defendant admitted helping wipe off the fingerprints. However, defendant also said the attack on the other superintendent by another inmate named Chico was an "isolated incident." Defendant made no mention of threats to guards.

Defendant's statements to Martin do not connect him to the threats testified to by Jarrett or the attack on another superintendent the day before Taylor was murdered. Although the testimony should not have been admitted into evidence, in light of defendant's admissions of involvement in Taylor's murder, it was harmless error. In addition, the defendant's post-trial motion did not raise the issue of Whitaker's testimony regarding

the previous day's attack on another guard and that issue, too, was waived by defendant.

Defendant next argues that he was denied the effective assistance of counsel when defense counsel elected to be absent from the courtroom while exhibits were viewed by the jurors. It is defendant's contention that, had defense counsel been present, he would have been able to object when one of the jurors indicated she did not want to view the photographs.

Prior to showing the exhibits to the jury, the trial court considered and overruled defendant's objection to one of the photographs which was to be shown to the jurors. Defendant does not argue on appeal that the trial judge's ruling was error. Indeed, the trial judge did not allow the jurors to view some exhibits, such as a vial of the victim's blood, tape recordings, and fingerprint cards of Easley and Lucas which showed their prior convictions on the back.

The viewing of exhibits came at the end of that day of trial, and defendant and the attorneys for both parties were given the opportunity to be absent from the courtroom while the judge supervised the viewing of exhibits by the jurors. The defendant and defense counsel chose not to remain in the court-room. No reason for that tactical decision was expressed by defense counsel. The appropriate analysis in this case involves the principles discussed in <u>Strickland v. Washington</u> (1984), 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068. In order to establish ineffective assistance of counsel so as to require a reversal of his conviction under <u>Strickland</u>, defendant

- 16 -

must demonstrate (1) that the defense attorney was not function-
ing as "counsel" as guaranteed by the sixth amendment of the
United States Constitution and (2) that the deficient performance
of counsel prejudiced the defense, deprived defendant of a fair
trial, fell below an objective standard of reasonableness, and
the result would probably have been different had counsel not
provided ineffective assistance. "Allegations arising from
matters of judgment or trial strategy will not support a claim of
ineffective assistance of counsel." People v. Clark (1991), 207
Ill. App. 3d 439, 450, 565 N.E.2d 1373, 1380.

In attempting to explain the reasons for defense
counsel's actions at trial, defendant casts a negative aspersion
on defense counsel which is inaccurate. Defendant suggests that
because defense counsel complained about not getting paid by the
DOC and threatened to go "on strike" two days later if not paid,
the reason defense counsel absented himself when the exhibits
were passed among the jurors was because he was not getting paid.
However, well before the exhibits were presented for viewing by
the jury, a representative from the DOC appeared in court to
advise the court and counsel that a check was being issued by the
State. Therefore, this could not have been the reason for
defense counsel's decision.

Instead, a more likely reason for the action by defense
counsel was to disassociate defendant from the exhibits. We do
not address the likelihood of the success of this trial tactic of
defense counsel and defendant being absent when exhibits were
presented to the jurors. However, in closing argument, defense

counsel did not deny that Taylor was killed.  Instead, it was the theory of defense that these exhibits had no connection to defendant.  In essence, it was defendant's theory that he did not solicit the murder, did not conspire to have Taylor killed, and was not connected to the attack.  Since the defendant and defense counsel being absent from the courtroom was a matter of judgment by defense counsel, it does not support a claim of ineffective assistance of counsel.

Finally, the State concedes that the trial court erred in entering judgment on all but one of the counts of which defendant was found guilty.  The conviction on two counts of conspiracy and one count of solicitation must be vacated since a defendant cannot be convicted of both the inchoate and principal offenses.  (Ill. Rev. Stat. 1991, ch. 38, par. 8-5; People v. Hill (1980), 78 Ill. 2d 465, 476, 401 N.E.2d 517, 523; People v. Crews (1989), 191 Ill. App. 3d 228, 234-35, 547 N.E.2d 580, 584-85.)  The State further concedes that the first degree murder convictions on which defendant was not sentenced (counts VII and IX) must also be vacated because all of the first degree murder charges involved the same act and victim.

Accordingly, the judgment of conviction of the circuit court of Livingston County for first degree murder based on count X of the indictment is affirmed.  The judgments of conviction of the circuit court of Livingston County for two counts of conspiracy to commit murder, one count of solicitation to commit murder, and two counts of first degree murder (counts VII and IX) are vacated.

- 18 -

Affirmed in part; vacated in part.

McCULLOUGH, J., with STEIGMANN, P.J., and KNECHT, J., concurring.

E-FILED
Monday, 11 August, 2008  12:04:38 PM
Clerk, U.S. District Court, ILCD

ORIGINAL

NO. **75884**

IN THE

SUPREME COURT OF ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the <u>Appellate</u> <u>Court</u> of Illinois, Fourth Judicial District, No. |
| ~~Plaintiff~~-Respondent, | ) <u>4-92-0298</u> |
| | ) |
| | ) There on appeal from the Circuit Court of the Eleventh Judicial Circuit, <u>Livingston</u> <u>County</u>, Illinois, No. |
| vs. | ) <u>87-CF-112</u>. |
| | ) |
| DAVID W. CARTER, | ) Honorable <u>Charles E. Glennon,</u> |
| ~~Defendant~~-Petitioner. | ) Judge Presiding. |

<u>PETITION FOR LEAVE TO APPEAL</u>

JO/W
no fee

**DANIEL D. YUHAS**
**Deputy Defender**
**Office of the State Appellate**
**Defender**
**Fourth Judicial District**
**400 S. 9th St., Suite 102**
**P.O. Box 5750**
**Springfield, IL  62705-5750**
**(217) 782-3654**

**KAREN MUNOZ**
**Assistant Defender**

**COUNSEL FOR DEFENDANT-PETITIONER**

<u>ORAL ARGUMENT REQUESTED</u>

**FILED**
AUG - 4 1993
**SUPREME COURT CLERK**

8-4-93
8-14-93

R-063093

EXHIBIT B

NO.

IN THE

SUPREME COURT OF ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Appellate Court of Illinois, Fourth Judicial District, No. 4-92-0298. |
| Plaintiff-Respondent, | ) ) ) ) ) | |
| vs. | ) ) ) ) ) ) | There on appeal from the Circuit Court of the Eleventh Judicial Circuit, Livingston County, Illinois, No. 87-CF-112. |
| DAVID W. CARTER, | ) ) ) | Honorable Charles E. Glennon, |
| Defendant-Petitioner. | ) | Judge Presiding. |

## PETITION FOR LEAVE TO APPEAL

TO THE HONORABLE JUSTICES OF THE SUPREME COURT OF THE
    STATE OF ILLINOIS:

May It Please The Court:

I.

## PRAYER FOR LEAVE TO APPEAL

David Carter, defendant-petitioner, petitions this Court pursuant to Illinois Supreme Court Rules 315 and 612(b) for leave to appeal from the judgment of the Appellate Court of Illinois, Fourth Judicial District, which affirmed Mr. Carter's conviction for first degree murder (Count X) and his sentence of natural life imprisonment.  Carter's convictions for two counts of conspiracy to commit murder, one count of solicitation to commit murder, and two additional counts of first degree murder were vacated.

-1-

## II.

### PROCEEDINGS IN THE APPELLATE COURT

The Rule 23 Order of the Appellate Court of Illinois, Fourth Judicial District, was filed on June 30, 1993. A copy is appended to this petition. No petition for rehearing was filed. An affidavit of intent to seek leave to appeal was filed on July 7, 1993.

## III.

## POINTS RELIED UPON FOR REVERSAL

### A.

THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION TO SUPPRESS STATEMENTS ON GROUNDS THAT THEY WERE INVOLUNTARY UNDER THE FOURTEENTH AMENDMENT DUE PROCESS CLAUSE AND OBTAINED IN VIOLATION OF MR. CARTER'S SIXTH AMENDMENT RIGHT TO COUNSEL. THE STATEMENTS WERE OBTAINED THROUGH THE PRETEXT USED BY INFORMANT HARRY MARTIN THAT HE HAD CONTACTED AN ATTORNEY FOR MR. CARTER AND FOR ALL THE OTHER INDIVIDUALS WHO WERE ALLEGEDLY INVOLVED IN THE INCIDENT AND WOULD BE HELPING INSURE THAT CARTER HAD LEGAL ASSISTANCE.

### B.

THE PROSECUTOR ERRED IN ELICITING HEARSAY TESTIMONY THAT GUARDS HAD BEEN THREATENED BY BLACK GANGSTER DISCIPLES AND THAT THE DAY BEFORE THE MURDER, ANOTHER GUARD WAS ATTACKED BY AN INMATE.

### C.

EVIDENCE OF GANG ACTIVITY WHICH WAS PERIPHERAL TO ANY MOTIVE FOR KILLING SUPERINTENDENT TAYLOR WAS IRRELEVANT AND HIGHLY PREJUDICIAL TO DAVID CARTER, SERVING ONLY TO INFLAME THE JURY AGAINST CARTER BECAUSE OF HIS ASSOCIATION WITH THE BLACK GANGSTER DISCIPLES.

### D.

THE ADMISSION OF EVIDENCE BY THE STATE THAT THE DEFENDANT, AS ALLEGEDLY THE UNIT COORDINATOR OF THE CELLHOUSE FOR UFO, THE SECURITY DIVISION OF THE BLACK GANGSTER DISCIPLES, HAD A VIOLENT CHARACTER, DENIED THE DEFENDANT A FAIR TRIAL WHERE HIS CHARACTER WAS NOT AT ISSUE.

## IV.

### STATEMENT OF FACTS

Livingston County Indictment No. 87-CF-112 was filed on October 16, 1987 and charged David Carter with two counts of conspiracy (first degree murder), three counts of solicitation (first degree murder), and five counts of first degree murder.  The charges stemmed from the stabbing death of Pontiac Correctional Center Superintendent Robert L. Taylor on September 3, 1987.  (Vol. I, C. 26-35)

The defendant filed two motions to suppress statements on December 16, 1988.  The first one alleged that the statements that were obtained by Harry James Martin from David Carter through the use of electronic surveillance and eavesdropping devices should be suppressed because the authorization for the wiretap was obtained by false statements. (Vol. I, C. 112-17)  The second motion to suppress challenged the process of using an informant, Harry Martin, to obtain statements from Mr. Carter through an eavesdropping device while Carter was incarcerated in prison on another conviction, but having been placed in segregation as a result of his suspected involvement in the instant case.  (Vol. I, C. 107-09)

On February 17, 1989, the trial court entered an order suppressing the statements of the defendant that were obtained by his conversation with Harry Martin as Martin wore a listening device.  The court found that the defendant's Fifth Amendment rights had been violated and that he was in custody for purposes of <u>Miranda</u>, even though he had not been formerly charged with Superintendent Taylor's murder.  The defendant was a "prime suspect" at the time that he was questioned by the undercover/inmate agent.  (Vol. I, C. 191-93)

-4-

The State filed an appeal from the suppression order on February 28, 1989. (Vol. I, C. 198)  The appellate court reversed the order of the trial court in an opinion filed on May 17, 1990.  (Vol. I, C. 221-27)

On the defendant's motion, his cause was severed from that of his co-defendants and his motion for change of venue was granted. (Vol. V, R. 427)

Prior to the start of trial, several hearings were held in which James Wasson, an inspector with the Division of Criminal Investigation of the Illinois State Police, presented his evidence deposition with regard to the set up of the electronic surveillance in this case. The court ruled that the prosecution had met its burden of showing proper foundation, and ruled that the overhear order was issued pursuant to probable cause and that if the tape was offered into evidence, it would be admissible.  (Vol. IX, R. 14)

Following opening statements (Vol. XI, R. 14-40), the State began its lengthy presentation of evidence in this case which established that Ike Easley and Roosevelt Lucas killed Superintendent Robert Taylor on September 3, 1987.  The State's theory at trial was that the attack on Superintendent Taylor was retaliation by a gang at the Pontiac Correctional Center, the Black Gangster Disciples (BGD), who believed that one of their members had been killed by correctional officers. Danny Jarrett was a guard at Pontiac on July 20, 1987 and was assigned to the Five, Six, Seven and Eight Galleries of the south cellhouse. On July 20, he worked the 3:00 to 11:00 p.m. shift.  Over the objection of defense counsel, the State was allowed to introduce evidence of the events which led up to the death of inmate Billy Jones and the

-5-

removal of inmate Kirk Williams from the south cellhouse. (Vol. XII, R. 47-68)

Jarrett stated that in July of 1987, he knew the defendant, Ike Easley and Roosevelt Lucas, because all of them lived in the south cellhouse in the upper galleries, which were under Mr. Jarrett's control. On July 20, inmates Kirk Williams and Billy Jones lived in cell 512 on the Five Gallery. Mr. Jarrett testified that there were several gangs at Pontiac but there was an alliance between the Black Disciples, the Black Gangsters, and the Latin Disciples. Inmate Kirk Williams had brought the three gangs together. (Vol. XII, R. 68-70) The gangs each wore different colors and had different signs or symbols. (Vol. XII, R. 70-71)

According to Jarrett, he saw David Carter wearing gang colors and giving gang signals, and he noticed this same behavior in Kirk Williams, Billy Jones, Roosevelt Lucas, and Ike Easley. (Vol. XII, R. 73-75) He had also noticed those four men participating in calisthenics, jogging and running when they were in the yard, and they would chant Black Gangster Disciple slogans. (Vol. XII, R. 76) Mr. Jarrett was of the opinion that Williams, Jones, David Carter, Lucas and Easley all belonged to the Black Gangster Disciples on July 20, 1987. (Vol. XII, R. 77)

Kirk Williams, according to Jarrett, "controlled the whole institution." Billy Jones was classified as the chief of securities of the institution for the gang. (Vol. XII, R. 77) On the evening of July 20, Jarrett was assigned to go into the passageway between the galleries to make sure that nothing was passed through the vents or thrown out. Kirk Williams and Billy Jones were being moved to the segregation unit in the north cellhouse. The reason for the

-6-

removal was because of their activities and according to Jarrett, the rest of the organization was "getting out of control." (Vol. XII, R. 79) As Williams was being moved, he told the guards that he had tried to be a diplomat but that the administration, whom he referred to as "hookers," would not listen. (Vol. XII, R. 80)

To move the men, the guards used chemical agents in Five Gallery to stop the debris from being thrown out of the cells. (Vol. XII, R. 81) Inmates were throwing soap, cans, light bulbs, and other objects at the officers. (Vol. XII, R. 82) The chanting and debris throwing continued as Billy Jones was taken off the gallery and led away. Jarrett noticed that Jones was chewing something. Jarrett started escorting Jones to the north segregation unit. When Jones got about a hundred feet outside the door, he collapsed. Cardio pulmonary resuscitation was attempted, and it was learned that Mr. Jones died from chewing on a bag of cocaine. (Vol. XII, R. 84-87)

After the incident involving Mr. Williams and Mr. Jones, Jarrett received threats from different inmates as they accused the guards of killing Jones. (Vol. XII, R. 87-89) Jarrett stated that the threats were made by members of the Black Gangster Disciples. (Vol. XII, R. 93) Mr. Jarrett was eventually reassigned jobs for his own safety, but testified that he had seen David Carter in the company of Ike Easley prior to his transfer. (Vol. XII, R. 96) Jarrett testified to the types of activities that he had seen David Carter participate in for the Black Gangster Disciples. One person within the gang is in charge of the security or monitoring the movement of other gang members. According to Jarrett, the person in charge would often be seen coordinating individuals to make sure that they are posted in certain positions. Jarrett claimed to have seen Carter

-7-

perform that function on several occasions. (Vol. XII, R. 99-100) Based on what Mr. Jarrett saw, he was of the opinion that David Carter was the security coordinator for the Black Gangster Disciples for the upper galleries in the south cellhouse. (Vol. XII, R. 104) On cross-examination, Mr. Jarrett admitted that the first time he had ever told anybody that he saw Carter socializing with Mr. Jones, Mr. Easley, and Mr. Lucas on Seven and Five Galleries was about three weeks earlier, and admitted that he had not testified to this in two previous cases. (Vol. XII, R. 110-12)

Various guards testified to the events of September 3, 1987 and the death of Superintendent Taylor. (Vol. XII, R. 135-215; Vol. XIII, R. 70-88)

Lawrence Spiller testified that he was an inmate at Pontiac in September of 1987, serving time for attempt murder, attempt armed robbery, and unlawful use of weapons. (Vol. XIII, R. 118-19) Mr. Spiller knew Superintendent Taylor. Taylor gave Spiller his job assignments. (Vol. XIII, R. 121) Sometime before 11:00 a.m. on September 3, Spiller saw Taylor in his office on Five Gallery. (Vol. XIII, R. 121) While Spiller was in Taylor's office, two men came in and attacked Taylor. The first one jumped on the arm of the chair that Spiller was sitting on, and then jumped across the desk. Taylor was then hit in the face with fists. The inmate then pulled a knife from his waistbelt and made a stabbing motion with it. (Vol. XIII, R. 126-27) The inmate who stabbed Taylor was Ike Easley. (Vol. XIII, R. 127)

Spiller started to leave when Roosevelt Lucas ran in. (Vol. XIII, R. 128-29) Spiller saw Lucas pull a pipe out of his waistband and strike Taylor with it. (Vol. XIII, R. 130-31) Spiller had noticed

-8-

that Easley was wearing gloves. (Vol. XIII, R. 132) Spiller went to the front of cell 546. He saw Easley come out and run toward the front end of Five Gallery. Lucas then came out and threw the pipe back in the office. He ran to the front end of Five Gallery and jumped up to Seven Gallery. (Vol. XIII, R. 133-34) Prior to the attack on Taylor, Ike Easley had been sitting on the radiator a few feet from Taylor's office. (Vol. XIII, R. 136)

Various exhibits were admitted into evidence and passed among the jurors. The defendant and his attorney chose to be absent when this occurred. (Vol. XIII, R. 188-93) One of the jurors indicated that she did not want to view all of the photographs. (Vol. XIII, R. 192)

The key witness against Mr. Carter was Harry Martin. Mr. Martin, who at the time of the trial was incarcerated and who had prior convictions for armed robbery, armed violence, and unlawful use of weapons, testified that he had a college degree in accounting and bookkeeping. In 1987 he was a member of the Black Gangster Disciples. Mr. Martin described the organization of the gang. Larry Hoover was the chairman, and below him was the board of directors consisting of institutional coordinator, assistant institutional coordinator, gallery coordinator, and various other subordinate department heads. (Vol. XIV, R. 18-19) The security division of the gang is called the UFO, the United Front of the Organization. According to Martin, this group does the assassinations, protects the board members or any of the hierarchy of the organization, guards the leadership and disciplines any organization members that may get out of line. (Vol. XIV, R. 19-20) The Black Gangster Disciples operate in and out of the prison system. (Vol. XIV, R. 20) Mr. Martin's former position

-9-

was that of financial adviser to the board.  (Vol. XIV, R. 20)  He
stated that the majority of his education was financed through the
gang.  (Vol. XIV, R. 21)

Mr. Martin stated that the gang made money by various illegal
activities, but also some legitimate business. He admitted that when
he was on the board as the financial adviser he had knowledge of the
illegal activities and participated in them.  In May of 1987, a
conspiracy was put together to assassinate Harry Martin.  Martin
received word of this threat from the warden at Stateville.  Martin
initially did not believe the warden, so he asked a few other board
members, whom he believed were allies.  They confirmed the warden's
information, and Martin then asked for protection in return for
cooperating with the law enforcement officials. (Vol. XIV, R. 22-23)

Martin was transferred to Dixon Correctional Center and then
to Pontiac in the second week of August in 1987. (Vol. XIV, R. 24-25)
While at Pontiac, Martin met with some gang members, including Corwyn
Brown, who was known as "Ketchup."  Brown was the assistant institu-
tional coordinator.  (Vol. XIV, R. 26-27)  While at Pontiac, Martin
saw Roosevelt Lucas, and stated that he provided security for Martin
and Brown.  (Vol. XIV, R. 28-29)

While at Pontiac, Martin talked with Corwyn Brown about the death
of Billy Jones.  Brown told Martin that the gang membership did not
believe that Jones' death was an accident, and thought that the
administration was responsible for Jones' death. (Vol. XIV, R. 33-34)
Brown also told Martin that the gang members in the institution wanted
to retaliate against the administration.  (Vol. XIV, R. 35)

In September of 1987, Martin was incarcerated in the Logan
Correctional Center, and he was approached by the BGD assistant

-10-

institutional coordinator who told him that the gang wanted inmate
Larry Spiller killed.  Spiller was to be killed by poisoning his food.
Both Martin and Spiller were in the segregation unit.  Martin informed
the warden.  (Vol. XIV, R. 37-38)

While at Logan, Mr. Martin was approached by Department of
Corrections investigators regarding the murder of Superintendent
Taylor.  They asked Martin to assist them in investigating various
Black Gangster Disciple members whom Corrections believed were involved
in the murder.  (Vol. XIV, R. 44-45)  Martin insisted that he had
not received anything from the Department of Corrections in return
for his cooperation.  He said that he decided to wear a wire and visit
various inmates to aid the investigation.  On October 7, 1987, while
wearing a wire, he visited David Carter.  (Vol. XIV, R. 46)

On that date, Martin and his wife were driven to the Pontiac
Correctional Center.  Martin's wife had sent Carter a letter asking
to have Martin put on Carter's visiting list.  (Vol. XIV, R. 47)
Carter and Martin talked, and Martin told Carter that he was there
to get information for Larry Hoover, the chairman of the Black Gangster
Disciples, about the murder of Superintendent Taylor.  (Vol. XIV,
R. 49-50)  Martin asked Mr. Carter who gave him instructions, and
Carter said it was "Dice," Michael Johnson, who was the institutional
coordinator for the security division.  (Vol. XIV, R. 50)  Carter
said that Mr. Johnson had told him that they were "to knock a patch
out of Superintendent Taylor's head" with pipes.  (Vol. XIV, R. 51)

According to Martin, David Carter told him that Superintendent
Taylor was killed because of what happened to inmate Jones, and because
of the guards "whipping folks in the dining room and on the sidewalk."
(Vol. XIV, R. 53)  Martin stated that before inmate Williams was

-11-

shipped out, he allegedly left word with Carter to make the hit. Carter told Martin that he sent Roosevelt Lucas and Ike Easley to do the job. (Vol. XIV, R. 53) Martin was told by the defendant that he just wanted Lucas and Easley to go in there and knock Taylor out and leave him there. The defendant told Martin that the attack had been planned for three or four weeks, and Taylor was followed so that arrangements could be made. (Vol. XIV, R. 54)

Carter told Martin that he had security people on the gallery playing the radio very loudly, and had other security people stationed at the gate. Lucas and Easley were given instructions not to jump up on the gallery and were told to drop the weapons at the scene of the crime. Carter was on Seven Gallery when Lucas and Easley hit Taylor. Carter said that things did not go according to plan, and that Superintendent Taylor staggered out of his office. Carter had given Lucas and Easley specific instructions to leave him in the cell, unconscious. (Vol. XIV, R. 55)

Carter told Martin that Lucas and Easley wore masks and gloves and had wiped the weapons before the attack. As instructed, they left the weapons at the scene. (Vol. XIV, R. 57-58) Carter indicated that two inmates were witnesses to the crime. (Vol. XIV, R. 58) After the death of Superintendent Taylor, Carter was promoted to the institutional coordinator of UFO. (Vol. XIV, R. 59) Carter also indicated that there were several people who knew about the hit before it took place, and they were all in agreement as to the plan. (Vol. XIV, R. 60) When the two men talked about Billy Jones' death, Martin mentioned that he had heard that Jones had swallowed cocaine. Mr. Carter got angry, and stated that he got upset every time someone said that caused Jones' death, and told Martin that that was not the

-12-

way it happened.  He said it would have been impossible for him to swallow a bag of cocaine on his own.  (Vol. XIV, R. 61-62)

Harry Martin testified that if an order is given to kill someone it would have to have come from the chairman of the gang, in this case Larry Hoover.  Hoover then would pass the word through the chain of command.  He would not have given orders directly to Carter.  (Vol. XIV, R. 62-63)  Martin also stated that if the attack on Taylor had not been sanctioned from the top, Mr. Carter would have been disciplined, because one of the rules within the gang organization is to not come in confrontation with employees of the Department of Corrections.  (Vol. XIV, R. 64)

Martin stated that he listened to the tape of the conversation that he had with David Carter, and was able to identify both himself and Carter on the tape.  (Vol. XIV, R. 65-66)

On cross-examination, Mr. Martin stated that he still had ten years left to serve on his prison sentence.  He stated that all he got in return for his cooperation with the authorities was protection. (Vol. XIV, R. 67-68)  Martin also admitted that when he went to talk to Carter, he lied to him about being sent by Larry Hoover.  (Vol. XIV, R. 74)

James Wasson's testimony was presented through evidence deposition. Mr. Wasson was an Inspector with the Division of Criminal Investigation of the Illinois State Police, and he set up the wire on Harry Martin prior to his meeting with David Carter.  Mr. Wasson then recorded the conversation between Mr. Carter and Mr. Martin. Mr. Wasson's evidence deposition was then read to the jury. (Vol. XIV, R. 104-17)

-13-

The tape of the overhear was played for the jury. (Vol. XIV, R. 118-50)

Demetre Brown, whose nickname was "PeeWee," was serving time for armed robbery and murder, and also had an unlawful use of weapons conviction. On September 3, 1987, Mr. Brown was housed at the Pontiac Correctional Center in cell 549. On the morning of September 3, Mr. Brown was between his cell and Superintendent Taylor's office. He was waiting for two inmates to come out of Superintendent Taylor's office, and he was talking to Lucas and Easley, who were putting on gloves and hats. Brown moved to the front of Taylor's office and watched through the window as the two men entered the office, jumped on the desk, and hit Taylor and stabbed him. (Vol. XV, R. 8-10) Brown went to his cell and saw the two men run by, throwing off their hats and gloves. (Vol. XV, R. 10-12) Brown then went into cell 546 with inmates Nealy and Spiller. (Vol. XV, R. 13-15) People's Exhibits 2 through 42B were admitted into evidence, and the State rested. (Vol. XV, R. 58)

The defendant's motion for a directed verdict was denied. (Vol. XV, R. 59-65) Douglas Read, an Internal Security Investigator with the Department of Corrections, testified to his conversation with Demetre Brown on September 3, 1987. Read spoke to Mr. Brown twice on that date. In the second interview, Brown told him that inmate Corwyn Brown had been with Easley and Lucas just minutes before the attack, and that Corwyn Brown had nodded his head and pointed toward Taylor's office at that time. (Vol. XV, R. 106-07) He also told Read that he believed Corwyn Brown was the institutional coordinator of the Black Gangster Disciples gang. (Vol. XV, R. 107) Inmate Spiller had also been interviewed by other investigators and he, too,

-14-

had stated that he had observed Corwyn Brown point toward Taylor's office prior to the attackers entering. (Vol. XV, R. 110) The defense rested.   (Vol. XV, R. 117)  The trial court admonished Mr. Carter of his right to testify, and determined that he was waiving that right. (Vol. XV, R. 117-19)

An instructions conference was held.   (Vol. XV, R. 132-57) Closing arguments were made.   (Vol. XVI, R. 181-256)  The jury was then instructed.   (Vol. XVI, R. 256-72)

The jury returned verdicts finding David Carter guilty of conspiracy as charged in Counts I and II; not guilty of solicitation as charged in Count III; guilty of solicitation as charged in Count IV; not guilty of solicitation as charged in Count V; not guilty of first degree murder as charged in Count VI; guilty of first degree murder as charged in Count VII; not guilty of first degree murder as charged in Count VIII; guilty of first degree murder as charged in Count IX; and guilty of first degree murder as charged in Count X.   (Vol. XVI, R. 305-17)

The defendant filed a motion for new trial on January 13, 1992. (Vol. I, C. 343)  A hearing was held on March 31, 1992.  Following arguments of counsel, the motion was denied.   (Vol. XVII, R. 2-9) A sentencing hearing was then conducted. As evidence in aggravation, the State introduced a certified copy of Mr. Carter's prior murder conviction in Cook County, as well as his conviction for armed violence.  (Vol. XVII, R. 9-15)  While entering judgment on all the counts, the court ruled that the convictions for murder, conspiracy, and solicitation merged and sentenced the defendant only on Count X, first degree murder.  (Vol. XVII, R. 21)  Following arguments of counsel, the trial court sentenced David Carter to natural life

-15-

imprisonment.  (Vol. XVII, R. 24-33)  A timely notice of appeal was filed on April 6, 1992.  On June 30, 1993, the appellate court affirmed Mr. Carter's conviction and sentence for first degree murder (Count X) but vacated the petitioner's other convictions.

V.

ARGUMENT

A.

THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION TO SUPPRESS STATEMENTS ON GROUNDS THAT THEY WERE INVOLUNTARY UNDER THE FOURTEENTH AMENDMENT DUE PROCESS CLAUSE AND OBTAINED IN VIOLATION OF MR. CARTER'S SIXTH AMENDMENT RIGHT TO COUNSEL. THE STATEMENTS WERE OBTAINED THROUGH THE PRETEXT USED BY INFORMANT HARRY MARTIN THAT HE HAD CONTACTED AN ATTORNEY FOR MR. CARTER AND FOR ALL THE OTHER INDIVIDUALS WHO WERE ALLEGEDLY INVOLVED IN THE INCIDENT AND WOULD BE HELPING INSURE THAT CARTER HAD LEGAL ASSISTANCE.

The trial court had granted a State motion for an order authorizing use of an eavesdropping device for purposes of recording conversations between State agent Harry Martin and various inmates of the Department of Corrections, including David Carter. Martin was an inmate who had made arrangements with the Department to gather information from Mr. Carter and from others who were suspected to have been involved in the murder of Superintendent Taylor. Martin contacted Mr. Carter and requested that he be placed on his visitor's list. Mr. Martin and his wife traveled to Pontiac on October 7, 1987, and Mr. Martin had a conversation with Mr. Carter, which was tape-recorded, without Carter's knowledge.

During the conversation between Mr. Martin and David Carter, at the prison visiting area at Pontiac, Mr. Martin solicited from Mr. Carter information concerning Carter's involvement in ordering the "hit" on Superintendent Taylor.

In his motion to suppress statement II, filed December 16, 1988, the defendant argued that the statements were inadmissible on Fifth Amendment grounds and also alleged that the statements were obtained in violation of the Sixth Amendment right to counsel and violated his Fourteenth Amendment right to due process of law. (C. 107-08)

-17-

The trial court entered an order suppressing the statements as a result of a custodial interrogation in the absence of <u>Miranda</u> warnings, basing its decision on <u>People v. Perkins</u>, 176 Ill.App.3d 443, 531 N.E.2d 141 (5th Dist. 1988). <u>Perkins</u> was subsequently reversed by the United States Supreme Court. <u>Illinois v. Perkins</u>, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). On appeal by the State, the appellate court reversed the trial court's suppression order, concluding that the statements were not the result of a custodial interrogation requiring the protections of <u>Miranda</u>. (Vol. I, C. 221-27)

On remand, another pretrial hearing was held and the motion to suppress statements was renewed.

As argued by defense counsel:

> Mr. Thomas:  ... Judge, then the other motion I have is coupled with matters that went up on appeal but raising the Sixth Amendment issue. There is one reference in the tape with David Carter about getting some lawyers. It did not mention Shel Bannister by name, that particular tape, but there is a reference made about it and also, Judge, Mr. Carter in order for Mr. Martin to get in to see Mr. Carter, that whole rumor went out about whether somebody coming down here and going to help you with some lawyers. I think the whole thing is tainted with the fact it is indicated Mr. Martin was working on behalf of trying to secure some lawyers for people who may or may not have been suspected of something. ...

(Vol. V, R. 432-33)

The trial court then discussed the differences between the interrogations made by Harry Martin of David Carter, codefendant Ike Easley, and co-defendant Michael Johnson. In the case of Easley, Harry Martin convinced Ike Easley that he had talked to an attorney named Shel Bannister, and that the lawyer wanted Martin to ask Easley a series of questions. Easley had said nothing to Martin prior to

-18-

this representation by Mr. Martin.    (Vol. V, R. 433)    As to Mr.
Martin's interview with David Carter, the court summarized it as
follows:

> THE COURT:  Mr. Thomas (defense counsel) indi-
> cates on page 14 of 19 pages of the interview
> by Martin with Mr. Carter that at the top of page
> 14 it says "that if they need something, I'll
> be here."    That is Martin talking to Carter.
> "And if the indictments come down, then they'll
> have lawyers. Whatever else they need, you know,
> I'll be on top of.  I don't perceive you all
> getting indicted.  I don't see how.  I don't
> think they've got anything, frankly.  Then how
> long now, a month and a week or something?"
> Carter responds, "Almost a month or something
> like that."
>
> So the reference to Mr. Carter is -- by Mr.
> Martin is that anything Mr. Carter or any person
> who was involved in the investigation would need
> would be provided.  That would include if in-
> dicted hiring lawyers.  And in Mr. Johnson's case
> they said we have already talked to a lawyer and
> in Mr. Easley's case they have said not only have
> we talked to a lawyer but there is a whole bunch
> of questions the lawyer wants me to ask you, and
> Mr. Easley proceeded to spill his guts after he
> believed Mr. Martin had come from the lawyer.
> This is a case where I am in the unenviable posi-
> tion of quite possibly in the Fourth District
> being wrong twice.  Wrong because of Illinois
> v. Perkins and if, in fact, for some reason they
> did not catch the Sixth Amendment issue and it
> slipped through, I, quite frankly, feel I may
> have the opportunity to be wrong again because
> I'm not going to suppress based upon Sixth
> Amendment issues in this case. ...
>
> Now, Mr. Carter had made quite a few statements
> before the issue of counsel was injected. ...
> And in Mr. Carter's case, the injection of coun-
> sel came at the very end of it and it was very
> vague and it would not seem to me a reasonable
> inmate, and I am looking at it from the eyes of
> someone in seg and ticketed and is out in the
> visiting room and under no coercion or compulsion
> out there that those -- and I would have to adopt
> the position of the appellate court those are
> correct, the statements came late enough there
> the statements are voluntary.  So at the risk
> of doing this all over again, the court will

deny, first of all, defense motion to -- the
motion concerning probable cause. ...

I further find, I think, we have some serious
Sixth Amendment issues coming in this country.
It is my opinion those issues are not raised in
People v. Johnson or People v. Carter and the
renewed motion to suppress their statements will
be denied, the court finding that under my
interpretation of Illinois v. Perkins trickery
is authorized, and if that trickery includes
trickery concerning counsel, then I think the
trickery must go beyond what is done in these
two cases.    I think impermissible trickery
occurred in Mr. Easley's case and I suppressed
that and the State chose not to take that up and
even let the appellate court look at what hap-
pened there.    I think trickery in People v.
Carter and People v. Johnson presses the limits
but is within the permissive range of what can
be done. I am personally very uncomfortable with
that in terms of constitutional law but I think
I have been overruled sufficiently in this I will
adhere to the finding of the U.S. Supreme Court,
and if the Fourth District has to address the
issue again, so be it, let them look and see it.
Motion to suppress is denied. ...

(Vol. V, R. 438-41)

The defendant maintains that the trial court was properly
concerned about the trickery used in this case by Harry Martin in
order to get David Carter to make statements incriminating himself
in these offenses. The statements were constitutionally involuntary
in violation of the due process clause of the Fourteenth Amendment.
(U.S.CONST., amend XIV)  The voluntariness of the statement depends
on the absence of police overreaching. People v. Easley, 148 Ill.2d
281, 592 N.E.2d 1036, 1049 (1982), citing Colorado v. Connelly, 479
U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473, 482 (1986).  Interrogation
techniques that overreach are offensive to a civilized system of
justice and will be condemned. (Easley, 592 N.E.2d 1036, 1050, citing
Miller v. Fenton, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405, 410
(1985).) Ultimately, the inquiry in determining whether statements

-20-

are involuntary as a matter of due process is whether the conduct of the state agent is "causally related to defendant's confession." (Easley, 592 N.E.2d at 1049.)

Here, an agent of the State told the defendant that he was there on behalf of the leaders of the gang and that things were being taken care of for all of those who were being suspected of involvement and who had been placed in segregation, and that an attorney would be secured for anyone who was indicted.  Mr. Martin used the ruse of indicating that he was there on gang business and had legal advice, hoping for an incriminating response.

The circumstances of the interrogation clearly troubled the trial court, who was concerned with how far the trickery could go.  The State can "barrage" a suspect with questions from an undercover agent until the suspect makes an inculpatory statement.  People v. Easley, 148 Ill.2d 281, 592 N.E.2d 1036, 1051 (1992), citing Illinois v. Perkins, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990).  As in Easley, the defendant here was "barraged" with questions from an individual he was acquainted with both as a fellow inmate and an alleged gang member.  (See Easley, 492 N.E.2d at 1052.)

Mr. Carter did not have an opportunity to confirm the circumstances under which Harry Martin had asked that the defendant put him on his visitors list, nor did Mr. Carter reasonably have cause to even question the visit.  (See Easley, 592 N.E.2d at 1051.)  An analysis of the state agent's conduct here compels the conclusion that that conduct was causally related to the defendant's statements.

Said conclusion is supported by the holding of this Court in Easley, stating:

-21-

> Confinement in a prison is a set of circumstances
> unique in obtaining information from a suspect.
> Inherent in this setting are factors which in-
> crease a suspect's anxiety; confiding in others
> is a likely form of relief for the suspect.
> (Perkins, 496 U.S. at 307, 110 S.Ct. at 2403,
> 110 L.Ed.2d at 258 (Marshall, J., dissenting)
> (and authority cited therein).)   Because the
> State has virtually complete control over the
> suspect's environment, the State is in a unique
> position to "exploit this vulnerability."
> (Perkins, 496 U.S. at 303, 110 S.Ct. at 2400,
> 110 L.Ed.2d at 255 (Brennan, J., concurring).)
> The State can barrage a suspect with questions
> from an undercover agent until the suspect makes
> an inculpatory statement. (See Perkins, 496 U.S.
> 292, 110 S.Ct. 2394, 110 L.Ed.2d 243.)   We
> believe the record in this matter supports this
> conclusion.

Easley, 592 N.E.2d at 1051.

The trial court's rulings and observations of the circumstances surrounding Mr. Carter's statements were made in the context of the Sixth Amendment analysis and a "voluntariness" analysis.  It is clear from this Court in Easley that the appropriate analysis lies under the due process clause of the Fourteenth Amendment.  (Easley, 592 N.E.2d at 1052.)  Indeed, the court in Easley observed that the trial court rulings there were made in the context of the Sixth Amendment analysis, but on review, may be considered in the context of whether the statements were involuntary under the due process clause.  (Easley, 592 N.E.2d at 1052.)

The defendant still maintains that a Sixth Amendment violation occurred because Harry Martin interfered with the defendant's attorney-client privilege, United States v. Seale, 461 F.2d 345 (7th Cir. 1972), but recognizes the decision in People v. Easley, 148 Ill.2d 281, 592 N.E.2d 1036, 1053 (1992), which rejected a Sixth Amendment claim because the right to counsel had not attached.

-22-

Because the statements in the present case were involuntary under the due process clause of the Fourteenth Amendment, and obtained in violation of the Sixth Amendment, their admission amounted to reversible error.   This Court should grant leave to appeal, reverse Mr. Carter's conviction and remand the cause for a new trial.

B.

**THE PROSECUTOR ERRED IN ELICITING HEARSAY TESTIMONY THAT GUARDS HAD BEEN THREATENED BY BLACK GANGSTER DISCIPLES AND THAT THE DAY BEFORE THE MURDER, ANOTHER GUARD WAS ATTACKED BY AN INMATE.**

The State's theory in this case was that Superintendent Taylor was murdered by Ike Easley and Roosevelt Lucas as part of a Black Gangster Disciple conspiracy to avenge the death of Billy Jones. Jones, also known as "Zodiac," was a member of the Black Gangster Disciples who died in the south cellhouse on July 20, 1987. The State theorized that David Carter was one of the security leaders of the Black Gangster Disciples and that he had given the order to retaliate for Jones's death and had ordered the "hit" on Superintendent Taylor.

Correctional Sergeant Danny Jarrett testified to the circumstances surrounding the death of Billy Jones. Jarrett had assisted in moving Kirk Williams and Billy Jones from the south cellhouse. According to Jarrett, Kirk Williams "controlled the whole institution," and Billy Jones was the chief of securities of the institution for the gang. (Vol. XII, R. 77) On the night of July 20, Williams and Jones were being moved to segregation because the gang was "getting out of control." (Vol. XII, R. 79)

Over the objection of the defendant, Mr. Jarrett was allowed to testify to Williams's statements as he was being moved to segregation. He allegedly told the guards that he had tried to be a diplomat but the administration, whom he referred to as "hookers," would not listen. (Vol. XII, R. 80) Jarrett stated that Williams was angry and stated that "he was going to tear the fucking place up." (Vol. XII, R. 80) As Jones was being transferred to segregation,

-24-

he suddenly collapsed and died from chewing on a bag of cocaine. CPR was attempted unsuccessfully. (Vol. XII, R. 85-86)

Again, over defense objection, Jarrett was allowed to testify to threats that he received after Jones's death on July 20. Jarrett testified that the threats came from "several inmates," and continued from the time of the incident until August 19, 1987. Jarrett was of the opinion that the inmates threatening him were from the Black Gangster Disciples. (Vol. XII, R. 87-88)

In closing argument, the State argued that the evidence of those threats showed the motive for the killing of Superintendent Taylor and that there was a conspiracy among the Black Gangster Disciples:

> In the weeks that followed July 20 and preceded September 3, the Black Gangster Disciples and their membership became extremely hostile, increasingly threatening to members of the staff of the Pontiac Correctional Center. And five weeks later, five weeks later, Superintendent Robert Taylor was murdered by who? Easley and Lucas, members of the Black Gangster Disciples.

(Vol. XVI, R. 240)

Jarrett's testimony regarding the threats that he received from Black Gangster Disciple members was improperly introduced into evidence. The same issue was raised in the case of co-defendant Roosevelt Lucas, and this Court found that the testimony regarding the threats was error, although harmless in Lucas's case. People v. Lucas, 151 Ill.2d 461, 603 N.E.2d 460 (1992). As stated in Lucas:

> The general rule that prior threats by an accused to do violence to the person eventually slain are admissible applies when the statements are introduced to show malice or criminal intent. The factors a court considers in determining whether the statements are relevant to show malice or criminal intent include whether (1) the defendant made the statement, (2) the statement was a threat, (3) the statement was made close in time to the crime, and (4) the

-25-

victim was threatened.  <u>See</u> <u>People v. Lampkin</u>
(1983), 98 Ill.2d 418, 75 Ill.Dec. 260, 457
N.E.2d 50 (threat made by the defendant held
inadmissible as evidence of malice and criminal
intent where the threat was too general and
impersonal to be reasonably characterized as
directed toward any one in particular, and was
made six years prior to the murder for which the
defendant was on trial).

<u>People v. Lucas</u>, 603 N.E.2d at 467.

In <u>Lucas</u>, the court found that Jarrett's testimony was
inadmissible because there was no evidence that the defendant had
made any of the threats that had been directed at Jarrett or those
that he heard directed at other guards, nor was there any testimony
that Superintendent Taylor was the recipient of any threats from
defendant Lucas.  The court also found that Taylor's murder, which
occurred more than two months after inmates Jones's death, was not
sufficiently close in time to the alleged threats so as to deem them
relevant to show motive, which was the purpose of their introduction.
In <u>People v. Nitz</u>, 143 Ill.2d 82, 572 N.E.2d 895 (1991), this Court
allowed certain statements made by the defendant to be admitted at
trial to show evidence of motive, and the court subjected those
statements to the same evidentiary standards as those introduced to
show malice or criminal intent.

In the instant case, as in the <u>Lucas</u> case, there was no testimony
from Sergeant Jarrett that David Carter was responsible for any threats
made against Jarrett or that Superintendent Taylor was ever the target
of a threat.   In fact, the evidence was to the contrary, that
Superintendent Taylor had a good relationship with the inmates, many
of whom viewed him as a father figure.  Where inmate Jones's death
was the result of an accident from ingesting cocaine, it is not
reasonable to infer that the inmates held every agent of the Department

-26-

of Corrections responsible for Jones's death.  At most, only those
correctional employees whom the inmates might have perceived did not
respond to the emergency situation in an expeditious manner would
have been held accountable.  In the instant case, the threats to
Jarrett cannot be construed to have extended to Superintendent Taylor
so as to allow the admissibility of this evidence.

The State also introduced evidence, over defense objection on
relevancy grounds, that the day prior to Superintendent Taylor's
murder, a superintendent on one of the lower galleries had been
assaulted, with fists, by an inmate.  (Vol. XV, R. 39)  Because there
was no evidence that David Carter committed this crime, and there
was no evidence that the crime was related in any way to Superintendent
Taylor's murder, the admission of this evidence was improper.

Evidence of collateral crimes is inadmissible if used merely
to establish a defendant's propensity to commit crimes.  People v.
Lindgren, 79 Ill.2d 129, 402 N.E.2d 238, 242 (1980).  Even if used
for a proper purpose, it cannot be admitted until it is shown that
a crime actually took place and that defendant committed it or
participated in its commission.  People v. Miller, 55 Ill.App.3d 421,
370 N.E.2d 1155, 1159 (1st Dist. 1977); People v. Gugliotta, 81
Ill.App.3d 362, 401 N.E.2d 262, 264 (2d Dist. 1980).

This exact issue was raised in the Lucas case, and this Court
agreed that the evidence was inadmissible because there was no evidence
connecting the defendant to the attack on the officer the day before
Superintendent Taylor's murder.  People v. Lucas, 151 Ill.2d 461,
603 N.E.2d 460, 471 (1992).

The other crime evidence did not tend to prove any issue properly
provable in the case because there was no evidence that David Carter

-27-

participated in the attack on the prison official the day before
Taylor's murder, or that the attack was in any way related to the
attack on Taylor.    There was no evidence that the attack on the
correctional officer was anything other than a singular, unconnected
act of violence by one inmate against a correctional officer, which
supplied no basis for the jury to infer that it was part of a common
plan to retaliate against the administration. It remained an isolated
outbreak of violence by one inmate.

The admission of the hearsay testimony regarding threats that
Correctional Officer Jarrett had received from unnamed inmates deprived
David Carter of his right to confront witnesses face to face as
guaranteed by Section 8 of Article I of the Illinois Constitution,
and violated the confrontation rights bestowed by the Sixth and
Fourteenth Amendments to the United States Constitution. See People
v. Smith, 38 Ill.2d 13, 230 N.E.2d 188, 190 (1967).

The evidence of an unrelated attack on a guard was not probative
of any fact in issue and only served to create a suspicion in the
minds of the jurors of David Carter's involvement in these other
crimes. Evidence of unconnected offenses is objectionable, not because
it has no appreciable probative value, but because it has too much.
It over-persuades the trier of fact who is likely to convict the
defendant because he is a bad person deserving of punishment, rather
than on the basis of facts related to the offense for which he is
being tried. People v. Romero, 66 Ill.2d 325, 362 N.E.2d 288 (1977).
The prejudice in allowing this collateral evidence is there was a
danger that the jury convicted David Carter because it suspected his
involvement in a larger criminal scheme, which they then believed
made it more likely that he was involved in the instant offense.

-28-

Because of the error in allowing this hearsay and collateral crimes evidence, this Court should grant leave to appeal and David Carter should be granted a new trial.

C.

EVIDENCE OF GANG ACTIVITY WHICH WAS PERIPHERAL TO ANY MOTIVE
FOR KILLING SUPERINTENDENT TAYLOR WAS IRRELEVANT AND HIGHLY
PREJUDICIAL TO DAVID CARTER, SERVING ONLY TO INFLAME THE
JURY AGAINST CARTER BECAUSE OF HIS ASSOCIATION WITH THE
BLACK GANGSTER DISCIPLES.

In this case, the court erred in allowing evidence of details

of gang activity which was peripheral to the issue of whether David

Carter was involved in the murder of Superintendent Taylor. The jury's

consideration of this evidence could only have distracted it from

its fact-finding function and inflamed the jury against Carter because

of his association with the Black Gangster Disciples. People v. Cruz,

164 Ill.App.3d 802, 518 N.E.2d 320 (1st Dist. 1987).

Harry Martin was the chief witness against David Carter. Martin

identified himself as a former member of the hierarchy of the Black

Gangster Disciples. He testified at great length about the history

of the Black Gangster Disciples, the corporate-like structure of the

gang, the inner-workings of the gang organization, and the various

rules of the organization. Martin testified that the first rule of

the organization is silence and secrecy. According to Martin, any

member who broke those rules would be considered to be an enemy, and

a policy of the Black Gangster Disciples was death before dishonor,

which meant that if you said anything against the organization or

violated any organizational policies, your ultimate fate was death.

(Vol. XIV, R. 28-31)

Martin described his own involvement with the Black Gangster

Disciples, and testified that the gang had put him through school.

He became a board member and a financial advisor to the BGD, and he

had ultimately been forced out of power and himself become a target

of a Black Gangster Disciples assassination plot, which led to him

-30-

cooperating with the Department of Corrections. (Vol. XIV, R. 18-35)
Evidence of the history and structure of the gang and its criminal
activities, and Harry Martin's involvement within the organization,
was peripheral and irrelevant to whether David Carter was involved
in the murder of Superintendent Taylor. It only distracted the jury
from its task of weighing and evaluating the proper evidence before
it to reach an accurate determination of guilt or innocence. The
passions of the jury were undoubtedly aroused when it heard of the
sordid activities of Black Gangster Disciples and the consequences
that Martin suffered when he became an informer, even though that
evidence did not shed any light on the question of David Carter's
guilt.

In <u>People v. Cruz</u>, 164 Ill.App.3d 802, 518 N.E.2d 320 (1st Dist.
1987), the defendant was charged with a shooting that the prosecutor
contended was gang motivated, either by a desire for revenge against
a rival gang or to recruit new members. To impeach defendant's denial
that he was a gang member on the day of the shooting, the State intro-
duced portions of a documentary film on gangs, entitled "Street Wars,"
which showed defendant to be an active gang member three months prior
to the shooting, but also depicted violent gang activity and commented
on the escalation of gang warfare in Chicago.

The appellate court reversed defendant's conviction, because
<u>inter alia</u>, the jury saw portions of the film which shed no light
on whether defendant did the shooting but were highly inflammatory
and could only have aroused the passions of the jury against street
gang activity, and motivated the jury's hostility against the defend-
ant. <u>Cruz</u>, 518 N.E.2d at 327. Harry Martin's testimony had the same
affect.

-31-

Martin also testified, over defense objection, that in September of 1987, he was an inmate at Logan Correctional Center, and was still a gang member, when he was approached by the Assistant Institutional Coordinator for the gang at Logan, who told him that inmate Lawrence Spiller had been transferred to Logan and that he was a witness in the Pontiac case. Martin was told that the gang would like to have Spiller killed, and they were going to poison his food. (Vol. XIV, R. 37-38) Martin said that he managed to stall the other gang members, and he then contacted the warden.

There was no evidence connecting David Carter to the plan to poison the food of Lawrence Spiller. While evidence of a plan to eliminate witnesses is admissible to show a consciousness of guilt where the scheme is connected to the defendant, absent such connection, the plan evidence is not probative of the defendant's consciousness of his guilt and should be excluded from evidence. Compare People v. Baptist, 76 Ill.2d 19, 389 N.E.2d 1200, 1204-05 (1979) (evidence that defendant's brother and others executed a plan to kill the State's eyewitnesses was admissible where a letter written by defendant to a family member of one of the eyewitnesses, threatening to have his brother and cousin harm the eyewitness if he testified, connected the defendant to the shootings) with People v. Frazier, 107 Ill.App.3d 1096, 438 N.E.2d 623, 626 (1st Dist. 1982) (evidence that defendant tried to pay complainant $1,000 in return for an agreement to drop the charges not admissible as evidence of his consciousness of guilt where it was the complainant who suggested the payment).

Allowance of an excessive amount of evidence on an issue which is only peripheral to the offense for which the defendant is being tried demonstrates an insensitivity by the trial court to the need

-32-

of balancing the probative value of each piece of evidence against its potential prejudice to the defendant.

The effect of this evidence which had no relevance on the question of David Carter's guilt as to the murder of Superintendent Taylor, was to divert the jury's attention from the true question at hand. This court cannot speculate that the jury acted only on the basis of competent evidence.  Therefore, a new trial is warranted.

D.

**THE ADMISSION OF EVIDENCE BY THE STATE THAT THE DEFENDANT, AS ALLEGEDLY THE UNIT COORDINATOR OF THE CELLHOUSE FOR UFO, THE SECURITY DIVISION OF THE BLACK GANGSTER DISCIPLES, HAD A VIOLENT CHARACTER, DENIED THE DEFENDANT A FAIR TRIAL WHERE HIS CHARACTER WAS NOT AT ISSUE.**

At trial, Harry Martin, who described himself as a former member of the board of directors of the Black Gangster Disciples (BGD), testified to a series of descriptions regarding the security members of the gang, and thereby presented evidence indicating that the defendant, because he was allegedly a security coordinator for the cellhouse, was allegedly of violent character. During Harry Martin's testimony, he described the alleged qualifications and responsibilities of the security division of the BGD:

> Q. (By the prosecutor) Okay. With respect to the security division of the gang, what is that called?
>
> A. (By Harry Martin) UFO.
>
> Q. And what does UFO stand for?
>
> A. The United Front of the Organization.
>
> Q. What is its function?
>
> A. They are like the first line of order for the organization. Like the Marines in comparison to what we have in the U.S. They are the front line. When something happens they are the first people to go in. They carry out hits, which are assassinations. They protect the board members, or any of the hierarchy of the organization. They guard the leadership and discipline the organization members that may get out of line or out of policy.
>
> (Vol. XIV, R. 19-20)
>
> \*         \*         \*
>
> Q. You mentioned that the UFO members, security fashion, who chooses the UFO members?

-34-

A. In each institution they are chosen by the UFO coordinator of the institution. There is a board member who chooses only the head of staff, but in each individual institution the institutional coordinator and the institutional UFO coordinator would choose his staff.

Q. What type of qualities would be considered in choosing a UFO member?

A. The length of time that they have. The charge in the case for which they were convicted. How long they have been in the organization. His strength. Their ability to carry out the functions.

Q. Would a code of silence be taken into account on that?

A. Definitely that would come into play where they would have to be somebody who has been in the organization for a long period of time and proved that they can conduct themselves according to Rule 1 especially.

Q. Which is the code of silence?

A. Right. ...

(Vol. XIV, R. 32-33)

Harry Martin testified that David Carter told him that he was the unit coordinator of the cellhouse for UFO. (Vol. XIV, R. 51) Mr. Martin stated that Mr. Carter would then be dealing with security. (Vol. XIV, R. 51) The prosecutor then questioned Mr. Martin as follows:

Q. Why did you pick out Carter as a possible person to talk to?

A. Because he was the head of security in the south house.

Q. Would a person in that position have any special knowledge that you thought would be helpful to the investigation as a matter of course?

A. Yes. If he is the unit coordinator in the security in the south house it would be his direct responsibility to coordinate and make sure

-35-

something was carried out if something happened
in his cellhouse with respect to the UFO member
in the cellhouse.

(Vol. XIV, R. 65)

In <u>People v. Lucas</u>, 151 Ill.2d 641, 603 N.E.2d 460 (1992), this
Court dealt with a similar issue. <u>Lucas</u> involved the prosecution
of Roosevelt Lucas for Superintendent Taylor's murder. In <u>Lucas</u>,
the State introduced evidence that Lucas, as a member of the UFO,
had a violent character. As here, the evidence was introduced through
the testimony of Harry Martin, who described the qualifications of
a member of the UFO. 603 N.E.2d at 470. The supreme court concluded
that the admission of character evidence was error, concluding:

> Generally, character evidence is inadmissible
> when a party's character is not in issue. (Cita-
> tion omitted)  The prosecutor may not present
> evidence of a defendant's bad character until
> the defendant puts his character in issue by
> presenting evidence of good character. (Citation
> omitted)  Where it is admissible, evidence of
> character is confined to proof of general repu-
> tation at or prior to the alleged offense.  It
> should also be confined to a time not very remote
> from the date of the alleged offense.  The per-
> sonal opinion of a witness and evidence of
> specific acts are not proper. (Citation omitted)
> Reputation evidence may not be based upon
> specific acts of either bad conduct or good
> conduct.  (Citation omitted)
>
> Defendant's character was not an element of the
> offense of murder.  Martin's testimony was pre-
> sented as part of the State's case-in-chief;
> defendant did not invite introduction of evidence
> of his bad character or propensity to violence
> by placing his character in issue.  Martin's
> testimony identifying defendant as a UFO member
> and describing the qualifications and responsi-
> bilities of the UFO was nothing more than an
> effort by the State to portray defendant as a
> person capable of murdering Taylor and thereby
> persuading  the jury that   his propensity
> for violence may it likely that he was guilty as
> charged. ...

603 N.E.2d at 470.

-36-

Under the authority of <u>Lucas</u>, 603 N.E.2d 460 (1992), the character evidence introduced in this case was error. Harry Martin's testimony was presented as part of the State's case-in-chief. Mr. Carter did not invite introduction of the evidence of his bad character or propensity to violence. The testimony by Martin was nothing more than an effort by the State to portray the defendant as a person capable of ordering the murder of Superintendent Taylor, and thereby improperly influencing the jury that propensity for violence made it likely that he was guilty.

The introduction of this evidence was error, and it is requested that this Court grant oeave to appeal, reverse the defendant's conviction and remand the cause for a new trial.

# VI.

## CONCLUSION

For the foregoing reasons, David Carter asks this Court to grant leave to appeal and order that he be given a new trial.

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate
  Defender
Fourth Judicial District
400 S. 9th Street, Suite 102
P.O. Box 5750
Springfield, IL  62705-5750
(217) 782-3654

KAREN MUNOZ
Assistant Defender

**COUNSEL FOR DEFENDANT-PETITIONER**

E-FILED
Monday, 11 August, 2008  12:04:58 PM
Clerk, U.S. District Court, ILCD

STATE OF ILLINOIS
SUPREME COURT

At a Term of the Supreme Court, begun and held in Springfield, on Monday,
the thirteenth day of September, 1993.

Present: Ben K. Miller, Chief Justice
Justice Michael A. Bilandic        Justice James D. Heiple
Justice Charles E. Freeman         Justice Moses W. Harrison II
Justice Mary Ann G. McMorrow       Justice John L. Nickels

On the sixth day of October, 1993, the Supreme Court entered the
following judgment:

No. 75884

People State of Illinois,

      Respondent

      v.

David W. Carter,

      Petitioner

Petition for Leave
to Appeal from
Appellate Court
Fourth District
4-92-0298
87CF112

The Court having considered the Petition for Leave to Appeal and
being fully advised of the premises, the Petition for Leave to
Appeal is DENIED.

As Clerk of the Supreme Court of the State of Illinois and keeper of the
records, files and Seal thereof, I certify that the foregoing is a true
copy of the final order in this case.

IN WITNESS WHEREOF, I have hereunto
subscribed my name and affixed the Seal
of said Court, this twenty-eighth day
of October, 1993.

Clerk,
Supreme Court of the State of Illinois

EXHIBIT C

E-FILED
Monday, 11 August, 2008  12:05:24 PM
Clerk, U.S. District Court, ILCD

IN THE

CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

LIVINGSTON COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS )
        Respondants )
                          )    No 87 CF 112
                          )
-VS-                     )
                          )    Charles E. Glennon
                          )    Judge Presiding
DAVID W. CARTER        )
        Petitioner     )

FILED IN CIRCUIT COURT
OF LIVINGSTON COUNTY, ILLINOIS

AUG 1 0 1998

*Judith K. Cremer*
CIRCUIT CLERK

## NOTICE

To:  Jim Ryan
     Attorney General of Illinois
     100 West Randolph St.
     Chicago, Illinois 60601

      PLEASE TAKE NOTICE that on August 7, 1998 the petitioner has filed with the clerk of the court of Livingston County Judy Cremer (3) copies of the attached Post Conviction Petition for filing in that Court. Mailed to them at the Livingston County Courthouse, Pontiac Illinois 61764. A copy of such is hereby served upon you.

*David W. Carter*
David W. Carter #N43429
P.O. Box 112
Joliet, Illinois 60434

## Certificate of Mailing

     I hereby certify that I have mailed the within to the above named as indicated, proper postage prepaid at state expense through the Stateville Prison mail system on this 7 day of Aug. 1998.

Subcribed To And Sworn Before Me
This 7 day of Aug, 1998.

*[signature]*

"OFFICIAL SEAL"
SANDRA SCHWAB
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 12/8/2001

*David W. Carter*
David W. Carter #N43429
P.O. Box 112
Joliet; Illinois 60434

EXHIBIT D

IN THE
CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
LIVINGSTON COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS
    Respondants
)
)
)
)
No 87 CF 112
)
)
-VS-
)
)
Charles E. Glennon
Judge Presiding
)
)
DAVID W. CARTER
    Petitioner
)
)
)

FILED IN CIRCUIT COURT
OF LIVINGSTON COUNTY, ILLINOIS

AUG 1 0 1998

*Judith K. Bremer*
CIRCUIT CLERK

MOTION TO PROCEED AS A POOR PERSON
&
APPOINTMENT OF COUNSEL

Now comes DAVID W. CARTER pro-se and request he be allowed to proceed as a poor person and have counsel appointed and in support thereof states as follows:

(1) He has no occupation or income and has been incarcerated since 1983.

(2) He has had no income during the preceeding year.

(3) He expects no income.

(4) He owns no real estate or personal property of value.

(5) He has not applied to defend or sue as a poor person during the proceeding year.

(6) He is unable to pay the cost of this suit and to obtain an attorney.

(7) He has a meritorious claim.

FURTHER AFFIANT SAYETH NOT!

Subscribed To And Sworn Before Me
This ___ day of _____ 1998

*Sandra Schwab*
Notary Public

"OFFICIAL SEAL"
SANDRA SCHWAB
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 12/8/2001

*David Carter*
David Carter #N43429
P.O. Box 112
Joliet, Illinois 60434

C-37

IN THE
CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
LIVINGSTON COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS                    )
                    Respondants                    )
                                                   )    No 87 CF 112
                                                   )
                                                   )
-VS-                                               )    Charles E. Glennon
                                                   )    Judge Presiding
                                                   )
DAVID W. CARTER                                    )
                    Petitioner                     )
                                                   )

FILED IN CIRCUIT COURT
OF LIVINGSTON COUNTY, ILLINOIS

POST CONVICTION PETITION
&
PETITION FOR RELIEF FROM JUDGEMENT

AUG 1 0 1998

*Judith K. Cremer*
CIRCUIT CLERK

Now comes the Petitioner, DAVID CARTER, pro-se and informa
pauperis and states as follows:

(1) This petition is brought pursuant to the Illinois Post
Conviction Hearing Act (720 ILCS 5/122-1 et seq) and pursuant to
Section 2-1401 of the Illinois Civil Practice Act, as it relates to
newly discovered evidence.

(2) Petitioner was convicted before a jury of first degree
homicide and sentenced to life in prison.

(3) Since then Petitioner has completed his direct appeals &
previously undisclosed evidence has been uncovered.

(4) Based on the Affidavit(s) and reports submitted with this
petition, an evidentiary hearing should be held.

(5) Livingston County Indictment No 87-CF-112 was filed on
October 16, 1987 and charged DAVID CARTER with murder in the stabbing
death of Pontiac Correctional Center Superintendent Robert Taylor on
September 3, 1987. (Vol I, C. 26-35)

Page 1 of 13                    C.38

(6) The petitioner filed two motions to suppress statements. The first one alledged that the statements that were obtained by Harry James Martin from DAVID CARTER through the use of electronic surveillance and eavesdropping device should be suppressed because the authorization for the wiretap was obtained by false statements. (Vol I, C. 112-117)

(7) The second motion to suppress challenged the process of using an informant, Harry Martin, to obtain statements from DAVID CARTER through an eavesdropping device while Carter was incarcerated in prison on another conviction, but having been placed in segregation as a result of his suspected involvement in the instant case. (Vol I, C. 107-09)

(8) The Key witness against CARTER was Harry Martin. Martin who at the time of trial was incarcerated and who had prior convictions for armed robbery, armed violence, and unlawful use of weapons, testified that he had a college degree in accounting and book keeping. In 1987 he was a member of the Black Gangster Disciples. Martin discribed the organization of the gang. Larry Hoover was the chairman, and below him was the board of directors consisting of instituional coordinator, assistant institutional coordinator, gallery coordinator, and various other subordinate department heads. (Vol XlV, R. 18-19)

(9) The security division of the gang is called the UFO, the united front of the organization. according to Martin, this group does the assasinations, protects the board members or any of the hierarchy of the organization, gaurds the leadership, and disciplines any organization member that may get out of line. The Black Gangster Disciples operate in and out of the prison system. Martin's former position was that of financial advisor to the board. He stated that the majority of his education was financed through the gang. (Vol XlV, R. 19-20, 21)

C.39

(10) Martin stated that the gang made money by various illegal activities, but also some legitimate business. He admitted that when he was on the board as the financial advisor he had knowledge of the illegal activities and participated in them. In May of 1987 a conspiracy was put together to assasinate Harry Martin. Martin received word of this threat from the warden of Stateville. Martin initially did not believe the warden, so he asked a few other board members, whom he believed were allies. They confirmed the warden's information, and Martin then asked for protection in return for cooperating with the law enforcement officials. (Vol XlV, R. 22-23)

(11) Martin was transferred to Dixon C.C. and then to Pontiac in the second week of August in 1987. While at Pontiac, Martin met with some gang members, including CORWYN BROWN, who was known as "KETCHUP". Brown was the assistant institutional coodinator. While at Pontiac, Martin saw Roosevelt Lucas, and stated that he provided security for Martin and Brown. (Vol XlV, R. 26-29)

(12) While at Pontiac, Martin talked with CORWYN BROWN about the death of Billy Jones. Brown told Martin that the gang membership did not believe that Jones death was an accident, and thought that the administration was responsible for Jones death. Brown also told Martin that the gang members in the institution wanted to retaliate against the administration. (Vol XlV, 33-35)

(13) In September of 1987, Martin was incarcerated in the Logan C.C. and he was approached by the BGD assistant institutional coordinadtor who told him that the gang wanted inmate Lawrence Spiller killed. Spiller was to be killed by poisoning his food. Both Martin and Spiller were in the segregation unit. Martin informed the warden. (Vol XlV, R. 37-38)

C.40

(14) While at Logan Martin was approached by Department of Corrections investigators regarding the murder of superintendent Taylor. They asked Martin to assist them in investigating various Black Gangster Disciples members who Corrections Officials believed were involved in the murder. Martin insisted that he had not received anything from the Department of Corrections in return for his cooperation. He said that he decided to wear a wire and visit various inmates to aid in the investigation. On October 7, 1987 while wearing a wire, he visited DAVID CARTER. (Vol XlV, R. 44-46)

(15) Harry Martin, at the request of law enforcement agents asked defendants Easley, Johnson, and Carter numerous questions about the death of Superintendent Taylor on September 3, 1987. Defendants making statements were lead to believe that Harry Martin was on the streets at the time that the statements were made and that they were reporting to him to communicate information to other gang members in Chicago and further that information given to him was to be relayed to attorney Shel Bannister, who Martin represented had been hired to represent defendants. (Attorney Shel Bannister had not in fact been hired to represent any of the defendants and the story was apparently made up to facilitate obtaining information from them under the thought that it would be treated confidentially.) At the time said conversation was recorded, Harry Martin was in fact an inmate in the Illinois Department of Corrections, had not been released from custody, and his wife, who accompanied him to the visit met him at the door of the prison where he was released into the visiting room under the supervision of law enforcement officials. (3-18-91 R.p. 436)

(16) On October 7, 1987 Martin and his wife were driven to the Pontiac C.C. Martin's wife had sent CARTER a letter asking to have Martin put on Carter's visiting list. Carter and Martin talked; and

Martin told Carter that he was there to get information for Larry Hoover, the chairman of the Black Gangster Disciples, about the murder of Superintendent Taylor. Martin also told Carter that he would provide Lawyers or anything else they would need. Martin asked CARTER who gave him instructions, and CARTER said it was "Dice" Michael Johnson, who was the institutional coordinator for the security division. CARTER said that Johnson had told him that they were to knock a patch out of Superintendent Taylor's head with pipes. (Vol XlV, R. 47-51) (R.p. 141, 11/19/91)

(17) According to Martin, DAVID CARTER told him that Superintendent Taylor was killed because of what happened to inmate Jones, and because of the gaurds whipping folks in the dining room and on the sidewalk. Martin stated that before inmate Williams was shipped out, he alledgedly left word with CARTER to make the hit. CARTER told Martin that he sent Roosevelt Lucas and Ike Easley to do the job. Martin was told by the Petitioner that he just wanted Lucas and Easley to go in there and knock Taylor out and leave him there. The Petitioner told Martin that the attack had been planned for three or four weeks, and Taylor was followed so that arrangements could be made. (Vol XlV, R. 53-54)

(18) CARTER told Martin that he had security people on the gallery playing the radio very loudly, and had other security people stationed at the gate. Lucas and Easley were told to drop the weapons at the scene of the crime. CARTER was on seven gallery when Lucas and Easley hit Taylor. CARTER said that things did not go according to plan, and that Superintendent Taylor staggered out of his office. CARTER had given Lucas and Easley specific instructions to leave him in the cell, unconscious. (Vol XlV, R. 55)

(19) CARTER told Martin that Lucas and Easley wore mask and gloves and had wiped the weapons before the attack. As instructed they left the weapons at the scene. Carter Indicated that two inmates were witnesses to the crime. After the death of Superintendent Taylor, CARTER was promoted to the institutional coordinator of the UFO. CARTER also indicated that there were several people who knew about the hit before it took place, and they were all in agreement as to the plan. When the two men talked about Billy Jones death, Martin mentioned that he had heard that Jones had swallowed cocaine. CARTER got angry, and stated that he got upset every time someone said that caused Jones death, and told Martin that that was not the way it happened. He said it would have been impossible for him to swallow a bag of cocaine on his own. (Vol XlV, R. 57-62)

(20) Harry Martin testified that if an order is given to kill someone it would have to have come from the chairman of the gang, in this case Larry Hoover. Hoover then would pass the word through the chain of command. He would not have given orders directly to CARTER. Martin also stated that if the attack on Taylor had not been sanctioned from the top, CARTER would have been disciplined because one of the rules within the gang organization is not to come into confrontation with employees of the Department of Corrections. (Vol XlV, R. 62-64)

(21) Martin stated that he listened to the tape of the conversation that he had with DAVID CARTER, and was able to identify both himself and CARTER on the tape.(Vol XlV R. 65-66)

(22) On cross examination, Martin stated that he still had ten years left to serve on his prison sentence. He stated that all he got in return for his cooperation with the authorities was protection. The trial judge in this case repeatedly questioned Martin, the States Attorneys, Martin's handlers Deputy Director Gerald Long, and Deputy Director David C. Watkins as to any agreements or inducements Martin

may have received to procure a taped conversation from DAVID CARTER.
All repeatedly denied that Martin was given or offered anything. These
denials were stated under Direct Examination, Cross Examination, and
Examination by the Trial Judge. Martin also admitted that when he went
to talk to CARTER, he lied to him about being sent by Larry Hoover.
(Vol XlV, R. 67-68, 74) (11/19/91 R.p. 45-46) (11/18/91 R.p. 21-42)
(11/18/91 R.p. 38-42)

> IF, BY FRAUD, COLLUSION, TRICKERY & SUBORDINATION OF PERJURY
> ON THE PART OF THOSE REPRESENTING THE STATE, THE TRIAL OF AN
> ACCUSED PERSON RESULTS IN HIS CONVICTION HE HAS BEEN DENIED
> DUE PROCESS OF LAW.

(23) The case can stand no better if, by the same devices, a
confession is procured and used in the trial. (Lisenba v. California
314 U.S. 237, 62 S CT 290) New evidence has been obtained that was
heretofore unavailable being sucessfully suppressed by the State
Officials that Harry Martin was given substantial inducements to
procure a taped conversation from DAVID CARTER. Had the trial court
known of these payoffs, it is likely CARTER'S statements would have
been suppressed.

(24) Substantial questions are record bound about the propriety
of the methods and manners used in acquiring CARTER'S statement. It
was simply a ploy, an investigative technique used, a trick, deception.
(3/18/91 R.p. 436) Martin played his acting role to the hilt. (3/18/91
R.p. 437) So the reference to Mr. CARTER is - by Mr. Martin is that
anything Mr. CARTER or any person who was involved in the investigation
would be provided. That would include if indicted hiring lawyers.
(3/18/91 R.p. 438-439) We also have things that occured and conduct
which occured in this case that are somewhat beyond the balance of
what ordinary investigative methods are used. (2/17/89 R.p.98)
(2/17/89 R.p.283-287)

(25) The trial judge had problems with the trickery used; Martin went far beyond what I anticipated anyone would do and I certainly never dreamed that he would be an active interrogator but rather he would go in and establish himself with the defendants and allow them to make voluntary unsolicited comments. (3-18-91 R.p 440-441)

(26) More importantly with what was known then the trial judge stated the "trickery in People v Carter presses the limits." (3-18-91 R.p. 441)

> THE STATE PROSECUTOR'S REMARKS DURING CLOSING ARGUMENT CONSTITUTED IMPERMISSIBLE COMMENT OF PETITIONER'S FAILURE TO TESTIFY: APPEALLATE COUNSEL'S FAILURE TO RAISE ISSUE OF FIFTH AMENDMENT VIOLATION ON DIRECT APPEAL CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL: AND THEREFORE FAILURE TO RAISE FIFTH AMENDMENT ISSUE IS EXCUSABLE UNDER CAUSE AND PREJUDICE TEST

(27) Here petitioner exercised his right not to testify. Direct and indirect references by the prosecutor of this decision are always a violation of the Fifth Amendment.

(28) The prosecutor's calculated and repeated remarks prejudiced the petitioner. "You'll also be told that the only evidence you can consider in this case is the testimony you've heard from the witnesses stand ... and not to speculate on things you did not hear. (R.p 184) You heard from one witness. (R.p. 231) You heard the witnesses testify ... You heard the expert witness say ... (R.p. 237) ... testimonial evidence you heard ... all uncontradicted ... You heard Harry Martin ... (R.p. 238) You heard ... you heard ... you heard ... (R.p. 240) You hearsd him testify ... (R.p. 241) You heard Harry Martin testify. (R.p.243) It's all uncontradicted. (R.p. 255)

(29) Final jury instructions, when given, are ordinarily not sufficient to cure Constitutional errors.

C.45

(30) The State prosecutor's repeated comments in closing arguments that the State's evidence was uncontradicted by any other evidence constitutes impermissible comment on petitioner's refusal to testify where the only evidence of the crime was a taped statement between Harry Martin and petitioner obtained by compulsion and trickery, and the only person who could satisfactorily rebut this evidence was petitioner.

(31) Importantly, the learned trial judge observed "I doubt without the tape Mr. CARTER would have been charged." (R.p. 519)

### NEWLY DISCOVERED EVIDENCE REVEALS THAT THIS CONVICTION IS SECURED BY THE KNOWN USE OF PERJURED TESTIMONY BY THE STATE AND THROUGH THE DELIBERATE SUPPRESSION OF EVIDENCE FAVORABLE TO THE PETITIONER

(32) On September 12, 1997 the States Key witness Harry Martin contacted petitioner through Attorney Aviva Futorian. Martin offered to provide information relevant to this case. On August 14, 1997 this evidence was obtained from Attorney Futorian. Attorney Futorian had several conversations with Martin and ascertained he could provide information that would be of importance in this case. (See Attached)

(33) Martin's Affidavit confirms and details the promises the State made to Martin in return for his becoming a government informant and witness in this case. (See Attached)

(34) Martin's affidavit also establishes that the State provided false information to the court when in its application for an eavesdropping device it claimed Martin had been a confidential informant for some years and had provided reliable information to the State.

(35) Martin's Affidavit also alleges the State paid him anywhere from $24,000 to $32,000 by the time of petitioner's trial.

(36) Pre-trial defense counsel Thomas filed a motion asking the State to disclose any kind of agreements or promises it had with their key witness Harry Martin. The State assured defense counsel and the trial judge that it had only promised Martin a guarantee of his safety.

(37) At trial Martin swore that he had not been promised anything from anybody in exchange for his cooperation and testimony. (Vol XlV, R. 44-46) (See also 11/18/91 R.p. 21-42) (11/18/91 R.p. 38-42)

(38) The evidence just received from Attorney Aviva Futorian reveals that on October 2, 1991 the State's key witness Martin did in fact have his original sentenced vacated and was in fact resentenced to a far less sentence for his cooperation in petitioner's and co-defendants cases. Petitioner was not tried by jury until November 13, 1991 over 1½ months after said sentence was reduced. (See attached Appendicies Exhibits)

(39) Evidence now reveals that on December 30, 1992 in <u>US v Burnside</u> 89 CR 909 Martin testified before the Honorable James Holderman that he had received a reduction in his sentence for cooperating with the State in a capital murder case involving four defendants and the Illinois Department of Corrections and that his sentence had been as a result of his cooperation in the State cases. In 1991 he had been placed in the Federal Witness Protection Program.

(40) Harry Martin also testified that at the time he began cooperating with the State he was serving two consecutive sentences for armed robbery totalling 45 years and in exchange for his testimony the State vouched for him too obtain a reduction in his sentence. (See Attached)

(41) On Febuary 17, 1994 Martin appeared before Judge Mahon in Cook County in an effort to get another sentenced reduced. He and his attorney recounted his cooperation with the State, claiming that the Warden at Stateville had approached Martin to seek his cooperation

with law enforcement agencies. He testified about a virtual career working undercover for law enforcement in a number of matters including the Taylor murder for which petitioner stands convicted. (See Attached)

(42) In that hearing before Judge Mahon it was revealed that Martin's wide range of criminal history included committing more than 20 batteries, using over 100 prison officials for payoffs to run a prostitution ring at Stateville and to smuggle drugs into the prison for money, paying prison personal to smuggle food into the prison, filing bogus tax forms using fictitious names and social security numbers in 40 different States to obtain thousands of dollars. (See Attached)

(43) Illinois Department of Law Enforcement vouchers show payments to Martin of over $8,000.00 during the 3½ month period from September 21, 1987 to January 7, 1988. Over $6,000.00 of that amount was for travel expenses and the rest was for miscellaneous expenses such as cosmetics and rent payments. (See Attached)

(44) If trial counsel had known of the agreements, the States payments, and the illegal activities that the Key State witness Martin described before Judge Holderman and Mahon, Thomas might have advised petitioner to take the stand, knowing he could impeach Martin's testimony and character. More importantly this suppressed evidence would have given support to establish the far flung reach of the gang involved in this matter and the kind of influence it had, and therefore how vulnerable petitioner was to that gang. In other words petitioner would have had a defense and strong evidence to support as fact that petitioner had to admitt what he was told too by the gang or face death.

(45) Records show that Martin received a 21 year sentence reduction, payments in excess of $8,000.00 over a 3½ month period, and his astonishing criminal activities within the confines of the prison system. It was only by chance and coincidence that petitioner obtained this Key information. Likewise it is difficult to believe that D.O.C. officials has been forthcoming on the extent of agreements with Demetre Brown and Lawrence Spiller in return for their testimony against petitioner.

(46) The trial judge in this case had very serious problems with the methods of subterfuge and trickery involved in obtaining a recorded conversation between Martin and petitioner. (3/18/91 R.p. 436-439) (2/17/89 R.p. 98) (2/17/89/ R.p. 283-287) (3/18/91 R.p. 440-433) (4/13/92 R.p. 33) Had the trial judge known of the aforementioned facts and inducements for Martin to obtain favorable information for the State, the judge may not have allowed the taped conversation into evidence.

(47) Demetre Brown and Lawrence Spiller also testified during petitioner's trial. This new evidence just obtained also provides solid foundation of the fact that they also received consideration for giving favorable testimony for the State.

(48) As a direct and proximate result of the State's suppression of evidence from the trial judge, jury, and petitioner effecting the credibility of the States case and Known use of perjured testimony, DAVID CARTER was denied Due Process of Law. (Supporting evidence is included in appendicies exhibits)

C.49

NEWLY DISCOVERED EVIDENCE ESTABLISHES A SHOWING OF ACTUAL
INNOCENCE

(49) New evidence recently obtained by petitioner shows someone
other than petitioner was responsible for the plot to kill the victim
Superintendent Taylor in this case. CORWYN BROWN has revealed that he
was the one responsible for conspiring with his direct and personal
associates in targeting and planning the murder.

(50) The affidavit of CORWYN BROWN is corroborated by the record
of the trial. CORWYN BROWN gave the orders to hit Superintendent
Taylor. CORWYN BROWN was with Easley and Lucas minutes before the
attack on Taylor. CORWYN BROWN nods his head towards Superintendent
Taylor office as they walked by. (Vol. XV, R. 106-07) (Vol. XV, R. 110)

(51) CORWYN BROWN, through his affidavit has sworn that petitioner
was not in any way shape or form involved in this plot, and more
importantly was placed in the position where he was fingered for the
blame and had to take it. (See Affidavit attached)

WHEREFORE petitioner prays this court will (a) grant him an
evidentiary hearing and (b) order a new trial, and (c) appoint counsel.

I hereby certify under penalties of perjury the within is true
and correct to my best belief and knowledge.

Respectfully Submitted

David W. Carter

Subscribed To And Sworn Before Me
This 17 day of Aug, 1998

David Carter #N43429
P.O. Box 112
Joliet, Illinois 60434

Notary Public

"OFFICIAL SEAL"
SANDRA SCHWAB
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 12/8/2001

Page 13 of 13

C-50

E-FILED
Monday, 11 August, 2008 12:06:24 PM
Clerk, U.S. District Court, ILCD

NO. 4-03-0402

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
DEC - 9 2005
CLERK OF THE
APPELLATE COURT, 4TH DIST.

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| DAVID W. CARTER, | ) | No. 87CF112 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Harold J. Frobish, |
| | ) | Judge Presiding. |

ORDER

On November 22, 1991, defendant, David W. Carter, was convicted of three counts of first degree murder (Ill. Rev. Stat. 1991, ch. 38, par. 9-1(a)(1)), one count of solicitation to commit first degree murder (Ill. Rev. Stat. 1991, ch. 38, par. 8-1.1(a)), and two counts of conspiracy to commit first degree murder (Ill. Rev. Stat. 1991, ch. 38, par. 8-2(a)). This court affirmed his conviction on direct appeal. People v. Carter, No. 4-92-0298 (June 30, 1993) (unpublished order under Supreme Court Rule 23). Defendant filed a combined petition under the Post-Conviction Hearing Act (725 ILCS 5/122-1 (West 1998)) and under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401(c) (West 1998)). The postconviction portion was dismissed as untimely. The section 2-1401 portion was dismissed on the merits. Defendant appeals. We affirm.

I. BACKGROUND

On September 3, 1987, two prisoners, Ike Easley and Roosevelt Lucas, attacked Robert Taylor, superintendent at

EXHIBIT F

Pontiac Correction Center, in his office with a shank and pipe. Taylor died as a result of the injuries he received during this attack.  Easley and Lucas were members of the Black Gangster Disciples.  Defendant, also a member of the gang, was Easley's and Lucas's superior in the gang and ordered the attack on Taylor to retaliate against the administration for its treatment of their gang and to demonstrate the gang's strength.

Before defendant's trial, he filed a motion to suppress statements he made to Harry Martin acknowledging he ordered the attack on Taylor.  Martin was also a gang member, but he was working with correctional officers in the investigation of Taylor's death.  He agreed to pretend he had been released from prison, visit defendant, and wear a tape-recording device concealed on his person.  Originally, defendant's motion to suppress the statements on the tape was granted on fifth-amendment grounds, but this court reversed that ruling.  People v. Johnson, 197 Ill. App. 3d 762, 555 N.E.2d 412 (1990).  At trial, Martin testified about the gang organization.  Martin discussed that when he learned of a conspiracy to murder him, he agreed to cooperate with authorities in exchange for protection but that he did not receive anything else in return for his cooperation.  The state and Department of Corrections (DOC) officials who worked with Martin also testified that he was not promised anything else in return for his cooperation and testimony.  The audiotapes of Martin and defendant were played for the jury.

After defendant was convicted, the trial court sen-

tenced him to natural life in prison.  On June 30, 1993, on
direct appeal, this court affirmed defendant's conviction while
vacating certain duplicative sentences.  <u>People v. Carter</u>, No. 4-
92-0298 (June 30, 1993) (unpublished order under Supreme Court
Rule 23).

On August 10, 1998, defendant filed the underlying
combined petition for postconviction relief and a petition for
relief from judgment under section 2-1401.  The petition was
based primarily upon evidence that was newly discovered in
September 1997.  Defendant claimed that DOC officials and Martin
committed perjury when applying for the eavesdrop authorization
and committed perjury at trial.  The alleged perjury concerned
Martin's history as an informant and the consideration given
Martin in exchange for his cooperation with the State.  Defendant
claimed to have learned of this information from Easley's
postconviction attorney.  Defendant attached an "affidavit" from
Martin that was supposedly witnessed by a Texas attorney but was
not sworn to before a notary.  Also appended were (1) an order
vacating Martin's original sentence and resentencing him to a
shorter time, (2) an order impounding the file in Martin's
sentence-reduction case, (3) an unidentified witness's testimony
from a transcript that bears no caption or court reporter's
certificate, (4) a partial transcript of Martin testifying as to
his level of involvement as an informer for DOC, and (5) an
affidavit of gang member Corwyn Brown, which stated that Brown
ordered the hit without authority from the gang and asked defen-

- 3 -

dant to accept responsibility.

According to defendant's petition, defendant's state-
ments would have been suppressed had the trial court known of the
substantial inducements provided to Martin to procure defendant's
statement and the false information officials used to procure the
eavesdropping order, namely the false statement that Martin had
been a confidential informant for some years. Without Martin's
testimony, defendant claims he would not have been convicted.
Also, defendant contended Brown's affidavit establishes that he
is innocent. Finally, defendant argued that the State's comments
in closing arguments impermissibly addressed his failure to
testify at trial and his appellate counsel was ineffective for
failing to raise this issue in his direct appeal.

The trial court appointed counsel for defendant and
held a hearing on the timeliness of defendant's joint petition.
Defendant had filed a motion to excuse the late filing of his
petitions. On March 15, 1999, defendant's attorney filed a
limited Rule 651(c) certificate (134 Ill. 2d R. 651(c)) that
addressed the question of timeliness. On April 23, 1999, the
court dismissed defendant's postconviction petition as untimely.
The court excused the late filing of the section 2-1401 petition,
but also granted the State leave to seek a hearing on the issue
of timeliness.

The State filed a motion to reconsider the ruling on
the section 2-1401 petition. Before the motion was decided,
defense counsel provided the trial court with passages from

- 4 -

This appeal followed

## II. ANALYSIS

The office of the State Appellate Defender (OSAD) filed a motion to withdraw as counsel on appeal pursuant to <u>Pennsylvania v. Finley</u>, 481 U.S. 551, 95 L. Ed. 2d 539, 107 S. Ct. 1990 (1987). The motion to withdraw claims that the appeal presents no issue of merit upon which the defendant could obtain relief for three reasons. First, defendant's section 2-1401 petition, which alleged State officials used perjured testimony at his trial, was unsupported by affidavits or direct proof. Second, the issue regarding the admissibility of the audiotape of defendant admitting to ordering others to injure Taylor has been extensively litigated. The tape is clearly admissible. Finally, defendant's allegations of improper comments in closing arguments is not newly discovered evidence and cannot be addressed in a section 2-1401 petition. The record shows service of the motion on defendant.

On its own motion, this court granted defendant leave to file additional points and authorities by July 11, 2005, which we extended to July 21, 2005. Defendant has done so, and the State has responded. After examining the record and executing our duties under <u>Finley</u>, we grant OSAD's motion and affirm the trial court's judgment.

Defendant responded with two main arguments. First, defendant claims one of his appointed attorneys for the post-conviction proceedings erroneously limited his consultation with

- 6 -

defendant and examination of the court file to the issue of
timeliness. Second, defendant claims he was entitled to an
evidentiary hearing on the allegation that officials falsely
represented the length of Martin's cooperation with them when
acquiring the eavesdrop authorization. Defendant claims this
information would have convinced the trial court to suppress the
wiretap evidence. Defendant attempts to raise additional argu-
ments in his reply brief. We will not consider these arguments
as Supreme Court Rule 341(g) does not permit parties to raise new
arguments in reply briefs. Official Reports Advance Sheet No. 21
(October 17, 2001), R. 341(g), eff. October 1, 2001.

        Initially, we note that defendant failed to appeal the
order dismissing the postconviction portion of his petition and
only appealed the order dismissing the section 2-1401 portion.
Defendant states, though, that he is appealing the dismissal of
his postconviction petition and section 2-1401 petition. Defen-
dant did not file notice of appeal within 30 days of the entry of
the order disposing of his postconviction petition as required by
Supreme Court Rules 651(d) and 606(b). 134 Ill. 2d Rs. 651(d),
606(b). Rule 651(b) requires, though, that the clerk of the
court mail or deliver notice to the petitioner of the entry of
the adverse judgment and the 30-day time limitation for filing
notice of appeal. 134 Ill. 2d R. 651(b). Nothing in the record
indicates that defendant received such notification. Therefore,
we will consider the merits of defendant's arguments regarding
the dismissal of his postconviction petition. People v. O'Toole,

- 7 -

174 Ill. App. 3d 800, 801, 529 N.E.2d 54, 55 (1988).

### A. Rule 651(c)

Defendant argues that he is entitled to further post-conviction proceedings because one of his first appointed attorneys limited his consultation with defendant and limited his examination of the court file to the issue of timeliness.

Supreme Court Rule 651(c) requires that an appointed attorney file a certificate stating that the attorney has consulted with the petitioner to ascertain petitioner's contentions of deprivation of constitutional right, has examined the trial record, and has made any necessary amendments. 134 Ill. 2d R 651(c). The Supreme Court of Illinois recently held that the untimeliness of a postconviction petition does not excuse post-conviction counsel from fulfilling his duties under Supreme Court Rule 651(c). People v. Lander, 215 Ill. 2d 577, 584-85, 831 N.E.2d 596, 600-01 (2005). In Lander, defendant's postconviction attorney never consulted with defendant on his substantive claims, thus his claims were never submitted to the State to give the prosecutor the opportunity to waive the affirmative defense of untimeliness in the event the claims were meritorious. Lander, 215 Ill. 2d at 585, 831 N.E.2d 601.

In this case, one of defendant's first appointed post-conviction attorneys filed, on March 15, 1999, a Rule 651(c) certificate parenthetically entitled "Limited to the question of timeliness of petition filing." In the certificate, counsel stated he consulted with defendant about the substantive claims

"to a lesser degree" and that his consultation in this regard was "insufficient at this stage in the proceedings to make a determination as to amendment or presenting upon the existing pro se petition." On April 23, 1999, the postconviction petition was dismissed as untimely, but the section 2-1401 petition proceeded on the merits. After the dismissal of the postconviction portion of the petition, defendant's attorney filed a report with the court concerning testimony at defendant's trial regarding consideration given to Martin. After denying the State's motion to dismiss for untimeliness, the trial court treated defendant's surviving section 2-1401 petition as a postconviction petition for "practical purposes." On May 1, 2003, a different postconviction attorney filed a Rule 651(c) certificate that stated he had consulted with defendant respecting his contentions of deprivation of constitutional rights.

Unlike the defendant in Lander, defendant in this case was afforded the chance to fully present his substantive claims after consulting with counsel. The substantive claims he ultimately presented were identical to the claims he originally laid out. While counsel originally failed to fully comply with Rule 651(c), the failure was ultimately harmless as the State's motion to dismiss the petition as untimely was denied and defendant's substantive claims were fully presented after consultation with an attorney. The concern in Lander, that a constitutional deprivation of some magnitude may not be corrected if the State does not have the opportunity to waive the affirmative defense of

untimely filing, is not implicated in this case.    "The failure to

file a certificate showing compliance with Rule 651(c) is harm-

less error if the record demonstrates that counsel adequately

fulfilled the required duties."   <u>Lander</u>, 215 Ill. 2d at 584, 831

N.E.2d at 600.

Defendant argues that his postconviction attorneys

should have developed new claims of constitutional deprivation

regarding the admissibility of the tape and should have secured

affidavits of previously unknown witnesses to support his "actual

innocence" claim.    Postconviction counsel is not obligated to

amend the <u>pro</u> <u>se</u> petition by adding new claims.   <u>People v.</u>

<u>Vasquez</u>, 356 Ill. App. 3d 420, 424-25, 824 N.E.2d 1071, 1076

(2005).   Further, counsel is not required to procure witnesses

not specifically identified by petitioner to support a claim in

the petition.   <u>People v. Williams</u>, 186 Ill. 2d 55, 60-61, 708

N.E.2d 1152, 1155 (1999).

### B. Hearing on the Misrepresentation

Defendant argues he was entitled to an evidentiary

hearing on his allegation that officials used perjured testimony

to acquire the eavesdropping authorization for Martin's wiretap.

Specifically, defendant claims officials falsely claimed that

Martin had been a confidential informant for some years and had

provided reliable information to the State.   Defendant attached

Martin's alleged affidavit in which he admitted that he had never

cooperated with DOC before the investigation into the Taylor

murder.   According to defendant, had the court known of this

- 10 -

misrepresentation, the wiretap evidence would have been sup-
pressed.

    We review the dismissal of a section 2-1401 petition
under an abuse-of-discretion standard of review. People v.
Pinkonsly, 207 Ill. 2d 555, 562, 802 N.E.2d 236, 241 (2003). A
section 2-1401 petition allows the court "to determine whether
facts exist that were unknown to the court at the time of trial
and would have prevented entry of the judgment." Pinkonsly, 207
Ill. 2d at 566, 802 N.E.2d at 243.

    The trial court found that this court and the court at
defendant's trial had previously considered defendant's allega-
tions that officials knowingly used perjury to obtain authoriza-
tion for the eavesdropping device. Prior to defendant's trial,
defendant filed a motion to suppress the taped statement on
grounds that the affidavit used to obtain the eavesdropping
device contained material false statements other than those
defendant raises now. The motion was originally granted on the
grounds that the tape violated the constitutional privilege
against compulsory self-incrimination, but this court reversed
finding that defendant was not entitled to Miranda warnings
(Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct.
1602 (1966)) as he was not in "custody" at the time of the
interrogation. Johnson, 197 Ill. App. 3d at 765-66, 555 N.E.2d
at 413-14.

    Under Franks v. Delaware, 438 U.S. 154, 155-56, 57 L.
Ed. 2d 667, 672, 98 S. Ct. 2674, 2676 (1978), a defendant is

- 11 -

entitled to a hearing on the veracity of an affidavit used to procure a search warrant if defendant (1) makes a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and (2) the "allegedly false statement is necessary to the finding of probable cause."

In this case, defendant failed to meet either prong under <u>Franks</u>. Under the first prong, Martin's affidavit is rebutted by his testimony at a February 17, 1994, hearing wherein he stated he began acting as an informer before Taylor's murder. Further, another official testified <u>in camera</u> during defendant's trial that Martin had worked with DOC prior to the Taylor murder. Under the second prong, it is not clear that the allegedly false statement was necessary to the finding of probable cause. The statement relates only to the length of time Martin worked with the DOC. Even without the statement, the affidavit could establish probable cause. The affidavit stated Martin talked to Easley and learned of defendant's involvement in the Taylor murder. Also, DOC stated it knew defendant was chief of security of the gang and would be responsible for carrying out orders to murder Taylor. Defendant was not, therefore, entitled to an evidentiary hearing.

As defendant's appeal is without merit, we grant OSAD's motion to withdraw as counsel on appeal.

### III. CONCLUSION

For the reasons stated, we grant OSAD's motion to

withdraw as counsel on appeal and affirm the trial court's
dismissal of defendant's section 2-1401 petition.

Affirmed.

COOK, J., with TURNER, P.J., and STEIGMANN, J., concur-
ring.

E-FILED
Monday, 11 August, 2008 12:07:04 PM
Clerk, U.S. District Court, ILCD

**101983** ≡

No:

IN THE

SUPREME COURT OF THE STATE OF ILLINOIS

| | | |
|---|---|---|
| PEOPLE ~~OF THE~~ STATE OF ILLINOIS, *Respondent* ~~Plaintiff-Appellee,~~ | ) ) ) ) ) | Petition for Leave to Appeal from the Appellate Court of Illinois, Fourth Judicial District. No. 4-03-0402 |
| v~~s~~. | ) ) ) ) | There on Appeal from the Circuit Court of the Eleventh Judicial Circuit, Livingston County, Illinois. No. 87-CF-112. |
| DAVID *W.* CARTER, *Petitioner* ~~Defendant-Appellant.~~ | ) ) ) | Honorable Harold J. Frobish, Judge Presiding. |

PETITION FOR LEAVE TO APPEAL

**FILED**

JAN 23 '04

SUPREME COURT CLERK

Submitted By:

*David Carter*

Mr. David Carter
Reg. No. N 43429
P.O. Box 112
Joliet, IL 60434

PRO SE LITIGANT

R-120905
No RH

EXHIBIT G

No.

IN THE

SUPREME COURT OF THE STATE OF ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS,<br><br>    Plaintiff-Appellee, | )<br>)<br>)<br>)<br>)<br>) | Petition for Leave to Appeal from the Appellate Court of Illinois, Fourth Judicial District.<br>No. 4-03-0402 |
| -vs- | )<br>)<br>)<br>)<br>) | There on Appeal from the Circuit Court of the Eleventh Judicial Circuit, Livingston County, Illinois.<br>No. 87-CF-112 |
| DAVID CARTER,<br><br>    Defendant-Appellant. | )<br>)<br>)<br>)<br>)<br>) | Honorable<br>Harold J. Frobish,<br>Judge Presiding. |

PETITION FOR LEAVE TO APPEAL

TO THE HONORABLE JUSTICES OF THE SUPREME COURT OF THE STATE OF ILLINOIS:

May It Please The Court:

I.

PRAYER FOR LEAVE TO APPEAL

Your Petitioner, David W. Carter, PRO SE, respectfully petitions this Honorable Court for Leave to Appeal pursuant to Supreme Court Rule 315, from the judgement of the Appellate Court of Illinois, Fourth Judicial Circuit, which affirmed the judgment of dismissal of his Post-Conviction / 2-1401 Petition.

-1-

II.

## DATE OF JUDGMENT

The first Direct Appeal was decided and Affirmed in part; and vacated in part. A Post-Conviction / 2-1401 Petition was filed August 10, 1998 and was dismissed on May 1, 2003; and appealed. The Appellate Court affirmed the dismissal on 12-9-05, Rule 23. An Affidavit for Leave to Appeal was filed on 12-27-05.

III.

POINTS RELIED UPON FOR REVERSAL

THE APPELLATE COURT ERRED WITH RESPECT TO DEFENDANT-
APPELLANT'S 5TH, 6TH, AND 14TH AMENDMENT VIOLATIONS WHEN
IT DID NOT ADEQUATELY ANSWER THE IMPORTANT QUESTION ON
APPEAL INVOLVING THE FALSE INJECTION OF COUNSEL CLAIM.
MAY ANY INDIVIDUAL MASQUERADE AS BEING AN ATTORNEY, OR
FUNCTIONING   ON BEHALF OF AN ATTORNEY FOR PURPOSES OF
OBTAINING INCRIMINATING EVIDENCE OR INFORMATION, MAY FRAUD
BE USED FOR OBTAINING INCRIMINATING INFORMATION, AS IN
PRETENDING TO BE AN ATTORNEY AND/OR ACTING ON BEHALF OF AN
ATTORNEY????

B.

THE TRIAL COURT ERRED IN ITS RULING ADMITTING THE TAPED
STATEMENT INTO EVIDENCE, BASED ON "THE CONSPIRACY BEING ON
GOING" AND THE APPELLATE COURT ERRED WHEN IT DID NOT ALLOW
DEFENDANT-PETITIONER THE OPORTUNITY TO SUPPLEMENT AND AMEND
HIS PETITION TO INCLUDE SUCH CONSTITUTIONAL CLAIMS THAT
WOULD HAVE EXONERATED DEFENDANT-APPELLANT, AND APPOINTED
COUNSEL'S CAREY J. LUCKMAN AND W. KEITH DAVIS FAILED TO
CONSULT WITH THE DEFENDANT TO ASCERTAIN HIS CLAIMS OF
CONSTITUTIONAL RIGHTS VIOLATED, AND MAKE THE PROPER SUPPLEMENTS
AND AMENDMENTS TO THE PRO SE PETITION THAT WERE NECESSARY
FOR AN ADEQUATE PRESENTATION OF THE DEFENDANT'S CONTENTIONS.

C.

WHETHER THE TRIAL COURT ERRED AND EXCEEDED ITS AUTHORITY
DURING THE INITIAL STAGE OF THE PROCEEDINGS UNDER THE POST
CONVICTION ACT, BY DISMISSING THE POST CONVICTION PORTION OF
DEFENDANT-APPELLANT'S PETITION ON THE BASIS OF UNTIMELINESS
AND DID THE COURT ERR WHEN IT DID NOT INFORM THE DEFENDANT
OF HIS RIGHT TO APPEAL THIS DECISION.

D.

WHETHER THE APPELLATE COURT ERRED WHEN IT REFUSED TO PROVIDE
DEFENDANT-APPELLANT WITH AN EVIDENTIARY HEARING ON HIS CLAIM
OF "ACTUAL INNOCENCE", WHICH IS COGNIZABLE UNDER THE POST
CONVICTION ACT.

E.

WHETHER THE TRIAL COURT ERRED IN REFUSING TO PROVIDE DEFENDANT-
APPELLANT WITH AN EVIDENTIARY HEARING ON HIS CLAIM THAT THE
STATE USED PERJURED TESTIMONY IN ORDER TO OBTAIN AUTHORIZATION
FOR THE WIRE TAP.

F.

WHETHER POST CONVICTION COURT ERRED IN DISSMISSING DEFENDANT-
APPELLANT'S PETITION DESPITE HIS CLEAR SHOWING OF DUE PROCESS
VIOLATION UNDER BRADY, AND BASED ITS DECISION UPON THE TAPED
RECORDED STATEMENT ITSELF, WHICH THE COURT CHARACTERIZED AS
"OVERWHELMING EVIDENCE OF GUILT".

PURSUANT TO ILLINOIS SUPREME COURT RULE 341 (H) DEFENDANT

REPECTFULLY REQUEST THAT THIS HONORABLE COURT ALLOW TO STAND

AS HIS BRIEF  FILED PRO SE AND FILED WITH THE CLERK OF THE

APPELLATE COURT OF THE FOURTH JUDICIAL DISTRICT ON JULY 18,

2005, AND HIS REPLY BRIEF FILED SEPTEMBER 27, 2005 WITH SAID

COURT AS HIS MAIN POINTS AND ARGUMENTS TO PRO SE POST-

CONVICTION/ 2-1401 PETITION.

A FAIR AND ACCURATE STATEMENT OF THE FACTS NECESSARY TO

A UNDERSTANDING OF THE CASE CAN BE FOUND ON PAGES 1-9 OF

DEFENDANT'S PRO SE REPONSE TO APPOINTED COUNSEL'S MOTION TO

WITHDRAW ON APPEAL. ( FILED JULY 18, 2005 WITH THE CLERK OF

THE APPELLATE COURT, 4TH DIST.)

ARGUMENTS, INCLUDING APPROPRIATE AUTHORITIES STATING WHY

REVIEW BY THE SUPREME COURT IS WARRANTED AND WHY THE DECISION OF

THE APPELLATE COURT SHOULD BE REVERSED CAN BE FOUND IN BOTH

THE DEFENDANT-APPELLANT'S PRO SE BRIEFS FILED SEPTEMBER 27,

2005 AND JULY 18, 2005 BRIEFS FILED IN THE CLERKS OF THE

APPELLATE COURT 4TH DIST.  BOTH OF THESE BRIEFS WILL BE AN

APPENDIX TO THE PETITION FOR LEAVE TO APPEAL.

## POINTS AND AUTHORITIES

### I

MAY ANY INDIVIDUAL MASQUERADE AS BEING AN ATTORNEY, OR
FUNCTIONING ON BEHALF OF AN ATTORNEY FOR PURPOSES OF OBTAINING
INCRIMINATING EVIDENCE OR INFORMATION.  MAY FRAUD BE USED
FOR OBTAING INCRIMINATING INFORMATION, AS IN PRETENDING TO
BE AN ATTORNEY AND/OR ACTING ON BEHALF OF AN ATTORNEY?
(Response to Plaintiffs Argument that the evidence is not
"CLOSELY BALANCED").

People v. Easley, 170, Ill. Dec. 356, 592 N.E.2d 1036,
1047, (1992)........................................... 6

People v. Easley, 148 Ill.2d 281, 592 N.E.2d 1036, 1049
(1992)................................................. 7

Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d
473, 482 (1986)........................................ 7

Miller v. Fenton, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d
405, 410 (1985)........................................ 7

People v. Bowman, No. 5-01-0340 (5th Dist. App. Ct.) 12-27-
02..................................................... 7

Illinois v. Perkins, 496 U.S. 292, 110 S.Ct. 2394, 110
L.Ed.2d 243 (1990)..................................... 8

People v. Lander, 2005 WL 1342246 (Ill. 2005).......... 9

725 ILCS 5/122-1 et. seq. (West 1998).................. 9

Supreme Court Rule 651(c).............................. 9

## II

THE TRIAL COURT ERRED IN ITS RULING ADMITTING THE TAPED STATEMENT INTO EVIDENCE, BASED ON "THE CONSPIRACY BEING ON GOING", AND APPOINTED COUNSEL'S CAREY J. LUCKMAN AND W. KEITH DAVIS FAILED TO CONSULT WITH THE DEFENDANT TO ASCERTAIN HIS CLAIMS OF CONSTITUTIONAL RIGHTS VIOLATED, AND MAKE THE PROPER AMENDMENTS TO THE PRO SE PETITION THAT WERE NECESSARY FOR AN ADEQUATE PRESENTATION OF THE DEFENDANT'S CONTENTIONS PURSUANT TO SUPREME COURT RULE 651(c) 651(d).

Kruelwitch v. United States, 69 S.Ct. 716 at 718......... 12
........................................................... 13
United States v. Cook, 45 F.3d 388 (10th Cir. 1995).... 14
Page v. United States, 844 F.2d 300, 302 (7th Cir. 1989) 14
Matire v. Wainwright, 811 F.2d 1430, 1438 (11th Cir. 1987) 14
PLAIN ERROR DOCTRINE................................. 14
14TH AMENDMENT U.S.C. ............................... 15
6TH AMENDMENT U.S.C. ................................ 15
Strickland v. Washington, 466 U.S. 668, 686-87, 80 L.Ed.2d 674, 692-93, 104 S.Ct. 2052, 2063-64 (1984).......... 16

## III

WHETHER THE TRIAL COURT ERRED AND EXCEEDED ITS AUTHORITY DURING THE INITIAL STAGE OF THE PROCEEDINGS UNDER THE POST CONVICTION ACT, BY DISMISSING THE POST CONVICTION PORTION OF DEFENDANT-APPELLANT'S PETITION ON THE BASIS OF UNTIMELINESS AND DID THE COURT ERR WHEN IT DID NOT INFORM THE DEFENDANT OF HIS RIGHT TO APPEAL THIS DECISION.

Supreme Court Rule 606(b)  ...................... 17
People v. Boclair, 202 Ill.2d at 101-02, 273 Ill.Dec. 560, 789 N.E.2d 734. ................................. 17

IV

THE TRIAL COURT ERRED WHEN IT REFUSED TO HEAR DEFENDANT-
APPELLANT'S 'ACTUAL INNOCENCE' CLAIM, WHICH IS COGNIZABLE
UNDER THE POST CONVICTION HEARING ACT.

People v. Lander, 2005 WL 1342246 (Ill. 2005)........ 20

Supreme Court Rule 651(c)............................ 20

Supreme Court Rule 651(d). .......................... 21

V

THIS HONORABLE COURT SHOULD DENY APPOINTED COUNSEL'S MOTION
TO WITHDRAW, BECAUSE THE TRIAL COURT ERRED IN REFUSING TO
PROVIDE APPELLANT WITH AN EVIDENTIARY HEARING ON HIS CLAIM
THAT THE STATE USED PERJURY IN ORDER TO OBTAIN AUTHORIZATION
FOR THE WIRE TAP.

People v. Lucente, 506 N.E.2d at 1277................ 22

Franks v. Delaware, 438 U.S. 154, 57 L.Ed.2d 667, 98 S.Ct.
2674 (1978)......................................... 23

U.S. v. Leon, 468 U.S. 897, 923, 104 S.Ct. 3405, 3424 (1984) 23

People v. Waters, 764 N.E.2d 1194 (1st Dist. (2002).. 25

Sanchez, 546 N.E.2d 574 (Ill. 1989)................. 25

Jennings, 269 N.E.2d 574 (Ill. 1971)................ 25

Koffski, 609 N.E.2d 364 (2nd Dist. 1993)........... 25

## VI.

POST CONVICTION COURT ERRED IN DISMISSING APPELLANT'S PETITION DESPITE APPELLANTS CLEAR SHOWING OF <u>DUE PROCESS VIOLATION</u> UNDER <u>BRADY,</u> AND BASED ITS DECISION UPON THE TAPE RECORDED STATEMENT ITSELF, WHICH THE COURT CHARACTERIZED AS "OVERWHELMING EVIDENCE OF GUILT".

14TH AMENDMENT........................................ 26

<u>PEOPLE V. BLACKMAN</u>, No. 1-02-3699 ---N.E.2d---, 2005 WL 2125344 (Ill. App. 1st Dist.)........................ 27

<u>Brady v. Maryland</u>, 373 U.S. 83, 87, 10 L.Ed.2d 215, 218, 83 S.Ct. 1194, 1196-97 (1963). ........................ 27

<u>Giglio v. U.S.</u>, 405 U.S. 150, 154, 31 L.Ed.2d 104, 108-09 92 S.Ct. 763, 766 (1972). ........................... 27

<u>SUPREME COURT RULES: 411 THROUGH 415</u>,............... 27

iiii

## POINTS RELIED UPON FOR REVERSAL

MAY ANY INDIVIDUAL MASQUERADE AS BEING AN ATTORNEY, OR

FUNCTIONING ON BEHALF OF AN ATTORNEY FOR PURPOSES OF

OBTAINING INCRIMINATING EVIDENCE OR INFORMATION.  MAY

FRAUD BE USED FOR OBTAINING INCRIMINATING INFORMATION, AS IN

PRETENDING TO BE AN ATTORNEY AND/OR ACTING ON BEHALF OF AN

ATTORNEY?

I

## ARGUMENT

Both the Court and the Prosecution fully acknowledge
the following facts:

COURT:

Full acknowledgment that Harry Martin (confidential
informant) was obtaining information from defendants Easley,
Johnson, and Carter (Defendant-Appellant), because they
believed that Harry Martin (confidential informant) was on
the streets at the time that the statements were being made
and that they were reporting to him to communicate information
to other gang members in Chicago and further that information
given to him was to be relayed to Attorney Shel Bannister,
who Martin (confidential informant) represented had been
hired to represent defendant (attorney Shel Bannister had
not in fact been hired to represent any of the defendants
and the story was apparently made up to <u>facilitate obtaining
information from them</u> under the thought that it would be
treated confidentially.

<u>See Additional Record Sheet --- No. 9, dated 2/17/89; attached
hereto in Appendix.</u>

This is clear and full recorded Acknowledgment by the

-1-

trial judge, that each defendant believed and was manipulated to conclude that the confidential informant Martin had in fact hired Attorney Shel Bannister to represent them, and that information they were being asked to provide to him would be relayed to her.

See Court's holding in Order Suppressing Statements (tapes), Finding at #5, to wit:

The Department of Corrections cloaked confidential informant Martin with a cover story that he was not in fact, at the the time of the visit, in the custody of the Department of Corrections, confidential informant Martin's wife was permitted to join him in the ruse; he asked three of the defendants numerous questions about their involvement in the death of Superintendent Taylor; he told defendants that a lawyer by the name of Shel Bannister, had been hired to represent him and confidential informant Martin was asking questions for the purpose of relaying information to the lawyer; that Martin was a member of a street gang who D.O.C. believed had sufficient rank which would cause defendants to talk to him under the guise of reporting to a superior.

The Court acknowledged that each of the defendants were collectively led to believe and accept that Shel Bannister was factually involved on their behalf, and that confidential informant Martin was gathering information for her. "A collective understanding of the defendants suspected in the death of Superintendent Taylor - Shel Bannister was their lawyer and confidential informant Martin was communicating specific facts to her from information conveyed to him by each defendant."

-2-

See Report of Proceedings on Appeal, Vol. No. Two 151-300.
17th of February 1989; pages 280-287.

    Court:

What do you do with a particular problem which I was
struck by in listening to the tapes and also as evidence by
portions of the transcript that Mr. Martin represented to
the person to whom he was talking that contact had already
been made with a Chicago lawyer, Shel Bannister, and that
the information that was being obtained from the defendants
was so that Mr. Martin could carry that information back to
the lawyer who was being retained to represent them and
that, in fact, the information defendants were giving to Mr.
Martin was information that he had been commissioned by the
lawyer to obtain and take back to Chicago. He didn't just
say there was a lawyer, he said it was Shel Bannister. For
anyone who had been involved in cases involving the Illinois
Prison Sytem, Shel Bannister is someone who is known to this
court and most courts as a lawyer who has, I guess, what I
would call a activist practice. She does a lot of defense
work. I have not encountered her since the Pontiac riot
trials ten years ago but to many inmates in the Department
of Corrections when somebody tells them Shel Bannister has
been hired to represent them, this is a person that is
familiar to them, and when somebody says this is who your
lawyer is going to be, we have already gotten this set up, I
need to know now. I am here from Shel, I need to know this
and this, and then a defendant, and I am not saying this is
a case where anybody spilled anybody's guts because there is
a limited amount of information that was obtained as a

-3-

result of the eavesdrop, but nonetheless, statements are
made thinking that they are going to go back to a lawyer,
which is a ruse, who has never been hired and never contacted
as far as I know is not going to represent them.  Does that
shock the conscience that Mr. Martin, whether somebody told
him to do this because it might help in getting information.
Is that something which, Mr. Bernardi, you feel might shock
the conscience?  (R. VOL. II P. 282-284)

REPORT OF PROCEEDINGS AT PRE-TRIAL HEARING. NOV. 18
1991.

COURT:

My concern is whether injection of an attorney who, in
fact, and in reality existed, who was known to inmates to
represent them in certain prison related matters but who
had, in fact, not been hired in these case, who had not been
contacted in these cases, and it was simply a misrepresentation
by Mr. Martin to gain the confidence presumably of Mr.
Johnson and Mr. Carter, Martin having been held at another
prison than the one these two defendants were in.  It was
simply a ploy, an investigation technique used, a trick,
deception, to make it more plausible for these two defendants
to talk to Martin and tell him what they knew.  (R. VOL.
THREE P. 436)

This constitutes clear acknowledgment and acceptance by
the court, that each defendant was aware of Shel Bannister
supposedly representing them and that Martin was gathering
information for her.  this conclusion must be deemed obvious,
under the joint allegations against each of them, information
was collective'y comunicated to each of them.

-4-

### PROSECUTORIAL ACKNOWLEDGMENT:

"...It was quite obvious to the defendant that Mr. Martin was not an attorney, and he did not explain in any of these tapes he was a lawyer, <u>he was representing himself as being sent by one</u> and if that is going to be a due process argument, and I guess it can be due process argument, I do not believe it rises to the level of due process violation under the Fourteenth Amendment..." (Mr. Bernardi, State's Attorney, R. VOL. II P.287)

Any attempt to exclude any of the defendants who were allegedly involved in this alleged conspiracy to murder the victim in this case, is suspect, given the clear proofs that Mr. Martin was providing the false information to all the defendants, that he was in fact acting on behalf of attorney Shel Bannister, and collecting information about the case for her. The state at page 20 of their arguments recites this courts opinion that the evidence in this case was not "closely balanced" on this point Defendant-Appellant is attempting to give the Court a clear perspective on the evidence in this case and on this point. It is insignificant as to when a lawyer or a lawyer's name may or may not have been mentioned and/or injected into any particular conversation. The whole purpose of including Mr. Martin's name on any of the defendant's visiting list, and going to the visiting room to meet with confidential informant Martin, was based uponthe false belief circulating amongst the defendants that Martin had obtained lawyers to represent the defendants and that he was in fact functioning in the name of the said Bannister.

-5-

PROSECUTORIAL ACKNOWLEDGMENT:

"...It was quite obvious to the defendant that Mr.
Martin was not an attorney, and he did not explain in any of
these tapes he was a lawyer, <u>he was representing himself as
being sent by one</u> and if that is going to be a due process
argument, and I guess it can be due process argument, I do
not believe it rises to the level of due process violation
under the Fourteenth Amendment..."  (Mr. Bernardi, State's
Attorney. R. VOL. II P.287)

Any attempt to exclude any of the defendants who were
allegedly involved in this alleged conspiracy to murder the
victim in this case, is suspect, given the clear proofs that
Mr. Martin was providing the false information to all the
defendants, that he was in fact acting on behalf of attorney
Shel Bannister, and collecting information about the case
for her.  The state at page 29 of their arguments recited
this courts opinion that the evidence in this case was not
<u>"closely balanced"</u> on this point Defendant Appellant is
attempting to give the Court a clear perspective on the
evidence in this case and on this point.  It is insignificant
as to when a lawyer or a lawyer's name may or may not have
been mentioned and/or injected into any particular conversation.
The whole purpose of including Mr. Martin's name on any of
the **defendant's visiting list**, and going to the visiting
**room to meet with confidential informant** Martin, was based
**uponthe false belief** circulating amongst the defendants that
**Mr. Martin had obtained lawyers** to represent the defendants
**and that he was in fact** functioning in the name of the said
**lawyer Shel Bannister.**

-5-

The misrepresentation made by the State's agent, as part of a ruse known by the State and pre-planned with Mr. Martin for the express purpose of securing incriminating statements from the defendants, under the guise of being sent by legal counsel, literally shocks the conscious of all reasonable thinking individuals.

The Illinois Supreme Court found in People V. Easley 170 Ill. Dec. 356, 592 N.E.2d 1036 at 1047 the following:

During a conversation between defendant and Martin in the prison visiting area Martin told defendant: "Now the other thing is we got <u>you all</u> some lawyers, but we ain't gonna bring them in yet. We got (attorney) Shel Bannister cause we don't want to make it seem like you all are admitting guilt you know, you bring lawyers in before you have been indicted, you are like saying I did something. So we gonna bring them in later. But what I need for Shel is some information insofar as is there anybody that saw the shit?" (Emphasis added.)

When Harry Martin visited Ike Easley at the Pontiac Correctional Center, he advised Easley that he had retained attorney Shel Bannister for <u>all defendant's</u> and that he needed to visit with Easley, Carter and Johnson for the purpose of obtaining information for the lawyer. See <u>People v. Easley</u>, 529 N.E.2d 1036 at 1047 (Ill. 1992). It was under this premise that the Appellant, David Carter, placed Martin on his visiting list and agreed to meet with Martin.

-6-

Such tactics and anything which may have resulted based
upon such unconscionable activity on the part of the State,
must be firmly rejected and harshly condemned.   This Honorable
Court must find that such State activity, for the purpose of
tricking a defendant into incriminating himself, are in fact
Constitutionally involuntary in violation of the due process
clause of the Fourteenth Amendment.  (U.S. CONST., Amend.
XIV).   The question of voluntariness of the statement depends
on the absence of police overreaching.  <u>People v. Easley</u>,
148 Ill.2d 281, 592 N.E. 2d 1036, 1049 (1992), citing <u>Colorado v.</u>
<u>Connelly</u>, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473, 482
(1986).   Interrogation techniques that overreach are offensive
to a civilized system of justice and will be condemned.
(<u>Easley</u>, 592 N.E.2d 1036, 1050, citing <u>Miller v. Fenton</u>, 474
U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405, 410 (1985).
"<u>Ultimately, the inquiry in determining whether statements</u>
<u>are involuntary as a matter of Due Process is whether the</u>
<u>conduct of the State Agent is "CASUALLY RELATED TO DEFENDANT'S</u>
<u>CONFESSION."</u>  (<u>Easley</u>, 592 N.E.2d at 1049.)

See also <u>People v. Bowman</u>, No: 5-01-0340 (5th Dist.
App. Ct.) 12-27-02; Dismissing a confession obtained by the
use of "deceptive interrogation tactics calculated to overcome
defendant's free will" and that such statements "cannot be
deemed the product of a rational intellect."

Based upon all the aforementioned facts herein, there
can be absolutely no doubt, that the activities of the State
via its confidential informant, was in fact related to those
admissions allegedly made by the Defendant-Appellant.

-7-

Certainly, a degree of trickery has been upheld by the United States Supreme Court, pursuant to the high court's holding in Illinois v. Perkins, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). However, at no time did the United States Supreme Court, hold that the State may, by way of misrepresentation in respect to legal counsel, employ deceptives practices by asserting that they were acting on behalf of legal counsel, in order to induce a criminal defendant into incriminating himself. Nonetheless, such is the level to which the State did stoop in order to deprive the Defendant-Appellant of his Constitutionally Guaranteed Liberty. By perverting his Constitutional protections and safeguards by misrepresentation. A fact which has been fully and unquestionably established in the record

Were it not for the misrepresentation in this particular case, the State would not have had any basis for depriving-permanently - the Defendant-Appellant of his liberty. It is simply unacceptable, and has always been unacceptable to present one's self as being an attorney at law, and/or of being a agent of an attorney at law for any purpose: such misrepresentation under such circumstances are in fact acknowledged as criminal. The Defendant- Appellant asserts that actual criminality is in fact beyond what the United States Supreme Court has held to be acceptable trickery in its ruling involving Illinois v. Perkins, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990).

-8-

It is to be properly noted, that the primary provisions of the Fourteenth Amendment of the United States Supreme Court, effectively applied the Bill of Rights to the States by forbidding States from denying Due Process and Equal Protection and from abridging the privileges and immunities of the United States Citizenship.  Criminal deception to undermine and to subvert such constitutionally guaranteed safeguards can not be acceptable, and must be rejected.

Had appointed Post-Conviction Attorney's Carey J. Luckman and W. Keith Davis consulted with the Appellant in the Circuit Court to ascertain his claims of deprivation of constitutional rights as mandated by S.Ct Rule 651(c) and People v. Lander, 2005 WL 1342246 (Ill. 2005) the Appellant would have been able to properly amend this claim to his petition.  Failure of both appointed attorney's deprived Defendant-Appellant of the reasonable level of assistance guaranteed him under the Post-Conviction Hearing Act, 725 ILCS 5/122-1 et. Seq., (West 1998)

II

THE TRIAL COURT ERRED IN ITS RULING ADMITTING THE TAPED
STATEMENT INTO EVIDENCE, AND APPOINTED COUNSEL'S CAREY J.
LUCKMAN AND W. KEITH DAVIS FAILED TO CONSULT WITH THE
DEFENDANT TO ASCERTAIN HIS CLAIMS OF CONSTITUTIONAL RIGHTS
AND MAKE THE PROPER AMENDMENTS TO THE PRO SE PETITION
NECESSARY FOR AN ADEQUATE PRESENTATION OF THE DEFENDANT'S
CONTENTIONS PURSUANT TO SUPREME COURT RULE 651(c).

In response to States argument I. The legal question as to
whether or not the conspiracy in question had ended, for
purposes of determining what was or not admissible, had been
raised in the Appellate Court of the Fourth Judicial District,
however; this Court did not address the question as to
whether or not statements were made <u>after the conspiracy was
terminated</u>. (See Transcript of Hearing conducted in the
Circuit Court on November 4, 1991 supplemented in the record
in the instant appeal. Additionally, the issue was re-
raised prior to trial, before the trial judge by appointed
counsel Roosevelt Thomas. (See Report of Proceedings at
trial, page 505, and on page 507, on the 4th day of November,
1991). Legal counsel had filed timely objections to any
attempt to admit statements from the tape, because such
alleged conspiracy had terminated. This was crucial, because
without such tape recorded statements, there was absolutely
no way in which the defendant could be connected to the
instant offense; nor was there any evidence by which the
defendant could be connected to the instant offense. The
trial Court erred in its ruling admitting the taped statement
into evidence, and trial counsel failed to preserve such

-10-

clear, Constitutional Error, which had a obviously prejudicial
impact upon the Substantial Rights of the Defendant, as will
be shown as follows:  Given the fact that such taped recorded
Statement, constituted the only evidence linking the defendant
to the alleged conspiracy in question; and without such
taped statements into evidence, there could not have been
any trial involving the defendant.  Such ruling by the trial
judge, which allowed for the introduction of such taped
recorded statements into evidence, affected the defendant's
substantial Constitutional Rights.  Clearly, such issue must
be reviewed under the <u>Plain Error Rule</u>; fundamental fairness
requires such review, and relaxation of the waiver rule.

Without the erroneous admission of the taped statements,
the jury could not have found the defendant guilty of the
offense charged in the indictment.  There was absolutely no
evidence, not a single grain of evidence, produced by the
State against the defendant, save the erroneously admitted
taped recorded statements.

The trial judge erred in allowing such taped recorded
statement, and made such a ruling upon a clearly impermissible
premise, which was <u>contrary to clearly established United
States Supreme Court rulings.</u>  The trial court based its
ruling upon the following:  (R.p. 514-515 Tr. Nov. 4, 1991)
<u>COURT:</u>

"My impression of the transcript of the tape, and I don't
    know how accurate it is.  I did listen to the original
    tape pursuant to the wire after I authorized it.  There
    are times because of noise, the background noise in the
    visiting room and accents that it is difficult at times to
    catch everything and I suspect you may have to listen to
    the tape a couple of times in certain spots.  But assuming
    for the moment the accuracy of the tape and the transcript
    made it, it does appear to the court while most of this is
    a story given by Carter to Martin as to what occurred,

-11-

also what is going on is , for want of a better term, a
cover-up or attempted cover-up, that is still ongoing
relative to the murder, relative to who is telling what
story and communications back and forth between persons
implicated in the murder as to what they are saying, who
they are saying it to and to try to get their stories
straight.  So my response is that I read the transcript as
if the conspiracy is ongoing, that it didn't terminate with
the murder, that it was in what amounts to a cover-up
phase of people trying to get their stories straight,
protecting each other and, of course, we are talking here
about a street gang and the inner connections between
them, their hierarchy, their officers, their
communications, not only in Pontiac but with other
correctional centers and with other high ranking street
gang members.  There is a reference to Larry Hoover.
I think it is clear, at least at this time from the
testimony and transcript, Mr. Hoover was in Stateville at
the time but yet he was the person calling the shots among
the Black Gangster Disciples in the Department of
Corrections.  <u>So I believe the conspiracy could be
considered to be ongoing based upon statements in the
transcript, and for that reason it is admissible on the
issue of conspiracy...</u>"

The reliance of the trial judge, upon an argument that a

cover-up was now going on, based on what he heard in the

taped transcript, and that such was indicative of an on-

going conspiracy, is representative of the effort made by

the Government in <u>Krulewitch v. United States</u>, 69 S.Ct 716,

at page 718:

Although the Government recognizes that the chief
objective of the conspiracy -. transportation for
prostitution purposes - had ended in success or failure
before the reported conversation took place, it
nevertheless argues for admissibility of the hearsay
declaration as one in furtherance of a continuing
subsidiary objective of the conspiracy.  Its argument runs
this way.  Conspirators about to commit crimes always
expressly or implicitly agree to collaborate with each
other to conceal facts in order to prevent detection,
conviction and punishment.  Thus the argument is that even
after the central criminal objective of a conspiracy have
succeeded or failed, an implicit subsidiary phase of the
conspiracy always survive, the phase which has concealment
as its sole objective.  The Court of Appeals adopted this
view.  It viewed the alleged hearsay declaration as one in
furtherance of this continuing subsidiary phase of the
conspiracy, as part of the "implied agreement to conceal."
167 F.2d 943, 948.  It consequently held the declaration
properly admitted.

-12-

also what is going on is , for want of a better term, a
cover-up or attempted cover-up, that is still ongoing
relative to the murder, relative to who is telling what
story and communications back and forth between persons
implicated in the murder as to what they are saying, who
they are saying it to and to try to get their stories
straight.  So my response is that I read the transcript as
if the conspiracy is ongoing, that it didn't terminate with
the murder, that it was in what amounts to a cover-up
phase of people trying to get their stories straight,
protecting each other and, of course, we are talking here
about a street gang and the inner connections between
them, their hierarchy, their officers, their
communications, not only in Pontiac but with other
correctional centers and with other high ranking street
gang members.   There is a reference to Larry Hoover.
I think it is clear, at least at this time from the
testimony and transcript, Mr. Hoover was in Stateville at
the time but yet he was the person calling the shots among
the Black Gangster Disciples in the Department of
Corrections.   So I believe the conspiracy could be
considered to be ongoing based upon statements in the
transcript, and for that reason it is admissible on the
issue of conspiracy..."

The reliance of the trial judge, upon an argument that a

cover-up was now going on, based on what he heard in the

taped transcript, and that such was indicative of an on-

going conspiracy, is representative of the effort made by

the Government in Krulewitch v. United States, 69 S.Ct 716,

at page 718:

Although the Government recognizes that the chief
objective of the conspiracy - transportation for
prostitution purposes - had ended in success or failure
before the reported conversation took place, it
nevertheless argues for admissibility of the hearsay
declaration as one in furtherance of a continuing
subsidiary objective of the conspiracy.  Its argument runs
this way.  Conspirators about to commit crimes always
expressly or implicitly agree to collaborate with each
other to conceal facts in order to prevent detection,
conviction and punishment.  Thus the argument is that even
after the central criminal objective of a conspiracy have
succeeded or failed, an implicit subsidiary phase of the
conspiracy always survive, the phase which has concealment
as its sole objective.  The Court of Appeals adopted this
view.  It viewed the alleged hearsay declaration as one in
furtherance of this continuing subsidiary phase of the
conspiracy, as part of the "implied agreement to conceal."
167 F.2d 943, 948.  It consequently held the declaration
properly admitted.

-12-

However, the United States Supreme Court found that:

**COURT:**

We cannot accept the Government's contention. There are many logical and practical reasons that could be advanced against a special evidentiary rule that permits out-of-court statements of one conspirator to be used against another. But however cogent these reasons, it is firmly established that where made in furtherance of the objective of a going conspiracy, such statements are admissible as exception to the hearsay rule. This prerequisite to admissibility, that hearsay statements by some conspirators to be admissible against others must be made in furtherance of the conspiracy charged, has been scrupulously observed by federal courts. The Government now ask us to expand this narrow exception to the hearsay rule and hold admissible a declaration, not made in furtherance of the alleged criminal transportation conspiracy charged, but made in furtherance of an alleged implied but uncharged conspiracy aimed at preventing detection and punishment. No federal court case cited by the Government suggest so hospitable a reception to the hearsay evidence to convict in conspiracy cases. The Government contention does find support in some but not all of the state court opinions cited in the Government brief. But in none of them does there appear to be recognition of any broad exception to the hearsay rule as that here urged. The rule contended for by the Government could have far-reaching results. For under this rule plausible arguments could generally be made in conspiracy cases that most out-of-court statements offered in evidence tended to shield co-conspirators. We are not persuaded to adopt the Government's implicit conspiracy theory which in all criminal conspiracy cases would create automatically a further breach of the general rule against the admission of hearsay evidence.

The United States Supreme Court went on and reversed the lower court ruling, and threw out the conviction. The record herein reflects the same impermissible premise by the trial judge, who literally employed the same reasoning which the Government attempted to persuaded the court with in the KRUELWITCH v. UNITED STATES 69 S.Ct. 716 as cited herein, the attempt to establish an on-going conspiracy based upon allegations of efforts to conceal and/or escape prosecution was flat out rejected by the high court.

There is absolutely no disputing the fact, that the trial judge's decision is clearly 'contrary to' firmly established United States Supreme Court legal rulings; in

-13-

addition to the similarity of issue involved.  Therefore,
the Doctrine of Fundamental Fairness requires that such
issue be heard under the Plain Error Doctrine, given the
obvious impact such erroneous decision had upon the defendant's
substantial Constitutional Rights.  Such issue must be heard,
and the finding of the trial judge reversed, because there
is no question with respect to the impermissible premise
applied which allowed for the admission of inadmissible
evidence.

In support of the aforementioned argument, I respectfully
direct the Courts attention to UNITED STATES v. COOK, 45
F.3d 388 (10th Cir. 1995); wherein it was held at page 395,

" Conversely, an appellate advocate may deliver deficient
performance and prejudice a defendant by omitting a "dead-
bang winner," even though counsel may have presented strong
but unsuccessful claims on appeal.  Page v. United States,
844 F.2d 300, 302 (7th Cir. 1989).  Although courts have not
defined the term "dead-bang winner," we conclude it is an
issue which was obvious from the trial record, see e.g.
Matire v. Wainwright, 811 F.2d 1430, 1438 (11th Cir. 1987)
(counsel's failure to raise issue which was obvious on the
record, and must have leaped out upon even a casual reading
of [the] transcript" was deficient performance), and one
which would have resulted in a reversal on appeal.  By
omitting an issue under these circumstances, counsel's
performance is objectively unreasonable because the omitted
issue is obvious from the trial record.  Additionally, the
omission prejudices the defendant because had counsel raised
the issue, the defendant would have obtained a reversal on
appeal.

The court concluded by saying, " although Defendant did not
raised the conflict of interest issue on direct appeal, we
hold that cause and prejudice present in this case excuse
the omission.  Moreover, because Defendant has demonstrated
that the district court's failure to comply with the dictates of
the Supreme Court's Decision in Holloway deprived him of his
Sixth Amendment right to effective assistance of counsel, we
reverse the judgement of the district court..."

-14-

It is clear from the record in Defendant-Appellant's case,
that assigned legal counsel Roosevlt Thomas, assigned
appellate counsel Karen Munoz, assigned post-conviction
counsel Carey J. Luckman, and W. Keith Davis, and the trial
judge Charles Glennon, all have failed to comply with the
dictates of the United States Supreme Court in <u>KRULEWITCH</u>,
and thus deprived the defendant of both Equal Protection of
the Law pursuant to the 14th Amendment and his 6th Amendment
rights under the United States Constitution of America.

As may be clearly seen from the above issue regarding
the admission of the only evidence the State had allegedly
linking defendant to this case, such evidence was inadmissible
under United States Supreme Court holdings, and without such
impermissible evidence being admitted into evidence, the
State has no case against the defendant. <u>Krulewitch</u> clearly
articulated the position of the U.S. Supreme Court with
respect to any attempt to use 'concealment' (an uncharged
allegation), as a basis for ruling a conspiracy to be on-
going. Had appointed Counsel's Carey J. Luckman and W.
Keith consulted with defendant, examined the record of the
trial court proceedings and made the requested amendments to
the pro se petition for adequate presentation to this Honorable
Courtin compliance with the duties set forth in Rule 651(c),
Defendant-Appellant believes he would have been granted
relief from this wrongful conviction.

-15-

Furthermore, defense counsel did not include these issues in a written post-trial motion, and on direct appeal, appellate counsel did not include the alleged errors amongst the issues raised. In anticipation of a claim by the State that the alleged errors have been waived, defendant argues that his trial counsel was ineffective in failing to preserve the alleged errors for review, and his appellate counsel was ineffective in failing to bring the alleged errors to this court's attention on direct appeal or to argue that trial counsel was ineffective. A defendant is guaranteed the effective assistance of counsel at trial and at a death sentencing hearing. Strickland v. Washington, 466 U.S. 668, 686-87, 80 L.Ed2d 674, 692-93, 104 S.Ct. 2052, 2063-64 (1984). A defendant is also guaranteed the effective assistance of counsel on direct appeal as of right Evitt v. Lucey, 469 U.S. 387, 396-97, 83 L.Ed2d 821, 830-31, 105 S.Ct. 830, 836-37 (1985), and a claim of ineffective assistance of appellate counsel is cognizable under the Post-Conviction Hearing Act, People v. Mack, 167 Ill.2d 525, 531 (1995) held that the doctrine of waiver should not bar consideration on an issue where the alleged waiver stems from incompetency of appellate counsel in failing to raise the issue on appeal. Mack, 167 Ill.2d at 531-32; Guest, 166 Ill.2d at 390; People v. Caballero, 126 Ill.2d 248, 269-70 (1989).

-16-

III

## QUESTION PRESENTED FOR REVIEW

WHETHER THE TRIAL COURT ERRED AND EXCEEDED ITS AUTHORITY DURING THE INITIAL STAGE OF THE PROCEEDINGS UNDER THE POST CONVICTION ACT, BY DISMISSING THE POST CONVICTION PORTION OF DEFENDANT-APPELLANT'S PETITION ON THE BASIS OF UNTIMELINESS, AND DID THE COURT ERR WHEN IT DID NOT INFORM THE DEFENDANT OF HIS RIGHT TO APPEAL THIS DECISION.

## ARGUMENT

Rule 606(b) provides for the  clerk of the court to mail or deliver to the petitioner notice of the entry of the adverse judgement and the 30-day time limitation for notice of appeal.  The record in this case clearly shows that the Defendant-Appellant was not notified of his right to appeal. Furthermore, on May 1, 1999 after reviewing the court's order dismissing the Post Conviction portion on Defendant's petition, the Defendant advised appointed counsel Carey J. Luckman that he indeed insist that such ruling be appealed because the defendant believes that "a dutiful prosecutor may waive its defense of untimeliness, because the defendant has demonstrated that he has suffered a deprivation of constitutional magnitude". People v. Boclair, 202 Ill.2d at 101-02, 273 Ill.Dec. 560, 789 N.E.2d 734.  Moreover, appointed counsel advised the defendant in a written letter that the issue was not yet appealable, pursuant to Illinois Supreme Court Rule 304, on April 28, 1999 (See Exhibit 1)  Furthermore, appointed counsel also advised the court of his conclusion in his PROPOSED FIRST INTERIM ORDER FOR PAYMENT OF FEES OF COURT-APPOINTED COUUNSEL, Dated May 7, 1999, at page -3-.

-17-

Defendant-Petitioner certainly should not be made to suffer any procedural default with respect to this issue because petitioner was advised by appointed legal counsel that this issue was not yet ripe for appeal.  (See exhibit #1 attached)

IV

THE TRIAL COURT ERRED WHEN IT REFUSED TO HEAR DEFENDANT-APPELLANT 'ACTUAL INNOCENCE' CLAIM, WHICH IS COGNIZABLE UNDER THE POST CONVICTION HEARING ACT.

Evidence obtained by the defendant shows that someone other than the defendant-appellant was responsible for the plot to kill the victim, in his Pro Se petition, Defendant-Appellate alleged that he had obtained evidence after his conviction which showed he was actually innocent of the crime for which he has been convicted.  In support of this actual innocence claim, the appellant attached an affidavit by Corwyn Brown to his petition (C-66).  In his affidavit, Mr. Brown admits that he was the person actually responsible for ordering the "hit" against Superintendent Taylor on September 2, 1987 (C-66).  Corwyn Brown also admits in his affidavit that the appellant was forced into taking the blame for the crime, and was intimidated into keeping quiet about his innocence (C-66, and C-50).  Such declaration was made with sufficient indicia of trustworthiness, and coincides with eyewitness accounts of Corwyn Browns direct involvement.  See the following excerpts from the trial transcripts which disclose testimony pertaining to the direct involvement of Corwyn Brown in the said offense.  Douglas Read, an Internal Security Investigator with the Illinois Department of Corrections, testified to his conversation with one Demetre Brown (an

-18-

occurence witness) Read spoke to Brown twice on that date.
In the second interview, Mr. Brown told him that inmate
Corwyn Brown had been with Easley and Lucas just minutes
before the attack, and that Corwyn Brown had nodded his head
and pointed towards the victim's office, Mr. Taylor, at that
specific time. (Jury Trial Nov. 20, 1991 VOL I R.P. 106-107).
He also told Mr. Read that he believed Corwyn Brown was the
Institutional Coordinator of the Black Gangster Disciples
gang (Nov. 20, 1991 VOL. I R. 107). Inmate Spiller (an
occurence witness) had also stated that he observed Corwyn
Brown point towards Taylor's office prior to the attackers
entering. (Nov. 20, 1991 VOL. I R. 110). After obtaining
Mr. Brown's affidavit, the Appellant also obtained an affidavit
from Michael Shaw (A.K.A. Torrence Evans), In Shaw's affidavit,
Shaw states that he had spoken with Corwyn Brown in October
1996 while at the Joliet Correctional Center. Shaw states
that Brown admitted to Shaw that Brown forced the Appellant
to take responsibility for the attack on Taylor in 1987.
Brown admitted to Shaw that Brown had ordered the attack on
Taylor, and that the Appellant had nothing to do with the
incident. Clearly, this affidavit obtained from Michael
Shaw after Appellant's conviction, supports Appellant's
claim that he had nothing to do with the attack on Taylor,
and that he was forced into accepting responsibility by gang
members, also this affidavit from Shaw supports the affidavit
of Corwyn Brown, attached to Appellant's Pro Se petition.
(See C-50, 66; and Supp. R. Affidavit of Michael Shaw).
However, In spite of this substantial Claim of "ACTUAL
INNOCENCE" assigned counsel's Carey J. Luckman and W. Keith

-19-

Davis failed to consult with the Appellant regarding any
Constitutional violations and amend said issues into his <u>Pro</u>
<u>Se</u> petition (Plaintiffs response, 22-27). Thus appointed
Counsel's refusal to comply with Ill. S. Ct. Rule 651(c) as
mandated by the Supreme Court in <u>Lander, Supra,</u> prejudiced
Appellant, in that it denied him the opportunity to amend
his petition with viable Constitutional issues. In fact,
the Appellant, David Carter, corresponded directly with the
Circuit Court Judge in this case to express dissapointment
of appointed counsel's failure to consult with him about his
claims of Constitutional Deprivations. On June 9, 2002
Appellant wrote Judge Frobish and advised the Court of
attorney Davis' refusal to consult with him (C-425). Ten
months later, on April 20, 2003, the Appellant again wrote
the trial court a letter regarding attorney Davis' refusal
to consult with him about his claims. in this letter,
Appellant requested that W. Keith Davis be removed from his
case due to the fact that he refused to communicate with
Appellant (C-442). Clearly, the Appellant, David Carter,
had every intention of amending his <u>Pro</u> <u>Se</u> petition in the
trial court to include additional claims of Constitutional
Deprivations, as evidenced by the letters to the Judge
included in the record. The fact that original counsel,
Carey Luckman, refused to amend the appellants Post Conviction
Petition prior to addressing the timeliness of the filing as
required under Rule 651(c) and <u>People v. Lander, Supra,</u>
prejudiced Appellant in this case, and the Appellant was
later precluded from including the claims due to appointed
Counsel W. Keith Davis' refusal to consult with him regarding

record conversations between Appellant and Martin from the
Circuit Court, the State falsely stated that Martin had
cooperated with the Department of Corrections for a number
of years and had been proven reliable during that time.   (C-59)
In this affidavit, Martin admitted that he had "never
cooperated with the Department of Corrections as an informer
or in any other way until after the murder of Robert Taylor
on September 3, 1987."   (C-59)   In his affidavit Martin
revealed that, before the murder in the instant case, the
I.D.O.C. had <u>attempted</u> to get him to cooperate with prison
officials in the Department by the use of threats and
intimidations, <u>but he had refused</u>.   (C-59, 60)   Therefore,
relying on this affidavit, the Appellant filed his <u>Pro Se</u>
petition, alleging that the State knowingly used perjury
when requesting authorization for the eavesdropping device
from the trial court, when they alleged that Martin had
worked with them in the past, and had been proven reliable. (C-46

"...if an informant is the source of false statements, a
defendant may still be entitled to a hearing to show that
the officer acted recklessly in using the information
received as a basis for the search warrant.   The greater
the showing that the informant blatantly lied to the
officer/affiant, or that the information from the
informant is substantially false, the greater is the
likelihood that the information was not appropriately
accepted by the affiant as truth and the greater the
probability that the affiant, in putting forth such
information, exhibited a reckless disregard for the truth
where the warrant affidavit recited no independent
corroboration of the information relied upon.   In such a
case, where the defendant's showing refutes the
allegations in the warrant affidavit, and the warrant
affidavit lacks any independent corroboration, the
balancing process may well result in a hearing being
granted."   <u>People v. Lucente</u>, 506 N.E.2d at 1277

-22-

Because such issue was directly related to the State's case
in chief, and it was the only evidence linking the defendant
to the offense, and there was no other means by which any
connection could be made to show any direct or indirect
involvement on the Appellant with the offense in question,
the appellant surely is entitled to an evidentiary hearing
on this matter.  (Plaintiff response 28-33).  The State's
informant Harry Martin provided the Appellant with an unsolicited
affidavit which conclusively refutes the representations
made by the State to the Court in order to obtain authorization
for an eavesdropping device.  The Appellant would like to
bring to the Court's attention, that jailhouse informant
Harry Martin, prepared such affidavit under the supervision
of an attorney, while under Federal Protection; and as far
as the Appellant's knowledge goes with respect to his whereabouts
the Appellant believes his status remains unchanged.


Franks v Delaware, 438 U.S. 154, 57 L. Ed.2d 667, 98 S.Ct.
2674 (1978);

  "False and misleading information in government affidavit
      concerning the necessity of the wiretaps required
  suppression of the information derived from the wiretaps."

  A defendant must make two showings to obtain suppression
   based upon possible government misconduct:  First, that
 tthe information at issue was known by the government to be
   false, or was presented with reckless disregard for its
    and Second, that the information was material to the
  decision to issue the warrant.  (485 U.S. at 156, 98 S.Ct.
  2674;  §Ill. 2. C. ).


U.S. v. Leon, 468 U.S. 897, 923, 104 S.Ct. 3405, 3424 (1984).

    Suppression remains an appropriate remedy "if the
  magistrate or judge in issuing a warrant was misled by
  information in an affidavit that affiant knew was false or
    should have known was false except for his reckless

disregard of the truth", or where an officer relied on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.

At the May 1, 2003 hearing on the State's Motion To Dismiss Appellants Relief From Judgement Petition, the Appellant asked the Circuit Court to address this claim. (Vol. IV Tr. 18) Appellant asked Judge Frobish: "What about the false testimony given in the application for the authorization of the wiretap?" In response, the trial court stated, "Well, I've dealt with that Mr. Carter, I've dealt with that; and the Fourth District Appellate Court has dealt with that. On this point of the importance of this reduction in sentence, we have worked diligently four years now trying to get to why this reduction took place. It is not clear to me that the reduction took place because of the testimony given by Mr. Martin here." The Appellant respectfully submits that the Honorable Judge Frobish erred as a matter of Illinois law when he failed to provide the Appellant with an evidentiary hearing on this claim. These facts, pleaded by the Appellant in his §2-1401 petition are uncontradicted by the Circuit Court record in this case, and, taken as true, clearly support the allegations advanced by the Appellant in his <u>Pro Se</u> petition. Clearly, the State's application for authorization to obtain the only evidence used at Appellants trial, was presented to the trial court through the use of perjury. Had this fact been presented to the trial court through the use of perjury. Had this fact been presented to the trial court at the time the application for the wire tap was requested, there is a strong possibility that the request

-24-

would have been denied.  Accordingly, the Appellant should
have been afforded an evidentiary hearing on this question.
See People v. Waters, 764 N.E.2d 1194 (1st Dist. 2002);
Sanchez, 546 N.E.2d 574 (Ill. 1989); Jennings, 269 N.E.2d
574 (Ill. 1971);  Koffski, 609 N.E.2d 364 (2nd Dist. 1993).
Therefore, the Appellant respectfully submits that the trial
court in this cause abused its discretion in refusing to
grant an evidentiary hearing on the Appellants allegation
that the State used perjured testimony to obtain its
eavesdropping authorization.  The trial court's ruling that
the claim had "been addressed" was false, and the Appellant
should have been afforded an evidentiary hearing on that
claim.  Considering the pleaded facts in Appellants Pro Se
§2-1401 petition as true, Appellants allegations was
uncontradicted by the record, and supported by the affidavit
of Harry Martin. (C-46, 59, Vol. IV Tr. Pg.18).  Accordingly,
the Defendant-Appellant, David Carter, respectfully submits
that this Honorable Court should deny appointed counsel's
Motion To Withdraw from the instant appeal, and appoint
counsel other than the Appellate Defenders Office due to the
fact that Appellant has meritorius issues preserved for
review in this case.

                              VI.

POST CONVICTION COURT ERRED IN DISMISSING APPELLANT'S PETITION
DESPITE APPELLANT'S CLEAR SHOWING OF DUE PROCESS VIOLATION
UNDER BRADY, AND BASED ITS DECISION
UPON THE TAPE RECORDING ITSELF, WHICH THE COURT CHARACTERIZED
AS "OVERWHELMING EVIDENCE OF GUILT".

Appellants defense counsel at trial and the presiding judge

extensively and thoroughly questioned the State, the Illinois
Department of Corrections Deputy Directors, and jailhouse
informant Harry Martin with respect to whether or not Martin
had received any benefits of any nature from the State in
exchange for his cooperation and testimony.  All vigorously
denied, under sworn oath that any benefit was given to
informant Harry Martin in exchange for his cooperation. (See
C-339-366).  Moreover, following the unsolicited Affidavit
provided by the State's informant Harry Martin, the following
facts came forth, showing conclusively that the STATE, the
Illinois Department of Corrections and the State's informant
Harry Martin, boldly lied while under under sworn oath, in
complete disregard for the penalties of perjury, and the
Appellants Right to Due Process of Law, Amend. 14.  (See C-
59-63).  Harry Martin in his affidavit also through receipts
established that he was paid over $40.000 in checks and
cash. (See C-59-63)  The criminal trial in this case was
held from November 4-22, 1991.  <u>ONE MONTH BEFORE THAT TRIAL
COMMENCED</u>, The State's informant Harry Martin appeared
<u>Pro  Se</u> before the Circuit Court of Dupage County, at which
time a secret off the record 402 Hearing was convened and
moments later, without explanation, State Informant Martin's
(35) year sentence in that particular case, imposed October
13, 1981, was vacated and reduced to (21) years with all
time considered served.  <u>On The State's Motion that file was
then impounded.</u> (See C-72-74)  (Plaintiff Response 18-20).
The Appellate Court of Illinois First District, Fifth Division
in the case of <u>PEOPLE V. BLACKMAN</u>, has recently on September

-26-

2, 2005 looked at this very issue, No. 1-02-3699 --N.E.2d---, 2005 WL 2125344 (Ill. App. 1st Dist.)  The State has clearly violated Supreme Court Rules regarding Discovery throughout these Legal Proceedings with respect to its jailhouse informant, Harry Martin.  The Illinois State Supreme Court, and the Unites States Supreme Court has firmly established specific requirements with respect to Discovery obligations which are applicable to both the State and the Defense.  Brady v. Maryland, 373 U.S. 83, 87, 10 L.Ed.2d 215, 218, 83 S.Ct. 1194, 1196-97 (1963).  Giglio v. U.S., 405 U.S. 150, 154, 31 L.Ed.2d 104, 108-09, 92 S.Ct. 763, 766 (1972).  Supreme Court Rule 415(b) (134 Ill.2d R. 415(b) Supreme Court Rules :411 through 415.  There is no question regarding this claim, the facts are evident, as has been specifically and referenced herein.  Clearly the State has failed and/or ignored such obvious obligations with respect to Discovery, and such actions have impacted adversely upon the Appellant, effectively denying him Due Process of Law in the defense of himself against the false allegations, which because of numerous Constitutional Violations have led to this 'miscarriage of justice' and an innocent, American Citizen stands deprived of his Constitutional Right to Liberty.

## CONCLUSION

Wherefore, the Defendant-Appellant respectfully prays that this Honorable Court deny appointed counsel's Motion To Withdraw from this appeal; appoint other counsel to represent him in order to brief the claims contained herein; and remand this cause to the trial court for all the reasons herein.

2, 2005 looked at this very issue, No. 1-02-3699 --N.E.2d-- -, 2005 WL 2125344 (Ill. App. 1st Dist.)  The State has clearly violated Supreme Court Rules regarding Discovery throughout these Legal Proceedings with respect to its jailhouse informant, Harry Martin.  The Illinois State Supreme Court, and the Unites States Supreme Court has firmly established specific requirements with respect to Discovery obligations which are applicable to both the State and the Defense.  Brady v. Maryland, 373 U.S. 83, 87, 10 L.Ed.2d 215, 218, 83 S.Ct. 1194, 1196-97 (1963).  Giglio v. U.S., 405 U.S. 150, 154, 31 L.Ed.2d 104, 108-09, 92 S.Ct. 763, 766 (1972).  Supreme Court Rule 415(b) (134 Ill.2d R. 415(b) Supreme Court Rules :411 through 415.  There is no question regarding this claim, the facts are evident, as has been specifically and referenced herein.  Clearly the State has failed and/or ignored such obvious obligations with respect to Discovery, and such actions have impacted adversely upon the Appellant, effectively denying him Due Process of Law in the defense of himself against the false allegations, which because of numerous Constitutional Violations, have led to this 'miscarriage of justice' and an innocent, American Citizen stands deprived of his Constitutional Right to Liberty.

## CONCLUSION

Wherefore, the Defendant-Appellant respectfully prays that this Honorable Court deny appointed counsel's Motion To Withdraw from this appeal; appoint other counsel to represent him in order to brief the claims contained herein; and remand this cause to the trial court for all the reasons herein.

-27-

E-FILED
Monday, 11 August, 2008 12:07:21 PM
Clerk, U.S. District Court, ILCD

STATE OF ILLINOIS
SUPREME COURT

At a Term of the Supreme Court, begun and held in Springfield, on Monday,
the thirteenth day of March, 2006.

Present: Robert R. Thomas, Chief Justice
Justice Charles E. Freeman        Justice Mary Ann G. McMorrow
Justice Thomas R. Fitzgerald      Justice Thomas L. Kilbride
Justice Rita B. Garman            Justice Lloyd A. Karmeier

On the twenty-ninth day of March, 2006, the Supreme Court entered the
following judgment:

No. 101983

People State of Illinois,

     Respondent

     v.

David W. Carter,

     Petitioner

Petition for Leave
to Appeal from
Appellate Court
Fourth District
4-03-0402
87CF112

The Court having considered the Petition for leave to appeal and being fully
advised of the premises, the Petition for leave to appeal is DENIED.

As Clerk of the Supreme Court of the State of Illinois and keeper of the
records, files and Seal thereof, I certify that the foregoing is a true
copy of the final order entered in this case.

     IN WITNESS WHEREOF, I have hereunto
     subscribed my name and affixed the Seal
     of said Court, this twentieth day
     of April, 2006.

     *Juleann Hornyak*

                     Clerk,
     Supreme Court of the State of Illinois

EXHIBIT H

E-FILED
Monday, 11 August, 2008 12:07:41 PM
Clerk, U.S. District Court, ILCD

TERMED

# United States District Court
## Northern District of Illinois - CM/ECF LIVE, Ver 3.2.1 (Chicago)
### CIVIL DOCKET FOR CASE #: 1:97-cv-02926

Carter v. DeTella
Assigned to: Hon. Harry D. Leinenweber
Demand: $0
Cause: 28:2254 Petition for Writ of Habeas Corpus (State)

Date Filed: 04/28/1997
Date Terminated: 10/29/1999
Jury Demand: None
Nature of Suit: 530 Prisoner: Habeas Corpus
Jurisdiction: Federal Question

**Petitioner**

**David Carter**                    represented by    **David Carter**
                                                      N-43429
                                                      Stateville - STV
                                                      P.O. Box 112
                                                      Joliet, IL 60434
                                                      PRO SE

V.

**Respondent**

**George DeTella**                  represented by    **Robert K. Villa**
                                                      Dykema Gossett Rooks Pitts PLLC
                                                      10 South Wacker Drive
                                                      Suite 2300
                                                      Chicago, IL 60606
                                                      (312) 876-1700
                                                      Email: rvilla@villalawfirm.com
                                                      *TERMINATED: 01/07/1998*
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Catherine F. Glenn**
                                                      Attorney General's Office
                                                      100 West Randolph Street
                                                      Thirteenth Floor
                                                      Chicago, Il 60601
                                                      (312)814-4448
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Chief of Criminal Appeals**
                                                      Attorney General's Office
                                                      100 West Randolph Street

EXHIBIT I

Thirteenth Floor
Chicago, Il 60601
(312)814-4448
*TERMINATED: 06/04/1997*
*ATTORNEY TO BE NOTICED*

**Courtney D Carter**
Rosenfeld, Rotenberg, Schwartzman,
Hafron & Shapiro
221 North LaSalle Street
Suite 1763
Chicago, IL 60601
(312) 372-6058

**William Browers**
Attorney General's Office
100 West Randolph Street
Thirteenth Floor
Chicago, Il 60601
(312)814-4448
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/23/1997 | 1 | RECEIVED Petition with 1 copies. (tlm) (Entered: 04/29/1997) |
| 04/23/1997 | 2 | CIVIL cover sheet. (tlm) (Entered: 04/29/1997) |
| 04/23/1997 | 3 | MEMORANDUM of law by petitioner in support of habeas petition (Attachments). [1-1] (tlm) (Entered: 04/29/1997) |
| 04/23/1997 | 4 | MOTION by petitioner for appointment of counsel ; Notice of filing. (tlm) (Entered: 04/29/1997) |
| 04/28/1997 | 6 | RECEIPT regarding payment of filing in the amount of $ 5.00 receipt # 492260 (Attachment). (tlm) (Entered: 05/01/1997) |
| 04/28/1997 |  | PETITION FOR WRIT OF HABEAS CORPUS (ar) (Entered: 08/22/1997) |
| 04/29/1997 |  | FORWARDED copy of petition and memorandum in support to Arleen Anderson per certified mail No. Z 441 007 145. (tlm) (Entered: 04/29/1997) |
| 04/29/1997 |  | FORWARDED complete file to Prisoner Correspondence Dept. (tlm) (Entered: 04/29/1997) |
| 04/30/1997 | 5 | RECEIPT for certified mail No. Z-441-007-145 dated 04/29/97. (tlm) (Entered: 05/01/1997) |
| 05/08/1997 | 7 | RETURNED RECEIPT for certified mail No. Z 441 007 145 delivered 05/01/97 (tlm) (Entered: 05/15/1997) |
| 05/12/1997 | 8 | MOTION by petitioner to amend habeas petition and for production of David Carter's petition for leave to appeal to the Illinois Supreme Court |

| | | |
|---|---|---|
| | | (Attachments); Notice of filing. (Temporarily unavailable for docketing.) (ar) (Entered: 05/29/1997) |
| 08/21/1997 | 9 | MINUTE ORDER of 8/21/97 by Hon. Harry D. Leinenweber : Respondent is ordered to answer or otherwise plead to the petition on or before 09/11/97. Petitioner's motion for appointment of counsel is denied as premature [4-1]. The court grants petitioner's motion to amend petition [8-1] and enters and continues his motion for production of his petition for leave to appeal [8-2]. The court dismisses the Illinois Attorney General as a respondent in this action. See Hogan v. Hanks, 97 F.3d 189, 190 (7th Cir. 1996). (Petitioner's custodian is the only proper respondent in a collateral proceeding). (See reverse of minute order). Mailed notice (ar) (Entered: 08/22/1997) |
| 08/29/1997 | 10 | MOTION by David Carter to amend the habeas corpus petition and request for appointment of counsel (Attachment); Notice of filing (ar) (Entered: 09/04/1997) |
| 08/29/1997 | 11 | EXHIBITS by David Carter of pay monies & deals withkey state witnes Harry J. Martin (1 vol.) (ar) (Entered: 09/04/1997) |
| 09/12/1997 | 12 | ATTORNEY APPEARANCE for George DeTella by Robert K. Villa (ar) (Entered: 09/15/1997) |
| 09/12/1997 | 13 | MOTION by Richard Gramley for extension of time to file respondent's answer ; Notice of motion. (Temporarily unavailable for docketing.) (ar) (Entered: 09/29/1997) |
| 09/12/1997 | 14 | AFFIDAVIT of Robert K. Villa regarding Robert Gramley's motion for extension of time to file respondent's answer [13-1]. (Temporarily unavailable for docketing.) (ar) (Entered: 09/29/1997) |
| 09/12/1997 | 15 | MOTION by Richard Gramley for leave to file respondent's motion for extension of time instanter ; Notice of motion. (Temporarily unavailable for docketing.) (ar) (Entered: 09/29/1997) |
| 09/12/1997 | 16 | AFFIDAVIT of Robert K. Villa regarding Richard Gramley's motion for leave to file respondent's motion for extension of time instanter [15-1]. (Temporarily unavailable for docketing.) (ar) (Entered: 09/29/1997) |
| 09/23/1997 | 17 | MINUTE ORDER of 9/23/97 by Hon. Harry D. Leinenweber : Richard Gramley's motion for extension of time to file respondent's answer is granted [13-1] [15-1]. The motion for extension of time to file respondent's answer is granted. Mailed notice (ar) (Entered: 09/29/1997) |
| 10/22/1997 | 18 | MOTION by petitioner to amend habeas petition with request for appointment of counsel (Attachments); Notice of filing. (fce) (Entered: 10/27/1997) |
| 10/22/1997 | 18 | REQUEST by petitioner for appointment of counsel with motion to amend habeas petition (Attachments); Notice of filing (fce) (Entered: 10/27/1997) |
| 10/31/1997 | 19 | MOTION by Richard Gramley for extension of time to file respondent's answer ; Notice of motion. (Temporarily unavailable for docketing.) (ar) Modified on 11/17/1997 (Entered: 11/17/1997) |
| | | |

| 10/31/1997 | 20 | AFFIDAVIT of Robert K. Villa regarding Richard Gramley's motion for extension of time to file respondent's answer [19-1]. (Temporarily unavailable for docketing.) (ar) (Entered: 11/17/1997) |
| 11/12/1997 | 21 | MINUTE ORDER of 11/12/97 by Hon. Harry D. Leinenweber : Richard Gramley's motion for extension of time to file respondent's answer, granted [19-1]. Mailed notice (ar) (Entered: 11/17/1997) |
| 12/02/1997 | 27 | MOTION by respondent for leave to file additional apearance ; Notice of motion. (Temporarily unavailable for docketing.) (ar) (Entered: 01/09/1998) |
| 12/02/1997 | 28 | AFFIDAVIT of Catherine F. Glenn regarding respondent's motion for leave to file additional apearance [27-1]. (Temporarily unavailable for docketing.) (ar) (Entered: 01/09/1998) |
| 12/11/1997 | 22 | MOTION by respondent for extension of time to file respondent's answer ; Notice of motion. (Temporarily unavailable for docketing.) (ar) (Entered: 12/23/1997) |
| 12/11/1997 | 23 | AFFIDAVIT of Catherine F. Glenn regarding respondent's motion for extension of time to file respondent's answer [22-1]. (Temporarily unavailable for docketing.) (ar) (Entered: 12/23/1997) |
| 12/22/1997 | 24 | MINUTE ORDER of 12/22/97 by Hon. Harry D. Leinenweber : Respondent's motion for extension of time to file respondent's answer, granted [22-1]. Respondent to answer by 01/30/98. Mailed notice (ar) (Entered: 12/23/1997) |
| 01/05/1998 | 25 | MINUTE ORDER of 1/5/98 by Hon. Harry D. Leinenweber : Catherine Glenn granted leave to file appearance as additional counsel for respondent DeTella. No notice (ar) (Entered: 01/07/1998) |
| 01/05/1998 | 26 | ATTORNEY APPEARANCE for respondent by Catherine Glenn (ar) (Entered: 01/07/1998) |
| 01/07/1998 | 29 | MINUTE ORDER of 1/7/98 by Hon. Harry D. Leinenweber : Respondent's motion for leave to file additional apearance, granted [27-1]. Mailed notice (ar) (Entered: 01/09/1998) |
| 01/30/1998 | 30 | ANSWER by George DeTella to habeas corpus petition [0-1]; Notice of filing (ar) (Entered: 02/02/1998) |
| 01/30/1998 | 31 | EXHIBIT list by George DeTella with exhibits to answer [30-1]; Notice of filing (1 vol.) (ar) (Entered: 02/02/1998) |
| 01/30/1998 | 31 | EXHIBITS by George DeTella with exhibit list to answer [30-1]; Notice of filing (1 vol.) (ar) (Entered: 02/02/1998) |
| 02/23/1998 | 32 | MINUTE ORDER of 2/23/98 by Hon. Harry D. Leinenweber : The proceedings in this matter are stayed. Petitioner's motions for appointment of counsel are denied [10-2] [18-1]. Petitioner's motions to amend the habeas corpus petition are granted [10-1] [18-1]. Petitioner is given until 04/30/98 to amend his petition. Respondent will not have to file a response to the amended petition until the stay is lifted and only if the court finds the petition to be timely. Petitioner's motion to produce his petition for leave to appeal to the |

| | | |
|---|---|---|
| | | Illinois Supreme Court ("PLA") is granted [8-2]. Respondent is ordered to produce petitioner's PLA by 03/30/98. (See reverse of minute order.) Mailed notice (ar) Modified on 02/24/1998 (Entered: 02/24/1998) |
| 04/07/1998 | 33 | LETTER MOTION by petitioner requesting that this court grant and accept petitioner's amendments to his habeas corpus petition ; Notice (rmm) (Entered: 04/09/1998) |
| 04/07/1998 | 34 | REPLY by petitioner to the State's answer [30-1] (Attachment); Notice (rmm) (Entered: 04/09/1998) |
| 03/12/1999 | 35 | MINUTE ORDER of 3/12/99 by Hon. Harry D. Leinenweber : The stay previously imposed on this case is lifted and petitioner's motion to enter amendments to his habeas corpus petition is granted [33-1]. The court finds the habeas petition is timely and orders the respondent to file a response to the amended petition by 4/30/99. (See reverse of minute order.) Mailed notice (rmm) Modified on 03/15/1999 (Entered: 03/15/1999) |
| 04/06/1999 | 36 | MOTION by petitioner to stay habeas corpus proceedings in case no. 97 C 2926 (Attachments); Notice (rmm) (Entered: 04/08/1999) |
| 04/26/1999 | 37 | ATTORNEY APPEARANCE for George DeTella by Courtney D Carter (ar) (Entered: 04/28/1999) |
| 04/26/1999 | 39 | MOTION by respondent for extension of time to answer or otherwise plead to petition for writ of habeas corpus ; Affidavit of Courtney D. Carter; Notice (ar) (Entered: 05/11/1999) |
| 04/28/1999 | 38 | MINUTE ORDER of 4/28/99 by Hon. Harry D. Leinenweber : The court grants petitioner's motion to stay his federal habeas corpus petition pending the resolution of his petition for post-conviction relief in Livingston County, Case No. 87-CF-112 [36-1]. Mailed notice (ar) (Entered: 04/30/1999) |
| 05/05/1999 | 40 | MINUTE ORDER of 5/5/99 by Hon. Harry D. Leinenweber : Respondent's motion for extension of time to answer or otherwise plead to petition for writ of habeas corpus is granted to 05/31/99 [39-1]. Mailed notice (ar) (Entered: 05/11/1999) |
| 05/26/1999 | 41 | MOTION by respondent to dismiss petition for writ of habeas corpus ; Notice (ar) (Entered: 06/01/1999) |
| 05/26/1999 | 42 | EXHIBIT list by respondent with exhibits (ar) (Entered: 06/01/1999) |
| 05/26/1999 | 42 | EXHIBITS by respondent to its motion to dismiss with exhibit list [41-1] (ar) (Entered: 06/01/1999) |
| 10/29/1999 | 43 | MINUTE ORDER of 10/29/99 by Hon. Harry D. Leinenweber : Respondent's motion to dismiss petitioner's petition for writ of habeas corpus is granted [41-1]. Petitioner has not exhausted his state court remedies because he has pending state court post-conviction relief actions. The petition is dismissed without prejudice. Petitioner may refile his petition after all state court remedies are exhausted. Terminating case. Mailed notice (ar) Modified on 11/01/1999 (Entered: 11/01/1999) |
| | | |

| 10/29/1999 | 44 | ENTERED JUDGMENT (ar) (Entered: 11/01/1999) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 07/22/2008 10:43:15 | | |
| PACER Login: | ia0009 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:97-cv-02926 |
| Billable Pages: | 3 | Cost: | 0.24 |

# United States District Court
## Northern District of Illinois
### Eastern Division

David Carter

v.

George DeTella

**JUDGMENT IN A CIVIL CASE**

Case Number: 97 C 2926

☐ Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■ Decision by Court. This action came ~~to trial or hearing~~ before the Court. The issues have been ~~tried or~~ heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that the motion to dismiss filed by respondent, George DeTella to dismiss the petition for a writ of habeas corpus is granted, petitioner having failed to exhaust his state court remedies.

Michael W. Dobbins, Clerk of Court

Date: 10/29/1999

Wanda Parker, Deputy Clerk

EXHIBIT J

E-FILED
Tuesday, 12 August, 2008  04:10:10 PM
Clerk, U.S. District Court, ILCD

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
LIVINGSTON COUNTY, ILLINOIS

FILED IN CIRCUIT COURT
OF LIVINGSTON COUNTY, ILLINOIS

APR 2 3 1999

*Judith K. Cremer*
CIRCUIT CLERK

PEOPLE OF THE STATE OF ILLINOIS )

vs. )  No. 87-CF-112

DAVID W. CARTER, )

Defendant. )

### ORDER DENYING MOTION TO EXCUSE LATE FILING UNDER THE POST-CONVICTION RELIEF ACT, GRANTING MOTION TO EXCUSE LATE FILING UNDER SECTION 2-1401 PETITION, GRANTING THE STATE LEAVE TO HAVE THE COURT RECONSIDER THE FINDING OF TIMELINESS UNDER 2-1401 UPON SUBMISSION OF FURTHER EVIDENTIARY MATTERS, AND DIRECTING COUNSEL TO SET CAUSE FOR STATUS HEARING

This cause comes before the court on the limited issue of whether the defendant's Post-Conviction Petition and Petition for Relief from Judgment shall be stricken for being filed untimely. The court having considered the proceedings herein, the submissions by counsel, and the applicable statute and precedent FINDS as follows:

1. Judgment of conviction was entered in the Circuit Court of Livingston County on March 31, 1992, after jury trial, for the offense of First Degree Murder and other offenses, and at which time defendant was sentenced to a term of natural life in prison to be served consecutive to his then present sentence in the Department of Corrections for the offense of First Degree Murder arising in Cook County.

2. Direct appeal followed, wherein the Appellate Court for the Fourth District affirmed the judgment of conviction for First Degree Murder and the sentence of natural life, and vacated certain other convictions and remanded the cause for judgment consistent with this ruling. The Circuit Court of Livingston County on November 15, 1993, entered an amended sentence in accord with the mandate of the Fourth District Appellate Court.

3. The Supreme Court of Illinois denied leave to appeal on October 6, 1993.

4. Defendant's Petition herein seeking Post-conviction Relief and also relief from judgment pursuant to 735 ILCS 5/2-1401 was filed August 10, 1998.

5. It is conceded that under the operative provisions

EXHIBIT E

of the post-conviction statute, that the Petition for Post-Conviction Relief was due by April 6, 1994, "unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence." 725 ILCS 5/122-1(c).

6.    Similarly, it is conceded that the due date under the Post-Judgment Relief for a petition filed thereunder was March 31, 1994, except that if the ground for relief is fraudulently concealed, such period of time shall be excluded in computing the limitation period of two years (see 735 ILCS 5/2-1401).

7.    Defendant bases his claim for ultimate relief on his receipt of an affidavit of witness Harry Martin dated September 5, 1997, and received by the defendant according to the pleadings herein in late 1997.  At time of argument upon the motion herein to excuse late filing, defense counsel asserted that such affidavit was in the possession of the defendant after September 15, 1997, but still during the second half of September of 1997.

8.    Defendant argues, in support of his motion for a finding of timeliness under the Post-Conviction Statute, that he was placed in segregation and lock down from April 21, 1997, until October 21, 1997, and permitted to visit the law library at the institution only twice during the entire six-month period; he further asserts that he was placed in segregation and not allowed to the law library at all during November and December of 1997; defendant concedes that from January 1, 1998, until August 10, 1998, when the Petition herein was filed, he was on lock down only 30 of said 222 days.

9.    Under the Post-Conviction Statute, the defendant was required to timely file a Petition setting forth only the "gist" of a constitutional claim.

10.    Under People v. McClain, 292 Ill.App.3d 185, 684 N.E.2d 1062 (4th App. 1997) the status of being on "lock down" does not excuse filing within the operative limitations period, and based upon such authority, the petition filed herein was untimely under the Post-Conviction Statute.

11.    Alternatively, the defendant was not on lock down during all days of the fall and winter of 1997 after he received the Harry Martin affidavit, and was on lock down very few of the days from January 1, 1998, to August 10, 1998; such being the case, the defendant is further shown to have filed in an untimely fashion under the Post-Conviction Act.

12.    With respect to relief under Section 2-1401, the essence of defendant's argument is that he did not become aware, until September of 1997, that the State had allegedly made

{2}

C.254

certain promises or agreements with witness Harry Martin to have Martin's sentence in the Department of Corrections reduced if he would cooperate in the investigation ultimately leading to the prosecution of the defendant.  Defendant asserts that false testimony was given at trial regarding the consideration given to witness Martin and that the failure to so disclose justifies relief herein.  The State responds that this information was the subject of a co-defendant's post-conviction petition in 1993, alleging a nearly identical claim, and argues that this defendant was not diligent because he did not raise such claim at that time.  The State does not explain how it was that the defendant should have become aware of such contention being made in a separate case, or how it is that the defendant could have been made aware had he been diligent.  Defendant replies that there is no indication that his co-defendant or the co-defendants' attorneys passed the information on to the defendant herein, and that further there is no indication that the State, after being confronted with such allegation in the companion case, gave any notice to the defendant herein of such claim.  The State asserts that no concealment occurred and in support of same argues that the companion defendant made the claim in 1993 without access to the affidavit herein.  The State further asserts that there was no duty to turn over this information--no continuing duty to disclose after the appeal process had run.  Defendant, in essence, argues that such "passive" conduct amounts to fraudulent concealment.

13.  The law regarding applicability of relief under 2-1401 is stated in People v. Hallom, 265 Ill.App.3d 896, 202 Ill.Dec. 897 (4th App. 1994) at page 903:

> In order to be entitled to relief under Section 2-1401, the newly discovered evidence must be (1) so conclusive that it would probably change the result if a new trial is granted; (2) discovered after the trial; (3) of such character that it could not have been discovered prior to trial in the exercise of due diligence; (4) material to the issue; and (5) not merely cumulative to the trial evidence....  The burden of proof on these factors is on the proponent of the motion..., and the determination of the existence of these factors rests within the sound discretion of the circuit court and will not be reversed on appeal absent an abuse of that discretion....  Furthermore, it has been held that a finding of a lack of diligence is reason enough to deny the motion without first conducting an evidentiary hearing.

Similarly, in People v. Edwards, 291 Ill.App. 3d 476,

{3}

C 255

225 Ill.Dec. 811 (1st App. 1997), the court discussed the applicability of 2-1401 as follows, at page 818:

> For a new trial based on perjured testimony by State witnesses (Section 2-1401), the defendant must prove, "by clearing and convincing proof, the substance of his allegations."... A reviewing court will disturb the trial judge's determination only if it is against the manifest weight of the evidence... Section 2-1401 relief is statutory, not constitution based.

The Edwards' court further stated at page 819:

> We believe, however, the defendant failed to present clear and convincing proof that Steele's trial testimony was perjured. The trial judge's decision that it was perjured is against the manifest weight of the evidence. As a general rule, "recantations are often deemed highly unreliable."... This case fits squarely within the general rule.

As is stated further in <u>Layfield v. Village of University Park</u>, 267 Ill.App.3d 347, 204 Ill.Dec. 628 at 630 (3d App. 1994):

> Section 2-1401 of the code provides a procedure where final orders, judgments, and decrees may be vacated after 30 days of entry; this is done by bringing to the court's attention matters of fact, unknown when the judgment was entered, but which, if known, would have affected or altered the judgment. <u>Koffski v. Village of North Barrington</u> (1993), 241 Ill.App.3d 479, 182 Ill.Dec. 61, 609 N.E.2d 364. A petitioner must first show, the grounds asserted for relief would have prevented the entry of judgment against him had it been known at trial, and then he must prove the failure to discover or present the grounds for relief were not the result of the petitioner's own lack of diligence. <u>Lubbers v. Norfolk and Western Ry. Co.</u> (1984), 105 Ill.2d 201, 85 Ill.Dec. 356, 473 N.E.2d 955. <u>However, after two years of the final judgment's entry, the litigant must additionally establish that the grounds for relief were fraudulently concealed from him.</u> <u>Ptaszek v. Michalik</u> (1992), 238 Ill.App.3d 72, 179 Ill.Dec. 283,

{4}

C. 256

606 N.E.2d 115. <u>Fraudulent concealment</u>
<u>consists in the affirmative acts or</u>
<u>misrepresentations intended to exclude</u>
<u>suspicion or prevent injury</u>. <u>Dils v. City of</u>
<u>Chicago</u> (1978), 62 Ill.app.3d 474, 19
Ill.Dec. 255, 378 N.E.2d 1130. <u>The main</u>
<u>thrust of this section of the Code is to</u>
<u>achieve just and equitable results and to</u>
<u>avoid unjust, unfair, or unconscionable</u>
<u>circumstances</u>. <u>Gas Power, Inc. v. Forsythe</u>
<u>Gas Co.</u> (1993), 249 Ill.App.3d 255, 188
Ill.Dec. 389, 618 N.E.2d 959. (emphasis
added)

Whether the defendant can meet the stringent
requirements of post-judgment relief on the merits may be
speculative; such particularly is the case inasmuch as the
evidence against him includes very damaging inculpatory
statements on his part that were taped. In considering the
question of limitations, the court is, however, required to
accept the allegations of the defendant as true and deal only
with the issue of whether fraudulent concealment occurred within
the meaning of the statute. In response to the defendant's
arguments that his claim is made in a timely manner, the State
responds first with nothing more than a conclusion that the
defendant's claim is "simply disingenuous"; the court finds that
said response is not responsive to the defendant's claims. The
second argument of the State that the defendant has failed to
show the prosecution took positive steps to prevent the defendant
from previously raising his claim for relief ignores the nature
of the alleged concealment and is not persuasive.

At the same time, it is true that what the defendant
knew and when he knew it is peculiarly within the knowledge of
the defendant. Should the State desire an evidentiary hearing
involving the defendant on this issue, the court would be
inclined to permit the State to request reconsideration of the
order made herein after examination of the defendant and
consideration of any relevant evidence.

Accordingly, it is hereby ORDERED:

1.   The defendant's Motion to Excuse Late Filing of
Post-Conviction Relief is denied.

2.   Defendant's Motion to Excuse Late Filing Under
Section 2-1401 is granted.

3.   The State is granted leave to seek reconsideration
with respect to the 2-1401 finding of timeliness herein, upon
presentation of relevant evidentiary basis.

{5}

C.257

4.    The State and defense counsel are directed to schedule a pre-trial by telephone with the court or to appear in court for pre-trial within 60 days of the order herein.

DATED this 23rd day of April, 1999.

ENTER:

/s/

JUDGE

{6}

C. 258